```
 1                  UNITED STATES DISTRICT COURT
 2               FOR THE WESTERN DISTRICT OF TEXAS
 3                         EL PASO DIVISION
 4   UNITED STATES OF AMERICA   )  No. EP-12-CR-2106-DB
                                )
 5   vs.                        )  El Paso, Texas
                                )
 6   MARCO ANOTNIO DELGADO      )  October 24 & 25, 2013
 7
 8                       JURY TRIAL EXCERPTS
 9              BEFORE THE HONORABLE DAVID BRIONES
10         UNITED STATES DISTRICT JUDGE, and a jury.
11
12   A P P E A R A N C E S:
13   FOR THE GOVERNMENT:  MS. DEBRA P. KANOF &
                          MS. ANNA E. ARREOLA
14                        Assistant United States Attorneys
                          700 E. San Antonio, Suite 200
15                        El Paso, Texas  79901
16   FOR THE DEFENDANT:   MR. RAY VELARDE
                          Attorney at Law
17                        1216 Montana
                          El Paso, Texas  79901
18
                          MR. RICHARD ESPER
19                        Attorney at Law
                          801 N. El Paso, Second Floor
20                        El Paso, Texas  79902
21
22
23
24       Proceedings reported by stenotype.  Transcript produced by
25   computer-aided transcription.
```

1  OCTOBER 24, 2013
2  23rd, who were you talking to if you recall.
3  A.  Tom Justice and Alex Ascencio.
4  Q.  Okay.  Do you know if Alex Ascencio was in Atlanta on --
5  when you were calling him?  Did -- were you able to verify if
6  he was in Atlanta?
7  A.  He would represent that he was in Texas, but I wasn't able
8  to verify it.
9  Q.  Okay.  Now, let's fast-forward to December 2008.  Well, let
10 me -- before I leave the Chicago scene, was the money brought
11 back to El Paso as far as you know?
12 A.  Yes.
13 Q.  Was that money placed in your account?
14 A.  Yes.
15 Q.  And you kept the money?
16 A.  Yes.
17 Q.  And you kept the money for what reason?
18 A.  That was a reimbursement of expenses incurred and all the
19 trips, and dining, and everything, on behalf of this effort by
20 Atlanta to have more access into various groups into Mexico.
21 Q.  Okay.  Which brings me to the next subject.  Following your
22 trip to Atlanta in September and all the way up to July, some
23 10 months later, did you make trips to Mexico?
24 A.  Yes.
25 Q.  Did you make those trips on behalf of Atlanta?

1       MS. KANOF: Objection.
2              * * * * *
3  OCTOBER 24, 2013
4  BY MS. KANOF:
5  Q.  You have said the source of this money is Mr. Vargas's
6  inheritance money, correct?
7  A.  No.  What I told you is that I do not know.  It's been
8  represented to me.  I wasn't involved in organizing this.
9  Mr. Vargas's employee, his right-hand man, showed up,
10 represented they were having a problem, and to assist
11 individuals that I rely on, I tried to resolve the issue.
12 Q.  Okay.  Agent Fry in both the video of the Carroll County
13 stop of Victor, and the video of the DPS stop of both of you,
14 you can see the settlement agreement, correct?
15 A.  I -- I haven't seen it.  I mean, I know that in the El Paso
16 one there's a document that Victor is waving.
17 Q.  And the agents testified that that document was the
18 settlement agreement, correct?
19 A.  Were they there?  They weren't in the vehicle with us.  How
20 would they know?
21 Q.  Well, they confiscated it, didn't they?
22 A.  I didn't know that.
23 Q.  In Georgia, you sat here and you watched -- everybody got
24 to see some of that video, correct?
25 A.  Yes.

1  Q.  And Victor immediately provides that settlement agreement
2  as the source of the million dollars of cash that he has in his
3  vehicle?
4                              * * * * *
5  OCTOBER 25, 2013
6           THE COURT:  September 4th of what?
7           MS. KANOF:  2007.
8           THE WITNESS:  Thank you.
9           THE COURT:  That's good enough.
10 BY MS. KANOF:
11 Q.  On September 4th of 2007, Victor picked up a million
12 dollars in cash in fives, tens and twenties from Atlanta.  Will
13 you dispute that?
14 A.  I don't know denominations or I wasn't privy to that.  I
15 now know that he picked up money and it was in different
16 denominations.
17 Q.  Okay.  And you tell him and others that when you find out
18 he picked up money that you thought it was a cashier's check,
19 correct?
20 A.  He mentioned funds, so funds could be in different forms,
21 at least to my understanding.
22 Q.  And that you didn't know he was in Atlanta?
23 A.  I didn't know that he left to Atlanta.  Eventually I found
24 out he was in Atlanta.
25 Q.  Okay.  I'm talking about September 4th, what was the origin

