1               IN THE UNITED STATES DISTRICT COURT

2             FOR THE WESTERN DISTRICT OF TEXAS

3                      EL PASO DIVISION

4

UNITED STATES OF AMERICA    )   No. EP-12-CR-2106-DB
5                           )
vs.                         )   El Paso, Texas
6                           )
MARCO ANTONIO DELGADO       )   October 21, 2013
7

8

9                   VOLUME 1 OF 6 VOLUMES
                         JURY TRIAL
10          BEFORE THE HONORABLE DAVID BRIONES
           UNITED STATES DISTRICT JUDGE, and a jury.
11

12

13   A p p e a r a n c e s:

14   FOR THE GOVERNMENT:     MS. DEBRA P. KANOF &
                             MS. ANNA E. ARREOLA
15                           Assistant United States Attorneys
                             700 E. San Antonio, Suite 200
16                           El Paso, Texas  79901

17   FOR DEFENDANT:          MR. RAY VELARDE
                             Attorney at Law
18                           1216 Montana Avenue
                             El Paso, Texas  79902
19
                             MR. RICHARD ESPER
20                           Attorney at Law
                             801 N. El Paso Street, 2nd Floor
21                           El Paso, Texas  79902

22

23

24        Proceedings recorded by mechanical stenography,

25      transcript produced by computer.

```
 1              (Open court; outside the presence of the venire

 2    panel.)

 3              THE COURT:  The clerk will call the case.

 4              THE CLERK:  EP-12-CR-2106, Marco Antonio Delgado.

 5              MS. KANOF:  Good morning, Your Honor.  Debra Kanof and

 6    Anna Arreola for the United States, and we are ready for trial.

 7              MR. VELARDE:  Your Honor, good morning.  Ray Velarde

 8    and Richard Esper.  Ready to proceed.

 9              THE COURT:  Mr. Delgado may have a seat.  He doesn't

10    have to stand up.

11              Counsel, the first thing I want to take up is the

12    Government's exhibits.  I want to know which ones are being

13    objected to.  I'm prepared to admit them right now if there are

14    no objections.

15              Ms. Kanof, do you want to address any of these?

16              MS. KANOF:  Which objections, Your Honor?

17              THE COURT:  I'm sorry?

18              MS. KANOF:  I don't know what they're objecting to.

19              THE COURT:  Well, it --

20              MS. KANOF:  I'm sure I will want to address them.

21              MR. VELARDE:  Your Honor, with respect to Exhibit

22    Numbers 81 and 82, there's still a question about that.  And

23    we're going to -- we've been trying to subpoena CPA Chris

24    Parker, who undertook to file Mr. Delgado's tax returns.  And

25    Mr. Delgado assures me that those tax returns were, indeed,
```

```
1    filed.  So consequently, those two exhibits would be an issue.
2              MS. KANOF:  I was going to show them to the Court,
3    Your Honor, in response -- that they are self-serving
4    affidavits with the gold seals on them.
5              What numbers are they, please?
6              THE COURT:  81 and 82.
7              MS. KANOF:  I'm tendering to the Court.
8              THE COURT:  I have them here.  You don't have to take
9    them out.
10             MS. KANOF:  Okay.  But I wanted you to see the
11   original, which has the gold seal on it.
12             THE COURT:  Okay.  81 is for what year?
13             MS. KANOF:  81 is for years 2007, 2008, and 2009, that
14   Delgado & Associates did not tender tax -- timely tender tax --
15   or that they -- when they did the search for the records.  And
16   the date of the search -- I don't know that it is on here.
17             THE COURT:  May 14th, 2013?
18             MS. KANOF:  Yes.  That they did not have those three
19   returns.
20             MR. VELARDE:  And the date was, Deb?
21             MS. KANOF:  May --
22             THE COURT:  May 14th, 2013, way at the bottom right
23   side.
24             MS. KANOF:  Correct.  May 14th, 2013.
25             And then the Government's Exhibit Number 82 is a copy
```

1    of his 2008 -- I think it's his personal -- no, it's not.

2              Well, he puts Remcon as his home address, but that's

3    not his home address; that's his business address.

4              And I think this is a 1040, so it's his individual

5    income tax return for 2008.  And it's a certified copy, and the

6    original is stamped in red ink that they've located this on

7    May 13th of this year as well.

8              And the purpose of us tendering this is his low

9    income, basically.

10             THE COURT:  How do you coincide the lack of records

11   with the tax returns being here?

12             MS. KANOF:  The lack of records is for Delgado &

13   Associates, for his law firm.

14             THE COURT:  I see.

15             MS. KANOF:  And this is his personal tax return that

16   they did provide to us, although it lists not his home address,

17   but it lists his business address on Remcon.

18             THE COURT:  Okay.  What's the objection, Mr. Velarde?

19             MR. VELARDE:  The objection is, Your Honor, my client

20   assures us that his CPA, Chris Parker, did, in fact, file tax

21   returns.  And I have one dated 10/11/12 for the year 2011.  So

22   I cannot...

23             THE COURT:  20- -- for the year what?

24             MR. VELARDE:  For 2011.

25             THE COURT:  Yeah, but this only covers -- the lack of

1    records only cover '07, '08, and '09.

2             MR. VELARDE:   '07.  I have a tax return dated 8/1/12,

3    signed by Chris Parker and Marco Delgado.  That's his personal

4    tax -- tax return --

5             THE COURT:  Mr. Velarde, the lack of records is for --

6             MR. VELARDE:  -- for Delgado & Associates.

7             THE COURT:  -- Delgado & Associates, PC.

8             MR. VELARDE:  Well, Your Honor, out of an abundance of

9    caution, we would ask the Court to defer any ruling on that

10   until such time as we have verified with Mr. Parker whether, in

11   fact, he filed --

12            THE COURT:  It's not going to come up now.

13            MS. KANOF:  Pardon?

14            THE COURT:  It's not going to come up now.

15            MR. VELARDE:  Well, but I thought the Court wanted

16   to -- the Court had already indicated I'm going to admit them

17   now.

18            THE COURT:  Well, I'll hold off on that one --

19            MR. VELARDE:  Yes, sir.

20            THE COURT:  -- on 81 and 82.

21            The fact that he's claiming that he didn't file -- or

22   he filed, and the fact that they have a record that he didn't,

23   that --

24            MR. VELARDE:  But that record --

25            THE COURT:  -- doesn't keep it from being admissible,

1    Mr. Velarde.

2              MR. VELARDE:  That record is dated May 13th -- May

3    2013.

4              THE COURT:  May 14th, 2013.

5              MR. VELARDE:  Yes, sir.  So if -- if anything has

6    happened subsequent to that, that would explain the discrepancy

7    in what he's telling me and what that record indicates, which

8    obviously relates to what was on file as of May 2013.

9              THE COURT:  Do you understand we're talking about

10   Delgado & Associates, PC?

11             MR. VELARDE:  I just want to -- I just want to verify

12   with his --

13             THE COURT:  Okay.

14             MR. VELARDE:  Thank you.

15             MR. ESPER:  Your Honor, and we do have an objection to

16   the Government's proposed Exhibit 84.  And that is a --

17             THE COURT:  Let me start from the beginning.

18             MR. ESPER:  Okay.

19             THE COURT:  On the first page, any objections?

20             MR. VELARDE:  No, sir.

21             THE COURT:  That's e-mail 1 through 7B.

22             MR. VELARDE:  Yes, sir.

23             THE COURT:  No objections.

24             MR. VELARDE:  They've made those e-mails available to

25   Mr. Delgado, and there's no --

```
 1              THE COURT:  Okay.  There's no objections?
 2              MR. VELARDE:  No objection.
 3              THE COURT:  Okay.  The Court will admit Government's
 4    Exhibits 1 through 7B.  That's 1, 2, 3, 4, 5, 6, 7A, and 7B.
 5              Page Number 2, beginning with 8A.  Again, we're
 6    talking about e-mails.  The whole page is e-mails.
 7              MR. VELARDE:  Judge, no objection.
 8              THE COURT:  Okay.  The Court will admit Government's
 9    Exhibits 8A, 8B, 9, 10, 11, 12, 13, 14, 14A, 15, 16 and 17.
10              Page Number 3, again, e-mails, 18 through 28.
11              MR. VELARDE:  No objection, Your Honor.
12              THE COURT:  The Court will admit Government's Exhibits
13    18, 19, 20, 21, 22, 23, 24, 25, 26, 26A, 27, and 28.
14              Page Number 4, beginning with Exhibit 29.
15              MR. VELARDE:  No objection, Your Honor.
16              THE COURT:  Some of these we've already gone over.
17    There's some videos in here, too.  No objections to those
18    either?
19              MR. VELARDE:  No, Your Honor.
20              THE COURT:  The Court will admit Government's Exhibits
21    29, 30, 31, 32, 33, 34, 35, 36, 37, 37A, 38, 38A, 39, 40, and
22    41.
23              Page Number 5, beginning with Exhibit 42, photo.
24              MR. ESPER:  No objection, Your Honor, to any of those
25    exhibits, 42 through 55, inclusive.
```

1            THE COURT:  The Court will admit Government's Exhibits

2  42, 43, 44, 45, 46, 47, 48, 49, 50, 50A, 51, 51A, 52, 52A, 53,

3  53A, 54, 54A, and 55.

4            Page Number 6, beginning with Exhibit 55A.

5            MR. ESPER:  No objection to Government's Exhibits 55A

6  through 67A, inclusive.

7            THE COURT:  The Court will admit, Government's

8  Exhibits 55A, 56, 57, 58, 58A, 59, 60, 61, 61A, 62, 62A, 63,

9  63A, 64, 64A, 65, 65A, 66, 66A, 67, 67A.

10            Page Number 7.  I am not admitting 81, the very --

11  very bottom at this time.

12            MR. ESPER:  What about 80?

13            THE COURT:  Do you want me to hold off?  I'll do it.

14            MR. VELARDE:  Yes, sir, 80 and 81 and 82.

15            MR. ESPER:  And 82.

16            THE COURT:  Okay.  80, 81, 82 are not being admitted

17  at this time.

18            What about the rest of them, Counsel?

19            MR. ESPER:  No objection to 83.

20            THE COURT:  Well, back up to the rest of -- the rest

21  of the exhibits on page 7.

22            MR. ESPER:  I apologize, Your Honor.

23            No objection through -- 67A through 79 inclusive.

24            THE COURT:  The Court will admit, Government's

25  Exhibits 68, 68A, 69, 69A, 70, 70A, 71, 71A, 72, 72A, 73, 74,

```
1   75, 76, 77, 78, and 79.

2             The last page.

3             MR. ESPER:  No objection to 83.

4             We do object to 84.  This is a -- Your Honor, a report

5   by an agent concerning his interview with the Defendant

6   Delgado.  The report clearly is not dismissal.  The agent can

7   testify to what the interview involved.  But to submit the

8   entire report where the Defendant has not signed off on it,

9   it's -- I think it's totally irrelevant and inadmissible.

10            MS. KANOF:  Your Honor, we're well aware, and it's not

11  a report.  It's a piece of a report.  We redacted all of the

12  report except for specific admissions the Defendant made to

13  Agent Joshua Fry.  And Joshua Fry, at the time, read them back

14  to the Defendant and he acknowledged that they were true.

15            THE COURT:  I'll have to look at it.

16            MS. KANOF:  Okay.

17            MR. ESPER:  Your Honor, in that vein, the agent is

18  going to testify.

19            THE COURT:  I'll take it up at that time.

20            MR. ESPER:  All right.

21            THE COURT:  I'm not going to admit it at this time.

22  That is 84?

23            MR. ESPER:  Yes.  And no objection to 85, Your Honor.

24            THE COURT:  83 and 85.  Government's Exhibit 83 and 85

25  will be admitted.
```

1          Now, what do I need to take up now?

2          MR. VELARDE:  Your Honor, with respect to the other

3     matter regarding the exhibit that we were proposing to offer,

4     the Government requested that we allow them to look at the

5     computer.  That effort was, in fact, undertaken.

6          There's still -- there's still lingering questions

7     about that.  So we still have the computer, and hopefully

8     during the course of the week we'll be working on that to see

9     to what the extent that the Government is still going to hold

10    on to their objection.

11         However, I will offer at this juncture to say that

12    it's not a matter of admissibility, it basically goes to the

13    weight.  And the only people that can testify to that document

14    are either the person receiving the e-mail or the person that

15    sent the e-mail.

16         And so I understand that the agent is going to deny

17    that that's his e-mail address.  So, obviously, we're not going

18    to offer it through him.

19         If and when Mr. Delgado testifies, of course, we could

20    offer it through him, and he would be the author of that

21    exhibit.

22         MS. KANOF:  I totally object, Your Honor.  Mr. Velarde

23    and Mr. Esper were present.  They brought the laptop.  We

24    called in two computer analysts from ICE to our office on

25    Saturday, and he made a conclusion that that e-mail did not

1    originate from the computer that it was on.  That the e-mail

2    originated from, like, a web cafe.  In other words, somebody

3    was at a remote place and got into their e-mail account.  That

4    the first place the e-mail -- the allegation is that -- what

5    Mr. Delgado's trying -- or wants to tell the jury is that he

6    was helping ICE at the time.

7         And aside from the other evidence that shows that's

8    not true, I think that's what he wants to use this e-mail for.

9    So this e-mail purports to be from an individual named Rafael

10   Solis.  Rafael Solis was the undercover name of an agent in

11   Atlanta.  And at some time they did communicate with each

12   other, but Rafael Solis -- that is the agent's name is Alex

13   Ascencio -- he didn't use a Bellsouth address.

14        What the computer analyst found was, first of all, the

15   e- -- you could not tell anything about the e-mail that

16   purports to be from the Defendant, because there -- it's

17   missing its header, it's missing a date.  You don't know

18   anything about it because --

19        THE COURT:  Well, don't you think that that would go

20   to the weight, Ms. Kanof?  I'm not inclined to leave it out.  I

21   would be surprised if they put it in with all the evidence that

22   you have that it was --

23        MS. KANOF:  Well, my concern, Judge, is that -- my

24   concern is more of my license, that I need to object to a

25   document that is clearly fictitious.  Because what they

1    found --

2         THE COURT:  But if everything you're telling me is

3    correct, and you have testimony to that --

4         MS. KANOF:  I do.

5         THE COURT:  -- the jury is going to know that it's

6    fictitious.

7         MS. KANOF:  Okay.  Because the CART examiner will

8    testify that the document did not leave Atlanta.  It left a

9    jurisdiction that had RoadRunner.  And -- the first server it

10   went through, and Atlanta did not have RoadRunner at that time.

11        And it purports to be Bellsouth, which means if it

12   left Atlanta it would have gone through one of AT&T's servers

13   like Yahoo! or AT&T.net or something like that.

14        But instead, it left from a RoadRunner server.  And

15   the RoadRunner -- El Paso didn't have RoadRunner.  So I'm just

16   concerned that it's -- you know, that -- that it's being

17   offered, even though the experts have already communicated

18   that.

19        THE COURT:  Well, it's up to them if they want to

20   offer it, Ms. Kanof.

21        MS. KANOF:  Okay.

22        THE COURT:  What's the number of your exhibit?

23        MR. VELARDE:  That would be Exhibit 1.

24        THE COURT:  I'm sorry?

25        MR. VELARDE:  That would be Defense Exhibit Number 1,

```
1    if it's offered at all.

2              THE COURT:  Okay.  Any other exhibits that Defense

3    has?

4              MR. VELARDE:  No, sir.

5              THE COURT:  Well, no, I'm not --

6              MR. VELARDE:  At this juncture we have not finalized

7    our exhibit list, if any.

8              THE COURT:  Okay.

9              MR. ESPER:  Defendant's Exhibit 2, Your Honor, will be

10   the AT&T phone records that were previously provided to

11   Counsel.  But we're only -- we're only introducing a portion of

12   those records.  We subpoenaed records from 2008 to 2013, so

13   we're only going to introduce a portion of those records.

14             I've discussed that with Ms. Kanof.  She's fine with

15   it.  We're only going to introduce a portion of the records

16   from July of 2008 through December of 2008.

17             MS. KANOF:  I have no objection to that, Your Honor.

18             MR. ESPER:  And we will make appropriate copies,

19   Your Honor, as directed by the Court.

20             THE COURT:  Okay.  Remember I have not admitted it

21   yet.  So --

22             MR. VELARDE:  Yes, sir.

23             MR. ESPER:  Yes, sir.

24             THE COURT:  -- bring it up at that time.

25             MR. ESPER:  Your Honor -- and also on Friday there
```

1  was -- Mr. Velarde, through the Defendant, had raised an

2  objection about the marital privilege concerning the testimony

3  of the Government witness Liliana Narvaez.

4         The Government has filed a memorandum regarding who

5  can claim the privilege.  And the case law is clear starting

6  back from *Trammel* -- with *Trammel*.  *Trammel* overrode *Hawkins*,

7  which used to be the law that the defendant's spouse could

8  claim the marital privilege if the testifying spouse decided to

9  testify adversely against him; however, *Trammel* overrode -- or

10  overruled *Hawkins*, and the Fifth Circuit has followed suit with

11  cases dealing with -- starting with -- there's a case of

12  *United States v. Koehler, United States v. Ramirez, United*

13  *States v. Archer,* all say that it's up to the testifying spouse

14  to assert the privilege.

15         THE COURT:  If there was a fact -- if they were, in

16  fact, married.  Which from what I see here, I'm going to have

17  to take testimony.  Put it all on the record, Counsel.

18         MR. VELARDE:  Yes, sir.

19         THE COURT:  And we'll probably do that with the lady

20  witness.

21         MR. ESPER:  And she's represented by Mr. Antcliff,

22  Your Honor, so I don't know what their position is going to be,

23  whether they're going to assert a privilege or not.

24         MS. KANOF:  Your Honor, I --

25         THE COURT:  Let me ask you something.  You make

1    reference to at least one federal tax return that he filed.

2    What about the other tax returns?

3         At the bottom of the first page of your memorandum,

4    for example, Delgado purchased real estate as a single man,

5    filed at least one federal tax return as an unmarried single

6    individual and referred to the witness as his fiancée.

7         Now, you have the tax returns.  What about the other

8    tax -- how many tax returns do you have where he filed single?

9         The one that I have not admitted yet, Counsel, Exhibit

10   Number 82, that you say the CPA prepared it, is that --

11        MR. VELARDE:  Yes, sir.

12        THE COURT:  Is that filed as a single person?

13        MR. VELARDE:  It is.

14        THE COURT:  How many more do you have, Ms. Kanof?

15        MS. KANOF:  Your Honor, I'm a little confused.  I'm

16   sorry.

17        But Mr. Velarde said that the tax returns have been

18   filed, but he didn't say what dates the tax return -- what

19   years the tax returns were for, and that they evidently were

20   recently filed, but he doesn't say what day, what -- the year

21   of the tax returns.

22        Because our Certificates of Nonexistence, which are

23   dated May 14th, 2013, are for his personal returns for 2007 and

24   2009 and for his business returns for 2007, 2008, and 2009.

25        THE COURT:  The personal returns, are they filed as a

```
1    single person?
2              MS. KANOF:  Yes.
3              THE COURT:  All of them?
4              MS. KANOF:  The actual -- we only have one, because
5    that's the certificate of -- that's the Certificate of Lack of
6    Record.
7              But the one that we do have, which is for the year
8    2008, is filed as a single man, single individual.
9              THE COURT:  That's pretty strong evidence, Counsel.
10             MS. KANOF:  Your Honor, I have additional evidence
11   that I would like to tender for the Court to make part of the
12   record at this status hearing.
13             This morning I filed a little brief, a little
14   memorandum of law regarding federal marital privilege in --
15   first of all, Mr. Esper is correct.  In fact, he told me where
16   to look for it -- that U.S. v. Trammel, the 1980 United States
17   Supreme Court case that it is the testifying spouse's
18   privilege, which she would be the spouse.
19             But we have -- we would like to tender to the Court
20   evidence that she was not.  And it's -- I'm going to name it
21   all as Government's Exhibit 101, because I wanted to also
22   inform the Court -- it's not in the exhibit list.  But we have
23   a map that's a demonstrative exhibit that we're going to mark
24   Exhibit Number 100, and the Court can take judicial notice.
25   It's a map.  It's going to be a map of the United States.
```

1          And so I've marked this 101, as a package.

2          The first document is an e-mail in Spanish.  The

3    e-mail was provided to us by Victor Pimentel, who was the

4    friend that got involved with Mr. Delgado.  And the actual

5    e-mail that he's forwarding is between Lilian de la Concha and

6    Liliana Nevarez [sic].  Lilian Nevarez [sic] is the witness

7    that Defendant is claiming is his spouse.

8          And the e-mail is dated November 26th of 2008, and

9    it's in Spanish.  And basically, the women are finding out

10   about each other.

11         And in Spanish, Liliana Nevarez [sic] says in the

12   e-mail to Lilian de la Concha that they have been dating for

13   two years and are engaged to be married.  So if they're engaged

14   to be married on November 26th, 2008, out of her own words,

15   there obviously is no agreement.

16         And in addition to that, everything that happened in

17   this case when he was dating -- for the two years that he was

18   dating Liliana Nevarez [sic], they would not have been married.

19   And that goes to -- the Fifth Circuit carves out a little thing

20   called confidential marital communication.  So even if,

21   assuming they were married, according to that case law it

22   wouldn't be admissible, because they're not.

23         So that's the first page of Government's Exhibit 101.

24         The second page of Government's Exhibit 101 is a

25   Specialty Warranty Deed where the Defendant is deeding his land

```
 1    from -- and this goes to whether or not they're married now --

 2    the Defendant is deeding his business office at 7362 Remcon

 3    Circle to Mr. Velarde as his attorney fees, and he is deeding

 4    it as a single male.

 5              THE COURT:  What's the date of that?

 6              MS. KANOF:  I'm sorry?

 7              THE COURT:  What's the date of that?

 8              MS. KANOF:  The date on that is December 3 of 2013.

 9         The third document is --

10              THE COURT:  2013 or 2012?

11              MR. VELARDE:  No, 2012.

12              MS. KANOF:  Oh.  That's the transfer of the condo?

13              MR. VELARDE:  Yes.

14              MS. KANOF:  Okay.  It's not -- that's just the address

15    Mr. Delgado was using.  The actual property is located in Taos,

16    New Mexico.  It's a condominium that he was deeding to

17    Mr. Velarde as his fee.

18         And we do have the original documents when Mr. Delgado

19    purchased it, and he purchased it as a single male.

20         And then the third document in this package is title

21    insurance.  And the title insurance is for $150,900.  And the

22    date of the policy is March 18th, 2011.  And it is, again, for

23    the Firehouse Road property in Taos, New Mexico, and he's a

24    single male.

25         So I think that takes us -- and Ms. Nevarez [sic]
```

1    will -- I think she'll testify that between the two, they also

2    weren't married.  And then, of course, we don't have

3    transcripts of the jail calls.  But we can certainly provide

4    them where, you know, she's basically saying, You should have

5    married me and you didn't marry me, and where he's encouraging

6    her to put on her engagement ring again.

7            So -- but the three substantive documents that we're

8    tendering for that package is the e-mail of November 26, 2008,

9    which shows that at the time of the charged offenses she did

10   not consider herself married and then, thus, had not made an

11   agreement, which is required by Texas law.  And that when he

12   acquired the Taos property he was a single male, and when he

13   deeded the Taos property he was a single male.

14           And then the Judge can take notice of the Government's

15   Exhibit Number 82, his 2008 tax returns, which he's filing as a

16   single individual.

17           May I approach the Court, Your Honor?

18           THE COURT:  You may.

19           I'm still going to have to take testimony, Counsel.

20           MS. KANOF:  Yes, Your Honor.

21           THE COURT:  Whenever -- before she testifies, I'll

22   take her testimony and put it all on the record.

23           MS. KANOF:  But, Your Honor, the law is that she

24   chooses, that it's not his privilege.  Assuming for a minute

25   that they were married, the federal law, since 1980, is it is

```
 1    the testifying spouse's privilege.

 2              THE COURT:  Well, I can take that up also.  Okay?

 3              From what I see, there's no reason for me to even

 4    consider it.  From what I see, they were not married, Counsel.

 5              MR. VELARDE:  Well, just as another tidbit,

 6    Your Honor.  My client has advised me that Ms. Narvaez has put

 7    him under her health insurance and has classified him as a

 8    domestic partner, per his request.

 9              THE COURT:  Do you have any law on domestic partner

10    not privileged?

11              MR. VELARDE:  I don't, Your Honor.

12              THE COURT:  I don't think you're going to find any.

13    That's not -- it doesn't mean they're married.

14              What else do we need to take up, Counsel?

15              MR. VELARDE:  That's it, Your Honor.

16              THE COURT:  Ms. Kanof, for the Government?

17              MS. KANOF:  Nothing further from the Government,

18    Your Honor.

19              THE COURT:  Okay.  Ruben, how many jurors do we have?

20    60?

21              THE CLERK:  60, Judge.

22              THE COURT:  Can we fit them all on that side or are we

23    going to have to use this side also?

24              THE CLERK:  I think we're going to have to use this

25    side, Judge.
```

```
 1              THE COURT:  You know, if we have to use this side --
 2    if spectators can -- I'll try to accommodate them.  Let's see
 3    how much room we're going to need for the jurors.  Okay?
 4              MR. VELARDE:  Yes, sir.
 5              THE COURT:  But we'll try to accommodate any
 6    spectator, be it family or the press.
 7              Anything else we need to take up?
 8              MR. ESPER:  No, Your Honor.
 9              MS. KANOF:  Nothing from the Government.
10              THE COURT:  Okay.  We'll be in recess waiting for the
11    panel to come in.
12              (Recess taken; open court.)
13              THE COURT:  The clerk will call the case.
14              THE CLERK:  EP-12-CR-2106, Marco Antonio Delgado.
15              THE COURT:  Announcements?
16              MS. KANOF:  Good morning, Your Honor.  Debra Kanof and
17    Anna Arreola for the United States.  We're ready for trial.
18              MR. VELARDE:  Your Honor, good morning.  Ray Velarde
19    and Richard Esper on behalf of Mr. Marco Antonio Delgado.
20    We're ready.
21              THE COURT:  Thank you, gentlemen.  Thank you,
22    Counselors.
23              Good morning, ladies and gentlemen.  I am David
24    Briones, United States District Judge, sitting in El Paso.
25              And we are here this morning to select a jury for a
```

```
 1   criminal case.  Now, I have tried to ask the attorneys to tell
 2   me, you know, as much as they can, how long they're going to
 3   take to try the case.  And I -- the answers that I've gotten is
 4   that we'll finish this week.  However, it doesn't always --
 5   doesn't always happen how you plan it it comes about.  So
 6   there's a very slim possibility that those of you that are
 7   chosen to hear this case could be heard next week.  Very slim.
 8   But I need to tell you because I don't want -- you know, I
 9   don't want to catch you by surprise.  They've assured me that
10   we can finish this week and we will do everything possible,
11   even if we have to stay a little later than usual.  So I do
12   anticipate that we will be finished this week.
13           I'm going to give you some principles that govern the
14   conduct of this trial and, really, all criminal trials.
15           The burden of proof is on the Government and never
16   shifts to the Defendant.  The Government must prove the
17   defendant's guilt beyond a reasonable doubt.  And if it fails
18   to do so and does not meet its burden, then the jury must
19   return a verdict of not guilty.
20           There is a presumption that the Defendant is innocent,
21   and that presumption persists until he or she has been proven
22   guilty, if at all.
23           The jury is the sole judge of the credibility of the
24   witnesses and the weight to be given to the witness's
25   testimony.
```

1          I, as the Judge, will rule on matters of law and

2     evidence.  In other words, I will make a determination of what

3     is proper evidence for you to consider.

4          The evidence which you will consider will be the

5     testimony of witnesses and any documents or other exhibits that

6     may be admitted during the course of the trial.

7          Now, we're going to undergo a voir dire examination

8     this morning, ladies and gentlemen.  Those of you that have

9     been jurors in state court will see that it's quite different

10    in federal court.  I will do most of the questioning, not the

11    attorneys.

12         But it is my policy to give the attorneys an

13    opportunity to ask additional questions that I may not have

14    asked, that they feel that you -- that you should be questioned

15    about.  So the attorneys will be given an opportunity, but I

16    will do most of it.

17         Now, the purpose of the voir dire examination is two

18    really important purposes.  The first one is for me to

19    determine whether or not any prospective juror should be

20    excused.  In other words, for some reason or other -- there may

21    be a variety of reasons -- why some of you may not be a proper

22    juror in this case.

23         You may have a personal interest in it.  You may know

24    some of the people involved, or for whatever reason.  I will

25    make a determination whether you're a proper juror for this

1    type of case.

2            And there's a second important reason, and that's for

3    the attorneys to be able to exercise their peremptory

4    challenges.  We call them strikes.  Each side is given a

5    certain number of challenges that they can -- that they can

6    exercise.  And they determine that from what they know about

7    you, from what they read as far as -- as your name, occupation,

8    or whatever list they have, and determine that from the way you

9    answer questions and how you answer them.

10           So you have taken an oath to respond truthfully.  We

11   expect you to truthfully answer all questions that the Court or

12   the attorneys may pose to you.

13           Now as I've indicated, ladies and gentlemen, we will

14   do everything possible to finish this week, and I think we can.

15           But having informed you of the scheduling of this

16   trial, any of you have -- any of you couldn't be here for the

17   extent of this trial?  Does that pose a problem to any of you?

18           And I'm going to address you, and so will the

19   attorneys.  We've got four rows, right?

20           THE CLERK:  Four rows.

21           THE COURT:  Okay.  I'll go -- row number one,

22   beginning on my left and come across.  Row number two, row

23   number three, and row number four.  So when I get to your row,

24   if you have a response to any of my questions or the attorneys'

25   questions, be sure to let us know.

1           Does the scheduling of this trial pose a substantial

2  problem to any of you as far as the schedule that I've given

3  you?

4           Anyone on the first row, beginning on my left going

5  right.  Anyone --

6           Yes, sir.  You are --

7           THE JUROR:  Cesar Villalobos.  I own and run a small

8  business, so it will highly affect my business.  I work mostly

9  hours alone there, so it's going to be really hard for me.

10          THE COURT:  Ordinarily that's not a valid reason to

11  excuse you, Mr. Villalobos, and I'm not going to do it at this

12  time.  If we finish with the examination and I can see we're

13  going to have a substantial number of jurors to pick, I will

14  reconsider.  But as of now, I'm not excusing you.

15          THE JUROR:  Thank you.

16          THE COURT:  Anyone else have a problem on the first

17  row?  Again on my left to my right.

18          Yes?

19          THE JUROR:  My name is Miguel Tavares.  My problem is

20  that I'm the only one --

21          THE COURT:  What's your number?  Give me your name and

22  number.

23          THE JUROR:  Miguel Tavares, Number 12.

24          THE COURT:  Okay.  Yes, sir?

25          THE JUROR:  My problem is that right now I'm the only

1  one working in my family.  And I asked my employer, and they

2  don't pay any jury duty service at any time.

3           THE COURT:  They don't take any what?

4           THE JUROR:  They don't pay any jury service.

5           THE COURT:  Any excuse?

6           THE COURT REPORTER:  They don't pay any jury service.

7           THE COURT:  Oh, I see.

8           Okay.  I'm going to take that into consideration.

9  Mr. Tavares?

10          THE JUROR:  Yes, sir.

11          THE COURT:  Okay.  Thank you.

12          Anyone else have a problem on the first row?  Anyone

13  have a problem with the scheduling on the second row, going all

14  the way across?

15          THE JUROR:  David Chan, Juror Number 17.

16          THE COURT:  Yes, sir.

17          THE JUROR:  I am the operator of a small business, the

18  only one that handles the business, a sole owner and sole

19  operator, so I would ask excused.

20          And third of all, I have a hearing impair.  I don't

21  hear too good.  That's all I have.

22          THE COURT:  You're Mr. Chan?

23          THE JUROR:  Yes, sir.

24          THE COURT:  Well, I'm going to go ahead and excuse

25  you, Mr. Chan.

1            THE JUROR:  Thank you.

2            THE COURT:  You may be excused, sir.  You're free to

3       leave.

4            Anyone else on the second row, again going down

5       across?  Anyone on the third row?

6            THE JUROR:  My name is Carlos Reynozo.  My number is

7       11.

8            Today I was supposed to have a procedure done in the

9       hospital, but I had to cancel.  If I can be excused I can go

10      back and they can reschedule my procedure.  I really appreciate

11      it if -- it has to be done this month.  That's why.

12           THE COURT:  Let me -- you were all given an

13      opportunity to ask for excuses earlier.  I could have made a

14      determination of how many jurors we were going to bring in

15      based on that.

16           THE JUROR:  But I canceled this morning, so I --

17           THE COURT:  Well, more than likely I'm not going to

18      excuse you.  I'll take it under consideration, Mr. Reynozo.

19           THE JUROR:  Thank you.

20           THE COURT:  Anyone else on -- anyone on the third row,

21      beginning on my left coming across?  Anyone on the fourth row?

22           THE JUROR:  My name is Kimberly Fierro.  My juror

23      number is 46.

24           THE COURT:  46?

25           THE JUROR:  I don't have childcare from Wednesday

```
1   through Friday.  I would have to just leave --
2               THE COURT:  Speak into the microphone.  We all need to
3   hear you.
4               THE JUROR:  Oh.  I do not have childcare from
5   Wednesday through Friday.  I would have to pick up my children
6   from school.  My only excuse is just having to leave early.
7               THE COURT:  On Friday?
8               THE JUROR:  Wednesday through Friday.
9               THE COURT:  Okay.  I'm going to go ahead and excuse
10  you, Ms. Fierro.
11              THE JUROR:  Okay.
12              THE COURT:  You may be excused, ma'am.
13              Anyone else on the fourth row?
14              Yes, ma'am?
15              THE JUROR:  Good morning.  My name is Juanita Vasquez.
16  My number is 51.  I don't have a problem.  I don't know if it
17  would be a problem to the attorneys, but I know Mr. Velarde's
18  brother and his family, and I've known them for a long time.
19              THE COURT:  Okay.
20              THE JUROR:  And I'm still in contact with them.  I
21  don't have a problem with it.  But...
22              THE COURT:  I'm going to get to that in a little bit.
23  That's going to be part of my questioning later on, but thank
24  you for bringing it to our attention, Ms. Vasquez.
25              THE JUROR:  Okay.
```

```
 1              THE JUROR:  Moises Hinojosa, Juror Number 58.
 2              I have a hearing pending this morning in the 65th
 3    District Court, and they reset it, and it might be reset for
 4    later this week.  And I won't know until I get out of here and
 5    call the court coordinator.
 6              THE COURT:  Mr. Hinojosa?
 7              THE JUROR:  Uh-huh.
 8              THE COURT:  Okay.  I'll go ahead and excuse you, sir.
 9    You're free to leave.
10              THE JUROR:  Thank you.
11              THE COURT:  Anyone else in any row?
12              THE JUROR:  Jennifer Rubalcaba, 52.  And --
13              THE COURT:  I'm sorry.  What's your number?
14              THE JUROR:  52.  And I'm asking to be excused because
15    my mother is going to start radiation and chemotherapy for
16    cancer treatment, and she's going to need my help along with my
17    brother's help.
18              THE COURT:  You're Number 56?
19              THE JUROR:  52.
20              THE COURT:  52?  I'm sorry.
21              THE JUROR:  Yes, sir.
22              THE COURT:  Okay, Ms. Rubalcaba.  I'll go ahead and
23    excuse you, ma'am.
24              THE JUROR:  Thank you.
25              THE COURT:  You're free to leave.
```

1          Anyone else?

2          Ladies and gentlemen, I'm going to read to you the

3    Indictment that issued by the Grand Jury.  I'll caution you,

4    though, the Indictment is not proof of any wrongdoing at all.