1    of the one million dollars?
2    A.  When he went to Atlanta, out there I wasn't -- I didn't
3    even know know.  I wasn't privy that he was going out there to
4    pick up any type of funds.
5    Q.  I'm sorry, sir.  What was the source of the one million
6    dollar funds?
7    A.  I don't know.  I didn't know he was picking up funds.
8    Q.  Okay.  But didn't you testify that the funds were related
9    to the bond issue?
10   A.  No.  What I testified is that my involvement with this
11   group had to do exclusively with the bond.
12   Q.  Okay.  So now you're telling the jury -- okay.  Let me try
13   again.
14           Do you know what the million dollars was from?
15   A.  The funds, once it was -- I was made aware of that they
16   were coming from Atlanta were the ones that had been discussed
17   with me with regards to an inheritance, so I assumed those were
18   the funds that we're talking about.
19   Q.  Okay.  So the funds were related to an inheritance?
20   A.  The funds that they had identified or discussed with me in
21   the past, when I asked, they told me, they're coming from an
22   inheritance.
23   Q.  Okay.  And who is they?
24   A.  When it was brought up to me, it was Vargas in one
25   conversation and then --

1   Q.  So when did Vargas tell you --
2           THE COURT:  Let him finish, Ms. Kanof.
3           MS. KANOF:  Okay.
4   A.  And then his CPA Pedro, I don't recall if he called me or
5   or if it was when I signed down in Mexico City.  He mentioned
6   that, and that's when I was telling him you need to be able to
7   show paperwork for, you know, the probate of the estate or
8   where the inheritance came.
9   Q.  Please, Mr. Delgado, if you don't understand my question
10  ask me and I'll ask it again.
11  A.  Okay.  Thank you.
12  Q.  But I'll ask you to answer the question that is asked.
13  Your attorney has a -- if you think that you didn't get talk,
14  your attorney gets to come back up and let you clarify.
15          Can we agree to that?
16  A.  We can.
17  Q.  Okay.  Now, when Victor showed up with the million dollars,
18  what was your understanding at that minute of the source of the
19  funds?
20  A.  In my mind it was the funds that they were discussing as
21  part of the inheritance.
22  Q.  Okay.  And you just speculated that?
23  A.  No.  When the funds were discussed with me --
24  Q.  By whom?
25  A.  The first conversation that I had, I already put it on the

```
1   record, was with Vargas and he said we want to make sure that
2   some funds that need to come into Mexico is done in such a way
3   that we don't violate any law.
4   Q.  Okay.  And --
5   A.  How is it done from the U.S. side because we already have
6   the information from the Mexican side.
7   Q.  Okay.  And this was an inheritance of some person from the
8   electric power company, right?
9   A.  I don't know.
10  Q.  I thought before you testified that Mr.- -- that somebody
11  that preceded Mr. Vargas at the union had died and these were
12  the inheritance funds of that guy?
13  A.  No.
14  Q.  You didn't testify to that?
15  A.  No, I did not.
16  Q.  Well, whose inheritance was it?
17  A.  I don't know, ma'am.  I wasn't involved in structuring the
18  transaction.  When I was asked, I told him, you need to
19  identify the source.  They discussed it in terms of an
20  inheritance.
21  Q.  Wait.  Wait.  Wait.  You told them you need to identify the
22  source?
23  A.  Yes, for the paperwork, for the declarations.
24  Q.  Wait.  Now, you're saying you told them you need to
25  identify the source?
```

1  A.  Yes.  You need to be able to establish the source of origin
2  of the funds.
3  Q.  I thought before you said what they needed to establish was
4  the source of origin of the treasury bond?
5  A.  They also needed to do that.  You see, what happens is when
6  you have different instruments, whether --
7          MS. KANOF:  Your Honor?
8          THE COURT:  You answered the question.
9  BY MS. KANOF:
10 Q.  Again your attorney will let you explain.
11         So you didn't know Victor was in Atlanta, correct?
12 A.  Not initially, no.
13 Q.  Okay.  And you testified that you did not find out that
14 Victor was in Atlanta until when?
15 A.  That I don't recall, ma'am.
16 Q.  Okay.  This is September 4th, correct, of 2007?
17 A.  Correct.
18 Q.  Okay.  And when you talked to the Department of Public
19 Safety officer who stopped your car, you told them it was
20 Victor's money.
21 A.  I don't recall.
22 Q.  Well, that's what the -- Officer Carrasco testified to.
23 Was he telling the truth?
24 A.  I don't recall, ma'am.
25 Q.  Okay.  And you told DPS that Carrasco -- that you were