5    It's only an accusation, but I need to read to you the

6    Indictment.

7          The Indictment reads as follows:

8          The United States of America, plaintiff, versus Marco

9    Antonio Delgado, Defendant.

10         The Grand Jury charges that:  Count One:

11         From on or about July 2007 through December 2008, in

12   the Western District of Texas and elsewhere, Defendant did

13   knowingly combine, conspire, and agree with other persons,

14   known and known to the Grand Jury, to commit offenses against

15   the United States in violation of Title 18, United States Code,

16   Section 1956, to wit:

17         A:  To knowingly conduct and attempt to conduct a

18   financial transaction affecting interstate commerce and foreign

19   commerce, which transaction involved the proceeds of specified

20   unlawful activity; that is, conspiracy to possess with intent

21   to distribute a controlled substance, in violation of Title 21,

22   United States Code, Section 846, knowing that the transaction

23   was designed in whole in or in part to conceal and disguise the

24   nature, location, source, ownership, and control of the

25   proceeds of specified unlawful activity, and that while

1    conducting and attempting to conduct such financial

2    transaction, knew that the property involved in the financial

3    transaction represented the proceeds of some form of unlawful

4    activity, in violation of Title 18, United States Code,

5    Section 1956(a)(1)(B)(i).

6           And, B:  To transport, transmit, and transfer, and

7    attempt to transport, transmit, and transfer a monetary

8    instrument or funds including the proceeds of specified

9    unlawful activity; that is, conspiracy to possess with intent

10   to distribute a controlled substance, in violation of Title 21,

11   United States Code, Section 846, from a place in the

12   United States to or through a place outside the United States,

13   knowing that the funds involved in the transportation,

14   transmission, and transfer represented the proceeds of some

15   form of unlawful activity and knowing that such transportation,

16   transmission, and transfer was designed in whole or in part to

17   conceal and disguise the nature, location, source, ownership,

18   and control of the proceeds of specified unlawful activity, in

19   violation of Title 18, United States Code,

20   Section 1956(a)(2)(B)(i).

21          And, C:  To transport and transfer, and attempt to

22   transport, transmit, and transfer a monetary instrument or

23   funds involving the proceeds of specified unlawful activity;

24   that is, conspiracy to possess with intent to distribute a

25   controlled substance, in violation of Title 21, United States

1   Code, Section 846, from a place in the United States to and

2   through a place outside the United States, knowing that the

3   funds involved in the transportation, transmission, and

4   transfer were designed in whole or in part to avoid a

5   transaction reporting requirement under State or Federal law,

6   in violation of Title 18, United States Code,

7   Section 1956(a)(2)(B)(ii).

8           All in violation of Title 18, United States Code,

9   Section 1956(h).

10          Ladies and gentlemen, I know it's a lot of legal

11  language in there, but what it is is money laundering.  Okay?

12  That's what you'll be asked to determine.

13          Now I know you can't get too much out of the

14  Indictment, so I'm going to -- I've asked the Government to

15  give me some of the facts that they allege that they're going

16  to prove.  And again, this comes from them, not from me.  Okay?

17          Now, I need to give you a little bit of information

18  because I need to know whether you know anything about this

19  case from any source whatsoever.

20          This is what the Government is claiming.  The

21  Government alleges that the Defendant Marco Delgado conspired

22  with others, known and known, in El Paso, Texas, the Western

23  District of Texas, and in the Republic of Mexico to launder

24  millions of dollars of illegally obtained money on behalf of

25  individuals from Mexico who, in exchange for his services,

1   promised to pay the Defendant a percentage of the value of the

2   money laundered.

3        The Government further alleges that in September of

4   2007, Delgado sent a co-conspirator to Atlanta, Georgia, to

5   pick up approximately $1 million in cash, which was proceeds of

6   a specified unlawful activity, for transportation to El Paso,

7   Texas, and then to Mexico.

8        The Government further alleges that in July of 2008

9   the Defendant sent the same co-conspirator to Chicago,

10  Illinois, to pick up 100,000 in cash, which was proceeds of

11  specified unlawful activity, and to deposit the money in the

12  bank account of a purported co-conspirator from Mexico.

13       Now, having given you some of the alleged facts as the

14  Government sees it, do any of you know anything about this

15  case -- let me put it this way.

16       Other than news reports -- I'm going to ask you

17  specifically about news reports.  Other than having heard some

18  kind of news report, either in the paper or from whatever

19  source, other than that, do any of you know anything about this

20  particular case, again from any source other than the news?

21       Anyone on the first row?  Anyone on the second row?

22  Third row?  Fourth row?

23       Now, my next question has to do with news articles

24  that you may have seen.  You know, like I read the paper every

25  day.  I suppose most of you do, or listen to the television.

1    There's nothing wrong with knowing -- with having heard any

2    news accounts regarding this matter.  What is wrong, though, is

3    for it to influence you.  So that's what I need to know.

4              Let me ask you this.

5              How many of you have read or listened to any accounts

6    having to do -- news accounts having to do with this case in

7    any way?  A show of hands.  Not that many.

8              Did any of you listen to the news this morning on Good

9    Morning El Paso?

10             Okay.  Any of you hear anything about this case, other

11   than the ones that have indicated so?

12             Okay.  Well, great.  As I've indicated, there's

13   nothing wrong keeping up with what the news is.  What is wrong,

14   though, is that it may influence you.  In other words, it may

15   set you to have a certain mindset where you come in here and

16   you've already either made up your mind as to be guilty or not

17   guilty or as to anything having to do with this case.

18             Remember that part of the instructions that I will

19   give you later are that you're not to read anything.  Up to

20   now, you're under no instructions.  But after -- those of you

21   that become jurors and you take an oath, I'm going to give you

22   the instruction that you're not to read or listen to anything.

23             The reason for that, ladies and gentlemen, is that the

24   jurors that will hear this case will listen to all the

25   witnesses.  They will listen -- they will hear all the

1    evidence, and they will make that determination.

2             The news person comes in the courtroom, they may sit

3    here for an hour and listen to one witness and go write a

4    story.  But the ones that really know what happened in this

5    case will be the jurors, because you'll determine that from

6    listening to all the witnesses and looking at all the exhibits.

7             So again, there's nothing wrong with you having heard

8    anything about the news, having heard anything about this trial

9    on the news.

10             But to the ones that indicated, I do need to ask you

11    more questions.  There are a couple of hands in row number

12    two -- row number one.  Anyone on row number one?

13             Anyone on row number two, I believe, that you

14    indicated that you heard something.

15             Yes?

16             THE JUROR:  Marcos Fraire, Juror Number 22.  I just

17    heard that it was going to start today on the news.

18             THE COURT:  Okay.  You heard that this morning?

19             THE JUROR:  Yeah, this morning.

20             THE COURT:  Okay.  Does that influence you in any way?

21             THE JUROR:  A little bit, because I've been reading

22    about it a little bit since it started about a year ago, too,

23    and I've read it before.

24             THE COURT:  Well, I understand that.  There's nothing

25    wrong with you reading and keeping up with the news, as I've

1    indicated.

2             What I need to know is, does that influence you in any

3    way?  I mean, do you come in here thinking that maybe he's

4    guilty, maybe he's not guilty?  Do you come in here with a

5    certain mindset?  Does it influence you?

6             THE JUROR:  I think I'm open-minded.  I just like to

7    read and just got informed, and I'm a little bit open-minded

8    about it.

9             THE COURT:  Can you sit as a juror in this case and

10   decide whatever you're asked in this case having to do with

11   only the testimony you hear here or the exhibits?

12            THE JUROR:  No, not really.

13            THE COURT:  Okay.  You're reluctant.  What's your

14   number, sir?

15            THE JUROR:  Number 22.

16            THE COURT:  Number 22.  Mr. Fraire?

17            THE JUROR:  Yes.

18            THE COURT:  Okay.  Okay, Mr. Fraire, I'm going to go

19   ahead and excuse you, sir.  You may be excused.

20            Is there someone else on the second row that indicated

21   that they heard some...

22            THE JUROR:  My name is Martha Reed, and I'm Juror

23   Number 26.  My husband is a state police officer, and I feel

24   that that would -- I would be one-sided.

25            THE COURT:  You don't think you could be fair and

```
1    impartial?
2              THE JUROR:  No, I would not.
3              THE COURT:  Okay.  That's going to be a question for
4    later.  But if you bring it up now, okay.  I'm not going to
5    hold you any -- here any longer, Ms. Reed.
6              THE JUROR:  Correct.
7              THE COURT:  Martha Reed?
8              THE JUROR:  Martha Reed, yes, sir.
9              THE COURT:  I'm going to go ahead and excuse you,
10   Ms. Reed.
11             THE JUROR:  Thank you.
12             THE COURT:  Anyone else hear any news accounts having
13   to do with this trial in any way?
14             THE JUROR:  Yes, Your Honor.  I'm Juror 24,
15   Christopher Boland.  I work as a --
16             THE COURT:  I'm sorry.  What's your number?
17             THE JUROR:  Number 24.
18             I work as a copy editor with the El Paso Times, so I'm
19   not sure I'm going to be able to avoid reading more coverage of
20   this, as that's part of my job duties.
21             THE COURT:  Okay.  Does that influence you in any way?
22             THE JUROR:  Not yet.  But if you --
23             THE COURT:  You ought to know that --
24             THE JUROR:  I'm sorry?
25             THE COURT:  -- some news accounts are not very
```

1    accurate.

2              THE JUROR:  Oh, well, as may be, sir.

3              THE COURT:  Including what I heard this morning, quite

4    frankly.

5              THE JUROR:  I -- as we go forward, if we're not

6    allowed to read coverage of the trial, that may be a problem

7    for me at work.

8              THE COURT:  Okay.  Does that influence you in any way?

9              THE JUROR:  Not -- no.  No.

10             THE COURT:  Can you be fair and impartial to both the

11   Government and the Defense?

12             THE JUROR:  I can.

13             THE COURT:  Thank you, Mr. Boland.

14             Anyone else from having heard any news accounts?

15             THE JUROR:  My name is Susan Daw, and I'm Juror Number

16   35.

17             THE COURT:  35.  Yes, ma'am?

18             THE JUROR:  Yes, I'm aware of the case, and I'm

19   familiar with the attorney and Mr. Delgado personally.  Our

20   children have been in school together before, and I'm very,

21   very aware of the situation.

22             THE COURT:  Do you think that would create a problem

23   for you here having to be a juror in this --

24             THE JUROR:  I'm sorry, it would, because I know his

25   son.  I know their children and --

```
 1              THE COURT:  I'm sorry?

 2              THE JUROR:  I do -- unfortunately, yes, as I know his

 3    son.

 4              THE COURT:  Okay.  I can understand that.  Ms. Daw?

 5              THE JUROR:  Yes.

 6              THE COURT:  Okay.  I'm going to go ahead and excuse

 7    you, ma'am.

 8              THE JUROR:  Thank you.

 9              THE COURT:  You're free to leave.

10          Anyone else heard any news accounts having to do with

11    this trial?  Rows one, two, three, and four?

12              THE JUROR:  Linda Mounts, Juror 56.  My husband used

13    to work with Mr. Delgado, and I'm aware of the newspaper

14    articles.

15              THE COURT:  You would have a problem --

16              THE JUROR:  No.

17              THE COURT:  -- sitting as a juror?

18              THE JUROR:  No, but I just thought I'd better offer

19    that information.

20              THE COURT:  What's your number, ma'am?

21              THE JUROR:  56.

22              THE COURT:  Yes, ma'am.

23              THE JUROR:  Thank you.

24              THE COURT:  Okay.  Thank you very much.

25          Anyone else, news accounts?  I'm going to get to more
```

1    questions in just a little bit.

2              Ms. Kanof, if you'll introduce yourself and who is

3    with you at counsel table, ma'am.

4              MS. KANOF:  I will, Your Honor.  Thank you.

5              My name is Debra Kanof.  I'm an Assistant

6    United States Attorney for the Western District of Texas,

7    assigned to the El Paso Division.

8              My co-counsel is Ms. Anna Arreola.  She's also an

9    Assistant United States Attorney for the Western District of

10   Texas, El Paso.

11             We have at counsel table, across from us, Mr. Joshua

12   Fry.  He's a special agent with Homeland Security

13   Investigations, although you will hear him referred to as being

14   a special agent with Immigration and Customs Enforcement, ICE,

15   as you hear it on TV.  They change their name a lot, so he is

16   HSI right now, but it used to be ICE during the period of this

17   case.

18             And sitting -- also assisting us is Ms. Arreola's

19   paralegal, Mr. Matthew Livingston.  He's an employee of our

20   office, and he's going to help both the Defense and the

21   Prosecution with the electronic display system.

22             As you can see three -- we three attorneys are a

23   little bit old, and we need some help from someone a little bit

24   younger.

25             THE COURT:  Ladies and gentlemen, as to the attorneys

1    representing the Government here, Ms. Kanof and Ms. Arreola, do

2    any of you know them in any capacity, professionally, socially

3    in any form?

4           Anyone on the first row?  Anyone on the second row?

5    Third?  Or fourth?

6           They've introduced you to Mr. Livingston, the

7    paralegal, and Agent Fry, Joshua Fry, with --

8           What agency was it, Ms. Kanof?

9           MS. KANOF:  This week, Your Honor, it's Homeland

10   Security Investigations.

11          THE COURT:  Okay.  I'm going to ask you about other

12   potential witnesses in just a second.

13          But as to these two gentlemen sitting at counsel

14   table, do any of you know them, again, in whatever capacity,

15   socially or professionally or whatever?

16          Anyone on the first row?  Second row?  Third?  Or

17   fourth?

18          The Government anticipates that they will call the

19   following witnesses -- anticipates.  Okay?  That doesn't

20   necessarily mean that they will, but they do have to give me a

21   list of who they anticipate they may call.  They may not call

22   them all, but I do have to mention them to you.

23          David Elliott, Carroll County Sheriff's Department.

24   Is that --

25          MS. KANOF:  That's a county that encompasses -- one of

```
 1    the counties that encompasses Atlanta, Georgia.

 2              THE COURT:  Georgia.  Okay.  David Elliott, a sheriff

 3    deputy from Georgia.

 4              Victor Ignacio Pimentel Rojas.

 5              Thomas Justice, special agent, Homeland Security

 6    Investigations.

 7              Santos Carrasco, Jr., trooper, Texas DPS.

 8              Alex Ascencio, special agent, Homeland Security.

 9              John McCabe, M-c-C-A-B-E, assistant special agent in

10    charge, HSI, Homeland Security.

11              Gabriel Aguirre, special agent, Homeland Security.

12              Mr. Fry.

13              Liliana Narvaez.

14              And Mark Martinez, special agent, Homeland Security.

15              Do any of you know or think you may know any of these

16    potential witnesses for the Government?

17              Anyone on the first row?  Anyone on the second row?

18    The third row?  Or fourth?

19              Mr. Velarde, if you'll -- I'm going to be addressing

20    myself to you, Mr. Velarde.  You are lead counsel?

21              MR. VELARDE:  Yes, sir.

22              THE COURT:  If you'll introduce who's with you at

23    counsel table, sir.

24              MR. VELARDE:  Thank you very much, Your Honor.

25              Good morning, ladies and gentlemen.  My name is Ray
```

1   Velarde, and I'm accompanied by my good friend, Richard Esper.

2   We will be both representing Marco Antonio Delgado, the

3   gentleman sitting right next to me.

4        I have an office here in El Paso on Montana Street,

5   and I'm a graduate of Bowie High School.

6        Mr. Esper?

7        MR. ESPER:  Good morning, ladies and gentlemen of the

8   jury panel.  I'm Richard Esper.  I'm a lawyer here in El Paso,

9   Texas, and I have been so for approximately 35 years.

10       I office at North El Paso Street and Yandell.  As you

11  get on the freeway, say, probably heading west, I office at

12  that location.  And I am a graduate of Austin High School and

13  the University of Texas at El Paso.

14       THE COURT:  I didn't know we were going to get an

15  advertisement.

16       MS. KANOF:  I'm sorry, Your Honor.  I didn't know we

17  were telling what high school we went to, but I'm a graduate of

18  Burges High School.

19       THE COURT:  Okay.  You may be seated.

20       MR. VELARDE:  Thank you.

21       THE COURT:  Do any of you know who -- obviously,

22  Mr. Delgado is at counsel table.  Anyone else you have,

23  counselors?  Mr. Velarde, other than Mr. Delgado, is anyone

24  else with you?

25       MR. VELARDE:  Oh, yes, sir, I apologize.

1          Our investigator is Ricardo Ortiz.  He offices with

2    me.

3          THE COURT:  Okay.  Thank you.

4          MR. VELARDE:  Thank you.

5          THE COURT:  My first question is as to the attorneys,

6    ladies and gentlemen.  Do any of you know, again in whatever

7    capacity, socially, professionally or otherwise, the attorneys

8    representing Mr. Delgado here today, Mr. Velarde and -- or

9    Mr. Esper?

10         Anyone on the first row?  Anyone on the second row?

11   Anyone on the third row?

12         Yes, ma'am?

13         THE JUROR:  Hi.  My name is Kelley González.  I'm

14   Juror Number 29, and I do know Mr. Ray Velarde.

15         THE COURT:  Okay.  Back up a little.  Number what?

16         THE JUROR:  29.

17         THE COURT:  29?  Ms. González?

18         THE JUROR:  Yes.

19         THE COURT:  And you're married to an attorney?

20         THE JUROR:  Yes, sir.

21         THE COURT:  Okay.  You know who, Mr. Velarde?

22         THE JUROR:  Yes.

23         THE COURT:  Not Mr. Esper or the other attorneys?

24         THE JUROR:  No.

25         THE COURT:  Okay.  Professionally, socially?

```
1              THE JUROR:  My husband used to office with him.
2              THE COURT:  Okay.  Does that influence you in this
3    case in any way?
4              THE JUROR:  Not at all.
5              THE COURT:  Can you be fair and impartial to both the
6    Government and the Defense?
7              THE JUROR:  Yes.
8              THE COURT:  You don't have anything against
9    Mr. Velarde because of that, do you?
10             THE JUROR:  No.
11             THE COURT:  Okay.  Okay, Ms. González.  Thank you very
12   much, ma'am.
13             Anyone else on the third row?  Fourth row?
14             They've introduced you to Mr. Delgado.  He's the
15   accused in this case here today.  Do any of you know
16   Mr. Delgado, again, in any capacity?
17             Why don't you stand up, Mr. Delgado, so they can see
18   you.
19             (Defendant complies.)
20             THE COURT:  Thank you very much.  Thank you.
21             Do any of you know Mr. Delgado in any capacity?
22   Anyone on the first row?  Second row?  Third?  Or fourth?
23             They've introduced you to Mr. Ortiz, Ricardo Ortiz,
24   the investigator for Mr. Velarde.  Do any of you know
25   Mr. Ortiz?
```

```
 1              Anyone on the first row?  Second row?  Third?  Fourth?
 2              Have any of you ever been involved in any capacity
 3    having to do with law enforcement, you yourself?  I will get to
 4    any close friends or family in my next question.  But right
 5    now, I need to know about you personally.  Have you ever been
 6    involved in any capacity having to do with law enforcement?
 7              Anyone on the first row?  Second row?  Third row?  Or
 8    fourth?
 9              THE JUROR:  Socorro Brito, Number 40.  My ex-husband
10    is a retired police officer.
11              THE COURT:  Okay.  I was going to ask that in my next
12    question.  But for now, does that influence you in any way,
13    Ms. Brito?
14              THE JUROR:  No.  No, not at all.
15              THE COURT:  Thank you, ma'am.
16              Again, you personally.  Any one of you ever been
17    involved in any capacity with law enforcement?
18              THE JUROR:  Gerardo Guerrero, Number 47.  I was an
19    instructor -- I don't know -- with the adult Probation
20    Department for the County of El Paso several years ago.
21              THE COURT:  You're not -- you're not there now, right?
22              THE JUROR:  No, I'm not.
23              THE COURT:  How long ago was that?
24              THE JUROR:  That was back in 2003.
25              THE COURT:  Okay.  Does that influence you in any way,
```

```
1    Mr. Guerrero?

2              THE JUROR:  No, it doesn't.

3              THE COURT:  Okay.  Thank you very much, sir.

4              THE JUROR:  Thank you.

5              THE COURT:  Anyone else, you personally involved in

6    law enforcement?

7              THE JUROR:  Yes, sir.  My name is Jorge Chavez, Juror

8    Number 53.  I'm just a security officer with the Texas Tech

9    University Police Department.

10             THE COURT:  Okay.  Does that influence you in any way

11   in this case, Mr. Chavez?

12             THE JUROR:  No, sir.

13             THE COURT:  You could be fair and impartial to both

14   sides?

15             THE JUROR:  Yes, sir.

16             THE COURT:  Thank you very much, sir.

17             Anyone else, on the fourth row I believe I'm in?

18             THE JUROR:  Irene Bustamante, Number 59.

19             THE COURT:  Yes, ma'am.

20             THE JUROR:  I worked corrections for -- I worked

21   corrections a few years back.

22             THE COURT:  How many years back?

23             THE JUROR:  I would say about four years.

24             THE COURT:  Okay.  Does that influence you in any way

25   in this case?
```

1              THE JUROR:  Not at all.

2              THE COURT:  Thank you, Ms. Bustamante.

3         Anyone else on any other rows, you personally?

4              My next question has to do with your close friends or

5    close family.  I don't need to know about your cousin that

6    lives in Georgia or whatever.  But those of you that have

7    contact with your friends and family, that are in contact with

8    them, do any of you have close friends or family that are or

9    have been involved in law enforcement?

10             Anyone on the first row?

11             THE JUROR:  Socorro Velasco, Juror Number 5.

12             THE COURT:  Yes, ma'am.

13             THE JUROR:  My brother works at the halfway house in

14   Horizon, the department of corrections.

15             THE COURT:  Your -- what is he?

16             THE JUROR:  I'm sorry?

17             THE COURT:  What relationship to you?

18             THE JUROR:  My brother.

19             THE COURT:  Your brother.

20             Does that influence you in any way in this case,

21   Ms. Velasco?

22             THE JUROR:  I don't believe so.

23             THE COURT:  You won't have a problem with it?

24             THE JUROR:  No, sir.

25             THE COURT:  Okay.  Thank you, ma'am.

```
1              THE JUROR:  Thank you.
2              THE COURT:  Anyone else?
3              Yes, sir.  Mr. Contreras?
4              THE JUROR:  Good morning, sir.  My name is Ramon
5     Contreras, Juror Number 6.
6              I do have two brothers-in-law.  One of them works
7     at -- they're both Homeland Security, one in Phoenix, and the
8     other one here in El Paso.
9              THE COURT:  Okay.  Does that influence you in any way,
10    sir?
11             THE JUROR:  No, sir, not in any way.
12             THE COURT:  Even if you know the witnesses are going
13    to be from Homeland Security?
14             THE JUROR:  No, sir.
15             THE COURT:  If you were to sit on this jury and the
16    Government couldn't prove their case and the jury came back and
17    found Mr. Delgado not guilty, do you have any qualms about the
18    next time you see your relatives that work for HSI and say, You
19    know what?  I served on a jury, they didn't prove it, and I
20    voted for not guilty.
21             THE JUROR:  Of course not, sir.  I think we live in a
22    fair country.  And definitely, until we're proven guilty, then
23    that's when we -- you know, even God tells us not to judge.  So
24    I would not have a problem with it.
25             THE COURT:  Okay.  Thank you very much.
```

1              Yes, ma'am?

2              THE JUROR:  My name is Romelia Guereque.  I have my

3  brother-in-law, a retired FBI agent for ICE.

4              THE COURT:  Okay.  Does that pose any problem to you

5  in this case, ma'am?

6              THE JUROR:  No, sir.

7              THE COURT:  Thank you, Ms. Guereque.

8              Anyone else, going down the line?

9              THE JUROR:  Melissa Armendáriz, Juror Number 8.  My

10 brother works for the sheriff's department here in El Paso.

11             THE COURT:  Okay.  Does that influence you in this

12 case, ma'am?

13             THE JUROR:  Not at all.

14             THE COURT:  Thank you, Ms. Reyes [sic].

15             Going down the line, yes, sir?

16             THE JUROR:  Sergio Reyes, Juror Number 9.

17             My son, he works at Homeland Security.  And a couple

18 of my nephews, they work in San Antonio as internal affairs,

19 and one -- another one in Homeland Security also.

20             THE COURT:  Okay, Mr. Reyes.  Does that pose any

21 problem to you in this case?

22             THE JUROR:  No, not really.

23             THE COURT:  Not at all?

24             THE JUROR:  No.

25             THE COURT:  Okay.  Thank you, Mr. Reyes.

```
 1              Anyone else on the first row, close family or
 2    friends -- oh, wait.
 3              There's someone else up here, Jayna.  Someone on the
 4    first row.
 5              THE JUROR:  Cesar Villalobos, Number 3.  I actually
 6    train Border Patrol and state troopers on a daily basis at my
 7    gym.  So...
 8              THE COURT:  Okay.  Do you have a problem?  Does that
 9    pose a problem in this case?
10              THE JUROR:  No.  I don't think so, no.
11              THE COURT:  Thank you, Mr. Villalobos.
12              Okay.  Now, I have somebody over here.
13              Yes, ma'am?
14              THE JUROR:  Katherine Wentling, Juror 14.
15              My husband is an agent with the Department of Homeland
16    Security.
17              THE COURT:  Okay.  What's your number, ma'am?
18              THE JUROR:  14.
19              THE COURT:  14?
20              THE JUROR:  Uh-huh.  Yes.
21              THE COURT:  He is presently with HSI?
22              THE JUROR:  He -- at DSH at Fort Bliss.
23              THE COURT:  Okay.  Oh.  Does that pose a problem to
24    you in this case?
25              THE JUROR:  No.
```

```
1            THE COURT:  Can you be fair and impartial --

2            THE JUROR:  Yes.

3            THE COURT:  -- to both sides?

4            THE JUROR:  Yes.

5            THE COURT:  Thank you, ma'am.

6            Yes, ma'am?

7            THE JUROR:  Gina Barnett, Juror 15.

8            THE COURT:  Yes, ma'am.

9            THE JUROR:  My father works for the Department of

10   Homeland Security as well.  And then my sister, for the DEA, in

11   assets and forfeitures.

12           THE COURT:  Presently working with them?

13           THE JUROR:  Yes.

14           THE COURT:  Does that pose a problem in this case?

15           THE JUROR:  Not yet.

16           THE COURT:  I think you're a little too close to --

17   you're a little too close to what we're going to be involved in

18   here.  I'm going to go ahead and excuse you, Ms. Barnett.

19           THE JUROR:  Thank you.

20           THE COURT:  You're Juror Number 15, right?

21           THE JUROR:  Yes.

22           THE COURT:  You may be excused, ma'am.

23           That's row one.  Now row two, beginning on my left

24   over here.

25           THE JUROR:  Hi.  My name is Susana Lopez, and my
```

```
1    husband is an agent with Border Patrol.  I am Juror Number 18.
2              THE COURT:  Does that pose a problem in this case to
3    you?  Will that influence you in any way?
4              THE JUROR:  I don't think so.
5              THE COURT:  Well, you hesitate.  We need to know,
6    ma'am.
7              THE JUROR:  No.
8              THE COURT:  You could be fair and impartial to both
9    sides?
10             THE JUROR:  I'm not sure.
11             THE COURT:  If you have a problem let us know.
12             THE JUROR:  I'm not sure.  I'm not positive if I can.
13             THE COURT:  You're not what?
14             THE JUROR:  I'm not positive if I can be fair and
15   impartial.
16             THE COURT:  You can be fair and impartial or you're
17   not sure?
18             THE JUROR:  I'm not positive I can.
19             THE COURT:  Okay.  I'm going to go ahead and excuse
20   you, Ms. Lopez.  You're free to leave, ma'am.  Thank you.
21             THE JUROR:  I'm Wendell N. Ladd, Juror Number 20.
22             My sister works for ICE in Dallas, but it won't affect
23   me at all.
24             THE COURT:  Okay.  Thank you, Mr. Ladd.
25             Anyone else on the second row?
```

```
 1              THE JUROR:  My name is Nancy Puga.  I'm Juror Number
 2    23.  I have several people in the law enforcement:  Three
 3    cousins, lawyers, and several family members also with ICE and
 4    Border Patrol.
 5              THE COURT:  You're a scheduler?
 6              THE JUROR:  Yes.
 7              THE COURT:  With who?
 8              THE JUROR:  With UMC, University Medical Center.
 9              THE COURT:  I see.  All these relationships that you
10    have, does that pose a problem to you?
11              THE JUROR:  No, not really.
12              THE COURT:  Okay.  You could be fair and impartial to
13    both sides?
14              THE JUROR:  Yeah.  If I could hear the case, yeah.
15              THE COURT:  Okay, Ms. Puga.  Thank you, ma'am.
16              Going down the line, row number two?
17              THE JUROR:  My name is Hannah Davis.  I'm Number 27.
18              THE COURT:  Yes, ma'am?
19              THE JUROR:  I'm married to a U.S. Border Patrol agent.
20              THE COURT:  Okay.  Does that influence you in this
21    case?
22              THE JUROR:  I think it would, yes, sir.
23              THE COURT:  Okay.  Okay, Ms. Davis.  I'm going to go
24    ahead and excuse you.  You're free to leave.
25              Second row.  Anyone else on the second row?  Anyone on
```

1    the third row, close friends or family that have been involved

2    or are involved in law enforcement?

3            THE JUROR:  I'm Herminia Hemmitt, Number 32.  My

4    brother-in-law is a Customs agent here in El Paso.

5            THE COURT:  Ms. Hemmitt?

6            THE JUROR:  Yes.

7            THE COURT:  Okay.  Does that influence you in this

8    case, ma'am?

9            THE JUROR:  No, sir.

10           THE COURT:  Thank you, ma'am.

11           THE JUROR:  My name is Eduardo Salas.  I'm Juror

12   Number 31.  My brother-in-law is a DEA agent here in El Paso

13   and in Juárez.

14           THE COURT:  Okay.  Does that influence you in this

15   case, Mr. Salas?

16           THE JUROR:  I hope not.

17           THE COURT:  No, no, no.  No.

18           THE JUROR:  I will try to be impartial.

19           THE COURT:  No, no, no, no.  You have to be impartial

20   if you're going to serve on this jury.

21           THE JUROR:  Okay.  I will be impartial.

22           THE COURT:  Now, can you be fair to the Government and

23   to the Defense?

24           THE JUROR:  Yes, sir.

25           THE COURT:  If you were sitting over here at the

1    Defense table, you wouldn't have any problem with someone like

2    you sitting on the jury box?  I mean, on the -- yeah, inside

3    the jury box?

4           THE JUROR:  Yes, sir, I would.

5           THE COURT:  You would have a problem?

6           THE JUROR:  To be honest, yes, sir, I would.

7           THE COURT:  Okay.  Okay, Mr. Salas.  I'm going to go

8    ahead and excuse you, sir.  Thank you.

9           THE JUROR:  Hello.  I'm Carmen Ayala, Juror Number 30.

10          THE COURT:  Yes, ma'am.

11          THE JUROR:  And I have an uncle who is a retired

12   police officer, and it would not influence me at all.

13          THE COURT:  Thank you, Ms. Ayala.  Thank you, ma'am.

14          THE JUROR:  Thank you.

15          THE COURT:  Anyone else there on the third row, I

16   believe?

17          Yes.

18          THE JUROR:  Jose Zamora, Juror 34.  Two cousins.

19   One's a canine, but it wouldn't make me be unfair and

20   impartial.

21          THE COURT:  You can be fair and impartial?

22          THE JUROR:  I would be fair and impartial.

23          THE COURT:  Thank you, Mr. Zamora.

24          Anyone else on the third row there?  Over here?

25          THE JUROR:  Stephanie Guerra, Juror Number 38.  I have

1    an uncle who used to be an FBI agent and another who is retired

2    police department.

3          THE COURT:  Can you be fair and impartial in this

4    case?

5          THE JUROR:  Uh-huh.  Yes.

6          THE COURT:  Thank you, ma'am.

7          Anyone else on the third row?

8          Yes, ma'am?

9          THE JUROR:  Soledad González, Juror Number 41.  My

10   brother is a U.S. Customs in California.

11         THE COURT:  Okay.  Would that influence you in this

12   case, Ms. González?

13         THE JUROR:  No, sir.

14         THE COURT:  Thank you very much, ma'am.

15         Anyone else, third row?  Okay.  Last row, number four,

16   beginning on my left?

17         Yes, sir?

18         THE JUROR:  Jesús Trejo, Juror Number 44.  I have a

19   cousin that works for Customs and Immigration in a border town

20   in South Texas, and has for many, many years.

21         I think based on conversations that I've had with him

22   over a period of time it would impair me.

23         THE COURT:  You would have a problem?

24         THE JUROR:  Yes, sir.

25         THE COURT:  Okay, Mr. Trejo.  I'm going to go ahead

1    and excuse you.  You're free to leave, sir.

2            Anyone else on the fourth row?  Family or friends,

3    close friends in law enforcement?

4            THE JUROR:  Sir, my name is Jorge Chavez, Juror Number

5    53.  All my co-workers are police officers right now.

6            THE COURT:  What's your number, 53?

7            THE JUROR:  Yes, sir.

8            THE COURT:  Does that influence you in any way in this

9    case?

10           THE JUROR:  No, sir.

11           THE COURT:  Thank you, Mr. Chavez.

12           THE JUROR:  Juanita Vasquez, Juror Number 51.  I have

13   very close friends Border Patrol, and close friends with the --

14   retired DEA.

15           THE COURT:  Okay.  Does that pose any problem to you

16   in this case?  Will that influence you?