1   helping Mr. Carrasco to go to the Chase Bank because you knew
2   an administrator at the Chase Bank?
3              MR. VELARDE:  I'm sorry --
4              THE WITNESS:  Ma'am, I don't know a Mr. Carrasco.
5              MR. VELARDE:  Your Honor, a point of clarifying --
6                          * * * * *
7   Q.  And then you told him that there were federal agents in the
8   Pastry Chef, people that looked like federal agents at the
9   Pastry Chef so that you should switch to the Starbucks?
10  A.  No, that's what he testified, but that's incorrect.
11  Q.  So you told him that you would meet him at the bank across
12  the street from his dorm?
13  A.  In the bank.  I don't know -- the Wells Fargo branch that I
14  go was not in his dorm.
15  Q.  Well, he didn't say it was in his dorm.  He said it was
16  across the street from his dorm.  Are you disputing that the
17  deposit was made at the Wells Fargo Bank across the street from
18  his dormitory in El Paso?
19  A.  No.
20  Q.  Okay.  So you didn't meet him to make the deposit, did you?
21  A.  No.
22  Q.  Okay.  But you did give him an account number to make the
23  deposit?
24  A.  Yes.
25  Q.  Okay.  It was your IOLTA account?

1  A.  Yes.
2  Q.  Why are you putting funds from a builder or a friend of a
3  builder who wants to do business in the United States in your
4  IOLTA account?
5  A.  Because that is the purpose of an IOLTA account, to hold
6  the funds of a client until he or she authorizes the
7  disbursement.
8  Q.  What was the name of your client?
9  A.  I already told you, GEO.
10 Q.  Okay.  And --- oh, so your client was GEO and Victor was
11 picking up the funds?
12 A.  Yes.
13 Q.  And -- okay.  And your client is GEO, but without you
14 knowing it, Victor arranges the pick up of a hundred thousand
15 dollars, right?
16 A.  Victor and Lilian were coordinating --
17 Q.  Yes or no, please, Mr. Delgado?
18 A.  Yes, he coordinated it, uh-huh.
19 Q.  Okay.  And you didn't even know about it?
20 A.  Yeah, not the specifics, no.
21 Q.  Okay.  Well, you testified you didn't know anything about
22 the fact that he was going to pick up two loads of $50,000?
23 A.  That is correct, I did not know that.
24 Q.  So it's your client, you put it in your IOLTA -- oh, can I
25 -- did you give your attorneys the contract with GEO?

1    MR. VELARDE: Your Honor, again I'm going to object
2 because this is assuming facts not no evidence.
3    THE COURT: I'll sustain the objection. Go on. Go on
4 to something else.
5 BY MS. KANOF:
6 Q. So if this was GEO's money, right? This was GEO's money?
7 A. Yes.
8 Q. Okay. And it was put into your IOLTA account, correct?
9 A. Yes.
10 Q. Why did you keep it?
11 A. Because at that point we celebrated an engagement agreement
12 and it allowed me to make use of the funds. We started working
13 for them.
14 Q. You testified that you got to keep the $45,000 as a result
15 of working for ICE, didn't you?
16 A. Not as a result of working for ICE. I had told Lilian that
17 in any project I would be involved, I needed a retainer in
18 advance because I was --
19    MS. KANOF: Your Honor --
20    THE WITNESS: No.
21    THE COURT: That's enough. That's enough.
22 BY MS. KANOF:
23 Q. Now, Government's Exhibit Number 14, this is an e-mail that
24 was sent to Victor Pimentel, no -- from you on February 7th of
25 2007, correct?

```
1   A.  Yes.
2   Q.  Okay.  Now, you talked about the semiconductor thing and
3   specifically what you told Mr. Velarde is that you were trying
4   to negotiate for insulators for conductors to be imported into
5   the United States because they were currently imported by
6   different countries, correct?
7             (End of requested excerpts.)
```

1                       CERTIFICATION

3     I certify that the foregoing is a correct transcript from
4  the record of proceedings in the above-entitled matter.  I
5  further certify that the transcript fees and format comply with
6  those prescribed by the Court and the Judicial Conference of
7  the United States.

9  Date:   December 4, 2013
10                              /s/ Maria del Socorro Briggs
11                              Maria del Socorro Briggs