17           THE JUROR:  I don't know.

18           THE COURT:  Well --

19           THE JUROR:  No, probably not.

20           THE COURT:  What's your number, ma'am?

21           THE JUROR:  51.

22           THE COURT:  Are you Ms. Vasquez?

23           THE JUROR:  Excuse me?

24           THE COURT:  What's your number, 51?

25           THE JUROR:  51, Juanita Vasquez.

```
 1                THE COURT:  Juanita Vasquez.  Now, you say it won't
 2      influence you in any way?  You would be fair and impartial?
 3                THE JUROR:  Uh-huh.
 4                THE COURT:  Yes?
 5                THE JUROR:  (No verbal response.)
 6                THE COURT:  Okay.  Thank you, ma'am.
 7                Anyone else on the fourth row?
 8                Yes, ma'am?
 9                THE JUROR:  My name is Zulema Inguanzo, Juror
10      Number 55.  My ex-husband, with the sheriff's department.
11                THE COURT:  Okay.  Does that influence you in any way
12      in this case, ma'am?
13                THE JUROR:  No, sir.
14                THE COURT:  Ms. Inguanzo?
15                THE JUROR:  Yes, sir.
16                THE COURT:  Thank you, ma'am.
17                Anyone else on the fourth row?
18                THE JUROR:  My name is Annette Findley, Juror
19      Number 57.  I have a cousin that works for the DEA.
20                THE COURT:  Okay.  Does that influence you in any way
21      in this case, ma'am?
22                THE JUROR:  Yes, it would.
23                THE COURT:  You think so?
24                THE JUROR:  Yes, sir.
25                THE COURT:  What's your number, ma'am?
```

```
 1              THE JUROR:  57.

 2              THE COURT:  Ms. Findley?

 3              THE JUROR:  Yes.

 4              THE COURT:  Okay.  I'm going to go ahead and excuse

 5    you, ma'am.  You're free to leave.

 6              Anyone else in any row?

 7              How many of you have served on a jury before in a

 8    criminal case like this one, where you actually went into

 9    deliberations?

10              Let me see on the first row, how many?  The second

11    row?  Just one.  Third row?  Fourth row?  There's one on the

12    fourth row?  Okay.

13              Did any -- a couple over here, too.  Okay.  Thank you.

14              Did any of those trials end up as a mistrial because

15    you and the other members of the jury could not reach a

16    verdict?  Do you have any mistrials?

17              What's your number, ma'am?

18              THE JUROR:  Sandra Noriega, Juror Number 4.

19              THE COURT:  Okay.  Was that in state court?

20              THE JUROR:  No.  It was actually federal.

21              THE COURT:  I'm sorry?

22              THE JUROR:  It was U.S.

23              THE COURT:  Federal court?

24              THE JUROR:  Yes.

25              THE COURT:  It was a mistrial?
```

```
 1                THE JUROR:  Yes, sir.
 2                THE COURT:  Okay.  Does that experience in any way
 3      affect you where you could not be fair and impartial in this
 4      case?
 5                THE JUROR:  No, it didn't affect me.
 6                THE COURT:  Okay.  Thank you, ma'am.
 7                THE JUROR:  My name is Romelia Guereque, Juror Number
 8      7, and it was a criminal case.
 9                THE COURT:  In state court?
10                THE JUROR:  Yes.
11                THE COURT:  Okay.  The jury could not reach a verdict?
12                THE JUROR:  It was a mistrial.
13                THE COURT:  Well, because the jury could not reach a
14      verdict?
15                THE JUROR:  Yes, sir.
16                THE COURT:  Okay.  There's a lot of reasons for
17      mistrials, okay?  That's one of them.
18                THE JUROR:  Yes.
19                THE COURT:  Does that affect you in any way?  Does
20      that maybe influence you in any way?
21                THE JUROR:  No, sir.
22                THE COURT:  Thank you.  Thank you, ma'am.
23                Anyone else?
24                THE JUROR:  Carlos Reynozo, 11.  It was a mistrial
25      because we couldn't get to -- the jury didn't get to agree, so
```

```
1   it was a mistrial.
2              THE COURT:  Okay.  What's your number?
3              THE JUROR:  11.
4              THE COURT:  I'm sorry?
5              THE JUROR:  Number 11.
6              THE COURT:  11.  Okay.  Did that experience affect you
7   in any way why you could not be fair and impartial here?
8              THE JUROR:  I think so.
9              THE COURT:  You would be affected?
10             THE JUROR:  I think so, yes.
11             THE COURT:  Okay.  Mr. Reynozo, I'm going to go ahead
12  and -- I'm going to go ahead and excuse you, sir.  You're free
13  to leave.  You're free to leave.
14             Ladies and gentlemen, you're going to hear from the
15  evidence that Mr. Delgado here, the gentleman on trial, is an
16  attorney.  He's a licensed attorney.  He is charged with an
17  offense involving conspiracy to commit money laundering.
18             Would the fact that he is charged with this offense
19  and that he's an attorney, will that influence you, any of you,
20  in any way where you could not be fair and impartial?
21             Anyone on the first row be influenced by that?  Second
22  row?  Third?  Or fourth?
23             Yes, ma'am?  What's your number, ma'am?
24             THE JUROR:  Juror Number 40, Socorro Brito.
25             THE COURT:  40?
```

```
1            THE JUROR:  Yes.  I'm not sure that I could be fair
2   and impartial.
3            THE COURT:  Now, you have to speak into the
4   microphone.
5            THE JUROR:  I'm not sure that I could be fair and
6   impartial.  I'm sorry.
7            THE COURT:  You could not be fair and impartial?
8            THE JUROR:  No.
9            THE COURT:  You're Ms. Brito?
10           THE JUROR:  Yes.
11           THE COURT:  Okay.  Thank you, ma'am.  You may be
12  excused, Ms. Brito.
13           You'll also hear evidence during trial that
14  Mr. Delgado was employed at one time with a law firm here in
15  El Paso.  That law firm is Delgado, Acosta, Braden & Jones.  He
16  is not the Delgado that's the named partner in this -- in this
17  law firm.  He was an attorney hired by the law firm, okay, as
18  an associate, not as a named partner.
19           Do any of you have any familiarity with the law firm
20  of Delgado, Acosta, Braden & Jones, represented by them in any
21  way, know them, any of the attorneys there?
22           Anyone on the first row?  Second row?
23           THE JUROR:  Nancy Puga, Juror Number 23.  Like I said
24  before, I do have a lot of family in the law enforcement,
25  lawyers.  And I knew -- well, I didn't know him personally, but
```

1    I knew the firm Braden & Jones.

2          THE COURT:  Right.  Ms. Puga, does that in any way

3    influence you?

4          THE JUROR:  You know, now that I'm thinking about it,

5    yes.  There's too many --

6          THE COURT:  You would have a problem?

7          THE JUROR:  Yes, sir.

8          THE COURT:  Okay.  Thank you.

9          THE JUROR:  And I graduated from Bel Air.

10          THE COURT:  Okay.  Thank you, ma'am.  You're free to

11    leave.  I'm excusing you at this time.

12          Anyone else familiar with the firm or know who they

13    are or been sued by them or anything like that?

14          THE JUROR:  Again, that's the same law firm that my

15    husband worked for.  Juror Number 56.

16          THE COURT:  That he works for?

17          THE JUROR:  Uh-huh.

18          THE COURT:  Are they --

19          THE JUROR:  He's no longer with them, though.

20          THE COURT:  Delgado, Acosta, are they -- I thought

21    they had dissolved the firm.

22          THE JUROR:  He's no longer with them.

23          THE COURT:  Okay.

24          THE JUROR:  He has not been with them for two to three

25    years.

1          THE COURT:  What is your number, ma'am?

2          THE JUROR:  56.

3          THE COURT:  Yes, ma'am, Ms. Mounts.

4          I think you're a little bit too close to what's

5   involved here, ma'am.

6          THE JUROR:  Okay.

7          THE COURT:  I'm going to go ahead and excuse you,

8   ma'am.  Thank you very much, ma'am.  You're free to leave.

9          Anyone else familiar with the law firm in any

10   capacity?

11          Ladies and gentlemen, I've introduced you, they've

12   introduced themselves, the people from the U.S. Attorney's

13   Office, Ms. Kanof and Ms. Arreola.

14          Do any of you know any of the other attorneys working

15   or who have worked at the U.S. Attorney's Office?  Attorneys or

16   otherwise, any kind of staff?  Any of you know or have known

17   them?

18          Anyone on the first row?  The second row?  Third row?

19   Or fourth?

20          Do any of you know each other?  Any of you know, like

21   Juror Number 3 know Juror Number 50 or whatever?  Do any of you

22   know each other?

23          Yes, sir?  What's your number?

24          THE JUROR:  Number 16.  I know Herminia.  We work,

25   well, kind of together, same place.  And I think I'll be

```
 1    impartial -- no.
 2              THE COURT:   Number 16?
 3              THE JUROR:   Yeah.  We just never get along.  That's
 4    why.
 5              THE COURT:   If you were on this jury, would that
 6    influence you in any way, sir?
 7              THE JUROR:   No.
 8              THE COURT:   No?  You would make up your own mind and
 9    not rely on someone else to make up your mind for you?
10              THE JUROR:   (No verbal response.)
11              THE COURT:   You'd be -- yes?
12              THE JUROR:   I have other reasons why I can't be on the
13    jury, but because of her, it's okay.
14              THE COURT:   Well, let me hear from you now.
15              THE JUROR:   Do you want to hear it?
16              THE COURT:   Yes.  Give him the microphone.
17              THE JUROR:   Well, I could never be in favor of the
18    federal government in a drug case.  Because as long as our
19    soldiers are guarding marijuana plants in Afghanistan and being
20    paid for it -- you guys know what I'm talking about -- I cannot
21    say this guy did anything wrong.
22              THE COURT:   Okay.  In other words, you could not
23    follow my instructions if I told you you have to follow the law
24    and --
25              THE JUROR:   No.
```

```
 1              THE COURT:  Okay.  Thank you, Mr. Carnevale --
 2              THE JUROR:  Right.  The federal government doesn't do
 3    it, so...
 4              THE COURT:  Okay, Mr. Carnevale.  Thank you very much.
 5    You're free to leave.
 6              THE JUROR:  Okay.  Thank you.
 7              THE COURT:  You may be excused.
 8         So I don't have to ask -- okay.  Somebody -- anybody
 9    else know each other?
10              Yes, ma'am?
11              THE JUROR:  Socorro Velasco, Juror Number 5.  I've
12    worked many years with Juror Number 60, but none of us work in
13    law enforcement.
14              THE COURT:  You wouldn't have a problem serving --
15    serving as a juror --
16              THE JUROR:  No.
17              THE COURT:  -- on a jury?
18              THE JUROR:  No, it wouldn't be an issue.
19              THE COURT:  No?  Okay.  Thank you, ma'am.
20              Anyone else know each other?
21              Ladies and gentlemen, when we have selected the jury
22    and -- when we have selected the jury and before we start
23    taking the testimony, or even before we -- we hear from the
24    attorneys on an opening -- their opening statement, I will give
25    you certain instructions.
```

1          One of the instructions that I will give you goes like

2     this:

3          The burden of proof is on the Government until the

4     very end of the case.  The Defendant has no burden to prove his

5     innocence or to present any evidence or to testify.

6          Since the Defendant has a right to remain silent, the

7     law prohibits you in arriving at your verdict from considering

8     that the Defendant may not have testified.

9          In other words, you cannot consider that if you're

10    part of this jury.  But if you have a problem with it -- I

11    don't know if he's going to testify or not, ladies and

12    gentlemen.  Maybe they haven't made up their mind or whatever.

13    It's perfectly all right.  It's perfectly all right.  They

14    don't have to -- they don't have to tell us.

15         But if -- in fact if he doesn't testify, would that

16    affect you to the extent that you could not follow the

17    instruction as I've given to you?  Anyone have a problem with

18    the instruction?

19         Anyone on the first row?  Second row?  Third row?  Or

20    the fourth?

21         THE JUROR:  My name is Maria Elena Martinez, and my

22    Juror Number is 36.

23         I just have a doubt because I'm not sure if I'm going

24    to understand everything.

25         THE COURT:  I can barely hear you.

1          THE JUROR:  Okay.  My question is if -- what if I

2  don't understand?  Can I go back and ask, if I don't understand

3  the instructions that you --

4          THE COURT:  Okay.  Do you want me to read it again?

5          THE JUROR:  Please.

6          THE COURT:  Okay.  What's your number, ma'am?

7          THE JUROR:  36.

8          THE COURT:  36?

9          THE JUROR:  Yes.

10          THE COURT:  The instruction that I will give you will

11  be as follows:

12          The burden of proof is on the Government until the

13  very end of the case.  The Defendant has no burden to prove his

14  innocence or to present any evidence or to testify.

15          Since the Defendant has a right to remain silent, the

16  law prohibits you in arriving at your verdict that the

17  Defendant may not have testified.  Okay?

18          My question is:  Do any of you have a problem with

19  that, where you could not follow the instruction as I've given

20  it to you?  Anyone?

21          First row?  Second row?  Third?  Or fourth?

22          Yes, ma'am.

23          THE JUROR:  Excuse me, again.  It's because English is

24  my second language, so I really --

25          THE COURT:  I can barely hear you.  Speak into the

```
1    microphone.

2           THE JUROR:  I'm saying that English is my second

3    language, so I can't really -- I'm not sure if I understand

4    everything.  I'm sorry.

5           THE COURT:  Well --

6           THE JUROR:  Is there any translation or something?

7           THE COURT:  Well, do you think you may have a problem?

8    You think you may have a problem listening and taking --

9    listening to the testimony because it will be in English?

10          THE JUROR:  Yes.

11          THE COURT:  You would have a problem?

12          What's your number, ma'am?

13          THE JUROR:  36.

14          THE COURT:  36.  Ms. Martinez?

15          THE JUROR:  Yes, sir.

16          THE COURT:  Okay.  Okay.  I'm going to go ahead and

17   excuse you, Ms. Martinez.  You're free to leave, ma'am.

18          THE JUROR:  Thank you.

19          THE COURT:  Anyone -- again, anyone that would not

20   follow the instruction as I've given it to you?

21          Anyone have -- like Ms. Martinez, anyone have any

22   other reason why you could not serve on this jury?  Again, like

23   I said, she has trouble understanding everything or whatever.

24   If you can't -- if you can't listen to all the testimony or --

25   obviously, there would be a problem.
```

```
 1              Do any of you have -- for any reason -- have a problem
 2      where you could not serve on this jury?  First row?
 3              THE JUROR:  Sergio Reyes, Juror Number 9.
 4              You see, I have some kind of problem on making a
 5      decision that might be impartial, or -- because the way that I
 6      educate my kids --
 7              THE COURT:  Wait, wait, wait.  I don't need to go into
 8      that --
 9              THE JUROR:  Okay.
10              THE COURT:  -- Mr. Reyes.  Do you have a problem that
11      you could not be fair and impartial?  That's all I need to
12      know.
13              THE JUROR:  I have a problem, so I probably -- I'm not
14      going to be impartial.
15              THE COURT:  Okay.  That's all I need to know.  I don't
16      need to know why.
17              THE JUROR:  Okay, sir.
18              THE COURT:  I'm going to go ahead and excuse you,
19      Mr. Reyes.  You may be excused, sir.  You're free to leave.
20              THE JUROR:  Okay.  Thank you.
21              THE COURT:  Thank you very much for your service.
22              THE JUROR:  My name Miguel Tavares, Number 12.  I do
23      have the same issue that the lady just left, Ms. Martinez, that
24      I don't know if I'm sure if I understand everything, because
25      the English is my second language.
```

1          THE COURT:  Okay.  That's all I need to know.  I'm

2   going to go ahead ask excuse you, Mr. Tavares.

3          THE JUROR:  Thank you.

4          THE COURT:  You're free to leave, sir.

5          Anyone else have a problem where they could not serve

6   on this jury.

7          THE JUROR:  My name is Eloy Carmona.  I'm Juror Number

8   19.  I've been listening more or less, and I figure that it's

9   going to take about a week.  I'm -- thinking back, I'm a

10  schoolteacher entrusted with 75 students, and I tend to think,

11  well, when is this going to be over or, you know, can they

12  hurry it up?  That might -- that might, you know, influence me.

13  But that's -- I just need to let you know.

14          THE COURT:  It might influence you where you could not

15  be fair?

16          THE JUROR:  When is it -- can we speed it up or -- I

17  might be thinking that, or what are my students doing, because

18  I'm entrusting these 75 students to a substitute teacher.  And

19  substitute teachers, some of them are good and some of them are

20  not great.  So I'm just thinking about it, and it's been on my

21  mind.

22          THE COURT:  Okay.  I'm not going to excuse you right

23  now, Mr. Carmona, because I have no reason to excuse you.  But

24  I'm going to take it under consideration.

25          THE JUROR:  Thank you, sir.

```
 1              THE COURT:  Thank you.
 2              Anyone else have a problem serving on this jury?
 3    Second row?  Third row?  Fourth row?
 4              Ms. Kanof, if you have any questions for the panel?
 5              MS. KANOF:  No, Your Honor.
 6              THE COURT:  Mr. Velarde?
 7              MR. VELARDE:  Yes, sir, I do, Your Honor.
 8                      VOIR DIRE EXAMINATION
 9    BY MR. VELARDE:
10              Ladies and gentlemen, first of all, thank you very
11    much for your service.
12              THE COURT:  You've got to get closer to the
13    microphone.
14              MR. VELARDE:  Well, let me get over there, Judge.
15              Okay.  Ladies and gentlemen, first of all, thank you
16    very much for your service.  Thank you very much for your
17    candid responses.  I hope to make some headway.
18              The Court has already touched upon a lot of subjects
19    that I would intend to go over.
20              But I am compelled to remind you again, my client --
21    our client sitting here at counsel table is an attorney by
22    profession, and I would like to revisit that subject very
23    carefully.
24              As attorneys, we are held to a higher standard.  Is
25    there anyone here, because this involves an alleged crime, that
```

```
1    is going to be inclined to think, Well, he's a lawyer;
2    therefore, he should have known better?
3            Is there anybody?  I take -- yes, sir, Mr. Carmona?
4            THE JUROR:  I'm Juror Number 19, Eloy Carmona.  That's
5    the first thing that came to my mind when you said attorney.  I
6    said, He should have known better, as you say, to a higher
7    standard.
8            So yes, I'm pretty sure that would influence me.  I
9    would say he should have known better.
10           THE COURT:  Okay.  Wait.
11           THE JUROR:  Yes.  I'm just --
12           THE COURT:  I can appreciate that.
13           THE JUROR:  You told me to be honest.  I'm being
14   honest.
15           THE COURT:  Okay.  All I need to know is if it might
16   influence you.  I'm going to go ahead and excuse you,
17   Mr. Carmona.  You're free to leave.
18           MR. VELARDE:  And, like Mr. Carmona, is there anybody
19   else that subscribes to the same belief?
20           THE JUROR:  Manuel Palma, Juror Number 42.  I think,
21   in that sense, it would influence me that he, being an
22   attorney --
23           MR. VELARDE:  Thank you very much.  Thank you, sir.
24           THE COURT:  What's your number?
25           THE JUROR:  42.
```

```
1              THE COURT:  42?

2              THE JUROR:  Yes, sir.

3              THE COURT:  Mr. Palma?

4              THE JUROR:  Yes, sir.

5              THE COURT:  Okay.  I'm going to go ahead and excuse

6    you, Mr. Palma.

7              THE JUROR:  Thank you, sir.

8              THE COURT:  You're free to leave, sir.

9              MR. VELARDE:  Anybody else besides Mr. Palma and

10   Mr. Carmona that feels the same way?

11             Now already, there's been one juror who has

12   volunteered that he works at the El Paso Times.  And of course

13   because we read newspapers, I'm compelled to ask you the next

14   question.

15             In this local community there's extensive coverage

16   about the increasing rate of drug trafficking and money

17   laundering.

18             THE COURT:  Mr. Velarde, one of my rules is that you

19   cannot go over what I've already asked them.

20             MR. VELARDE:  Okay.

21             THE COURT:  Don't waste your time on that.  You only

22   have about five more minutes, sir.

23             MR. VELARDE:  Thank you very much.

24             Well, I just want to know, because of the nature of

25   the crime, is there anybody here who has any issue with that,
```

1    taking into account his profession?

2              Thank you very much.

3              Now, let me ask the following question.

4              The Judge did touch upon burden of proof.  And burden

5    of proof has not been spelled out for you.  The way I spell it

6    is if --

7              MS. KANOF:  I'm going to object, Your Honor.  They get

8    the law from the Court.

9              THE COURT:  I'll sustain the objection.

10             MR. VELARDE:  Is there anyone who would lessen the

11   Government's burden, as already discussed by the Court, given

12   Mr. Delgado's profession?

13             Now, this question the Court did not touch upon.  And

14   inasmuch as it might touch upon personal medical issues, I

15   would like to invite anyone who might have a problem because

16   they're taking meds, medication, because they're -- they have

17   some hearing impairment.

18             Is there anybody who would like to address that matter

19   before the Court at the bench?  Any medical issues that might

20   interfere with your ability to sit as a juror?

21             I take it -- yes, sir.

22             THE JUROR:  Joe DeAngelis, 21.  I've had extensive

23   back surgeries and I have hardware -- a titanium cage in my

24   spine, screws and rods in my back.  The length of time to sit

25   on the jury, to sit here would become an issue for me if I

```
1    was -- for any extended amount of time.  I'm good for 45

2    minutes to an hour.  After that I become crippled up and one

3    thing or another.  That's the only problem that I have

4    physically.

5             THE COURT:  What's your number?

6             THE JUROR:  21.

7             THE COURT:  21?

8             THE JUROR:  Yes.

9             I've had two extensive back surgeries.  The last one

10   implanted titanium cages and screws and rods in my back and hip

11   bone, from both my hips and stuff.  So I have an issue for an

12   extended length of time sitting, is my only problem.

13            THE COURT:  Okay.  Okay.  I can understand,

14   Mr. DeAngelis.  I'm going to go ahead and excuse you, sir.

15   You're free to leave.

16            THE JUROR:  Thank you.

17            MR. VELARDE:  There was another hand that went up in

18   the back.

19            THE JUROR:  Gerardo Guerrero, Number 47.  Are we

20   allowed to use the restroom while we're in session?  Because

21   sometimes I do need to use it.

22            THE COURT:  Yes.  There's a restroom in the jury room.

23   Ordinarily we're not in court -- we're not in the court more

24   than an hour and a half.  Okay?  Ordinarily.

25            And sometimes when I have a juror that needs to go to
```

1    the restroom or something, needs to be excused, there will be

2    an officer sitting over here.  All you have to do is let him

3    know and I'll take a recess.  Okay?

4              THE JUROR:  Thank you very much.

5              THE COURT:  Thank you, sir.

6              THE JUROR:  Thank you.

7              MR. VELARDE:  Now, finally, I would like for all of

8    you who are now remaining, if there's any issue that you want

9    to take up with the Court in private that would bear on your

10   willingness to serve as a juror, is there anybody who would

11   like to visit with the Court about any matter and you want to

12   discuss that in private with Counsel and the Judge?

13             Thank you very much.  I take it by your silence --

14   I've exhausted my time.  Thank you.

15             THE COURT:  Ladies and gentlemen, for whatever reason,

16   either for questions that I've asked or from Counsel, any of

17   you at this time have any reason why you could not be fair and

18   impartial in this -- in this trial if you were selected as a

19   juror?  Anyone have a problem with that?

20             I take that as a no.

21             I want you to look around, ladies and gentlemen, see

22   where you're at.  We're going to take a 20-minute break.  We'll

23   return at 11:30.  Okay?

24             But you have to come seated -- and be seated right

25   where you are now, okay?  So look around and see where you're

1    at.

2          With that, we'll be in recess for the next 20 minutes.

3          (Recess taken; open court.)

4          THE COURT:  Ladies and gentlemen, the clerk is going

5    to read the names of the 12 jurors and two alternates.  If your

6    name is called, please rise.  The officer is going to seat you

7    in the jury box.

8          JURY CLERK:  1, Gabriela L. Reyna, is Juror Number 1.

9          2, Lorena Cuellar, is Juror Number 2.

10         3, Cesar L. Villalobos, is Juror Number 3.

11         5, Socorro M. Velasco, is Juror Number 4.

12         10, Stephanie Rose Chavarria, is Juror Number 5.

13         13, Daniel Nuñez, is Juror Number 6.

14         25, Lisette N. Nabhan, is Juror Number 7.

15         30, Carmen Virginia Ayala, is Juror Number 8.

16         34, Jose M. Zamora, is Juror Number 9.

17         38, Stephanie N. Guerra, is Juror Number 10.

18         39, Armando Rafael Rodriguez, Jr., is Juror Number 11.

19         43, Delmarie Colmenero, is Juror Number 12.

20         49, Landra Vasquez Piñedo, is Alternate Number 1.

21         50, Jose Alfredo Saucedo, is Alternate Number 2.

22         THE COURT:  If you'll please rise to take the oath.

23         (The jury was duly sworn; all answered, "I do.")

24         THE COURT:  Ladies and gentlemen of the panel, the

25    rest of you, I want to thank you for your service here this

1     morning.

2            What's their instructions, Michele?

3            JURY CLERK:  They need to call back on the 26th to

4     see.

5            THE COURT:  Call back on the 26th to see if you're

6     going to be needed any further this month.

7            So with that, again with our thanks, ladies and

8     gentlemen, thank you for your service here this morning.

9            All rise for the jury to be excused.

10           (Venire panel exits courtroom.)

11           THE COURT:  You may be seated.

12           Ladies and gentlemen of the jury, as I indicated to

13    you earlier, I'm going to give you that -- those instructions

14    that I made reference to.  Please listen -- and please abide by

15    all of these instructions.  When we get here every morning I'm

16    going to ask you if you have complied with all the instructions

17    I've given you.  It's very important, so please listen to them

18    as I give them to you.

19           These instructions are meant to guide your

20    participation in this trial.

21           It will be your duty to find from the evidence what

22    the facts are.  You and you alone are the judges of the facts.

23    You will then have to apply to those facts the law as I will

24    give it to you.

25           You must follow the law whether you agree with it or

1    not.

2            Nothing that I may say or do during the course of this

3    trial is intended to indicate what your verdict should be.

4    That is your prerogative only, not mine.

5            The evidence from which you will find the facts will

6    consist of the testimony of witnesses, documents, and other

7    things received into the record as exhibits.

8            And you may find that the lawyers stipulate to

9    something.  When the lawyers stipulate to something that means

10   that both sides have agreed that this is a fact.  They would

11   not have to go and present anymore evidence into that.  You

12   must accept it as being a fact.

13           Certain things are not evidence, and I'm going to --

14   I'm going to give you a list of those at this time.

15           Statements, arguments, and questions by the lawyers

16   are not evidence.

17           Objections to questions are not evidence.  Lawyers

18   have an obligation to their client to make an objection when

19   they believe certain evidence being offered is improper under

20   our rules of evidence.

21           You must not be influenced by the objections or by my

22   rulings as to the objections.

23           If the objection is sustained, you ignore the

24   question.  If the objection is overruled, then you treat the

25   question and the answer just like you would any other question

1    and answer.

2              If I instruct you that I am admitting certain evidence

3    for a limited purpose only, then you must follow that

4    instruction.

5              Testimony that I may exclude or tell you to disregard

6    should not be considered by you in arriving at your verdict.

7              Anything you may have seen or heard outside the

8    courtroom is not evidence.  You are limited to the evidence

9    presented here by both sides.

10             There are two kinds of evidence, direct and

11   circumstantial.

12             Direct evidence is direct proof of a fact, such as the

13   testimony of an eyewitness.

14             Circumstantial evidence is proof of facts from which

15   you may infer or conclude that other facts exist.

16             I will give you further instructions on these as well

17   as other matters at the end of the case.

18             But bear in mind that you may consider both direct and

19   circumstantial evidence.

20             It will be up to you to decide which witnesses to

21   believe, which witnesses not to believe, and how much of any

22   witness's testimony to accept or to reject.

23             Again, I will give you more instructions on this also,

24   when the testimony has concluded and before you start your

25   deliberations.

1          As I've indicated to you, this is a criminal case.

2   There are three basic rules about a criminal case that you must

3   bear in mind.

4          First, the Defendant is presumed innocent until proven

5   guilty.

6          The Indictment against the Defendant, brought by the

7   Government, is only an accusation, nothing more.  It is not

8   proof of guilt or anything else.

9          The Defendant starts out with a clean slate.

10          Second, the burden of proof is on the Government until

11   the very end of the case.

12          The Defendant has no burden to prove his innocence or

13   to present any evidence or to testify.

14          Since the Defendant has a right to remain silent, the

15   law prohibits you in arriving at your verdict from considering

16   that the Defendant may not have testified.

17          Third, the Government must prove the defendant's guilt

18   beyond a reasonable doubt.

19          I'm going to give you further instructions on

20   reasonable doubt, also, at the end of the testimony.

21          I will also give you detailed instructions on the law

22   at the end of the case, and those instructions will control

23   your deliberations and your decision.

24          Ladies and gentlemen, this next part is -- part of the

25   instructions we didn't need to give several years ago.  But now

1    with the Internet and the problems that we're having sometimes

2    with jurors getting into it, I need to emphasize these are a

3    very important part of the instructions that I'm giving you.

4         Many times jurors sometimes do something that is

5    improper, and when it comes out it causes a mistrial.  That

6    means that everything will have to start all over again.  We

7    should try to avoid that, really, if at all possible.  So

8    please listen to these instructions that I'm going to give you.

9         During the course of the trial do not speak with

10   anyone, any witnesses or with the Defendant or with any of the

11   lawyers in this case.  Please do not talk to them about any

12   subject at all.

13        You may be unaware of the identity of everyone

14   connected with this case; therefore, in order to avoid even the

15   appearance of impropriety, do not engage in any conversation

16   with anyone in or about the courtroom or courthouse.  It is

17   best that you remain in the jury room during the breaks --

18   during the breaks that we take during the trial, and do not

19   linger in the hallway.

20        In addition, during the course of the trial, do not

21   talk about this trial nor discuss this case among yourselves

22   until I have instructed you on the law and you have gone to the

23   jury room to make your decision.

24        Otherwise, without realizing it, you may start forming

25   opinions before the trial is over.  It is important that you

1   wait until all the evidence is received and you have heard any

2   instructions or rules of law before you deliberate among

3   yourselves.

4          During the course of the trial you will receive all

5   the evidence you properly may consider to decide the case.  Do

6   not try to find out information from any source outside the

7   confines of this courtroom.

8          Do not seek or receive any outside information on your

9   own which you think might be helpful.  Do not engage in any

10  outside reading about this case or the law involved.

11         Do not attempt to visit any places mentioned in this

12  case, whether in person or via maps or online resources such as

13  Google Earth.

14         You must not read about it in any publications or

15  watch or listen to television or radio reports of what is

16  happening here.

17         Do not use the Internet or form any –– or any other

18  form of electronic communication to obtain or provide

19  information to an otherwise –– or whether a phone –– whether by

20  any means, whether by phone, computer, or any other device.

21         This includes but is not limited to the use of

22  websites and search engines such as Google or Yahoo! or other

23  online resources or publications for the use of sending or

24  receiving information on the case.

25         Do not attempt to learn from the parties, the

1    witnesses, the lawyers, or the Judge -- do not attempt to learn
2    about the parties, the witnesses, the lawyers, or the Judge.
3              Do not send or receive e-mails or text messages
4    relating to this case or your involvement.
5              Do not read or post information on Facebook or any
6    other blog or social networking site such as Twitter or
7    Myspace.
8              The reason for these rules, as I am certain you will
9    understand, is that your decision in this case must be made
10   solely on the evidence presented here in the courtroom.
11             We're going to break up for lunch.  Counsel will do
12   the opening statements after lunch.
13             Ladies and gentlemen, we're going to break up for
14   lunch for an hour and 15.  You'll be on your own.
15             The officer is going to take you to the jury room.
16   You will return there after lunch.  If you come back early,
17   we'll make sure that you can get in any time.  Okay?  If you
18   come back -- but you must be here by 1:15, so we can start with
19   the opening statements.
20             When we come back, each side is going to be given an
21   opportunity to make an opening statement.  They will outline to
22   you what they believe the evidence is going to come in and what
23   the evidence will show.
24             After the opening statements, the Government will
25   start calling all of its witnesses.

1          When they have called all of their witnesses they will

2     rest.

3          Then we go to the Defense.  The Defense, if they have

4     witnesses, will call witnesses.  When they have presented their

5     witnesses, they will rest.

6          Then we go back to the Government.  We go back to the

7     Government to see if they have rebuttal witnesses.  And if they

8     do have rebuttal witnesses, the Defense is given an opportunity

9     to bring in rebuttal witnesses.

10          After you have heard all the evidence, I will give you

11     the law and the last set of instructions.  After that the

12     attorneys will address you in their closing arguments and then

13     you will be sent to deliberate.

14          Ladies and gentlemen, please abide by all the

15     instructions I've given you.  Please.

16          We will be recess until 1:15 in the afternoon.

17          (Recess taken; open court; jury present.)

18          THE COURT:  Ladies and gentlemen of the jury, I

19     understand that at least one of you wants to take notes.  You

20     may, if you want to.  Okay?  You've been provided with pads and

21     pencils.

22          If you want to take notes it's fine.  You may.  I need

23     to give you some special instructions, though.

24          If you do take notes you will not share them with

25     anybody, and you leave them here in the evening when you go

1   home.  They do not leave the courthouse.  They do not leave the

2   jury room.  And if you do use notes, I will give you further

3   instructions at the end of the testimony.

4        Ms. Kanof, you have 15 minutes.

5        MS. KANOF:  Thank you, Your Honor.

6        May it please the Court, Counsel for the Defense,

7   Co-counsel, ladies and gentlemen of the jury.

8                    OPENING STATEMENT

9   BY MS. KANOF:

10       The Judge has given me 15 minutes for what's known as

11  opening statement.  And it's called statement for a purpose,

12  because there's no evidence before you, so there's nothing to

13  argue.

14       And I do want to remind you, because I think it's very

15  important, that nothing that I say is evidence.  The purpose of

16  opening statement is merely to give you a little roadmap of

17  what the Government expects the evidence to be.

18       And I say expects, and I mean expects.  Because in my

19  experience you really never know what's going to come from the

20  witness stand.  Nervous witnesses, people forget.  There's all

21  kinds of things that can happen in a trial.  But only the

22  exhibits and the testimony under oath that comes from the

23  witness stand that the Judge has allowed is evidence.

24       And of course Defense Counsel and the Government have

25  an obligation to represent their clients, and they'll argue

1     that evidence to you in closing.

2               Thank you on behalf of myself and my co-counsel, the

3     team, for making it through jury selection.  And I say that

4     because you saw it's fairly easy to get out of jury duty.

5               The Defendant is relying on you.  We're relying on

6     you.  We rely on its community service jurors to listen to the

7     evidence and make a fair decision.

8               So I'm going to tell you just give you a little

9     roadmap of what the Government expects to put into evidence.

10              The Defendant, Marco Delgado, is an attorney -- was an

11    attorney.  And he lived a very privileged life.  He had a lot

12    of money, he spent a lot of money.  He had a great education,

13    he came from a family that was very educated.

14              On September 5th of 2007, a man by the name of

15    Sheriff's Officer David Elliott was patrolling I-10 out in

16    Carroll County, Georgia, right outside of Atlanta.  And he's

17    going to tell you that Atlanta, Georgia, is the biggest hub for

18    drugs and money laundering in the United States.  Drugs flow

19    into Atlanta before they are distributed to the east coast, and

20    then they are distributed, and they flow out of Atlanta.  And

21    money flows back into Atlanta and then to, usually, Mexico or

22    other foreign countries, depending on where the individuals who

23    own the drugs are residing.

24              He saw a vehicle on its way out of Atlanta on I-10

25    going towards Texas.  And he is very experienced, and he

1    immediately thought there was something wrong.

2           First of all, the driver wasn't really staying in the

3    lanes, appeared nervous.  And second of all, it had Mexican

4    plates, license plates.  It was a Jeep.

5           He stopped the car.  And you're going to see -- I

6    won't tell you too much about it because you're actually going

7    to see a video.  Police officers, a lot of them, have cameras

8    on the hoods of their cars and it did capture this.

9           It's a very long tape.  We won't play all of it, but

10   the Judge has admitted it into evidence.  And if you want to,

11   when you go back to deliberations, you're free to play all of

12   it.

13          You will see that a young man by the name of Victor

14   Pimentel was driving that vehicle by himself.  Victor Pimentel

15   was a UTEP student who had been befriended by Mr. Delgado a few

16   years earlier, and they had become friends.  And I think you'll

17   hear from Mr. Pimentel how that occurred.

18          But basically, through a period of about six or eight

19   months, Mr. Delgado had engaged Mr. Pimentel -- who, by the way

20   is from Mexico City and still has family there -- to help him

21   with some people in Mexico.

22          Several years ago, or years before this happened,

23   Mr. Delgado met a woman by the name of Lilian de la Concha.

24   Lilian de la Concha is the ex-wife of Vicente Fox, the former

25   president of the Republic of Mexico.  And he engaged in a

1    relationship with her and they decided to do business together,

2    and over and over had meetings with friends of hers in Mexico

3    City, many of which Victor was a part of.

4         But you will not have to rely just on Victor's

5    testimony, because they exchanged a lot of e-mails.  And those

6    e-mails will be provided to you through the witness stand and

7    through the judge's admission of that evidence between Victor

8    and Mr. Delgado.

9         So when Victor is stopped he's quite nervous.  And the

10   officer has him get out of the car.  And eventually, of course,

11   they bring a drug-sniffing dog.  It hits on two duffel bags in

12   the back.

13        But there weren't drugs in the duffel bags, there was

14   a million -- just a little under a million dollars in cash in

15   1s, 5s, and 20s, shrinkwrapped by a FoodSaver.  And they were

16   in -- contained in red duffel bags.  You'll see photos.

17        And Victor explained and waved a document and said,

18   you know, this is why I have the money (indicating).

19        The document will also come into evidence.  It is a

20   fraudulent lawsuit settlement that was created by the Defendant

21   Delgado, at the instruction of the individuals in Mexico, to

22   explain the source of the money should he be caught.  And in

23   this false settlement document it said that Victor Pimentel,

24   who was a college student at UTEP, was the lawyer that had

25   participated in this $1,058,000 settlement.

1          The -- Victor immediately cooperates with the

2   Government.  He explains everything that had happened.  And

3   eventually, the money is flown back to El Paso and Victor

4   becomes -- assists the Government by enticing Mr. Delgado into

5   receiving the money.

6          He's wearing a wire.  It's kind of hard to hear what

7   he's saying on the wire.  But again, that's photographed.

8          When they get to El Paso, DPS is engaged to assist in

9   a traffic stop, and that traffic stop occurs on the west side

10  of town.

11          It's a legitimate traffic stop.  He'll explain how

12  they have to have the reason to stop before they can even stop

13  someone, but they knew about it.

14          Victor was driving the vehicle, but he was working for

15  the Government at that time.  He was assisting.

16          And when the vehicle was stopped, both of them got out

17  of the car.

18          Now since Victor was assisting, he was separated.  And

19  Mr. Delgado told his story to the DPS officers that the money

20  was not his, that it was Victor's, who was a friend, that

21  Victor was taking him to the airport -- and he did have clothes

22  in the back of the car, but they weren't going in the direction

23  of the airport.  They were about to go under the I-10 overpass

24  on Mesa going onto Country Club on the way to the Santa Teresa

25  Port of Entry to meet the other individuals from Mexico City.

1          Eventually, Mr. Delgado was taken into custody, and he

2    also decides to cooperate with the United States Government.

3          He tells -- not only did Victor fly back to El Paso

4    from Atlanta, but what happened was the officer called Homeland

5    Security, the ICE agents in Atlanta, because they work together

6    in a money laundering and drug transporting task force,

7    especially in Atlanta, and so the agents from Atlanta came as

8    well.

9          And Mr. Delgado told Agent Justice, who was an agent

10   out of the Atlanta, the story.  He talked about meeting de la

11   Concha.  He talked about these meetings.

12         Now, he left out the fact that Victor Pimentel was

13   with him at most of the meetings.

14         He said that the first time he met, de la Concha said

15   she had some business friends, and he went to this office of an

16   individual who was named Paco, Francisco Fernandez.

17         And de la Concha was sitting with Paco on one side.

18   And another individual by the name of Pete, who is Pedro

19   Mendoza Meneses, was there as well.

20         And Mr. Meneses said, I have some very important

21   clients that need a delicate issue handled, and they want- --

22   he wanted to talk about Mr. Delgado, since he was an attorney,

23   somehow helping them prevent these people from being

24   extradited.

25         Mr. Delgado told ICE Agent Justice that he looked up

1   the names of the people that were provided, the clients, and

2   they were all -- some of them were on the Treasury Department

3   Kingpin's drug -- Kingpin's Designation List on the Internet,

4   and he was correct about that.

5         He told them that they met several times.  And since

6   Mr. Pimentel was there, he'll tell you about the specifics and

7   so will the e-mails.  And that on the fourth meeting they

8   discussed money laundering.  They discussed something called a

9   mirror operation.

10        The intent was to do a million dollar test to see if

11  it would work, but they talked about laundering $600 million.

12  They paid for Mr. Delgado's ticket to that meeting and agreed

13  to pay him 5 percent of whatever he could launder.

14        The next day he met with -- or one more meeting

15  occurred, and it was actually in the airport in Mexico City,

16  where another individual, kind of a tough-looking individual

17  named Chuy, met them at the airport, and they insisted on

18  seeing everybody's identification documents.  He made copies of

19  them and told them he was sending people to shadow the

20  operation.

21        After the Atlanta stop, Mr. Delgado had introduced an

22  individual by the name of Alex Ascencio as an undercover.

23  Mr. Ascencio is also an ICE agent that was from Atlanta, and

24  he's certified undercover.  And he was going to be introduced

25  into the organization, because what they were really interested

1    in was the drug trafficking organization, and so they didn't

2    arrest Mr. Delgado.

3          Mr. Ascencio did have some meetings and some phone

4    calls, and they led nowhere.  Switch to 2008.

5          One of the e-mails, by the way -- a lot of the

6    e-mails, by the way, are in code, and they're with de la

7    Concha.

8          For example, at one point she talks about Mr. Delgado

9    needing to hurry because there were no longer 300 boxes of Girl

10   Scout cookies in the warehouse, there were 500, and that they

11   could get 5 to each school a week.  And some of the code talk

12   is pretty obvious like that, but they use all kinds of terms

13   like iron and construction.

14         In 2008, now -- now, even though Victor had trusted

15   Delgado, they had become like older brother and younger

16   brother -- he had even lived with him for a while when he was

17   going to school.

18         In 2008, Mr. Delgado calls Victor again and says, I'm

19   working with ICE -- which, by the way, was not true.  I'm

20   working with ICE.  Will you go Chicago and pick up $100,000?

21         Victor becomes very concerned.  He doesn't believe him

22   and he calls ICE.  So Victor does go to Chicago, but he goes to

23   Chicago wired and with the assistance of Chicago ICE agents.

24         And it does happen, and you will hear the phone calls.

25   We have e-mails.  We have a lot of phone calls that were --

1   that were taped.  You'll hear the phone calls between

2   Mr. Delgado and others, including Victor, and the panic that

3   they have because the individual who dropped $50,000 at a mall

4   for Victor to pick up got arrested immediately after he sped

5   away, because he was in a stolen truck.  And they're very

6   suspicious, and you'll hear the suspicious nature.

7           Everything is in Spanish, but we've provided English

8   translations simultaneous to the Spanish if anybody really

9   needs that.

10          In the Chicago incident, he gives his attorney IOLTA

11  account ultimately for Victor to deposit the money in in

12  El Paso, and he keeps it and spends it.  And he admits that.

13          On December 3 of 2008, agents -- Victor, actually --

14  calls ICE and says, I've talked to Ms. de la Concha and there's

15  a threat on Mr. Delgado's life.

16          So they call Mr. Delgado in, because they're

17  obligated -- if there's a credible threat on somebody's life,

18  even if they're a Defendant, even if they're investigating

19  them, the Government is obligated to tell them about it.

20          THE COURT:  You have three minutes.

21          MS. KANOF:  Thank you, Your Honor.

22          And he, this time, talks to Gabe Aguirre, an El Paso

23  ICE agent.  He first denies knowing about the Chicago deal,

24  then admits it.  He admits he put the 45- -- or he had Victor

25  put the $4,500 in his account.  And he says that, contrary to

1    what he told Victor, he was doing it without the knowledge of

2    ICE.

3            Ultimately, ladies and gentlemen, later on Mr. Delgado

4    is arrested.  And when he's arrested Josh Fry, the ICE agent

5    that's here at counsel table, interviewed him.  And by this

6    time Delgado had made about four different statements to law

7    enforcement in which he admitted engaging in this conduct.

8            And Mr. Fry goes through every one of those statements

9    that had been developed at the time, and Mr. Delgado admitted

10   each and every one of them.

11           In the very end, though, he told Mr. Fry, I didn't

12   want to believe it was drug money because I didn't want to

13   think of myself as a member of a drug cartel.

14           Ladies and gentlemen, we know that it takes a lot of

15   your time and that you-all have other things that are pressing

16   in your lives.  But we appreciate your time, and we will try to

17   go through the evidence as quickly as we can but as fairly as

18   we can, not leaving anything important out.

19           Thank you, Your Honor.

20           MR. VELARDE:  May it please the Court, Counsel,

21   Mr. Esper, Mr. Delgado.

22                        OPENING STATEMENT

23   BY MR. VELARDE:

24           Ladies and gentlemen, I, too, would like to thank you

25   personally on behalf of Mr. Delgado and Mr. Esper for this

1    precious time that you're giving us to be able to help us find

2    our way out of this.

3         Whatever Ms. Kanof has told you, whatever I tell you,

4    is not evidence.  She made a note of that, and I concur with

5    that.

6         So I'm going to take it one step further.  I'm going

7    to invite you to please keep an open mind and commit to nothing

8    until all the evidence is in.

9         Notwithstanding the fact that it's not our burden to

10   put on any evidence, we don't have the burden of production

11   either.  Mr. Delgado can decide to sit there at counsel table

12   and not even testify.  And you've already been told about that

13   right.

14        But notwithstanding all of that, I anticipate the

15   evidence will show that in the year 1995 Mr. Delgado initiated

16   his career as an attorney here in El Paso following his

17   graduation from Texas Tech Law School, and he went on to work

18   for a very prominent law firm by the name of Delgado, Acosta,

19   Braden & Jones.  The first two years he was an associate, and

20   then the last eight years he was a partner.

21        During the time that he was at Delgado Acosta, he

22   became rather fluent in international law and energy law.  And

23   then in the year 2005, he decided to venture out on his own.

24        In the course of his business which he had developed

25   at Delgado Acosta, that business took him to Mexico City.  And

1    there in Mexico City he met the wife of Vicente Fox, the

2    ex-wi- -- who subsequently became the ex-wife of Vicente Fox.

3          He became romantically involved with her.  And during

4    the course of this courtship Ms. de la Concha took it upon

5    herself to promote Mr. Delgado as an attorney, not only for the

6    Secretary of Ministry, so that he would represent the Mexican

7    Government in Washington, D.C., but she also promoted him with

8    a lot of business types including, but not limited to, one of

9    Mexico's most prominent labor leaders, Nareo Vargas.

10         And it was during the course of these contacts with

11   these business types, political figures and labor leaders, that

12   many subjects came up:

13         How can you represent us?  Can you represent us?

14         Well, Mr. Vargas, Nareo Vargas, was the one gentleman

15   that broached the subject of this inheritance that was

16   sitting -- that was waiting to be picked up in Atlanta,

17   Georgia.

18         At no time did either Nareo Vargas; at no time did

19   Lilian de la Concha; at no time did Chuy, Francisco Fernandez;

20   Pedro Mendoza Meneses -- at no time, ladies and gentlemen --

21   the evidence is going to show at no time was the subject of

22   drug money ever touched upon with Mr. Delgado.

23         Victor Pimentel, who has also been talked about --

24   Victor Pimentel was, indeed, a friend of Marco Delgado.

25   Mr. Delgado met Victor Pimentel through Nareo Vargas.

1          Now bear in mind that Nareo Vargas is the president of

2     the second-largest labor union in Mexico.  And so what happens

3     is that Mr. Victor Pimentel goes to pick up the money in

4     Atlanta.

5          When Victor Pimentel gets stopped, Victor Pimentel

6     doesn't tell the trooper that this is drug money.  As a matter

7     of fact when that trooper stopped Victor Pimentel, he stopped

8     him on a traffic violation.  He didn't stop him because he had

9     been prompted by ICE or any other law enforcement entity, Stop

10    that vehicle because it's loaded with drug money.  That's not

11    the case.

12         So up until that point Victor Pimentel doesn't know

13    it's drug money.  The officers don't know it's drug money.  But

14    he did agree to cooperate.  Cooperate.

15         And the next thing that happens is that Victor

16    Pimentel, with the agents in tow, they come to El Paso.  And he

17    goes -- as directed, he goes to Marco Delgado's house.

18         Following the stop in Atlanta and all the way up until

19    the time he comes to El Paso, Victor Pimentel is being coached

20    by these agents.  You do this, you do that.

21         Well, the instructions were, You go to Marco

22    Delgado's, and he did.

23         And you're going to see a video.  You're going to see

24    a video that Victor Pimentel took of Mr. Delgado, where

25    Mr. Delgado, indeed, gets into the vehicle.

1          Now again, the vehicle was followed from the point

2    where he picks up Mr. Delgado and he gets stopped later on down

3    the road.  He gets stopped on Mesa across the street, right

4    there in front of Chase.  That's where he gets stopped.

5          When they stop him Mr. Delgado says, We're going to

6    the bank to deposit this money.

7          You're also going to see in that video that there's

8    talk, Yeah, we're going to the bank.

9          But the money never gets to the bank because they get

10   stopped.  Mr. Delgado gets arrested, and then he's subsequently

11   released.  But he agrees to cooperate.

12         With the instructions of these agents from Atlanta

13   Mr. Delgado, indeed, sets up telephone conferences with

14   Mr. Ascencio, the undercover agent, and different people in

15   Mexico, to include Lilian de la Concha.

16         You're going to hear these tapes.  And in those tapes

17   you're never going to hear that this money belongs to any drug

18   cartel.

19         In theses tapes you're never going to hear that

20   this -- that these are drug proceeds.

21         As a matter of fact, you're not going to hear that

22   these are proceeds of any specified unlawful activity.

23         There is talk about the money.  Can you help us,

24   Mr. Rafa Solis -- that's Mr. Ascencio's alias.

25         Mr. Solis, can you help us get that money back?

1          Well, the long and short after many, many phone calls,

2    nothing happens.

3          Subsequent to that, there is now a meeting in McAllen

4    where two of these people actually come from Mexico to meet

5    with Mr. Ascencio.  And again, there's discussion about the

6    money.  Again, never was there any talk about this money being

7    drug money.

8          The money, ladies and gentlemen, was never recovered

9    by the -- by the owners of the money.  Yes, there was another

10   incident 10 months later, in July of 2008.  And the evidence is

11   going to show that Victor Pimentel, indeed, went to go pick up

12   the money.

13         And there was extensive talk between Victor Pimentel

14   and Mr. Delgado.  Again, you're never going to hear that these

15   are proceeds of any unspecified illegal activity.

16         You're never going to hear that this money represents

17   drug proceeds.

18         This money, as a matter of fact, represented money

19   that belonged to a contractor that Lilian de la Concha had

20   talked to Mr. Delgado about picking up for her.

21         Yes, Mr. Delgado has been debriefed.  But at no time

22   has Mr. Delgado ever admitted that these were drug proceeds.

23         Mr. Delgado is being charged with conspiracy to commit

24   money laundering.  And the only way you can convict him is if

25   you can -- you determine beyond a reasonable doubt that he knew

```
1     that these were unlawful drug proceeds.

2             And again I remind you, the most objective evidence is

3     the evidence that was talked about in those tape recordings,

4     the evidence that occurred simultaneously without any coaching.

5     At no time was there any discussion about that.

6             For those reasons, ladies and gentlemen, I'm going to

7     ask you now, at the conclusion of this trial, the only just

8     verdict is a verdict of not guilty.

9             Thank you very much.

10            THE COURT:  How many Government witnesses are here,

11    Ms. Kanof?

12            MS. KANOF:  I'm sorry, Your Honor -- approximately

13    ten.

14            THE COURT:  How many?

15            MS. KANOF:  Ten.

16            THE COURT:  Bring them all in.  Is the Rule being

17    invoked?

18            MS. KANOF:  They're not all here.  Some of them are

19    here, some of them aren't.

20            THE COURT:  Okay.  Who is here?

21            MS. KANOF:  I know that David Elliott is here.  I

22    don't know if -- is Victor here yet?

23            We don't know who all is here, Your Honor.

24            THE COURT:  Bring them in.  Whoever is here bring them

25    in.  We'll swear them in.
```

```
1              Who's going to be your first witness?
2              MS. KANOF:  The first witness is David Elliott.
3              THE COURT:  Is the Rule being invoked, Counsel?
4              MR. ESPER:  Yes, Your Honor.
5              MS. KANOF:  With the exception of Special Agent Fry,
6    Your Honor.
7              THE COURT:  Yes.  He's exempt from the Rule.
8              Come on up here.  I am informed that you will be
9    witnesses in this trial.  We're going to swear you in at this
10   time.  Okay?
11             And also, the Rule has been invoked.  You probably
12   know what it is.  You've probably been through this before, but
13   I need to put it on the record.  It means that you cannot
14   discuss this case with anyone.  That means anyone who is a
15   witness, anyone who is going to testify or who has testified,
16   anyone.  Except you are at liberty to discuss this case with
17   the attorneys for the Government and the attorneys for the
18   Defense if you so wish.
19             The clerk is going swear all three of you in.
20             (Witnesses duly sworn; all answered, "I do.")
21             THE COURT:  You are exempt from the Rule, Agent Fry.
22             Mr. Elliott?
23             THE WITNESS:  Yes, sir.
24             THE COURT:  Take a seat up here.
25             You may wait outside.
```

Elliott - Direct by Ms. Arreola

```
 1                THE WITNESS:  Yes, sir.
 2                THE COURT:  I forgot to put on the record, what's the
 3      other gentleman's name?
 4                What's your name, sir?
 5                THE WITNESS:  Mark Martinez.
 6                THE COURT:  And Agent Fry?
 7                THE WITNESS:  Yes, sir.
 8                THE COURT:  And Agent Elliott have been sworn in.
 9                You may be excused.
10                THE WITNESS:  Thank you, Your Honor.
11             DAVID ELLIOTT, GOVERNMENT'S WITNESS, SWORN
12                       DIRECT EXAMINATION
13      BY MS. ARREOLA:
14      Q.  Please state your name for the record, sir.
15      A.  Deputy David Elliott, E-L-L-I-O-T-T.
16      Q.  Deputy Elliott, how are you employed?
17      A.  I'm employed currently with the Carroll County Sheriff's
18      Office in Georgia -- in the state of Georgia.
19      Q.  How long have you been employed with the Carroll County
20      Sheriff's Office?
21      A.  Since 2002.
22      Q.  Now, you just mentioned that Carroll County is in Georgia.
23      For those who aren't familiar with Georgia, can you give us a
24      rough description of where it is?
25      A.  It's -- Carroll County, Georgia, is just west of -- it's
```

1    actually considered metro Atlanta, and it's just west of the

2    city of Atlanta approximately 30 miles or so, give or take.

3    Q.  With the Carroll County Sheriff's Office, are you assigned

4    to any particular unit?

5    A.  I'm a canine handler with the interstate crime unit.

6    Q.  How long have you been a canine handler with the interstate

7    crime unit?

8    A.  Since 2002.

9    Q.  What are your duties as a deputy with that unit?

10   A.  We work exclusively on the interstates.  We work the I-20

11   corridor west of Atlanta and we work the I-85 corridor south of

12   Atlanta in Meriwether County.

13          Our duties include traffic enforcement, stopping to

14   help somebody change a tire, to criminal interdiction.

15   Q.  What is criminal interdiction?

16   A.  Atlanta –– Atlanta is a major hub for narcotics

17   trafficking, and narcotics are brought from the southwest

18   border by way of I-20 and I-85, which are two major pipelines,

19   and brought into the Atlanta area.  And then those illegal

20   narcotics are redistributed to the rest of the country because

21   of where it's centrally located, and then the proceeds are then

22   packaged back and smuggled back towards the southwest border.

23          And we attempt to target people who smuggle illegal

24   drugs, weapons, and money.

25   Q.  When you say you target those people, what do you mean by

1    that?

2    A.  We -- we just look for bad people.  We -- through my

3    training and experience, what we do is we basically sit on the

4    interstate and we face traffic.  And as traffic is going by us,

5    we're sitting like this (indicating), and we observe people's

6    behaviors, is the best way that we target people who are doing

7    something bad.

8         For instance, if I see somebody who drives past me and

9    they have their hands like this (indicating) and they're

10   looking like this (indicating), well, that's a clue that

11   perhaps there's some other criminal activity going on besides

12   maybe they were just speeding five minutes ago.

13        And it could be that.  In and of itself that means

14   nothing, but those are the indicators that we look for.

15        We look for source state, destination state, southwest

16   border tags coming out of the Atlanta area.  We look at that.

17        We look at how people react to our presence, whether

18   they're -- and we stay out in the open.  We don't hide.  You

19   could see -- you could see my patrol car from half a mile away

20   in both directions.  If you're going 70 miles an hour and I

21   have you going 70 miles an hour, and then by the time you get

22   close to me you're going 45 miles an hour, that, too, could be

23   another indicator.  As well as failing to maintain your lane,

24   following too close to other vehicles.

25        All of those in and of themselves, although they're a

Elliott – Direct by Ms. Arreola

1    traffic offense, are also an indicator that something else may

2    be going on, and that's what we target.

3    Q.  You mention I-20 and I-85.  Do you mean Interstate 20 and

4    Interstate 85?

5    A.  Yes, ma'am.

6    Q.  I'd like to show you what's been marked for identification

7    as Government's Exhibit 100.

8          MS. ARREOLA:  Your Honor, this is a demonstrative

9    exhibit we're not asking to admit into evidence.

10   BY MS. ARREOLA:

11   Q.  Could you take a look at Exhibit 100 on your screen, sir?

12   Can you tell me if you recognize it?

13   A.  I do.  It's a map of metro Atlanta.

14         MS. ARREOLA:  Your Honor, the Government asks that the

15   jury be allowed to view this exhibit.

16         MR. VELARDE:  No objection.

17         THE COURT:  The jurors may view the exhibit.

18   BY MS. ARREOLA:

19   Q.  Can you briefly describe for the jury what we're looking

20   at, sir?

21   A.  This is –- this is a map of the metro Atlanta area.  You

22   have downtown in the center, which is downtown Atlanta, and

23   then all of the other interstates that come –- come into and

24   out of the Atlanta area.

25         Our responsibility is Interstate 85 down in here

1   (indicating) south of Atlanta, and west of Atlanta on

2   Interstate 20.

3           MS. ARREOLA:  Your Honor, may the record reflect that

4   the witness has highlighted Interstate 20 and Interstate 85 on

5   this exhibit?

6           THE COURT:  The record will so reflect.

7   BY MS. ARREOLA:

8   Q.  Deputy, I would like to direct your attention to

9   September 5th, 2007.

10  A.  Yes, ma'am.

11  Q.  Did you conduct a traffic stop on that day that led to the

12  seizure of money?

13  A.  Yes, ma'am, I did.

14  Q.  Please briefly describe for the jury what led to that

15  traffic stop.

16  A.  I was -- I was sitting stationary on I-20 observing the

17  westbound lanes of travel.  I observed a silver smaller

18  crossover SUV pass me.

19          The windows were pretty dark, and I couldn't see into

20  the back windows.  I could see -- I could see a person in the

21  front -- in the front driver's seat, and he had had hands at

22  ten and two.  And when the vehicle went by me, I noticed the

23  back windows were too dark for Georgia law, and I noticed that

24  his rear tag, one side of it was hanging down and it was

25  really, really dirty.

Elliott - Direct by Ms. Arreola

1           And at first -- it actually looks like a South

2    Carolina tag, and that's what I thought it was.

3           And I pulled -- I immediately pulled out, and I wanted

4    to get a better look at the driver and the vehicle.

5           And when I approached -- when I approached the car, I

6    always do this as common practice.  I look at the driver.  I

7    look to make sure that they're wearing a seatbelt.  If there's

8    any other passengers, especially children -- and the reason why

9    I do that is if somebody attempted to run and they had children

10   in their car I wouldn't chase them.  And I do that with

11   everybody before I initiate a traffic stop.

12          And I then initiated the traffic stop.

13   Q.  What was the basis for the traffic stop?

14   A.  When I -- as I was catching up to the vehicle, I noticed

15   that the vehicle started failing to maintain its lane.  And it

16   would -- it would cross the center line.

17          And on the interstate in this area it's two lanes one

18   way in both directions.  And he crossed the center line and

19   then come back over into the -- and crossed the fog line, which

20   is the solid white line on the interstate, and did that several

21   times before I initiated my traffic stop.

22   Q.  Just to be clear for the record, this was on I-20, which

23   runs east-west?

24   A.  Yes, ma'am.

25   Q.  Was the patrol car that you were in equipped with any sort

 1   of recording equipment?

 2   A.  Yes, ma'am, an in-board camera system.

 3   Q.  Can you describe that for the jury?  Where is it located?

 4   What does it do?

 5   A.  It -- it videos everything that happens.  And it's not just

 6   video, it's audio.  It's equipped with audio as well.  So it

 7   will -- it shows the entire traffic stop.  It shows everything

 8   that we do when we're working.  We video all of our traffic

 9   stops, and all of our patrol units are equipped with that type

10   of camera system.

11   Q.  Was that camera on your patrol car working that day?

12   A.  Yes, ma'am.

13   Q.  I would like you to take a look at what has already been

14   admitted into evidence as Government's Exhibit 35 in front of

15   you, sir.

16   A.  Yes, ma'am.

17   Q.  Do you recognize that CD?

18   A.  Yes, ma'am, I do.

19   Q.  What is it?

20   A.  It's a copy of the CD that -- from -- from that stop from

21   that day.  And -- and I recognize it because it's got my

22   initials on it and the date.

23   Q.  Does it contain the recording of the traffic stop?

24   A.  Yes, ma'am, it does.

25   Q.  And no additions or deletions have been made to it?

1    A.  No, ma'am.

2              MS. ARREOLA:  Your Honor, the Government requests

3    permission to play a portion of the tape.

4              THE COURT:  You may.

5              MS. ARREOLA:  For the record, I'm going to play the

6    first minute and 10 seconds.

7              (Video played.)

8    BY MS. ARREOLA:

9    Q.  Officer –– Deputy, in the video that we just saw, who is

10   the uniformed individual who approached the vehicle?

11   A.  That's me.

12   Q.  When you approached the vehicle, how many people were

13   inside it?

14   A.  The driver.

15   Q.  Did he identify himself?

16   A.  He did.

17   Q.  As?

18   A.  Victor Pimentel.

19             MS. ARREOLA:  Your Honor, may I continue to play?

20             THE COURT:  You may.

21             MS. ARREOLA:  For the record, I'm going to continue to

22   play until the 4-minute 10-second mark.

23             (Video played.)

24   BY MS. ARREOLA:

25   Q.  Deputy, can you describe for the jury what just happened?

Elliott - Direct by Ms. Arreola

1    As you can tell, the audio was a bit difficult to discern at

2    parts.

3    A.  Would you like me to start from the vehicle?

4    Q.  Yes -- pardon, sir?

5    A.  From when I was talking to Mr. Pimentel?

6    Q.  Yes, sir.

7    A.  Okay.  I had asked, as I do everyone, for his driver's

8    license, proof of insurance.

9          He had his driver's license in his hand, but he was

10   fumbling through paperwork.  And he started -- just out of the

11   blue started talking about his two-month-old daughter that he

12   had just had and actually opened up his cell phone and showed

13   me a picture of her.

14         That was another indicator to me.  In my training and

15   experience, when somebody tries to over-personalize and -- I

16   mean immediately, before he ever even handed me his driver's

17   license, that tells me that something else is going on.

18         And it's happened to me before.  And in all of those

19   types of cases where somebody tries to over-personalize that

20   way, I've made seizures.  And I felt like there was -- there

21   was a crime beyond the initial traffic stop that was occurring.

22         And I received the paperwork.  He had handed me his

23   driver's license.  And when he did, his hand was literally

24   shaking.

25         And as you see in the video, I talk to everybody very

1    cordial, very professional, and I try to -- I try to get people

2    to -- to be comfortable talking to me, even though they just

3    got stopped by the police, because I get nervous when I get

4    stopped by the police as well.

5              But -- and his level of nervousness just continued to

6    stay very, very high.

7    Q.  Deputy, what, if anything, did do as a result of your

8    suspicions?

9    A.  I walked back to my patrol car.  I called my partner and

10   told him what my suspicions were and asked him to meet up here.

11             And I -- I ran Mr. Pimentel through -- through a

12   database called EPIC.

13   Q.  What does EPIC stand for?

14   A.  El Paso Intelligence Center.

15   Q.  Who is your partner that you called?

16   A.  Corporal Chad Sheriff.

17   Q.  After you called for your partner what, if anything,

18   happened in the next few minutes?

19   A.  My partner showed up pretty quick and actually walked up

20   and started talking to Mr. Pimentel while I was still on the

21   phone with EPIC.

22             MS. ARREOLA:  Your Honor, there's a bit of time -- a

23   few minutes where the deputy is waiting for his partner to

24   arrive.  Would it be okay if I fast-forward through those

25   minutes.

Elliott – Direct by Ms. Arreola

```
1              THE COURT:  You may.
2              MS. ARREOLA:  For the record, I'm going to start at
3    the 6-minute 20-second mark.
4              (Video played.)
5    BY MS. ARREOLA:
6    Q.  We just played approximately 10 seconds, up until the
7    6-minute 30-second mark.
8              Deputy, who is the other uniformed gentleman who just
9    appeared in the video?
10   A.  That's my partner, Chad Sheriff.
11   Q.  After Corporal Sheriff had a conversation with the driver,
12   what, if anything, happened next?
13   A.  After -- after the conversation?
14   Q.  Yes, sir.
15   A.  As I was finishing up with EPIC, I observed Corporal
16   Sheriff wave to me like that, like in a hurry (indicating), to
17   get out of the car and come up there.
18             And he had -- he had told me that during this
19   conversation that he had --
20             MR. VELARDE:  Your Honor, I'm going to object to him
21   testifying to any hearsay.
22             THE COURT:  I'll sustain the objection.
23             MS. ARREOLA:  Your Honor, may I play a portion of the
24   video starting at the 8-minute 20-second mark?
25             THE COURT:  You may.
```

1          (Video played.)

2   BY MS. ARREOLA:

3   Q.  For the record, we just made it from the 8-minute 20-second

4   to the 8-minute 50-second mark.

5          Deputy, can you explain to the jury what happened in

6   the video we just saw?

7   A.  Corporal Sheriff motioned me out of car.  I got out of the

8   car.

9          He asked Mr. Pimentel to exit the car because he had

10  already told him that he had a million dollars in two red

11  duffel bags in the back.

12         This was the second time that he had asked for consent

13  to search the car, which was granted by Mr. Pimentel prior to

14  Corporal Sheriff opening the back of that hatchback.

15         MS. ARREOLA:  We're now going to play from the

16  8-minute 50-second mark to the 9-minute 40-second mark.

17         (Video played.)

18  BY MS. ARREOLA:

19  Q.  Deputy, can you explain to the jury what we just saw?

20  A.  We looked into the -- Corporal Sheriff looked in the red

21  duffel bags as I kept on eye on Mr. Pimentel and, indeed,

22  confirmed large quantities of U.S. currency vacuum-sealed in

23  those two duffel bags.

24         And I immediately placed handcuffs on Mr. Pimentel for

25  officer safety and for his safety and read him his *Miranda*

Elliott - Direct by Ms. Arreola

1    warnings.

2    Q.  We're going to continue to play up until the 10-minute

3    10-second mark.

4              (Video played.)

5    BY MS. ARREOLA:

6    Q.  Deputy, can you explain to the jury what we just saw?

7    A.  Mr. Pimentel kept offering some settlement paperwork as

8    justification for -- for the large amount of U.S. currency he

9    had in his vehicle.

10             And Corporal Sheriff went up to the passenger side and

11   retrieved that paperwork so we could have a better look at it.

12             MS. ARREOLA:  We are now going to continue to play up

13   until the 12-minute mark.

14             (Video played.)

15   BY MS. ARREOLA:

16   Q.  Deputy, can you explain to the jury what we just saw?

17   A.  That's one of the duffel bags that I retrieved from the

18   back of his vehicle, placed it on the hood of my patrol car,

19   and then pulled all the bundles out and showed them to the

20   camera and stacked them up on the top of my patrol car.

21             And there was a -- there was another duffel bag, red

22   in color, with his -- was also full the same way, packaged the

23   same, with bundles of U.S. currency.

24   Q.  Deputy, how was that U.S. currency packaged?

25   A.  It was heat-sealed in FoodSaver bags.  And in between the

Elliott - Direct by Ms. Arreola

1    bundles were fabric softener sheets, dryer sheets.

2    Q.  Deputy, you testified earlier that you've been a deputy

3    since 2002.

4            In your experience, have you previously been involved

5    in seizures of drug money?

6    A.  Yes.

7    Q.  Approximately how many?

8    A.  100, at least.

9    Q.  And have you received training on how drug money is

10   packaged?

11   A.  Yes.

12   Q.  Was the money that you seized on September 5th, that we

13   just saw in this video, packaged in a manner that's consistent

14   with the way in which you've seen other drug money packaged?

15   A.  Yes, ma'am.

16   Q.  Can you explain that?

17   A.  Drug money is usually packaged in -- in FoodSaver bags.

18   They'll suck out the air in the FoodSaver bags and package them

19   that way and put dryer sheets in between them.

20           And I've seen them also wrapped in black or gray duct

21   tape with -- with masking agents such as dryer sheets, axle

22   grease, mustard.

23           And usually, if they're in -- most of the time with

24   money, there -- there's markings on them.  And you may have saw

25   that on the video.

Elliott - Direct by Ms. Arreola

1          The way I've seen it, my experience is they're in

2   sequential order like one, two, three, four, five, six, to

3   depict how many bundles.

4          Or I've seen them where it has the denomination on it,

5   and that's the way it is in this case, where some of them had

6   100 on it or 50 on it.  And what that depicts is 100- or

7   50,000.  And they're usually pretty accurate.

8   Q.  What is the reason for putting U.S. currency in heat-sealer

9   bags?

10  A.  They -- they want the currency, one, to stay whole.  The

11  masking agents that they use, they think it masks the odor of

12  narcotic odor, whether it's on money or narcotics, from trained

13  canines.

14         And when they do heat-sealed bags, they do it so they

15  come back the same way that they left, meaning they don't get

16  ripped off.  Somebody doesn't cut the bag -- cut into the bag

17  and take the money out, whether it's -- whether it's somebody

18  transporting that or somebody who happens on that money.  That

19  money stays whole, and they know that it's been heat-sealed,

20  and if it's tampered with they know that as well.

21  Q.  After you seized the -- or pulled the currency out of the

22  vehicle, what did you do next, if anything?

23  A.  I placed the currency back in the duffel bag that I got it

24  from and laid it on the ground in front of my patrol car.

25              MS. ARREOLA:  Your Honor, the Government requests

1    permission to fast-forward the video.

2              THE COURT:  You may.

3              MS. ARREOLA:  I'm going to start, for the record, at

4    the 14-minute 5-second mark and continue up until the 16-minute

5    mark.

6              (Video played.)

7    BY MS. ARREOLA:

8    Q.  For the record, we just played from the 14-minute 5-second

9    to the 16-minute mark.

10             Deputy, please briefly described for the jury what

11   happened in the video we just saw.

12   A.  We make it common practice, whenever we -- we seize a load

13   of money or drugs, is we try to get those people to cooperate

14   with us.  And the reason we do that is to further our

15   investigation, as a good law enforcement officer would.

16             We had asked him to -- if he would cooperate.

17             And he started telling us his story about he was told

18   to come up to Atlanta and meet a gentleman in a motel and take

19   possession of the money.  And if he was stopped on the way

20   back, to show them that settlement agreement.

21             And he had told me and my partner that Marco Delgado

22   told him if he's stopped by police to show them that paperwork

23   as a justification for that money.

24   Q.  Deputy, I'm going to show you what has already been

25   admitted into evidence as Government's Exhibit 33.

Elliott – Direct by Ms. Arreola

1          Deputy, do you recognize that document?

2     A.  Yes, ma'am.

3     Q.  What is it?

4     A.  That's the front page of that settlement agreement.

5          MS. ARREOLA:  Your Honor, the Government requests

6     permission for this exhibit to be published to the jury.

7          THE COURT:  It's been admitted.

8          MS. ARREOLA:  Oh, yes, sir.

9          Are they looking at it right now?  Oh.  Sorry,

10    Your Honor.

11    BY MS. ARREOLA:

12    Q.  Deputy, can you tell from the caption what this settlement

13    agreement relates to?

14    A.  It relates to a settlement by a Texas oil company to a Juan

15    Hernandez for $1 million.

16    Q.  And if you look at the top of Government's Exhibit 33, does

17    the court appear to be an El Paso County, Texas, court?

18    A.  Yes, ma'am.

19    Q.  And if I can direct your attention to paragraph 2 at the

20    bottom of that page.

21         In this settlement agreement is Texas Oil Corporation

22    purportedly paying an individual named Hernandez and his

23    attorney, Victor Pimentel, 1-point -- roughly $1.5 million?

24    A.  Yes, ma'am.

25    Q.  I would like to now direct your attention to the last page

1   of Government's Exhibit 33, page 8 -- or excuse me, page 7.

2           Do you see a signature line on page 7 for Victor

3   Pimentel, attorney for plaintiff?

4   A.  I do.

5   Q.  Was the copy of the settlement agreement that you saw back

6   on September 5th, was that copy signed?

7   A.  Yes, ma'am, it was.

8   Q.  Did you have any conversation with Mr. Pimentel during that

9   stop about who had signed it?

10  A.  My experience, I've seen where somebody will try to justify

11  money.  And -- and I asked him, when I saw his signature under

12  attorney, I asked him if he was an attorney.

13          And he said, No, I'm not an attorney.  That's where he

14  told me to sign the document as the attorney.

15  Q.  When you say "he," who are you referring to?

16  A.  Mr. Delgado.

17  Q.  After you spoke with Mr. Pimentel about this fake

18  settlement document, what did you do next, if anything?

19  A.  We did a -- my partner, Corporal Sheriff, did a free air

20  sniff of the outside of the vehicle utilizing his canine,

21  Rocky.

22          MS. ARREOLA:  Your Honor, may I fast-forward to that

23  portion of the video?

24          THE COURT:  You may.

25          MS. ARREOLA:  For the record, I'm going to play the

Elliott - Direct by Ms. Arreola

```
1    37-minute 50-second mark to the 38-minute 50-second mark.
2              (Video played.)
3    BY MS. ARREOLA:
4    Q.  What happened in the video we just saw, Deputy?
5    A.  Corporal Sheriff did a free air sniff of the exterior of
6    that car.  And his dog indicated positive for the presence of a
7    narcotic odor on the rear lid of that vehicle by -- by way
8    of -- by way of scratching.
9    Q.  Just to be clear for the record, were the duffel bags
10   actually inside the trunk of the car at that time?
11   A.  We had taken the duffel bags out.  And you couldn't see it,
12   it was off screen.  But he also did a free air sniff of those
13   duffel bags, where the canine, Rocky, indicated positive on
14   those as well.
15   Q.  Deputy, after the seizure, what happened to Mr. Pimentel?
16   A.  He -- we allowed him to drive the vehicle and follow us
17   down to the sheriff's office.
18              On our way down there -- and this other gentleman in
19   the picture next to -- standing next to me and Mr. Pimentel
20   is -- is my supervisor, Lieutenant Pope.
21              I contacted him, let him know what we had, that we had
22   made a money seizure, and also contacted Homeland Security,
23   ICE, who we have a very good relationship with, and took the
24   bundles of U.S. currency and the vehicle and Victor down to the
25   Carroll County Sheriff's Office.
```

Elliott - Direct by Ms. Arreola

1    Q.  Why did your agency call ICE?

2    A.  We -- we have a good relationship with ICE.  And

3    Mr. Pimentel indicated that he was willing to cooperate with us

4    and -- in an attempt to do a controlled delivery to where the

5    money was ultimately going.

6    Q.  What investigative steps, if any, did you and/or ICE and

7    your agency decide to take?

8    A.  We decided -- once we all got together at the sheriff's

9    office and we felt like Mr. Pimentel was being genuine, he was

10   being honest with us, collectively we decided that we would

11   take steps to deliver the money to its ultimate destination,

12   which was Mr. Delgado, here in El Paso, Texas.

13   Q.  What is a controlled delivery?

14   A.  You take the money or drugs and you deliver it to where

15   it's going.  And it's considered controlled because we -- we

16   have control over what happens.  We -- and the reason why we do

17   that is for all of our safety, including -- including

18   Mr. Pimentel's and Mr. Delgado's safety.

19          Everything is -- is under surveillance, everything is

20   watched, everything is recorded.  And this is -- this is the

21   way that -- that we continue up the ladder so to speak.

22   Q.  Briefly, and -- briefly, what did you do next logistically?

23   A.  We boarded a plane the next early afternoon.  Myself; my

24   partner, Corporal Sheriff; a couple of HSI agents; ICE Customs

25   agents, and we took the money.  We flew the money down to

Elliott - Direct by Ms. Arreola

1    El Paso and started to set up a controlled delivery.

2    Q.  When you took the money, did you take the exact same money

3    that we saw in the video today?

4    A.  Yes.

5    Q.  Did you, in any way, alter the packaging of the money?

6    A.  No, we didn't alter the packaging.  All we did -- it was so

7    heavy, those two duffel bags, we actually boarded a plane as a

8    carry on with all this money.

9          And the way we did it is we took -- we took the two

10   duffel bags and we -- we took the bundles out and put them into

11   four smaller duffel bags, and then took those same original two

12   red duffel bags with us and boarded the plane that way as carry

13   on.

14         Otherwise, you -- I mean you couldn't carry it any

15   other way.  It's just that heavy.

16         And once we got down here to El Paso we put it back

17   into the two red duffel bags.

18   Q.  But to be clear for the record, you didn't remove the

19   currency from the heat-sealed FoodSaver bags?

20   A.  No.

21   Q.  Deputy, you testified earlier about the role of Atlanta as

22   a hub for illegal drug trafficking.

23         Can you explain to the jury what role, if any, the

24   particular interstates you patrol, I-20 and I-85, play in drug

25   trafficking in Atlanta and in the United States?

1    A.   I-20 and I-85 are the two major pipelines, two major

2    pipeline interstates out of the southwest border that actually

3    come into the city of Atlanta.

4          And usually the way it works is large amounts of

5    narcotics, illegal narcotics and marijuana, are transported

6    into the Atlanta area and then are redistributed to the rest of

7    the country because of -- because of its location.

8          And then that money is transported back towards the --

9    to the southwest border the same way.

10   Q.   What, if anything about Atlanta, has made it become a hub

11   for this -- what you've described?

12   A.   Because of its location.  It is -- it is a good stopping

13   point logistically for the cartels.  And it is probably -- it's

14   probably become, if not the number one hub in the

15   United States, close -- close to it.

16         And it's just so centrally located for the rest of the

17   country, instead of driving or transporting all the way to the

18   border or the border transporting all the way to New York,

19   Atlanta has become the major hub.

20         And from my training and experience this really all

21   took place after the '96 Olympics.

22   Q.   Deputy, a follow-up question about the way the money was

23   packaged.

24         You mentioned earlier that it was -- that there were

25   dryer sheets inserted between the currency.  What would be the

Elliott – Direct – Cross by Mr. Velarde

1    reason for people involved in illegal drug trafficking to place

2    dryer sheets in bundles of U.S. currency?

3    A.  It's used as a masking agent to mask the odor of illegal

4    narcotics.  I don't -- it's a high percentage.  I think it's

5    88 percent.  The U.S. Secret Service says that 88 percent of

6    all U.S. currency is laced with narcotic odor, so they'll use

7    masking agents to mask that odor.  They think it masks the odor

8    from the ca- -- from a trained canine, but it really doesn't.

9         MS. ARREOLA:  No further questions for this witness,

10   Your Honor.

11                       CROSS-EXAMINATION

12   BY MR. VELARDE:

13   Q.  Deputy Elliott, good afternoon.

14   A.  Good afternoon, sir.

15   Q.  This tape of the traffic stop, how long does it run?

16   A.  The whole tape?

17   Q.  Yes, sir.

18   A.  I'm not sure if -- 40-something minutes, maybe.

19   Q.  40 minutes?

20         So this jury has only seen but a fraction of those 40

21   minutes; is that correct?

22   A.  Yes, sir.

23   Q.  And what they've seen, you will agree with me, represents

24   what you perceive to be the highlights of this traffic stop?

25   A.  I think the whole traffic stop is a highlight to me.

Elliott - Cross by Mr. Velarde

```
1    Q.  Very well.
2            Now, you testified at length repeatedly that this was
3    a traffic stop?
4    A.  Yes, sir.
5    Q.  Okay.  Now let me ask you, just out of an abundance of
6    caution, were you directed by anybody else to conduct this
7    traffic stop?
8    A.  No, sir.
9    Q.  Were you directed by somebody else to pursue this vehicle
10   for any reason?
11   A.  No, sir.
12   Q.  So when you stopped the vehicle you had no earthly idea of
13   what, if anything, was contained inside?
14   A.  No, sir.
15   Q.  You didn't have any idea?
16   A.  No idea.
17   Q.  Okay.  Now, I saw that you first made contact with Victor
18   Pimentel.
19   A.  Yes, sir.
20   Q.  And that contact maybe lasted how long -- how many minutes?
21   A.  A few.
22   Q.  Okay.
23   A.  A couple.
24   Q.  He -- he started to tell you where he was going; is that
25   correct?  Did he tell you where he was going?
```

```
1    A.  Initially?

2    Q.  There in that video.

3    A.  In the video, yes.

4    Q.  Yes.  Where was he going?

5    A.  To El Paso, Texas.

6    Q.  Is that in the video?  Because I couldn't pick it up.  I

7    picked up Dallas, but --

8         MS. KANOF:  Objection, Your Honor.  He -- he's

9    testifying that he didn't pick it up.  It's not relevant and

10   it's improper.  It's not cross-examination.

11   BY MR. VELARDE:

12   Q.  Let me ask you this.

13        Is it your testimony that in that video Victor

14   Pimentel said he was headed back to El Paso?

15   A.  Yes, sir.

16   Q.  Okay.  Now initially, you said he showed you pictures of a

17   child?

18   A.  A picture of his two-month-old daughter --

19   Q.  Yes, sir.

20   A.  -- on his cell phone.

21   Q.  And then papers.  Papers?  He showed you papers initially?

22   A.  He -- he showed me -- prior to him handing me his driver's

23   license he showed me -- he told me about his two-month-old

24   daughter and showed me a picture of her on his cell phone.

25   Q.  Okay.  Let me get to the settlement document that he
```

Elliott - Cross by Mr. Velarde

1   eventually showed you.

2   A.  Yes, sir.

3   Q.  You testified that the document that you saw was, in fact,

4   signed.

5   A.  Yes.

6   Q.  Okay.  Now, they showed you Exhibit Number 33.

7   A.  Yes, sir.

8   Q.  Correct?

9   A.  Yes, sir.

10  Q.  They even showed you the last signature page.

11  A.  Yes, sir.

12  Q.  That exhibit does not bear a signature.

13  A.  No, sir, it does not.

14  Q.  What happened to that document that you allegedly saw with

15  a signature on it?

16  A.  I -- I don't know.

17  Q.  When was the last time you saw a document that was signed?

18  A.  That day.

19  Q.  Were you the only one that handled that document?

20  A.  No, sir.

21  Q.  If you recall, who did you turn that document over to?

22  A.  Well, my partner handled it, as you saw in the video.  And

23  the document was turned over to the ICE investigator.

24  Q.  So the exhibit that's in evidence today is not the same

25  exhibit that you had --

1    A.  No, sir.

2    Q.  -- obviously.

3        It's your testimony, though, that Victor Pimentel said

4    that Marco Delgado made him sign it?

5    A.  No, that wasn't my testimony.

6    Q.  Okay.  Let's go back to the actual question and answer --

7    A.  Okay.

8    Q.  -- episode regarding this document.

9        Did you ask Victor Pimentel, Whose signature is that?

10   A.  Yes.

11   Q.  Okay.  Did he respond to that question?

12   A.  Yes.

13   Q.  And what -- that response was?

14   A.  His signature.

15   Q.  His signature?

16   A.  Yes.

17   Q.  Did he say anything else besides that?

18   A.  He had said that he was told -- Marco had told him to sign

19   the document and then to present it, if he -- if he was stopped

20   by police, by law enforcement.

21   Q.  That -- those questions and those answers, would those be

22   borne out by this audio/video that you have been testifying to?

23   A.  Yes.  I would say -- I would say so, yes.

24   Q.  Okay.  Can you please find for me in this exhibit,

25   Exhibit 100, where in that exhibit he says --

Elliott – Cross by Mr. Velarde

```
1              THE COURT:  Exhibit 33.

2              MR. VELARDE:  Pardon me?

3              THE COURT:  Isn't it 33?

4              MR. VELARDE:  Is it 33?  No, 100 was the map.  I

5    apologize.

6              No, and it wouldn't be 33.  That's the document.

7    BY MR. VELARDE:

8    Q.  I'm talking about the video.  I did not hear -- please

9    forgive me -- is there any language in there, a portion where

10   Victor Pimentel says, Marco Delgado made me sign it?

11   A.  That wasn't my testimony.

12   Q.  Okay.  What is your testimony, then, about what he told you

13   regarding --

14   A.  I tes- -- I testified that -- that he -- he told him to

15   sign it.  But he -- he didn't make him sign it.  That wasn't my

16   testimony.

17   Q.  Okay.  Fine.

18   A.  He said, Make -- make sure that you sign it where -- where

19   your name is as the attorney, and to present that paperwork if

20   you're stopped by law enforcement.  He said police.

21   Q.  Okay.  Now, my question goes to this.

22             Is that discussion on this video?  Have you seen that

23   discussion on this video?

24   A.  You probably can't hear it very well.  There's certain --

25   there are certain parts of the video that -- that I can't -- I
```

Elliott - Cross by Mr. Velarde

```
1    can't make out.  But that's -- that's how I remember the

2    conversation going.

3    Q.  But you don't -- you can't hear it on the video?

4    A.  You may be able to.  If you can enhance it, you may be able

5    to hear it on there.  If it can be enhanced or louder, but

6    it -- it's -- it's been record- -- it's recorded.

7         He says it on the side of the road.  And as you see,

8    the whole thing is recorded.

9    Q.  But nevertheless, your testimony -- your testimony is you

10   cannot hear it on the video?

11   A.  I cannot hear it.

12   Q.  Okay.  You cannot hear it.

13         Now, did you probe as to the origin, the whereabouts

14   of this document?  If it's no longer signed did you bother to

15   look into where it was?

16   A.  No.

17   Q.  Did you inform ICE of the fact that the document you saw

18   was signed and that now it's not?

19   A.  Yes.  They -- I turned it over to ICE.

20   Q.  You turned it over?

21   A.  Yes.

22   Q.  Okay.  Do you know, was that Agent Justice?

23   A.  Yes.  That night.

24   Q.  Special Agent Justice.  You turned over that document, the

25   signed document?
```

Elliott - Cross by Mr. Velarde

1   A.  Yes.

2   Q.  Okay.  Thank you.

3        Now, on this -- on this recording that you finished

4   testifying to, you can hear Victor Pimentel saying, I did not

5   do anything wrong.

6        Would you agree with me?

7   A.  I don't -- I don't remember hearing it.  If you say so, I

8   would say yes.

9   Q.  Victor did not tell you that the money that was contained

10  in the duffel bags that he was carrying were drug proceeds?

11  A.  No, he didn't tell me that.

12  Q.  For that matter, he didn't tell you that the money belonged

13  to a cartel?

14  A.  He did not tell me that.

15  Q.  He told you that he had picked up the money at a hotel?

16  A.  A motel.

17  Q.  At a motel?

18  A.  Yes, sir.

19  Q.  Did he tell you that he had received a phone call or

20  anything?

21  A.  I don't remember.

22  Q.  You don't remember that?

23  A.  No, sir.

24  Q.  Did you take custody of his cell phone?

25  A.  I believe so.

Elliott - Cross by Mr. Velarde

1    Q.  I don't want you to guess.

2    A.  I -- I don't remember.

3    Q.  Okay.  And so did Victor continue to debrief or be

4    interviewed after he went to the station?

5    A.  Yes, sir.

6    Q.  Were you present during those interviews?

7    A.  Bits and pieces.  But as a whole, no, sir.

8    Q.  Okay.  Thank you.

9         Did you prepare a report regarding the events that you

10   just finished testifying to today?

11   A.  Yes, sir.

12   Q.  Have you had a chance to look at that report?

13   A.  I have.

14   Q.  Are there any corrections you want to make to that report

15   now?

16   A.  No, sir.

17   Q.  Okay.

18        MR. VELARDE:  May I have a minute, Your Honor?

19        THE COURT:  You may.

20   BY MR. VELARDE:

21   Q.  Were you present when Mr. Pimentel was interviewed by

22   Special Agents Justice and Blackman?

23   A.  No, sir.

24   Q.  Okay.

25        MR. VELARDE:  I have no further questions, Your Honor.

```
 1                THE COURT:  Any redirect, Counsel?

 2                MS. ARREOLA:  Yes, Your Honor.

 3                May I have one moment, Your Honor?

 4                THE COURT:  You may.

 5                MR. ESPER:  Your Honor, may we approach?

 6                Before we commence the redirect, may we approach

 7      sidebar for just one minute?

 8                THE COURT:  You may approach.

 9                (Bench discussion outside the hearing of the jury.)

10                MR. ESPER:  Your Honor, it's always been my

11      understanding that whatever attorney examines the witness, that

12      attorney is responsible for lodging an objection.

13                THE COURT:  Correct.

14                MR. ESPER:  Ms. Kanof lodged some objections.  We

15      didn't call it to the Court's attention, but I think it's only

16      proper.  I know I wanted to object, but I'm not taking this

17      witness.

18                THE COURT:  You're correct.  You're correct.  The

19      attorney that's in charge of the witness is the one that does

20      the objections.

21                MS. KANOF:  Okay.

22                THE COURT:  Wait a minute.

23                While you're here, I'm returning -- let the record

24      reflect that I'm returning the passport.  I don't think it's of

25      any value to anybody, quite frankly.
```

Elliott - Cross by Mr. Velarde

```
 1              MR. VELARDE:  Thank you.
 2              MS. KANOF:  Oh, Your Honor, can I bring up a point?
 3         We've had some difficulty in talking to Defense
 4    Counsel about -- like he asked, Did you make a report, and then
 5    he walked up to us and said, You never gave it to us.
 6              And that's happened a couple of times during the
 7    preparation for trial.
 8              Ms. Arreola showed him his receipt where we did give
 9    it to him.  And I'm going to ask before he makes -- and he was
10    very kind.  He was very -- I appreciate Mr. Velarde not saying,
11    You didn't give it to us in front of -- because it turns out we
12    did.
13              But since there seems to be some confusion, and maybe
14    it's just a matter of how it was filed in the Defense about
15    what we gave and what we didn't give.  Because every time he
16    said we didn't give it to them, we've been able to prove that
17    we did.
18              But I would ask that he not do it vocally, and we'll
19    point it out, because I think that would be unfair.
20              THE COURT:  All I can tell you is you'd better make
21    sure damn sure you didn't get it.
22              MS. KANOF:  I'm sorry, Your Honor?
23              THE COURT:  You'd better be damn sure you didn't get
24    it.
25              MR. VELARDE:  I am sure, Your Honor.
```

Elliott — Cross by Mr. Velarde

1           THE COURT:  Wait a minute.

2           How many questions do you have for this witness?  How

3  long do you anticipate?

4           MS. ARREOLA:  About five questions, Your Honor.

5           MS. KANOF:  It will be very quickly -- it will be very

6  quick.

7           THE COURT:  We should be talking a break right about

8  now, but I wanted to get through with this witness.  I want to

9  excuse him.

10          MR. ESPER:  The other issue I had, Your Honor, even

11 though it's been admitted, all we've ever seen is an unsigned

12 copy of this fraudulent agreement.  This witness says he saw a

13 signed --

14          THE COURT:  Well, you made that plain.

15          MR. ESPER:  I know.  But --

16          MS. KANOF:  Really?  You want us to say we got the

17 unsigned copy from the e-mail that Marco Delgado sent --

18          MR. ESPER:  Well, I know that's coming in anyway.  I'm

19 just curious about where this signed one is.

20          MS. KANOF:  Atlanta did not send it to El Paso.  When

21 we got the file it was not in the file.

22          THE COURT:  You can use it for whatever you want to.

23          MR. ESPER:  Okay.  All right.

24          (End of bench discussion; open court.)

25          THE COURT:  You may proceed, Ms. Arreola.

1          MS. ARREOLA:  Thank you, Judge.

2                    REDIRECT EXAMINATION

3    BY MS. ARREOLA:

4    Q.  Deputy, you were asked by Mr. Velarde whether or not a

5    conversation you recalled was audible on this video.

6          Now, this video was taken on I-20.  Is that a busy

7    interstate?

8    A.  Yes, ma'am.

9    Q.  And was every word that was exchanged during your

10   conversation with Mr. Pimentel and the other deputies who were

11   present, were all of those conversations clearly audible on

12   this video?

13   A.  No, ma'am.

14   Q.  In your experience is that unusual, that the camera

15   equipment won't pick up every single word that is said in front

16   of the camera on a busy interstate?

17   A.  It's common.  It's not unusual.

18   Q.  Deputy, you also mentioned that you had gone to El Paso as

19   part of this effort to do a controlled delivery.

20          When you were in El Paso, did you see Mr. Delgado in

21   person?

22   A.  Yes, ma'am.

23   Q.  Do you see Mr. Delgado in the courtroom today?

24   A.  Yes, ma'am.

25   Q.  Can you describe where he is seated and identify an article

Elliott – Redirect by Ms. Arreola

1    of clothing that he is wearing?

2    A.  He's seated between Defense Counsel and has on a --

3          THE COURT:  You've got to get closer to the

4    microphone.  Get closer to the microphone.

5          THE WITNESS:  I'm sorry.

6    A.  He's seated between Defense Counsel and has a stripped blue

7    and gray tie on.

8          MS. ARREOLA:  Your Honor, may the record reflect that

9    the witness has identified the Defendant?

10         THE COURT:  The record will so reflect.

11   BY MS. ARREOLA:

12   Q.  Deputy, you also testified that you've been involved in at

13   least 100 seizures of drug money during your time as a deputy

14   with Carroll County Sheriff's Office.

15         Have you ever been involved in a seizure of a large

16   amount of currency which you later found out was not drug

17   money?

18   A.  No.  Never.

19         MS. ARREOLA:  No further questions, Your Honor.

20         THE COURT:  Mr. Velarde?

21         MR. VELARDE:  Nothing further.

22         THE COURT:  Very well.  I'm going to excuse the

23   officer, so you'd better ask whatever questions you have.

24   Unless the Government wants to keep him any longer, I'm going

25   to excuse him.

```
1              MS. KANOF:  No, Your Honor.  We don't want to
2    sequester him again.
3              THE COURT:  Okay.  You're free to leave.
4              THE WITNESS:  Thank you, Your Honor.
5              THE COURT:  Counsel, it's -- we need to take our
6    afternoon break at this time.
7              We'll be in recess for the next 15 minutes.
8              (Recess taken; open court.)
9              THE COURT:  The Government will call its next witness.
10             MS. KANOF:  The Government calls Victor
11   Pimentel-Rojas.
12             THE COURT:  He has not been sworn, has he?
13             MS. KANOF:  He has not been sworn, Your Honor.
14             (Witness duly sworn.)
15             THE WITNESS:  I do.
16             THE COURT:  The record will reflect the witness has
17   been sworn in.
18             You may proceed.
19             MS. KANOF:  Thank you, Your Honor.
20             Mr. Pimentel, you might want to -- the exhibit
21   notebook is in front of you, and we're going to start back in
22   the beginning, so -- no, no.  Just put that aside.
23             You might -- the notebook right there, put it back to
24   Number 1, because that's where we're going to start.
25             Are you, ready?
```

 1            VICTOR PIMENTEL ROJAS, GOVERNMENT'S WITNESS, SWORN

 2                          DIRECT EXAMINATION

 3    BY MS. KANOF:

 4    Q.  State your name for the jury, please.

 5    A.  My name?

 6    Q.  Yes.

 7    A.  Victor Ignacio Pimentel-Rojas.

 8    Q.  And, Mr. Rojas, where do you live -- I mean, Mr. Pimentel,

 9    where do you live?

10    A.  Tacoma, Washington.

11    Q.  And what are you doing in the state of Washington?

12    A.  I'm a Ph.D. student at Washington State University.

13    Q.  Do you also work for a living?

14    A.  Yes.  I teach.

15    Q.  Where do you teach?

16    A.  I teach at the Washington State University.

17    Q.  And what area are you getting your Ph.D. in?

18    A.  Business operation management.

19    Q.  I'm sorry?

20    A.  Business operation management.

21    Q.  Okay.  Just make sure you speak into the microphone so

22    everybody can hear you well.

23    A.  Business operation management.

24    Q.  Okay.  What other education do you have?

25    A.  I have a bachelor's degree from the University of Texas at

1    El Paso in supply chain -- management, and I'm also getting a

2    doctoral minor degree in psychology and a doctoral minor degree

3    in statistics.

4    Q.  And before that -- you come from Mexico City, correct?

5    A.  Mexico City, yes.

6    Q.  Did you have any formal education in Mexico?

7    A.  Yes.  I went to high school in Mexico, middle school and

8    elementary school.

9    Q.  I'm sorry.  What was the last one?

10   A.  Elementary school.

11   Q.  But did you have any post-high school education?

12   A.  I went to the engineering school in Mexico in -- the

13   national university in Mexico City.

14   Q.  And you got a culinary degree; is that correct?

15   A.  Yes.  I also have a culinary degree from the *Universidad de*

16   *Anahuac del Sur* in Mexico City.

17   Q.  Okay.  When you came to the United -- did you -- have you

18   ever lived in the United States?

19   A.  Yes.

20   Q.  Okay.  When was that?

21   A.  When I started attending UTEP in 2004.

22   Q.  And did you come here on a student visa?

23   A.  Yes.

24   Q.  Are you currently on a student visa?

25   A.  Yes.

Pimentel - Direct by Ms. Kanof

```
 1   Q.  And have you always been in the United States legally?

 2   A.  Yes.

 3   Q.  When you came to the United States to go to UTEP, do you

 4   remember approximately what year it was?

 5   A.  2004.

 6   Q.  And prior to that, had you met an individual by the name of

 7   Marco Delgado?

 8   A.  Yes.

 9   Q.  Is he here in the courtroom?

10   A.  Yes.

11   Q.  Would you identify him, please, by indicating where he is

12   sitting?

13   A.  He's right there (indicating).

14   Q.  And what does -- what has he got on?

15   A.  A suit, a tie, a white shirt.

16   Q.  Where is his hand?

17   A.  Her [sic] mouth and his eye.

18        MS. KANOF:  Okay.  Let the record reflect that the

19   witness has identified the Defendant.

20        THE COURT:  The record will so reflect.

21   BY MS. KANOF:

22   Q.  How did you meet him?

23   A.  He was introduced to me by a mutual friend.

24   Q.  What was the purpose of introduction?

25   A.  At the time we were trying to purchase the rights of Double
```

Pimentel – Direct by Ms. Kanof

1    Dave's Pizzaworks for Mexico.

2    Q.  At the time, were you working in your field of food

3    preparation?

4    A.  Yes.

5    Q.  What were you doing at the time in the field of food

6    preparation?

7    A.  In Mexico the CFE utility company builds power plants all

8    around the country.

9    Q.  Okay.  Just slow down just a little bit.  And I apologize.

10   Your accent is -- sometimes is getting distorted.

11   A.  It's also a problem when I teach.  Sorry about that.

12   Q.  CFE is what you said, correct?

13   A.  Yes.

14   Q.  And is CFE basically the electric company of the Republic

15   of Mexico?

16   A.  Yes.

17   Q.  And did you have a contract with them?

18   A.  Yes.

19   Q.  For what?

20   A.  To operate the restaurants or canteens in the

21   construction -- while they construct the power plants.  Usually

22   they have between a thousand to five thousand employees 24

23   hours a day.  So it is used to provide the service to them for

24   food.

25   Q.  Okay.  The employees in the electrical power plants, were

Pimentel – Direct by Ms. Kanof

1   they unionized?

2   A.  Yes.

3   Q.  Okay.  And did you come to the El Paso area, but

4   specifically to Juárez, to set up one of those cantinas in a

5   power plant?

6   A.  Yes.  Samalayuca.

7   Q.  The Samalayuca Power Plant is outside of Juarez; is that

8   correct?

9   A.  Correct.

10  Q.  And it -- was it during that time that you met Mr. Delgado?

11  A.  Yes.

12  Q.  Was he an attorney at that time?

13  A.  Yes.

14  Q.  And was he introduced to you as such?

15  A.  Yes.

16  Q.  And was it just a casual meeting because you had a common

17  friend?

18  A.  It was supposed to be a business meeting.  It was supposed

19  to be, again, to buy the franchise rights for Mexico for Double

20  Dave's Pizzaworks.

21  Q.  Okay.  So did your friend know Mr. Delgado?

22  A.  Yes.

23  Q.  And the two of them wanted to -- what pizza kind of place?

24  A.  Double Dave's.  I think that's the name.

25  Q.  And because you were in the food business, did your friend

Pimentel – Direct by Ms. Kanof

1    ask you to come to a meeting?

2    A.   Yes.

3    Q.   Where was the meeting?

4    A.   It was here in a hotel downtown.  I think it was the Camino

5    Real.

6    Q.   And do you remember approximately when that occurred?

7    A.   It was November 2002, I think.

8    Q.   Okay.  And you had basically not been out of culinary

9    school very long, correct?

10   A.   No.

11   Q.   It was before you decided to go to UTEP?

12   A.   Yes.

13   Q.   And at this meeting at the Camino Real, you discussed

14   franchise -- getting a franchise of Double Dave's Pizza in

15   El Paso?

16   A.   No, for Mexico.

17   Q.   Oh, it was for Mexico?

18   A.   Yeah.  Buying what is the master franchise rights to invest

19   in Mexico.

20   Q.   Okay.  And after you met Mr. Delgado at this meeting, when

21   did you see him next?

22   A.   He invited me to ski at his house at that time, in Ruidoso,

23   New Mexico.

24   Q.   He asked you to ski at his house in Ruidoso.

25            So what time of the year was it that you --

Pimentel - Direct by Ms. Kanof

1    A.  It was Thanksgiving.  We went there for Thanksgiving.

2    Q.  Okay.  You had just met him and he invited you to his home

3    in Ruidoso for Thanksgiving?

4    A.  Yes.

5    Q.  Would you -- I guess you guys hit it off?

6    A.  We became friends pretty fast.  True.

7    Q.  Is he quite a bit older than you are?

8    A.  Yes.

9    Q.  And at the time -- or about how much older is he than you?

10   A.  Probably 15, 17.  I don't know exactly how old is he.  But

11   yeah, there's at least two digits number between his age and my

12   age.

13   Q.  And did you continue that friendship from the year 2002 --

14   by the way, did you ever get the Double Dave's franchise in

15   Mexico?

16   A.  No.  Never.

17   Q.  Did you continue that friendship with Mr. Delgado all the

18   way through to 2006?

19   A.  Yes.

20   Q.  And could you please describe to the jury basically what

21   you did as friends?

22   A.  Well, we -- basically, we had a lot of fun.  We traveled.

23   We go to Mexico.  We went to a couple of trips in Cuba.

24        We went to New Mexico to ski on several occasions.

25   And at some point I even moved into his house and I start

Pimentel - Direct by Ms. Kanof

1    attending UTEP.

2            We became such close friends that, actually, I got the

3    key to the cabin in Ruidoso so I could use it any time I

4    wanted.

5            We used each other's cars.  We met each other's

6    girlfriends.  We had dinner with our families.

7    Q.  When you first met with Mr. Delgado, he was married,

8    correct?

9    A.  Yes.

10   Q.  Okay.  And at some time he got a divorce?

11   A.  Yes.

12   Q.  Was it after the divorce that you moved in with him?

13   A.  Yes.

14   Q.  Okay.  And did you pay rent?

15   A.  No.

16   Q.  How did it come about that you moved in with him?

17   A.  I started attending UTEP and Marco offered me his house to

18   stay there while I was going to school.

19   Q.  Okay.  That was of financial assistance to you?

20   A.  Well, I didn't need the financial assistance at that time.

21   I was doing good money with the canteens in Mexico.

22           But it was very nice because it was a nice house.  And

23   again, we were very good friends and we had dinner several days

24   a week.  We traveled.  We had a lot of fun, and it was --

25   Q.  You met his family?

Pimentel – Direct by Ms. Kanof

1   A.  Yeah.

2   Q.  You knew them very well?

3   A.  Very, very well.

4   Q.  Between 2002 and, let's say June of 2006, did you get

5   involved in any business dealings with Mr. Delgado?

6   A.  No.

7   Q.  During that time, did you ever visit his law office?

8   A.  Yes.

9   Q.  And by the time -- and when you first met him, when you

10  visited his law office, was he with other lawyers or was he by

11  himself?

12  A.  At his office?

13  Q.  Yes.

14  A.  We were always the two of us at his office.  He just had

15  the corner office in the Delgado Acosta offices.

16  Q.  And at some time did he leave Delgado Acosta and start

17  Delgado & Associates?

18  A.  Yes.

19  Q.  Who were the associates?

20  A.  There was no associates.

21  Q.  He was the only lawyer, then?

22  A.  Yes.

23  Q.  And was the location of his office on Remcon here in

24  El Paso?

25  A.  Remcon Circle, yes.

Pimentel - Direct by Ms. Kanof

1   Q.  And so you visited him at his law office sometimes?

2   A.  Yes.

3   Q.  Okay.  Did there come a time -- and you said you traveled

4   sometimes to Mexico, correct?

5   A.  Yes.

6   Q.  Did there come a time when you traveled to Mexico for

7   business instead of for pleasure?

8   A.  Yes.

9   Q.  When did that occur?

10  A.  Through our friendship -- again, we have this friend in

11  common.  He works part of the union in CFE.

12          And Marco used to represent El Paso Electric, so they

13  have a common interest to make business with electricity and

14  the exchange of energy between El Paso and Ciudad Juárez.

15  Q.  When Mr. Delgado was at Delgado Acosta, he was the attorney

16  assigned to do legal work for El Paso Electric, correct?

17  A.  Yes.

18  Q.  And so he met the people at CFE, the electric company in

19  Mexico?

20  A.  Yes.

21  Q.  Is it -- when you met Mr. Delgado for the first time, the

22  individual that you both knew was Mr. Vargas, correct?

23  A.  Yes.

24  Q.  Okay.  And he was part of a labor -- the labor union for

25  the electric company?

1   A.  Yes.

2   Q.  When you were traveling on business, did you have business

3   with the electric company when you would travel with

4   Mr. Delgado?

5   A.  Just the canteens.

6   Q.  Just the cantinas?

7   A.  Yes.

8   Q.  Okay.  And did there come a time when you traveled with

9   Mr. Delgado on business other than electric company business?

10  A.  Before or after 2006?

11  Q.  Between 2002 and 2006.

12  A.  Yes.

13  Q.  When was that?

14  A.  We went to Mexico for a mediation for Angelica Fuentes, who

15  was suing the Delgado, Acosta, Braden & Jones law firm.

16        And Marco --

17  Q.  Okay.  Don't go any further.

18        But -- so there was one business-related time that you

19  went with him?

20  A.  Yes.

21  Q.  Other than for the electric company until 2006?

22  A.  Yes.

23  Q.  And did you and Mr. Delgado communicate with each other

24  through e-mail?

25  A.  Yeah.

1    Q.  How many e-mail addresses did he have?

2    A.  Two.

3    Q.  And was one of those --

4    A.  Well, three actually.  He has -- the Delgado, Acosta,

5    Braden & Jones, which disappeared when the law firm

6    disappeared; the AOL account; and the Delgado & Associates

7    e-mail account.

8    Q.  Okay.  So now do you remember about what year he created

9    Delgado & Associates?

10   A.  From 2004 or -5, around there.

11   Q.  Okay.  And so once 2004 or -5 came, he just had two e-mail

12   addresses, correct?

13   A.  Yes.

14   Q.  One was AOL and --

15         MR. ESPER:  Excuse me, Your Honor.  I'm going to

16   object to counsel testifying.  She should ask the question.

17         THE COURT:  I'll sustain the objection.

18   BY MS. KANOF:

19   Q.  What were those two accounts?

20   A.  AOL and Delgado & Associates.

21   Q.  And what did he use the AOL account for, if you know?

22   A.  Personal e-mail, jokes, probably sending some -- I don't

23   know, meetings, where we were going to have dinner, things like

24   that.

25   Q.  Okay.  And what did he use the Delgado & Associates account

Pimentel – Direct by Ms. Kanof

1   for?

2   A.  Business-related e-mails.

3   Q.  And did he e-mail you on both of those accounts?

4   A.  Yes.

5   Q.  Did there come a time around 2000- –– around the middle of

6   2006 that you accompanied Mr. Delgado to Mexico to meet with a

7   woman by the name of Lilian de la Concha?

8   A.  Yes.

9   Q.  Had you met her before?

10  A.  No.

11  Q.  When was the first time you met her?

12  A.  I think we had coffee at a coffeehouse in Polanco, Mexico.

13  And then we ––

14  Q.  Polanco is a neighborhood?

15  A.  Polanco is a neighborhood, yeah.

16         And then we –– we went to –– there's a hotel in

17  Polanco that has a terrace on the top floor, and we have

18  something else there.  I don't remember what we had, but we

19  spent, there, a couple of hours with her.

20  Q.  Okay.  And was it just the three of you?

21  A.  Yes.

22  Q.  What was the purpose of that meeting?

23  A.  At that time Lilian was a very well-known female in Mexico.

24  Q.  Who was she?

25  A.  She is the former wife of Vicente Fox, which is the

Pimentel - Direct by Ms. Kanof

1   ex-president of Mexico.

2   Q.  And when you met her, was she already divorced from Vicente

3   Fox?

4   A.  Yes.

5   Q.  And what did you understand her and Mr. Delgado's

6   relationship to be when you first met her?

7   A.  They were business associates and they were very good

8   friends.  And they seemed to start -- just starting a

9   relationship, a personal relationship.

10  Q.  And again, the purpose of that meeting at the terrace at

11  the hotel in Polanco was?

12  A.  Business.

13  Q.  What business?

14  A.  Marco started doing bad at his business and wanted to --

15  extra income in Mexico.

16  Q.  What do you mean he was doing bad in his business?  What

17  business was he in that he was doing bad?

18  A.  Well, after the Delgado Acosta law firm close, he start

19  struggling with money.

20          And then when he met this lady in Mexico, he just

21  tried to use her contacts in Mexico to get contracts or

22  businesses in Mexico.

23  Q.  When you met her for the first time, was that Mr. Vargas

24  there?

25  A.  No.

Pimentel – Direct by Ms. Kanof

1    Q.  And what business did you discuss on that first occasion?

2    A.  It was several business.  We discuss -- well, they discuss.

3    I didn't talk too much in that conversation.

4         Marco told me then that he -- that he could represent

5    Mexico and the -- in the consulate here in Washington, that he

6    could be the representative of Pemex, which is the oil company,

7    utility company in Mexico, here in the U.S.

8         He also offered his financial services to her to move

9    money from point A to point B.

10   Q.  What do you mean his financial services?  You knew him as

11   an attorney, correct?

12   A.  Yes.

13   Q.  Did he do financial services for people as on attorney?

14   A.  I never saw him doing that.

15   Q.  Okay.  And so what -- he said he could move money.  Is that

16   what you said?

17   A.  Yes.

18   Q.  What did you take him to mean?

19   A.  Money laundering.

20   Q.  Why did you think that?

21   A.  It was pretty clear during the conversation that that was

22   the purpose of the movement of the money.

23   Q.  And what did -- did Ms. de la Concha have clients or why

24   was he telling her this?

25   A.  Well, again, Marco and I both, we were living a pretty high

Pimentel - Direct by Ms. Kanof

1    life, which -- to travel and spend a lot of money.  And then

2    when business started going back --

3    Q.  Well, whose money were you spending?

4    A.  I was spending my own money and he was spending his own

5    money.

6    Q.  And your money was earned from cantinas?

7    A.  Yes.

8    Q.  And his money was earned how?

9    A.  It was my understanding that -- from his law practice.

10   Q.  Okay.  Go ahead.

11   A.  And then when that money stopped getting in, he tried to

12   continue to live the same life.  But obviously, there's a point

13   where there's no money left.

14          So he thought that he could offer his services to do

15   money laundering in Mexico so he could -- we could still be

16   living that lifestyle.

17   Q.  Okay.  Did he discuss that with you before you went to

18   Mexico to meet with Ms. de la Concha?

19   A.  Yes.

20   Q.  And where was that discussion?

21   A.  Well, we had several.  One that I remember, we were at his

22   house.  Again, we used to live together, so it was pretty

23   common that I was either doing homework or watching TV, and we

24   used to watch The Simpsons.  That was our thing together.  I

25   think it was every Tuesday.  And we used to talk --

Pimentel – Direct by Ms. Kanof

```
 1   Q.  About stuff?
 2   A.  -- about everything.  Yeah, everything.
 3   Q.  What were you studying at UTEP?
 4   A.  Business.
 5   Q.  And when -- when you were at his house as a student at
 6   UTEP, did he support you otherwise, or you could support
 7   yourself from the cantinas?
 8   A.  No, I could support myself.
 9   Q.  So when was it that he discussed the money laundering
10   business with you?
11   A.  Everything start with he -- when we start -- the first, I
12   guess, money laundering conversation that we had was with
13   Angelica Fuentes.
14   Q.  Okay.  And of course the Court has made a ruling we're not
15   going to talk about the Angelica Fuentes situation.
16         But then when was the next time?
17         MR. ESPER:  Your Honor, could the Court instruct the
18   witness to slow down a little bit?
19         THE COURT:  Okay.
20         MR. ESPER:  It's hard to understand.
21         THE COURT:  Okay.  Wait until she finishes the
22   question, okay --
23         THE WITNESS:  I'm sorry.
24         THE COURT:  -- before you respond.
25         And you wait until he finishes the answer before
```

Pimentel – Direct by Ms. Kanof

1    you --

2            MS. KANOF:  I will try, Your Honor.

3    BY MS. KANOF:

4    Q.  Okay.  After -- you made one discussion that you've

5    referred to.

6            And then what was the next discussion?

7    A.  Marco, again, I -- I'm not clear when he start having this

8    type of conversations with Lilian.

9            But it was clear when he -- one time he came back from

10   a trip from Mexico, he started discussing that we -- if we

11   could do that, how was my feeling about doing it.  That it was

12   pretty simple, that he knew people, that he knew how to move

13   money from point A to point B.  That he knew people in Iceland,

14   in the Caribbean, that could help us during the movement.

15           That he knew people in -- how do you call the exchange

16   rate houses in Mexico, where you can buy and sell money there,

17   that could help us to put the money in the system and things

18   like that.

19   Q.  Okay.  And did he ever discuss with you how he would

20   launder money?

21   A.  Yes.

22   Q.  What did he say?

23   A.  At the beginning, he told me that we're going to pick up

24   the money in cash, and maybe we could use -- we could use

25   several schemes.  Either we could send them the money to Turks

Pimentel – Direct by Ms. Kanof

1   and Caicos Islands, he had a friend there.  Actually, once I

2   went to the Turks and Caicos Islands to meet this friend.

3           Or we could use casinos, that he knew people in

4   casinos here in the United States that could be used to put the

5   money into the system.

6   Q.  Okay.  Let's talk about the -- you said briefly that you

7   went to the Turks and Caicos.

8           Did Mr. Delgado have a bank account in the Turks and

9   Caicos Islands?

10  A.  I think -- yes.

11  Q.  Was it his account or were there other individuals whose

12  account he was using?

13  A.  To my knowledge, it was other individuals.  And actually,

14  when I went to the Turks and Caicos Island we set up an LLC, or

15  we start the paperwork to start an LLC to -- an LLC to move

16  money from the account from that company to different places in

17  the world.

18  Q.  Okay.  You said -- when was it that you went to the Turks

19  and Caicos?

20  A.  It was 2006 -- it's in my passport, the seal is there.

21  Q.  Okay.  Was the trip that you took to the Turks and Caicos,

22  you just decided you were going to go?

23  A.  No.  Marco send me to meet this lawyer.

24  Q.  Did he go with you?

25  A.  No.

Pimentel – Direct by Ms. Kanof

1    Q.   And you met somebody?

2    A.   Yes.

3    Q.   What was his name?

4    A.   Big John.

5    Q.   Big John?

6    A.   Yes.

7    Q.   Do you know Big John's last name?

8    A.   No.

9    Q.   Okay.  And when you returned from the Turks and Caicos,

10   what did you tell Marco that you had done?

11   A.   Well, actually, we -- when I was in the Turks and Caicos

12   Islands, we had a conference call.

13          Big John -- actually, Big John's wife was right next

14   to him.  I was there.  Marco was on the other line in the

15   States.  I'm assuming we called his cell phone.

16   Q.   So in this conference call while you were there with Big

17   John, what was discussed?

18   A.   It was discussed that we were going to open this LLC

19   account.  That -- I provided Big John with my passport, and he

20   made photocopies out of my passport.  And he told me that I was

21   going to be the only one that could access that account with

22   that passport, and we were going to use it to move money.

23   Q.   Did that ever happen?

24   A.   No.

25   Q.   Okay.  Why the Turks and Caicos?

Pimentel – Direct by Ms. Kanof

1    A.   It was explained to me by Marco Delgado that Turks and

2    Caicos is an island that belongs technically to the United

3    Kingdom, so the U.S. didn't have any authority to go there and

4    ask for accounts, information, and things like that.

5    Q.   Okay.  And -- but that never happened.  Your name never

6    went on an account?

7    A.   That never happened.  Yes.

8    Q.   Okay.  And in the process of developing this money

9    laundering situation, or money laundering business, did you

10   ever learn what the source of the money was?

11   A.   Yes.

12   Q.   When was that?

13   A.   I don't remember the exact date that I first heard of it.

14   But we -- we had a meeting in Mexico in the Camino Real Hotel

15   there, in a restaurant called Le Cirque.  And we were on that

16   meeting, and Marco told me that this guy was the financial head

17   of one of the biggest cartels in Mexico.

18   Q.   Did he tell you the name of the cartel?

19   A.   Not at that moment.  Later.

20   Q.   Okay.  Well, later, when he did tell you, what was the name

21   of the cartel?

22   A.   The *Milenio* cartel.

23   Q.   I'm sorry?

24   A.   The *Milenio* cartel.

25   Q.   *The Milenio* cartel?

Pimentel - Direct by Ms. Kanof

1    A.  Yes.

2    Q.  Do you remember when the first time after the meeting on

3    the terrace with Lilian de la Concha -- by the way, do you

4    remember when that occurred, approximately?

5    A.  It was around the World Cup.  It was the 2006 World Cup.

6    Q.  The World Cup.  What's the World Cup, please?

7    A.  It's the international soccer championship.  And I remember

8    this because this hotel set up a lot of screens.

9          When you walk into the restaurant area they just have

10   the games there.  So I remember that Germany was playing.  I

11   don't know why I remember that detail, but it was pretty clear.

12   Q.  But your memory is good, right?

13   A.  Yes.

14   Q.  And so it was the World Cup competition and Germany was

15   playing.

16   A.  Yes.

17   Q.  And have you gone -- you told -- years ago, in 2007, you

18   told this to ICE agents, correct?

19   A.  Yes.

20   Q.  And did they go back and try to find out, or you helped him

21   try to find out when Germany was playing in the World Cup in

22   Mexico City that it would have been?

23   A.  Yeah.

24   Q.  And approximately when it was?

25   A.  It was the summer.  I don't remember the month.  I'm sorry

Pimentel - Direct by Ms. Kanof

1   about that.  I just don't remember.

2   Q.  But the summer of what year?

3   A.  2006.

4   Q.  2006.

5          When you started going to Mexico with him was there --

6   did there come a time when you met with people other than

7   Lilian de la Concha?

8   A.  Yes.

9   Q.  And when did that occur?

10  A.  It was either at the end of 2006 and the beginning of 2007.

11  And through all that process, starting in the summer, we start

12  meeting with a lot of people in Mexico City.

13  Q.  Okay.  And when you -- was there meetings that he went to

14  that you did not accompany him?

15  A.  Yes.

16  Q.  And were there meetings that you went to that he was not

17  at?

18  A.  Yes.

19  Q.  Okay.  And how was it determined who would go to a meeting?

20  A.  It was pretty random.  If I was in Mexico City, because my

21  whole family is in Mexico City, I was there.  He would ask me

22  to go.

23          If he was in Mexico or he wanted to go to Mexico, he

24  would think that the meeting was important enough he would go,

25  especially if somebody would ask Marco's presence, Marco would

1    go.

2    Q.   Okay.  Did you ever meet an individual that is referred to

3    repeatedly as Paco?

4    A.   Yes.

5    Q.   Who is Paco?

6    A.   Paco was introduced to me by Marco and Lilian.

7    Q.   Do you know what his real name is or what his full name

8    was?

9    A.   Francisco.  I don't remember the last name.  I mean, it's

10   in the e-mails.

11   Q.   Okay.  But Paco is a nickname for Francisco, right?

12   A.   Yes.

13   Q.   Where did you meet him?

14   A.   In Mexico City.

15   Q.   But physically, was it in a restaurant?

16   A.   A restaurant.  We usually would meet in restaurants.

17   Q.   Do you remember when that was?

18   A.   It was in late 2006, early 2007.

19   Q.   And what was the purpose of that meeting?

20   A.   Again, we discussed -- Marco asked him to find clients to

21   move money.  So --

22   Q.   By the way, was a Mr. Vargas ever at any of these meetings?

23   A.   Never.

24   Q.   And so you would discuss clients.  Well, who had clients?

25   A.   Either Lilian or friends of Lilian.

Pimentel - Direct by Ms. Kanof

1    Q.  And what was the purpose of developing these clients?

2    A.  Start moving money from the U.S. to Mexico and Colombia.

3    Q.  Were these clients builders?  Were they construction

4    companies?

5    A.  No.

6    Q.  Were they ironworks companies?

7    A.  No.

8    Q.  Were the Girl Scouts one of his clients?

9    A.  No.

10   Q.  I'm going to draw your attention to Government's Exhibit

11   Number 1, which has already been admitted into evidence by the

12   Court.

13        If you can take a look at it, and if -- I think you

14   said you forgot your glasses; is that right?

15   A.  Yes.

16   Q.  Are you going to be able to --

17   A.  To look at it on the screen, yes.

18   Q.  Okay.

19        MS. KANOF:  Government's Exhibit Number 1, Your Honor,

20   may we publish it to the jury?

21        THE COURT:  You may.

22   BY MS. KANOF

23   Q.  This -- let me go back and talk about how we got these

24   e-mails.

25        When you were arrested in Atlanta, you immediately

Pimentel - Direct by Ms. Kanof

1    began to cooperate, correct?

2    A.  Yes.

3    Q.  And did you, along -- in the many different conversations

4    you had with Homeland Security/ICE, did you tell them that you

5    exchanged e-mails?

6    A.  Yes.

7    Q.  And did they ask you to provide e-mails between you and

8    Mr. Delgado?

9    A.  Yes.

10   Q.  And was that beginning in 2007 and 2008?

11   A.  Yes.

12   Q.  And then recently, when I came on this case, did I ask you

13   if you still had those e-mails?

14   A.  Yes.

15   Q.  And did I ask you to produce all of them to the Government

16   in case we had missed any?

17   A.  Yes.

18   Q.  And did you do that?

19   A.  Yes.

20   Q.  You had retained them?

21   A.  Yes.

22   Q.  Where had you retained them?

23   A.  In my e-mail account.

24   Q.  I'm sorry?

25   A.  In my e-mail account.

Pimentel - Direct by Ms. Kanof

1   Q.  And what is your e-mail address?

2   A.  It's victor8590@gmail.com.

3   Q.  On Government's Exhibit Number 1, is that the e-mail

4   address that Mr. Delgado was writing to you from?

5   A.  Yes.

6   Q.  And let me ask you this.

7          Did you talk in the e-mails in code?

8   A.  Sometimes, yes.

9   Q.  Okay.  Did you ever sit down and discuss a specific code

10  you were going to use?

11  A.  No.

12  Q.  All right.  And with regard to the meeting of Paco, did you

13  also meet somebody named Pedro?

14  A.  Yes.

15  Q.  And was that Pedro Mendoza Meneses?

16  A.  Yes.

17  Q.  When did you meet him?

18  A.  I met Pedro -- or Peter, I used to call him -- on the

19  Camino Real Hotel in the meeting that we all had there.

20  Q.  Okay.  When was the meeting at the Camino Real Hotel?

21  A.  It was early 2007.

22  Q.  You're talking about in Mexico City, correct?

23  A.  Yes.

24  Q.  And when -- who was there at that meeting?

25  A.  It was Paco, it was Lilian, it was Marco, it was me, my

Pimentel – Direct by Ms. Kanof

1  cousin, and I think that was it.

2  Q.  Sometimes you took your cousin with you?

3  A.  Yes.

4  Q.  Why?

5  A.  He used to work with me on the canteens, and he was like my

6  right hand, my best friend, and we --

7  Q.  Younger than you?

8  A.  We were about the same age.

9  Q.  Okay.  And so basically, it was comfortable for you to have

10  him with you?

11  A.  Yeah.  We grew up together.

12  Q.  At this particular meeting what was discussed?  And you

13  said end of 2006, beginning of 2007?

14  A.  Yes.

15  Q.  Was money laundering discussed?

16  A.  Yes.

17  Q.  Okay.  Could you tell us who said what about it?

18  A.  Well, again, Marco was pretty much offering his services.

19  It was pretty much like a presentation or portfolio.  It was

20  like a business presentation of the different type of things

21  that he could do, money -- to move money in different ways,

22  different types, different destinations, different pickup

23  locations, and things like that.

24  Q.  Okay.  And had you reviewed that paper before?

25  A.  No.

Pimentel - Direct by Ms. Kanof

1    Q.  No?  So this was the first time you saw it?

2    A.  Yes.

3    Q.  And do you remember any of the different ways he talked

4    about being able to move money?

5    A.  Yeah.  Through casinos, bank accounts, LLCs.

6    Q.  Did he use something called a mirror --

7    A.  The mirror operation, yes.

8    Q.  Yes?  What was that?

9    A.  We didn't call it a mirror operation.  I learned that term

10   after the fact.

11   Q.  Okay.

12   A.  You do the -- what they called simultaneous delivery.  So

13   you pick up the money here in the States, which is point A, and

14   you deliver that money either in Mexico or some other country

15   in the world.

16         At the same time that you're picking up the money, you

17   have somebody else in point B delivering the same amount of

18   money.  So it was like a built-in trust type of operation.

19   Q.  Do legitimate construction companies use mirror imaging for

20   getting money from place to place?

21   A.  No.

22   Q.  Okay.  And you're from Mexico, correct?

23   A.  Yes.

24   Q.  And do you have friends in Mexico that are legitimate

25   business individuals?

Pimentel - Direct by Ms. Kanof

1    A.  Yes.

2    Q.  And -- and are you familiar with business in Mexico?

3    A.  Yes.

4    Q.  Okay.  Is it common that a construction company would pick

5    up a million dollars of 1s, 5s, and 20s and have it transmitted

6    in a car from Atlanta, Georgia, to Mexico?

7    A.  You don't need it.  You can make a bank transfer to do

8    that.

9    Q.  Okay.  With regard to Government's Exhibit Number 1, what's

10   the date?

11   A.  It's June 17, 2006.

12   Q.  And who is this e-mail from?

13   A.  Marco Delgado.

14   Q.  And who is it to?

15   A.  Me.

16   Q.  And what is it about?

17   A.  Can I read it for a second and then...

18   Q.  Before you read it, let me ask you something.

19          You're obviously fluent in Spanish, correct?

20   A.  Yes.

21   Q.  And did we provide -- the Government provide these e-mails

22   back to you with the translations that had been done by ICE to

23   check to make sure that they reflected the nature of the

24   conversation?

25   A.  Yes.

Pimentel – Direct by Ms. Kanof

1    Q.  And the ones you've reviewed, Government's Exhibits 1

2    through 32, which are the e-mails in this case, correct?

3    A.  Yes.

4    Q.  And is the English translation a fair and accurate

5    reflection of what's being said in Spanish based on your

6    knowledge of the individuals and of the language?

7    A.  Yes.

8    Q.  Okay.  With regard to the first one, yes, go ahead and read

9    it in English, please.

10   A.  "Our friend is going to call Paco to see about the dinner

11   tonight so that she can tell Paco that I'm already back and I

12   will not be attending, and of Paul.  So she can tell him to

13   call Ulises" -- it's in Spanish after that -- "de la Serna

14   directly.  He already has the money.  A hug."

15   Q.  Okay.  The female friend is who?

16   A.  Lilian.

17   Q.  And who is Paco?

18   A.  It's Lilian's friend.

19   Q.  Okay.  Is this e-mail actually about two different things?

20   A.  Yes.

21   Q.  Okay.  What are the two different things it's about?

22   A.  At the top it's the money laundering.  At the bottom is

23   business referring to CFE.

24   Q.  Okay.  And what kind of business did you and Delgado have

25   with CFE at the time?

Pimentel - Direct by Ms. Kanof

1   A.  Well, it was not me and Delgado.  It was just Marco.  He

2   was trying -- okay.  Something happened.

3   Q.  I'm sorry?

4   A.  Something happened to my screen.  It just went --

5   Q.  Oh, no, I made it smaller because I was going to go to the

6   next one.

7         Do you need it bigger again?

8   A.  No, it's fine.

9   Q.  Okay.

10  A.  He -- since I met Marco, he's been trying to develop this

11  interconnection between El Paso and Ciudad Juárez to create

12  just one system between two cities electronically --

13  electricity-wise so they could freely exchange energy from one

14  side to another depending on the needs of each other's side.

15        For example, if El Paso Electric has excess of

16  capacity, they can sell that to the system in Juárez without

17  having to do too much trouble.  They're just sort of

18  interconnected, so there's a free movement of electricity from

19  one side to another.

20  Q.  Okay.

21  A.  So that was what Marco was trying to do.

22  Q.  And Ulises de la Serna?

23  A.  Uh-huh.  Ulises de la Serna.

24  Q.  Who is that?

25  A.  He used to work for CFE.

Pimentel - Direct by Ms. Kanof

1   Q.  Okay.  And that's who Delgado was dealing with in trying to

2   get this exchange of electricity; is that correct?

3   A.  Yes.

4   Q.  Did that ever happen?

5   A.  No.

6   Q.  Okay.  And the other part of the e-mail calling Paco.  Did

7   Paco have anything to do with CFE?

8   A.  No.

9   Q.  Okay.  The other part of the e-mail that Lilian is going to

10  call Paco to see about the dinner tonight so that she can tell

11  Paco that I'm ready, back, and will not be attending.

12          What's that about?

13          I closed it out.  That's me.

14          What was that about?

15  A.  That Marco was going to -- told Paco that he was -- well,

16  Lilian was going to call Paco to tell her [sic] that he was not

17  going to be at the dinner because he already was back in

18  El Paso.

19  Q.  Okay.  And the next -- Government's Exhibit Number 2, if

20  you can turn to that.

21  A.  Uh-huh.

22  Q.  I'm going to make it smaller.  Don't freak out.

23          Government's Exhibit Number 2.  Do you recognize it?

24  A.  Yes.

25  Q.  And does it actually begin a couple of pages down?

1    A.  Yes.

2    Q.  Okay.  Generally an e-mail, when you read e-mail

3    communication, you start at the bottom, correct?

4    A.  Yes.

5    Q.  Because the most recent communication is at the top --

6    A.  Yes.

7    Q.  -- is that correct?

8         Government's Exhibit Number 2, the original -- the

9    person who started this communication, was that you?

10   A.  No, Marco.

11   Q.  Okay.  Let me get down there.

12        And what was the date?

13   A.  Wednesday, June 21, 2006.

14   Q.  And what was the message about?

15   A.  Her mom and -- his mom and his aunt were going to travel to

16   Mexico, and he wanted me to see if I could pick them up or have

17   somebody pick them up to take them to the house that they have

18   outside of Mexico City in Texcoco.

19   Q.  So he called upon you to pick up his family to take them to

20   their home in Mexico City, correct?

21   A.  Yes.

22   Q.  And that's really -- there's nothing illegal about that?

23   A.  Nothing illegal about that.

24   Q.  Okay.  But it -- does it show your friendship?

25   A.  I -- if you trust me with your mom, I would assume that.

Pimentel - Direct by Ms. Kanof

1    Q.  He completely trusted you; is that correct?

2    A.  Yes.

3    Q.  Okay.

4         MS. KANOF:  Oh.  I'm hearing that the large screen is

5    not working, Your Honor.

6         Oh.  I haven't published it yet.  I'm sorry.

7         Your Honor, I would like to publish Government's

8    Exhibit Number 2, which the Court has already admitted.

9         THE COURT:  You may.

10        MS. KANOF:  Sorry about that.

11   BY MS. KANOF:

12   Q.  And the second e-mail -- basically, most of Government's

13   Exhibit Number 2 is talking about picking up his family until

14   the last one, correct?

15        MR. ESPER:  Excuse me, Your Honor.  Counsel is

16   testifying.

17        THE COURT:  I'll sustain the objection.

18   BY MS. KANOF:

19   Q.  Okay.  The last e-mail, which is at the top of Government's

20   Exhibit Number 2, who is that from?

21   A.  Marco Delgado.

22   Q.  And who is it to?

23   A.  To me.

24   Q.  Okay.  And what does it say?

25   A.  That they want another meeting.

Pimentel – Direct by Ms. Kanof

1   Q.  Who is "they"?

2   A.  The people -- the cartel.  Because if we go down to the

3   previous e-mail, the one at 1624, I say, It's okay.  Perfect.

4   Just let me know what time -- or what time --

5   Q.  Is that referring to his family?

6   A.  Yeah.

7          And then the next line is, "By the way, anything from

8   your friend?"

9          And obviously, "my friend," I was talking about

10  Lilian, and I was asking about the money laundering.

11  Q.  And again in the translations, we put whether the friend is

12  a male or a female.

13  A.  Yes.

14  Q.  Because in Spanish the word is specific --

15  A.  Yeah, there's a difference.

16  Q.  -- to gender.

17         And what was Delgado's response to you?

18  A.  That they want another meeting.

19  Q.  And who is "they"?

20  A.  The cartel people.

21  Q.  Please look at Government's Exhibit Number 3.

22         MS. KANOF:  And we ask that it be published to the

23  jury, Your Honor, as admitted.

24         THE COURT:  You may publish.

25

1    BY MS. KANOF:

2    Q.   Okay.  Government's Exhibit Number 3.  What is that,

3    Mr. Pimentel?

4    A.   It's an e-mail from Marco to me.

5    Q.   And the date?

6    A.   July 3rd, 2006.

7    Q.   And is it at 4:07 a.m.?

8    A.   Yes.

9    Q.   And what is he telling you?

10   A.   That there's going to be a meeting.  That the meeting is

11   going to be in Guadalajara, Mexico.  That it's super confirmed,

12   and he mentioned *Viva Fox.*

13   Q.   Okay.  So who is Gomez Morin?

14   A.   Gomez Morin is an old politician in Mexico.  It's related

15   to the party that, at the time, was the power in Mexico, the

16   PAN.

17   Q.   And what was the purpose of this meeting in Guadalajara?

18   A.   To talk about that with the cartel.

19   Q.   Okay.  And did you at some point learn where the center of

20   the *Milenio* cartel was?

21   A.   Guadalajara.

22   Q.   In Guadalajara?

23   A.   Yes.

24   Q.   I'm going to go to Government's Exhibit Number 4.

25            MS. KANOF:  Your Honor, may we publish to the jury?

```
1              THE COURT:  If it's been admitted --

2              MS. KANOF:  Okay.

3              THE COURT:  -- unless there's an objection, you may

4     publish.

5              MS. KANOF:  Okay.  Thank you, Your Honor.

6     BY MS. KANOF:

7     Q.  What is the date of the string of e-mails in Government's

8     Exhibit Number 4?

9     A.  It's an e-mail from Lilian to Marco that he forwarded to

10    me.

11    Q.  Okay.  And it's from Lilian to Marco?

12    A.  Yes.

13    Q.  How do you know that?

14    A.  Because the language that they use.

15    Q.  Was it common that he would forward Lilian's e-mails to

16    you?

17    A.  Yeah.

18    Q.  What was the purpose of that?

19    A.  Well, since Marco wanted me to help him with the money

20    laundering, he'd keep me updated of the negotiates and how

21    things were developing.

22    Q.  Okay.  And the e-mails were about business, primarily; is

23    that correct?

24    A.  Primarily, yes.

25    Q.  Government's Exhibit Number 4 is dated what?
```

Pimentel - Direct by Ms. Kanof

1    A.  Is what?  Excuse me?

2    Q.  What is the date on Government's Exhibit Number 4?

3    A.  It is August 16th, 2006.

4    Q.  And is that an e-mail that was forwarded to you by Marco

5    Delgado?

6    A.  Yes.

7    Q.  Could you read it please?

8    A.  "I'm asking that we focus as much as possible.  The

9    potential is great, love.  In relationship to the cookies that

10   you will look to see if you can place for the Girl Scouts, they

11   tell me that hopefully you can help them in the schools to

12   place more than five boxes per school each week.  Because right

13   now they have in the warehouse 500 instead of 300.  And with

14   the donations that they are receiving, this figure will

15   increase.

16        "You can tell that you gave them confidence, because

17   they almost want to turn all of it over to you.  Ha-ha, ha-ha!

18   So now you're going to get real fat, because either you place

19   them, or I will start to eat the cookies.  Ha-ha, ha-ha!

20        "I am sending you a kiss, and I hope you can find a

21   way to move this matter forward.  This is an act of charity, so

22   move as much as possible, yes?  Take care.  I am I'm sending

23   you a kiss. "

24   Q.  First, let me ask you, what is her interest in this?

25   A.  Well, there was a relationship at that point between her

Pimentel - Direct by Ms. Kanof

1    and Marco.

2    Q.  Did she have a financial interest?

3    A.  Yes.

4    Q.  Okay.  First of all, in the discussions with the

5    individuals that you met about money laundering in Mexico, was

6    a fee to Mr. Delgado ever discussed?

7    A.  Yes.

8    Q.  What was that fee?

9    A.  10 percent.

10   Q.  And what -- 10 percent of what?

11   A.  Of the total amount of money that we move.

12   Q.  Okay.  And was there ever a figure discussed about what the

13   total amount of money would be that would be moved?

14   A.  Yes.

15   Q.  How much?

16   A.  The end, when we actually starting doing it, it was

17   $600 million.

18   Q.  $600 million?

19   A.  Yes.

20   Q.  If you look at this e-mail, Lilian de la Concha references

21   500 in a warehouse instead of 300.

22          Is she talking about boxes of Girl Scout cookies?

23   A.  No.

24   Q.  What is she talking about?

25   A.  Millions of dollars.

Pimentel - Direct by Ms. Kanof

1   Q.  And does the 500 mean what?

2   A.  Millions of dollars.

3   Q.  And the 300?

4   A.  Millions of dollars.

5   Q.  And when she refers to the donations that they are

6   receiving, what kind of donations is she talking about?

7   A.  It is the profits from their business.

8   Q.  Okay.  But donations they are receiving.  Is there more

9   than one drug trafficker that is accumulating money for

10  Mr. Delgado and you to launder?

11  A.  It was explained to me that it's the same, let's just say

12  company, the same cartel.  But they have different locations

13  and, like, subcompanies.  So even though everything is to the

14  same company they have, like, subdivisions.  So they -- they

15  put the money in different locations.

16  Q.  Okay.  And when she says to see if you can place the Girl

17  Scouts, they tell me hopefully you can help them in the schools

18  to place more than five boxes per school each week, what is she

19  referring to?

20  A.  Well, when they say schools, she's -- geographical

21  locations, different geographic locations around the world.

22          And five boxes per school each week is $5 million per

23  company that you're going to place somewhere else in the world

24  per week.

25  Q.  With regard to this around the world inference you just

Pimentel – Direct by Ms. Kanof

1   made, were any -- were Paco and Pedro both Mexican citizens?

2   A.  No.

3   Q.  Okay.  Were either of them Mexican citizens?

4   A.  Yes.

5   Q.  Who?

6   A.  Pedro.

7   Q.  And what citizenship -- where was Paco from?

8   A.  Spain.

9   Q.  Spain?

10  A.  Yes.

11  Q.  When she says that you can -- you can tell they gave -- you

12  gave them confidence because they almost want to turn all of it

13  over to you, do you know what she's referring to?

14  A.  All the money.

15  Q.  Okay.  And again, when she says she hopes he can find a way

16  to move this matter forward, does she have a financial

17  interest?

18  A.  Yes.

19  Q.  Do you know what her percentage was?

20  A.  Yes.

21  Q.  What was it?

22  A.  Out of the 10 percent, it was going to be 4 percent for me,

23  4 percent for Marco, 2 percent for her.

24  Q.  Okay.  So of $600 million, 10 percent, would be?

25  A.  $6 million and --

Pimentel – Direct by Ms. Kanof

1    Q.  $60 million?  You're the college student, not me.

2         And then of the $60 million you would get 4 percent;

3    is that correct?

4    A.  Yes.

5    Q.  And what would be Mr. Delgado get?

6    A.  4 percent.

7    Q.  And what would Lilian de la Concha get?

8    A.  2 percent.

9    Q.  Okay.  Did there come a time when the cartel thought that

10   that was too much?

11   A.  Yes.

12   Q.  What happened?

13   A.  They decide to hold the deal because it was more expensive,

14   that they -- the people that they were using at that time.

15   Q.  Okay.  What do you mean?

16   A.  They obviously don't know -- it was explained to me that

17   cartels, they don't --

18   Q.  When you say "it was explained to me," who explained it?

19   A.  Marco.

20   Q.  Okay.

21   A.  That they don't only have one people doing the money

22   laundering, they use several because of the amount of money

23   they -- they have.

24         And the rate that you call it -- it was the rate that

25   Marco proposed -- it was higher than I guess our competition.

Pimentel – Direct by Ms. Kanof

1    Q.  Okay.  And did that get negotiated?

2    A.  Yes.

3    Q.  With whom?

4    A.  With the cartel.

5    Q.  Were you present during that negotiation?

6    A.  No.

7    Q.  Did you learn from Mr. Delgado that that percentage had

8    changed?

9    A.  Yes.

10   Q.  What did he tell you?

11   A.  That they set up the fees -- and actually, it is mentioned

12   in one of the e-mails that we can start at a lower rate.  And

13   once we prove that we can actually do it better than the

14   competition we can take the rate up again.

15   Q.  Okay.  And it's one of the exhibits?

16   A.  Yes.

17   Q.  Okay.  Well, if you can look at Government's Exhibit Number

18   5.

19        At the bottom, the beginning of Government's Exhibit

20   Number 5 is the same e-mail that is Government's Exhibit Number

21   4, correct?

22   A.  Yes.

23   Q.  But it continues upward after Mr. Delgado has sent Lilian

24   de la Concha's e-mail to -- after he sent it to you, you

25   respond; is that correct?

Pimentel - Direct by Ms. Kanof

1    A.   Yes.

2    Q.   What day do you respond?

3    A.   Wednesday, the 16th -- August 16th, 2006.

4    Q.   And what do you respond?

5    A.   I said, "At what time I will see you on Friday and where?"

6    Q.   And does Mr. Delgado respond to you?

7    A.   "Is it okay?  It's a deal.  So tomorrow at 2 in

8    *Providenciales*."

9    Q.   Okay.  What is *Providenciales*?

10   A.   *Providenciales* is the main -- the big island in the Turks

11   and Caicos.  It's where the airport is at.  It's where all the

12   big hotels are, where the banks are, and where Big John has his

13   office.

14   Q.   It's like the capital or the major city in --

15   A.   I don't know if it's the capital, but it's the big city

16   where the airport is at, where the businesses are, where you

17   can find the restaurants, the hotels, the --

18   Q.   When you went to see Big John, did you fly into

19   *Providenciales*?

20   A.   Yes.

21   Q.   Okay.  And what is Mr. Delgado telling you about that?

22   A.   That we're going to meet on Friday at *Providenciales*.

23   Q.   Was there a plan to go to the Turks and Caicos in August of

24   2006?

25   A.   Yes.

Case 3:12-cr-02106-DCG   Document 121   Filed 03/25/14   Page 187 of 251

1 - 187

Pimentel - Direct by Ms. Kanof

```
1    Q.  And did that trip occur?
2    A.  No.
3    Q.  Okay.  Were there a lot of plans that fell through?
4    A.  Yes.
5    Q.  But were there plans that did bear fruit?
6    A.  Obviously.
7    Q.  The top e-mail in Government's Exhibit Number 5, is that
8    from Mr. Delgado to you?
9    A.  Yeah.
10   Q.  Okay.  Mr. Pimentel, I notice that every single one of
11   Mr. Delgado's e-mails have two paragraphs -- first have the
12   words Calgary - El Paso - Mexico City, and then have two
13   paragraphs after it.
14       What does Calgary - El Paso - and Mexico City mean?
15   A.  Calgary is a city in Canada.  El Paso is obviously a city
16   in Texas.  And Mexico City is Mexico City.
17   Q.  And this is his Delgado & Associates e-mail?
18   A.  Yes.
19   Q.  Did he have an office in Calgary?
20   A.  No.
21   Q.  Did he have an office in Mexico City?
22   A.  No.
23   Q.  He did have an office in El Paso?
24   A.  Yes.  Remcon Circle.
25   Q.  And then after that is a disclaimer, correct?
```

1    A.  Yes.

2    Q.  And it looks like -- what is this disclaimer?

3        Did you ever discuss that with him, the disclaimer?

4    A.  It's a paragraph that states that this message is personal,

5    and if you misuse it or something like that you are going to

6    be -- can be a penalty, and it's covered by some laws in the

7    United States.  It's pretty standard in the industry and law

8    offices to use it.

9    Q.  Okay.  And so in the middle e-mail that's at 10:52:45 on

10   August 17th, he tells you that you're going to meet in

11   *Provid* --

12   A.  *Providenciales*.

13   Q.  Yeah.  Thank you.

14        -- at 2:00 the next day, correct?

15   A.  Correct.

16   Q.  That doesn't happen?

17   A.  No.

18   Q.  And what do you respond?

19   A.  It's not here.  It's up --

20   Q.  Oh, it's farther up?  Okay.  Go ahead and go up.

21        Is it in the next e-mail?

22   A.  I --

23   Q.  Before we leave Exhibit Number 5, did he say anything to

24   you about somebody named Miriam?

25   A.  Yes.  He was very excited about this meeting, so he asked

Pimentel - Direct by Ms. Kanof

1    me to confirm the reception of this e-mail to Miriam so he

2    could do the financial move that he told me that he was going

3    to do.

4    Q.   Okay.  Who is Miriam?

5    A.   Miriam was, at that time, Marco Delgado's personal

6    assistant.

7    Q.   And was she involved in the money laundering?

8    A.   Not to my knowledge.

9    Q.   Okay.  And he says, "If it's before noon I can process

10   codes."

11          What codes its he referring to?

12   A.   According to Marco, the codes were the financial codes that

13   you need to alert the authority when you're going to move a big

14   amount of money through the financial system.

15   Q.   And did you ever receive those codes?

16   A.   No.

17   Q.   Look at Government's Exhibit Number 6.

18          MS. KANOF:  Please publish.

19   BY MS. KANOF:

20   Q.   And at the bottom of Government's e-mail Number 6, reading

21   upward, what's the date?

22   A.   It's Wednesday, September 13th, 2006.

23   Q.   Some of these there are weeks in between, correct?

24   A.   Correct.

25   Q.   And do you remember what was -- was there a lot of waiting?

1   A.   Yeah.  The way the process, or the interview process that

2   the cartel used with us --

3   Q.   What do you mean, the interviewing process?

4   A.   We had several meetings with several people.  And it was,

5   like, okay.  You meet with the first guy, now this guy approved

6   it.

7           They would set up a meeting with another guy, a

8   different location, different time, with even a different type

9   of people.

10          Sometimes they were pretty business, professional,

11  rich-looking people, sometimes not so much, different

12  locations.

13          And it was like an interviewing process.  Like when

14  you're going to get a job, you get a first interview, second

15  interview, and final interview.

16          In this case there were a lot more than two.  But

17  yeah, that's...

18  Q.   Who is Chuy?

19  A.   Chuy was the link between the cartel and us.

20  Q.   "Us," meaning Pedro, Paco --

21  A.   Pedro, Paco, Marco, me.

22  Q.   And Ms. de la Concha?

23  A.   Yes.

24  Q.   And when did you first meet Chuy?

25  A.   It was at the Camino Real Hotel.  There was a meeting that

Pimentel - Direct by Ms. Kanof

1    we were very close.
2              Once we met Chuy, he had the direct link with the
3    cartel.  It started getting pretty serious, so we knew it was
4    going to happen.  That's when I met Chuy.
5    Q.  Okay.  Do you remember when you met Chuy?
6    A.  It was 2007, I think.
7    Q.  Okay.  In the spring of 2007?
8    A.  Yes.
9    Q.  And you said it was at the Camino Real?
10   A.  Yeah, in Mexico City, yes.
11   Q.  Who else was present?
12   A.  It was Pedro, Paco, my cousin, myself.
13   Q.  How did you know he was from the cartel?
14   A.  It was clarified to me that that's who he was.
15   Q.  Did Mr. Delgado ever tell you that the money that you were
16   laundering was from someone's inheritance?
17   A.  No.
18   Q.  Do they have wills in Mexico?
19   A.  Yes, we do.
20   Q.  And did he ever tell you that the money was from gambling?
21   A.  No.
22   Q.  Okay.  And how, again, did you know that Chuy was the
23   go-between with the cartel?
24   A.  Oh, excuse me.  Can you repeat the question?
25   Q.  How did you know that Chuy was the go-between with the

1   cartel?

2   A.  Oh.  He told me, and the people that introduced me to Chuy

3   told me that he was the guy.

4   Q.  Okay.  Did you meet Chuy again?

5   A.  Yes.

6   Q.  Where?

7   A.  We met her [sic] again, and it was dinner right next to the

8   Camino Real Hotel.

9           And then we meet him at the Mexico City airport.

10  Q.  Okay.  The meeting at the Mexico City airport, was that

11  right before you were going to pick up a million dollars in

12  Atlanta?

13  A.  Yes.

14  Q.  And what was the purpose of that meeting?

15  A.  It was just that we were ready to start meeting, and it was

16  pretty serious.  We were all there.  They took photocopies of

17  our IDs.  They said --

18  Q.  Who took photocopies of the IDs?

19  A.  Chuy.

20  Q.  Okay.  And how did that happen?

21  A.  It was pretty straightforward.  He just stand up and ask

22  for our identifications, and we provided all our IDs and he

23  made copies.

24  Q.  What was his reaction to your identification?

25  A.  He was surprised about the name on the -- on the --

1    Q.  Was your identification Victor Pimentel?

2    A.  Yes.

3    Q.  Okay.  And why was he surprised?

4    A.  Because I was not introduced to them as Victor Pimentel.

5    Q.  How were you introduced?

6    A.  Francisco Ruiz.

7    Q.  And who introduced you as Francisco Ruiz?

8    A.  Marco Delgado.

9    Q.  Where did you get the name Francisco Ruiz?

10   A.  He gave it to me.

11   Q.  When did he give it to you?

12   A.  Prior to 2006.

13   Q.  Did he ask you to pretend like you were Francisco Ruiz in

14   the past?

15   A.  Yes.

16   Q.  And in this drug money laundering transaction you were

17   using that name as well?

18   A.  Yes.

19   Q.  How did Chuy react?

20   A.  He was surprised.  And he asked me why I had an ID with

21   another name.

22   Q.  What did you tell him?

23   A.  That it is the nickname that I have, because I used to do

24   the -- because we sell ourselves -- Marco sold ourselves as

25   this big-time money laundering company, which we were not.

Pimentel – Direct by Ms. Kanof

```
1            And I used that to say, Well, this is my -- the
2   nickname that I use when I travel, so I don't get caught -- if
3   I ever get caught.
4   Q.  You tell them it was like your alias?
5   A.  Yeah.
6   Q.  Did he care?
7   A.  Not much.
8   Q.  Did you find out that others use aliases as well?
9   A.  Yes.
10  Q.  How did you find that out?
11  A.  Well, when everything fall down, we learned pretty much
12  everything about everybody.  So that's how.
13  Q.  Okay.  Now with regard to the this exhibit, it begins on
14  Wednesday, September 13th, I believe you said?
15  A.  Yes.
16  Q.  From Mr. Delgado.  And what does he tell you?
17  A.  That there's a meeting tomorrow at noon.
18  Q.  Okay.  I believe that's -- oh.  And then you respond to
19  him?
20  A.  Okay.  They're making me really nervous.
21  Q.  And how does he respond?
22  A.  Can you please move up the --
23  Q.  I am.
24  A.  -- exhibit?
25          MR. ESPER:  Your Honor, I can't hear.
```

```
 1              THE COURT:  Repeat that.  What did you say?
 2              THE WITNESS:  That I was getting nervous.
 3    BY MS. KANOF:
 4    Q.  Why were you getting nervous?
 5    A.  Because we have all these big plans and big meetings and
 6    big numbers were thrown at us, and you're going to do this,
 7    you're going to do that, you're going to move this money,
 8    you're going to be rich and powerful.
 9              But it was already almost a year from --
10              MR. ESPER:  Excuse me, Your Honor.  I'm going to ask
11    that the witness slow down.  I'm having a hard time
12    understanding what's he's saying.
13              THE COURT:  Yeah.  Slow down, please, when you're
14    speaking.
15              THE WITNESS:  Okay.
16    BY MS. KANOF:
17    Q.  Pretend like you're teaching to your kids.
18    A.  Okay.
19              We've been having all these meetings and we were
20    getting all these big numbers thrown at us.
21              As you recall the exhibits, $300 million,
22    $500 million, and promises of us being rich and powerful
23    people.
24              But it has already been almost a year since we start
25    doing these meetings and nothing had actually happened.  So I
```

Pimentel - Direct by Ms. Kanof

1    was starting -- getting nervous about meeting these people.

2           You put yourself at risk when you meet with these

3    people.  You know they're serious, you know you can get killed.

4    And nothing -- you're not seeing any financial benefit, and we

5    know that, so that's why I was getting nervous.

6    Q.  Okay.  And when you tell Mr. Delgado, They're making us

7    suffer so we can learn, how -- what does he respond?

8    A.  I think that's my answer.

9    Q.  Is that him or is that you?

10   A.  That's me.

11   Q.  That's you?

12   A.  Yes.

13   Q.  Okay.  And how does he respond?

14   A.  I say, Well, hopefully that's what they're doing, as long

15   as the deal does not fall apart.

16   Q.  Okay.  Move to Government's Exhibit 7A.

17           Do you recognize that e-mail?

18   A.  Yes.

19   Q.  And that e-mail, I believe, had an attachment to it.

20   A.  No.  It's just an e-mail, just the subject.

21   Q.  Okay.  What is the subject?

22   A.  He's asking me to buy *La Jornada*, which is -- it's either a

23   weekly or monthly magazine in Mexico.

24   Q.  What day is he asking you to do that?

25   A.  It is the -- September 19th, 2006.

Pimentel – Direct by Ms. Kanof

1    Q.   And he wants you to go buy the magazine; is that correct?

2    A.   That's correct.

3    Q.   Okay.  And moving, then, to Government's Exhibit 7B.

4         Do you find out why he wants you to go buy that?

5    A.   Yes.

6    Q.   Why did he want you to go buy it?

7    A.   They have drug-related articles on the magazine.

8    Q.   And did you buy the -- did you buy the article that he

9    wanted -- or did you read the article he wanted you to read?

10   A.   Yeah.

11   Q.   Okay.  Did you actually buy the magazine or did you read it

12   online?

13   A.   I think I did both.

14   Q.   You did both?

15   A.   Yeah.

16   Q.   Okay.  And what was the article about?

17   A.   It was a big drug lord in Mexico getting caught.

18   Q.   Okay.  Where was he caught?

19   A.   It was in either Guadalajara or Colombia.  I don't remember

20   exactly.

21   Q.   So he wanted you to read an article about a drug dealer

22   that had been caught.

23        And after you read the article at -- on September 19th

24   at 1:11 -- that's 1311 on the screen --

25   A.   Yes.

Pimentel – Direct by Ms. Kanof

1   Q.  –– what is said about it?

2   A.  I said, Well, no wonder why there's so much silence from

3   the cartel.

4   Q.  Okay.  And why did you say that?

5   A.  Because if this big guy has been captured then, obviously,

6   the operations of the cartel, you would assume that they would

7   slow down.

8   Q.  Compro- –– they're afraid they're compromised?

9   A.  Yes.

10  Q.  And what did Marco respond?

11  A.  Marco told me that the cartel was going to let him know if

12  this guy could get bail to get out of jail, and they were going

13  to let Marco know.

14  Q.  So he's telling you that he's going to find out?

15          What is he telling you?

16  A.  He's telling me that the cartel people is going to let him

17  know if he –– if this guy is going to get out of jail with

18  bail.

19  Q.  Okay.  And Government's Exhibit 8A.

20          What is that?

21  A.  It's an e-mail with an attachment.

22  Q.  And the attachment, do you recall what the attachment is?

23  A.  Yes, a picture.

24  Q.  Was it –– what was the attachment?

25  A.  It's a picture with Marco, Lilian, and President –– well,

Pimentel - Direct by Ms. Kanof

1   it was the candidate at that time.  He was not the president

2   yet -- Calderon, the three of them.

3   Q.  Okay.  And it's actually Government's Exhibit 80-something,

4   right, the picture?

5              What does Mr. Delgado tell you?

6   A.  That's the picture.

7   Q.  Okay.  That's the picture.

8              Let me go back.  It's the same one?  Okay.

9              First, when he sent you the attachment of the picture,

10   what did he tell you?

11   A.  He asked me -- in the subject, he just -- let me know if

12   you are able to open the e-mail.

13   Q.  No.  But look at Government's Exhibit 8A that I have on the

14   screen.

15   A.  Uh-huh.

16   Q.  I'm trying to make it bigger so that you can -- can you

17   read that?

18   A.  Yeah.  The subject again is, Let me know if you open it.

19              And then on the e-mail, the actual e-mail, he's

20   actually kind of joking.  He said, Well, you were questioning

21   the power.  Tell Ready -- which is my cousin.  That's the name

22   that I've been calling him since we were kids.

23   Q.  Your cousin that was going with you -- your nickname for

24   him is Ready?

25   A.  Yes.

1    Q.  Okay.  Go ahead.

2    A.  That -- I told my cousin Ready that he needs to prepare.

3    That the next week they're going to recommend him for a

4    position in the Mexican Government, that they need his résumé.

5    Q.  And attached to that is this photo.

6          And who's in the photo?

7    A.  Marco Delgado, Lilian, and former President Felipe

8    Calderon.

9    Q.  Okay.  But he wasn't -- he hadn't been elected at this

10   time; is that correct?

11   A.  Yes.

12   Q.  And what does he -- he say -- what does he mean when he

13   says you're questioning the power?

14   A.  Well, at the beginning, I didn't totally believe Marco that

15   he had so close a relationship with Lilian.

16          And this picture was the proof that, actually, they

17   were pretty close.

18   Q.  With regard to the next one.

19          MS. KANOF:  If we could publish Government's Exhibit

20   8B.

21   BY MS. KANOF:

22   Q.  That starts with that e-mail that we were just discussing

23   on September 26 at 4:38.

24          And what do you respond?

25   A.  That the other business, for when -- that when the other

Pimentel – Direct by Ms. Kanof                          1 – 201

1    business, it was going to happen.

2    Q.  Okay.  What other business are you talking about?

3    A.  The money laundering.

4    Q.  When he's talking to you about questioning the power, he's

5    saying something about your cousin's résumé.

6            What is that about?

7    A.  Marco wanted to –– for my cousin to get the Palomas

8    crossing border.  He wanted my cousin to be the administrator

9    of that crossing border.

10   Q.  Okay.  Palomas is located where?

11   A.  I think it's outside of El Paso.

12   Q.  And he wanted your cousin to do what?

13   A.  To administrate [sic] that border crossing on the Mexican

14   side.

15   Q.  Be like a customs official?

16   A.  Yeah.  Like the chief custom official there.

17   Q.  Okay.  And do you get appointed to that position in Mexico?

18   A.  Yes.

19   Q.  How old is your cousin?

20   A.  Around my age, 35.

21   Q.  No.  How old was he then?

22   A.  2006 –– 29, 30.

23   Q.  Did –– was he involved in politics?

24   A.  No.

25   Q.  Did he have the education to be a customs –– chief customs

 1    inspector?

 2    A.   No.

 3    Q.   Did Marco Delgado discuss with you why he wanted your

 4    cousin to control the plaza in Palomas?

 5    A.   Yes.

 6    Q.   What did he tell you?

 7    A.   Well, once you control that crossing bridge you can cross

 8    anything you want from the U.S. to Mexico.

 9           At that time the U.S. didn't have any type of

10    searching from the people going out to -- the U.S. to Mexico.

11    They only -- actually, search was done in Mexico.  Every time

12    you cross they can look to your car or to your belongings.

13           So if you can control the -- if you're the authority

14    that controlled that crossing bridge, you can cross pretty much

15    anything you want.

16    Q.   When the next -- in the response on September 26th at

17    6:37 -- it says 1837 military time -- you said, "Does that mean

18    this is not going to happen or what, my friend?"

19    A.   Uh-huh.

20    Q.   What are you asking?

21    A.   Well, there was some -- according to Marco, there was some

22    requests that people in Mexico were doing that we couldn't come

23    through.

24           And I was asking if that was -- if that means that the

25    deal was not going to happen.

Pimentel – Direct by Ms. Kanof

```
1    Q.  And what did he respond?  I know there's a cuss word, but
2    go ahead and read it.
3    A.  That it better not, because we already have a -- put in a
4    shitload of money.  And that way we would be left on foot,
5    meaning that we already invest everything that we've got in
6    this business.  It better happen.
7    Q.  The e-mail doesn't exactly say money, but that's what it
8    meant?
9    A.  Yeah.
10   Q.  Okay.  And so what is his concern?
11   A.  That we were not going to get the contract for doing the
12   money laundering.
13   Q.  And when he says you've already put in a lot of money, what
14   does he mean?
15   A.  Well, again, we were -- he was not doing very good
16   financially.  Anything that --
17   Q.  Who was he living with at the time?
18   A.  With his mother.
19   Q.  With his mother.  And where were you living?
20   A.  I was living in Chihuahua.  I just have a canteen there.  I
21   was driving on -- I was between Chihuahua and Mexico City.
22   Q.  Okay.  Were you going to school --
23   A.  Yes.
24   Q.  -- at that time?
25   A.  Yes.
```

Pimentel - Direct by Ms. Kanof

1   Q.  So were you also coming to El Paso?

2   A.  Yeah.  I was -- I set up my schedule to only be in school

3   Tuesdays and Thursdays so I can attend the canteens between the

4   weekends only.

5   Q.  And he was living with his mother.

6        Who were you living with?

7   A.  With my cousin in this house in Chihuahua.

8   Q.  And when you were in El Paso, did you stay with Delgado?

9   A.  Yes.

10  Q.  Okay.  Government's Exhibit Number 9.

11       Beginning at the bottom --

12       MS. KANOF:  If we can publish it, please.

13  BY MS. KANOF:

14  Q.  And are -- is this e-mail talking about that newspaper

15  article and the individual that was caught?

16  A.  No.  This is a different article.

17  Q.  Oh, this is a different article?

18  A.  Yeah.  This is a different one.

19  Q.  And did you send him this article?

20  A.  Yes.

21  Q.  Okay.  And what was the nature of the article that you sent

22  to him?

23  A.  The police in Colombia had captured another Mexican drug

24  lord.  It was creating a lot of trouble, and it was a big

25  problem between cartels because of that capture.

Pimentel - Direct by Ms. Kanof

1   Q.  This e-mail -- that e-mail is dated October 13th of 2006,

2   correct?

3   A.  Yes.

4   Q.  And we began, in Government's Exhibit Number 1, June 17th

5   of 2006.

6          So was this taking longer than Mr. Delgado had

7   anticipated?

8   A.  A lot longer, yes.

9   Q.  And when you send him that article, how does he respond?

10  A.  He replies to me that the plaza, which is a geographical

11  location, was hot or under surveillance.

12  Q.  What plaza is he referring to?

13  A.  Colombia.

14  Q.  Why is he referring to Colombia?

15  A.  When we first start talking about moving money for the

16  cartels, Colombia was one of the main spots that they were

17  wanting us to put money on.

18  Q.  Okay.  Government's Exhibit Number 10.

19          MS. KANOF:  Please publish.

20  BY MS. KANOF:

21  Q.  And the next e-mail is in November of 2006.  So still, you

22  have not started to move money; is that correct?

23  A.  That's correct.

24  Q.  And at 1911, which would be 7:11 at night on November 3rd,

25  do you e-mail Mr. Delgado?

Pimentel - Direct by Ms. Kanof

1    A.  Yes.

2    Q.  What are you asking him?

3    A.  I'm asking him, When are we going to start?

4    Q.  How does he respond?

5    A.  That everything in Turks and Caicos is ready.  Big John is

6    in Turks and Caicos.  That we haven't got the contract yet.

7            Until we -- until we confirm with the petitions that

8    these people in Mexico ask us for, and that we need to get a

9    new vehicle -- one of the things that we needed to account for

10   with the Mexican people was giving a brand-new truck.

11           I used to have a truck that it was pretty new at that

12   time.  It was like six months old, and it was pretty nice.  But

13   apparently that was not up to these people's standards.

14   Q.  So you had offered them your truck; is that correct?

15   A.  Yes.  Yes.

16   Q.  But it wasn't good enough?

17   A.  It wasn't good enough.

18   Q.  So does this e-mail stream refer also to try to get ahold

19   of a new truck?

20   A.  Yes.

21   Q.  Okay.  And Mr. Delgado, in his response at the top of

22   Exhibit 10, on November the 3rd at 7:39 p.m., responds to you

23   how?

24   A.  That Big John is ready to move forward with the business.

25   Q.  It says he still won't sign.

1          What does that mean, won't sign?

2    A.   The people is not ready to give us the green light to start

3    doing the money laundering.

4    Q.   And does sign, in the translation, actually mean a physical

5    signature that you would use a pen?

6    A.   No.

7    Q.   What does it mean?

8    A.   It's just approval for starting the business.

9    Q.   Okay.  Is the word sign referred to throughout the e-mails?

10   A.   Yeah.

11   Q.   And when you were discussing the money laundering, does

12   that mean an actual contract?

13   A.   No.

14   Q.   If you would refer to Government's Exhibit Number 11.

15          MS. KANOF:  Please publish.

16   BY MS. KANOF:

17   Q.   Government's Exhibit Number 11 starts with a letter sent to

18   you in an e-mail that Mr. Delgado received from Lilian de la

19   Concha?

20   A.   Yes.

21   Q.   Okay.  And what's that about?

22   A.   This was the letter that Lilian and Marco draft to send it

23   to the -- at that time -- chief of staff of the presidency

24   to -- for two reasons.

25          One, Marco --

Pimentel – Direct by Ms. Kanof

1   Q.  Is this Calderon now or was still Vicente Fox?

2   A.  No.  At that point, December 12th, already was Calderon the

3   president.

4   Q.  Okay.  And this was like his chief of staff?

5   A.  This is the chief of staff or the vice president.  It's a

6   very important position.

7           They wanted, basically, two things.

8           The first one is that Marco was designated as the

9   representative of Mexico in -- for the office that my country

10  has in Washington, D.C.

11  Q.  She's requesting this?

12  A.  She's requesting that.

13  Q.  Okay.  Go ahead.

14  A.  To the chief of staff.

15          And the second one was that my cousin was appointed to

16  be the administrator of the Palomas crossing bridge.

17  Q.  Look at the second paragraph of the letter.

18          The attorney, Marco Delgado, president of the law

19  office.

20          By this time the letterhead says Delgado & Associates,

21  correct?

22  A.  Correct.

23  Q.  And was he the president or the head of the law office?

24  A.  Oh, he was the president, the head and everything, because

25  there was only him.

Pimentel – Direct by Ms. Kanof

1   Q.  And highly recognized and esteemed among members of the

2   Bush Administration; is that true?

3   A.  No.

4   Q.  Did Mr. Delgado say that he had relationships with

5   high-level politicians in the United States?

6   A.  Yes.

7   Q.  Did -- and who -- well, first tell us when he said it.

8   A.  Since I met Marco he's -- he told me, and every time that

9   we met somebody new in Mexico, he would make reference to his

10  connections here in the States.  That he had friends in the

11  Bush administration, that he was very close friends with

12  ex-President Bush's wife.

13       That actually, the -- President Bush's cousin, when he

14  used to travel to Mexico, he used to stay at his house, in

15  *Valle de Bravo* in Mexico, so they were pretty close.

16  Q.  Was any of that true?

17  A.  No.

18  Q.  How do you know?

19  A.  Because -- I mean it's a lie.

20  Q.  Okay.  But you lived with him?

21  A.  Yeah.  I never met -- or we went on several trips and

22  nothing ever --

23  Q.  Did he ever make a representation that he was close to

24  high-level officials in Mexico?

25  A.  No.

Pimentel - Direct by Ms. Kanof

1   Q.  Did he?

2   A.  Excuse me?

3   Q.  Mr. Delgado, did he ever make a representation that he was

4   close to high-level officials in Mexico?

5   A.  Oh, yeah.

6   Q.  What?

7   A.  When I went to Carneige Mellon with him on -- he was

8   recognized at Carneige Mellon University.  He was actually a

9   member of the board.  And I was --

10  Q.  Did he go to Carneige Mellon?

11  A.  Yes.

12  Q.  Is that -- where is that, in Pennsylvania?

13  A.  It's in Pittsburgh, Pennsylvania, yes.

14  Q.  And was that law school or...

15  A.  No.  I think it was the management.  It was the Hinds

16  School of Business.  I think it's a management type of school

17  that's --

18  Q.  Okay.  He was getting recognized because he donated money

19  to them?

20  A.  Yeah.  He -- they used to have a scholarship under his

21  name.  He donated $250,000 to get a scholarship in his name.

22  Q.  This was when he still had money, before he was divorced?

23  A.  Yes.

24  Q.  And what representation did he make to Carneige Mellon?

25  A.  That he knew pretty much everybody in Mexico, that he was

Pimentel – Direct by Ms. Kanof

1   very close to you name it, the president, the governors in

2   Chihuahua, officials in different public schools in Mexico,

3   staff of ex-presidents, things like that.

4   Q.  Okay.  If you look at the transmission e-mail that he

5   included from de la Concha that starts with, "Hello, Love," on

6   December 12th, 2006, at 12:05 p.m.

7   A.  Uh-huh.

8   Q.  She -- what did she tell them about how she marked the

9   e-mail?

10  A.  He's [sic] actually asking Marco to just review the letter

11  that we previously saw on the other exhibit to see if that's --

12  if it's correct or we need to add something or delete

13  something.  Just pretty much like a reading proof.

14  Q.  And then he sent it to you?

15  A.  Yes.

16  Q.  Why did he send it to you?

17  A.  I -- I can only guess.  He asked me -- again in the e-mail,

18  he asked me to correct the letter to see if my cousin's

19  information is correct.

20  Q.  Okay.  And so she's asking -- first, she's asking for your

21  cousins's position, and then she's asking for a position for

22  Mr. Delgado?

23  A.  Yes.

24  Q.  And you respond, professor?

25  A.  Uh-huh.

Pimentel - Direct by Ms. Kanof

1    Q.  Why are you calling --

2    A.  No, actually, that's Marco.

3    Q.  Okay.  That's him?

4    A.  Yeah.

5    Q.  I'm sorry.  That's correct.  And it's to you, correct?

6    A.  Yes.

7    Q.  And what is he telling you?

8    A.  He's actually asking me what we need to add, what we need

9    to remove, or what are my input in the letter.

10   Q.  Then does he change subjects, where it says everyone is

11   ready?

12   A.  Everyone is ready, yes.

13   Q.  Everyone is ready, waiting on you guys.

14           What is that about?

15   A.  Everyone else is the people in Mexico that we're going to

16   move the money for the cartel.

17   Q.  What did you think about the letter?

18   A.  It was good.

19   Q.  Okay.  And at the top of Government's Exhibit Number 11

20   from Mr. Delgado to you, what is that about?

21   A.  Marco is telling me that he's going to come back on Monday,

22   that he needs -- just make a confirmation with an appointment

23   that he was going to have with the energy secretary, and he's

24   asking me what I heard from the people from CFE.

25   Q.  So that's two different topics?

1    A.  Yes.

2    Q.  Okay.  Next -- and again, was he meeting with Vargas at

3    CFE?

4    A.  Well, we never meet with Vargas at CFE.  Mr. Vargas has his

5    office at the union office.  They're close, but it's not the

6    same building.

7    Q.  Okay.  Government's Exhibit Number 12.

8         I'm going to try to make it larger.  The problem is

9    when you make it larger you can't scroll up and down.

10        On January -- now we're in 2007, right?

11   A.  Yes.

12   Q.  And nothing has happened yet?

13   A.  Nothing yet.

14   Q.  Has any money been provided to be moved?

15   A.  No.

16   Q.  And Mr. Delgado, where is he living?

17   A.  With his mother.

18   Q.  And are you -- are you having lavish trips like you used to

19   have?

20   A.  Not anymore.

21   Q.  What happened to the house in Ruidoso, do you know?

22   A.  I think it was sold.

23   Q.  And he -- at 8:13 a.m. Mr. Delgado sends you an e-mail.

24   What's it about?

25   A.  Again, it's Lilian telling Marco that he talked to Paco,

1   that they're going to have a meeting, that they're going to let

2   her know that Paco, which is the contact between the other

3   people, thinks that everything is pretty serious, that we're

4   going to do the business.

5            He's asking for Marco to --

6   Q.  Where she says to Marco, "because he's already spoken with

7   the man from Puebla" -- what is Puebla?

8   A.  Puebla is a state outside of Mexico City two hours away.

9   Q.  And who was from Puebla?

10  A.  Some of the people from the cartel, that they were dealing

11  with money.

12  Q.  And -- but basically she's saying that things are getting

13  ready to go?

14  A.  Yes.

15  Q.  And when she says, And this man was the one who mentioned

16  about the meeting on Sunday.

17  A.  Yes.

18  Q.  Is that correct?  That would be the man from Puebla?

19  A.  Yes.

20  Q.  She said, Yesterday Paco was going to call him to tell him

21  about your phone call, like today we are going to pray a lot at

22  mass.

23  A.  Yes.

24  Q.  And then after that does she refer to the letter?

25  A.  Yes.

1    Q.  What does she say about that?

2    A.  That they have -- nobody has been designated yesterday to

3    those positions.  That -- that they have the letter on their

4    desk and they're going to let us know later.  That we need to

5    do a lot more praying.

6    Q.  Government's Exhibit Number 13, an e-mail.

7              What's the date of the e-mail?

8    A.  It is January 30, 2007.

9    Q.  I'm trying to get it enlarged.  It doesn't want to -- okay.

10             And this is a single e-mail from whom?

11   A.  From Lilian to Marco.

12   Q.  And he's forwarding it to you?

13   A.  Yes.

14   Q.  And what does it say?

15   A.  That she talked to Paco and Pete, that we don't have to

16   worry about it, that we're going to do the business, but that

17   the people in the cartel is very complicated.

18             Pretty much that we're just waiting, but that we're

19   going to do it.

20   Q.  Well, does she say, Well, what can I say?  If it doesn't

21   work for us I will cut my veins.

22   A.  Uh-huh.

23   Q.  Does she have a lot of investment in this?

24   A.  At that point we all had a lot of investment.  They're

25   political connections.  I mean we all invest different things,

Pimentel - Direct by Ms. Kanof

```
1    not only money.
2           You ask for favors, you travel, you go to meetings,
3    you put yourself at risk.  So, yeah, there was a lot of
4    personal things invested.
5    Q.  Did you know anything about the financial situation of
6    Lilian de la Concha?
7    A.  Yeah.
8    Q.  What did you know?
9    A.  She's well off.  I mean she's not superrich, but she does
10   pretty good.
11   Q.  Had she made investments as well?
12   A.  Yes.  But more political than financial.
13   Q.  She was calling in favors?
14   A.  Yes.
15   Q.  Government's Exhibit Number 14.
16          Can you explain that to the jury?
17   A.  Which part?
18   Q.  When I enlarge it, it won't scroll, so that's why I have
19   to -- let me go down to the bottom.
20          Okay.  Starting at the bottom, does -- I guess it's
21   just one e-mail, Government's Exhibit 14.
22          Is that dated February 7th of 2007 at 10:06?
23   A.  Yes.
24   Q.  Is it, again, forwarding an e-mail from Ms. de la Concha to
25   you?
```

Pimentel - Direct by Ms. Kanof

```
1    A.  Yes.

2    Q.  And what is it about?

3    A.  That they talk to Pete in relationship with the business

4    that we're going to do.  That they as --

5    Q.  Well, it says "in relation to the ironworks."

6    A.  Uh-huh.

7    Q.  What -- what are ironworks?

8    A.  It's the money.

9    Q.  Okay.  Did any of you ever sit down and discuss codes?

10   A.  No.

11   Q.  How do you know -- before, how did you know Girl Scout

12   cookies was money?

13   A.  Because it was explained to me by Marco.  And I mean we're

14   not idiots, and we've never been dealing with cookies, and

15   we've never been dealing with ironworks.  And we only have one

16   business going on with these people, so we all know what we're

17   talking about.

18   Q.  He says first to be patient, since he had made several

19   business deals with these contractors.

20           What contractors is she talking about?

21   A.  The cartels.  The cartel and different locations of the

22   cartel.

23   Q.  So not talking about people that build buildings?

24   A.  No.

25   Q.  And it had taken them around three months to complete.
```

Pimentel - Direct by Ms. Kanof

```
1              So basically, she's saying it's going to happen, but
2    it takes them a long time?
3    A.  It takes time, yes.
4    Q.  That when they say no, it's no.  But when they say yes,
5    even though it takes time, they do it?
6    A.  Yes.
7    Q.  Okay.  So is she reassuring Mr. Delgado this is going to
8    happen?
9    A.  Yes.
10   Q.  Then she says, What happens is that he has to study various
11   key points, because the things for that industry are difficult;
12   is that correct?
13   A.  Yes.
14   Q.  They owe him a large sum of money and the director told
15   him.
16              Who is the director?
17   A.  The head of the cartel.
18   Q.  That as soon as they brought the ironworks they would pay
19   him; is that correct?
20   A.  Yes.
21   Q.  And you're saying ironworks is money?
22   A.  Yes.
23   Q.  That he asked for patience.  But that, yes, they were going
24   to pay him and the importation would occur.
25   A.  Yes.
```

Pimentel - Direct by Ms. Kanof

1   Q.   So let's not despair.  Patience is the key.  We'll come out

2   triumphantly, correct?

3   A.   Yes.

4   Q.   It looks like you're getting closer, correct?

5   A.   Yes.

6   Q.   Government's Exhibit Number 14.  And this is a specific

7   e-mail that is still talking about hyper-urgent, correct?

8   A.   Yes.

9   Q.   And although the title of the e-mail -- this is February --

10  this is Valentine's Day, February 14th, correct, 2007?

11  A.   Yes.

12  Q.   And what is -- and again, he's showing you an e-mail that

13  Ms. de la Concha wrote; is that correct?

14  A.   Yes.

15  Q.   And what is that about?  If you look at number two, I

16  think...

17  A.   That Paco called her, that Peter called her, that they need

18  to know if we can do a movement, like a really quick move of

19  money now, like they were pretty -- in a hurry.

20          But that we all knew what now means, like the previous

21  e-mail mentioned, these things take time.  So they wanted to

22  know if we could do something quickly.

23  Q.   Right away?

24  A.   Yes.

25  Q.   In February 2007?

1    A.  Yes.

2    Q.  You don't actually move money until September of 2007,

3    correct?

4    A.  Correct.

5    Q.  And Government's Exhibit Number 15, from Mr. Delgado to

6    you.

7    A.  Yes.

8    Q.  Is that also forwarding something that Lilian sent him?

9    A.  Yes.

10   Q.  And what does it say?

11   A.  That it's from Lilian to Marco.  She's saying that she's

12   forwarding an e-mail that Marco sent to her in relationship

13   with Peter -- Pete's previous e-mail that -- the petition to do

14   a quick movement.

15   Q.  And now they're closing a case; is that correct?

16   A.  Yeah.

17   Q.  They're not doing cookies or ironworks or construction, and

18   they're closing a case?

19   A.  Correct.

20   Q.  Okay.  Government's Exhibit Number 16.

21   A.  Yes.

22        MS. KANOF:  If we can publish it to the jury,

23   Your Honor?

24   BY MS. KANOF:

25   Q.  From Mr. Delgado to you.  And this one starts down at the

1    bottom.

2              Could you give the date, please?

3    A.  It's February 15th, 2007.

4    Q.  At 6:12?

5    A.  Yes.

6    Q.  And again from Lilian to Marco to you?

7    A.  No, that's from me to Marco.

8    Q.  From you to Marco?

9    A.  Yes.

10   Q.  And what's -- so "My dear attorney" is not Lilian, it's

11   you?

12   A.  It's me, yes.

13   Q.  Okay.  And what are you telling him?

14   A.  Well, we were waiting for this deal to happen and we were

15   waiting at that point for several months.  And we were going to

16   do some things in Mexico, obviously, so I needed to have some

17   people waiting, just hire them to just help us with the move.

18             And I was paying them out of my pocket, and it was

19   getting pretty expensive.  And again, we didn't have any money

20   flowing in.  The only thing we had was money flowing out of our

21   pocket.

22             So I was, like, asking him, What are we going to do?

23   When are we going to start?  Because I couldn't keep paying

24   these people without getting money out of this deal.

25   Q.  Are these people construction workers?

Pimentel – Direct by Ms. Kanof

1   A.  No.

2   Q.  Did -- how did Marco represent you to the people he was

3   doing business with?

4   A.  Well, it was not representing me.  He said -- he told these

5   people that he had a whole team of money launderers all around

6   Mexico, but it was pretty much only me.

7   Q.  And did he tell you to have your cousin find some other --

8   you and your cousin find some other people to help?

9   A.  Yes.

10   Q.  And why did you need anyone to help?

11   A.  Because we were talking big amounts of money.  So...

12   Q.  What does Mr. Delgado mean when he says, "It is necessary

13   to be more harsh"?

14   A.  Well, that I need to rough these people, that -- at this

15   point they already know what we're going to do, but we need to

16   rough them in case they don't want to cooperate.

17   Q.  Rough them?

18   A.  Yeah.  Get physical with them.

19   Q.  Okay.  In other words, you're supposed to be stern with

20   them to wait?

21   A.  Yes.

22   Q.  To get paid?

23   A.  Yes.

24   Q.  Government's Exhibit Number 17.

25       And this exhibit begins on -- it's an e-mail from

Pimentel – Direct by Ms. Kanof

1    Mr. Delgado; is that correct?

2    A.  Yes.

3    Q.  And what's the date?

4    A.  It is February 17th, 2007.

5    Q.  Okay.  And it's at 6:45 a.m.; is that correct?

6    A.  That's correct.

7    Q.  Is this again from Lilian?

8    A.  Yes.

9    Q.  Forwarded to you?

10   A.  Yes.

11   Q.  "Hello, Marco.  I'm resending you a mail from Paco that

12   supports the telephone conversation that you and I just had."

13        Correct?

14   A.  Yes.

15   Q.  "At the same time I'm sending a copy of the mail to Paco so

16   that the 'dream team' is clear on everybody's position."

17        Who's the dream team?

18   A.  I'm the dream team.

19   Q.  You're the dream team?

20   A.  Yes.

21   Q.  "Like you told me, the thing is to start, and once the

22   contractor sees the quality of ironworks and materials that we

23   are handling, you can be sure that they will stay with us."

24        And again, that's laundering the money?

25   A.  Yes.

Pimentel – Direct by Ms. Kanof

1   Q.  "You agree to provide the service to each of the three

2   groups."

3           Before, we had an e-mail and you said that -- the

4   Girl Scout cookie e-mail -- said they were getting

5   contributions, correct?

6   A.  Yes.  Donations, yes.

7   Q.  Here, she relates to three groups:  Ironworkers,

8   carpenters, and construction workers.

9           Were there ironworkers, carpenters, and construction

10  workers?

11  A.  No.

12  Q.  Was there a building being built?

13  A.  No.

14  Q.  What does she mean?

15  A.  Different departments of the same cartel.

16  Q.  The only thing that is left to determine, the shipping and

17  delivery locations?

18  A.  Those are the --

19  Q.  Okay.  So if you have people that are building something,

20  wouldn't you already know where the location would be?

21  A.  Excuse me.  Can you please repeat the question?

22  Q.  I'm sorry.  I'll withdraw the question.

23          "You do not have any problem with handling the

24  materials within the Republic of Mexico and making color

25  adjustments."

Pimentel - Direct by Ms. Kanof

1    A.  No.

2    Q.  What does color adjustments -- are you changing the color

3    of the ironworks?

4    A.  No.  When you make color adjustments, what you're doing is

5    giving -- exchange pesos to dollars and dollars to pesos.

6    Q.  So dollars are green?

7    A.  Yes.

8    Q.  And pesos are a different color?

9    A.  Yes.

10   Q.  "They commented to Paco that no later than within one month

11   they would begin moving the ironworks for the construction.

12   Well, like I told you, because we had the prices a little

13   higher, they had to purchase the materials elsewhere."

14        Previously, you testified about the percentage of

15   10 percent being lowered.

16   A.  No, higher.

17   Q.  Is this the e-mail you were referring to?

18   A.  Yeah.  10 percent was higher than the competition, not

19   lower.

20   Q.  And so one of the reas- -- do you find out from Lilian,

21   through Marco, that one of the reasons nothing has happened is

22   because they went to your competition because you were too

23   expensive?

24   A.  Yes.

25        MR. ESPER:  Excuse me, Your Honor.  I object.

1          THE COURT:  I'll sustain the objection.

2    BY MS. KANOF:

3    Q.   What is she telling you about why you have been waiting?

4    A.   That we are very expensive, and they decide to go somewhere

5    else to do the services.

6    Q.   And then she says, "Do you agree on the price adjustments

7    to begin the process?"

8          What does that mean?

9    A.   If we can offer a better price to move the money.

10   Q.   "If it's necessary in the future it can be discussed with

11   them to see the possibility, in the event that the contract is

12   not convenient for you, to adjust the price again."

13         What does that mean?

14   A.   That eventually we are doing what Marco's promising them

15   that we're going to do.  We can adjust the money, in case that

16   we're not getting all the money that we should.

17   Q.   "If everything goes well, we will continue as it started."

18         What does that mean?

19   A.   That if we're doing good with the money, we're going to get

20   up to $600 hundred million.

21   Q.   "Better to have a little of something than a whole lot of

22   nothing."

23   A.   You're better to start small and then going up with it.

24   Q.   "Starting on Wednesday, are you available to meet with the

25   contractor?"

1            Who's the contractor?

2   A.   The cartel.

3   Q.   And then, of course, she says personal things.

4            Government's Exhibit Number 18.

5            MS. KANOF:  Please publish to the jury.

6   BY MS. KANOF:

7   Q.   Is this e-mail dated February 18th of 2007?

8   A.   Yes.

9   Q.   And who is it from?

10  A.   From Marco to me.

11  Q.   What is the subject of this e-mail?

12  A.   Start of operations.

13  Q.   It doesn't say start of construction, does it?

14  A.   No.

15  Q.   Okay.  And this is from Mr. Delgado to you?

16  A.   Yes.

17  Q.   Does it say, "Master, as a follow-up to the various

18  conversations I inform you that we are in the position to begin

19  and only waiting for the issue with the vehicle on the part of

20  your people.

21       "In the spirit of transparency that this operation

22  requires, I ask you to inform me where we were at. "

23       What is he talking to you about the vehicle for?

24  A.   That if we are in position to deliver the brand-new truck

25  that he requested me to get.

Pimentel – Direct by Ms. Kanof

```
 1   Q.  Had you given him a vehicle yet?

 2   A.  Yes.

 3   Q.  Okay.  Government's Exhibit Number 19.

 4          MS. KANOF:  If we can publish.

 5   BY MS. KANOF:

 6   Q.  Is that from Mr. Delgado to you?

 7   A.  Yes.

 8   Q.  Is it, again, Lilian's forwarded e-mail that went first to

 9   Mr. Delgado?

10   A.  Yes.

11   Q.  Does it say, "Hi, Marco.  Very late last night Paco called

12   me to tell me that Pete had just called him to tell him that

13   the contractors had called him and that they wanted to eat with

14   Paco."

15          Is that what she's telling Marco?

16   A.  Marco, yes.

17   Q.  "If you want to, and Pete on Tuesday, with the owners of

18   the construction company in order to meet each other and

19   determine the things with the shipment."

20          Is this the e-mail that preceded the meeting in the

21   airport in Mexico City with Chuy?

22   A.  Yes.

23   Q.  Okay.  And in this e-mail she says, "The shipment, because

24   they are going to be now apparently final 50 kilograms of

25   ironworks, like I mentioned on Wednesday."
```

Pimentel – Direct by Ms. Kanof                1 –  229

1              What does the 50 kilograms refer to?

2    A.   $50 million.

3    Q.   "50 another day of this week -- it will be discussed

4    tomorrow."

5              Again, another 50 million?

6    A.   Yes.

7    Q.   "And from then on 10 every week until the end of the year."

8              Is she talking about another $10 million?

9    A.   Yes, every week.

10   Q.   And is this basically the amount of money that had been

11   agreed upon to launder?

12   A.   Yes.

13   Q.   And is it drug money?

14   A.   Yes.

15   Q.   "And this will be determined supposedly on Tuesday.  You

16   know how it is to deal with these people," and then she talks

17   about personal things.

18              Excuse me.

19              So are you getting closer, or do you think you're

20   getting closer to starting this?

21   A.   Yeah.  We think, but it still took several months.

22   Q.   You're getting close to a year that this has been going on;

23   is that correct?

24   A.   That's correct.

25   Q.   And the next e-mail, Government's Exhibit Number 20, is

1   dated March 3rd, 2007.

2          What are you doing in your life on March 3rd, 2007?

3   Were you in school?

4   A.  I was in school at UTEP.

5   Q.  At UTEP?

6   A.  Yeah.

7   Q.  So what was Mr. Delgado -- where was he living?

8   A.  With his mother.

9   Q.  Did she tell him, "On March 3rd, I spoke with Paco.  He

10  told me that it's still a yes, but they don't say when.  That

11  Rafa called him to tell him that everything still stands.  It's

12  great about Lalo, et cetera."

13          Who is Rafa?

14  A.  Rafa, again, is another people that we interview in

15  Mexico -- actually, in Puebla.  Again, more interviews to get

16  this deal done.

17  Q.  Is Rafa with the cartel?

18  A.  No, I don't think so.

19  Q.  Okay.  Do you know his last name?

20  A.  Renteria, I think.

21  Q.  Renteria.  And how did you understand he was involved in

22  the money laundering?

23  A.  Again, he was part of the interviewers, part of the links

24  between these people in Mexico and us, with the cartel.

25  Q.  One of the checkers?

Pimentel - Direct by Ms. Kanof

1    A.   Yeah.

2    Q.   Government's Exhibit Number 21.

3         Government's Exhibit Number 21, an e-mail dated the

4    next day, March 4th.  Again, Lilian forwarded it to you.

5    A.   Marco forwarded to me, not Lilian.

6    Q.   I'm sorry?

7    A.   Marco forwarded to me.

8    Q.   Right.  Marco forwarded it to you.

9         "I spoke with Paco.  He told me that Rafa called."

10        Is this the same Rafa Renteria?

11   A.   Yes.

12   Q.   "And that everything is still the same with those people.

13   But what is now certain for this week is the one of the client

14   of 100 houses.  One of other clients of 100 houses.  I don't

15   know -- I don't want to know more.  I spend my commission

16   without having the money."

17        Okay.  So client of 100 houses, what's 100 houses?

18   A.   $100 million.

19   Q.   And is the commission she -- that she's talking about?

20   What is that?

21   A.   The money that she's going to get out of the deal.

22   Q.   And she's saying that, like any woman, she's spent it

23   already, correct?

24   A.   Yes.  Well, I don't know about any women.

25   Q.   Okay.  Or you don't want to know?

Pimentel - Direct by Ms. Kanof

1    A.   No.

2    Q.   Government's Exhibit Number 22.

3         MS. KANOF:   If we could publish.

4    BY MS. KANOF:

5    Q.   The next day -- now we're moving pretty quick, almost day

6    to day in March, correct?

7    A.   Yeah.

8    Q.   Mr. Delgado sends you an e-mail that was sent to him by --

9    is this one sent to him by Ms. de la Concha or is this from

10   him?

11   A.   I think it goes -- if you go down a little bit.

12   Q.   If you go down -- yes, I see it.

13        Down to from you and the -- one of the 100 houses, or

14   down further?

15   A.   No, it goes further a little bit.  It has one more page.

16   Q.   Let's start at the bottom of Government's Exhibit 22.

17   A.   Yes.

18   Q.   And is that an e-mail from Marco Delgado on March 5th at

19   4:14?

20   A.   Yes.

21   Q.   And is he forwarding an e-mail from Ms. de la Concha?

22   A.   Yes.

23   Q.   What does it say?

24   A.   Again, the mention --

25   Q.   That's the e-mail from the previous exhibit, correct?

1    A.   True.   Sorry.

2    Q.   It's the starting e-mail that brings us to the next one,

3    which is your response to Mr. Delgado, which is what?

4    A.   I'm asking Marco what we need to do with those hundred

5    million dollars, that -- what is the purpose of it.

6    Q.   Okay.  And how does he respond?

7    A.   He said that he doesn't know what to do now.  That he's

8    going to be begging somebody to -- well, actually, this one, it

9    doesn't answer what are we going to do with the hundred houses.

10          He's trying to get in contact with Mr. Vargas in

11   Mexico for another different business of -- legitimate business

12   with CFE.

13          But Mr. Vargas was very busy at the time.  He wanted

14   to get a meeting with him, and -- again, because he didn't

15   want -- Mr. Vargas didn't have anything to do with the money

16   laundering, money -- was going to beg for a meeting with him.

17   Q.   He's still trying to do this electric company thing?

18   A.   Yeah.

19   Q.   But the first line, "I don't even know to what to do now,"

20   does that resp- -- is that about not getting a meeting with

21   Mr. Vargas that he wanted, or is that about the hundred houses

22   that's money?

23   A.   The hundred houses.

24   Q.   Okay.  And again, it's a mixed e-mail, correct?

25   A.   Yeah.

Pimentel - Direct by Ms. Kanof

1    Q.  Government's Exhibit Number 23, starting at the bottom.

2          That is, again, Lilian de la Concha's e-mail from

3    March 5th, correct?

4    A.  It's the same e-mail that we already went through.

5    Q.  I'm sorry?

6    A.  This part we've already gone through.

7    Q.  This part we've already gone through?

8    A.  The 100 houses, yes.

9    Q.  Sometimes you would be on different chains of e-mails at

10   the same time; is that correct?

11   A.  Well, we all had BlackBerrys at that time, so you could

12   delete e-mails that come in and start answering a different

13   e-mail that you already previously read.  So that's why there

14   was some overlapping between e-mails.

15   Q.  So really, the only new part of this is from you to

16   Mr. Delgado and at 2 -- at 1404 on March 5th, "I will call at

17   exactly 12" -- or, actually, is that part of the preceding one?

18   A.  Yes.

19   Q.  And then he responds to you on that same day, "I left a

20   message last night and neither my friend, female, or friend,

21   male, have answered.  I suppose about Paulino, but I don't

22   know.  What a pain."

23          Let me first ask you.  Sometimes the times seem to go

24   back and forth, but these were sent from different locations in

25   the country and in Mexico, correct?

Pimentel - Direct by Ms. Kanof

1   A.   No, it's more than that.  When we sent -- when you have a

2   BlackBerry and you send an e-mail you could have received it --

3   we can exchange several e-mails on the same conversation and

4   then delete the last four and then answer to the first one.

5          So obviously, if you're answering me later, the hours

6   are going to be way off.

7   Q.   And sometimes e-mails don't -- aren't delivered right on

8   time?

9   A.   Yeah.

10  Q.   And so is Mr. Delgado telling you that he's left a message

11  for his female friend?

12         Who is that?

13  A.   Lilian.

14  Q.   Or male friend.

15         Who is that?

16  A.   *Ingeniero* Nareo Vargas.

17  Q.   And so is this just about CFE?

18  A.   No.  It's -- again, we could have several conversations at

19  the same time.  Mr. Vargas didn't want to meet with

20  Mr. Delgado, and apparently Lilian didn't answer Marcos's phone

21  call.

22  Q.   Okay.  Government's Exhibit Number 24, from -- now, that's

23  the next day.  It's the 6th of March of 2007.

24         And Mr. Delgado forwards another Lilian e-mail to you,

25  correct?

Pimentel – Direct by Ms. Kanof

1    A.  Yes.

2    Q.  That she had dinner with Paco and a group of Spanish buyer

3    friends of his.

4          And is this consistent –– or who has the connection to

5    Spain?

6    A.  Paco.

7    Q.  Okay.  "And he told me that today he's going to eat with

8    Rafa and Pete."

9    A.  Yes.

10   Q.  Those were individuals that are part of this conspiracy; is

11   that correct?

12   A.  Yes.

13   Q.  "And when we were at dinner, Rafa called him and told him

14   discreetly he will let you know the most certain thing is that

15   you need to come on Wednesday so that the operation can begin."

16          Is the operation the money laundering operation?

17   A.  Yes.

18   Q.  And she asks, "Should we believe them, would you be able to

19   come?"

20   A.  Yes.

21   Q.  Correct?

22   A.  Correct.

23   Q.  Government's Exhibit Number 25, the next day, March 7th.

24          So at this point in time what do you–all think about

25   what's going to happen with the money laundering?

Pimentel - Direct by Ms. Kanof

1   A.  Well, the -- we're going to start.  We're getting closer

2   and closer, and we are ready to go.

3   Q.  Okay.  This began in June of 2006, and now it's March of

4   2007, correct?

5   A.  Correct.

6   Q.  And it still hasn't happened?

7   A.  Not yet.

8   Q.  But Mr. Delgado is still working on it?

9   A.  Yes.

10  Q.  And you're going to school?

11  A.  Yes.

12  Q.  On March the 7th of 2007, does Mr. Delgado tell you that

13  he's in Washington, D.C.?

14  A.  Yes.

15  Q.  Is that true?

16  A.  No.

17  Q.  Why is he telling you he's in Washington, D.C.?

18  A.  Marco told me several times that he used to work with --

19  again, presidents and the Pentagon and people in DC.  And he

20  told me that time that he was in DC.  But after --

21  Q.  How did you know that he was not?

22  A.  Once you get to know Marco pretty well, you know that when

23  he doesn't want to go somewhere or when he doesn't want to do

24  something, he will create this fantastic story about being

25  somewhere else and doing something a lot more thrilling or a

Pimentel - Direct by Ms. Kanof

```
1    lot more interesting, so he cannot be bothered.
2         If you read the e-mails --
3    Q.  Was he living a lavish lifestyle at that time?
4    A.  No, we didn't have the money to do it anymore.  So it was
5    not like we could afford to go to Washington or Turks and
6    Caicos and Cuba anymore.  We...
7    Q.  Okay.  And was he living with his mother?
8    A.  Yeah, he was living with his mother.
9    Q.  Do you know if he had a good law practice at the time?
10   A.  No.
11   Q.  Okay.
12   A.  I mean he did not have a good law practice at the time.
13   Q.  And Government's Exhibit Number 26, which is somewhat
14   lengthy.
15        But starting down at the bottom of this exhibit, the
16   generating e-mail, the first e-mail is from whom?
17   A.  Can you go a little bit up?  I think -- I just want to make
18   sure that it's from Paco to Marco.
19   Q.  Okay.  Go ahead and check.
20        This is an e-mail that has a lot of...
21   A.  This is Exhibit 26, right?
22   Q.  Yes.  This particular e-mail came from -- came from you.
23   You provided it to the Government, correct?
24   A.  Yes.
25   Q.  And when you provided it to us, did it have all of this
```

1    computer symbolic language in it?

2    A.  Yeah.

3    Q.  And so did we just highlight the part that's actually in

4    language, for ease of your testimony and to present the e-mail

5    to the jury?

6    A.  Yes.

7    Q.  And although it's hard to get in between all of that

8    language, is this an e-mail from Paco, Francisco Manuel

9    Fernandez Castillo Igarses?

10   A.  Just give me a second.

11   Q.  Okay.

12   A.  I think I already destroyed --

13          THE COURT:  You've got to speak into the microphone.

14          THE WITNESS:  Sorry.  Can I get a minute, because I

15   think I'm creating a mess here with the exhibits.

16          MS. KANOF:  Yeah.  That --

17          THE WITNESS:  Sorry about that, Judge.  Okay.

18   BY MS. KANOF:

19   Q.  Okay.  Does the e-mail start on the 5th of June of 2007?

20   A.  Yes.

21   Q.  And is it to Rafa Renteria from Marco?

22   A.  Yes.

23   Q.  And is it copied to Ricardo Renteria?

24   A.  Yes.

25   Q.  Who's that?

Pimentel - Direct by Ms. Kanof

1    A.   Rafa's brother.

2    Q.   Pedro Mendoza Meneses?

3    A.   Pete.

4    Q.   Okay.   Goyo Chavez?

5    A.   That's a friend of Pete.

6    Q.   And it says -- the subject is "Letters from client"?

7    A.   Yes.

8    Q.   "Definitely this, on my part, totally leaves the

9    150,000-peso payment to Mr. Camacho clear.   Marco, I think you

10   are now the one that should honor the deal.   I will be waiting

11   for your reply.   Greetings, Paco."

12           What's the 150,000 pesos about?

13   A.   At that time these people from the cartel, they get ahold

14   of a bond, U.S. Treasury bond, that Marco offered to cash.

15           And the client, the one that Mr. Camacho -- the one

16   that they're talking here -- wanted 150,000 pesos like a

17   security fee for us while we cash the bond.

18   Q.   Okay.   And we'll talk about the bond later.

19           But then does he continue, "Hello, everyone.   With

20   this the conditions are met in order to proceed immediately"?

21   A.   Yes.

22   Q.   So he's saying that when you-all provide 150,000 pesos by

23   cashing the bond, that you can go ahead with the money

24   laundering deal?

25   A.   Yes.

Pimentel - Direct by Ms. Kanof

1   Q.   And does he say, "Due to your office's history that we had

2   by means of Lilian, Paco Fernandez, and Peter, we never doubted

3   that we could 100 percent trust the people that you entrusted

4   us to.   And as such, their methods, actions, decisions,

5   including his use of an alias or whatever" --

6           Are they talking about you?

7   A.   Yeah.

8   Q.   -- "applies, were rejected and have been respected 100

9   percent."

10          Basically, they are saying, We're waiting for you,

11  correct?

12  A.   Yes.

13  Q.   Well, why are they waiting for you?

14  A.   Because Marco didn't come forward with his part of the

15  money.

16  Q.   Okay.   This bond.   Tell the jury what this bond was all

17  about.

18  A.   Well, the bond is a paper document that the U.S. Treasury.

19          THE COURT:   You're going to have to talk into the

20  microphone.

21          THE WITNESS:   I'm sorry.   Okay, sir.

22  A.   The U.S. bond, it's a piece of paper that the U.S.

23  Treasury, when they need the money, you can buy bonds from the

24  U.S. Treasury, and then you can hold on to them and they

25  increase value over time.

```
 1              This particular bond, it was pretty old and --
 2    BY MS. KANOF:
 3    Q.  How old?  Do you remember?
 4    A.  It was, I think, from the '40s.
 5    Q.  The 1940s?
 6    A.  From the 1940s.  So it was -- if it was a real document,
 7    his net worth at that specific time, it was in the hundreds of
 8    millions of dollars.
 9    Q.  You said if it was a real document, right?
10    A.  Yeah.
11    Q.  Why do you think it might not have been?
12    A.  I don't think it was a real document.
13    Q.  Why?
14    A.  I had the document in my hand, and it didn't look like a
15    real bond.
16    Q.  Okay.  And how did this bond come up?
17    A.  Again, when Marco offered his services as a money
18    launderer, one of the services that he offered, it was to
19    provide legitimate provenance, which is the paperwork that you
20    need to have of a document of this type to actually cash it
21    legally.
22              So what he offers was to create a legitimate track for
23    this document until this actual owner, in order to be cashed
24    legally and the U.S. Government didn't put any obstacle in the
25    cashing of this bond.
```

Pimentel – Direct by Ms. Kanof

1    Q.   So who first received the bond?

2    A.   I received the bond.

3    Q.   Where did you receive it?

4    A.   In Mexico City.

5    Q.   From whom?

6    A.   Mr. Camacho.

7    Q.   And what did you do with the bond?

8    A.   I gave it to my cousin, and my cousin flew to Juárez, and

9    he crossed on foot to El Paso, and he deposited the bond in the

10   Remcon Circle, the law office of Marco Delgado.

11   Q.   Did the bond ever get cashed?

12   A.   Nope.

13   Q.   And -- but they're waiting for the bond to be cashed as a

14   condition to proceed with the laundering, correct?

15   A.   Yes.

16   Q.   So how -- that e-mail -- then does Mr. Rafa Renteria

17   respond on June 5th at 12:29?

18   A.   Yes.

19   Q.   To everyone that I mentioned before that's on the copy

20   line?

21   A.   Yes.

22   Q.   Does he say agreed?  Peter -- that's Pedro, correct?

23   A.   Yes.

24   Q.   Paco Fernandez?

25   A.   Yes.

Pimentel - Direct by Ms. Kanof

1    Q.  Who at that time was evidently in Panama, correct?

2    A.  He was visiting Panama, not living.

3    Q.  Ricardo?

4    A.  Yeah, Renteria.

5    Q.  Goyo?

6    A.  Yes.

7    Q.  And myself.  It will be Monday June 11th, in Mexico City?

8    A.  Yes.

9    Q.  "Please confirm Peter, Paco Fernandez, with Lilian for the

10   best time," correct?

11   A.  Yes.

12   Q.  Okay.  And Mr. Delgado sent all of that to you?

13   A.  Yes.

14   Q.  Government's Exhibit Number 26A.

15        THE COURT:  Well, it's 5:00 almost, Ms. Kanof.

16        MS. KANOF:  Okay.

17        THE COURT:  I've gone a little bit longer than I

18   prefer to without taking a break, but I figured that if we took

19   a break it would just take that much longer.

20        Ladies and gentlemen, we're going to get started at

21   9:00 in the morning.  Okay?  Members of the jury, please be on

22   time.  We do want to get started promptly at 9:00.

23        If you get here a little bit early, there's going to

24   be coffee there, and breakfast snacks for you.  Okay?  So if

25   you want to come have something, you're welcome to come as

1    early as you want.

2              We'll be in recess until 9:00 tomorrow morning.

3              (Proceedings continued in Volume 2.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          I N D E X
 2    Status Conference ...........................................2
 3    Voir Dire Examination of the Jury Panel by Mr. Velarde ......73
 4    Jury Called .................................................79
 5    Jury Sworn ..................................................79
 6    Venire Panel Excused ........................................80
 7    Instructions of the Court ...................................80
 8    Opening Statement by Ms. Kanof ..............................88
 9    Opening Statement by Mr. Velarde ............................97
10
11                      GOVERNMENT'S EVIDENCE
12    WITNESSES:
13    DAVID ELLIOTT:
14       Direct Examination by Ms. Arreola  .......................105
         Cross-Examination by Mr. Velarde .........................127
15       Redirect Examination by Ms. Arreola ......................139
16    VICTOR PIMENTEL ROJAS:
17       Direct Examination by Ms. Kanof  .........................142
18
19
20
21
22
23
24
25
```

```
 1                        GOVERNMENT'S EXHIBITS

 2     NO.    DESCRIPTION                              ADMITTED

 3     1      E-mail, 6-17-06                                 7

 4     2      E-mail, 6-21-06                                 7

 5     3      E-mail, 7-3-06                                  7

 6     4      E-mail, 8-16-06                                 7

 7     5      E-mail, 8-17-06                                 7

 8     6      E-mail, 9-13-06                                 7

 9     7A     E-mail, 9-19-06                                 7

10     7B     E-mails, 9-19 to 9-20-06                        7

11     8A     E-mail, 9-26-06                                 7

12     8B     E-mail, 9-26-06                                 7

13     9      E-mail 10-13-06                                 7

14     10     E-mail, 11-3-06                                 7

15     11     E-mail, 12-12-06                                7

16     12     E-mail, 1-28-07                                 7

17     13     E-mail, 1-30-07                                 7

18     14     E-mail, 2-7-07                                  7

19     14A    E-mail, 2-14-07                                 7

20     15     E-mail, 2-15-07                                 7

21     16     E-mail, 2-15-07                                 7

22     17     E-mail, 2-17-07                                 7

23     18     E-mail, 2-18-07                                 7

24     19     E-mail, 2-26-07                                 7

25     20     E-mail, 3-3-07                                  7
```

```
 1                    GOVERNMENT'S EXHIBITS

 2     NO.   DESCRIPTION                              ADMITTED

 3     21    E-mail, 3-4-07                                  7

 4     22    E-mail, 3-5-07                                  7

 5     23    E-mail, 3-5-07                                  7

 6     24    E-mail, 3-6-07                                  7

 7     25    E-mail 3-8-07                                   7

 8     26    E-mail, 6-5-07                                  7

 9     26A   E-mail, 7-26-07                                 7

10     27    E-mail 8-15-07                                  7

11     28    E-mail, 8-24-07                                 7

12     29    E-mail, 9-4-07                                  7

13     30    Phone Screen Shot                              7

14     31    E-mail, 9-4-07                                  7

15     32    Cell Phone Screen Shot                         7

16     33    Attachment to Exhibit 31 E-mail                7

17     34    Montes v. City of El Paso Case                 7

18     35    Video of Sheriff's Traffic Stop                7

19     36    Currency/Monetary Instrument Seizure           7
             Inventory
20
       37    Consent Recorded Conversation                  7
21
       37A   Transcript of Exhibit 37                       7
22
       38    Consent Recorded Conversation                  7
23
       38A   Transcript of Exhibit 38                       7
24
       39    Photograph                                     7
25
       40    Photograph                                     7
```

| | | | |
|---|---|---|---|
| 1 | | GOVERNMENT'S EXHIBITS | |
| 2 | NO. | DESCRIPTION | ADMITTED |
| 3 | 41 | Photograph | 7 |
| 4 | 42 | Photograph | 8 |
| 5 | 43 | Photograph | 8 |
| 6 | 44 | Photograph | 8 |
| 7 | 45 | Photograph | 8 |
| 8 | 46 | Photograph | 8 |
| 9 | 47 | Photograph | 8 |
| 10 | 48 | Photograph | 8 |
| 11 | 49 | DPS Video | 8 |
| 12 | 50 | Consent Recorded Conversation | 8 |
| 13 | 50A | Transcript of Exhibit 50 | 8 |
| 14 | 51 | Consent Recorded Conversation | 8 |
| 15 | 51A | Transcript of Exhibit 51 | 8 |
| 16 | 52 | Consent Recorded Conversation | 8 |
| 17 | 52A | Transcript of Exhibit 52 | 8 |
| 18 | 53 | Consent Recorded Conversation | 8 |
| 19 | 53A | Transcript of Exhibit 53 | 8 |
| 20 | 54 | Consent Recorded Conversation | 8 |
| 21 | 54A | Transcript of Exhibit 54 | 8 |
| 22 | 55 | Consent Recorded Conversation | 8 |
| 23 | 55A | Transcript of Exhibit 55 | 8 |
| 24 | 56 | Undercover Certificate of Seizure | 8 |
| 25 | 57 | Undercover Settlement Agreement and General Release | 8 |

```
 1                    GOVERNMENT'S EXHIBITS

 2      NO.    DESCRIPTION                           ADMITTED

 3      58     Consent Recorded Conversation               8

 4      58A    Transcript of Exhibit 58                    8

 5      59     Photograph                                  8

 6      60     Photograph                                  8

 7      61     Consent Recorded Conversation               8

 8      61A    Transcript of Exhibit 61                    8

 9      62     Consent Recorded Conversation               8

10      62A    Transcript of Exhibit 62                    8

11      63     Consent Recorded Conversation               8

12      63A    Transcript of Exhibit 63                    8

13      64     Consent Recorded Conversation               8

14      64A    Transcript of Exhibit 64                    8

15      65     Consent Recorded Conversation               8

16      65A    Transcript of Exhibit 65                    8

17      66     Consent Recorded Conversation               8

18      66A    Transcript of Exhibit 66                    8

19      67     Consent Recorded Conversation               8

20      67A    Transcript of Exhibit 67                    8

21      68     Consent Recorded Conversation               9

22      68A    Transcript of Exhibit 68                    9

23      69     Consent Recorded Transcript                 9

24      69A    Transcript of Exhibit 69                    9

25      70     Consent Recorded Conversation               9
```

```
 1                    GOVERNMENT'S EXHIBITS

 2     NO.    DESCRIPTION                              ADMITTED

 3     70A    Transcript of Exhibit 70                        9

 4     71     Consent Recorded Transcript                     9

 5     71A    Transcript of Exhibit 71                        9

 6     72     Consent Recorded Transcript                     9

 7     72A    Transcript of Exhibit 72                        9

 8     73     Photograph                                      9

 9     74     Photograph                                      9

10     75     Google Subscriber Information                   9

11     76     AOL Subscriber Information                      9

12     77     Wells Fargo Bank Records                        9

13     78     Wells Fargo Bank Records                        9

14     79     Wells Fargo Bank Records                        9

15     83     Photograph                                      9

16     85     Stipulation                                     9

17

18

19

20

21

22

23

24

25
```