1         IN THE UNITED STATES DISTRICT COURT

2       FOR THE WESTERN DISTRICT OF TEXAS

3           EL PASO DIVISION

4

UNITED STATES OF AMERICA  )  No. EP-12-CR-2106-DB

5                 )

vs.              )  El Paso, Texas

6                 )

MARCO ANTONIO DELGADO    )  October 22, 2013

7

8

9          VOLUME 2 OF 6 VOLUMES

             JURY TRIAL

10     BEFORE THE HONORABLE DAVID BRIONES

      UNITED STATES DISTRICT JUDGE, and a jury.

11

12

13  A p p e a r a n c e s:

14  FOR THE GOVERNMENT:    MS. DEBRA P. KANOF &

                     MS. ANNA E. ARREOLA

15                 Assistant United States Attorneys

                 700 E. San Antonio, Suite 200

16                 El Paso, Texas  79901

17  FOR DEFENDANT:        MR. RAY VELARDE

                 Attorney at Law

18                 1216 Montana Avenue

                 El Paso, Texas  79902

19

                 MR. RICHARD ESPER

20                 Attorney at Law

                 801 N. El Paso Street, 2nd Floor

21                 El Paso, Texas  79902

22

23

24      Proceedings recorded by mechanical stenography,

25    transcript produced by computer.

 1              (Open court; outside the presence of the jury.)

 2              THE COURT:  Counsel, we're going to get started in a

 3     few minutes.  We still have two jurors missing.

 4              THE CLERK:  No, they're here.

 5              THE COURT:  Are they here?  Oh, okay.  We'll get

 6     started in just a few minutes.

 7              I received some information that our witness has

 8     received some death threats, Counsel.  I'm going to be taking

 9     extra precaution.  I'm going to have everybody that comes in

10     the courtroom identify themselves.  Okay?

11              I don't know how far you're going to get into

12     cross-examination.  I don't want to limit you, but I don't want

13     too much information about where he's at.  He's already

14     testified as to where he's at and what he's doing.

15              MR. ESPER:  I wouldn't worry.

16              MR. VELARDE:  No, Judge.  We're not going to do any of

17     that.

18              THE COURT:  Okay.

19              MR. VELARDE:  I'm at a loss as to why that happened.

20              THE COURT:  Okay.  It's really not surprising.

21              Did you tell them anything, Ms. Kanof?

22              MS. KANOF:  What?

23              THE COURT:  Did you --

24              MS. KANOF:  I didn't tell them about the threat, but I

25     did show them the newspaper articles.  Evidently AP picked it

 1   up.  And it's in the *Miami Herald*, the Pittsburgh newspaper,

 2   the Seattle newspaper, and in every newspaper in Mexico.

 3           THE COURT:  Okay.  We'll get started in just a few

 4   minutes.

 5           Let's have your witness in here, Ms. Kanof.  Is he --

 6           MS. KANOF:  Yes.

 7           THE COURT:  Have him on the stand when we get started.

 8           We'll be in recess for the next few minutes.

 9           (Recess taken; open court; jury present.)

10           THE COURT:  Welcome back, members of the jury and

11   counsel.

12           Members of the jury, remember I put you under

13   instructions.  Please, please abide by all of them.  I'm going

14   to be reminding you every time we get started and every time we

15   leave for the day.  You've been given the instructions and

16   you're expected to abide by all of them.

17           Ready to proceed?

18           MS. KANOF:  Yes, Your Honor.  Thank you.

19           THE COURT:  You may.

20   VICTOR PIMENTEL ROJAS, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

21                        DIRECT EXAMINATION

22   BY MS. KANOF:

23   Q.  Mr. Pimental [sic], may I remind you you're still under

24   oath?

25           Pimentel.  I keep mispronouncing.  Sorry.  May I

Pimentel – Direct by Ms. Kanof

1    remind you you're under oath?  Do you understand that?

2    A.  Yes.

3    Q.  Okay.  Yesterday, we were on Exhibit 26.  And there aren't

4    too many more e-mails.  So --

5    A.  This --

6    Q.  No, 26.  I'm sorry.

7          Exhibit 26.  And fortunately, I've learned how to

8    scroll down when it's -- it's cutting it off.

9          THE COURT:  Before you start your questioning,

10   Ms. Kanof.

11         Mr. Pimentel, you're talking really fast.  Okay?

12   You've got to slow down for the benefit of just -- not just the

13   people in here.  But my court reporter has got to make sure she

14   takes everything down.  Slow it down.

15         THE WITNESS:  Yes, sir.

16   BY MS. KANOF:

17   Q.  Okay.  I think we already did Exhibit 26, so we'll go to

18   26A.

19         Have you got 26A on the screen in front of you?

20   A.  Yes.

21         MS. KANOF:  And may we publish it, Your Honor?

22         THE COURT:  You may publish.  If it's been admitted

23   you don't have to request it.

24         MS. KANOF:  Thank you, Your Honor.

25

```
 1   BY MS. KANOF:
 2   Q.  On July 26th of 2007, did you receive an e-mail from
 3   Mr. Delgado with attachments?
 4   A.  Yes.
 5   Q.  And what -- he says, "Friend I've attached the three key
 6   documents with which we started negotiating with partners in
 7   New Jersey.  I'm going to send them to Pete, once I have your
 8   approval to start and capitalize the operation.  I ask you to
 9   review as soon as possible in case they merit changes before
10   sending."
11        Okay.  First of all, did you have partners in
12   New Jersey?
13   A.  No.
14   Q.  Why is he saying that?  Do you know, or did you --
15   A.  I don't know.
16   Q.  More code?
17   A.  Yeah.
18   Q.  And --
19        MR. ESPER:  Excuse me, Your Honor.  I'm going to
20   object.  That's unresponsive to the question.  I object and ask
21   that it be stricken.
22        THE COURT:  I'll sustain the objection.
23        MR. ESPER:  Pardon me?
24        THE COURT:  I'll sustain the objection.
25
```

Pimentel – Direct by Ms. Kanof

1    BY MS. KANOF:

2    Q.  What is the purpose of putting New Jersey in an e-mail when

3    you do not have partners in New Jersey?

4    A.  It's code.

5          MR. ESPER:  Objection, Your Honor.  He testified

6    earlier he doesn't know what New Jersey is about, and now he's

7    trying to say it's a code.

8          MS. KANOF:  He didn't say he didn't know.

9          THE COURT:  Overruled.  Overruled.

10   BY MS. KANOF:

11   Q.  Attachment Number 1 –– okay.  Before I go to the

12   attachments.

13          You received this e-mail, correct?

14   A.  Yes.

15   Q.  And when you received the e-mail, did you know what the

16   attachments were about?

17   A.  It's mentioned in there, that's documents for the bond.

18   Q.  I'm sorry.  I can't hear you very well.

19   A.  It's –– on the e-mail it states that they're documents that

20   we were going to use to cash the bond.

21   Q.  Okay.  And I guess that's on the subject line.  Is that

22   correct?

23   A.  Yes.

24   Q.  Rough draft documentation bond?

25   A.  Yes.

1   Q.  Okay.  The first document that was attached is called a

2   confidentiality agreement.  And does it say on it that there's

3   a corporation an LLC?

4   A.  Yes.

5   Q.  What —— and the name of it?

6   A.  TEPDEL.

7   Q.  TEPDEL Group?

8   A.  Yes.

9   Q.  And what is TEPDEL?

10  A.  I know that it was a corporation, that it was supposed to

11  be used to —— once the money of the bond was received, they

12  were going to put the money on that corporation and use it to

13  disburse the money across the parties involved.

14  Q.  Okay.  And you're not mentioned in this; is that correct?

15  A.  Correct.

16  Q.  The second document that was attached, that's on the

17  screen, what is that?

18  A.  It's the articles of the organization of the TEPDEL Group.

19  Q.  And who does it list as being part of the TEPDEL Group?

20  A.  Five people:  Pedro Mendoza, Francisco Fernandez, Lilian de

21  la Concha, Rafael Renteria, and Marco Delgado.

22  Q.  Okay.  And what is Mr. Delgado's address?

23  A.  7362 Remcon Circle, El Paso, Texas  79912.

24  Q.  And read, please, paragraph Number 4.

25  A.  The name and post office or a street address, either

1  residence or business, of the sole organizer is Marco Delgado,

2  7362 Remcon Circle, El Paso, Texas  79912.

3  Q.  And then does it have a signature line?

4  A.  No.

5  Q.  No.  I'm not asking if it has a signature.  Does it have a

6  line for a signature?

7  A.  Yes.

8  Q.  And whose name is under that line?

9  A.  Marco Delgado.

10  Q.  The third document, what is it dated?

11  A.  July 6, 2007.

12  Q.  And what is it called?

13  A.  Revelations of the TEPDEL Group.

14  Q.  Where is it allegedly incorporated?

15  A.  In the state of Nevada.

16  Q.  And what does it say about the state of Nevada?

17  A.  A Nevada Limited Liability Company.

18  Q.  What, if anything, do you know about Mr. Delgado using the

19  state of Nevada for corporations?

20  A.  According to Mr. Delgado, the state of Nevada was pretty

21  friendly with corporations, with LLCs.  So in case that

22  something happened and something went wrong with the business,

23  the government is only going to be able to take the assets from

24  the LLC.  They cannot go through your personal assets.

25  Q.  Okay.

1    A.   So pretty much you're protecting yourself and your personal

2    assets against any legal action from the government.

3    Q.   Basically, the document is fairly lengthy, correct?

4    A.   Yes.

5    Q.   And if you'll go to page 3 of the document, are the

6    para- -- do the paragraphs bear a number?

7    A.   Yes.

8    Q.   If you would go to paragraph 2.04.

9    A.   Uh-huh.

10   Q.   And paragraph 2.04, could you read it, please?

11   A.   "2.04.   Purposes.   The purposes of the company are to

12   engage in the returnable plastic container business and any and

13   all other lawful purposes for which limited liability companies

14   may be organized in the state."

15   Q.   Was there ever a mention in any of the meetings of a

16   returnable plastic container business?

17   A.   No.

18   Q.   Did you even discuss -- ever discuss a returnable plastic

19   container business with Mr. Delgado?

20   A.   No.

21   Q.   And why was he sending these documents to you?

22   A.   It's stated in the e-mail that he wanted me to review the

23   e-mail to see if the people in Mexico would agree with the

24   terms of the attachments of that e-mail.

25   Q.   Why did he think you would know if the people in Mexico

1    would agree with the terms?

2    A.  I don't know.

3    Q.  And then on the very last page, page 23 of the document, is

4    it Exhibit A to this -- the articles?

5    A.  Yes.

6    Q.  And who does it name as members?

7    A.  It's Pedro Mendoza, Francisco Fernandez, Lilian de la

8    Concha, Marco Delgado, and Rafael Renteria.

9    Q.  In the last column it says "Sharing Ratio."

10            Is there any percentage next to anyone's name?

11   A.  Yes.

12   Q.  Whose name?

13   A.  Marco Delgado.

14   Q.  What is the percentage?

15   A.  45 percent.

16   Q.  Did this have -- this didn't have anything to do with

17   plastic containers, did it?

18   A.  No.

19   Q.  What did it -- what was the purpose of this document?

20   A.  Once -- well, it is -- when you have an LLC and you have

21   the 45 percent of the sharing ratio, any profit or any money

22   that the LLC does, 45 percent is yours.

23   Q.  Okay.  Was this document drafted by Mr. Delgado?

24   A.  I cannot be 100 percent sure, but he was the one that sent

25   it to me.

Pimentel – Direct by Ms. Kanof

1   Q.   And after you received it, did you discuss it with him?

2   A.   Yes.

3   Q.   What -- where did -- where were you when you discussed it?

4   A.   Over the phone.

5   Q.   And what did you discuss?

6   A.   Well, that it looks good to me.  I don't have any law

7   degree or any legal training.  So as far as my knowledge, it's

8   good for the purposes that we wanted to...

9   Q.   What were those purposes?

10  A.   Again, when the bond was cashed, we were all going to

11  receive a share of that money.  And obviously, the percentages

12  are pretty clear here.  45 percent of that money was going to

13  be to Marco.  And half of that, according to our discussion,

14  was going to be mine.

15  Q.   Back when the bond was still brought up, first brought up,

16  was it part of your money laundering discussions?

17  A.   Yes.

18  Q.   And was there any negotiations that would result in a

19  contract like this or a business like this?

20  A.   Yes.

21  Q.   Explain that.

22  A.   Well, we got together and we discussed the bond.

23  Q.   Who is "we"?

24  A.   Pedro Mendoza, Francisco Ramirez, Lilian, Marco Delgado,

25  Rafael Renteria, and myself.  And there were a couple of other

Pimentel - Direct by Ms. Kanof

1    people on the table, and they are mentioned in the document.

2           And we discussed the percentages and the procedures to

3    cash the bonds and provide the providence for the origin of the

4    document.

5    Q.   Okay.  You used the "providence."  What is your

6    understanding, from talking to Mr. Delgado?

7    A.   The providence is the legal documentation that made the

8    holder of the bond the legal owner.  So you basically provide

9    the track of how you get ahold of that bond legally, so you can

10   cash it with no problem with the U.S. Government.

11   Q.   When the bond was given to you, did it have a providence?

12   A.   No.

13   Q.   And why are you talking about a providence?

14   A.   That's what -- Marco offered his services.  That was pretty

15   much the whole point of bringing Marco to the bond business,

16   that he could provide that documentation so the bond could be

17   cashed.

18   Q.   And did you and Mr. Delgado discuss him providing that

19   documentation?

20   A.   Yes.

21   Q.   Was that documentation going to be truthful regarding the

22   owner?

23   A.   No.  We didn't knew the origin of the bond, so it was clear

24   that it was not going to be truthful.

25   Q.   Okay.  Moving on to Government's Exhibit 26A -- oh, that's

1    the one we just did.  Sorry.

2            27.  You recognize this exhibit?

3    A.  Yes.

4    Q.  And what is it?

5    A.  Scroll down some.

6            It's an e-mail that somebody by the name of Pedro sent

7    to Marco, and it was forwarded to me and other people involved

8    in the bond transaction.

9    Q.  The date of the e-mail?

10   A.  There's several, but the first date is August 5th, 2006.

11   Q.  And you see that the date is in Spanish, correct?

12   A.  Yes.

13   Q.  And Mr. Renteria, where did he live?

14   A.  In Puebla, Mexico.

15   Q.  Okay.  And what is the subject?

16   A.  Bond.

17   Q.  And when -- that e-mail is forwarded to you by whom?

18   A.  Marco Delgado.

19   Q.  And what did Mr. Renteria say in the e-mail?

20   A.  Can we go up a little bit?

21   Q.  I'm sorry?  I need to move it up for you?

22   A.  Yeah.  Because -- yeah.

23           Well, he's -- addressed to Marco and said, "Marco,

24   it's a pleasure to greet you below.  I inform you that today,

25   August 14th, I spoke with Chuy and he informed me that

1    August 20 it's likely that that day the Spanish business will

2    be ready.  The business in which the advance was made has not

3    been settled, which is the business in the U.S."

4    Q.  And does anyone respond, on –– at least on this?

5    A.  No.  It was just forwarded to me by Marco with an FYI.

6    Q.  Okay.  What was the date –– the date it was written was

7    what?

8    A.  Wednesday, August 15th, 2007.

9    Q.  Okay.  And the date it was forwarded to you, is that the

10   same date?

11   A.  No.

12   Q.  When was it forwarded to you?

13   A.  August 15th –– oh, yeah.  August 15th, 2007.  Sorry.

14   Q.  Government's Exhibit 28.  28 is –– oh, here it is.  Okay.

15   I messed up.

16        Government's Exhibit 28.  Can you identify it?

17   A.  Yes.

18   Q.  And going from the bottom, is that –– the bottom, is that

19   the e-mail that you just discussed?

20   A.  Yes.

21   Q.  So it's the beginning of this e-mail stream?

22   A.  Yes.

23   Q.  Okay.  After Pedro Mendoza sends that e-mail and Marco

24   sends it to you on Friday the 24 –– on Friday –– I'm sorry.

25        On the 24th of August, is there another e-mail to

1    Marco?

2    A.   Yes.

3    Q.   And who is it from?

4    A.   Pedro Mendoza.

5    Q.   What does it say?

6    A.   If we go back --

7    Q.   No, that was the one you already testified to.  So starting

8    at "magnificent."

9    A.   What Marco responds to Pedro was that it was magnificent,

10   the news that Pete had for him.  And they set up a meeting next

11   Tuesday at 5:00 p.m., when they saw each other the last time,

12   and they were going to wait for everybody's confirmation.

13   Q.   What location was he talking about?

14   A.   Mexico City's airport.

15   Q.   Okay.  And is there another e-mail from Pedro Mendoza to

16   Marco Delgado on Friday, the 24th of August?

17   A.   Yes.

18   Q.   And what does Mr. Mendoza Meneses say?

19   A.   They're just confirming the date for the Tuesday,

20   August 28, at 5:30 at the Mexico City airport.

21   Q.   And he -- Mr. Delgado forwarded these to you?

22   A.   Yes.

23   Q.   Okay.  And when he forwards it to you, what does he say?

24   A.   He's asking me to call him and he sends me a hug.

25   Q.   What does "PTI" mean?

1    A.  I have no idea.

2    Q.  Government's Exhibit Number 29.

3          Okay.  Before we go to Government's Exhibit 29 let's

4    talk a little bit.

5          So now we're in the end of August of 2007, correct?

6    A.  Correct.

7    Q.  And what is the significance of these communications

8    directly with one of the individuals from Mexico?

9    A.  Well, finally, we are ready to start operation.  Finally,

10   we set up the meeting in Mexico.  We all got together there,

11   and we're ready to go.

12   Q.  Did you get together on August 28th or around that time?

13   A.  Yes.

14   Q.  And where did you meet?

15   A.  At the Mexico City airport.

16   Q.  I'm sorry.  At the -- yesterday you testified about Chuy

17   requiring identification.  Was that the meeting where he

18   required identification?

19   A.  Yes.

20   Q.  Okay.  And after that meeting what happened?

21   A.  Basically, we just got together.  We all went to the

22   airport.  We were all there.  We discussed that we were ready.

23         It was not that long of a meeting, probably half an

24   hour, 45 minutes, and pretty much that we're ready to go.

25   We're going to do the money transportation.

Pimentel - Direct by Ms. Kanof

1    Q.  Did you travel to Mexico with Mr. Delgado?

2    A.  No.  I was already in Mexico City.

3    Q.  And how did -- where did you go when you left the airport

4    in Mexico City?

5    A.  That night?

6    Q.  No.  Just -- what happened next in this subject matter?

7    A.  Well, I stayed in Mexico City just waiting for final

8    instructions.

9    Q.  And who did you get the final instructions from?

10   A.  Mr. Delgado.

11   Q.  And did he convey them to you while you were in Mexico

12   City?

13   A.  Yes.

14   Q.  What did he tell you to do?

15   A.  Oh, no.  I'm sorry.  No.  I flew to El Paso, when we were

16   ready to go.  I crossed and we met, and that's when we set up

17   the final details, which we had no idea what we were going to

18   do, to be honest with you.  So there was not a lot of details

19   to --

20   Q.  To talk about?

21   A.  -- to talk about.

22   Q.  At the time that you had that discussion with him in -- was

23   at the end of August of 2007?

24   A.  Yes.

25   Q.  Did you know how much money was going to be laundered?

Pimentel – Direct by Ms. Kanof

1  A.  Yes.

2  Q.  How much?

3  A.  It was –– be a total of $600 million.

4  Q.  Did you expect that there would be $600 million in this

5  first laundering?

6  A.  No.

7  Q.  Okay.  How much money –– was it discussed how much money

8  would be in the first laundering effort?

9  A.  Yeah.

10  Q.  And who discussed that?

11  A.  We all did, in the Mexico City meeting.

12  Q.  And how much money?

13  A.  $1 million.

14  Q.  When –– what was the purpose of starting with $1 million?

15  A.  It was a trial run.

16  Q.  What do you mean by a trial run?

17  A.  Well, you need to prove these people that you can do what

18  you've been saying for a year that you can do.

19  Q.  So when you discussed it with Mr. Delgado, when you got

20  back to El Paso, were the particulars of how it would happen

21  discussed?

22  A.  No.

23  Q.  When was –– when did that occur?  What was the next

24  discussion you had regarding the laundering of the million

25  dollars?

1    A.  There was not a lot more discussions.  After that, we just

2    wait for the final day and...

3    Q.  And did the final day come?

4    A.  Yes.

5    Q.  What day was that?

6    A.  I don't remember exactly.

7    Q.  Okay.  Do you remember what you did when the directions

8    were received?

9    A.  Yes.

10   Q.  What did you do?

11   A.  I drove with my car from Mexico City to El Paso.  I crossed

12   with my car to -- from Juárez to El Paso.

13   Q.  What bridge did you use?  Do you remember?

14   A.  Yeah.  The Cordova Bridge, the one downtown.

15   Q.  When -- did you cross with Marco Delgado very often?

16   A.  In the same car?

17   Q.  In the same car.

18   A.  Not very often.

19   Q.  Do you know what bridge he used when he crossed into

20   Mexico?

21   A.  Probably the Santa Teresa.  Because it just makes sense if

22   you land in the Juárez airport, it's the faster route to the

23   west side of El Paso, which is where he was living with her

24   [sic] mom at the time.

25   Q.  When -- who -- who told you to drive to Atlanta?

Pimentel – Direct by Ms. Kanof

1    A.  No, I didn't drive to Atlanta.  I flew to Atlanta.

2    Q.  Oh, I'm sorry.  You drove your vehicle where?  From Mexico

3    City to where?

4    A.  From Mexico City to Juárez, and we crossed with my vehicle

5    to El Paso.

6    Q.  Were you by yourself?

7    A.  No.  I was with my cousin.

8    Q.  Okay.  Did you have a nickname that you called your cousin?

9    A.  Yes.

10   Q.  What is that?

11   A.  Ready.  We have two.  Ready and Inclan.

12   Q.  Inclan?  Could you spell that, please?

13   A.  I-N-C-L-A-N.

14   Q.  You've had an opportunity to listen to some phone calls.

15        And when you refer to Inclan in the phone calls, who

16   are you referring to?

17   A.  My cousin.

18   Q.  Okay.  And your cousin drove with you from Mexico City to

19   Juárez?

20   A.  Yes.

21   Q.  What was the purpose of that?

22   A.  Again, we were pretty stupid in our plans.  So it occurred

23   to me that we were going to transport the money in my personal

24   vehicle.  So we drove together --

25   Q.  Wait.  Why do you think that's stupid?

1   A.  Well, because it has Mexico City license plates, so it was

2   pretty stupid from my part.

3           We drove over there from Mexico City to here, and then

4   I flew from El Paso to Atlanta while my cousin was driving my

5   vehicle from El Paso to Atlanta.

6   Q.  Okay.  And why were you going to Atlanta?

7   A.  To pick up the money.  That was the location of the money.

8   Q.  Okay.  And when you flew to Atlanta, where did you go?

9   A.  I went to the Hyatt hotel at the airport.

10  Q.  What were the instructions that were given to you?

11  A.  I was going to meet with two other people there.  And we

12  were --

13  Q.  Did you know who?

14  A.  Yes.

15  Q.  Who?

16  A.  It was Pedro Meneses and somebody else.  I don't remember

17  the -- Chilo was his name.

18  Q.  Okay.  And --

19          MR. ESPER:  I'm sorry.  I didn't hear that,

20  Your Honor.

21          THE COURT:  Repeat it.

22  BY MS. KANOF:

23  Q.  You said Chilo?

24  A.  Chilo, C-H-I-L-O.

25  Q.  Was Chilo related to anybody?

1    A.  To Pedro.

2    Q.  How was he related to Pedro?

3    A.  He -- it was his nephew.

4    Q.  Okay.  And you were going to meet with him at that hotel?

5    A.  Yes.

6    Q.  So on September -- what -- was it September 4th?

7    A.  Yes.

8    Q.  On September 4th of 2007, did you fly from the El Paso

9    International Airport to --

10   A.  Atlanta, Georgia.

11   Q.  -- McLaren, in Atlanta?

12   A.  Yes.

13   Q.  And you were by yourself?

14   A.  Yes.

15   Q.  Were you in communication with anyone?

16   A.  With everybody.

17   Q.  Okay.  And who is everybody?

18   A.  Marco Delgado, Pedro, Chilo.

19   Q.  Okay.  And did you, in fact, have a meeting at the Hyatt?

20   A.  Yes.

21   Q.  With who -- with those two individuals?

22   A.  With those two individuals, yes.

23   Q.  Had your cousin arrived yet?

24   A.  Yes, but my cousin was not present at the meetings.

25   Q.  All right.  And what was discussed at the meeting?

Pimentel - Direct by Ms. Kanof

1    A.  Not much.  We were just waiting for the call from the

2    cartel to pick up the money.

3    Q.  All right.  Did that call come?

4    A.  Yes.

5    Q.  Now while you were waiting for the call from the cartel to

6    pick up the money, you previously testified that there was a

7    discussion about having some papers.

8    A.  I don't think I have discussed that yet.

9    Q.  Oh, I'm sorry.  Okay.

10          Did you have a discussion with Mr. Delgado about what

11   you should do if you got caught?

12   A.  Yes.

13   Q.  What did he tell you?

14   A.  He was going to provide me with documentation that would --

15   would help me to prove that the money was not from any illegal

16   business.

17   Q.  Did he tell you what kind of documentation?

18   A.  Not at the time.

19   Q.  When did you find out what type of documentation?

20   A.  When I opened the attachment of the e-mail.

21   Q.  I'm sorry?

22   A.  When I opened the attachment of e-mail that he sent me.

23   Q.  If you look to Government's Exhibit Number 29, please --

24   A.  Uh-huh.

25   Q.  -- an e-mail.

1          What is the subject of the e-mail?

2    A.   Proposed Settlement.

3    Q.   Who is the e-mail from?

4    A.   Marco Delgado.

5    Q.   What is the date?

6    A.   September 4, 2007.

7    Q.   What did Mr. Delgado write?

8    A.   "Esteemed attorney, attached please find the sanitized

9    settlement form for purposes of your negotiations.  Best luck.

10   Let me know if you receive it."

11   Q.   Now, he says esteemed attorney.  Did he usually call you

12   that?

13   A.   No.

14   Q.   Why does he call you that, if you know, in this e-mail?

15   A.   I don't know.

16   Q.   Was there an attachment?

17   A.   Yes.

18   Q.   I'm going to show you what's marked as Government's

19   Number 30, Exhibit Number 30.

20          And what is that document?

21   A.   It's a picture of my -- pretty much of my -- of my phone.

22   Q.   Okay.  And what is it a picture -- they call it a screen

23   shot?

24   A.   It's a screen shot, yes.

25   Q.   And what is it a screen shot of?

Pimentel – Direct by Ms. Kanof

1   A.  It's showing that the e-mail comes from Marco Delgado on

2   September 4th, 2007, at 1:35 p.m.  And it shows that there's an

3   attachment on the e-mail.

4   Q.  And then does the computer give you information about the

5   delivery of the e-mail?

6   A.  Yes.

7   Q.  And what did it say?

8   A.  It says, "Your message was delivered to the recipient."

9   Q.  And then at the bottom, does it reference that there's an

10  attachment?

11  A.  Yes.

12  Q.  Okay.  Exhibit Number 31.

13        You recognize that?

14  A.  Yes.

15  Q.  And what is the date?

16  A.  September 4, 2007, at 1:37 p.m.

17  Q.  Again in this one there's no subject, correct?

18  A.  Correct.

19  Q.  What -- who is it from?

20  A.  Marco Delgado.

21  Q.  To you?

22  A.  Yes.

23  Q.  What did he tell you?

24  A.  He was re-sending the e-mail.  He wanted to confirm if I

25  received it.

1    Q.  Is this what was attached to the e-mail, the next page in

2    that same government's exhibit?

3    A.  Yes.

4    Q.  And where did you receive this e-mail?

5    A.  I opened it at the busi- –– well, it was not a business.

6    It was a computer.  We had a printer at the Hyatt hotel in

7    Georgia.

8    Q.  Okay.  So how –– did you know this was going to be sent to

9    you before it was sent to you?

10   A.  I knew that some type of documentation was going to be sent

11   to me, but I didn't knew [sic] what type of documentation.

12   Q.  Okay.  And if you will look at paragraph 2.

13          Is this –– is this the document that was sent to you?

14   A.  Yes.

15   Q.  Okay.  If you look at paragraph 2, what does it –– read it

16   to the jury, please.

17   A.  "In consideration of the promises and undertakings of

18   Hernandez set forth in this Settlement Agreement and General

19   Release Agreement, Texas Oil Corporation agrees to pay

20   Hernandez and his attorney, Victor Pimentel, collectively, the

21   total sum of $1,583,000 and no cents to be divided and

22   distributed between themselves as they see fit."

23   Q.  Who –– okay.

24          First of all, who is Juan Manuel Hernandez?

25   A.  I don't know.

 1   Q.  And the Texas Oil Company?

 2   A.  I don't know.

 3   Q.  Are you aware?

 4   A.  No.

 5   Q.  Were you aware on this day?

 6   A.  No.

 7   Q.  With regard to the document, did you read the whole thing?

 8   A.  Not the whole thing.  I just scanned it.

 9   Q.  Okay.  If you look at page 2 of the document that's now

10   before you on the screen, there's a whole list of names and

11   companies.

12          Do you know anything about those?

13   A.  No.

14   Q.  Okay.  Did Mr. Delgado discuss using those names and

15   companies before he created this document?

16   A.  No.

17   Q.  And again at the end of the document, does your name

18   appear?

19   A.  Yes.

20   Q.  And what are the words under your name?

21   A.  Attorney for Plaintiff.

22   Q.  Okay.  And what is the date at the bottom?

23   A.  August 31st, 2007.

24   Q.  Okay.  Did you sign -- once you received it through the

25   computer in the hotel in Atlanta, did you sign the document?

1    A.  Yes.

2    Q.  And what did you do with it?

3    A.  I put it in a folder, the paper folder.

4    Q.  And after you signed the document, what did you do with it?

5        You put it in a paper folder and then what?

6    A.  I took it with me.

7    Q.  I'm sorry?

8    A.  I took it with me.

9    Q.  Where did you take it?

10   A.  Well, first to the meeting to pick up the money.

11       And then after I picked up the money, I took it with

12   me to the Georgia airport where my cousin was waiting for me

13   with my car.  So I put the folder with the money, and we put

14   the document in my car.

15   Q.  Government's Exhibit Number 2.  Is that another screen

16   shot?

17   A.  Yes.

18   Q.  And does it show when he re-sent it?

19   A.  Yes.

20   Q.  Is this one the one that was re-sent?

21   A.  Yes.

22   Q.  And it occurred when?

23   A.  September 4, 2007, at 1:37 p.m.

24   Q.  Was it two minutes later?

25   A.  Two minutes later than the previous one, yes.

1   Q.  Okay.  Government's Exhibit Number 33.

2          This exhibit -- do you know where this exhibit came

3   from?

4   A.  No.

5   Q.  Okay.  And do you see on the exhibit, however, Government's

6   Exhibit 33, that it's the same agreement but has some changes?

7   A.  Well, I don't recall the other document, so I don't know.

8   What changes are you --

9   Q.  You weren't part of this; is that correct?

10  A.  Yes.

11  Q.  But I'll just show you.  Does it say $5 million?

12  A.  No.  It says 1,583,000.

13  Q.  Okay.  This is the second one, I think, that was -- that

14  was sent to you.

15         Okay.  So you're in the Hyatt hotel in Atlanta.

16  You're waiting for word.  Did you get word?

17  A.  Yes.

18  Q.  Do you know about when you got that word?

19  A.  It was about lunchtime.

20  Q.  What happened next?

21  A.  I don't remember if Pedro or Chilo received a -- we were

22  using Nextel at that time, the radio direct connect.

23  Q.  Nextel?

24  A.  Nextel, yeah, the cell phone provider.

25  Q.  What is Nextel?

Pimentel — Direct by Ms. Kanof

1   A.  You don't place phone calls.  You get, like, direct connect

2   with radio, like the beep, beep.  Like...

3   Q.  Is it called -- is there a special -- is it like an old

4   walkie-talkie kind of thing or...

5   A.  No.  Like a very new walkie-talkie, I would say.

6   Q.  Okay.  And you don't actually have to place the call?

7   A.  No.

8   Q.  And what information did you receive on that Nextel?

9   A.  We received a location that we were going to meet people,

10  that they were going to deliver the money to us.  We were

11  instructed to rent a car and drive to a location.

12  Q.  Did you rent a car?

13  A.  Yes.

14  Q.  What kind of car did you rent?

15  A.  If I recall correctly, it was a Ford.  It was either an

16  Edge or something like that.  It was white, a Ford white, some

17  type of vehicle.

18  Q.  And did you actually rent it or did one of the other

19  gentlemen rent it?

20  A.  I went with Peter to rent it, but he placed his credit card

21  for the rental.

22  Q.  What did you do next?

23  A.  We drove to the airport to pick up our luggage.  And then

24  we drove to the -- we drove to a restaurant where we were going

25  to meet with these people.

Pimentel — Direct by Ms. Kanof

1    Q.  What restaurant, if you recall?

2    A.  I don't recall the name of the restaurant.

3    Q.  Okay.  And what happened next?

4    A.  We sat down.  And five, ten minutes later, two people sit

5    down right at our table.

6    Q.  And then what happened?

7    A.  Then they asked us if we were riding a bicycle, referring

8    to if we had the car that they asked us to rent.

9          We said yes.

10         And they asked who was going to drive back to Mexico

11   with the money.

12         And I said I was going to do it.

13         And then they -- one of them asked me to go with him.

14   We get into the car.  We drove to a Kroger store.

15   Q.  A Kroger?  What kind of store is that?

16   A.  Kroger?  It's like a grocery store, to the parking lot.

17   They drop me at the Kroger store and they asked me to wait 20

18   minutes.

19   Q.  Did they leave you there or...

20   A.  Yes, they leave me there.

21   Q.  And were you in the vehicle that you had rented?

22   A.  No, no.  They took the vehicle with them.  They drop me at

23   the parking lot.  I wait -- they have some tables outside, so I

24   wait on the tables.

25   Q.  How long did you wait?

Pimentel – Direct by Ms. Kanof

1   A.  20 minutes --

2   Q.  And then what happened?

3   A.  -- exactly.

4        They -- I was instructed to wait.  Then the truck, it

5   was going to park at the parking lot and they were going to

6   leave the keys in one of the -- in the left tire of the car.

7        And I needed to wait until this person that was

8   driving the vehicle leave the parking lot until I approached

9   the vehicle to pick up the car with the money.

10  Q.  Did that happen?

11  A.  Yes.

12  Q.  Did you approach the truck?

13  A.  Yes.

14  Q.  Were the keys there?

15  A.  Yes.

16  Q.  What did you do?

17  A.  I drove back to the restaurant to pick up Pedro and Chilo.

18  Q.  And then where did you got?

19  A.  We went to the hotel to drop off Pedro and Chilo.

20  Q.  What happened with the truck?

21  A.  I was driving the truck.  We were using the same truck.

22  Q.  Oh.  By "the truck," do you mean your car?

23  A.  No, the car that we rent.

24  Q.  Oh, okay.

25  A.  Yeah.  That one.

Pimentel - Direct by Ms. Kanof

1    Q.   And then what happened?

2    A.   And then I dropped them at the Hyatt hotel.

3         I called my cousin, and we met at the airport.

4    Q.   All right.  And what happened at the airport?

5    A.   We put the money in my car, and I started driving back to

6    El Paso.

7    Q.   Describe what kind -- how the money was -- how were you

8    able to carry the money?

9    A.   It was two gym bags, probably this big (indicating), full

10   of money.  But I --

11   Q.   Did you look in it?

12   A.   Yeah.  I -- when I was driving to the airport, I parked in

13   a parking lot in a shopping mall, because I thought that the

14   currency was going to be like hundred-dollar bills, it wasn't

15   going to be such a big of a bulk.

16   Q.   Was it heavy?

17   A.   It was really heavy.

18        And then I parked to see where the money was.  I

19   thought it was going to be hidden or something, but it was not.

20   It was two -- what looked to me huge bags full of money, really

21   heavy, and the currency was 1s, 5s, 20s.  It was ridiculous how

22   big it was, and it was really heavy.

23   Q.   And after you checked and saw that it was money, you went

24   to the airport?

25   A.   Well, I -- yeah.

Pimentel – Direct by Ms. Kanof

1   Q.  Okay.  And what was the purpose of going to the airport?

2   A.  I was going to drop the rental, get my car that my cousin

3   drove to Georgia, and start going back to El Paso.

4   Q.  Okay.  Did you do that?

5   A.  Yes.

6   Q.  And you said your car -- what kind of a car do you have?

7   A.  It's a Jeep Compass.

8   Q.  A Jeep Compass?

9   A.  Yes.

10  Q.  The Government had an opportunity to show you a video of

11  you -- of the Jeep Compass after you were stopped in Carroll

12  County, Georgia.

13          Have you seen that video?

14  A.  Yes.

15  Q.  And is that your vehicle that's portrayed in the video?

16  A.  Yes.

17  Q.  Okay.  So what do you do, once you drop your cousin off?

18  A.  I drove --

19  Q.  Where was your cousin supposed to go?

20  A.  Back to Mexico.

21  Q.  And what did you do after you dropped him off at the

22  airport?

23  A.  I started driving -- well, I went to put some gas in the

24  car because there was not a lot of gas.  I filled my tank.  I

25  bought a map at the gas store, to drive back to El Paso.

Pimentel – Direct by Ms. Kanof

1              I ate something.  I bought something to eat, some

2    chips and a Gatorade, if I remember correctly, and then I

3    started driving back.

4    Q.  And did something happen to you while you were driving

5    back?

6    A.  Yeah.

7    Q.  What?

8    A.  I was stopped by a trooper of the Georgia State Police.

9    Q.  Who was that?

10   A.  Agent Dave Elliott.

11   Q.  Dave Elliott?

12   A.  Dave Elliott.

13   Q.  About how long were you outside of the Atlanta city limits

14   before you were stopped?

15   A.  Not much.  I drove probably for 30 minutes, probably less

16   than that.

17   Q.  Okay.  And were you nervous?

18   A.  Yes.

19   Q.  Okay.  And how -- how were you treated by Dave Elliott?

20   A.  With respect.  I cannot express how much -- how well they

21   treated me.  They treated me like a person, which I never

22   thought that could happen.

23   Q.  When -- was David Elliott initially alone?

24   A.  Yes.

25   Q.  And when he approached you, what did you tell him?

1    A.  Well, he stopped me first, and he started asking routine

2    questions of who I was, where I was driving, where I was coming

3    from, what was my purpose of driving through that route, and

4    things like that.

5    Q.  What did you tell him?

6    A.  I told him that I was coming from Disneyland, that I was

7    going back to Mexico.

8    Q.  Why did you tell him that you were coming from Disneyland?

9    A.  That was the first lie that came up to my mind.

10   Q.  And what else did you tell him?

11   A.  I told him that I have a newborn baby and I was dying to

12   see her.  And I showed him a picture of my daughter.

13   Q.  Okay.  Why did you lie to him?

14   A.  Well, because I was carrying a million dollars in cash in

15   the back of my car.

16   Q.  Did you have the settlement agreement with you?

17   A.  At that time, yes.

18   Q.  And at some point in time did you show that to him?

19   A.  Not to him.  I offered him to see it, but he told me that

20   we were going to wait until we were -- we were going to drive

21   to their office, or their station, and that was when I will

22   have a chance to explain myself and why I was carrying the

23   money.

24   Q.  Okay.  At some point in -- does anybody else show up?

25   A.  Yes.

Pimentel – Direct by Ms. Kanof

1   Q.   Who shows up first?

2   A.   A trooper named Chad.

3   Q.   Okay.  And when Chad shows up, did he take over the

4   questioning?

5   A.   Yeah.  After -- on the video, it shows that Dave Elliott is

6   talking with other people because my story is fishy, at the

7   least.

8        And then Chad, it was on my -- I was in the driver's

9   seat, obviously, and he was in my window.  And he's asking me a

10  couple of questions.  And then at some point he told me, Do you

11  have cash with you?

12       And I say, Yes.

13       And he asked me, How much money do you have with you?

14       And I said, A million dollars in cash.

15       And the first -- he didn't -- I think he did not

16  believe me.  And he asked me, Where is the cash?

17       And I said, Well, it's in the back of my truck.

18       And then he pulls his gun and he said, Get the fuck

19  out of the car now.

20       And obviously, I get the fuck out of the car.  And...

21  Q.   Did you -- did he ask you whether or not he could search

22  your -- your Jeep?

23  A.   Yes.

24  Q.   And what did you tell him?

25  A.   Yes.

1    Q.  And did he?

2    A.  Yes.

3    Q.  Did he find the million dollars?

4    A.  It was in the truck.  Yeah, just open the truck and it was

5    there.

6    Q.  It wasn't hidden or anything?

7    A.  No.

8    Q.  Okay.  At some point in the video someone handcuffs you?

9    A.  Yes.

10   Q.  Who was that?

11   A.  I don't remember.

12   Q.  And was it after the money was discovered?

13   A.  Yes.

14   Q.  Are they still treating you well?

15   A.  Yeah.  They actually allowed me to have the Gatorade that I

16   was --

17          MR. ESPER:  Excuse me, Your Honor.  This is

18   irrelevant.

19          MS. KANOF:  I'll move on.

20          THE COURT:  I'll sustain the objection.

21   BY MS. KANOF:

22   Q.  What else did you tell them?

23   A.  That I had the documentation, that it was all a

24   misunderstanding, that the money was from a settlement in Texas

25   that I was instructed to do.

Pimentel - Direct by Ms. Kanof

1   Q.  At some time, did you change your story?

2   A.  Yeah.

3   Q.  When?

4   A.  Well, when you are handcuffed on the highway in Georgia and

5   you're seeing your life going to waste, it's time to change

6   your life and start doing the right thing.  At least that was,

7   for me, the moment when I -- I started cooperating, because it

8   was pretty clear that what I was doing is illegal.

9   Q.  Did you start cooperating there on the side of the road or

10  did you wait until they took you down to the sheriff's office?

11  A.  We did not discuss about my cooperation on the side of the

12  road.  They read me my rights.  They told me that I was going

13  to be took to the detention facility, and that ICE people was

14  going to interview me and wanted to talk to me.

15  Q.  And did that happen?

16  A.  Yes.

17  Q.  Did they uncuff you?

18  A.  Actually, I drove my car to the detention facility to -- in

19  Georgia.

20  Q.  Okay.  Was there anybody with you?

21  A.  No.

22  Q.  They let you drive by yourself?

23  A.  Yes.

24  Q.  And you did, in fact -- how did you know where the

25  detention facility was?

Pimentel - Direct by Ms. Kanof

1    A.  They were behind me, and they were telling me with their

2    lights which exit, and they told me which speed should I be

3    driving.  And obviously, they advised me not to do anything

4    stupid, like trying to run away.

5    Q.  When you arrived at the -- where did you end up?

6    A.  The detention facility.

7    Q.  And what happened there?

8    A.  First, they count the money.  They talk to me just -- I

9    don't remember what was the conversation.  And then we took a

10   couple of pictures with the money.

11   Q.  Okay.  And then --

12   A.  Then they fingerprint me, and then the ICE agents arrived.

13   Q.  Did the sheriff's deputies interview you or did the ICE

14   agents interview you?

15   A.  The ICE agents interviewed me.

16   Q.  Okay.  And do you remember who arrived?

17   A.  It was, if I remember correctly, five agents total.

18   Q.  Okay.  And did they talk to you together?

19   A.  Yes.  Well, not all the five, but it was two.  And then

20   I -- with one.  It was different agents, if I recall correctly.

21   Q.  What did you tell them?

22   A.  Everything.

23   Q.  What do you mean by everything?

24   A.  Well -- well, everything.  How we start doing this

25   negotiation, how I met Mr. Delgado, what was the purpose of my

1    trip, how much money, how did I get the money, where did I get

2    the money, who was with me.

3    Q.  Okay.  So did you tell them basically what you've testified

4    to yesterday?

5    A.  Yes.

6    Q.  And did they give you -- did they ask anything of you?

7    A.  A lot of things about me.

8    Q.  No, I don't mean ask questions.  Did they ask you to help?

9    A.  Yes.

10   Q.  Who asked you?

11   A.  The ICE agents.

12   Q.  What did they ask you to do?

13   A.  That if I wanted to do the right thing.

14   Q.  What did you say?

15   A.  Yes.

16   Q.  Did they make any promises to you?

17   A.  No.

18   Q.  And what -- then what?  Did you -- then what did they want

19   you to do?  What is their definition of the right thing?

20   A.  Just cooperating and tell them what I was going to do with

21   the money and where I was going to drive with the money and who

22   I was going to deliver the money to.

23   Q.  Did they ask you to -- to go ahead and deliver the money to

24   Marco Delgado?

25   A.  Not that night, but it was discussed the next day.

1    Q.   Okay.  So the night of September the 4th you didn't -- they

2    didn't talk to you about using you; is that correct?

3    A.   No.

4    Q.   What happened the next day?  Did you spend the night in the

5    sheriff's office?

6    A.   Yes.

7    Q.   Okay.  And then what happened the next day?

8    A.   They allowed me to shower, then they gave me breakfast.

9    And then agent -- Trooper Chad and Dave Elliott drove me to the

10   ICE office in Georgia.

11   Q.   And what happened there?

12   A.   That's when they asked me if I wanted to cooperate.

13        And I said yes.  And -- yeah.

14   Q.   So what -- did they explain to you what they wanted you to

15   do?

16   A.   Yes.

17   Q.   What did they tell you?

18   A.   They wanted me to record my conversations with Mr. Delgado

19   and make a controlled delivery in El Paso.  And pretty much

20   that was it.

21   Q.   And at that time did you know what a controlled delivery

22   was?

23   A.   No.

24   Q.   Okay.  But did you find out what a controlled delivery is?

25   A.   Oh, yes.

1    Q.  And what -- what -- did you participate in a controlled

2    delivery?

3    A.  Yes.

4    Q.  What did you do?

5    A.  Since the beginning?

6    Q.  I'm sorry?

7    A.  Since the beginning or...

8    Q.  No.  Okay.  When you -- who did you leave the ICE office

9    with?

10   A.  I was by my -- which ICE office?  El Paso or Georgia?

11   Q.  Georgia.

12   A.  Oh, I was with everybody.  It was five agents from ICE and

13   Trooper Chad and Dave Elliott.

14   Q.  Okay.  And you left with all of those people?

15   A.  Yeah.  We flew all together to El Paso.

16   Q.  And do you know what happened to the money?

17   A.  Excuse me?

18   Q.  Do you know what happened to the money?

19   A.  It was with us.  We flew with a -- on a commercial airline

20   with the money.

21   Q.  And when you say "us," you didn't touch the money?

22   A.  No.

23   Q.  Okay.  One of the law enforcement officers was carrying the

24   money?

25   A.  Three of them, because it was really heavy.

Pimentel – Direct by Ms. Kanof

1   Q.   Okay.  And three of them.  Did they -- was it in the same

2   two bags that you had --

3   A.   It was in the same two bags.  And I was impressed of how

4   easy it is for the Government agents just to fly with

5   $1 million.  It's -- it was like a carry-on, and you just put

6   it on the plane, and we flew with a million dollars.

7   Q.   So what happened when -- you landed in El Paso.  And are we

8   on September 5th?

9   A.   Yes.

10  Q.   Okay.  And when you landed in El Paso, where did they take

11  you?

12  A.   To a hotel.

13  Q.   Okay.  And what hotel, if you recall?

14  A.   It was the Marriott Suites on the freeway.

15  Q.   What -- what did they instruct you to do?

16  A.   Well, that night besides the five agents, more agents from

17  ICE El Paso get to the hotel.  At that point probably it was

18  like 10, 12 agents in the room asking questions and drawing

19  conclusions.

20          And I was not involved in the conversation.  It was --

21  they were pretty much making between them, and once in a while

22  they ask me a question or two.

23  Q.   Okay.  Did they ask you -- what was the plan?

24  A.   At that time I didn't knew what was the plan.

25  Q.   Okay.  Did they tell you what the plan was at some time?

1   A.  Later, yes.  We were going to do a controlled delivery.

2   Q.  But did they tell you what your role would be?

3   A.  Well, I was already helping them to record my conversations

4   with Marco Delgado.

5   Q.  Okay.  So when did you start recording conversations with

6   Marco Delgado?

7   A.  When they took me to the ICE office in Georgia.

8   Q.  Okay.  And when Marco Delgado talked on the phone was he

9   easy to hear on those days?

10  A.  No.  He whispered a lot when we were talking about the --

11  this operation, this money laundering thing.

12  Q.  And at some point in time did you have some conversations

13  with him that were audible, that could be heard?

14  A.  Yes.

15  Q.  I'll draw your attention to Government's Exhibit 37A.

16          And first of all, do you recognize the document?

17  A.  Yes.

18  Q.  What is it?

19  A.  It's the transcript of a phone conversation that was

20  recorded in September 6, 2007, between me and Marco Delgado.

21  Q.  At what time?

22  A.  2:24 p.m.

23  Q.  And again, did the Government provide this transcript to

24  you to make sure that their translation fairly and accurately

25  represented the tenor of the conversation?

Pimentel — Direct by Ms. Kanof

1    A.  Yes.

2    Q.  Okay.  And you reviewed 37A, and it's correct?

3    A.  It's accurate, yes.

4         MS. KANOF:  Just for the jury's understanding,

5    Your Honor, the English is on the right side, the Spanish on

6    the left, and we've synchronized the transcript with the

7    conversation.

8         (Call played.)

9    BY MS. KANOF:

10   Q.  Okay.  That line, But they will have to.  That I know, they

11   have to verify the contract before beginning the other one.

12         What is he talking about?

13   A.  They need to count the money and make sure that the money

14   is complete and that we delivered what we promised to deliver.

15   It was a trial run.

16   Q.  Was there a written contract?

17   A.  No.

18   Q.  Okay.

19         (Call played.)

20   BY MS. KANOF:

21   Q.  And he said that he already told them that I had my people

22   ready to leave.

23         What does he mean by that?

24   A.  That we have people in place to do the next operation.

25   Q.  Okay.  And who is his people?

```
1    A.  I'm his people.
2              MR. ESPER:  I'm sorry.  I didn't hear the answer,
3    Your Honor.
4    A.  I am his people.
5              (Call played.)
6    BY MS. KANOF:
7    Q.  Does Mr. Delgado know where you were?
8    A.  No.
9    Q.  Where -- where did he think you were, based on the
10   conversation?
11   A.  He thought I was driving back from Georgia to El Paso.
12   Q.  Okay.  So he does not know you're in El Paso?
13   A.  Yeah.  He doesn't know.
14   Q.  So when you talk about driving and being tired, is that
15   what he's referring to?
16   A.  Yes.
17              (Call played.)
18   BY MS. KANOF:
19   Q.  Okay.  The only thing that I tell you is that -- remember
20   that I think that the volume will triple.
21              What does that mean?
22   A.  That if we had a successful one million trial run, probably
23   the next run it was going to be triple that, so $3 million.
24   Q.  And then he says, I think that if now there are about 20
25   sheets of paper, what is he talking about?
```

1    A.  It's just a figure of speech.  Again, more code.  Because

2    we refer to the money as the contract.  So the contract is --

3    really means sheets of paper.  So...

4              (Call played.)

5    BY MS. KANOF:

6    Q.  80, 3 times 20?

7    A.  Well, he had his math wrong.  3 times 20 is 60.  But, yeah.

8              (Call played.)

9    BY MS. KANOF:

10   Q.  The voice that you -- the voices that you hear in English,

11   what are they?

12   A.  The ICE agents recording the conversation.

13   Q.  Okay.  And the next time that you talked to him, was it

14   that same day?

15   A.  Yes.

16   Q.  I'm pulling up what's been marked as Government's Exhibit

17   38A.

18              Is that another transcript?

19   A.  Yes.

20   Q.  Was this another conversation that you had with him on that

21   day?

22   A.  Yes.

23   Q.  And what time did it occur?

24   A.  4:34 p.m.

25              (Call played.)

Pimentel – Direct by Ms. Kanof

1   BY MS. KANOF:

2   Q.  Okay.  You're talking about a big box.  And you actually

3   come out and state, And there we can store the money, correct?

4   A.  Yes.

5   Q.  And are you referring to the million dollars?

6   A.  Yes.

7   Q.  Okay.

8           (Call played.)

9   BY MS. KANOF:

10  Q.  Okay.  And were you say, Yes, yes.  Good.  A little bit

11  tired, is that where it's clear that he did not know that you

12  were in El Paso?

13  A.  Yes.

14  Q.  Okay.

15          (Call played.)

16  BY MS. KANOF:

17  Q.  Okay.  So what was the plan?  What did you do on this --

18  did you do something on the 6th of September after these phone

19  calls?

20  A.  Excuse me?

21  Q.  Did you do something on the 6th of September after these

22  phone calls?

23  A.  I think I spent the night at the hotel with the...

24  Q.  Okay.  And what happened on September 7th?

25  A.  We set up a controlled delivery.

1    Q.  And did you make that controlled delivery?

2    A.  Yes.

3    Q.  Where were you instructed to tell Mr. Delgado that you

4    would meet?

5    A.  Where he was living at his mother's house.

6    Q.  Did you do that?

7    A.  Well, actually, I was not instructed.  He asked me to pick

8    him up there.

9    Q.  Okay.  And again, there are some conversations that

10   occurred that are inaudible because he was whispering; is that

11   correct?

12   A.  Yes.

13   Q.  So he's the one that asked you to pick him up at his

14   mother's house?

15   A.  Yes.  Because we were going to drive back to Mexico

16   together, so there was no point in picking him up in another

17   place.

18   Q.  Okay.  Government's Exhibit Number 39.

19        Do you recognize this location?

20   A.  Yes.

21   Q.  What is it?

22   A.  It's Marco's mom's house.

23   Q.  And is there someone depicted in that photo?

24   A.  Yes.

25   Q.  Who is that walking in front of that white vehicle with the

1   bag in his hand?

2   A.  It's Mr. Delgado.

3   Q.  Government's Exhibit Number 40.

4          What does that depict?

5   A.  It's Marco with myself.

6   Q.  Are you wearing the white cap?

7   A.  Yes.

8   Q.  And is that -- he's walking towards you.  And is that your

9   vehicle that you're standing behind?

10  A.  It's the rental vehicle that the ICE agents provided me

11  to --

12  Q.  Okay.  Well, let's talk about this.

13         What -- you were supposed to rent a vehicle and drive

14  it back?

15  A.  Yes.  That's what I told Marco that I was going to do.

16  Q.  Okay.  And so was a rental vehicle provided for you?

17  A.  Yes.

18  Q.  And was this the rental vehicle that was provided for you?

19  A.  Yes.

20  Q.  Government's Exhibit Number 41.

21         What is that a photo of?

22  A.  It's, again, Mr. Delgado and myself hugging.

23  Q.  Okay.  You were basically acting how?

24  A.  Like always.  We were very good friends.

25  Q.  Okay.  Government's Exhibit Number 42.

Pimentel - Direct by Ms. Kanof

1              I know that's -- it's hard to see because of the tree

2    that's in the way.  But what does that depict?

3    A.  It looks like it's me closing the car.

4    Q.  You're doing what?  I'm sorry?

5    A.  At the back of the car.

6    Q.  Okay.  Government's Exhibit Number 43.

7              What is that a photograph of?

8    A.  It's the rental car that was provided to me by the ICE

9    agents.

10   Q.  Do you know who took that picture?

11   A.  Excuse me?

12   Q.  Do you know who took that picture?

13   A.  No.

14   Q.  But is that -- that was your car?

15   A.  Yeah.

16   Q.  Number 44.

17             What is that a picture of?

18   A.  That's the money in the two bags.  Marco's -- this one is

19   the Marco luggage and this --

20   Q.  Okay.  He was carrying out some things, right?

21   A.  Yes.

22   Q.  Was he carrying out luggage?

23   A.  Yes.

24   Q.  In the middle of that picture there's a brown leather bag.

25   Who does that belong to?

Pimentel – Direct by Ms. Kanof

1    A.   Marco Delgado.

2    Q.   And next to it there's a black -- to the right of it

3    there's a black bag sitting on top of a red duffel bag.  Who

4    does that black bag --

5    A.   Mine.

6    Q.   I'm sorry?

7    A.   Mine.

8    Q.   That's yours?

9    A.   Yes.

10   Q.   Okay.  And what was in the black bag?

11   A.   Clothing.

12   Q.   The brown bag, was that the luggage that you're referring

13   to?

14   A.   That was -- that's Marco Delgado's luggage bag.

15   Q.   Was he going somewhere?

16   A.   He was going to drive with me to Mexico.

17   Q.   Okay.  And the two red duffel bags, what -- they had the

18   money in it?

19   A.   That's the million dollars.

20   Q.   Did the ICE agents actually leave the money in the bags?

21   A.   Yes.

22   Q.   Government's Exhibit Number 45.

23        That's another photograph, but a closeup of the bags

24   and the luggage, correct?

25   A.   Correct.

Pimentel – Direct by Ms. Kanof

1   Q.  Government's Exhibit Number 46.

2           And obviously, this was taken without Mr. Delgado

3   present, correct?

4   A.  I -- I don't know.

5   Q.  Oh, you don't know.

6           Is that what the money looked like?

7   A.  Yeah.

8   Q.  And previously, you testified to this jury that they were

9   in small denominations.  Is this a representation of the 20s --

10  A.  Yes.

11  Q.  -- and how they were wrapped?

12  A.  Yes.

13  Q.  There are rubber bands?

14  A.  Rubber bands and seal -- and the vacuum seal.  I think

15  that's the term.

16  Q.  The -- I'm basically referring to this rubber band.

17  A.  Yeah.

18  Q.  Rubber bands, correct?

19  A.  Yes.

20  Q.  Were those rubber bands on the money when the sheriff's

21  deputy took them out?

22  A.  I don't remember.

23  Q.  Okay.  And Government's Exhibit Number 47.

24          Is that a photograph of the money as well?

25  A.  Yes.

Pimentel — Direct by Ms. Kanof

1   Q.  Does it depict denominations of $5?

2   A.  Yes.

3   Q.  And denominations of $100; is that correct?

4   A.  And $10 too.

5   Q.  And $10 as well.

6          Okay.  When you did this controlled delivery, were you

7   wired?

8   A.  Yes.

9   Q.  Okay.  And was -- by wired, I mean were you wearing

10  recording equipment that had been placed on your body by the

11  ICE agents?

12  A.  Yes.

13  Q.  Where was it physically located?

14  A.  I had the battery and the recording device attached to my

15  leg.  Actually it was pretty painful, because we didn't have

16  anything to put on my leg, so we just put tape on it.

17  Q.  You've had an opportunity to view this video?

18  A.  Yes.  And then I have a camera on my -- here on the shirt

19  that I was wearing (indicating).

20  Q.  Okay.  What were you supposed to do?

21  A.  Just pick up Mr. Delgado at his mom's house and then drive

22  through a route that I was already provided by the ICE agents.

23  And then switch lanes without putting my signal, and then I was

24  going to be stopped by state troopers, and they were going to

25  find the money.

1    Q.  Okay.  And this -- this video, because the recording device

2    was on your leg -- you've looked at this video, correct?

3    A.  Yes.

4    Q.  And is it audible?

5    A.  I don't remember.

6    Q.  Okay.  Do you remember how long the video is?

7    A.  It's quite long, because it took time to do the controlled

8    delivery.

9    Q.  All right.  I'm just going to move it up a little bit.

10            (Video played.)

11   BY MS. KANOF:

12   Q.  Have you already been stopped at this point or are you

13   still getting in the car?

14   A.  I don't know.

15   Q.  I'm at the 9:00.

16            (Video played.)

17   A.  No.  That looks like Marco's mom's house.

18   BY MS. KANOF:

19   Q.  Okay.  So -- and that --

20            THE COURT:  Where are you at, Ms. Kanof, and what

21   exhibit?

22            MS. KANOF:  I said 9 -- oh, I'm sorry.  Exhibit Number

23   49.

24   BY MS. KANOF:

25   Q.  And is that Mr. Delgado?

1   A.  Yes.

2                   (Video played.)

3                   THE COURT:  Okay.  Hold on a second.  Stop it, if you

4   would.

5                   MS. KANOF:  It won't stop.

6                   THE COURT:  Let me give the jury some instructions,

7   Ms. Kanof.

8                   (Video stopped.)

9                   THE COURT:  Ladies and gentlemen of the jury, you've

10  heard 37A and 37 -- 38A, and you're about to hear some more

11  conversations which are accompanied by a transcript.  I'm going

12  to give you some instructions in regards to that.

13                  These are transcripts that have been provided for you,

14  that you will be reviewing, are of the oral conversations which

15  can be heard on the tape recordings received into evidence as

16  Exhibits 37, 38, and all the way through to about 60-something,

17  I think.  Okay?

18                  I have admitted the transcript for the limited and

19  secondary purpose of aiding you in following the content of the

20  conversation as you listen to the tape recording, and also to

21  aid you in identifying who the speakers are.

22                  You are specifically instructed that whether the

23  transcript correctly or incorrectly reflects the content of the

24  conversation or the identity of the speakers is entirely for

25  you to determine, based on your own evaluation of the testimony

1    you have heard concerning the preparation of the transcript and

2    from your own examination of the transcript in relation to your

3    hearing of the tape recording itself as the primary evidence of

4    its own contents.

5            Remember that the evidence is the tape, not -- not the

6    transcript.  The transcript is for you, to aid you in

7    understanding the recording.  But you can disregard it.  It's

8    up to you to regard -- to accept it or not accept it as being a

9    correct transcript of what is recorded.

10           MS. KANOF:  Your Honor, to assist the jury, the whole

11   numbers are the actual disc, which the Court has admitted into

12   evidence, which can be played as either the audio or the video.

13   And if it carries the letter A, A means the transcript.

14           THE COURT:  Right.  So what I'm telling you applies to

15   all the As, which are the transcripts.

16           MS. KANOF:  May I proceed, Your Honor?

17           THE COURT:  You may proceed.

18           (Video played.)

19   BY MS. KANOF:

20   Q.  This is actually the beginning, when you arrive at his

21   house, correct?

22   A.  Correct.

23   Q.  And you -- do you get out of the vehicle?

24   A.  Yes.

25           (Video played.)

1   BY MS. KANOF:

2   Q.  Who is that?

3   A.  Marco Delgado.

4          MS. KANOF:  And I'm at nine and eight seconds.

5          (Video played.)

6   BY MS. KANOF:

7   Q.  The volume is already up.  But can you -- are you speaking

8   with him?

9   A.  I don't think so.  We just -- Hi, hi, we hug, and we put a

10  few things in there.

11         (Video played.)

12  BY MS. KANOF:

13  Q.  Who instructed you on what route to take?

14  A.  ICE agents.

15  Q.  Where did they tell you to drive?

16  A.  I was going to drive to -- from Marco's mother's to Mesa

17  Street, and then switch lanes on Mesa Street without putting my

18  light.

19  Q.  Okay.  And that took a few minutes, correct?

20  A.  Correct.

21  Q.  So let me fast-forward.

22         Are you still driving here?

23  A.  I can assume that I was.

24         (Video being played while continuing to ask

25  questions.)

```
 1   BY MS. KANOF:
 2   Q.  What were you supposed to do when they reached Mesa Street?
 3   A.  Switch lanes without putting my turning signal.
 4   Q.  Well, you're driving down Resler, correct?
 5   A.  Yes.
 6   Q.  Okay.  And you're driving from the mountain down towards
 7   Mesa Street; is that correct?
 8   A.  That's correct.
 9   Q.  And which way did they tell you to turn?
10   A.  To the right, so we could go onto the freeway.
11   Q.  Okay.  Did Mr. Delgado tell you where to go or did the
12   agents?
13   A.  No, the agents.
14   Q.  Okay.  And is this when you were stopped?
15   A.  Yes.
16          (Video stopped.)
17   BY MS. KANOF:
18   Q.  Okay.  Now, when you're stopped -- and we're going to view
19   the rest of this video with another witness.
20          But when you are stopped, you've been given
21   instructions of what you should do when you got stopped?
22   A.  Yeah.
23   Q.  What were -- by the ICE agents?
24   A.  Yes.
25   Q.  What were you supposed to do?
```

1    A.  Just play along with the stop.

2    Q.  As if you were still in your character?

3    A.  Yes.

4    Q.  And did they separate you and Mr. Delgado?

5    A.  At some point, yes.

6    Q.  And were you present when they were talking to Mr. Delgado?

7    A.  I was present, but I couldn't hear anything.  We were

8    separated by a good distance.

9    Q.  Okay.  When -- after the stop -- by the way, where was the

10   vehicle stopped?

11   A.  On Mesa.

12   Q.  Was there a building nearby?

13   A.  A gas station right across the street.

14   Q.  And was there a bank anywhere nearby?

15   A.  Close.

16   Q.  Okay.  What bank is that?

17   A.  I don't remember.

18   Q.  Was there any instructions that you received from

19   Mr. Delgado or the other co-conspirators about a bank in

20   El Paso in this transaction?

21   A.  No.

22   Q.  Were you -- did you intend to go to Chase Bank on Mesa

23   Street?

24   A.  No.

25   Q.  Do you have an account at Chase Bank on Mesa Street?

Pimentel – Direct by Ms. Kanof

```
 1   A.  No.
 2   Q.  And having lived with Mr. Delgado for years and knowing him
 3   well, do you know whether he had a bank account at Chase?
 4   A.  No.
 5   Q.  Was that you know, or you don't know?
 6   A.  I -- he does not have, at that time, a bank account at
 7   Chase.
 8   Q.  Okay.  What were you and Mr. Delgado -- where were you
 9   going?
10   A.  To the Santa Teresa bridge.  We were going down to Mexico.
11   We were going to use that bridge to cross to Mexico.
12   Q.  Okay.  Where were you going in Mexico?
13   A.  Colima.
14   Q.  Where is Colima?
15   A.  It's in the north part of Mexico, Pacific.
16   Q.  What state is it in, if you know?
17   A.  I don't remember right now.  I'm sorry.
18   Q.  Okay.  And was this the end of your involvement with ICE on
19   this transaction?
20   A.  Yes.
21   Q.  Okay.  They didn't ask anything else of you at that time?
22   A.  No.
23   Q.  Okay.
24        MS. KANOF:  I'm ready to go on to the next
25   transaction, Your Honor.
```

1          THE COURT:  I'm sorry?

2          MS. KANOF:  I'm ready to go to the next transaction,

3   if the Court wanted to take a break.

4          THE COURT:  No.  We'll go for a little bit more.

5          MS. KANOF:  Okay.

6   BY MS. KANOF:

7   Q.  At some point in time, what –– after this happens, do you

8   learn whether or not Mr. Delgado has spoken with ICE and agreed

9   to cooperate?

10  A.  Yes.

11  Q.  How do you learn that?

12  A.  Well, it was told to me by the ICE agents.

13         MR. ESPER:  Objection, Your Honor.  This calls for

14  hearsay on the part of this witness.

15  BY MS. KANOF:

16  Q.  Did Mr. Delgado discuss it with you?

17  A.  Yes.  Actually, Mr. Delgado told me that he was an

18  undercover agent for ICE for years.  That he would be –– he was

19  working with them for a long period of time.  That he planned

20  the stop on Mesa, and that he was working for them since the

21  beginning.

22         Which was a lie, because I knew that the controlled

23  delivery was a controlled delivery, that he didn't plan

24  anything.

25  Q.  Okay.  And what –– when did he tell you this?

Pimentel – Direct by Ms. Kanof

1   A.  After we got stopped and then we were both released, that's

2   when -- when he told me that.

3   Q.  He was released, correct?

4   A.  Yeah.

5   Q.  And did he tell you any specifics with regard to what ICE

6   wanted him to do with Pedro and Isidro?

7   A.  Yeah.

8   Q.  What did he tell you?

9   A.  We actually did another controlled delivery, and we

10  assisted on the fake arrest of Pedro and Chilo.

11  Q.  Okay.  When did that happen?

12  A.  I think it was later that day or the next day.  I don't

13  remember.

14  Q.  When you say another controlled delivery, had that already

15  been planned before the stop with Mr. Delgado?

16  A.  No.

17  Q.  All right.  So after Mr. Delgado and you were stopped, did

18  the ICE agents ask you to be involved in another controlled

19  delivery?

20  A.  Yes.

21  Q.  And who was that to?

22  A.  To Pedro and Chilo.

23  Q.  Who was going to be involved in that controlled delivery?

24  A.  Both Marco and myself.

25  Q.  Okay.  And did that occur?

1    A.  Yes.

2    Q.  Okay.  I'm going to show you what's been marked and

3    admitted into evidence as Government's Exhibit Number 59.

4            Is that a photograph?

5    A.  Yes.

6    Q.  Who is that?

7    A.  Pedro.

8    Q.  And Government's Exhibit Number 60.

9            Is that a photograph?

10   A.  Yes.

11   Q.  And who is that?

12   A.  Chilo.

13   Q.  Chilo is a nickname for Isidro?

14   A.  Yes.

15   Q.  Okay.  Do you know -- let me go back to 59.

16           Was that the clothing that Pedro was wearing the day

17   that you did the controlled delivery?

18   A.  Yes.

19   Q.  And 60.

20           Is that the clothing that Chilo was wearing the day

21   that you the did controlled delivery?

22   A.  Yes.  Actually, I was present when they took those

23   pictures.

24   Q.  You were?  Okay.

25   A.  They took the same picture of me.

1    Q.   They took one of you as well?

2    A.   Yes.

3    Q.   Did they take one of Mr. Delgado in your presence?

4    A.   No.  Marco was supposed to get us out of trouble.

5    Q.   Okay.  What do you mean by Marco was supposed to get you

6    out of trouble?

7    A.   When we made the second controlled delivery, I had learned

8    that after the fact.  I played -- I was the driver of the

9    money.  The four of us were supposed to leave El Paso in a

10   private plane owned by Mr. Delgado.

11   Q.   Okay.  Let's go back a little bit.

12        In the second controlled delivery to Pedro and Isidro,

13   were you driving the vehicle?

14   A.   Yes.  It was -- I was -- it was me with the supervisor of

15   ICE at that time.

16   Q.   Okay.  You were the two that were in the vehicle?

17   A.   Yes.  We picked them up at the Hyatt hotel on the freeway.

18   Q.   Was the money in the vehicle?

19   A.   No.  When we picked them up, then we picked up the money

20   in, actually, the parking lot of the Holiday Inn Express in

21   downtown.

22   Q.   Okay.  So when -- what were you supposed to tell Pedro and

23   Isidro about the money?

24   A.   That we were going to pick up the money and flew with the

25   money to Mexico.

```
 1    Q.  And where was the money located again?
 2    A.  In the parking lot at the Holiday Inn Express in El Paso
 3    downtown.
 4    Q.  Okay.  And did you do that?
 5    A.  Yes.
 6    Q.  Was there only one other person in your car?
 7    A.  It was Chilo and the ICE supervisor and myself, Isidro, and
 8    me.
 9    Q.  Okay.  And all of you were in the same vehicle?
10    A.  Yeah.  In the same Jeep.
11    Q.  When did you pick them up?  I mean, you obviously started
12    out with yourself and the ICE supervisor, right?
13    A.  Yeah.  We go to the Hyatt hotel in the freeway.  And
14    actually, we were supposed just to pick them up at the lobby,
15    but they were having -- they were taking their time.  They were
16    taking showers, and they wanted me to go to the room.
17           And it was a big discussion between me and the ICE
18    supervisor.  He didn't want me to go upstairs, so it was -- it
19    took a moment to know if it was safe for me to go up there or
20    not.
21           Finally, they -- I went up there.  I spent, like, 20
22    minutes with them.  Actually, we watched the news and they took
23    a shower.  They packed their stuff and we went down with the
24    luggage, and then we went to pick up the money.
25    Q.  Who did you say -- what was the -- who did you introduce
```

1   the ICE supervisor –– who was he?

2   A.  I introduced the ICE supervisor to Chilo and Pedro Mendoza

3   as Marco's driver.

4   Q.  Okay.  Once all of you were in the vehicle, where did you

5   go?

6   A.  We were supposed to drive to the Santa Teresa airport.

7   Q.  And the Santa Teresa airport is located in New Mexico; is

8   that correct?

9   A.  Yes, that's correct.

10  Q.  Did you drive there?

11  A.  No.

12  Q.  What was the intent?  Did you discuss with Chilo and Pedro

13  what was going to happen?

14  A.  Well, I did not.  Marco discussed with them that he had a

15  private plane waiting for us to fly back down to Mexico with

16  the money and all of us.

17  Q.  And so they knew that that's where they were going?

18  A.  That's where they thought they were going.

19  Q.  What happened?

20  A.  We did another stop.  I did the same thing.  I was on the

21  freeway and I switched lanes without putting my turn signal.

22  And the same state troopers did another stop.

23          And they asked if we could –– if they could search the

24  car.

25          I say, Yes, and they discovered the money again, and

1   they made a fake arrest.

2   Q.  Okay.  And then what happened?

3   A.  They took us to a detention facility on the east side of

4   El Paso.

5   Q.  You were still pretending you were a co-conspirator?

6   A.  Yes.  We were all handcuffed.  We stayed there for a couple

7   of hours.  They took the pictures.  They asked questions.  They

8   took photocopies of our IDs again.

9            And then Marco gets inside the room as our lawyer.

10  And actually, he pretend that he was very upset with me because

11  I put everybody at risk, and he was the hero of the fake

12  delivery, and he got Chilo and Pedro out of the detention

13  facility.

14  Q.  And that was orchestrated by ICE, correct?

15  A.  That was orchestrated by ICE, yes.

16  Q.  Okay.  And there -- there are tapes of that.  You weren't

17  present when that happened or were you?

18  A.  I was in the room when Marco was -- there were the three of

19  us and Marco.  And the three of us, it was Chilo, Pedro, and

20  myself.

21            And Marco started yelling at me and, you know, faking

22  that it was all my fault, but all of this was staged by ICE.

23            And then they allowed to -- Pedro and Chilo to go

24  home, and that was it.

25  Q.  Okay.  And what happened with you?

Pimentel - Direct by Ms. Kanof

1   A.  They took me back to the hotel that I was staying at, spent

2   the night there.

3        And then the next day, if I recall correctly, we all

4   had breakfast at the -- I had breakfast at the -- continental

5   breakfast at the -- downstairs.  And they told me that I was --

6   because I cooperated they gave me back my passport.  And they

7   told me that I was going to be able to flew back to Georgia and

8   pick up my car and drive back to Mexico.

9   Q.  In between -- that was in the first week of September.

10        In between that time and July of 2008, what kind of a

11   relationship did you and Marco have?

12   A.  Well, it took a while for me and Marco to start talking

13   like we used to, because I knew that he was lying to me that he

14   was an undercover agent, because that was a lie, that he knew

15   all along that the stop was going to be made.

16        So it was -- it was hard for me -- well, I never

17   trusted him again, so it was distant.  But it was the distant

18   relationship, but we still had contact.

19        I was -- I moved back to my parents' house in Mexico,

20   and then I enrolled myself again at school.  But we still

21   continued having --

22   Q.  And when you enrolled yourself again in school, where did

23   you live?

24   A.  The dorms at UTEP.

25   Q.  Okay.  And while you were living in the dormitory, about

Pimentel – Direct by Ms. Kanof

1   how often did you talk to Mr. Delgado?

2   A.  Not very often.  Phone calls here and there.  We had

3   breakfast for Father's Day at the country club up there in

4   Coronado.

5   Q.  How did that come about?  Father's Day, of course, is in

6   June, correct?

7   A.  Yes.

8   Q.  Okay.  So this happened in September.  What you have

9   testified to so far happened in September of 2007.  And now

10  it's June of 2008?

11  A.  Yes.

12  Q.  And how did you come about having a meal with him on

13  Father's Day?

14  A.  Well, I -- when all this thing happened, I promised myself

15  that I was going to change my life, that I was going to go back

16  to school, finish my degree.  I always wanted to get a master's

17  and a Ph.D., so I promised myself and my daughter that I was

18  going to do that.  So I moved back to Mexico -- well, I went

19  back to Georgia to get my car, drove back to Mexico.  I

20  start -- my daughter was pretty much six, seven months old, so

21  I was being a dad.

22          And then I decided to move back to El Paso.  So my

23  relationship with Marco was pretty much over the phone.  He

24  flew a couple of times to Mexico.

25  Q.  What happened when he flew to Mexico?

1   A.  We went to a couple of meetings with people from the

2   electric utility company.

3   Q.  Was there any discussion about money laundering between you

4   and Mr. Delgado between September of 2007 and June of 2008?

5   A.  No.  Because every time I tried to brought [sic] up the

6   subject, he told me that he was an undercover agent, that he

7   was working for ICE, and that he couldn't discuss anything with

8   me about it.

9   Q.  Okay.  So you -- where did you all -- I mean, how did it

10  come about that you were having a meal with him on Father's

11  Day?

12  A.  Well, when I moved back to El Paso, I let Marco know that I

13  was moving back, that I was going to...

14  Q.  Did he have a girlfriend at that time?

15  A.  Yes.

16  Q.  What was her name?

17  A.  Liliana Narvaez.

18  Q.  And was she at this meal?

19  A.  Yeah.

20  Q.  Just -- describe -- was this the first time you had a warm

21  and friendly encounter with Mr. Delgado since the incident that

22  came out of Atlanta?

23  A.  No, not the first time.  Actually, my daughter got baptized

24  in Mexico City, and I invited Marco's mom, Marco's aunt,

25  because we were like family.  And they were -- they were

Pimentel – Direct by Ms. Kanof

1   present at my daughter's baptism in Mexico, and he was there.

2   We took a picture.  Actually, I think I still have the picture.

3   But he didn't went to the breakfast that we had for my

4   daughter's baptism.  He didn't go back to --

5   Q.  He didn't go?

6   A.  No, he didn't go.

7   Q.  And so in El Paso, after the Father's Day brunch, did

8   Delgado contact you again?

9   A.  Yes.

10   Q.  When was that?

11   A.  It was later in July -- no, later in June.  He wanted me to

12   do another money pickup operation.

13   Q.  When he told you he wanted to do another money laundering

14   pickup, what did you tell him?

15   A.  Well, first I thought that he was kidding.

16           And then he told me, No, don't worry about it.

17   Because I knew the ICE agents, when they arrest me and when all

18   this happened, they told me, If you ever do this again and you

19   don't let us know, you will spend your life in prison.

20           I took that very seriously.  Again, I was trying to

21   change my life.

22           So when he told me that, I thought he was kidding.

23   But then he was pretty serious.

24           And I asked, Does the people in ICE know that we're

25   going to do this?

1              And he said, Yes, don't worry about it.  They know,

2      and they are actually controlling the operation.

3              I knew Marco, and I knew that it was a lie.  So what I

4      did, I tried to contact Agent Justice in Atlanta, which was the

5      guy that first interviewed me when they arrest me in Georgia.

6      Q.  Okay.  So as soon as he brought up the transportation of

7      money, you called ICE Atlanta?

8      A.  Yes.

9      Q.  And were you successful in getting ahold of Agent Justice?

10     A.  No.  I called him twice and --

11     Q.  Okay.  Did you -- did -- at some time did he call you back

12     and tell you he was moving and he'd been promoted, so that's

13     why he didn't --

14             MR. ESPER:  Excuse me, Your Honor.  Excuse me.  That's

15     hearsay, number one.

16             And number two, Counsel is leading the witness.

17             THE COURT:  I'll sustain the objection.

18             And it's time for our morning break, so we'll be in

19     recess for the next 15 minutes.

20             (Recess taken; open court.)

21             THE COURT:  You may continue, Ms. Kanof.

22             MS. KANOF:  Thank you, Your Honor.

23     BY MS. KANOF:

24     Q.  Mr. Pimentel, we were talking about June and July of 2008.

25     When was the first time -- and I -- not the exact date.  But

1   during that time, did Mr. Delgado approach you about money

2   again?

3   A.  Yes.

4   Q.  What did he tell you?

5   A.  That we were going to do a $100,000 pickup in Chicago.

6   Q.  When he -- did he tell you on the phone or in person?

7   A.  He called me on my phone, and we met in person.  We went to

8   the Ardovino's restaurant that is nearby her -- his mom's

9   house.

10  Q.  What action did you take after that first phone call?

11  A.  I called ICE Agent Justice in Georgia.

12  Q.  And you were not able to get ahold of him?

13  A.  Correct.

14  Q.  And then you met at the Ardovino's on Resler?

15  A.  Yes.

16  Q.  And what happened there?

17  A.  He explained me that we were going to go back to business,

18  that we were going to do another hundred thousand dollars money

19  pickup.

20        And I asked him if ICE knew about this.  Because

21  again, ICE was very clear to me that if I ever, ever did that

22  again, they're going to charge me with the million dollars and

23  whatever I was caught with.

24  Q.  What did he tell you?

25  A.  He told me that yes, that ICE knew that we were going to be

1    doing it, that everything was going to be fine.

2    Q.  Did you believe him?

3    A.  No.

4    Q.  What did you do next?

5    A.  I tried to call Agent Justice again.

6    Q.  And you still could not get ahold of him?

7    A.  And I couldn't get ahold of him.

8    Q.  And what did you do next?

9    A.  I -- at the beginning, I thought it was not very serious.

10   But then Marco called me and gave me a code for my plane ticket

11   to Chicago.

12   Q.  What do you mean by a code?

13   A.  The reservation code.  The one that you give at the counter

14   and they give you a plane ticket.

15   Q.  Okay.  So it was like on the Internet, a code you get on

16   the Internet or...

17   A.  The reservation code.  When you buy a ticket plane [sic],

18   you get a code.  You just can get -- you can pull your ticket

19   online and you can print it, or you can go to the counter with

20   an ID and you can get your ticket.

21   Q.  What were you doing at this time?

22   A.  I was going to school.  I was taking summer classes at

23   UTEP.

24   Q.  And did he tell you an original date?

25   A.  Yes.

Pimentel – Direct by Ms. Kanof

1    Q.  Were you able to go to Chicago on that date?

2    A.  No.

3    Q.  Why?

4    A.  Two things.  I had a test.  And again, I was taking my

5    school pretty serious.  So I said I had a test.

6         And then my brother, who lives in Ciudad Juárez, was

7    going to get married around those dates.  So I didn't want to

8    miss my test, obviously, but I didn't want to miss my brother's

9    wedding.

10   Q.  Did you tell Mr. Delgado that?

11   A.  Yes.

12   Q.  How did he react?

13   A.  He was upset.  But I was pretty clear that I was not going

14   to do it for those two reasons.

15   Q.  Okay.  And did he -- and then when he provided you with the

16   ticket number, was that after the time limitations you gave

17   him?

18   A.  Yes.

19   Q.  And what did you do with that information?

20   A.  I was freaking out, because I knew it was a lie, and I knew

21   that I was doing something illegal.  And I knew that ICE didn't

22   knew that I was going to be doing that.

23        So I pulled my phone records when I was here in

24   El Paso, and I get the supervisor ICE phone number from

25   El Paso, and I call him.

1    Q.   Here in El Paso?

2    A.   Here in El Paso.  And I explained to him what was going on,

3    that I thought that Georgia didn't know that we were going to

4    do the pickup, and that I didn't want to do it without them

5    knowing that I was going to fly to Chicago to pick up that

6    hundred thousand dollars.

7    Q.   And did you receive a phone call after that?

8    A.   From the supervisor, yes.

9    Q.   Okay.  And do you know who Gabe is?

10   A.   Agent Gabriel Aguirre, yes.

11   Q.   Okay.  Agent Gabe Aguirre, did he call you?

12   A.   Yes.

13   Q.   When you made these two phone calls, or when you spoke with

14   ICE El Paso, where were you?

15   A.   I was already at the El Paso airport.

16   Q.   And what did Agent Aguirre do?

17   A.   They instruct me to -- as soon as I land in Chicago, I was

18   going to call an agent -- I think it's Mike -- in Chicago.

19   Q.   And did he give you a phone number?

20   A.   He gave me a phone number, and he instruct me what to do

21   once I land in Chicago.

22   Q.   Okay.  And did he give you any kind of recording equipment

23   or anything?

24   A.   No.

25   Q.   Okay.  So did you fly to Chicago on July 22nd of 2008?

1    A.  Yes.

2    Q.  And what happened when you landed?

3    A.  As I was instructed, I called the agent that was in

4    Chicago.  They instruct me to take a cab and go to a city that

5    is nearby the airport, between the airport and Chicago called

6    Oak Brook.  And actually --

7    Q.  They told you to go to Oak Brook?

8    A.  No.  Marco told me to go to Oak Brook, and I told the agent

9    that I was going to go to Oak Brook.  Sorry.

10   Q.  Okay.  And how was the hotel that you stayed in selected?

11   A.  Marco told me that I -- well, again, I'm sorry.

12         I tried to get a hotel first, but I couldn't.  And

13   then by the time they couldn't give me a room, the taxi already

14   left the hotel.  So I got to walk from the original hotel to

15   another hotel.  So I explained that to Marco over the phone.

16   Q.  So you didn't stay in the original hotel that Marco had

17   told you to stay in?

18   A.  Yes.

19   Q.  Okay.  What hotel did you end up staying in?

20   A.  At the Doubletree.

21   Q.  Okay.  And that's in Oak Brook, Illinois?

22   A.  That's in Oak Brook, Chicago, yes.

23   Q.  Before you got to the hotel -- by the way, was it nighttime

24   when you landed?

25   A.  It was late, yes.

Pimentel — Direct by Ms. Kanof

1    Q.   Okay.  Did you receive any phone calls after you landed?

2    A.   Yes.

3    Q.   From whom?

4    A.   The people in Chicago that was going to give me the money.

5    Q.   What was the name?

6    A.   Martel.

7    Q.   And that may or may not have been the person's true name?

8    A.   I don't know.

9    Q.   Okay.  Had you heard that name before?

10   A.   No.

11   Q.   Mr. Delgado did not provide that name to you?

12   A.   No.

13   Q.   Did he provide any other name to you?

14   A.   Yes.

15   Q.   What name?

16   A.   It was Rafael Solis.

17   Q.   And who did he tell you that was?

18   A.   He told me that he was a business guy in Mexico located in

19   Monterrey, and that he was going to be in charge of the -- he

20   was part of the cartel, and that he was going to be the one

21   that oversees operation on their side.

22   Q.   Had you ever heard that name before?

23   A.   No.

24   Q.   In September of 2007, when Marco was cooperating, did you

25   ever meet an agent from Atlanta by the name of Alex Ascencio?

1    A.  No.

2    Q.  Okay.  And did you know that Alex Ascencio was an agent

3    from Atlanta that was participating with Mr. Delgado?

4    A.  Now I know, but at the time, I did not.

5    Q.  And did you know that anything about the name Rafael Solis

6    related to Alex Ascencio?

7    A.  No.

8    Q.  Okay.  So the first time you heard that name was from

9    Mr. Delgado?

10   A.  Yeah.  Actually, Marco told me that he was the one that

11   paid for my plane ticket.

12   Q.  Okay.  And so when you got to the airport, you got a call

13   from Martel; is that correct?

14   A.  Yes.

15   Q.  And what did he tell you?

16   A.  That they were trying to do the operation that night.  But

17   I was by myself, I was without an agent, I was –– it was late.

18   So I called the agents, and they instructed me to tell them

19   that that night it was not going to be possible to be done.

20   Q.  Okay.  Did the agents escort you to the Doubletree?

21   A.  No.  They encountered me.  I was already at the Doubletree,

22   and then the agents came ––

23   Q.  Okay.

24   A.  –– to my room.

25   Q.  How many agents?

1    A.  I think there was two.

2    Q.  Did they give you instructions?

3    A.  Yes.

4    Q.  What were the instructions?

5    A.  We set up a couple of phone calls with Marco.  We taped

6    those phone calls.

7            They instructed me to wait in the hotel and try to set

8    up the -- I guess the controlled pickup for the next day.

9    Q.  Did you also -- did they give you a recording device?

10   A.  They didn't give it to me through the phone.  They recorded

11   it right there with me.  When I went to do the pickup, yes, I

12   had a recording device with me.

13   Q.  But in the motel they actually operated the --

14   A.  Yes.  They actually operated the recording device.

15   Q.  Did you also record conversations with other members of the

16   conspiracy?

17   A.  With Martel, I think there's a couple of phone calls.

18   Q.  I'm going to draw your attention to Government's Exhibit 61

19   and 61A.

20            (Audio recording played.)

21   BY MS. KANOF:

22   Q.  Did you have a conversation on July 22nd of 2008 at

23   10:58 p.m. with this individual that you were told his name was

24   Martel?

25   A.  Yes.

1    Q.  Okay.

2            (Audio recording played.)

3    BY MS. KANOF:

4    Q.  That's the operator?

5    A.  Yeah.  I was instructed to get a prepaid cell phone by

6    Marco.  So every time that I called, I would get the balance on

7    my phone.

8    Q.  Okay.  Well, let's talk about this prepaid cell phone.

9            Normally, when you communicated with Mr. Delgado, what

10   phone did he use?

11   A.  He used his regular phone, the phone that he has all his

12   life, 915-204-2985, I think.

13   Q.  And was that phone the phone that you communicated with him

14   concerning the Atlanta controlled delivery?

15   A.  To the Atlanta, yes.

16   Q.  Okay.  What happened with regard to telephones for the

17   Chicago delivery?

18   A.  By that time, Cricket was already on the market.  And we

19   learned that it was pretty easy to get Cricket phones, and it

20   was pretty cheap.  They were pretty much disposable, so we get

21   Cricket phones on there.

22   Q.  Who told you to get Cricket phones?

23   A.  Actually, we -- both.  I went with -- Marco took me to the

24   Cricket store.  And we went -- we get phones under the -- my

25   AKA name.

Pimentel – Direct by Ms. Kanof

1   Q.  The Ruiz name?

2   A.  Yeah.  Francisco Ruiz.

3   Q.  How many phones?

4   A.  Two.

5   Q.  And in the Chicago recordings with Mr. Delgado, are you

6   using your Cricket phone?

7   A.  I'm using the prepaid phone, and he kept both Cricket

8   phones.

9   Q.  Okay.

10  A.  This was an AT&T phone.

11  Q.  I'm sorry?

12  A.  This was an AT&T prepaid phone.

13          (Audio recording played.)

14  BY MS. KANOF:

15  Q.  Okay.  What were you told, or were you instructed to report

16  to someone?

17  A.  In that conversation, yes.

18  Q.  No.  But I mean before this conversation, had someone said

19  that when you arrived you had to report to someone?

20  A.  To Marco.  But because I was not in the presence of an

21  agent, I didn't want to make a phone call until they were with

22  me.

23  Q.  Okay.  And so now we go to Government's Exhibit Number 62

24  and 62A.

25          And this is from the next day; is that correct?

1    A.   That's correct.

2    Q.   And did it occur at 9:30 a.m.?

3    A.   Yes.

4    Q.   And who was it with?

5    A.   Marco Delgado.

6              (Audio recording played.)

7    BY MS. KANOF:

8    Q.   In addition to the recorded conversations, were you also

9    texting him?

10   A.   Yes.

11   Q.   Okay.  And with your regular phone or with the prepaid?

12   A.   With this phone, the one that I made the calls with.  It

13   was an AT&T prepaid.

14   Q.   Okay.  And at some time did you tell Mr. Delgado the day

15   before that you had moved to Doubletree?

16   A.   Yes.

17             (Audio recording played.)

18   BY MS. KANOF:

19   Q.   What does he mean by beggars can't be choosers?

20   A.   That -- because the cartel is asking us for a favor, they

21   cannot push us to do anything on their own terms.  We need to

22   set up the terms.

23   Q.   Now, Mr. Delgado told you that he was working undercover

24   for ICE, correct?

25   A.   Correct.

Pimentel - Direct by Ms. Kanof

1    Q.   But you're talking to him on the phone about the

2    transactions?

3    A.   Yes.

4    Q.   So you would not be an unwitting -- well, did he tell you

5    to act any special way?

6    A.   Like if I was an agent or something?  No.

7    Q.   Yes.  Okay.

8         But he -- he doesn't -- does he ever mention to you,

9    The ICE agents want me to talk to you about this or anything?

10   A.   No.

11        (Audio recording played.)

12   BY MS. KANOF:

13   Q.   Okay.  With regard to Mr. Delgado saying, I can't say that

14   you are doing something illegal, or something like that,

15   what -- what is that about?

16   A.   Well, when he sent me to Chicago, we had a meeting at his

17   house.  And he told me that -- because again, I asked him if

18   ICE knew that we were going to do this.

19        And he said yes.  And he told me that he was going to

20   notify Interpol that we were doing that money movement, and

21   that we were going to be doing something that the Government,

22   of the financial authority, knew we were doing.

23   Q.   That's the reference?

24   A.   That's the reference.

25   Q.   Okay.  Government's Exhibit Number 63.

1            (Audio recording played.)

2   BY MS. KANOF:

3   Q.  Okay.  You sounded surprised that he was going to be there

4   in five minutes.

5   A.  I was very surprised.

6   Q.  Why?

7   A.  Because nobody -- supposedly, nobody knew where I was

8   staying but Marco.

9   Q.  And --

10  A.  So five minutes to come from Chicago to Oak Brook, it was

11  impossible.

12  Q.  Did you talk to Martel after that?

13  A.  Yes.

14  Q.  At 9:59 a.m. on July 23rd?

15  A.  Yes.

16  Q.  Government's Exhibit 64.

17            (Audio recording played.)

18  BY MS. KANOF:

19  Q.  So initially you agreed to meet at the McDonald's; is that

20  correct?

21  A.  Yes.

22  Q.  And it was -- where was it located with reference to your

23  hotel?

24  A.  It was in the same side of the street in the corner.

25  Q.  Did you start walking in that direction?

1    A.  Yes.

2    Q.  And while you were walking in that direction, did you have

3    a conversation with Marco Delgado?

4    A.  Yes.

5    Q.  Was it at approximately 12:15 p.m. on that same day?

6    A.  Yes.

7    Q.  Government's Exhibit Number 65.

8            (Audio recording played.)

9    BY MS. KANOF:

10   Q.   Mr. Pimentel, you bring up –– you were the first one on

11   page 2 of the transcript to bring up, The bank is far, buddy.

12           What bank are you talking about?

13   A.  Wells Fargo.

14   Q.  Now, why are you talking about the Wells Fargo bank?

15   A.  Because that's where I was instructed by Marco to make the

16   deposit.

17   Q.  Okay.  When did he give you those instructions?

18   A.  Before I leave to Chicago.

19   Q.  What exactly did he tell you about the bank?

20   A.  That I was going to make a cash deposit in the Wells Fargo.

21   Q.  So how much cash were you going to deposit?

22   A.  Originally, it was $100,000.

23   Q.  Okay.  Did Mr. Delgado tell you how much money?

24   A.  Yes.

25   Q.  What did he tell you about that?

Pimentel – Direct by Ms. Kanof

1   A.   That we were going to have two different pickups to –– each

2   one for $50,000.

3   Q.   And were they supposed to occur at the same time?

4   A.   No.   It was a different time.

5   Q.   And were you supposed to deposit both of the pickups in a

6   bank?

7   A.   Yes.

8   Q.   And what bank was that again?

9   A.   Wells Fargo.

10   Q.   Who do you know that banks at Wells Fargo?

11   A.   In this case?

12   Q.   Yes.

13   A.   Well, Marco Delgado has his Delgado Acosta account there.

14   Liliana Narvaez, Marco's girlfriend at the time.

15   Q.   Has an account at Wells Fargo?

16   A.   Yes.   They both have an account there.

17   Q.   Did you know, at the time, that there were no Wells Fargo

18   banks in Chicago?

19   A.   I knew before the trip.

20   Q.   How did you find out?

21   A.   Because I googled –– when Marco told me the location of the

22   pickup, I googled for the closest Wells Fargo branch.   But then

23   I learned that they didn't have any close by, and the closest

24   was in Wisconsin in a small town called Racine, I think.

25   Q.   Okay.   Did you tell that to Mr. Delgado?

Pimentel – Direct by Ms. Kanof

1    A.  Yes.

2    Q.  Did you tell him that you would have to go to Racine,

3    Wisconsin, before you left for Chicago?

4    A.  Yes.

5    Q.  And did -- where were you supposed to -- whose account were

6    you supposed to deposit the money?

7    A.  At the beginning, it was his account and he was going to

8    transfer it to Rafa Solis.  He actually give me an account

9    number.

10           And then something happened and we couldn't put the --

11   he didn't want me to deposit it in that account.  And he --

12   like he stated in the phone call, he wanted me to wait, and we

13   were going to be provided with account numbers from Rafa Solis.

14   But those numbers never came.

15   Q.  Okay.  And is that clear from other conversations that you

16   had with him?

17   A.  Yes.

18   Q.  So when he -- on page 3 of the transcript, he says he's

19   waiting for the account numbers that he needs as well, so that

20   they can see it directly there via Wells Fargo; correct?

21   A.  Yes.

22   Q.  So did -- so he was going to give you an account number at

23   Wells Fargo, but for this Rafa Solis person?

24   A.  Correct.

25   Q.  Okay.  And did that ever happen?

1    A.  No.

2    Q.  Now, you leave.  Do you leave the hotel to go to meet

3    Mr. Martel or whoever...

4    A.  No.  At this point we already had the money with us.

5    Q.  Okay.  You already had the money at 12:15?

6    A.  That's why I told Marco on the conversation that I already

7    count the money, that it looks good.

8    Q.  Okay.  That's right.  All right.

9         So now -- let's go back to you were walking to the

10   McDonald's; is that correct?

11   A.  That's correct.

12   Q.  And while you're walking to the McDonald's, do you receive

13   a phone call from Mr. Martel?

14   A.  Yes.

15   Q.  What does he tell you?

16   A.  He tells me that we're not going to do the delivery at the

17   McDonald's.

18   Q.  Did he tell you why?

19   A.  Yes.

20   Q.  What did he say?

21   A.  Because there was a white truck that looks like they were

22   agents.

23   Q.  Where was that truck?

24   A.  In the McDonald's parking lot.

25   Q.  So what did you tell him?

```
 1    A.  Where did you want to do the pickup?

 2    Q.  And what did he tell you?

 3    A.  He asked me to walk to the -- there was a mall right across

 4    the street -- to the mall.  So I drove -- I didn't drive.  I

 5    started walking through the parking lot.  And he pointed out a

 6    store that he wanted me -- to that store.

 7    Q.  So you're walking talking to him than the phone, right?

 8    A.  Yes.

 9    Q.  Do you ever see him?

10    A.  I saw his -- the car that he was driving.

11    Q.  Okay.  Did he -- did he drive by you when you were walking?

12    A.  Yes.

13    Q.  What happened?

14    A.  It was pretty weird.  He's driving by.  We're talking over

15    the phone.  He identified what he's driving, and then he

16    stopped right in front of me -- well, the truck is here

17    (indicating).  I'm here (indicating).

18    Q.  Well, a truck.  Was it a Lexus SUV?

19    A.  Yeah.  It's a Lexus.  And he told me get in.

20            And I said, No way.

21            I was instructed by the agents that not any way I was

22    going to get in the car with them.  So it was just, like, No.

23            And then he parks the car.  He never turned the engine

24    off.  He walks out of the car with a bag full of money.  He put

25    it in front of the car on the floor, and then he drives away
```

1   really, really fast.

2   Q.  Okay.  When you say on the floor, you mean on the pavement?

3   A.  On the floor, yeah.  On the pavement there in the parking

4   lot.

5   Q.  Okay.  And what -- what was the money in?

6   A.  The same --

7   Q.  No.  What --

8   A.  Wrapped in the --

9   Q.  Was it in a duffel bag like the other money?

10  A.  It was the same wrapping that we saw in the other exhibits,

11  the vacuum --

12         MR. ESPER:  Excuse me.  That's nonresponsive to the

13  question.

14         THE COURT:  I'll sustain the objection.

15  BY MS. KANOF:

16  Q.  I'm going to show you what's marked as Government's Exhibit

17  Number 73.

18         Do you recognize what is depicted in that exhibit?

19  A.  Yeah.  It's the money that the -- it's the bag that the

20  money was in.

21  Q.  And what kind of a bag is that?

22  A.  It was like a shopping -- the same bag that you will get if

23  you buy something at Hollister or Abercrombie or something like

24  that.

25  Q.  Okay.  And Government's Exhibit Number 74.

Pimentel – Direct by Ms. Kanof

1          Is that -- there's a demarcation on the top right that
2    says July 23rd, '08; is that accurate?
3    A.  Yes.
4    Q.  Where were these pictures taken?
5    A.  In the hotel room.
6    Q.  Who were they taken by?
7    A.  Agents.
8    Q.  Is that the Hollister bag that he put on the pavement?
9    A.  Yes.
10   Q.  And what else is depicted in this photo?
11   A.  Money.
12   Q.  And does that look like the money that you saw the agents
13   take out of the Hollister bag?
14   A.  Yes.
15   Q.  And it has -- how is it wrapped?
16   A.  It was wrapped in, again, rubber bands and then sealed
17   vacuum bags, plastic bags.
18   Q.  Did you recognize how it was wrapped?
19   A.  It was the same type of wrapping that -- in Georgia.
20   Q.  While you're at the hotel room does Mr. Delgado call you?
21   A.  Yes.
22   Q.  And Government's Exhibit 66.
23          (Audio recording played.)
24   BY MS. KANOF:
25   Q.  Okay.  When you said, What about the other 50, what are you

Pimentel — Direct by Ms. Kanof

1   referring to?

2   A.   Again, there was going to be a total of 100,000 in two

3   $50,000 deliveries each.

4   Q.   Okay.   When you put the Hollister bag on the bed, did the

5   agents count the money in front of you?

6   A.   Yes.

7   Q.   How much was there?

8   A.   50,000.

9   Q.   And did they remove any of that money?

10  A.   Yes.

11  Q.   How much?

12  A.   2,000.

13  Q.   Why?

14  A.   Because it was the money that I was going to use.   Because

15  at that time I was in school, so I was not working anymore.   I

16  didn't have a lot of money, so I needed that money to buy my

17  plane ticket back to El Paso.

18  Q.   Okay.   And you having worked -- by the way, did you get the

19  $2,000?

20  A.   No.

21  Q.   Okay.   What happened to it?

22  A.   The ICE agents took it with them.

23  Q.   Okay.

24           (Audio recording played.)

25

1    BY MS. KANOF:

2    Q.  By this time, have you received either by text or by phone

3    the bank account number that you're supposed to put the money

4    in?

5    A.  No.

6    Q.  Okay.  And do you speak with Marco Delgado again at

7    2:04 p.m.?

8    A.  Yes.

9    Q.  Government's Exhibit Number 67.

10            (Audio recording played.)

11   BY MS. KANOF:

12   Q.  You tell him twice that you took the money and walked

13   through the mall; was that true?

14   A.  Yes.

15   Q.  Okay.  And were you by yourself?

16   A.  Yes.

17   Q.  Did you know whether or not you were on surveillance?

18   A.  I was under surveillance.

19   Q.  Okay.  And you walked through the mall and took it to your

20   motel?

21   A.  Yes.

22   Q.  At 2:50 p.m., do you have another -- by the way, in between

23   the last conversation which occurred at 2:04, and the next one

24   at 2:50, did you -- a little more than 45 minutes apart -- did

25   you get a bank account number from Mr. Delgado?

1    A.  I don't remember.

2    Q.  Okay.  But you're still talking to him; is that correct?

3    A.  Yes.

4    Q.  Government's Exhibit Number 68.

5           (Audio recording played.)

6    BY MS. KANOF:

7    Q.  And then at 4:00 p.m., a little over an hour later, do you

8    again speak with Mr. Delgado on that same day?

9    A.  Yes.

10   Q.  Government's Exhibit 69.

11          (Audio recording played.)

12   BY MS. KANOF:

13   Q.  Still no deposit number?

14   A.  No, I had an account number.

15   Q.  Sorry.

16   A.  I had an account number with me since I leave El Paso, and

17   it was supposed to be Marco's law firm account.  So that's why

18   I asked on that phone call, What is the difference, if it's the

19   same bank?  We can move it from one account to another, like

20   with a transfer, if I deposit it in your account and then you

21   move the money to the other account.  But still, he didn't want

22   me to put it in.

23   Q.  He still wants you to wait?

24   A.  Yes.

25   Q.  And then 22 minutes later he -- you speak with him again;

Pimentel – Direct by Ms. Kanof

1    is that correct?

2    A.   Correct.

3    Q.   Government's Exhibit 70.

4              (Audio recording played.)

5    BY MS. KANOF:

6    Q.   Even though he told you not to, did you go ahead and go to

7    Racine?

8    A.   Yes.

9    Q.   And were the agents with you?

10   A.   Yes.

11             (Audio recording played.)

12   BY MS. KANOF:

13   Q.   He refers to a mishap.  At that time, did you know what he

14   was referring to?

15   A.   Yes.

16   Q.   What is the mishap?

17   A.   When we were counting the money at the hotel, we learned

18   that because this guy left so fast he was speeding on the

19   freeway and he was stopped.

20             The stop was not made by the ICE.  Actually, we were

21   worried when we learned that the stop was made, because

22   automatically the cartel would assume that we set him up, which

23   was not true.  And then that's when they close all

24   communications with Marco.

25   Q.   Okay.  So right when he left you back earlier in the day --

1    A.  Yeah.  Four or five hours earlier than those phone calls,

2    yes.

3    Q.  You said the money had been counted before 12:00.  So was

4    it before noon that that happened, that you learned of that?

5    A.  Yes.

6    Q.  Okay.  Then at 5:09 -- this would be Government's Exhibit

7    Number 71.

8         Do you talk with him again?

9    A.  Yes.

10        (Audio recording played.)

11   BY MS. KANOF:

12   Q.  Okay.  What are you referring to?

13   A.  Before I left El Paso, he gave me a bank account -- a bank

14   account number.  He told me that that bank account was his law

15   firm's bank account.

16        Actually, I was instructed that if something happened

17   at the bank and if for some reason they were to call the

18   police, I would mention Gary Hill, which is a lawyer here in

19   El Paso, and that he was going to represent me with the case of

20   why I was depositing large amounts of money in cash.

21   Q.  So you had already planned what to do; is that correct?

22   A.  Yeah.

23   Q.  And you -- when you went to the bank, the Wells Fargo in

24   Racine with regard to this exhibit, you tell him the account is

25   under Liliana's name, and if they don't speak to Liliana, they

1    won't accept the money.

2              Are you telling the truth?

3    A.  Yes.

4    Q.  What happened at the bank?

5    A.  Well, I walk into the bank with $50,000.

6    Q.  And the agent?

7    A.  And an agent.  And obviously, it's not a normal transaction

8    at a bank.

9              Then they -- I mean, this is a small town, Racine, so

10   I'm pretty sure they're not familiar with people walking in --

11             MR. ESPER:  Objection, Your Honor.  Objection, calls

12   for speculation as to the --

13             THE COURT:  I'll sustain the objection.

14   BY MS. KANOF:

15   Q.  Okay.  Just tell them what happened.

16   A.  Then I get to the teller and I put the money on the

17   counter.  And I said, I want you to deposit into this bank

18   accounts, which I assumed it was Delgado & Associates bank

19   account.

20             So the teller goes to the computer, looks at the

21   account number, and she asked me, What is this account number?

22   Who is this account number?

23             And I said, Delgado & Associates.

24             And she said, No.  The name on this account is Liliana

25   Narvaez.

Pimentel – Direct by Ms. Kanof

1              That's why, when I called Marco, I said, Why did you

2    lie to me?  This bank -- this bank account is not yours; it's

3    your girlfriend's account.  I was pretty upset.

4    Q.  Go ahead.

5    A.  So that's what happened at the bank.

6    Q.  And then when -- and then the conversation continues when

7    you tell him that; is that correct?

8    A.  That's correct.

9              (Audio recording played.)

10   BY MS. KANOF:

11   Q.  So when he asked you to ask for a cashier's check, did you?

12   A.  Yeah.  But again, they didn't want to do it.

13   Q.  Okay.  Did you speak with him shortly -- that conversation

14   occurred at 5:09.

15              Did you speak to him at 5:26 again?

16   A.  Yes.

17   Q.  And that's Government's Exhibit Number 72; is that correct?

18   A.  (No verbal response.)

19              (Audio recording played.)

20   BY MS. KANOF:

21   Q.  Okay.  Now, what were you instructed to do next, now that

22   you still had this money?

23   A.  Then we obviously couldn't get a cashier's check or make a

24   deposit, so I was instructed to rent a car and drive to

25   El Paso.

Pimentel – Direct by Ms. Kanof

1   Q.  Who rented the car?

2   A.  Nobody rented the car.

3   Q.  Oh, okay.  No.  I mean, who instructed you to rent a car?

4   A.  Marco.

5   Q.  And did you do that?

6   A.  No, because I was with the agents, so they took control of

7   the money.  And then I flew back to El Paso, and then I meet

8   with agents of ICE here in El Paso.

9   Q.  Did you use this same ticket that had been provided to you

10  by Marco?

11  A.  No, because -- the ticket that it was provided to me, it

12  was only one way.  I was supposed to pay for the flight back

13  with the $2,000 that I was supposed to take for my expenses.

14  But I paid that with my own money.

15  Q.  Okay.  And when you tell -- when you discuss with Marco

16  that you're going to fly back, does he tell you to take more

17  money?

18  A.  Yes.

19  Q.  What does he tell you?

20  A.  Because I'm going to drive -- I'm not going to fly back.

21  He didn't knew that I flew back.  He knew that I was going to

22  drive.

23       He told me, Take more money.  Rent a car without the

24  GPS so you cannot be tracked, and drive to El Paso.

25  Q.  He told you without a GPS?

1    A.  Yes.

2    Q.  And did you do that?

3    A.  Of course not.  I was with the ICE agents.

4    Q.  When you flew back to El Paso, who did you meet with?

5    A.  I was with the supervisor of ICE at that time here in

6    El Paso.

7    Q.  Okay.  And did they debrief you?

8    A.  Yes.

9    Q.  Did you give them the actual account numbers that were

10   provided to you by Marco Delgado?

11   A.  Yes.

12   Q.  And did you tell them which one was identified by the

13   banker as Liliana's number?

14   A.  Yes.  Liliana Narvaez, yes.

15   Q.  And did you tell them which one was identified to you as

16   Mr. Delgado's number?

17   A.  Yes.

18   Q.  Okay.  What happened next?

19   A.  Then they instruct me to call Marco, and they record

20   another phone call.  And I was instruct by Marco to make a

21   deposit on the Wells Fargo on Mesa Street right next to the

22   dorms that I was living.  And it was Saturday morning, so

23   that's what I did.

24   Q.  And you deposited the money in his account?

25   A.  Yes.

Pimentel – Direct by Ms. Kanof

1   Q.  And did you have any other involvement after that?

2   A.  I met with Mr. Delgado after that.  We met at the Pastry

3   Chef in Mesa -- well, it's not Mesa.  The Pastry Chef is a

4   coffee place.

5        When we get there --

6   Q.  On Shadow Mountain and North Mesa?

7   A.  Yes.

8   Q.  A little strip mall?

9   A.  Yeah.  And then when we got there, he told me that we

10  couldn't talk there because there people that looked like

11  agents, which it was -- I mean again, I knew it was a lie.  But

12  he told me that the agents were aware of what we were doing, so

13  that was weird.  But again --

14  Q.  He told you he didn't want to be at the Pastry Chef why?

15  A.  Because there were people that looked like agents.

16  Q.  And why did you find that unusual?

17  A.  Because he told me that ICE knew that we were doing the

18  money pickup.

19  Q.  Okay.  So what happened next?

20  A.  Then we moved to the Starbucks across the street.

21  Q.  And what happened at the Starbucks?

22  A.  We just talk about the money.

23        And I asked him, When are we going to do another money

24  pickup with these people?

25        And then that was pretty much it.

Pimentel - Direct by Ms. Kanof

1   Q.  Did he provide you any other money, other than -- I mean

2   other than the two and the three thousand dollars that --

3   A.  No.

4   Q.  Okay.  And where did you go after that, after you deposited

5   the money?

6   A.  I went back to my dorm.

7   Q.  To the dorm?

8   A.  Well, I met with the agents, and then I finally went back

9   to my dorm.

10   Q.  In what account did you deposit it to?

11   A.  The Delgado & Associates account.

12   Q.  Okay.  Here in El Paso?

13   A.  Yes.  And I provide the agents with the receipt.

14          MS. KANOF:  May I have a moment, Your Honor?

15          THE COURT:  You may.

16   BY MS. KANOF:

17   Q.  When you first got involved in the money laundering venture

18   with Mr. Delgado, did he talk to you about reporting

19   requirements?

20   A.  Reporting to who?

21   Q.  Reporting money.

22   A.  Yes.

23   Q.  What did he tell you?

24   A.  That -- he told me that we could do big deposits of big

25   movements of money if we would report those movements to the --

1    it was the Interpol authority, or the financial authority in

2    the U.S.

3    Q.  Okay.  And did he say anything about any other reporting

4    requirements?

5    A.  No.

6    Q.  And when he created the TEPDEL or other LLCs, did he say

7    anything about how that related to money?

8    A.  Well, we were going to use the LLCs to move the money

9    across the world.  That's why we went first to Turks and

10   Caicos, to create the LLC on the Caribbean.  And that's why we

11   create -- well, he create the TEPDEL thing for the bond, to

12   also move money across the world.

13   Q.  Did he tell you something about how, if it was an LLC, it

14   changed the rules?

15   A.  Yes.

16   Q.  What did he tell you?

17   A.  That in the state of Nevada if you have an LLC, you're not

18   liable of your pers- -- if you commit a felony or your -- the

19   LLC goes bankrupt, you're not -- they're never going to go to

20   your personal assets.  So they're only -- the company is only

21   liable for what they have.  And in this case it was just

22   papers, so the companies were not liable for anything.  They

23   wouldn't take anything.

24   Q.  In preparing for the first -- the million-dollar delivery,

25   did he tell you anything about a bank's requirement should you

Pimentel - Direct by Ms. Kanof

1    try to deposit more than $10,000 in cash?

2    A.  Yes.  That if you needed to -- if you walk into a bank and

3    you make a deposit of more than $10,000 in cash, that would

4    automatically raise a flag with the IRS.  So they would flag

5    the transaction and take a look at it.

6    Q.  Okay.  And yet, he told you to deposit $48,000?

7    A.  Yes.

8    Q.  In Racine, Wisconsin?

9    A.  Yes.

10   Q.  Did he give you any instruction about the IRS reporting

11   requirement?

12   A.  It's mentioned in one of the conversations that he's going

13   to do the reportings.  And this custody -- the agency that he

14   was going to report it to was Interpol.  So he actually

15   mentioned in one of the conversations that we're doing the

16   right reports, so don't worry about it.

17   Q.  Oh, okay.  That's what the reports references to?

18   A.  Yes.

19   Q.  He's talking about the money reports?

20   A.  Yes.

21   Q.  To the federal government?

22   A.  Yes.

23   Q.  One more thing.

24        When you were handling the million dollars, did he

25   tell you what bank that money was going to go to?

1   A.   No.   No, we were going to drive with the money to Mexico.

2   Q.   Did he -- previously, yesterday, when you were testifying,

3   you talked about the Turks and Caicos?

4   A.   Yes.   That was when the big money would come to the table.

5   And this was a trial run, so we just needed to prove that we

6   could take money from Point A to Point B.

7          And then once we start doing the 5 millions a week,

8   the 3 millions a week and so and so, we were going to use Big

9   John in the Turks and Caicos Island to move that amount of

10  money.

11  Q.   And how was that money going to be filtered?

12  A.   That, I don't know.

13  Q.   Okay.   You previously testified that he never told you that

14  this was money derived from gambling, correct?

15  A.   Correct.

16  Q.   Did he ever talk to you about casinos or gambling?

17  A.   Right.   He told me that he knew people in the casino

18  business, some tribes in New Mexico, that would allow us to use

19  their -- all the cash movement that they have, so we can

20  launder the money through them, and that that money will be

21  sent to Turks and Caicos, or which -- any part of the world

22  that we would want it to.

23  Q.   But you didn't use it for the million dollars?

24  A.   No.

25          MS. KANOF:   Your Honor, we pass the witness.

1          MR. ESPER:  Your Honor, do you want me to start now?

2          THE COURT:  Well, I was hoping to stay a little bit

3     longer, but it would probably be a good time to take a lunch

4     break.

5          We'll be an hour and 15 minutes, ladies and gentlemen,

6     so 1:25.  We'll reconvene at 1:25 in the afternoon.

7          Please remember all the instructions I gave you,

8     members of the jury.

9          We'll be in recess until 1:25.

10         (Recess taken; open court.)

11         THE COURT:  You may proceed, Mr. Esper.

12         MR. ESPER:  Thank you, Your Honor.

13                        CROSS-EXAMINATION

14    BY MR. ESPER:

15    Q.  Mr. Pimentel, you came to the El Paso/Juárez area in

16    approximately 2002; is that right?

17    A.  Yeah.

18    Q.  And you came, really, to the area known as Samalayuca; is

19    that correct?

20    A.  That's where I worked, but I lived in Ciudad Juárez.

21    Q.  Pardon me?

22    A.  That's where I was working, but I was living in Ciudad

23    Juárez.

24    Q.  Okay.  And before that, of course, you were living

25    somewhere in Mexico, correct?

1   A.  Yes.

2   Q.  All right.  Now when you come up here to the Juárez area,

3   you're coming up here to try to obtain a -- the culinary

4   contract with this electric company?

5   A.  No, I didn't come to try.  I already came with the

6   contract.

7   Q.  You already had a contract?

8   A.  Yeah.

9   Q.  And who did you obtain that contract from?

10  A.  From the -- when you're building that type of supply and

11  you have a main builder, you negotiate that contract with them.

12  Q.  Okay.  And you know an individual -- and I believe you

13  testified to this on direct examination -- named Nareo Vargas;

14  is that correct?

15  A.  Nareo Vargas, yes.

16  Q.  And what does he have to do with -- did he have something

17  to do with you obtaining that contract?

18  A.  Yes.

19  Q.  Okay.  And what is it that he did for you to obtain that

20  contract?

21  A.  He didn't do anything for me.  What he does, he's the one

22  that -- because he's the leader of the union, he negotiate

23  in -- with the main contractor and the union, with companies

24  like mine, to get those contracts.

25  Q.  Okay.  Would it be fair to say that he's a fairly powerful

1    man in the Republic of Mexico?

2    A.  Define powerful.

3    Q.  Well, powerful from the standpoint he's head of one of the

4    top unions in Mexico, correct?

5    A.  I don't know what you want powerful -- power to do what?

6    Q.  Does he exert a lot of political influence, Mr. Pimentel?

7    A.  I don't think he holds any political charge.

8    Q.  Okay.  You said he is the head of -- the name of the union

9    again?

10   A.  SUTERM, yes.

11   Q.  Okay.  And is that a very powerful union, worker's union?

12            MS. KANOF:  Objection, Your Honor, relevance.

13            THE COURT:  Overruled.

14   A.  Again, powerful to do what?  They have a lot of workers,

15   yes.

16   BY MR. ESPER:

17   Q.  Okay.  And do they -- he controls, basically, as head of

18   the union --

19   A.  He's not head of the union.  He's part of the union, but

20   he's not head of the union.

21   Q.  Okay.  Was he ever head of the union?

22   A.  No.

23   Q.  Okay.  Does he control the decisions that the workers make?

24   A.  Decisions that the workers make?  I think that workers

25   control their own decisions.  I --

Pimentel - Cross by Mr. Esper

1    Q.  Okay.  How long have you known Mr. Vargas?

2    A.  Probably 15 years.

3    Q.  Okay.  And so you knew him when you were just a young kid,

4    correct?

5    A.  Yes.

6    Q.  Okay.  And did he kind of take you under his wing and kind

7    of be a mentor to you?

8    A.  No.

9    Q.  No?

10   A.  No.

11   Q.  Okay.  What is it -- how is it that he befriended you?

12   A.  Actually, I became friends with his daughter.

13   Q.  Okay.  And because you became friends with his daughter, he

14   took a liking to you, correct?

15   A.  Yeah.

16   Q.  Okay.  And he was instrumental in obtaining this contract

17   for you at Samalayuca to provide food for the workers there,

18   correct?

19   A.  When you say instrumental, can you please be more specific

20   about it?  What do you mean by instrumental?  I just don't want

21   to say anything that's not accurate.

22   Q.  Did he help you get that contract to feed the workers that

23   were going to be working at Samalayuca?

24   A.  No, he didn't help me.  What we do is bid with other

25   companies like mine.  And between the main contractor and the

1    union they make a decision of which company provide those

2    services.

3    Q.  Okay.  And he is very influential in the union that worked

4    with that contractor, correct?

5    A.  Yes.

6    Q.  Okay.  And it's between the workers union and the

7    contractor who gets that contract, correct?

8    A.  Yes, they decide.

9    Q.  And you got the contract?

10   A.  Yes.

11   Q.  Okay.  And that is the contract that basically provides for

12   the workers to buy the food to feed them while they are

13   working, right?

14   A.  They don't buy the food.  The company pays for the food.

15   Q.  Okay.  And that's lucrative financially to you, is it not?

16   A.  We made money, yes.

17   Q.  Okay.  When you say "we," did you have a partner?

18   A.  Yes.

19   Q.  Okay.  And how long was that contract for?  Did it start in

20   2002?

21   A.  It goes on a plant basis.  So it depends on how long the

22   plant takes to build.  For example this plant, I think it took

23   probably 18 months.  So your contract is for that period of

24   time.

25   Q.  Okay.  So for 18 months, you had a very lucrative income

1   coming in, correct?

2   A.  No.  You have a very big fixed expense at the beginning,

3   because you need to set up the dining room.  You need to hire

4   people, you need to train people.  You usually work with local

5   governments to get that people.  You need to give IRS -- you

6   need to give benefits to those workers.

7           So it's not really lucrative during the 18-month

8   period.

9           You would spend a lot of money at the beginning, then,

10  in the peak, because they hired people on periods.  So when the

11  building got its peak, then you do make money for those two

12  months.  But other than that, it's not lucrative for those 18

13  months.

14  Q.  You testified, Mr. Pimental [sic], that you were living a

15  lucrative lifestyle, didn't you?

16  A.  Yes.

17  Q.  And where did that money come from?

18  A.  From those businesses.

19  Q.  Okay.  So the businesses were lucrative, correct?

20  A.  Good business, yes.

21  Q.  Okay.  So when I asked you, Did it provide lucrative income

22  to you, you said --

23          MS. KANOF:  Objection.  Argumentative, Your Honor.

24          THE COURT:  I think he answered that already,

25  Mr. Esper.

1            MR. ESPER:  Okay.

2     BY MR. ESPER:

3     Q.  You were able to live a lavish lifestyle, correct?

4     A.  Define lavish.

5     Q.  Well, you're the one that said it yesterday, Mr. Pimental

6     [sic].

7     A.  Yeah.  I know what I meant when I say it.  I don't know

8     what you mean when you say it.

9     Q.  Okay.  What do you mean by lavish?

10    A.  Well, you have a good lifestyle.  If you want to go out and

11    eat tonight, you can go and have dinner tonight.  If you want

12    to do some trip with your girlfriend you can do it.  So, yeah.

13    Q.  Okay.  Live in a nice place, correct?

14    A.  No, it was not a nice place.  It was -- we paid rent for

15    $400 at that time on a very small house.

16    Q.  You were living the life that you wanted to live at that

17    time, weren't you?

18    A.  Yeah.

19    Q.  Okay.  And you had money to spend?

20    A.  Yes.

21    Q.  Okay.  And to you at that time, that was a lavish

22    lifestyle?

23    A.  It was a nice lifestyle, yes.

24    Q.  Okay.  Now what happens is, you enroll at UTEP, correct?

25    A.  Yes.

1    Q.   And that's when you start to live with Mr. Delgado?

2    A.   Yes.

3    Q.   Okay.  And when do you graduate from UTEP?

4    A.   In 2010.

5    Q.   2010?

6    A.   Yes.

7    Q.   So it would be fair to say, when you started at UTEP even

8    though you had education in Mexico, you got no credits for

9    anything that -- for any educational credits in Mexico when you

10   enrolled at UTEP, correct?

11   A.   Not in Mexico.  I did have some credits from the University

12   of Phoenix.

13   Q.   The University of Phoenix?

14   A.   Yes.

15   Q.   So when you entered UTEP, you did have some credits from

16   the University of Phoenix?

17   A.   Yes.

18   Q.   Okay.  That was an online course that you were taking?

19   A.   No.  I came once a week to take classes on the Santa Teresa

20   campus.

21   Q.   Okay.  And how many credits did you get when you start --

22   did you have --

23           MS. KANOF:  Objection, relevance.

24           THE COURT:  I'm going to sustain the objection.

25

1   BY MR. ESPER:

2   Q.  Did you drop out of UTEP from that period of 2004 to 2010?

3   A.  Yes.

4   Q.  Okay.  And...

5   A.  I didn't drop out.  I just -- I gave the advice that you --

6   to the school.  You let them know that you won't continue.

7   Q.  I'm sorry.  I didn't understand you.

8   A.  You don't drop out of the school, because I couldn't pay

9   anymore the school.  I have to suspend my attendance.

10  Q.  Well, sir, if you were going to school, when did you have

11  time to be going to Mexico City, to Turks and Caicos, to

12  Atlanta?  When did you have time to do that?

13  A.  As I said yesterday, I set up my schedule to only attend

14  classes Tuesdays and Thursdays so I could have Wednesday to do

15  my homework.  And I have Friday, Saturday, Sunday, and Monday

16  to do other things.

17  Q.  Okay.  In 2006 and 2007 were you going to UTEP?

18  A.  No.

19  Q.  Okay.  You had dropped -- you didn't enroll?

20  A.  Actually in 2007, I was enrolled -- no.  I don't remember.

21  It's in my passport with my visa.  I don't remember.  Sorry.

22  Q.  Okay.  Now, Mr. Pimental [sic], during this period of time

23  of 2006 to 2008, you never said no to anybody, did you?

24  A.  Oh, yes.

25  Q.  You did?

1    A.  Yes.

2    Q.  Well, did you say, No, I don't want to go to Atlanta?

3    A.  No.

4    Q.  You went, didn't you?

5    A.  Yes.

6    Q.  And when you went to Chicago, you didn't say no, did you?

7    A.  No.

8    Q.  You said, Ah, yeah, I'm ready to go.  Right?

9    A.  Well, I said no because I have a test.  No, because it's my

10   brother's wedding.  And if we can do it in some other time,

11   yes.

12   Q.  Mr. Pimentel, you didn't say, No, I'm not going to do that,

13   did you?

14   A.  Nope.

15   Q.  Okay.  You went head and did it, didn't you?

16   A.  Yes.

17   Q.  Okay.  Now, when you get to Atlanta -- before you get to

18   Atlanta we've heard -- we've gone through all these e-mails

19   where there's just conversations and conversations and

20   conversations involving numerous people.

21          Do you recall all that?

22   A.  Yes.

23   Q.  Okay.  And it doesn't appear like anything is happening,

24   does it?

25   A.  Correct.

```
1    Q.  How many meetings were there at the Mexico City airport, at
2    this restaurant there?
3    A.  Meetings with who?  And -- because we had a lot of meetings
4    with different people.  Actually, Marco and I had meetings
5    between the two of us there, so there was a lot of meetings in
6    the Mexico City airport.
7    Q.  Okay.  So you go -- you've gone to Mexico City a bunch of
8    times, haven't you?
9    A.  I am from Mexico City.  So, yes.
10   Q.  Okay.  So you're living in El Paso, and you're going back
11   and forth frequently, correct?
12   A.  Yes.
13   Q.  Okay.  And how are you paying for all that?
14   A.  During what time?
15   Q.  During 2006.
16   A.  Well, I just have savings.  Sometimes I pay my tickets with
17   miles.  I work, so I do have some -- some income.
18   Q.  Where were you working?
19   A.  Again, I have a food business in Mexico.  It was not as
20   profitable as it used to be, because the recession came during
21   those years, and we couldn't get the contract -- the amount of
22   contracts that we used to get.  So I do still have small
23   operations, but it was pretty marginal.
24   Q.  Do you consider Mr. Vargas a good friend of yours?
25   A.  No.
```

Pimentel - Cross by Mr. Esper

```
 1    Q.  You don't?
 2    A.  No.
 3    Q.  Okay.
 4    A.  We were --
 5    Q.  Yes -- that's all I asked you, sir.
 6    A.  Okay.  No.
 7    Q.  Okay.  Now whenever you meet this guy Chuy in Mexico City,
 8    how many times do you meet with him at the airport?
 9    A.  Once.
10    Q.  Once.  And you say that was sometime in -- before you went
11    to Atlanta in 2007?
12    A.  Yes.
13    Q.  Okay.  Was it a few weeks before?
14    A.  Yes.
15    Q.  That's the first time you'd ever met him?
16    A.  No.
17    Q.  When did you meet him before?
18    A.  At the Camino Real Hotel.
19    Q.  Okay.  And that was about six, eight, nine months earlier?
20    A.  No, it was prior.  And actually, if I recall correctly, the
21    Miss Universe contest was happening at that hotel that day, so
22    we can look up the date if you want to.  So the exact date was
23    the Miss Universe contest.  All the participants were dancing
24    in the hotel, so we can look for the date.  But it was not six
25    or nine months.  It was a lot closer to the --
```

1   Q.  It was sometime in 2007 or 2006?

2   A.  2007.

3   Q.  Okay.  And also present at some of these meetings were

4   Pedro Mendoza, correct?

5   A.  Correct.

6   Q.  He's the person that's referred on these e-mails as Pete or

7   Peter, correct?

8   A.  Correct.

9   Q.  And what about Francisco?

10  A.  Which Francisco?

11  Q.  Is there anybody named Francisco there?

12  A.  There's two people named Francisco.

13  Q.  Okay.  And do you know their last names?

14  A.  Well, one was me.  There was Francisco Ruiz, and then it

15  was another Francisco.  I don't remember the last time right

16  now.

17  Q.  Okay.  And you have assumed that Francisco Ruiz alias for a

18  period of time, have you not?

19  A.  Yeah.

20  Q.  Okay.  And you used it a number of times, didn't you?

21  A.  Yes.

22  Q.  Okay.  And did you use it whenever it was convenient for

23  you to use it?

24  A.  Not convenient.  It was when Marco told me to do it.

25  Q.  Okay.  So Marco is telling you to use this whenever you

1   need to use it?

2   A.  Yeah.  He created it.

3   Q.  Okay.  Whenever you are traveling, whenever you go to

4   Atlanta, do you have any identification that says Francisco

5   Ruiz?

6   A.  Not to travel, no.

7   Q.  Okay.  Whenever you finish -- in July of 2007, after you

8   agree to cooperate, the agents gave you back your passport,

9   correct?

10  A.  Correct.

11  Q.  And they told you, We're not going to prosecute you so long

12  as you stay out of trouble, correct?

13  A.  Correct.

14  Q.  Did they ask you to continue to provide information if you

15  got any information?

16  A.  They told me that if I ever get some knowledge that we were

17  going to do something else I'd better tell them.

18  Q.  Okay.  So you, to this day, still have a student visa?

19  A.  Yes.

20  Q.  The federal government did not deport you or revoke your

21  student visa, did they?

22  A.  No.

23  Q.  So you got a big break --

24  A.  Yes.

25  Q.  -- by that happening, correct?

1    A.  Yes.  Yes.

2    Q.  All right.  Now, did you ever give the agents, Hey, here's

3    this fake identification that I've got?

4    A.  No.  Marco instruct me to destroy those after we got

5    caught.

6    Q.  Okay.  Again, Marco is the one that's telling you to

7    destroy the fake identification, correct?

8    A.  Correct.

9    Q.  All right.  Now, did -- did this Chuy, when you gave him

10   your identification of Victor Pimental [sic], did he ask you,

11   Hey, I thought your name was Francisco?

12   A.  Yes.

13   Q.  What did you tell him?

14   A.  This Victor Pimentel was my alias.

15   Q.  Pardon me?

16   A.  That Victor Pimentel was my alias.

17   Q.  Victor Pimental [sic] was your alias?

18   A.  Yes.

19   Q.  Oh, okay.  So you told him just the opposite of what was

20   true?

21   A.  Correct.

22   Q.  Now your cousin, also known as Inclan, or Ready?

23   A.  Yes.

24   Q.  His name is Isaac, is it not?

25   A.  That's correct.

1    Q.   Okay.  And is Isaac with you at this meeting in Mexico

2    City?

3    A.   Yes.

4    Q.   Okay.  So he knows what's going on, doesn't he?

5    A.   Yes.

6    Q.   Okay.  Now, whenever you first interviewed with the agents,

7    you told them that Isaac didn't know anything that was going

8    on, didn't you?

9    A.   Yes.

10   Q.   Okay.  So when you first met with the agents and told them

11   that your cousin didn't know anything that was going on, you

12   lied about that, didn't you?

13   A.   Yes.

14   Q.   Okay.  Isaac -- you and he then fly from Mexico City to

15   Juárez?

16   A.   No, we drove.

17   Q.   You drove?

18   A.   Yes.

19   Q.   Okay.  And you drove in your vehicle, correct?

20   A.   Correct.

21   Q.   And that vehicle is the Jeep that was stopped by Officer

22   Elliott on September the 4th or 5th, whatever day it was?

23   A.   That's correct.

24   Q.   Okay.  Now, there was some discussion in some of these

25   e-mails about obtaining another vehicle.  Do you remember that?

```
 1   There was some talk about a Suburban?

 2   A.  Yes.

 3   Q.  Okay.  And whose decision was it for you to take that Jeep

 4   to Georgia?

 5   A.  Was this -- I don't understand the Suburban.

 6   Q.  No.  There was some talk about obtaining a vehicle to

 7   transport, supposedly, this money that was going to be

 8   laundered, correct?

 9   A.  Correct.

10   Q.  And that never happened?

11   A.  What never happened?  I'm sorry.

12   Q.  Did anybody obtain a vehicle for you?

13   A.  I was the one in charge of obtaining the vehicle.

14   Q.  Okay.  That Jeep, you had that for a while, didn't you?

15   A.  I was paying for it, yes.

16   Q.  Yeah.  So you didn't buy any other vehicle that's be --

17   like that's being referenced --

18   A.  But the vehicle was not supposed to be used to transport

19   the money, the new vehicle that we were going to get.

20   Q.  It was supposed to do what?

21   A.  We were not supposed to use the Suburban to transport the

22   money.  That was not the use that we were going to give to that

23   Suburban.

24   Q.  What were you going to use it for?

25   A.  Marco told me that somebody in the cartel wanted a
```

1    Suburban, just like a gift.  And it's discussed in the e-mails

2    that the start of the operation is subject to us delivering the

3    Suburban to them.

4    Q.  Oh.  So this Suburban is supposed to be a gift?

5    A.  Yes.

6    Q.  In order to get the, quote, contract to start moving this

7    money?

8    A.  Yes.

9    Q.  Okay.  Now, Lilian de la Concha was at these meetings,

10   correct?

11   A.  No, not all of them.

12   Q.  Pardon me?

13   A.  Not on all of them.

14   Q.  Not all of them?

15   A.  No.

16   Q.  Some of them?

17   A.  Yes.

18   Q.  Okay.  And you describe her as being the former wife of

19   President Fox, correct?

20   A.  Correct.

21   Q.  And when was as he president of Mexico?

22   A.  Should be 2002 to 2006, or around those -- around that

23   period.

24   Q.  How long is the presidency in Mexico?  Do you know?

25   A.  Six years.

1  Q.  Six years?

2  A.  Yes.

3  Q.  So it would be 2000 to 2006?

4  A.  That's correct.

5  Q.  Okay.  And being the president of Mexico, would it be fair

6  to say he was a fairly powerful man?

7  A.  Yeah.

8  Q.  Correct?

9  A.  Yeah.

10  Q.  Okay.  And when he became president, was she still his

11  wife, if you know?

12  A.  No, I don't.

13  Q.  If you don't know say, I don't know.

14  A.  I'm pretty sure that they divorced when he was the governor

15  of Guanajuato.

16  Q.  Okay.  So he was governor of a state of Mexico --

17  A.  Yeah.

18  Q.  -- before he became president?

19  A.  Yes.

20  Q.  So he's been a pretty powerful guy for some time, correct?

21  A.  Yeah.

22  Q.  Okay.  And now, she's at some of these meetings allegedly

23  talking about moving drug monies, correct?

24  A.  Correct.

25  Q.  But you've said that she appeared to be a well-off woman

1  financially.  Not superrich, but well off, correct?

2  A.  Yeah.

3  Q.  Okay.  And she certainly was well off politically, correct?

4  A.  Yes.

5  Q.  Okay.  Were you at all surprised that she was at these

6  meetings?

7  A.  Not surprised, because I was told that she was going to be

8  there.

9  Q.  Okay.  As a matter of fact, when you first met her is when

10 Marco Delgado told you that he knew her and had previously met

11 her, correct?

12 A.  Correct.

13 Q.  And he went down to try to solicit business through her

14 with Mexican businesses, correct?

15 A.  Businesses through Mexican businesses?

16 Q.  Yes.

17 A.  Yeah.

18 Q.  Right?

19 A.  Yeah.

20 Q.  He went to her to try to solicit business, have her put him

21 in touch with people who could -- who could be potential

22 clients, correct?

23 A.  Yeah.

24 Q.  And those clients weren't money launderers, were they?

25 A.  Not all of them.

1    Q.  Okay.  Well, a bunch of them, are you saying, are?

2    A.  Some of them, yes, they were.

3    Q.  Okay.  And is it your understanding that money laundering

4    is transporting money from one place to another place?

5    A.  No.

6    Q.  That's not your understanding of it?

7    A.  No.

8    Q.  Is it your understanding that you have to know that the

9    monies come from drug -- is that your understanding of it?

10   A.  No.

11           MS. KANOF:  Objection, Your Honor.  The law would come

12   from the Court.

13           THE COURT:  I'll sustain the objection.

14   BY MR. ESPER:

15   Q.  Mr. Pimentel, when you met -- after you got arrested --

16   well, let me ask you this.

17           Your cousin Isaac, who was involved in this matter, he

18   drove your vehicle to Mexico?

19   A.  No.

20   Q.  I mean to Atlanta.  I'm sorry.

21   A.  Yes.

22   Q.  And apparently, he drove there and never got stopped by any

23   law enforcement, correct?

24   A.  Correct.

25   Q.  All right.  And you made a comment that, Boy, that was

Pimentel - Cross by Mr. Esper

1    stupid of me to be driving that money with Mexican plates,

2    correct?

3    A.  Correct.

4    Q.  Okay.  But you made that decision, right?

5    A.  Yes.

6    Q.  Okay.  Now, you also said that you -- did you rent a

7    vehicle while you were there in Atlanta?

8    A.  Yes.  I did not -- Peter provide his credit card.  I was

9    with him when we rent the vehicle.

10   Q.  Okay.  So who's there in Atlanta?  You --

11   A.  Peter.

12   Q.  -- Pedro -- is that Pedro Mendoza Meneses?

13   A.  And Chuy.

14   Q.  And Chuy.  Do you know Chuy's real -- Chuy is the guy at

15   the airport, correct, in Mexico City?

16   A.  No, I mean Chilo.

17   Q.  Chilo?

18   A.  Yeah.  Sorry.

19   Q.  Do you know his real name?

20   A.  Isidro.

21   Q.  Isidro.  Do you know his last name?

22   A.  I don't remember.

23   Q.  Had you ever met him before?

24   A.  Yes.

25   Q.  Where had you met him?

1    A.  At the Camino Real Hotel in Mexico City.

2    Q.  The same place where these discussions are taking place,

3    correct?

4    A.  Some of them, yes.

5    Q.  Okay.  And so they -- did you know they were flying to

6    Atlanta to meet you?

7    A.  Yes.

8    Q.  Okay.  And you go check in at the Hyatt.  Is that where you

9    were staying?

10   A.  Yes.

11   Q.  Where is Isaac at at this time?

12   A.  He's driving.

13   Q.  He's driving?

14   A.  Yeah.

15   Q.  So when you get to Atlanta, he's still on the road?

16   A.  Yes.

17   Q.  Does he know you're staying at the Hyatt?

18   A.  I don't remember.

19   Q.  Okay.  And now -- now, you and Pedro and Chilo eventually

20   meet up with a couple of characters that you've never seen

21   before, correct?

22   A.  Correct.

23   Q.  All right.  And Pedro had rented a vehicle.  I think you

24   said it was a Ford.  Was it an SUV?

25   A.  An Edge.  Yeah.  It was a big SUV.

1   Q.  A big SUV?

2   A.  Yeah.

3   Q.  Like an Expedition?

4   A.  Yeah, like an Edge, Expedition, some -- it was not an

5   Expedition.  It was like a new model.  I think it was an Edge,

6   but I'm not sure of the model.

7   Q.  But it was definitely an SUV?

8   A.  It was an SUV for sure.

9   Q.  And that's where the money got put into the -- these duffel

10  bags got put into the vehicle, correct?

11  A.  Yes.

12  Q.  You now go back to the hotel.  And you take the money out

13  of the SUV, or do you go to the airport?

14  A.  No.  I drop off, at the hotel, Pedro and Chilo.

15  Q.  You drop them off in the vehicle that Pedro had rented?

16  A.  Yes.

17  Q.  What do you do with that vehicle?

18  A.  I go to the airport.  I deliver the -- return the vehicle

19  and grab my Jeep.

20  Q.  Okay.  You go to the airport and drop off that vehicle?

21  A.  Uh-huh.

22  Q.  When do you take the bags out of that vehicle?

23  A.  At the parking lot.  When you get to the Georgia -- or the

24  Atlanta airport, you have the blue side and the red side, I

25  think.  I get into the red side, and my cousin was already

```
1    there waiting for me with my car.  So we were in the garage,

2    and we put the money from one car to another.

3    Q.  And then you returned the vehicle to the car rental place?

4    A.  Yes.

5    Q.  Okay.  So you lift up these bags and you put them into your

6    vehicle?

7    A.  Yes.

8    Q.  And then you return the rental car?

9    A.  Yes.

10   Q.  Your cousin follows you?

11   A.  No.

12   Q.  What --

13   A.  We park at the park- -- we leave the car parked in the

14   garage.  He took a plane back to Mexico City from Atlanta.

15   Q.  Well, how did you get back to the garage.  Did you walk?

16   A.  Yeah.

17   Q.  You walked?

18   A.  Yeah.

19   Q.  Okay.  Now, whenever you first meet with -- or you're

20   stopped by Agent Elliott, you don't tell him -- you tell him

21   you'd gone to Disneyland.

22        We know that's a lie, correct?

23   A.  Correct.

24   Q.  All right.  And of course you're trying to convince him

25   that you're not doing anything illegal; is that correct?
```

1    A.  That's correct.

2    Q.  And basically, he's not buying your story, is he?

3    A.  That's correct.

4    Q.  Okay.  He then asks you whether you've got any guns, drugs,

5    or money in your car, doesn't he?

6    A.  No, he did not ask me.  Chad, the -- Trooper Chad, he was

7    the one that asked me about the money; not Elliott.

8    Q.  Okay.  This Officer Elliott goes back to check on the

9    computer the information that you've given him on your driver's

10   license, correct?

11   A.  I don't know.

12   Q.  You don't know?

13   A.  No.

14   Q.  Well, you saw the video.  You saw him walk back to his car,

15   didn't you?

16   A.  Yeah.

17   Q.  Okay.  Now, what kind of driver's license do you have?  A

18   Texas driver's license?

19   A.  I had a Texas driver's license.

20   Q.  Okay.  And you tell him that you're going back to Texas or

21   you're going back to Mexico?

22   A.  I think I told him I was going back to Mexico.

23   Q.  Okay.  So here you are with a vehicle that has Mexican

24   plates, a Texas driver's license, you're coming from Disneyland

25   by yourself, and you're going back to Mexico, correct?

Pimentel - Cross by Mr. Esper

1    A.  That's correct.

2    Q.  And he doesn't buy your story at all, does he?

3    A.  Of course not.

4    Q.  Okay.  And had you -- hadn't anybody given you a cover

5    story about, Oh, tell him that you came from here and you're

6    going there.  Nothing like that?

7    A.  No.  The only thing that was discussed was the settlement

8    agreement.

9    Q.  That's not what I asked you, Mr. Pimental [sic].

10            MS. KANOF:  Objection, Your Honor.

11            THE COURT:  I'll sustain the objection.  That's a

12   cover story.

13   BY MR. ESPER:

14   Q.  Did anybody tell you --

15            MR. ESPER:  That was a cover story for the money,

16   Your Honor.

17   BY MR. ESPER:

18   Q.  Did anybody tell you what you were supposed to say, if you

19   get stopped, where you -- where you're coming from?

20   A.  No.

21   Q.  Okay.  Did you just make that up on the spot when you got

22   stopped?

23   A.  Yes.

24   Q.  Or had you thought about it?

25   A.  No, I just make it on the spot.

1    Q.  Okay.  You seem like a fairly intelligent guy.  You hadn't

2    given it any thought about what I'm supposed to do if I get

3    stopped?

4    A.  Honestly, no.

5    Q.  Okay.  Now when the officer, the second officer, asked you

6    about drugs, money, or weapons, you fess up and say, I've got a

7    million dollars in the back seat?

8    A.  He asked me if I had money.

9           And I said, Yes, I do.

10          And he asked me, How much?

11          And I said, A million dollars.

12          And he thought I was joking.  And he told me, Where's

13   the money?

14          And I go, Two duffel bags in the back of the car.

15          He took a look to the back of the car.  He saw the two

16   duffel bags, and that's when he asked me to get out of the car.

17   Q.  All right.  And do you tell him at that time, Oh, by the

18   way, this is drug money?

19   A.  No.

20   Q.  Okay.  They're the ones that tell you, This is drug money,

21   isn't it?

22   A.  I don't think they did that.

23   Q.  Pardon me?

24   A.  I don't think they told me at that time that it was drug

25   money.

Pimentel - Cross by Mr. Esper

1    Q.  Okay.  Do you think they did or you just don't remember?

2    A.  I don't remember.

3    Q.  Okay.  The next thing that happens is, you're being

4    escorted back down to the ICE headquarters because they've put

5    you under arrest, haven't they?

6    A.  No.  They never arrest me.

7    Q.  Oh.  I thought you said they put handcuffs on you.

8    A.  They put handcuffs on me.  But then they allow me to drive

9    my own car to the detention station in Georgia.

10   Q.  Okay.

11   A.  And they fingerprint me.  They took pictures.  But they

12   told me that I was not under arrest, that they were going to

13   wait for ICE to come.

14   Q.  Okay.

15   A.  And then when ICE leave the facility, I was never put in a

16   cell.  They allowed me to sleep on the floor on the dining room

17   of the troopers.

18   Q.  Let me rephrase my question.

19          Did you feel like you were free to get in your car and

20   drive off?

21   A.  Not at that time.

22   Q.  Okay.  In other words, once you got stopped you weren't

23   going anywhere, were you?

24   A.  No.

25   Q.  Okay.  The only place you were going is to where the

Pimentel — Cross by Mr. Esper

1  officers led you to, correct?

2  A.  That's correct.

3  Q.  Okay.  Now whenever the ICE agents come, they -- you've

4  agreed to cooperate, correct?

5  A.  Yes.

6  Q.  Okay.  And basically, they have told you that absent

7  cooperation, you know, you're going to get locked up, you're

8  going to go to jail, and you're going to be get prosecuted,

9  correct?

10  A.  No, it was not like that.

11  Q.  It wasn't like that?

12  A.  No.

13  Q.  You just agreed to cooperate just out of the clear blue

14  sky?

15  A.  No.  The thing that -- it was not like that was what they

16  told me.

17  Q.  Did they ask you, We want you to cooperate?

18  A.  No.  They told me, We want you to do the right thing.

19  Q.  We want you to do the right thing?

20  A.  Yes.

21  Q.  And what did you interpret -- did you say, What is the

22  right thing?

23  A.  No.  I know what is the right thing.  As you say, I'm a

24  fairly smart person.  I know what's right and what's wrong.

25  Q.  Okay.  Did they ever tell you, if you don't cooperate, then

1    you could be prosecuted and jailed?

2    A.  No.  They told --

3    Q.  They never told you that?

4    A.  No.  They told me -- they gave me my rights.  And they told

5    me, If you decide not to talk you're going to have fair trial.

6    And if this money is legal or not is going to be decided by the

7    Court.

8    Q.  Right.  In other words, you're going to go to jail, you're

9    going to have a trial, and you're going to go in front of a

10   jury just like this, correct?

11   A.  They never put it like that.  They put it exactly like I

12   told you.

13   Q.  Okay.  And you -- you decided that you're going to

14   cooperate, right?

15   A.  Yes.

16   Q.  Okay.  Now, do you -- shortly thereafter, the ICE agents

17   arrive, correct?

18   A.  Yes.

19   Q.  Do you ever -- now, you start to tell them about these

20   people that you've already mentioned.  You tell them about

21   Mr. Delgado, correct?

22   A.  Correct.

23   Q.  And you tell them about Lilian de la Concha, correct?

24   A.  No.

25   Q.  You don't?

1   A.  I didn't mention it in that conversation.

2   Q.  Okay.  So you withheld that evidence from them, correct?

3   A.  No, I didn't withheld.  They asked me who was the client

4   and where I was going to.

5        So I said, I'm going to El Paso to meet Marco, and

6   Chuy and Chilo are here in Atlanta.

7   Q.  Okay.  You're going to go meet Marco and Pedro, and who

8   else?

9   A.  And Chilo.  They were in the Atlanta at that time.

10  Q.  Okay.  Did you tell them that they had been in Atlanta just

11  the day before?

12  A.  Yeah, they knew.  They knew they were there.

13  Q.  They knew they were there?

14  A.  They knew they were there.

15  Q.  The ICE agents knew that Pedro Mendoza was in Atlanta?

16  A.  Yeah.

17  Q.  They told you that?

18  A.  No, I told them that.

19  Q.  You told them?

20  A.  Yes.

21  Q.  My question to you was:  Did they know, before you told

22  them, that they had been in Atlanta?

23  A.  Oh, no.

24  Q.  Okay.  They didn't even know you were in Atlanta, did they?

25  A.  Obviously not.

1   Q.  Okay.  Now, you told them that Pedro and Chilo had been in
2   Atlanta, correct?
3   A.  They were -- at that point in time they still were in
4   Atlanta.
5   Q.  And this is when you also told them about your cousin
6   Isaac, who you told didn't know anything about any of this?
7   A.  He was landing -- at that point he was already landing in
8   Mexico City.
9   Q.  Pardon me?
10  A.  At that point, when they were interviewing me outside of
11  the detention facility, it was pretty late, so he was already
12  landing.  He already land in Mexico City.
13  Q.  Okay.  But you did tell them that he doesn't know anything
14  about that?
15  A.  That's correct.
16  Q.  Okay.  And you didn't tell them about Lilian de Concha
17  [sic], correct?
18  A.  I was not asked about Lilian de la Concha.
19  Q.  Well, they asked you who was involved, didn't they?
20  A.  They asked me who was I going to and who was in Atlanta
21  with me.
22  Q.  Okay.  Who was in the plan with you?
23  A.  No.  In Atlanta, with me, Georgia.
24  Q.  Okay.  And they asked you who was with you in Georgia?
25  A.  Yes.

Pimentel – Cross by Mr. Esper

1   Q.  Did they ask you about the other two guys that you --

2   A.  Yes.

3   Q.  Okay.  You told them about those two guys, correct?

4   A.  I told them that we met with two guys.  That's the only

5   thing I knew.

6   Q.  Did they show you any photographs to see if you recognized

7   them?

8   A.  No.

9   Q.  No?

10  A.  No.

11  Q.  You so you told them about Pedro, Chilo, the two guys that

12  you met, correct?

13  A.  Correct.

14  Q.  And you told them about your cousin?

15  A.  And Marco, yes.

16  Q.  And Marco?

17  A.  Yes.

18  Q.  Okay.  Now, you don't -- now, you make -- now, you made --

19  there's a plan devised where you're going to come to El Paso,

20  correct?

21  A.  Not at that point.

22  Q.  Well, sometime shortly after that --

23  A.  The next day, yes.

24  Q.  -- Mr. Pimental [sic], there's a plan devised to come to

25  El Paso?

1    A.  Yes.

2    Q.  And they put you on an airplane?

3    A.  Yes.

4    Q.  They leave your vehicle in Atlanta?

5    A.  Yes.

6    Q.  And that's the vehicle they ultimately give back to you,

7    correct?

8    A.  Yes.

9    Q.  And how did you get back to Atlanta to get your vehicle?

10   A.  I flew back weeks later.

11   Q.  Who paid for that?

12   A.  My mom.

13   Q.  Your mom paid for that?

14   A.  Yes.

15   Q.  Okay.  And when you get to El Paso, there's another vehicle

16   that is rented, correct?

17   A.  Yes.

18   Q.  Okay.  And when you left -- when you came to Juárez and

19   crossed over the bridge with your cousin, did you tell

20   Mr. Delgado what vehicle you were going in?

21   A.  I don't remember.

22   Q.  You don't remember if you told him or you don't remember if

23   you told him what vehicle you were going in?

24   A.  I know that we discussed about me driving back.  It's on

25   the phone calls.  So it was discussed that we were going to

1    drive back.

2            I don't remember if I told him that I was going to use

3    my personal vehicle or not.

4    Q.  Okay.  But you did have a discussion about a vehicle being

5    used to drive back from Atlanta?

6    A.  Yes.

7    Q.  Were you ever going to go to Laredo, Texas?

8    A.  No.

9    Q.  No?

10   A.  No.

11   Q.  You were always coming back to El Paso?

12   A.  Yeah.  I was going to pick up Marco.

13   Q.  Okay.  And when you get back here to El Paso, you're in a

14   vehicle that doesn't belong to you, correct?

15   A.  It's a rental, yes.

16   Q.  Okay.  And does Marco seem alarmed?  Or does he ask you,

17   Hey, where did you get this -- where did you get this car?

18   A.  No.  As he discussed in the phone calls, I told him I was

19   going to rent --

20   Q.  Mr. Pimental [sic], did he seem alarmed that you weren't

21   driving your vehicle?

22   A.  No.

23   Q.  Okay.  He didn't ask you -- did he ask you, Where did you

24   get this vehicle from?

25   A.  He already knew.

1   Q.  Pardon me?

2   A.  He already knew it was a rental, so there was no need for

3   the question.

4   Q.  He told you -- you told him that you had rented a vehicle?

5   A.  Yeah.  So there was no need to ask me if it was a rental or

6   not.

7   Q.  Mr. Pimental [sic], when you drive up to Mr. Delgado's

8   mother's house, you've already told him, I'm here in town and I

9   rented a vehicle to drive back from Atlanta?

10  A.  Not to drive back from Atlanta, to cross the money to

11  Mexico.

12  Q.  Where did you tell him you rented the vehicle at?  What

13  location?

14  A.  I don't think we discussed that.

15  Q.  You didn't discuss that?

16  A.  I don't think we did.

17  Q.  According to you, all you did was, I rented a vehicle to

18  drive back to Mexico in.

19  A.  Uh-huh.

20  Q.  Correct?

21  A.  Uh-huh.

22  Q.  And this vehicle has Texas plates, does it not?

23  A.  I think so.

24  Q.  Okay.  And have you ever driven a vehicle with Texas plates

25  into Mexico?

1    A.  Yes.

2    Q.  You have?

3    A.  Yeah.

4    Q.  Do they –– did you have to have some type of insurance or

5    some type of registration to do that?

6    A.  All cars need insurance and registration in Mexico.

7    Q.  Pardon me?

8    A.  All cars need insurance and registration in Mexico.

9    Q.  Okay.  Is it easier to drive a vehicle in Mexico that has

10   Mexican plates as opposed to plates that are issued in the U.S.

11   out of some state?

12   A.  Easier?  Like drive –– it's the same type of car, so

13   it's ––

14   Q.  I know that the distance is the same.  I understand that.

15   A.  Yeah.  So when you say easier, what do you mean?

16   Q.  Well, do law enforcement pay any attention to vehicles that

17   have plates in the United States?

18   A.  Not on the border.

19   Q.  Not on the border?

20   A.  Not on the border.

21   Q.  And how far is Colima from the border?

22   A.  It's pretty far.

23   Q.  Well, how far is pretty far?

24   A.  I don't know exact distance.

25   Q.  More than 200 miles?

```
 1   A.  Probably.

 2   Q.  Okay.  More than 500 miles?

 3   A.  Probably.

 4   Q.  Okay.  A thousand miles?

 5   A.  I don't know.

 6   Q.  Okay.  This particular vehicle that you're in, when Marco

 7   Delgado gets in, you're wearing a body mic, correct?

 8   A.  A camera.

 9   Q.  A body -- a camera?

10   A.  Yes.

11   Q.  And it's also -- it's not only a video camera, it's an

12   audio camera, too, as well, correct?

13   A.  Correct.

14   Q.  Now, you and he have some conversations in that car when

15   you're driving towards -- towards Mesa Street, correct?

16   A.  Correct.

17   Q.  Okay.  And does he tell you -- first of all, did the agents

18   tell you how to steer the conversation, what to say?

19   A.  No.  They just told me to act normal.

20   Q.  Just drive normal?

21   A.  Act normal.

22   Q.  Act normal?

23   A.  Yes.

24   Q.  Okay.  And so when you're in the vehicle with Mr. Delgado

25   is he talking to you and is he also making phone calls?
```

1    A.  I don't remember.

2    Q.  You don't remember?

3    A.  No, I don't.

4    Q.  Does he ever tell you -- do you tell him that you have some

5    concern about dog sniffing, the canines?

6    A.  Yes.

7    Q.  Okay.  That happens in the vehicle, correct?

8    A.  Yes.

9    Q.  And you're concerned about taking the money into Mexico

10   because of the canine sniffing the money, correct?

11   A.  Yes.

12   Q.  Okay.  And --

13   A.  Well, not the money.  Actually, I say that could smell like

14   coke, like --

15   Q.  Could smell the coke?

16   A.  Yeah.  And I used the word -- the expression Cocoa Beach,

17   meaning that -- because it was my understanding that the money

18   was from drug -- drug money.  The dogs would sniff the coke.  I

19   used the expression Cocoa Beach.

20   Q.  Okay.  But what you're saying is that you don't know that

21   it was from cocaine, do you?

22   A.  No.

23   Q.  Okay.  You just know that the money has the scent, you

24   believe, of drugs on it, correct?

25   A.  That it could, yes.

1    Q.   Okay.  And so you're expressing concern to him in the

2    vehicle about the canines sniffing or picking up the odor of

3    this money that has drugs on it, correct?

4    A.   Yes.

5    Q.   Okay.  And does he tell you, Okay.  You know what?  Let's

6    just take it to the bank.

7    A.   No.

8    Q.   He never says that to you?

9    A.   No.

10   Q.   Does he ever call Miriam Guerrero -- you know who she is,

11   don't you?

12   A.   I know who she is.  I don't remember if she [sic] called

13   her or not.

14   Q.   Okay.  Could he have called her while you were in the car

15   and you just don't remember?

16   A.   Could he?

17   Q.   Yeah.

18   A.   He could do a lot of things.  Yes.

19   Q.   He could have called her.  You just don't remember?

20   A.   Yeah.

21   Q.   Okay.  And so he could have called her and said, Meet us at

22   the bank, and you just don't remember that, do you?

23   A.   It should be in the video.

24   Q.   Well, the conversations are not very audible.  You've seen

25   that video, haven't you?

1   A.  Not all of it.  But yeah, parts of it.

2   Q.  You've seen parts of it, correct?

3   A.  Yeah.  It's pretty long.  Yes.

4   Q.  Okay.  And you've seen the parts where the two of you are

5   in the car together, haven't you?

6   A.  Some of the parts, yes.

7   Q.  Okay.  And it's hard to -- it's hard to hear the voices, is

8   it not?

9   A.  Yes.

10  Q.  Okay.  Now, you go to Mesa Street -- off of Resler you turn

11  right, and you're stopped probably at the next light or another

12  light further down?

13  A.  Yeah.  We didn't go very far.  Yeah.

14  Q.  And you're playing the part, are you not, of someone who's

15  obviously not cooperating.  You're playing the part like, Oh,

16  no.  We're -- we're --

17  A.  It was a controlled delivery, yes.

18  Q.  Yeah.  Well, you didn't know what a controlled delivery was

19  before that?

20  A.  Well, at that point I knew I was making one.  So, yeah, I

21  knew.

22  Q.  Okay.  The officers told you, When you get stopped act

23  like, Oh, no.

24  A.  Yes.

25  Q.  Act scared, correct?

1   A.  Like if –– yeah.

2   Q.  Like you did when you were stopped there in Georgia?

3   A.  That's correct.

4   Q.  Okay.  So now they separate the two of you, correct?

5   A.  Yes.

6   Q.  Okay.  Where are you taken after that?  Are you –– do they

7   act like they arrest you?

8   A.  We both –– took us to the ICE building here in Mesa.

9   Q.  Okay.  Do you know at that time that Mr. Delgado has agreed

10  to cooperate with law enforcement?

11  A.  No.

12  Q.  You don't know that?

13  A.  That –– when they took us to the car?  No.

14  Q.  Yeah.

15        And Mr. Delgado doesn't know that you have been

16  cooperating since you got stopped in Georgia, does he?

17  A.  It is my understanding that he doesn't know.

18  Q.  Okay.  Whenever you went to Chicago, did you ever tell him,

19  Hey, I cooperated with ICE this whole time?

20  A.  No.  They told me not to ever tell anybody that I was

21  cooperating.

22  Q.  Okay.  So here you are cooperating.  You're involved in

23  this controlled delivery.  The both of you get taken into

24  custody, correct?

25  A.  That's correct.

```
 1   Q.  And you see him later, do you not, after you get out of --

 2   they release you, don't they?

 3   A.  Yes.

 4   Q.  Okay.  Do you ever tell him, Hey, Marco, you know, I hate

 5   to tell you this, but I was arrested and I cooperated?

 6   A.  No.  Because he approached me and told me that he was

 7   working with ICE since the beginning, that he knew, that he was

 8   an undercover agent, that he had been working with them for

 9   years.

10   Q.  Okay.  So whenever -- so after the two of you are

11   separated, you're taken to headquarters out on Montana Street,

12   correct, in east El Paso?

13   A.  It's Mesa.

14   Q.  Mesa?  Okay.

15            And then he agrees to cooperate?

16   A.  I don't know.

17   Q.  You don't know whether he does or not?

18   A.  I was not at the meeting, so I don't know what they agree.

19   Q.  So you don't know what he does after that, correct?

20   A.  I was not present.  No.

21   Q.  Okay.  But sometime after that he tells you, Don't worry.

22   I'm an undercover agent with ICE.  I've been working with them

23   for years.

24   A.  Yes.

25   Q.  Okay.  And you didn't believe that, did you?
```

1    A.  Not -- yeah.  Of course.

2    Q.  Pardon me?

3    A.  No.

4    Q.  Okay.  Did you subsequently find out that he started

5    cooperating at that time, on September 7th?

6    A.  No.

7    Q.  You never found that out?

8    A.  No.

9    Q.  Now after this incident in Chicago, the ICE agent is with

10   you, correct?

11   A.  In Chicago?

12   Q.  Yeah.

13   A.  Yes.

14   Q.  And do you know why the -- did you -- who brought that

15   money back to El Paso?

16   A.  It was a wire transfer with the deposit -- well, like, ICE

17   took control of the money in Chicago.  And when I land in

18   El Paso the next day, ICE agents gave me money.  But I'm

19   assuming it was not the same money.

20   Q.  Okay.  They gave you the money to take to Mr. Delgado,

21   correct?

22   A.  No, to take it to the bank.

23   Q.  To take it to the bank?

24   A.  Yes.

25   Q.  And deposit it into his bank account?

Pimentel – Cross by Mr. Esper

1    A.  That's correct.

2    Q.  Did you find that strange, that they would let you do that?

3    A.  Well, I —— they were with me when I was in the bank.  They

4    were outside the bank with me.  So, no, it was not strange.

5    Q.  Okay.  In other words, they didn't seize the money and say,

6    Hey, just tell them you lost it?

7    A.  No.

8    Q.  Okay.  You —— it was deposited into his account?

9    A.  Yes.

10   Q.  With ICE participating in that, correct?

11   A.  Yes.

12   Q.  All right.  And then after that, you don't have any contact

13   with Mr. Delgado other than —— you have no contact with him,

14   correct?

15   A.  Well, we went to have —— we tried to meet at the Pastry

16   Chef.

17   Q.  Yeah.

18   A.  And then we went to the Starbucks.  And then later in that

19   week or the next week, we have lunch at Mi Piaci, on Mesa, and

20   we had two or three other meetings.  And we had contact over

21   the phone.

22   Q.  Okay.  Now you got a call, did you not, in October from

23   Ms. Lilian de Concha [sic], didn't you?

24   A.  October of when?

25   Q.  Of 2008.

Pimentel — Cross by Mr. Esper

1    A.  Oh, yes.

2    Q.  She was looking for Marco, wasn't she?

3    A.  Yes.

4    Q.  And you were upset with him because he had not been charged

5    with anything; isn't that right?

6    A.  No.

7    Q.  You weren't?

8    A.  I was done with Marco and the money laundering, and I was

9    focused on my studies.  I never pursued anything about him or

10   anything.

11   Q.  You never told the agents that you were upset with him

12   because he hadn't been arrested for anything?

13   A.  It was unfair.  But after I put my life at risk in

14   Chicago --

15   Q.  Sir -- were you upset with him, sir?

16   A.  Not upset.  I said unfair.

17   Q.  When you got -- when you met with Ms. Lilian de Concha

18   [sic] she was looking for Marco, correct?

19   A.  When we met?  When we met or when she called me?

20   Q.  When she called you on the phone.

21   A.  She was not upset.  She was crying.  She was looking for

22   Marco.

23   Q.  Okay.  And you -- that's when you start to tell her that

24   all this stuff that he's been telling her is a bunch of lies?

25   A.  Well, Marco was faking he's dead.  He told her that he has

1    cancer, that he is on a cancer treatment center in Houston.

2    Q.  Mr. Pimental [sic] --

3    A.  A couple of things --

4    Q.  -- just a minute.

5    A.  Okay.

6    Q.  Mr. Pimental [sic], did you tell her that many of the

7    things that he had told her were nothing but lies?

8    A.  The only thing I told her in that conversation, it was that

9    Marco was not dying, that he was good.  That I knew that he was

10   in El Paso, and that he was definitely not dying from cancer.

11   Q.  Okay.  Do you call ICE and tell them, Hey, guess who just

12   called me?

13   A.  Yes.

14   Q.  You told ICE about that?

15   A.  I think so, yes.

16   Q.  Okay.  And as a matter of fact, she now shows up in Juárez,

17   doesn't she?

18   A.  After a couple of weeks, yes.

19   Q.  Yeah.  And she calls you?

20   A.  Yes.

21   Q.  And you go over to Juárez and meet her?

22   A.  No.

23   Q.  You don't?

24   A.  No.  She crossed to El Paso and meet me here.

25   Q.  Okay.  You don't tell the agents that you went over and met

1   her and crossed over with her?

2   A.  I pick her up at the bridge and we cross together, but I

3   never leave El Paso.  I stayed on the bridge boundaries.

4   Q.  Okay.  Now, do you tell -- do you call ICE and say, Hey,

5   guess who's coming over to El Paso?

6   A.  No.

7   Q.  You don't tell them, do you?

8   A.  No.

9   Q.  And why don't you call them?

10  A.  Because she was here to visit me, nothing related to the

11  cartel or wanting drugs or anything.

12  Q.  Well, but --

13  A.  She just wanted -- you're asking me why, and I'm trying to

14  answer.

15       She was very upset because she was under the

16  understanding that she was dating Marco.  She gave me e-mails,

17  romantic emails that they both exchanged.

18       Marco's ex-wife, Sharon, and her exchanged some

19  emails.  Marco was telling Lilian at some point that Sharon was

20  dying from leukemia.  Obviously, Lilian find out that that was

21  also a lie.

22       So she was more upset than any other thing.

23  Q.  Mr. Pimental [sic], you have told this jury that she is

24  involved in money laundering and getting 2 percent of the

25  commission.

1    A.  That's correct.

2    Q.  Okay.  Now, you know -- you know you've been cooperating

3    with ICE, correct?

4    A.  Yeah, but I was released from that --

5    Q.  Were you cooperating with ICE or not, sir?

6    A.  I was released at that point.  They made -- they take you

7    to the center and they take your fingerprints, and you sign

8    when you're an active CI.

9           When you're deactivated you do the same paperwork.  So

10   I was deactivated at that point.

11   Q.  So you finished.  You were done?

12   A.  I was done --

13          THE COURT:  Wait.  Wait.

14   Q.  Mr. Pimental [sic] --

15   A.  I was done --

16          THE COURT:  Wait until he finishes the question.

17          And don't be so argumentative, Mr. Esper.  Be calm.

18          You, too.  Wait until he finishes the question.

19          THE WITNESS:  Yes, Judge.

20   BY MR. ESPER:

21   Q.  You finished -- you felt you were finished doing business

22   with ICE, correct?

23   A.  With everybody, yes.

24   Q.  With everybody?

25   A.  Yes.

Pimentel – Cross by Mr. Esper

1    Q.  Okay.  So even though you've said Ms. de la Concha was

2    involved and she came to El Paso, you didn't feel any

3    obligation to contact ICE, correct?

4    A.  I didn't even know her reasons, her real reasons --

5    Q.  Sir -- sir, did you --

6            THE COURT:  Just answer the question.

7    BY MR. ESPER:

8    Q.  Did you feel any obligation to call ICE?

9    A.  No.

10   Q.  None?

11   A.  No.

12   Q.  And you didn't call them, did you?

13   A.  That's correct.

14   Q.  Okay.  Then why was it that you then called them after she

15   left and told them that she had been here?

16   A.  Because I learned that the cartel was looking for Marco.

17   Actually when she was here, there was a phone placed to

18   Lilian's phone call [sic] when they were trying to kill Marco

19   and her [sic] girlfriend.

20   Q.  Okay.  As a matter of fact, you had to get on the phone to

21   some unknown person and explain to them that -- that, you know,

22   you weren't invol- -- that you had nothing to do with this

23   mishap, correct?

24   A.  Yes.

25   Q.  Okay.  And you were basically trying to cover your own

1   self, correct?

2   A.  Well, I was telling the truth to them.  I had nothing to do

3   with Marco spending the $50,000.

4   Q.  Well, sir, did -- were you -- they were asking what had

5   gone wrong.

6        And you said, I had nothing to do with it.

7   A.  That's correct.

8   Q.  Okay.  So you were basically lying to them that --

9   A.  For the cartel, yes.

10  Q.  -- that you had nothing to do with any of this happening,

11  correct?

12  A.  Yes.  Yes.

13  Q.  Okay.  And that was when you're in the car with Lilian de

14  Concha [sic]?

15  A.  Yes.

16  Q.  Okay.  And sometime after that there's a comment made to

17  you by her that Marco or somebody is going to have to pay for

18  this, correct?

19  A.  It was made by this person over the phone.

20  Q.  The person on the phone said that?

21  A.  Yes.

22  Q.  Okay.  Now you then, now, feel an obligation to contact

23  ICE?

24  A.  That's correct.

25  Q.  Okay.  And is it about another -- how long after that do

1    you call ICE?  Was it a month?  Two months?

2    A.  No.  It was pretty soon after that.

3    Q.  Well, how soon is pretty soon?  A couple of weeks?

4    A.  Probably a couple of days.

5    Q.  Did they ask you, Why didn't you call us when she was here?

6    A.  I don't remember.

7    Q.  You don't remember?

8    A.  No, I don't.

9    Q.  There was a number of meetings, were there not,

10   Mr. Pimental [sic], with Nareo Vargas about Mr. Delgado's

11   attempt to get this electrical business going, correct?

12   A.  Yes.

13   Q.  Okay.  And were you present at those meetings?

14   A.  Some of them, yes.

15   Q.  Okay.  And this was all going on at the same time that

16   these discussions were being had about transporting money,

17   correct?

18   A.  No.  At that time -- when I first met Marco, that's where

19   all the discussions were happening.  When Marco met Lilian, he

20   decide to, instead of attacking the union part of the utility

21   company, Lilian set up meetings with people high in the utility

22   company.

23        We went a couple of times to have meetings in

24   buildings -- and I don't know how to translate this -- but

25   CREA, *Comision Reguladora De Energia*, the commission that

 1    regulate energy in Mexico.  We have meetings with them, not

 2    with the union.

 3    Q.  Okay.  I want to take you back to Atlanta for just a

 4    minute --

 5    A.  Okay.

 6    Q.  -- in your meetings with Mr. Justice.

 7          These e-mails that we've seen here in court, you

 8    didn't -- you had your phone with you, didn't you?

 9    A.  Yes.

10    Q.  Okay.  Did you show the agents those e-mails?

11    A.  I gave the agent my phone.

12    Q.  You gave the agent your phone?

13    A.  Yes.

14    Q.  Agent Justice?

15    A.  I don't remember who, but they took all control over my

16    Nextel and Blackberry, yes.

17    Q.  And you never got those back?

18    A.  Yes.

19    Q.  When did you get it back?

20    A.  When they release me here in El Paso.

21    Q.  Okay.  So whenever you come to El Paso and they say, Okay.

22    You've done well.  Here's your -- here's your -- here's your

23    passport, your student visa back, and here's your phones back?

24    A.  Yes.

25    Q.  Okay.  And go get your car in Atlanta.  We'll arrange for

1    it to be released?

2    A.  Yes.

3    Q.  Did you ever tell them, Hey, I've got all these e-mails in

4    my phone that support what I've tried to tell you guys?

5    A.  No.  That supports what I told them about the delivery --

6    Q.  Sir, did you tell them that --

7            THE COURT:  Let him answer.

8            MR. ESPER:  I'm trying --

9            THE COURT:  Let him answer.

10           Now, answer the question only.

11   BY MR. ESPER:

12   Q.  Did you tell them, yes or no, I've got these e-mails in

13   here?

14   A.  No.

15   Q.  Okay.  When was the first time you told anybody about these

16   e-mails in your phone?

17   A.  Well, they were in my e-mail account, not only on my phone.

18   Q.  Where?

19   A.  In my e-mail account, not only on my phone.  When I was

20   first detained, I provide the ICE with my passwords for all my

21   e-mails.  So I assumed they have -- if they wanted to look at

22   them, they have the password to get into.

23           And then when they called me back probably a year ago,

24   I provide them with the e-mails that I had.

25   Q.  Okay.  That's the first time you actually voluntarily said,

1    Hey, I've got these e-mails in my computer that I can access

2    from my phone?

3            MS. KANOF:  Objection, Your Honor.  That's a

4    mischaracterization of his testimony.  He said he gave them the

5    passwords at the time.

6            THE COURT:  Well, let him answer.

7    BY MR. ESPER:

8    Q.  Did the agents in Atlanta ever call you and say, Hey, we

9    want to know about these -- we want to know about these e-mails

10   that you've got that we -- that you are accessing on your phone

11   and on your Blackberry?

12   A.  No, they never called me.

13   Q.  They never did?

14   A.  No.

15   Q.  And you never volunteered the information?

16   A.  They had the passwords.  So --

17   Q.  Sir -- sir, did you volunteer the information?

18   A.  I volunteered my passwords, yes.  They had full access to

19   my e-mail account.

20   Q.  You gave them the password, correct?

21   A.  Yes.

22   Q.  But you didn't volunteer the information that, I've got a

23   bunch of stuff on these e-mails, did you?

24   A.  If you go to my e-mail --

25   Q.  Sir, could you please answer the question?

1           Did you voluntarily tell them or not?

2    A.  No.

3    Q.  Okay.  And it wasn't until 2012, almost five years later,

4    that you told the ICE agents here, Hey, I've got these e-mails

5    in my computer?

6    A.  That's correct.

7    Q.  All right.

8           MR. ESPER:  May I have just a moment?

9           THE COURT:  You may.

10   BY MR. ESPER:

11   Q.  Mr. Pimental [sic], which agent told you that you were

12   deactivated as an informant?

13   A.  I was not told.  I was took to the ICE office here in

14   El Paso.  And I signed paperwork, and they told me that I was

15   released from my CI.

16   Q.  This is in September of 2007?

17   A.  I don't think so.  It was earlier than -- I don't remember

18   the exact date.  I was at school.  I was in class.  They called

19   me and told me that they needed to deactivate me.

20   Q.  Okay.  Well, we've already heard that when you got the

21   passport back and that you can go get your car and we're not

22   going to revoke your student visa, but you'd better not do this

23   again because next time you're going to -- we're going to

24   prosecute you, right?

25   A.  That's correct.

1   Q.  Okay.  That was here in El Paso in September of 2007,

2   right?

3   A.  That's correct.

4   Q.  Okay.  Now, in July of 2008 -- well, let me ask you this.

5        Did you feel you had any further obligation to ICE in

6   September of '07, other than keeping yourself out of trouble?

7   A.  After the Chicago --

8   Q.  No.  Sir, in September of 2007 when they gave you your

9   student visa back and they said, We're not going to prosecute

10  you so long as you don't ever do this again, did you feel you

11  were finished as far as ICE was concerned?

12  A.  Yes.  I actually moved to Mexico.  So that's as far as I

13  could.

14  Q.  Okay.  You moved to Mexico?

15  A.  Yeah.

16  Q.  Okay.  And so now what happens is, in 2008, Mr. Delgado

17  tells you that there's another operation going on, but it's

18  being run by ICE because he's now cooperating with ICE?

19  A.  Yes.

20  Q.  Okay.  And you didn't believe him, did you?

21  A.  That's correct.

22  Q.  Okay.  But you did it anyway, correct?

23  A.  Yes.

24  Q.  Okay.  Why did you do it if you didn't believe him?

25  A.  I was -- I called ICE and I asked them what to do.

1   Q.  Okay.  You called Atlanta and you got no answer, correct?

2   A.  Yes.

3   Q.  And now you call El Paso?

4   A.  That's correct.

5   Q.  And they tell you, Go ahead and go through with it,

6   correct?

7   A.  That's correct.

8   Q.  Okay.  And so now you're back doing the same activity

9   again, right?

10  A.  Not the same.  Now I'm supervised by ICE, so it's not the

11  same.

12  Q.  Well, you're back doing the same conduct, Mr. Pimental

13  [sic], aren't you?

14  A.  Yes.

15  Q.  Okay.  And when you get to Chicago, do you rent a car?

16  A.  No.

17  Q.  You take a taxi?

18  A.  Yes.

19  Q.  And what monies did you use to -- while you were there in

20  Chicago?

21  A.  My own money.

22  Q.  Your own money?

23  A.  Yeah.

24  Q.  Okay.  Did you ask ICE, Hey, you guys want me to go up

25  there.  How about some money?

1    A.  No.

2    Q.  You went -- you went on your own and spent your own money?

3    A.  Yeah.

4    Q.  Did anybody promise they would reimburse you?

5    A.  No.

6    Q.  After that situation occurs, are you then deactivated by

7    ICE?

8    A.  After a couple of months.

9    Q.  After a couple of months?

10   A.  Yes.

11   Q.  So now we're talking about maybe September of 2008?

12   A.  Probably October or November.

13   Q.  It's before you meet with Lilian de Concha [sic]?

14   A.  Yes.

15   Q.  Okay.  They told you, We don't want your help anymore.  We

16   don't need your help anymore?

17   A.  There was no more help to provide; that's correct.

18   Q.  Okay.  And so that was the reason why you didn't feel the

19   need to call them when she came here?

20   A.  That's correct.

21   Q.  Okay.  Besides -- besides Pedro Mendoza, besides Chilo,

22   besides Marco Delgado, did you ever tell the agents about

23   Lilian de Concha [sic]?

24   A.  In -- when?

25   Q.  When they interviewed you.

1   A.  Yeah.  I mean, when we were detained here in El Paso, one

2   of us, yeah.  We both mentioned Lilian de la Concha.

3   Q.  Yes.  This is in September of 2007, correct?

4   A.  Yeah.  That's Georgia, yes.

5   Q.  Okay.  In Georgia, you don't tell them anything about it.

6   But now when you get to El Paso, you start telling them about

7   other people and you start telling them about these meetings in

8   Mexico City, correct?

9   A.  Yeah.

10  Q.  Okay.

11       MR. ESPER:  May I have just one moment again,

12  Your Honor?

13       THE COURT:  You may.

14  BY MR. ESPER:

15  Q.  This individual in Chicago, did he actually get out of his

16  car and throw the bag on the floor?

17  A.  Yeah.

18  Q.  Okay.  Did he -- or did he -- was he with somebody else?

19  A.  No.

20  Q.  Were you being surveilled by ICE at the time?

21  A.  Yes.

22  Q.  And when you walked into the mall, I guess they lost sight

23  of you, didn't they?

24  A.  They asked me to clear myself, meaning get lost in the

25  mall, and they would meet me in the hotel.

1  Q.  They told you that -- to do that beforehand?

2  A.  No.  When I got the money in my hand I called Agent Mike.

3       And he told me, Clear yourself.  Walk around the mall,

4  and we'll see you in the hotel in 15 minutes.

5  Q.  Okay.  Now, what was this $2,000 that you tried to take out

6  of the money and they said, No, no, no, you can't have that?

7  A.  No, I told them everything.  I said, I'm supposed to take

8  this money, but this is all the money.  I never took money.  I

9  just told them everything that I was supposed to do.

10  Q.  Okay.  And they said, No, you're not going -- you're not to

11  take any of that money out --

12  A.  I already knew that I was not going to take any money out

13  of it.

14  Q.  Pardon me?

15  A.  I already knew that I was not going to take any money out

16  of it.

17  Q.  Well, didn't you testify that you had taken -- tried to

18  take 2,000 --

19  A.  I was supposed to take it.

20  Q.  Sir, sir.

21       Did you tell them --

22       MS. KANOF:  I would object, Your Honor.  He did not

23  testify that he tried to take --

24       THE COURT:  Well, let him finish the question before

25  you answer.

1    BY MR. ESPER:

2    Q.  Did you try to take $2,000 out?  Did you not testify to

3    that?

4              And the agent said, No, you can't take $2,000.

5              Did you testify to that?

6    A.  No.

7    Q.  You didn't?

8    A.  No.

9              MR. ESPER:  May I have just one moment, Your Honor?

10             Your Honor, I would like to play --

11             (Attorneys conferring.)

12   BY MR. ESPER:

13   Q.  Can you see this video, Mr.- --

14   A.  Not yet.

15             Now, yes.

16             (Video being played while continuing to ask

17   questions.)

18   BY MR. ESPER:

19   Q.  That's you in the car, correct?

20   A.  Yes.

21   Q.  Okay.  Are you waiting in this video for Mr. Delgado?

22   A.  No.  I think I'm waiting for the agents to tell me that I

23   can start driving.

24   Q.  And the agent has given you some -- some sort of outline on

25   what to do or not to do, correct?

1    A.  They just told me to drive to Mesa Street and do the switch

2    lanes without putting my light.

3    Q.  Did he -- did he tell you to bring up the conversation

4    about the dog sniffing?

5    A.  No.

6    Q.  You brought that up on your own?

7    A.  Yeah.

8    Q.  Okay.  Why did you bring that up?

9    A.  Well, they told me to act normal.  That would be a

10   legitimate concern, if you're crossing money that comes from

11   drugs.

12   Q.  In other words, you expressed concern to Mr. Delgado about

13   crossing with possible odor on this money, correct?

14   A.  Yes.

15   Q.  And who told you that -- that money has narcotics odor on

16   it?

17   A.  Nobody.

18   Q.  Where did you learn that from?

19   A.  Well, if you are exchanging drugs with that money, it's --

20   you assume.  It was my assumption, if that's what you're

21   asking.

22   Q.  You just assumed that that was correct?

23   A.  Yeah.

24   Q.  Okay.  You don't have any experience with that, do you?

25   A.  No, of course not.

| | |
|---|---|
| 1 | THE COURT:  How long is this video?  How long is it? |
| 2 | MS. KANOF:  It's pretty long. |
| 3 | THE COURT:  Are we going to go through the whole |
| 4 | thing? |
| 5 | MR. ESPER:  Your Honor, we want to -- can we just |
| 6 | fast-forward up to the -- where he gets in the car? |
| 7 | BY MR. ESPER: |
| 8 | Q.  This is you getting out of the car? |
| 9 | A.  Yes. |
| 10 | Q.  That was Mr. Delgado? |
| 11 | A.  That's correct. |
| 12 | Q.  What did you just say right there, if you can tell? |
| 13 | A.  I said, *Gracias*. |
| 14 | Q.  You say or he does? |
| 15 | A.  I did. |
| 16 | Q.  Okay.  Can you tell what's being said there? |
| 17 | A.  Excuse me? |
| 18 | Q.  Could you hear what's being said there? |
| 19 | A.  No. |
| 20 | Q.  You could not? |
| 21 | A.  No. |
| 22 | Q.  Okay.  Where is this camera?  Is it on your coat? |
| 23 | A.  No.  It was a shirt with a button here (indicating). |
| 24 | Q.  Could you tell what was being said there? |
| 25 | A.  No. |

Pimentel - Cross by Mr. Esper

1   Q.  Could you discern what was being said there?

2   A.  No.

3   Q.  Did you understand that?

4   A.  No.

5   Q.  Is that you talking or Mr. Delgado?

6   A.  I can't tell.

7   Q.  Are you able to understand that?

8   A.  No.

9   Q.  Is that when the police stopped you?  In other words, the

10  vehicle is stopped and Mr. Delgado gets out, correct?

11  A.  Yeah.  That's not where the police stopped.  Marco just

12  wanted to take a look at the money.

13  Q.  So you're driving along and he tells you to stop?

14  A.  Yeah.

15  Q.  And he goes back and looks at the money?

16  A.  He was looking at it.

17  Q.  Okay.  And have you-all had a discussion at that point

18  about the dog sniffers?

19  A.  I don't remember at that point if we discussed that.

20  Q.  Okay.  And it's your recollection that there was no

21  discussion about going to a bank?

22  A.  That's correct.

23  Q.  When you say you have no recollection, that means it wasn't

24  said or you just don't remember?

25  A.  I don't remember.

Pimentel – Cross by Mr. Esper

1   Q.  You don't remember?

2   A.  That's correct.

3   Q.  Okay.  Did you understand that?

4   A.  It was a laugh.

5   Q.  Pardon me?

6   A.  Somebody is laughing.

7   Q.  Somebody is knocking?

8   A.  Laughing.

9   Q.  Laughing?

10  A.  Yes.

11  Q.  Okay.

12          THE COURT:  You've got a long way to go.  Can't we

13  just get it to wherever you want to go?  That's not even

14  one-quarter yet.

15          MR. ESPER:  I think we're going to stop it there,

16  Your Honor.

17          MR. VELARDE:  Your Honor, may we approach on this?

18          THE COURT:  Do you want to keep this thing going?

19          MR. ESPER:  No.

20          MR. VELARDE:  No, let's turn it off.

21          (Off-the-record bench discussion had.)

22          MR. VELARDE:  Your Honor, I'm not sure if it's the

23  equipment or if its the CD.  But the Government has given us

24  the CD that's a lot more audible than this.  And we would

25  represent to the Court that the CD that we have has

1    conversation where the discussion of the bank is had.

2         Also the question is made -- the point is made by

3    Mr. Pimentel, What if the dog sniffs?

4         Mr. Delgado's response is, I don't know what you're

5    talking about.  And so Mr. Delgado is requesting that we be

6    permitted to interrogate this witness with the other CD which

7    is at my office.

8         THE COURT:  No, no, no.

9         MR. VELARDE:  If not, I just want to make that known.

10   This one has been filtered, and I don't know what is meant by

11   filtering.  But the conversation that is on our CD is not on

12   this one.

13        MS. KANOF:  Filtered, enhanced the language, not

14   reduced it.  And Mr.- -- if Mr. Delgado takes the stand, they

15   can play it and he can point it out from theirs.

16        THE COURT:  Or any other witness, if that's relevant.

17   You should have brought it with you.  You could put it in there

18   right now and use it.

19        MS. KANOF:  I think it might be the Court's audio

20   equipment.  I'm not sure that it...

21        THE COURT:  Well, possibly.  We had trouble with it

22   this morning.

23        I'm not going to stop the trial to let you go to the

24   office to get it.

25        MR. ESPER:  Your Honor, I'm through with this witness.

1    But could he be made available for recall?

2              MS. KANOF:  Your Honor -- look.  He can -- it's in

3    evidence, and I have no objection in closing argument if they

4    want to play it and tell the jury that's what's being said.  I

5    have no objection to that.

6              MR. VELARDE:  Okay.

7              MR. ESPER:  All right.  Thank you.

8              THE COURT:  Let me ask you something.  Is he leaving

9    town right after we finish?

10             MS. KANOF:  Yeah.  He's missed a lot of classes.  He's

11   got a substitute teacher.

12             THE COURT:  Okay.

13             (End of bench conference; open court.)

14             MR. ESPER:  I'll pass the witness, Your Honor.

15             THE COURT:  Ms. Kanof?

16                        REDIRECT EXAMINATION

17   BY MS. KANOF:

18   Q.  Mr. Pimentel, let's talk first about the rental car he was

19   talking about.

20             Who told you to rent a car?

21   A.  Which rental?

22   Q.  Oh, I think he was talking about the rental car that you

23   picked Marco up in.

24   A.  ICE.

25   Q.  So it wasn't your idea?

1    A.  No.

2    Q.  So was there an intent to ever let that into Mexico?

3    A.  No.

4    Q.  So the fact that it had Texas plates, would that have made

5    a difference?

6    A.  No.  We would have had a chopper following us during the

7    whole thing, so there was no way we were going to go to Mexico.

8    Q.  Okay.  So that -- it would not have been suspicious,

9    because you never would have gone to Mexico?

10   A.  That's correct.

11   Q.  Okay.  Let's first talk about your schooling.

12         You previously testified that when you came back from

13   Chicago and deposited the money in Mr. Delgado's account it was

14   in the Wells Fargo across the street from the dorms, correct?

15   A.  That's correct.

16   Q.  Were you living in the UTEP dorms, then, in 2008 in July?

17   A.  That's correct.

18   Q.  And so can you live in the dorms if you're not signed up to

19   go to school at UTEP?

20   A.  No.

21   Q.  Were you signed up to go to school?

22   A.  Yes.

23   Q.  With regard to Ms. de la Concha.

24         Repeatedly you were asked, Did you tell about her?

25   Did you tell about her?

```
1              After these two transactions, you were not arrested,
2    were you?
3    A.   That's correct.
4    Q.   Mr. Delgado was not arrested?
5    A.   That's correct.
6    Q.   Isidro was not arrested?
7    A.   That's correct.
8    Q.   Pedro was not arrested?
9    A.   That's correct.
10   Q.   Do you know what was in the minds of Homeland Security and
11   why they were not arresting people, but letting them go?
12             MR. ESPER:   Calls for speculation.   Objection,
13   Your Honor.
14             MS. KANOF:   I asked if he knows.   It's a yes-or-no
15   answer.
16             THE COURT:   Overruled.
17             THE WITNESS:   No.
18   BY MS. KANOF:
19   Q.   And when you talked to de la Concha in –– later in 2008,
20   did she call you or did you call her?
21   A.   She called me.
22   Q.   And what did she tell you about Mr. Delgado's health?
23   A.   That he just sent a text to her saying that, This is the
24   last text I send you.   I'm dying.
25   Q.   Were you aware whether or not he, for a while, had been
```

Pimentel - Redirect by Ms. Kanof

1    telling de la Concha that he had cancer?

2    A.  Yes.

3    Q.  Did he or did he not tell her he was going to M.D.

4    Anderson --

5    A.  Yes.

6    Q.  -- in Houston?

7    A.  Yes.

8    Q.  Getting cancer treatment in Houston?

9    A.  Yes.

10   Q.  And did he tell her he was dying?

11   A.  Yes.

12   Q.  And he discussed that with you, didn't he?

13   A.  Yes.

14   Q.  Was he?

15   A.  No.

16   Q.  Did he have cancer?

17   A.  No.

18   Q.  Did he ever tell you why he was telling her this?

19   A.  Yeah.

20   Q.  Why was he telling her this?

21   A.  Because the cartel required all the parties involved to pay

22   the money back.  He didn't have the money to pay back, so the

23   people in Mexico was asking for Marco's part of the money.  And

24   Lilian was telling the people in the cartels, He's dying, he's

25   dying.  He's dealing with his health.  We can't ask him for

1    money right now.

2    Q.  So how did it come about that she was going to come to

3    El Paso and visit you?

4    A.  Well, once I told her that Marco was not dying, she just --

5    Q.  Why did you tell her -- why did you tell her the truth?

6    A.  Well, she -- when she called me again I was done with

7    everything.  I hadn't had contact with Marco in a couple of

8    weeks or months.  I was not interested in doing any type of

9    business other than my schooling.

10        When she he called me, she was crying, like a

11   desperate woman.  She told me, Please tell me that Marco hasn't

12   died.

13        I'm like, No, he hasn't died.  No, he's pretty healthy

14   right now.  And that's why I said, Well, this -- it's a lie.

15   He's not dying.

16   Q.  And why did you tell her the truth?

17   A.  Again --

18   Q.  Did you feel sorry for her?

19   A.  Yes.

20   Q.  Okay.  And by this time did Marco have another girlfriend?

21   A.  Yes.

22   Q.  Did you tell her about the girlfriend as well?

23   A.  Yes.

24   Q.  In that same conversation or at a different time?

25   A.  I don't remember.

Pimentel - Redirect by Ms. Kanof

1    Q.  Okay.  But at some point in time you -- you told her?

2    A.  Yes.

3    Q.  Was she angry?

4    A.  Yes.

5    Q.  When she -- when you met her at the bridge to bring her

6    into El Paso, what was the purpose of her trip?

7    A.  Just make sure that Marco was not dead and make sure that

8    he -- that everything I said was true.

9         Because at that point we were not very close, so we

10   were just developing trust.  And she wanted me to make sure

11   that Marco was not dead, that he actually had a new girlfriend,

12   that he was living with her [sic] mom, things like that.

13   Q.  She was corroborating the information you provided?

14   A.  That's correct.

15   Q.  Okay.  Are there any e-mails in 2006 or 2007 between you

16   and Lilian de la Concha?

17   A.  No.

18   Q.  When you said, We didn't have that close of a relationship,

19   before you started discussing whether or not he was dying of

20   cancer with Lilian de la Concha, did you have a friendship?

21   A.  With Lilian, no.

22   Q.  No.  You didn't e-mail each other at that time either?

23   A.  No.

24   Q.  Did you call each other?

25   A.  No.

1   Q.  So was it this communication between the two of you and her

2   visiting El Paso that opened up talking between the two of you?

3   A.  That's correct.

4   Q.  And I believe you said something about a Sharon?

5   A.  Sharon, yeah.

6   Q.  Who is Sharon?

7   A.  Marco's ex-wife.

8   Q.  And what were you -- I couldn't exactly understand -- that

9   de la Concha had talked to Sharon?

10  A.  They sent e-mails to each other.

11  Q.  Okay.  And she told you that?

12  A.  She showed me the e-mails.

13  Q.  Okay.  And that was one of the reasons she was upset?

14  A.  Yes.  Marco, during her relationship, told Lilian that

15  Sharon was drying from leukemia.

16  Q.  Was Sharon dying from leukemia?

17  A.  No.

18  Q.  And did she learn the truth through the e-mails with

19  Sharon?

20  A.  That's correct.

21  Q.  Okay.  And so now, having learned that Marco had lied to

22  her, she comes to El Paso?

23  A.  That's correct.

24  Q.  To verify?

25  A.  That's correct.

Pimentel – Redirect by Ms. Kanof

1   Q.   Okay.  And again, the transaction in Chicago occurred in
2   July of 2008, correct?
3   A.   That's correct.
4   Q.   And you actually call ICE in December of 2008?
5   A.   That's correct.
6   Q.   About the threat; is that correct?
7   A.   That's correct.
8   Q.   And in between that time had anybody in the money
9   laundering operation been arrested?
10  A.   No.
11  Q.   Okay.  So did you have any reason to believe those people
12  were going to be arrested?
13  A.   No.
14  Q.   Did you have any reason to believe ICE would have wanted
15  you to tell them she was there?
16  A.   No.
17  Q.   With regard to the dogs.  When -- we saw the video of you
18  being stopped in Atlanta, correct?
19  A.   That's correct.
20  Q.   There was a dog in that video, correct?
21  A.   That's correct.
22  Q.   Okay.  And did you watch the dog?
23  A.   Yes.
24  Q.   And what did the dog do when it smelled the back?
25  A.   Well, they start scratching the duffel bags.

1    Q.  And is that the first time you had seen that?

2    A.  In person, yes.

3    Q.  And did you assume -- what did you assume, since you saw

4    the dogs scratching at the location where the money was?

5    A.  Well, I didn't assume anything.  I was too scared to assume

6    something.

7    Q.  Now, Mr. Esper asked you a lot about money and work.

8    You've worked in other places in El Paso, haven't you?

9    A.  Yes.

10   Q.  Where else have you worked?

11   A.  While I was at school I worked for Holiday Inn.

12   Q.  For what?

13   A.  Holiday Inn.

14   Q.  For the Holiday Inn?

15            What did you do for them?

16   A.  I was a front desk clerk.  And then I got a position as a

17   food and beverage manager.  Well, food and beverage supervisor.

18            And then I worked for Rudy's BBQ.

19   Q.  And what did you do for Rudy's BBQ?

20   A.  I started as a cook, and I end up being one of their floor

21   managers.

22   Q.  Okay.  So how long did you work for Rudy's?

23   A.  Almost a year and a half.

24            And then I graduate, and then I got a NAFTA visa to be

25   an international consultant for Knight Transportation.

Pimentel - Redirect by Ms. Kanof

1    Q.  Okay.  So after you -- you worked for Holiday Inn and

2    Rudy's after this happened?

3    A.  Yes.  Because I didn't have any money, and I really wanted

4    to go to school.  So I put myself through school.

5    Q.  And then after that you were given a NAFTA visa?

6    A.  Yes.

7    Q.  And what was the purpose of providing the NAFTA visa to

8    you?

9    A.  It's stated in my visa to my passport as an international

10   consultant for Knight Transportation.  It's a trucking company.

11   Q.  And were you working for that trucking company?

12   A.  Yes, I was.

13   Q.  Okay.  Legitimate businesses?

14   A.  Yes.

15   Q.  Rudy's is a legitimate BBQ business?

16   A.  Yes.

17   Q.  And the transportation company, was it a legitimate

18   business?

19   A.  Yes.

20   Q.  Okay.  You were asked all these questions about Mr. Vargas.

21           Was Mr. Vargas ever at any money laundering meeting no

22   matter where in the world it took place?

23   A.  No.

24   Q.  Was he involved as a co-conspirator in any of the money

25   laundering?

1    A.  No.

2    Q.  Did Mr. Delgado ever tell you he had a large inheritance

3    and that was what the $600 million was?

4    A.  No.

5    Q.  Is it -- did he?

6    A.  No.

7    Q.  Okay.  And when you first met Mr. Vargas, it was to talk

8    about a Double Dave's Pizza franchise?

9    A.  No.  It was about the canteens in the power plants.

10   Q.  Okay.  And -- but when you met Mr. Vargas with Mr. Delgado.

11   A.  That's correct.

12   Q.  And Mr. Delgado already knew Mr. Vargas, didn't he?

13   A.  That's correct.

14   Q.  So you didn't introduce him?

15   A.  No.

16   Q.  Okay.  And who brought you along?

17   A.  Mr. Vargas.

18   Q.  Why?

19   A.  Because we were business partners.

20   Q.  Okay.

21   A.  Well, we shared the canteen business and...

22   Q.  Okay.  And Mr. Delgado cooperated, correct?

23   A.  When?  With whom?

24   Q.  With ICE.

25   A.  Yes.

Pimentel – Redirect by Ms. Kanof

1    Q.  You know that now?

2    A.  Yes.

3    Q.  Okay.  And you cooperated?

4    A.  Yes.

5    Q.  Did you ever mention Mr. Vargas to ICE?

6    A.  No.

7    Q.  Okay.  So the only person you didn't mention right away was

8    Lilian de la Concha; is that correct?

9    A.  That's correct.

10   Q.  And as soon as you got to El Paso, you did mention Lilian

11   de la Concha, correct?

12   A.  That's correct.

13   Q.  Were you trying to protect her?

14   A.  I was scared more than trying to protect her.

15   Q.  Were you trying to keep that information from anyone?

16   A.  I was scared, yes.

17   Q.  No, I understand that.  But did you have a personal

18   relationship with her at that time?

19   A.  No.

20   Q.  Were you trying to protect her at that time?

21   A.  No.

22   Q.  Okay.  You, within a day or two, did talk about her; is

23   that correct?

24   A.  Yes.

25   Q.  Do you know whether or not Mr. Delgado talked to her?

Pimentel – Redirect by Ms. Kanof

1   A.  Talked to her?

2   Q.  Talked to ICE about her.

3   A.  Yes.

4   Q.  You do know that he did?

5   A.  Yes.

6   Q.  And do you know whether or not he did undercover telephone

7   calls for ICE with her?

8   A.  Yes.

9   Q.  Did you?

10  A.  No.

11  Q.  Could you have?

12  A.  Yes.

13  Q.  The other -- the only other, I guess information you did

14  not provide, was that your cousin was helping you; is that

15  correct?

16  A.  That's correct.

17  Q.  And then later did you admit that he was?

18  A.  Yes.

19  Q.  They asked you about the powerfulness of Vicente Fox.  Did

20  you know Vicente Fox?

21  A.  I knew he was the president.

22  Q.  No.  Did you know him personally?

23  A.  No.

24  Q.  Okay.  Did you know the president after that, Calderon?

25  A.  No.  Not in person.

Pimentel - Redirect by Ms. Kanof

```
1    Q.  Did you have your picture taken --

2    A.  No.

3    Q.  -- with Lilian de la Concha and President Calderon?

4    A.  No.

5    Q.  Mr. Esper asked you that when you proceeded in Chicago,

6    were you doing the exact same thing you did when you proceeded

7    to Atlanta.

8         Do you remember that question?

9    A.  Yes.

10   Q.  And you said yes.

11   A.  First I say no, because I was not doing illegal activity.

12   I was doing it under ICE surveillance.

13   Q.  Right.  Did you have the same intent?

14   A.  No.

15   Q.  Were you money laundering in Chicago?

16   A.  No.

17   Q.  Were you cooperating with ICE in Chicago?

18   A.  Yes.

19   Q.  Was it with the same people that you were money laundering

20   with in Atlanta?

21   A.  I don't know that.

22   Q.  You don't know if it was the same organization, right?

23   A.  Yeah.

24   Q.  There were different names?

25   A.  They were different names.
```

1  Q.  Okay.  Now you were told by ICE, according to your

2  testimony, Do not tell anybody you cooperated or are

3  cooperating with ICE, correct?

4  A.  Yes.  You sign that -- there's rules, and you sign that you

5  agree to those rules.

6  Q.  You actually signed an agreement, correct?

7  A.  That's correct.

8  Q.  And what did -- did they tell you what happens to you if

9  you violate that agreement?

10  A.  Yes.

11  Q.  What happens to you?

12  A.  You go to jail.

13  Q.  Mr. Delgado, however, told you he -- you never told him you

14  were cooperating with ICE, correct?

15  A.  No.

16  Q.  But he told you he was, correct?

17  A.  That's correct.

18  Q.  If he signed the same contract you did with ICE, would he

19  have been violating it?

20  A.  That's correct.

21        MR. ESPER:  Objection, Your Honor, calls for

22  speculation.

23        THE COURT:  I'll sustain the objection.

24  BY MS. KANOF:

25  Q.  You started to talk in cross-examination about when Marco

1    first met Lilian.

2    A.  Yes.

3    Q.  I guess the questions were whether -- again about this

4    Mr. Vargas -- whether or not Mr. Delgado was trying to get work

5    in Mexico through Mr. Vargas, correct?

6    A.  Yes.

7    Q.  Was he?

8    A.  I don't know.

9    Q.  Okay.  You weren't part of that?

10   A.  I was not there.

11   Q.  You didn't go to any meetings where he was asking

12   Mr. Vargas to get him work?

13   A.  No.

14           MR. ESPER:  Objection, Your Honor.  Counsel is

15   testifying.  She can ask the question and let the witness

16   answer.

17           THE COURT:  Overruled.

18   BY MS. KANOF:

19   Q.  And then you said something about when Marco met Lilian you

20   really never heard anything about Vargas again, correct?

21   A.  That's correct.

22   Q.  With regard to your phone.

23           When they took your phone in Atlanta, you gave them

24   your passwords, correct?

25   A.  Yes.

1    Q.  And did you say, This is my e-mail password?

2    A.  Yes.

3    Q.  And did you have other passwords?

4    A.  No.

5    Q.  Okay.  So if they wanted to query your e-mails at that time

6    they could have?

7    A.  Actually, there's a folder in my Hotmail account that says

8    Marco, and all the e-mails are there, and they knew that.

9    Q.  Okay.  So were you hiding something from them?

10   A.  No.

11   Q.  Did you consider the fact that you voluntarily gave them

12   your password, basically giving them your e-mails, if they

13   wanted them?

14   A.  Yeah.  They had total control of my e-mail account if they

15   wanted to.

16   Q.  In the pieces of the video that the defense showed in

17   Government's Exhibit 49, the little bit that you actually could

18   see, there was a document that was being waved across the

19   screen.

20        What was that document?

21   A.  It was a fake settlement that Marco e-mailed me.

22   Q.  Who was holding it?

23   A.  Me.

24   Q.  And did Marco say, What's that?

25   A.  No.

1    Q.  Did he know what it was?

2    A.  Yes.

3    Q.  Did you discuss that document?

4    A.  Yes.

5    Q.  What did you discuss?

6    A.  I just needed to have it ready, because we were going to

7    cross to Mexico, so we needed documentation.

8    Q.  Okay.  And who told you to have it ready?

9    A.  Marco.

10   Q.  And did you have it ready?

11   A.  It's -- you can see that in this video.

12            MS. KANOF:  May I have a moment, Your Honor?

13            THE COURT:  You may.

14            MS. KANOF:  Pass the witness.

15                     RECROSS-EXAMINATION

16   BY MR. ESPER:

17   Q.  Mr. Pimental [sic], when did Mr. Delgado tell you to have

18   that document ready?

19   A.  I don't remember exactly.

20   Q.  You don't remember?

21   A.  No.

22   Q.  Well, was it when you got here to El Paso or when?

23   A.  When --

24   Q.  You don't remember?

25   A.  Well, it was discussed, prior to me going to Georgia, that

Pimentel — Recross by Mr. Esper

1    I need to have the documentation that he provided with me all

2    the time.

3    Q.  Well, I understand that part, sir.  In fact, when you went

4    to Georgia, you didn't even have a document, did you?

5    A.  No.  He e-mailed it to me.

6    Q.  Okay.  So when was it that he told you that you needed to

7    have that document to get to Mexico?

8    A.  It was discussed prior to me going to Georgia.

9    Q.  But you didn't even have a document, did you?

10   A.  No.  But he told me that he was going to send me

11   documentation.

12   Q.  Sir, did Ms. Lilian de la Concha —— when she came to

13   El Paso, she was expressing concern that people wanted her and

14   others to pay up for that lost money, correct?

15   A.  No, they all paid their part.  But the part that they were

16   concerned was Marco's part of the money.  They were concerned

17   about Marco not paying his part of the money.

18   Q.  What about your part?

19   A.  I was not considered —— if you see the TEPDEL agreement, I

20   was never considered one of the mains.  I was covered with

21   Marco.

22   Q.  Well, sir, you testified that you were getting 4 —— it was

23   10 percent initially.  And you were getting 4 percent, Marco

24   was getting 4 percent, and Lilian was getting 2, correct?

25   A.  That's correct.

1    Q.   Okay.  Now this document that we saw, that had to do with

2    some bond transaction, did it not?

3    A.   It was one of the tools to do the money laundering, not

4    only the bond.

5    Q.   Well, what I'm asking you is:  You are there at a meeting

6    where you're going to be getting 4 percent of this 10 percent,

7    correct?

8    A.   That was not stated in that meeting.  That was stated

9    between Marco and I in private conversations.

10   Q.   Oh.  So no nobody knew you were getting a portion of the

11   alleged money laundering fund?

12   A.   They didn't have to.  It was that Marco signed the

13   agreement.

14   Q.   Sir, sir.  Nobody knew, then, other than you and --

15           MS. KANOF:  Objection, speculation, Your Honor.  He

16   doesn't know who Marco told.

17           THE COURT:  If he knows.  Go ahead.

18   BY MR. ESPER:

19   Q.   Who knew, besides you and Marco, that you were supposed to

20   get each 4 percent?

21   A.   Probably my cousin.

22   Q.   Probably your cousin?

23   A.   Yeah.

24   Q.   Okay.  So that's three people that know, correct?

25   A.   That I can assume they know, yes.

1    Q.  Okay.  And what about Lilian de Concha [sic]?

2    A.  I don't know if Marco discussed that with her.

3    Q.  Okay.  Well, there was a discussion, according to your

4    testimony, 4 percent, 4 percent, 2 percent, correct?

5    A.  Yeah.

6    Q.  All right.  And you don't know whether she told Lilian

7    de -- he told Lilian de Concha [sic] that you and Marco had

8    agreed to give her 2 percent?

9    A.  I cannot -- I can't testify that they agreed on 2 percent.

10   But I cannot say that Marco discussed my part with her.  I

11   don't know.

12   Q.  Okay.  How much was your cousin getting?

13   A.  It was half of whatever I got.

14   Q.  Pardon me?

15   A.  Half of whatever I got.

16   Q.  You were halving it with him?

17   A.  Yes.

18   Q.  Okay.  But nobody ever came looking for you for a

19   proportion of these lost funds?

20   A.  No.

21   Q.  And how many times do you think -- and if you don't know,

22   simply say so -- that you fooled people that you were Francisco

23   Ruiz?

24   A.  Different people or times?

25   Q.  Different people.

1    A.   Three times.

2    Q.   Three times?

3    A.   Three different people, I guess.

4    Q.   How many?

5    A.   Three different people.

6    Q.   Three different people.  During the time that you had this

7    documentation, you fooled at least three people that you were

8    Francisco Ruiz?

9    A.   That's correct.

10   Q.   And not Victor Pimentel?

11   A.   That's correct.

12   Q.   And you had the credentials to back it up, correct?

13   A.   Credentials or documentation?

14   Q.   The documentation.

15   A.   Yes.

16   Q.   Okay.  And so basically you were lying about who you were,

17   correct?

18   A.   That's correct.

19   Q.   All right.  And you got away with it?

20   A.   That's correct.

21   Q.   Okay.

22            MR. ESPER:  No further questions.

23            THE COURT:  Ms. Kanof?

24

25

1                        REDIRECT EXAMINATION

2    BY MS. KANOF:

3    Q.   Okay.  Let's talk about Francisco Ruiz.

4            Where did you get the name?

5    A.   Marco provided it to me.

6    Q.   When?

7    A.   When he was sued by Angelica Fuentes.

8    Q.   Who is she?

9    A.   She's a very wealthy woman in Mexico.

10   Q.   I'm sorry?

11   A.   She's a very wealthy woman in Mexico.

12   Q.   Okay.  And how did he know her?

13   A.   They were friends.

14   Q.   At the time --

15           MR. ESPER:  Excuse me, Your Honor.  This exceeds the

16   scope.

17           THE COURT:  You brought it up.

18           MR. ESPER:  Pardon me?

19           THE COURT:  You brought it up.

20           MR. ESPER:  I asked him how many times he fooled

21   people.  I didn't ask about any lawsuit.

22           THE COURT:  You may proceed.

23           MS. KANOF:  Thank you.

24   BY MS. KANOF:

25   Q.   Okay.  So were you living with --

```
1                    THE COURT:  This is going to take a while, I believe.

2                    MS. KANOF:  Yeah.

3                    THE COURT:  Let's take a break at this time.

4                    We'll be in recess for the next 15 minutes.

5                    (Recess taken; open court.)

6                    THE COURT:  You may proceed, Ms. Kanof.

7                    MS. KANOF:  Thank you, Your Honor.

8    BY MS. KANOF:

9    Q.  Okay.  When you first heard the name Francisco Ruiz, was

10   Mr. Delgado still with the law firm of Delgado Acosta?

11   A.  Yes.

12   Q.  And under what circumstances did you hear the name?

13   A.  A client of him, Mr. Angelica Fuentes [sic], was requesting

14   money that he was -- that she had sent to Marco, so he could

15   administer that money.  And she was requesting that money from

16   him, and he didn't have the money.

17   Q.  Okay.  Let's go back.

18            You said before the break she was a client of his; is

19   that correct?

20   A.  Yes.

21   Q.  And what kind of a client?  Do you know?

22   A.  Again, she gave Marco money so he could invest or pay

23   things for her.

24   Q.  And do you know how much money was involved?

25   A.  It was a lot of money, a lot of millions of dollars.
```

Pimentel — Redirect by Ms. Kanof

1    Q.  How much?  I'm sorry?

2    A.  Millions of dollars.

3    Q.  Millions?  Okay.

4         And she was from Mexico, you said?

5    A.  She was -- I think she's a U.S. citizen, but she lives in

6    Mexico.

7    Q.  Okay.  And at some point in time did you discuss with Marco

8    that she wanted her money back?

9    A.  Yes.

10   Q.  What did he tell you about giving her the money back?

11   A.  I was living with Marco, and he asked me for a favor.  And

12   some client had been -- actually, I learned that it was going

13   to be Angelica -- was going to make a phone call, and he asked

14   me to pretend that I was somebody else on the phone.

15   Q.  Did he ask you to make up a name?

16   A.  No.  He made the name.  He already had the name.

17   Q.  How do you know he already had the name?

18   A.  Because he provided it to me.  On the documentation that he

19   showed me, the name was already there.

20   Q.  And what kind of documentation did he show you?

21   A.  He was the middle -- well, the contracts and powers of

22   attorney, things like that.

23   Q.  Okay.  So he showed you contracts and powers of attorney

24   that had the name Francisco Ruiz on it, right?

25   A.  That's correct.

1   Q.  Okay.  And what -- what did -- what authority did the

2   paperwork give this person Francisco Ruiz?

3   A.  He was able to invest Angelica Fuentes' money.

4   Q.  Did a real Francisco Ruiz exist?

5   A.  Not to my knowledge.

6   Q.  What did Mr. Delgado tell you when he showed you the

7   paperwork about Francisco Ruiz?

8   A.  That Angelica owes him some money, some fees.

9           MR. ESPER:  Your Honor, for the record, may we have a

10  continuing objection to this testimony?

11          THE COURT:  You may have a running objection.

12  BY MS. KANOF:

13  Q.  Go ahead.

14  A.  That she owed him some fees.  That she was requesting this

15  money, and that she was going to make a phone call.

16          He and I were going to be right next to the phone, and

17  we were going to discuss the fees, the payment of the fees.

18  Q.  Okay.  So did he tell you that he made up that name?

19  A.  Yes.

20  Q.  And did he tell you why he made up that name?

21  A.  Yes.

22  Q.  Why?

23  A.  This name was the middle person between Angelica and Marco.

24  So if something ever happened to that money, Angelica would

25  only -- was going to be able only to sue Francisco Ruiz, not

1    Marco.

2    Q.   Okay.  So did you participate in that phone call?

3    A.   Yes.

4    Q.   And I'm sure you don't remember the day.  But was it the

5    same day he asked you to be Francisco Ruiz?

6    A.   No.  It was two or three days earlier.

7    Q.   Okay.  So a few days later, where did the phone call occur?

8    A.   I think we were in Marco Delgado's house at that time.

9    Q.   And did she call or did you call?

10   A.   I -- we call.

11   Q.   Okay.  You -- did you personally call her?

12   A.   No.  She -- he dialed the phone.

13   Q.   Okay.  Was -- were both you and Mr. Delgado, like, on a

14   conference call where you could both hear her?

15   A.   Yeah.

16   Q.   And had he helped you on what to say?

17   A.   Yeah.  He gave me a script.

18   Q.   He gave you a script?

19   A.   Yes.

20   Q.   Was it a written script?

21   A.   No.

22   Q.   Okay.  An oral script?

23   A.   Yes.

24   Q.   What did he tell you to say?

25   A.   We were talking about the fees, and there was some details

Pimentel - Redirect by Ms. Kanof

1   that I don't remember.  And he specifically asked me to ask her

2   about the fees that she owes Marco.

3   Q.  And did you?

4   A.  Yes.

5   Q.  Was there anything else he told you to say as Francisco

6   Ruiz?

7   A.  No.  Not at that time.

8   Q.  Did there come a time when he asked you -- I think

9   Mr. Esper said how many times, and you said three.

10          So we knew you did it in the money laundering Atlanta

11   situation, correct?

12   A.  That's correct.

13   Q.  And you did it on the phone call, correct?

14   A.  That's correct.

15   Q.  Was there another time when Mr. Delgado asked you to be

16   Francisco Ruiz?

17   A.  Yes.

18   Q.  When was that?

19   A.  Later, after that phone, things went bad between Angelica

20   and Marco, and Angelica end up suing the Delgado Acosta law

21   firm, and they have some mediations in Mexico -- one mediation

22   in Mexico City, one mediation in El Paso, and one mediation in

23   Houston.  I pretend to be Francisco Ruiz in those three

24   meetings.

25   Q.  And did you lie for him?

Pimentel – Redirect by Ms. Kanof

1   A.  Yes.

2   Q.  Under oath?

3   A.  Not under oath.

4   Q.  Okay.  Well, you call them deposit- –- oh, they were

5   mediations, not depositions, correct?

6   A.  That's correct.

7   Q.  Okay.  So you were present in the mediations for what

8   purpose?

9   A.  They were trying to settle how much the insurance of the

10  law firm was going to pay Angelica Fuentes, because they never

11  found the money that she gave Marco.

12  Q.  Do you know what happened to the money?

13  A.  Marco spent it.

14  Q.  Did you ever have documentation that showed that you were

15  Francisco Ruiz?

16  A.  Yes.

17  Q.  And where did you get that?

18  A.  *La Plaza de Santo Domingo* in Mexico City.

19  Q.  Who was with you?

20  A.  I was by myself when I get it.

21  Q.  Okay.  And were you told to get that inf- –- that

22  documentation?

23  A.  Yes.

24  Q.  Who told you?

25  A.  Marco Delgado.

1          MS. KANOF:  Pass the witness.

2                    RECROSS-EXAMINATION

3   BY MR. ESPER:

4   Q.  Mr. Pimentel, let's first talk about the Houston mediation

5   here.

6               Who was there?

7   A.  The Houston was not a mediation.  It was only a meeting.

8   The mediations were in Mexico City and El Paso.

9   Q.  Who was at the Houston meeting, sir?

10              Please answer my questions.  Who was at the Houston --

11          MS. KANOF:  Objection, Your Honor.

12          THE COURT:  I'll sustain the objection.

13   BY MR. ESPER:

14   Q.  Who was at the Houston meeting?

15   A.  It was Marco Delgado; Marco's assistant at that time of

16   Delgado, Acosta, Braden & Jones; Hector Delgado; Mr. Acosta.

17   It was Ms. Angelica Fuentes' lawyer and myself.

18   Q.  Okay.  And so there were a number of lawyers from Delgado

19   Acosta, correct?

20   A.  That's correct.

21   Q.  Including Hector Delgado?

22   A.  That's correct.

23   Q.  Including Alex Acosta?

24   A.  That's correct.

25   Q.  Mr. Delgado's paralegal?

1   A.  I think she's an assistant.  I don't know if it's a

2   paralegal or not.

3   Q.  Okay.  And do you know the name of the lawyer of

4   Ms. Fuentes?

5   A.  No, I don't remember.

6   Q.  Do you know if the lawyer was from El Paso or Houston?

7   A.  No.  It was probably from Houston, because that was his

8   office.

9   Q.  Okay.  It was at the lawyer's office in Houston?

10  A.  I think so, yes.

11  Q.  And you show up there?

12  A.  Yes.

13  Q.  And do you -- are you asked questions by Ms. Fuentes'

14  lawyer?

15  A.  Yes.

16  Q.  Okay.  And you present some credentials that you're this

17  Francisco Ruiz who is supposed to be some kind of financial

18  investor, correct?

19  A.  Not in Houston.  The only time I showed the credentials was

20  here in El Paso.

21  Q.  Okay.  Let's stay with Houston.

22          At Houston, there's a meeting that's held, correct?

23  A.  That's correct.

24  Q.  And you're at the meeting?

25  A.  Yes.

1   Q.  Are you -- is anybody asking you any questions?

2   A.  Yeah.

3   Q.  Okay.  And are you posing yourself off as a financial

4   investor?

5   A.  Financial engineer, yes.

6   Q.  At that meeting?

7   A.  Yes.

8   Q.  Okay.  And are you saying that the other lawyers of Delgado

9   Acosta knew you were a fraud?

10  A.  No.

11  Q.  They didn't know?

12  A.  They didn't know.

13  Q.  They thought you were a legitimate guy?

14  A.  Yeah.

15  Q.  They thought you were a legitimate financial adviser?

16  A.  Yeah.

17  Q.  So you are able to fool the other partners in the firm,

18  correct?

19  A.  That's correct.

20  Q.  And you're able to fool the lawyer for Ms. Fuentes?

21  A.  That's correct.

22  Q.  And now you go to a mediation.  Where was the actual

23  mediation, in Mexico City?

24  A.  No, I think it was here in El Paso.

25  Q.  Okay.  Who's present at that meeting, at that mediation?

Pimentel - Recross by Mr. Esper

1    A.   The same persons -- the same people that I already

2    mentioned, and it was the mediator.  I don't remember the name

3    of the mediator.

4    Q.   Okay.  Are you asked questions at that mediation?

5    A.   Yes.

6    Q.   And who's asking questions?

7    A.   I think everybody.

8    Q.   Okay.  And are they asking you -- at that point, do you

9    have to produce some credentials?

10   A.   Not produce.  I had it with me.  Just show it.

11   Q.   Okay.  Do they ask you about your educational background?

12   A.   No.

13   Q.   Do they ask you how it is that you're a financial adviser?

14   A.   No.

15   Q.   How do you convince them that you are a financial adviser

16   who's invested all this money for Ms. Fuentes?

17   A.   We were pretty much just showing documentation that it was

18   provided for Marco.  It was financial documentation,

19   agreements, contracts.

20   Q.   That had the name of Francisco Ruiz on them?

21   A.   Francisco Ruiz, yes.

22   Q.   Okay.  You don't have to account -- you don't have to

23   account -- Francisco Ruiz doesn't have to account what he did

24   with the money?

25   A.   Yeah.

1    Q.  You don't have to say where you invested it?

2    A.  We did mention what Marco said he did with the money.

3    Q.  Well, you're the one that's being asked the questions,

4    aren't you?

5    A.  Yeah.

6    Q.  You're the one who's supposedly invested this money for

7    Ms. Fuentes at the behest of Mr. Delgado, correct?

8    A.  That's correct.

9    Q.  Are you asked, Well, what did you invest this money in,

10   Mr. Ruiz?

11   A.  Yeah.

12   Q.  And what did you tell him?

13   A.  What Marco told me.  There was an apartment in Mexico City.

14   There was a house in *Valle de Bravo.*  There was three

15   corporations.  There were two or three bank accounts.  Yeah,

16   that's what I said.

17   Q.  Okay.  And did they ask you what banks?

18   A.  No.

19   Q.  They didn't ask you what banks?

20   A.  No.

21   Q.  They didn't ask you the address of the apartments?

22   A.  Well, Angelica Fuentes was actually living in that

23   apartment in Mexico City.  She actually was the previous owner

24   of the house in *Valle de Bravo,* so everybody knew where those

25   properties were.  The only thing she didn't have, it was the

1    proof of ownership of those places.

2    Q.  She didn't have proof of ownership?

3    A.  That's correct.

4    Q.  So she's living in these places, but she doesn't --

5    A.  She's living just in the Mexico City apartment.

6    Q.  Just in the Mexico City apartment?

7    A.  Yes.

8    Q.  And she's living in some apartments that she doesn't even

9    know she owns?

10   A.  According to Marco she owned it, but she never got proof

11   that she owned the place.

12   Q.  And this other house, she supposedly owns this house, but

13   she doesn't even know she owns it?

14   A.  She was the previous owner, to my knowledge.  And then they

15   did -- I cannot tell you exactly.  I didn't see the money

16   movement.  But at some point they've been part of a corporation

17   that Marco Delgado handled.

18   Q.  Well, Mr. Pimental [sic], you've got to go in there and be

19   convincing and sound like you know what you're talking about,

20   don't you?

21   A.  Yeah.

22   Q.  Okay.  And you came across to people who are lawyers, who

23   are members of this firm, who -- you're convincing them as well

24   that what -- what these documents are saying are true.

25            MS. KANOF:  Objection, speculation as to how he came

1    across to other people, Your Honor.

2    BY MR. ESPER:

3    Q.  Did anybody doubt --

4              THE COURT:  Overruled.  Answer the question.

5    BY MR. ESPER:

6    Q.  Did anybody doubt you?

7    A.  They didn't have to doubt me.  The documentations were

8    real.

9    Q.  Did anybody doubt you, sir?

10             THE COURT:  Well, no.

11             THE WITNESS:  I don't know.

12             THE COURT:  How does he know?  How is he supposed to

13   know that?

14   BY MR. ESPER:

15   Q.  That's why I'm asking the question.  Did anybody express

16   doubt as to who you were?

17   A.  Yeah.

18   Q.  Who did?

19   A.  I don't remember.  But at some point in the meeting here in

20   El Paso, they asked -- that's why they asked for my

21   documentation, because they -- I probably said -- made some

22   mistakes when I was explaining the financial thing.

23             And actually I know, because Angelica Fuentes told me

24   that -- because they did it later after that meeting, that they

25   went -- because we provide addresses in different cities in

1    Mexico.  They hire a private investigator to find who I was.

2    Q.  And you were not under oath when you were doing this?

3    A.  No.

4    Q.  But you were convincing people that what you were saying

5    was the truth?

6            MS. KANOF:  Your Honor, we just --

7    A.  I don't know.

8            THE COURT:  Sustain the objection.

9    BY MR. ESPER

10   Q.  Now, did you --

11           THE COURT:  Nevermind.  You started this.  I'm going

12   to give you five more minutes, and that's it.

13   BY MR. ESPER:

14   Q.  Did you tell the agent that when you did this you thought

15   it was funny?

16   A.  Yes.

17   Q.  Okay.  So you thought this was all a big joke as well?

18   A.  Honestly, yes.

19   Q.  Do you know -- and if you don't, say simply say so -- what

20   year this was occurring?

21   A.  I don't remember.

22   Q.  Were you paid any money to do this?

23   A.  No.

24   Q.  Have you been paid any money to testify in this case?

25   A.  No.

Pimentel – Recross by Mr. Esper

1  Q.  HSI has not paid you any money?

2  A.  No.

3         MS. KANOF:  Excuse me, Your Honor.  Paid you money to

4  testify in this case?  I would object to the character of the

5  question.

6         MR. ESPER:  I'll rephrase it.

7  BY MR. ESPER:

8  Q.  Have you been made any money by Homeland Security or ICE

9  for your cooperation in this matter and in other matters?

10  A.  No.

11         MS. KANOF:  No further questions, Your Honor.

12         THE COURT:  I had previously informed you that I'm

13  going to excuse the witness.

14         MS. KANOF:  Thank you, Your Honor.

15         THE COURT:  You are excused.  You're free to leave.

16         THE WITNESS:  Yes, sir.

17         THE COURT:  Call your next witness.

18         MS. KANOF:  Santos Carrasco.

19         THE COURT:  Has he been sworn?  I don't think he was

20  sworn in.

21         MS. KANOF:  I don't think he was sworn, Judge.

22         (Witness duly sworn.)

23         THE WITNESS:  I do.

24         MS. KANOF:  May I proceed, Your Honor?

25         THE COURT:  You may proceed.

1          MS. KANOF:  Thank you, Your Honor.

2          SANTOS CARRASCO, JR., GOVERNMENT'S WITNESS, SWORN

3                    DIRECT EXAMINATION

4    BY MS. KANOF:

5    Q.  State your name.

6    A.  Santos Carrasco, Jr.

7    Q.  How are you employed?

8    A.  I'm a sergeant with the Texas Department of Public Safety

9    in the highway patrol division.

10   Q.  What are your duties and responsibilities with DPS?

11   A.  I enforce traffic and criminal laws.

12   Q.  How long have you been with DPS?

13   A.  I've been with DPS nine years this month.

14   Q.  Okay.  And, Sergeant, that's a fairly high-ranking

15   position, correct?

16   A.  Yes, ma'am.

17   Q.  Okay.  In September of 2007, what was your rank?

18   A.  I was a trooper.

19   Q.  Okay.  And now I'm assuming you have administrative

20   responsibilities?

21   A.  Yes, ma'am, I do.

22   Q.  But back then you were enforcing the laws on the streets;

23   is that correct?

24   A.  That is correct.

25   Q.  And where were you assigned?

Carrasco — Direct by Ms. Kanof

1   A.  I was assigned to the highway patrol office here in

2   El Paso.

3   Q.  What areas does the office in El Paso patrol?

4   A.  We mainly patrol El Paso County, the rural areas of El Paso

5   County.

6   Q.  Okay.  In September of 2007, did you receive a request from

7   ICE to assist them?

8   A.  Yes, ma'am.

9   Q.  Is this an unusual thing?

10  A.  No, ma'am.

11  Q.  Can you explain to the jury about task forcing and

12  helping -- law enforcement helping each other in El Paso?

13  A.  Yes, ma'am.  We usually are tasked out at some times to

14  assist other agencies within El Paso County that include --

15  that could include El Paso PD, the local sheriff's department,

16  and any other federal agency.

17  Q.  Okay.  Does -- what are you -- in July -- I'm sorry.

18          In September of 2007, were you asked to assist ICE in

19  making a traffic stop?

20  A.  Yes, ma'am.

21  Q.  Is that something that you frequently are asked to do?

22  A.  Yes, ma'am.

23  Q.  What are the rules and regulations regarding DPS's

24  assistance with a federal agency in making a traffic stop?

25  A.  If they request assistance we -- we can provide assistance

Carrasco - Direct by Ms. Kanof

1    that will help them out.  We still need probable cause to

2    conduct a traffic stop.

3    Q.  What does that mean?

4    A.  That means there has to be enough -- they have to have

5    broken the law in order for me to conduct a traffic stop.

6    Q.  Okay.  Is it pretty difficult sometimes to -- do you follow

7    them and wait for them to break the law?

8    A.  Yes, ma'am.

9    Q.  Okay.  And generally, is that a difficult thing?

10   A.  I'm not understanding your question, ma'am.

11   Q.  No.  I'm asking you if a lot of people break the traffic

12   laws and it's easy to stop them, to find reason to stop them.

13   A.  A lot of people do break traffic laws, yes, ma'am.

14   Q.  Okay.  How did you learn about your assistance, that they

15   needed your assistance?

16   A.  I was contacted by one of our narcotics agents at the time.

17   His name was Joe Sanchez.  He's a sergeant with narcotics.

18   Q.  Okay.  And did he tell you what he wanted you to do?

19   A.  Yes, ma'am.

20   Q.  What did he say?

21   A.  He explained to me briefly that he needed me to conduct a

22   traffic stop, and he explained to me the type of vehicle it

23   was.

24   Q.  What kind of vehicle was it?

25   A.  It was described as a gold SUV.  I don't remember if he --

1  he explained to me if it was a Jeep or a Dodge.

2  Q.  Did it have -- what kind of license plates did it have?

3  A.  I don't remember the license plates.

4  Q.  Did you remember if they were Texas plates or -- no, you

5  don't remember?

6  A.  I don't remember, ma'am.

7  Q.  Okay.  And did he give you any information about the

8  purpose for the stop?

9  A.  He advised me that there was some contraband in the

10  vehicle, and that it was going to be money.

11  Q.  Okay.  And did he tell you whether or not anyone in the

12  vehicle was cooperating with the federal government?

13  A.  Yes, he did.

14  Q.  What did they tell you regarding that?

15  A.  They explained to me, in brief, stating that there was a

16  CI, a confidential informant, in the vehicle.

17  Q.  Did they tell you whether he would be the driver or the

18  passenger?

19  A.  They explained to me he was going to be the driver.

20  Q.  Okay.  And then?

21  A.  That's the details.  It was real brief details on the

22  description of the vehicle, and the driver was a confidential

23  informant.

24  Q.  So all you knew was there was money in the vehicle and the

25  driver was a confidential informant; is that correct?

Carrasco – Direct by Ms. Kanof

1    A.  That's correct.

2    Q.  And did you set up surveillance and wait for the federal --

3    for ICE to tell you that the vehicle was near you?

4    A.  I did not set up surveillance, no, ma'am.  I just waited

5    nearby.

6    Q.  Okay.  All right.  You were watching.  I guess surveillance

7    is a little bit too technical.

8            Where were you located?

9    A.  I remember I was at a convenience store parking lot near

10   the area where the team had set up surveillance.

11   Q.  Were you in a marked DPS vehicle?

12   A.  Yes, ma'am.

13   Q.  And did you have a partner with you?

14   A.  Yes, I did.

15   Q.  Who was that?

16   A.  My partner that day was Trooper Shane Ramirez.

17   Q.  Okay.  And at some point in time did you receive a

18   transmission that the vehicle was approaching you?

19   A.  Yes, ma'am.

20   Q.  Where was the vehicle traveling from and where was it

21   traveling to?

22   A.  I remember seeing the vehicle.  It was traveling on Resler,

23   and it was approaching the intersection of Mesa Street.

24   Q.  Okay.  And you were in a -- the parking lot of a

25   convenience store nearby?

Carrasco – Direct by Ms. Kanof

1   A.  I was at a parking lot at the convenience store nearby

2   until I received the call that the vehicle was —— had left the

3   location.  And I made my way towards that area, and that's when

4   I first saw that vehicle.

5   Q.  When did you first see the vehicle?

6   A.  At the intersection of Resler and Mesa, ma'am.

7   Q.  And did you let the vehicle proceed in front of you?

8   A.  Yes, ma'am.

9   Q.  And then did you follow the vehicle?

10  A.  Yes.

11  Q.  Were you driving or was your partner driving?

12  A.  I was driving, ma'am.

13  Q.  Okay.  And then what did you do?  Did you watch for a

14  traffic violation?

15  A.  Yes.

16  Q.  Okay.  And at any point did you observe a traffic

17  violation?

18  A.  Yes, ma'am.  When the vehicle made the right turn from

19  Resler on to Mesa, they failed to use the turn signal.  And

20  also, while driving down Mesa, he failed to signal a lane

21  change.

22  Q.  Okay.  And when he made the right turn on Mesa, what

23  direction was he traveling?

24  A.  He was traveling west.

25  Q.  And how far did you permit the vehicle to travel before you

1   pulled it over?

2   A.  I don't remember the exact distance, but it was -- we

3   usually look for a location that is safe.

4   Q.  And did you find that location, when you thought it was the

5   right time to pull the vehicle over?

6   A.  Yes, ma'am.

7   Q.  And approximately where was that?

8   A.  It was -- it was right near the intersection of Resler and

9   Mesa.  I would say a couple hundred feet from it.

10  Q.  Okay.  And what did you do?

11  A.  I turned on the overhead emergency lights to conduct a

12  traffic stop.  The vehicle came to a stop on the shoulder of

13  the roadway near the sidewalk.

14          And then I proceeded to make contact with the

15  occupants of the vehicle.

16  Q.  Did you -- how did you make that contact?  Did you go up to

17  them or did you tell them to get out of the vehicle?

18  A.  I walked up to the passenger side door of the vehicle and I

19  explained to them the reason for the traffic stop and who I

20  worked for.

21  Q.  Did you do that in English or in Spanish?

22  A.  In English.

23  Q.  And did you get a response?

24  A.  Yes, ma'am.

25  Q.  Did you get a response from the passenger?

1    A.   I got a response initially from the passenger of the SUV.

2    Q.   And was that response in English or Spanish?

3    A.   He responded in Spanish.

4    Q.   And because he respon- –– you asked in English but he

5    responded in Spanish?

6    A.   That is correct.

7    Q.   You're fluent in Spanish?

8    A.   Yes.

9    Q.   And so as a result, did you conduct the rest of your

10   discussions with him in Spanish?

11   A.   Yes, ma'am.

12   Q.   Did you think he did not speak English?

13   A.   I did at the time.

14   Q.   The individual that was the passenger, that you started

15   speaking with, is he here in the courtroom?

16   A.   Yes, ma'am.

17   Q.   Could you identify him, please?

18   A.   He's sitting next to his counsel (indicating) with the ––

19   looks like a brownish tie.

20   Q.   Kind of a –– okay.

21   A.   Yes, with ––

22   Q.   There's three men at counsel table.  Is he number one,

23   number two, or number three?

24   A.   Number two.

25            MS. KANOF:  Let the record reflect the witness has

 1    identified the Defendant Marco Delgado.

 2              THE COURT:  The record will so reflect.

 3    BY MS. KANOF:

 4    Q.  So now you're speaking to him in Spanish.  And what do

 5    you -- what do you say to him?

 6    A.  I asked the driver for his driver's license, insurance, and

 7    had him step out.

 8              Once I got his information, he explained to me it was

 9    a rental vehicle.

10              Usually when we run with a partner I'll have the

11    driver step out of the vehicle and exit to go speak with my

12    partner in the rear of the vehicle.

13    Q.  Did you do that in this case?

14    A.  Yes, I did, ma'am.

15    Q.  Did you stay with Mr. Delgado?

16    A.  Yes, I stayed with Mr. Delgado there at the passenger side

17    window.

18    Q.  Okay.  And for a period of time did you talk to

19    Mr. Delgado?

20    A.  Yes.

21    Q.  First of all, could you -- what was the first thing that he

22    told you, if you can recall?

23    A.  I remember asking him for his driver's license or ID, if I

24    could see some -- his driver's license or ID.

25              And he exited the vehicle to retrieve it from the rear

1    hatch of the SUV.

2    Q.  Okay.  Did you walk with him when he went to the rear

3    hatch?

4    A.  Yes, ma'am.

5    Q.  And when he opened the hatch, what did you see?

6    A.  I saw a large amount of luggage.  There was two large red

7    duffel bags.  I believe it was a brown and a black duffel bag

8    and some gifts, looked like presents.

9    Q.  Okay.  And did he give you his ID?

10   A.  Yes, ma'am.  He retrieved it from one of the bags and gave

11   me his ID.

12   Q.  And then what happened next?

13   A.  I engaged with him in conversation and asked him if they

14   were going on a trip, if he was traveling, due to the luggage

15   in the vehicle.

16   Q.  Now, before you proceed with your conversation, was the

17   driver of the vehicle present when you had these conversations?

18   A.  Yes, he was -- he was nearby.  Yes, ma'am.

19   Q.  But was he participating or was he with your partner?

20   A.  He was not participating.  He was standing next to my

21   partner.

22   Q.  Okay.  And you were aware that he was a CI?

23   A.  Yes, ma'am.

24   Q.  Okay.  Go ahead.

25   A.  I spoke with Mr. Delgado and asked him if he would be

Carrasco — Direct by Ms. Kanof

1    traveling, due to the large amount of luggage in the rear of
2    the SUV.
3         And he stated that -- he stated that he was actually
4    going to Mexico City.
5    Q.  Did he tell you all that luggage was his?
6    A.  No, ma'am.
7    Q.  What did he say?
8    A.  During the conversation he stated that the two red duffel
9    bags were the driver's.  He stated --
10   Q.  Okay.  Go ahead.
11   A.  He stated that the -- he pointed out his bags, which were a
12   black cloth bag and a brown one.
13   Q.  He told you the back bag was his as well?
14   A.  Yes, ma'am.
15   Q.  And the brown?
16   A.  Correct.
17   Q.  What did you do next?
18   A.  He also explained to me at the time that he was going to
19   Chase Bank initially, when I asked him for his ID.
20   Q.  Well, when you saw the luggage, did you ask him if he was
21   traveling somewhere?
22   A.  Yes, ma'am, I did.
23   Q.  And what did he tell you?
24   A.  He told me that he was going to Mexico City.
25   Q.  Okay.  And then did he volunteer some information about a

Carrasco – Direct by Ms. Kanof

1    bank?

2    A.  Yes.

3    Q.  Okay.  What did he say?

4    A.  He stated that he was going -- that he had a -- I don't

5    remember the word he used -- but there was somebody at the bank

6    that was going to help him with some deposits.

7    Q.  He used the word administrator?

8    A.  Yes, ma'am.

9    Q.  Okay.

10   A.  In Spanish he stated *administrador* at the bank.

11   Q.  Okay.  And what was going to happen there?

12   A.  He was going to the -- this person was going to help him

13   with some deposits at the Chase Bank.

14   Q.  Okay.  And did he give you the name of his administrator at

15   Chase Bank?

16   A.  No, ma'am.

17   Q.  Do you know what an administrator is?

18   A.  I don't.

19   Q.  And again, he was speaking to you in Spanish?

20   A.  Correct.

21   Q.  Okay.  Then did you -- is it part of your job, or part of

22   your responsibilities as a law enforcement officer, to observe

23   demeanor?

24   A.  Correct.

25   Q.  Okay.  Did you -- were you also, at the same time, watching

1    his demeanor?

2    A.  Yes, ma'am, I was.

3    Q.  Describe it, please.

4    A.  He was very talkative, over-friendly.  I remember when he

5    was speaking his lips were quivering while speaking to me.

6    Q.  Did he stay in one place?

7    A.  He was pacing up and down.  When I was in the -- actively

8    engaged with him in conversation, he was pacing up and down the

9    sidewalk.

10   Q.  What does being overly talkative mean to you?

11   A.  When somebody is very nervous and they have no way of

12   controlling their nervousness, usually they'll revert to, you

13   know, talking a lot, giving a lot of information and just, you

14   know, laughing, nervous laughing.  It's...

15   Q.  And was his -- his demeanor was consistent with what?

16   A.  Someone that was highly nervous.

17   Q.  Did that -- did the demeanor that you observed from

18   Mr. Delgado cause you to ask another question?

19   A.  Yes, ma'am.

20   Q.  What question did you ask?

21   A.  Due to his nervous behavior, I thought there was some type

22   of criminal activity going on, so I then asked him if -- if he

23   had anything illegal in the vehicle.

24   Q.  Well, you actually knew there was criminal activity going

25   on --

1    A.  Correct.

2    Q.  -- because you knew there was an informant, correct?

3    A.  That is correct.

4    Q.  But was -- was his conduct consistent with what you would

5    see if the person was not aware that it was a controlled

6    delivery?

7    A.  That is correct.

8    Q.  Okay.  You said he laughed in a nervous manner as well?

9    A.  Yes, ma'am.

10   Q.  Did you ask him how long he was going to be in Mexico City?

11   A.  Yes, I did.

12   Q.  Did he tell you?

13   A.  He stated that he was going to be down for -- I believe he

14   said a couple of days.

15   Q.  And did you find this response unusual?

16   A.  Yes, I did.

17   Q.  Why?

18   A.  Due to the large amount of luggage that was in the SUV, it

19   wouldn't be necessary to take that amount of luggage for a

20   two-day trip.

21   Q.  Okay.  And when you asked him about the bags, did he open

22   the hatch for you again?

23   A.  Yes, ma'am.

24   Q.  Okay.  And what did -- and again, that time did he also

25   tell you that both the brown and the black were his?

Carrasco − Direct by Ms. Kanof

1    A.  Yes, ma'am.  That's when he told me.

2    Q.  Oh, that's when he told you?

3    A.  Yes, ma'am.

4    Q.  Okay.  Now, throughout the entire interaction with him, did

5    he continue to display nervousness?

6    A.  Yes, ma'am.  He again -- he continued to walk, pace up and

7    down the sidewalk.  You could see he -- when he was speaking to

8    me, when I did engage him with -- in conversation with him, his

9    lips -- he would avoid eye contact and...

10   Q.  Okay.  Did you ask the driver for consent to search?

11   A.  Yes, ma'am.

12   Q.  Okay.  Did he -- and the driver is Victor Pimentel, the

13   cooperating witness, right?

14   A.  Correct.

15   Q.  And what did he tell you?

16   A.  He said no.

17   Q.  Do you know, normally, if the person controlling the

18   vehicle is cooperating with the Government, that they are told

19   not to give consent, or do you know?

20   A.  I don't know.

21   Q.  Okay.  Anyway, so he didn't give consent.

22        But do you need consent to search a traveling vehicle

23   if you have probable cause?

24   A.  No, ma'am.

25   Q.  Okay.  And you don't need a search warrant either, do you?

1    A.   Correct.

2    Q.   Okay.  And so even though Mr. Pimentel said no that you

3    could not search the vehicle, did you?

4    A.   No, ma'am.

5    Q.   Okay.  What did you do?

6    A.   I requested for a canine.

7    Q.   What was the purpose of asking for a dog?

8    A.   To see if the dog would alert on any type of contraband in

9    the vehicle.

10   Q.   And if the dog did alert, would that give you the probable

11   cause --

12   A.   Yes, ma'am.

13   Q.   -- to search?

14   A.   Yes.

15   Q.   Okay.  How long did it take for the canine officer to

16   arrive?

17   A.   I don't remember the time.  It was fairly quick, within --

18   Q.   Well, they were part of the deal, too, right?

19   A.   Correct, ma'am.

20   Q.   They were part of the ruse, so they were nearby?

21   A.   They were nearby.

22   Q.   Okay.  And when -- he told you again something about the

23   bank while you were waiting for the dog?

24   A.   Yes, ma'am.

25   Q.   What did he say?

1    A.  I don't remember exactly what he stated about the bank.

2    Q.  That's okay.  I'll go on.

3    A.  Okay.

4    Q.  Did he start to whistle?

5    A.  Yes, ma'am.  He was whistling when I was waiting for the

6    canine officer.

7    Q.  Okay.  And was he physically standing still?  What was he

8    doing?

9    A.  He continued to pace up and down the sidewalk.  And that

10   and the whistling itself, I mean, it was very odd.

11   Q.  When the other trooper showed up with the dog, what did the

12   dog do?

13   A.  The dog and the dog handler themselves did their free air

14   search of the vehicle.

15   Q.  What's a free air search of the vehicle?

16   A.  They -- the dog handler runs the dog around the vehicle on

17   the outside without intruding, and he sniffs around the

18   vehicle.

19   Q.  Okay.  And did the dog alert to the back of the vehicle?

20   A.  Yes.  The canine officer explained to me that the dog

21   alerted to the vehicle.

22   Q.  And did that give you the probable cause to search the

23   vehicle?

24   A.  Yes, ma'am.

25   Q.  Did you search the vehicle --

Carrasco - Direct by Ms. Kanof

1    A.   Yes.

2    Q.   -- there on Mesa, right?

3    A.   Yes, ma'am.

4    Q.   And what did you find?

5    A.   In the rear of the vehicle the two red duffel bags were

6    full of U.S. currency.  And they were wrapped in clear plastic

7    bags marked with the markers.  They had numbers on them.

8    Q.   What did you do once you found the cash?  You weren't

9    surprised.  You knew the cash was in there, right?

10   A.   Correct.

11   Q.   Okay.  What did you do next?

12   A.   I contacted our Narcotics Officer Sanchez and -- well, I

13   detained both subjects first, and then I contacted --

14   Q.   Did you continue the ruse by detaining both of them?

15   A.   Yes, ma'am.

16   Q.   Okay.  And what happened next?

17   A.   After we detained both of them, then we contacted our

18   special -- our Agent Sanchez, so they could notify ICE and

19   whoever else was assisting, that we had found the money.

20   Q.   And did you have anything else to do with them that day?

21   A.   No, ma'am.

22   Q.   Okay.  That same week, were you asked again to assist with

23   ICE?

24   A.   Yes, ma'am.

25   Q.   And do you remember how close it was to the day that you

Carrasco — Direct by Ms. Kanof

1   stopped the Defendant and the CI?

2   A.  It was the following day, ma'am.

3   Q.  Okay.  What happened?

4   A.  Again, I was contacted by Agent Sanchez.  He explained to

5   me kind of the same deal was going on that happened the day

6   before, and that he would need my assistance in conducting a

7   traffic stop.

8   Q.  Okay.  And did you assist, then, in a traffic stop?

9   A.  Yes, ma'am.

10  Q.  Just go ahead and tell the jury about this stop.

11  A.  Okay.  We were down on Interstate 10 going westbound and we

12  spotted the same vehicle, which was the gray SUV.  The vehicle

13  failed to signal a lane change, and we conducted a traffic stop

14  on that vehicle.

15  Q.  Who was in that vehicle?

16  A.  There was an undercover officer in the vehicle.  There

17  was --

18  Q.  Somebody from ICE?

19  A.  Correct.

20  Q.  Had you already met him, so you knew that he was from ICE?

21  A.  Yes, ma'am.

22  Q.  Okay.  Who else?

23  A.  Also Victor Pimentel Rojas was in the vehicle.

24  Q.  Was he driving?

25  A.  No, ma'am.

Carrasco – Direct by Ms. Kanof

1    Q.  Okay.

2    A.  He was actually in the backseat of the passenger side.

3         And there was two other gentlemen, that I had never

4    met, that day.

5    Q.  Okay.  And what were you directed to do with regard to this

6    stop?

7    A.  Speak with the passengers and see if they would give

8    consent to search the vehicle.  Speak with them and get any

9    information that was possible.

10   Q.  Mr. Delgado was not at that traffic stop, correct?

11   A.  No, ma'am.

12   Q.  Okay.  And again, did you find money in the vehicle?

13   A.  Yes, I did.

14   Q.  And was it the same two red duffel bags that you had found

15   the day before?

16   A.  Yes, they were.

17   Q.  And what did you do after -- was a dog called out again and

18   did you go through the whole same scenario?

19   A.  Yes, ma'am.  The consent was denied, so we called the

20   canine officer, alerted on the vehicle, and all four subjects

21   that were in the vehicle were detained.  And then we again

22   contacted --

23   Q.  So you actually arrested or detained the ICE undercover as

24   well?

25   A.  Yes, ma'am.

Carrasco — Direct by Ms. Kanof

1   Q.  Okay.  Was he driving?

2   A.  He was the driver, yes, ma'am.

3   Q.  Was he the one that refused the consent to search?

4   A.  Yes.

5   Q.  Okay.  So you continued that ruse; is that correct?

6   A.  Yes, ma'am.

7   Q.  And after you detained them, who took them?

8   A.  There was a couple of vehicles that showed up, and they

9   were transporting them there.  And I know one of them was our

10  Agent Sanchez.  I don't recall who the --

11  Q.  Were they DPS vehicles or ICE vehicles?

12  A.  ICE vehicles.

13  Q.  Okay.  And so basically the federal government took over?

14  A.  Yes, ma'am.

15         MS. KANOF:  Pass the witness.

16         Wait.  Hold on.

17         Oh, okay.  I'm sorry.

18  BY MS. KANOF:

19  Q.  When he was talking to you about the money in the red

20  duffel bags, did he tell you --

21         MR. VELARDE:  Objection, Your Honor.  It's unclear who

22  she is referring to.

23         MS. KANOF:  I'm sorry.

24  BY MS. KANOF:

25  Q.  When Mr. Delgado, the Defendant, was talking to you about

Carrasco — Direct — Cross by Mr. Velarde

1    the currency in the red duffel bags, did he tell you whether or

2    not there was more money?

3    A.   Throughout the vehicle, ma'am?

4    Q.   No.   That more money existed.

5    A.   He explained to me that a portion of the contents of that

6    bag were money and the rest was clothes.

7    Q.   Okay.   But did he also tell you that the money that was

8    there -- well, first of all, was he wrong about that?

9    A.   Yes, ma'am.

10   Q.   Because it was all money?

11   A.   Correct.

12   Q.   But did he also tell you that the money that was in the red

13   duffel bags was only part of the money and there was more?

14   A.   Yes, ma'am.

15        MS. KANOF:   Pass the witness.

16              CROSS-EXAMINATION

17   BY MR. VELARDE:

18   Q.   Sergeant Carrasco, good afternoon.

19   A.   Good afternoon, sir.

20   Q.   Sergeant, you've testified about events that happened

21   approximately six years ago; is that correct?

22   A.   That is correct.

23   Q.   And prior to your testimony this afternoon, you had the

24   benefit of reviewing the report -- reports, perhaps -- that you

25   prepared in connection with the matters that you just finished

Carrasco – Cross by Mr. Velarde

1    testifying about?

2    A.  Yes, sir.

3    Q.  How many reports did you generate?  One, two or more?

4    A.  There were two reports generated, sir.

5    Q.  There's two reports?

6    A.  Yes, sir.

7    Q.  Okay.  Have you had a chance --

8             THE COURT:  One for each stop?

9             THE WITNESS:  Yes, sir.

10   BY MR. VELARDE:

11   Q.  I'd like to direct your attention, if you will bear with

12   me, to the contents of the report that you prepared in

13   connection with the first stop.  Okay?

14   A.  Yes, sir.

15   Q.  That occurred on September the 7th; is that correct?

16   A.  That is correct.

17   Q.  The second stop occurred a day or two later?

18   A.  A day later, yes, sir.

19   Q.  Okay.  Now, you testified that you stopped this vehicle on

20   Mesa Street -- I'm sorry -- yes, on Mesa Street; is that

21   correct?

22   A.  That is correct.

23   Q.  After it made a -- after it made a right on Resler onto

24   Mesa, correct?

25   A.  Yes, sir.

Carrasco - Cross by Mr. Velarde

1    Q.  Are you familiar with the west side?

2    A.  Not too familiar, no, sir.

3    Q.  Okay.  The next major intersection -- and you can tell me

4    if you agree with me or not.

5         The next major intersection is a street by the name of

6    Belvidere?

7    A.  I wouldn't know, sir.

8    Q.  Okay.  Then there's another major street -- there's two

9    other major lights before you get to the underpass -- three

10   major lights before you get to the underpass of I-10.  Are you

11   familiar with that?

12   A.  No, sir.

13   Q.  No?  Okay.

14        In any event, you told us that you stopped this

15   vehicle within some distance from the intersection of Mesa and

16   Resler; is that correct?

17   A.  That is correct.

18   Q.  Do you recall that right across the street there was a

19   carwash?

20   A.  I don't recall that, no, sir.

21   Q.  Have you looked at the video that was taken on the day on

22   this -- on this occurrence by Victor Pimentel?

23   A.  Which video, sir?

24   Q.  Mr. Pimentel was equipped with a video camera.  Have you

25   had a chance to look at that video?

1    A.  Yes, sir.  Yes, sir, I have.

2    Q.  Okay.  Now the report that you prepared relative to the

3    events of September the 7th, the one that you read in

4    preparation for today's hearing, is that complete or did you

5    forget to mention things in there?

6    A.  It's a complete report, sir.

7    Q.  Okay.  The report that you prepared on September 7th does

8    not make any reference to any statement made by Mr. Delgado

9    that this money that was found in this vehicle was part of a

10   bigger amount of money.

11        Ms. Kanof asked you that question right before she

12   turned over the witness.

13        Do you remember Mr. Delgado actually saying that to

14   you?

15   A.  No, sir.

16   Q.  Okay.  But I understood you to say yes.

17        Did he tell you that the money that was found in this

18   vehicle was part of a bigger amount of money?

19   A.  No, sir.

20   Q.  Thank you.

21        Now, when Mr.– —— when you stopped Mr. Delgado —— when

22   you stopped the vehicle, you made contact with the passenger;

23   is that correct?

24   A.  That is correct.

25   Q.  And then you requested, as is routine, driver's license and

Carrasco - Cross by Mr. Velarde

1    proof of insurance; is that correct?

2    A.  That is correct.

3    Q.  Was -- were those items furnished to you then and there by

4    the driver of the vehicle?

5    A.  He provided me with his driver's license.  And then he

6    explained to me that it was a rental car, so he didn't have

7    insurance paperwork.

8    Q.  Okay.  Fine.  Did the driver of the vehicle get out to

9    retrieve documents from the rear hatchback?

10   A.  No, sir.

11   Q.  Okay.  Then at a certain point you directed yourself to the

12   passenger; is that correct?

13   A.  That is correct.

14   Q.  And you asked the passenger where they were doing?

15   A.  Yes, sir.

16   Q.  Before anything happens, okay, before you even go to the

17   rear, you asked him, Where are you going, correct?

18   A.  Correct.

19   Q.  And then the passenger stated that they were going to Chase

20   Bank, correct?

21   A.  Correct.

22   Q.  And there's a Chase Bank just down the street on Mesa,

23   maybe two major streetlights from where you stopped them.

24   Would you agree with me?

25   A.  Yes, sir.

Carrasco - Cross by Mr. Velarde

1    Q.  The passenger also told you that he was going to Mexico

2    City, correct?

3    A.  Excuse me.  I didn't hear you.

4    Q.  Mr. Delgado told you that he was en route to Mexico City;

5    is that correct?

6    A.  That is correct.

7    Q.  You stated that the driver, Mr. Rojas -- Mr. Pimentel --

8    was driving him to the airport after going to the bank; is that

9    correct?

10   A.  That is correct.

11   Q.  Then he stated that they were going to his office.  But

12   before that he stated they were going to his office after the

13   bank; is that correct?

14   A.  That is correct.

15   Q.  After you obtained these responses from Mr. Delgado, that's

16   when he gets out of the vehicle and he goes and opens up the

17   rear hatchback; is that correct?

18   A.  No, sir.

19   Q.  Who opened up the rear hatchback?

20   A.  Mr. Delgado.

21   Q.  Okay.  But he did open it.  So you inquired about the bags

22   in the back, correct?

23   A.  That is correct.

24   Q.  And he explained to you that two of the bags were his?

25   A.  At that time, no.

1    Q.  Pardon me?

2    A.  At that specific time when he was retrieving his ID, no,

3    sir.

4    Q.  I'm not concerned about that.  This is what I'm concerned

5    about.  He told you that there was currency in the red bag?

6    A.  Yes, sir.

7    Q.  And he stated that his administrator was going to be at

8    Chase Bank to assist with the deposit of the money, his

9    administrator.

10   A.  I don't remember if he said his administrator, but an

11   administrator was going to be there.

12   Q.  Well, would it -- if I give you the report will it refresh

13   your recollection?

14   A.  Yes, sir.

15           MR. VELARDE:  May I approach, Your Honor?

16           THE COURT:  No, no, no.  Take his word for it.  It's

17   there.

18   BY MR. VELARDE:

19   Q.  Okay.  This report clearly says the following, and I'll

20   share this with -- with you, for the benefit of the Government

21   who is reading the report.

22           Paragraph Number 25:  "Delgado stated that his

23   administrator was going to be at Chase Bank to assist with the

24   deposit of the money."

25           That's in your report.  And if it's in your report

Carrasco – Cross by Mr. Velarde

```
1    that's true, correct?

2    A.  That is correct.

3    Q.  And then finally at paragraph 32 again you note, "I spoke

4    to Delgado again, and he stated that the driver -- the driver

5    was going to open up a bank account at Chase Bank, and he was

6    having his administrator assist with the account."

7             That's in your report; is that correct?

8    A.  Yes, sir.

9    Q.  And if it's in the report it's true?

10   A.  Correct.

11            MR. VELARDE:  Thank you very much.

12            THE COURT:  Any further questions for this witness?

13            MS. KANOF:  No, Your Honor.  May he be excused,

14   Your Honor?

15            THE COURT:  You may be excused, sir.  You're free to

16   leave.

17            THE WITNESS:  Thank you, sir.

18            THE COURT:  Call your next witness.

19            MS. ARREOLA:  Your Honor, the Government calls Agent

20   Thomas Justice.

21            (Witness duly sworn.)

22            THE WITNESS:  I do.

23            THE COURT:  You may proceed.

24            MS. ARREOLA:  Thank you, Your Honor.

25
```

Justice – Direct by Ms. Arreola

1      THOMAS JUSTICE, GOVERNMENT'S WITNESS, SWORN

2                    DIRECT EXAMINATION

3   BY MS. ARREOLA:

4   Q.  Please state your name for the record.

5   A.  It's Thomas Justice.

6   Q.  How are you employed, sir?

7   A.  I'm a special agent with the Department of Homeland

8   Security.

9   Q.  How long have you been a special agent with the Department

10  of Homeland Security?

11  A.  Since 2002.

12  Q.  When you first joined the Department of Homeland

13  Security -- can we say DHS for short?

14  A.  Yes.

15  Q.  When you first joined DHS, were you assigned to any

16  particular group?

17  A.  Yes, ma'am.  I was assigned to a financial investigative

18  group in the SAC Miami office.

19  Q.  What types of activity did you investigate when you were a

20  member of that group?

21  A.  We did money pickups that related to narcotics trafficking

22  for South America.

23  Q.  How long did you remain in that group?

24  A.  I was in that group for three years.

25  Q.  What happened after three years?

Justice – Direct by Ms. Arreola

1   A.  After three years, I transferred to the SAC Atlanta

2   investigative office with HSI.

3   Q.  How long did you remain there?

4   A.  Three years.

5   Q.  So you left in approximately what year?

6   A.  2000- –– when did I leave Atlanta or...

7   Q.  Yes, sir.  When did you leave Atlanta?

8   A.  2008.

9   Q.  When you were in Atlanta, were you assigned to any

10  particular group?

11  A.  Financial investigations.

12  Q.  What types of activity did you investigate?  Or what were

13  your duties and responsibilities as a member of that group?

14  A.  Part of my duties were financial investigations related to

15  the Bank Secrecy Act.

16       I also did cases related to money pickups, narcotics

17  trafficking cases.

18       I also worked with our state and local counterparts

19  for road interdiction cases, where they would stop vehicles

20  with currency or narcotics, and they would contact us for

21  assistance in the investigation.

22  Q.  I'd like to direct your attention, Agent, to

23  September 2007, when you were still in the Atlanta group.

24       During that time, did you become involved in an

25  investigation of someone named Marco Delgado?

1    A.  Yes, ma'am, I did.

2    Q.  Can you take a look around the courtroom and tell us if you

3    see him here?

4    A.  Yes, ma'am, I do.

5    Q.  Can you tell us where he is seated and identify an article

6    of clothing that he is wearing?

7    A.  He's seated to the right (indicating), and he's wearing

8    a -- I believe that's a dark blue suit with a striped tie.

9           MS. ARREOLA:  Your Honor, may the record reflect that

10   the witness has identified the Defendant?

11          THE COURT:  The record will so reflect.

12   BY MS. ARREOLA:

13   Q.  How did you become involved in the investigation of

14   Mr. Delgado?

15   A.  One of our local departments, the Carroll County Sheriff's

16   Office, had given me a call that they had stopped a vehicle on

17   I-20 westbound with approximately $1 million in U.S. currency.

18   And they had requested I come out and assist with the

19   investigation.

20   Q.  Was that unusual, for a Carroll County Sheriff's Office to

21   contact you regarding a stop?

22   A.  No, it was not.

23   Q.  Why not?

24   A.  I had worked with them on previous cases where they had

25   stopped vehicles that had hidden traps, narcotics, currency.

Justice — Direct by Ms. Arreola

1    Q.  How did you respond to the call?

2    A.  I drove out there that evening.

3    Q.  What happened when you arrived?

4    A.  When I arrived, I requested -- I requested assistance from

5    another Special Agent Jansen Blackman.  He also responded.  And

6    also a Task Force Officer Ed Christian.  He responded to the

7    Carroll County Sheriff's Office.

8            When we got out there, we met with the Carroll County

9    Sheriff's Department Deputies Chad Sheriff and Dave Elliott,

10   who had brought in an individual by the name of Victor Pimentel

11   to the sheriff's department for us to interview.

12   Q.  Did you interview Mr. Pimentel?

13   A.  Yes, I did.

14   Q.  Did he agree to cooperate with law enforcement?

15   A.  Yes, he did.

16   Q.  What investigative steps, if any, did you decide to take?

17   A.  Once we knew that Mr. Pimentel was going to cooperate with

18   us, to assist us, we decided to do a controlled delivery to

19   El Paso.  That's where Mr. Pimentel had indicated the currency

20   was going to go, to El Paso, and the end destination of Mexico.

21   Q.  Can you briefly describe for the jury logistically what

22   happened next?

23   A.  It was late into the evening, so the next day we went to

24   the office.  We coordinated with the SAC El Paso office to get

25   assistance from them.  We flew out to El Paso with myself,

Justice – Direct by Ms. Arreola

1    Group Supervisor Brian Ramsey, the Carroll County Sheriff's

2    deputies, and Ed Christian.  We all flew out to El Paso with

3    the currency to do the controlled delivery.

4    Q.  Did you participate in the controlled delivery here in

5    El Paso?

6    A.  Yes.

7    Q.  And just so the record is clear, was that a controlled

8    delivery to Mr. Delgado?

9    A.  Yes, that's where it was delivered to.

10   Q.  What role, if any, did you play in the controlled delivery?

11   A.  Basically, just assisted the Case Agent Josh Fry with

12   surveillance.

13   Q.  All right.  What happened after the controlled delivery?

14   A.  After the money was delivered to Mr. Delgado, he was

15   brought back to the SAC El Paso office where he was

16   interviewed.

17   Q.  Did you participate in that interview?

18   A.  Yes, I did.

19   Q.  Who was present during the interview?

20   A.  Myself; Group's Supervisor Brian Ramsey, from the Atlanta

21   field office; Jose de Jesús, who was a special agent from the

22   SAC El Paso office; myself; and then there was other agents

23   that came in and out of the interview.

24   Q.  Before Mr. Delgado was interviewed, did you read him –– or

25   was he read his *Miranda* rights?

Justice – Direct by Ms. Arreola

1   A.  Yes, he was.

2   Q.  Did he agree to waive those rights and speak without the

3   presence of an attorney?

4   A.  Yes.  He advised us that he was an attorney, he completely

5   understood his rights, and he wanted to cooperate.

6   Q.  Okay.  Was the interview conducted in English or Spanish?

7   A.  Both English and Spanish, but predominantly Spanish.

8   Q.  Why was that?

9   A.  I'm not sure.  Delgado's choice -- I'm not sure why he

10  chose to do it that way, but that's the way it was done.

11  Q.  But it was his decision?

12  A.  Yes.  He was comfortable speaking Spanish to the other

13  agent.

14  Q.  Are you fluent in the Spanish language?

15  A.  No, I'm not.

16  Q.  And is your group supervisor, Brian Ramsey, fluent in

17  Spanish?

18  A.  Not fluent.

19  Q.  Who translated during the interview?

20  A.  Special Agent Jose de Jesús.

21  Q.  And during the interview, did he at any -- did you later

22  learn whether Mr. Delgado does speak English?

23  A.  Yes.  Mr. Delgado speaks fluent English.

24  Q.  And how do you know that?

25  A.  Because during the meeting -- or during the interview he

Justice – Direct by Ms. Arreola

 1    spoke English also.

 2    Q.  During the interview was Special Agent de Jesús translating

 3    throughout the interview as it progressed?

 4    A.  Yes.

 5    Q.  At any time did -- during the interview did Mr. Delgado

 6    stop him and say, Oh, you translated that incorrectly?

 7    A.  No.

 8    Q.  Were you taking notes during the interview?

 9    A.  Yes, ma'am.

10    Q.  Let's turn to what Mr. Delgado said during the interview.

11    What, if anything, did he say?

12    A.  Mr. Delgado basically started with how he got involved with

13    this $1 million that we had just seized from him.

14            He explained that in the late '90s he somehow was able

15    to get on the fundraising campaign of President Vicente Fox's

16    campaign.  And through that relationship, he was able to -- or

17    he became friends with Lilian de la Concha, which at the time I

18    believe was the president's wife.

19            From there, he sort of fast-forwarded to 2006, where

20    he explained to us that he had -- eventually, he became

21    romantically involved with Lilian de la Concha, when she was

22    then the ex-wife of the president.

23            He explained to us that, through Lilian, she

24    introduced him to other business associates that she had in

25    Mexico that needed his services or his assistance.

Justice – Direct by Ms. Arreola

1            He explained to us -- there were several different
2    meetings they had, but he explained to us that during one of
3    the meetings they discussed an issue with some extradition that
4    some of their clients that they had had problems with, and they
5    wanted to know if Mr. Delgado could slow the extradition
6    process down.
7            As part of that, one of the individuals that
8    Ms. Lilian de la Concha had introduced them to, one of their
9    concerns was if they got involved with slowing this extradition
10   down, if it didn't go the way they wanted, that it could be
11   very dangerous or cost them their lives for being involved with
12   it.
13   Q.  What does that mean, to slow down an extradition process?
14   A.  Well, I'm assuming that they wanted to -- I mean the
15   extradition was already ordered, but they were trying to
16   basically slow that person from being extradited from Mexico to
17   the United States.
18   Q.  And that would be to face some sort of criminal
19   prosecution?
20   A.  Face criminal prosecution in the United States, yes, ma'am.
21   Q.  What else, if anything, did Mr. Delgado say about this
22   group of individuals who were interested -- or who had clients
23   who were interested in slowing an extradition?
24   A.  These individuals also said they had clients that had large
25   sums of money that they needed to move from the United States

1    to Mexico.

2    Q.  Did he say anything about a bond?

3    A.  Yes.  There was also a treas- -- a U.S. Treasury bond that

4    they had that was -- I don't remember the year.  It was a very

5    old treasury bond, and they wanted to know if Mr. Delgado could

6    negotiate the bond and actually get the cash value of it.

7             Mr. Delgado told us at that time that he still had the

8    bond, and he suspected it was a fraudulent bond.

9    Q.  Did he indicate that these were -- and when you say "they"

10   wanted him to cash a bond, was this the same group of people

11   who wanted him to move the money?

12   A.  Yes, the same individuals.  The business associates that

13   Lilian de la Concha had introduced them to.

14   Q.  And these were also the same people who wanted him to slow

15   an extradition?

16   A.  Yes, ma'am.

17   Q.  Did Mr. Delgado ever say anything about an inheritance?

18   A.  He said that some of the individuals had money that they

19   needed to move that was a result of an inheritance in gambling

20   proceeds.

21   Q.  Did he say that the money that you seized, the million

22   dollars that you seized, that that was from an inheritance?

23   A.  No, he did not.

24   Q.  As far as you can recall, is there anything else you can

25   remember that Mr. Delgado said during the interview?

1    A.  Just that one of the individuals had a large sum of

2    currency, or monies that they needed to move.  It was 600- or

3    $700 million in currency that needed to be moved from the

4    United States to Mexico.

5    Q.  Anything else?

6    A.  No, ma'am.

7    Q.  After the interview, did you generate a report documenting

8    what Mr. Delgado had said during the interview?

9    A.  Yes, ma'am, I did.

10            MS. ARREOLA:  Your Honor, may I show the witness

11   what's been marked for identification as Government's Exhibit

12   Number 84?  We're not going to seek to introduce it at this

13   time.  I just want to set the foundation.

14            THE COURT:  Counsel?

15            I need to see it.

16            MR. VELARDE:  I need to see it.

17            THE COURT:  It's a redacted report.  I need to –– it

18   has not been admitted.

19            Have you seen it, Counsel?

20            MR. VELARDE:  Yes, Your Honor.

21            THE COURT:  Approach.

22            (Bench discussion outside the hearing of the jury.)

23            THE COURT:  You've all been provided with this?

24            MR. VELARDE:  Yes, sir, we've been provided with that,

25   and we've noted an objection.

Justice – Direct by Ms. Arreola

1            MR. ESPER:  We objected to it earlier, when we were

2       going through the exhibits.

3            THE COURT:  I know.  State your objection.

4            MR. VELARDE:  Your Honor, the objection is cumulative.

5       It's hearsay.  And the witness -- there's nothing to indicate

6       that this witness has -- doesn't have a recollection about

7       what's in that report.

8            So there's no need for him to be refreshed or anything

9       of that nature.  Nor has he been impeached, so there's nothing

10      for him to clarify.

11           MS. ARREOLA:  Your Honor, we're just setting the

12      foundation.  We're not going to try to admit it today.  But

13      Special Agent Fry will testify that he -- when he did the

14      arrest of November 2012, he sat down with Mr. Delgado.  He

15      showed him this report, and they walked through each line that

16      is not redacted.

17           Mr.- -- Agent Fry read each line -- or read each

18      paragraph and said to Mr. Delgado, Is this true, or, Did you

19      say that, or some variation of that.

20           THE COURT:  Well, you laid the foundation, so I'm not

21      going to admit it at this time.

22           MS. ARREOLA:  Right.  Right, Your Honor.

23           THE COURT:  Okay.

24           MS. ARREOLA:  Thank you.

25           (End of bench conference.)

```
 1              THE COURT:  You may continue.
 2   BY MS. ARREOLA:
 3   Q.  Agent Justice, I'm going to ask you to take a look at
 4   what's been marked for identification as Government's Exhibit
 5   84.
 6              Do you see that on your screen?
 7   A.  Yes, ma'am, I do.
 8   Q.  Do you recognize this document?
 9   A.  Yes, ma'am.  It's a Report of Investigation that I
10   generated and wrote.
11   Q.  Okay.  And does -- this Report of Investigation, does it
12   contain the -- your recorded recollection of your interview
13   with Mr. Delgado?
14              And I know you can only see the first screen.  But if
15   you wanted to take a look at the full document, you can take a
16   look at the binder that's in front of you.
17   A.  Okay.
18              MS. ARREOLA:  Your Honor, may I approach the witness
19   to provide --
20              THE COURT:  You may.
21              I presume it's only on this monitor?
22              MS. ARREOLA:  Pardon me, sir?
23              THE COURT:  I presume it's only on this monitor?
24              MS. ARREOLA:  Yes, sir.
25              MS. KANOF:  Yeah, it's blacked out.
```

Justice – Direct by Ms. Arreola

1    A.  Yes, ma'am.  This is my Report of Investigation.

2    BY MS. ARREOLA:

3    Q.  Okay.  And does it contain some redactions?

4    A.  Yes, ma'am, it does.

5    Q.  Okay.  And is the section that's not redacted --

6    A.  Yes, ma'am.

7    Q.  -- can you describe what that -- can you briefly describe

8    what's there?  Without describing the contents, can you just

9    explain what it is?

10   A.  It is what I -- it's -- it's basically the interview of

11   Mr. Delgado non-verbatim.

12   Q.  Okay.  And you generated that after the interview?

13   A.  Yes.

14   Q.  When you generated that report, was your memory fresh?

15   A.  Yes, ma'am.

16   Q.  By the way, does -- that interview summary, does it contain

17   other information that was described during the interview that

18   you don't have a present recollection of?

19   A.  Yes, it does.

20   Q.  Is that because this occurred several years ago?

21   A.  Close to six years ago, yes, ma'am.

22   Q.  Okay.  After the interview of Marco Delgado, was there a

23   second controlled delivery?

24   A.  Yes, ma'am.

25   Q.  Did you participate in that?

Justice — Direct by Ms. Arreola

1    A.  Yes, I did.

2    Q.  Generally speaking, what was your role in that controlled

3    delivery?

4    A.  It was very minimum.  I was assisting the case agent with

5    surveillance.

6    Q.  Did Mr. Delgado agree to participate in that controlled

7    delivery?

8    A.  Yes, he did.

9    Q.  Can you briefly describe for the jury what his role was in

10   that controlled delivery?

11   A.  His role was to basically set up the phone calls to the

12   individuals in El Paso.  They were waiting to receive the money

13   to transport it to Mexico.

14   Q.  Did he play any additional role, or you don't recall?

15   A.  I don't recall anything additional.

16   Q.  Okay.  I want to fast-forward to your next meeting with

17   Mr. Delgado after that second controlled delivery.

18        Did you have -- where was that?

19   A.  We did have a subsequent meeting with Mr. Delgado in

20   Atlanta, Georgia.

21   Q.  What was the purpose of that meeting?

22   A.  It was to continue gaining Mr. Delgado's cooperation with

23   the cases that we were trying to build against the individuals

24   that he had introduced -- or had described in this interview

25   that I had taken.

Justice – Direct by Ms. Arreola

1    Q.  Who was present during that meeting?

2    A.  Myself, Group Supervisor Brian Ramsey, and Alex Ascencio.

3            Another reason we were doing the meeting was we wanted

4    to introduce Mr. Delgado to our undercover agent who we wanted

5    Mr. Delgado to introduce to the individuals in Mexico.

6    Q.  Approximately how long after the two controlled deliveries

7    did this meeting take place in Atlanta?

8    A.  Within -- I don't know the exact date, but probably within

9    two to three months, maybe less.

10   Q.  What was explained to Mr. Delgado at that meeting about

11   what investigative steps were going to take place?

12   A.  Well, we told him our intention was to try to build a

13   criminal investigation against the individuals in Mexico that

14   were wanting to move these monies from -- through the

15   United States into Mexico.

16           We also told him that our intention to try to get the

17   undercover agent introduced was to remove him from the picture,

18   where he wouldn't have to be involved in the actual

19   negotiations of any of the deals we were trying to set up.

20   Q.  Did you explain to Mr. Delgado what the end goal was for

21   setting up or infiltrating this organization?

22   A.  Yes.  We -- he was advised that our end goal was to

23   create -- to work criminal investigations, criminal cases,

24   where we could actually indict these individuals for money

25   laundering.

Justice – Direct by Ms. Arreola

1   Q.  At any point during this meeting, did Mr. Delgado say, You

2   guys got this wrong.  This is legitimate money.  These are good

3   people.

4           Did he give you any indication of that during this

5   meeting?

6   A.  No.

7   Q.  Now after this Atlanta meeting, did Mr. Delgado ever give

8   you any information about any money pickups?

9   A.  No.

10  Q.  Did he ever call you about any money pickup in Chicago?

11  A.  No.

12  Q.  Did he ever give up any useful information?

13  A.  Me personally, no.

14          MS. ARREOLA:  Your Honor, may I have a moment?

15          THE COURT:  You may.

16  BY MS. ARREOLA:

17  Q.  I have a follow-up question about that first interview that

18  you did of Marco Delgado on the day of his arrest.

19          Did he mention to -- anything to you about individuals

20  on a treasury list?

21  A.  Yes, he did.

22  Q.  What, if anything, did he say?

23  A.  Well, he was -- it was in relation to -- relationship to

24  the extradition orders.  He said that he was provided a list of

25  names -- I don't recall the specific names, but he was -- he

Justice – Direct by Ms. Arreola

1  was advised a list of names, that when he did his research,

2  they were identified on a U.S. Treasury list as, basically,

3  narcotic kingpins.

4  Q.  And did –– how did this relate to the individuals that had

5  been introduced to him through Lilian de la Concha?

6  A.  Well, they were –– this was related to the extradition,

7  what they needed to slow down.

8  Q.  Okay.

9  A.  The list of names that he provided.

10  Q.  Okay.  Thank you.

11         I would like to now turn your attention to what has

12  already been admitted into evidence as Defense Exhibit 2.

13         THE COURT:  Defense Exhibit 2?

14         MS. ARREOLA:  Your Honor –– okay.

15  BY MS. ARREOLA:

16  Q.  Have you seen these records before today?

17  A.  There's nothing on my screen yet.

18         MS. ARREOLA:  Your Honor, the Government requests to

19  publish to the jury.

20         THE COURT:  Which one is it?  Let me see it first.

21  What was Defense Exhibit 2?

22         MR. VELARDE:  The toll records.

23         MR. ESPER:  The telephone toll records, Your Honor.

24         MS. KANOF:  Your Honor, I stipulated to the

25  custodian ––

```
 1              THE COURT:  There's a stipulation?

 2              I don't have Defense Exhibit 2 being admitted.

 3              MS. ARREOLA:  Your Honor, it was on the stipulation

 4    that the parties signed.

 5              THE COURT:  Well, I don't have a stipulation.

 6              MS. ARREOLA:  It's Government's Exhibit 85,

 7    Your Honor.

 8              THE COURT:  I have Government's Exhibit 85, and I only

 9    have the first page up here.  Government's Exhibit 85 has been

10    admitted, so I think you should refer to it as Government's

11    Exhibit 85.

12              Okay.  You may publish.

13    BY MS. ARREOLA:

14    Q.  Agent Thomas [sic], do you see -- or excuse me.

15              Agent Justice, do you see that these appear to be AT&T

16    records?

17    A.  Yes, ma'am, they are.

18    Q.  Had you seen these records before today?

19    A.  Yes, ma'am, I have.

20    Q.  Did you see them when you met with the U.S. Attorney's

21    Office?

22    A.  Yes, ma'am.

23    Q.  On these records, do you see that the originating number

24    for all of these -- for many of these appears to be a 915

25    number ending in 2985?
```

1    A.  Yes, ma'am, I do.

2    Q.  Do you know whose number that is?

3    A.  I was advised by your office that that was Marco Delgado's

4    number.

5    Q.  I'm going to direct your attention to page 11 of that

6    document.

7          Do you see a 404 number that I just highlighted?

8    A.  Yes, ma'am.

9    Q.  And that number is 404-392-5199?

10   A.  Yes, ma'am, it is.

11   Q.  Do you recognize that number?

12   A.  That was my government-issued cell phone number at the time

13   when I worked in -- at the Atlanta field office.

14   Q.  Approximately how long did you have that phone number?

15   A.  Probably just a little over three years, maybe.  A few

16   months after I transferred to Washington I still had it.

17   Q.  Okay.  And I'm going to highlight the rest of that line.

18          On July 23rd, 2008, at 12:18 p.m., does that record

19   indicate that there appears to have been a phone call at

20   12:18 p.m. from the Defendant's phone number for your phone?

21   A.  Yes, ma'am, it does.

22   Q.  And does that indicate that the purported elapsed time of

23   the call was about five seconds?

24   A.  Yes, ma'am.

25   Q.  I'm going to also direct your attention to a call that same

Justice - Direct by Ms. Arreola

1   day at 12:28 p.m. for -- also from the Defendant's phone number

2   to your phone.

3           Do you see that call?

4   A.  Yes, ma'am.

5   Q.  And do you see that call appears to have been a four-second

6   call?

7   A.  Yes, ma'am.

8   Q.  I'm also going to direct your attention to page 10 of that

9   document.

10          Do you see two other calls about 10:00 a.m., also

11   originating from the Defendant's phone number to your phone

12   number?

13   A.  Yes, ma'am, I do.

14   Q.  And one of those calls was 38 seconds, and the other one

15   was 4 minutes and 29 seconds?

16   A.  Yes, ma'am.

17   Q.  And we saw some other calls, as well, to your phone number

18   during that time frame on those records, correct?

19   A.  Yes.

20   Q.  Do you remember speaking with the Defendant in 2008?

21   A.  Yes.

22   Q.  Can you describe for the jury basically what was happening?

23   A.  During this time frame, around March or April, I had gotten

24   a notification that I was being promoted to move to Washington,

25   D.C.  When I got my EOD orders, I had 90 days to move, and it

Justice - Direct by Ms. Arreola

1  was during the June and July time frame that I was moving to

2  Washington.

3          So I was in the process of transferring cases, closing

4  cases out, house-hunting trips.  Just basically preparing --

5  sort of winding down at the SAC Atlanta office so that I could

6  relocate to Washington, D.C.

7  Q.  And what would have happened in those calls?  Do you

8  remember any of those calls?

9  A.  Not specifically.  I don't know -- some of these calls

10 could be either hangups, or he possibly left voice mails.  I

11 don't recall any specific conversations.

12          I -- toward the end -- up to this point Mr. Delgado

13 had never provided me any useful information, and I ignored a

14 lot of his calls.

15 Q.  Was there any other reason for ignoring his calls?

16 A.  Just because he didn't have anything useful that I wanted

17 to talk about, and the fact that I was relocating.

18          I did have one -- one call I do -- probably the only

19 call I really remember having a conversation with him -- was

20 also in July, where I told Mr. Delgado that I had -- was

21 transferring to Washington, D.C., and that I would no longer be

22 taking his calls, and that he could -- would still continue to

23 work with Alex Ascencio, if he had any information to provide

24 to us.

25 Q.  What, if anything, did -- what, if anything, did

Justice – Direct by Ms. Arreola

1    Mr. Delgado say in response to that information?

2    A.  It was a cordial conversation.  I remember him saying,

3    Congratulations on your -- you know, your promotion.

4         And I don't remember why he did this, but I do

5    remember him, because I thought it was strange -- him saying

6    that he was going to tell Victor that I had gotten in trouble,

7    or some kind of disciplinary issue, that I wouldn't be dealing

8    with the case anymore.

9         And I really didn't care what he told Victor or what

10   he thought, but I'm not sure what the train of thought was when

11   he said that.

12   Q.  Well, at the time that Mr. Delgado and Mr. Pimentel had

13   begun cooperation, was Mr. Pimentel's cooperation made known to

14   Mr. Delgado?

15   A.  No.  We never disclosed to Delgado that Victor Pimentel was

16   cooperating with us.

17   Q.  Did Mr. Delgado ever give you any information about a money

18   pickup?

19   A.  No, he did not.

20   Q.  And did he ever tell you about any money pickups in

21   Chicago?

22   A.  No, he did not.

23          MS. ARREOLA:  Your Honor, no further questions.

24          THE COURT:  Mr. Velarde.

25          MR. VELARDE:  Yes, sir.  Thank you.

Justice – Cross by Mr. Velarde

1                          CROSS-EXAMINATION

2   BY MR. VELARDE:

3   Q.  Agent Justice, let me pick up at the tail end of your

4   testimony, with regards to that portion that relates to the

5   transfer notice --

6   A.  Yes, sir.

7   Q.  -- that you received sometime in March/April.

8            Would it be safe to say that once you got that

9   transfer notice your concentration was mainly in transferring

10  up -- transferring out your cases to other people, because you

11  were going to make the move to Washington, D.C.?

12  A.  Yes, sir.  I was moving in a different direction in my

13  career.

14  Q.  Was the money seizure in Atlanta, that you finished

15  testifying about, a case that your office in Atlanta was

16  working on?

17  A.  Yes.  That was an Atlanta investigation.

18  Q.  Once you decided to transfer out, did you also make it a

19  point -- sir, did you make it a point to transfer out that case

20  to another agent?

21  A.  My supervisor did transfer it to another case agent in the

22  field office.

23  Q.  And who was that?

24  A.  I believe it was Jeff Walton.  I'm not 100 percent sure on

25  that, but I believe it was Special Agent Jeff Walton.

1   Q.  And when was the case transferred out to Mr. Walton, to

2   Agent Walton?

3   A.  That, I do not know.  It would have been after I left,

4   which would have been at the end of July, maybe Aug- –- in

5   August, sir.

6   Q.  Did you make it a point to advise Mr. Delgado to

7   communicate or conduct this visits with your office through

8   Special Agent Walton?

9   A.  No, I did not.

10  Q.  So when Mr. Delgado was calling you between late March,

11  early April, and all the way up until July when you were

12  supposed to leave, Mr. Delgado was, in fact, texting you and

13  leaving voice messages for you, correct?

14  A.  He was not texting me.  I had –- the phones we had at the

15  time didn't –-

16  Q.  Pardon me.

17  A.  We had Nextels.  I don't believe they texted.

18  Q.  Okay.  But he was leaving messages?

19  A.  Possibly, yes.

20  Q.  Did you document any of these contacts that Mr. Delgado had

21  with your office?

22  A.  No.

23  Q.  Now let me go back, then, to the start of the case in

24  September of 2007.

25  A.  Yes, sir.

Justice - Cross by Mr. Velarde

1    Q.  Were you the case agent at that point?

2    A.  Yes, sir.  For the Atlanta portion, yes, sir.

3    Q.  Okay.  Was there another portion other than Atlanta?

4    A.  Well, when you do the controlled delivery, the controlled

5    delivery portion of the case is the office that -- wherever the

6    money or drugs or something is being delivered.  So there was

7    another portion, which was SAC El Paso.

8    Q.  And who was the case agent here in El Paso?

9    A.  Josh Fry.

10   Q.  Okay.  So you were the case agent in Atlanta.  And --

11   A.  Yes, sir.

12   Q.  -- Agent Fry was the agent here.

13        Did you stay in contact with him?  Did you generate

14   any correspondence back and forth regarding this major

15   investigation?

16   A.  Regarding this $1 million seizure?

17   Q.  Yes, sir.

18   A.  Not that I recall.

19   Q.  Okay.  So the right hand -- or the left hand wasn't talking

20   to the right hand.  That's safe to say?  Atlanta wasn't talking

21   to El Paso?

22   A.  I'm not sure that that's 100 per- -- there's other agents

23   involved.  For example, Alex Ascencio.  Alex Ascencio --

24   Q.  I'm going to get to him.

25   A.  Okay.

1    Q.  But you personally -- you're the case agent.  You're not

2    talking to the case agent here during that time period?

3            MS. ARREOLA:  Your Honor, can we have some

4    clarification on what time period?

5    BY MR. VELARDE:

6    Q.  From the date of the seizure, September 2007, up until

7    July, when you -- did you leave Atlanta?

8    A.  It was -- I believe it was towards the last new weeks of

9    July.  I don't know for sure, sir.

10   Q.  July 2008?

11   A.  Yes, sir.

12   Q.  Between that time frame did you talk to Agent Fry?

13   A.  I'm sure I did.

14   Q.  Did you tell Agent Fry that Delgado was trying to get in

15   touch with you?

16   A.  No.

17   Q.  Thank you.

18           When the seizure was carried out in Atlanta by the

19   Carroll County sheriff's deputy, were you aware that this money

20   was being picked up there in Atlanta?  Was your office aware of

21   that?

22   A.  Was I aware?

23   Q.  Was the office -- prior to the seizure, was your office --

24   A.  No, sir.  No, sir, I was not aware of it.

25   Q.  Subsequent to the seizure, some -- some persons were

Justice - Cross by Mr. Velarde

1    identified to your office; is that correct?

2    A.  (No verbal response.)

3    Q.  The people that handled the money in Atlanta, were those

4    people identified to you?

5              MS. ARREOLA:  Your Honor, which people?

6    BY MR. VELARDE:

7    Q.  The people in Atlanta that made the delivery, the people

8    that were handling the money.

9    A.  That passed the money off to Victor Pimentel?

10   Q.  Yes, sir.

11   A.  They were never fully identified.

12   Q.  Okay.  When you arrested Mr. Pimentel, you testified that

13   he agreed to cooperate with you.

14   A.  Yes, sir, he did.

15   Q.  He didn't give you the name of Pedro Meneses and/or Isidro

16   Vega, did he?

17   A.  Without looking back at my notes, I would not be able to

18   tell you that, sir.

19   Q.  If your report doesn't reflect -- well, your re- -- in your

20   report, you note that you interviewed Mr. Pimentel.

21   A.  Yes.

22   Q.  And that Mr. Pimentel made a statement to you about his

23   activities in connection with this money?

24   A.  Yes, sir.

25   Q.  The report that I have read does not make any reference to

 1   him saying that he had actual contact to Pimentel.

 2          MS. ARREOLA:  Objection, Your Honor.  Counsel is

 3   testifying, and it's hearsay.

 4          THE COURT:  Well, I'm going to permit it for the sake

 5   of time.

 6   A.  Could you repeat?  I'm sorry.

 7   BY MR. VELARDE:

 8   Q.  Okay.  Your report, as it relates to the interview of

 9   Victor Pimentel --

10   A.  Uh-huh.

11   Q.  -- does not touch upon any disclosure by Mr. Pimentel

12   telling you that he was in direct contact with Pedro

13   Meneses-Mendoza and Isidro Vega?

14   A.  Without looking at my notes or report, I don't know.  But

15   what I have is redacted.  This one in front of me is redacted.

16   It does not have Victor Pimentel's part of the interview.

17          MR. VELARDE:  Your Honor, this is going to be a

18   lengthy cross-examination, so I would like to have the

19   opportunity for him to refresh his recollection with the

20   report.

21          THE COURT:  Go ahead.  Give it to him.

22          (Report handed to witness.)

23   A.  If you would, just repeat the two names, I'll try to

24   answer, sir.

25

Justice – Cross by Mr. Velarde

1    BY MR. VELARDE:

2    Q.  Okay.  Did -- Mr. Pimentel did not disclose to you the fact

3    that he had had actual physical contact with Pedro

4    Meneses-Mendoza and Isidro Rubio there in Atlanta prior to the

5    pickup and after the pickup of the money?

6    A.  He had contact via cell phone.

7    Q.  He didn't tell you that he had actual physical contact with

8    them, correct?

9    A.  No, sir.

10   Q.  Thank you.

11   A.  Yes, sir.

12            THE COURT:  You may approach.

13            MR. VELARDE:  Thank you, Your Honor.

14   BY MR. VELARDE:

15   Q.  Now when you interviewed Mr. Delgado here in El Paso he

16   did, in fact, tell you that those individuals were calling him

17   and that they were en route to Laredo, Texas; is that correct?

18   A.  Yes.  I believe those were the names that were in my

19   report, yes, sir.

20   Q.  And on your instructions, you told -- you directed

21   Mr. Delgado to tell these two individuals who were driving back

22   to Laredo, Texas, to come to El Paso, is that correct, because

23   you wanted to identify them?

24   A.  I don't know if they were already coming to El Paso.  We

25   did want to identify them, yes, sir.  I don't recall telling

1    them to go one way or the other.

2    Q.  Were you present when Mr. Delgado was calling those two

3    individuals?  Or were you made aware that Mr. Delgado was

4    calling two individuals so that they would come to El Paso?

5    A.  I was in the presence of some of the conversations with

6    those individuals, but I don't recall those exact conversations

7    sir.

8    Q.  Did two individuals ultimately come to El Paso?

9    A.  Yes, they did.

10   Q.  Was Alex -- Special Agent Alex Ascencio part of this group

11   that was interviewing Mr. Delgado?

12   A.  No, sir.

13   Q.  Okay.  So it was you, from Atlanta, and who else?

14   A.  Group Supervisor Brian Ramsey.

15   Q.  Okay.

16   A.  Jansen Blackman.  I'm trying to think of -- and then the

17   local El Paso -- de Jesús.  Josh may have come in and out of

18   the -- some people came in and out of the interview room, but

19   those are the core people.

20   Q.  And who was the one that was engaging Mr. Delgado in

21   conversation?

22   A.  I would say predominately de Jesús.

23   Q.  Agent de Jesús?

24   A.  Yes, sir.

25   Q.  And was this being conducted, you said, in Spanish?

1    A.  Yes, sir.

2    Q.  So you wouldn't have understood what they were talking

3    about, right?

4    A.  No, sir, I would not.

5    Q.  Now the interview that Mr. Delgado shared with your group

6    here in El Paso, following the -- the arrest in September

7    involved discussion about the many people that were involved in

8    this transaction; is that correct?

9    A.  Yes.

10   Q.  He identified Lilian de la Concha?

11   A.  Yes.

12   Q.  He identified Francisco Paco Fernandez?

13   A.  Yes.

14   Q.  He also identified, of course, Pedro Meneses-Mendoza and

15   this other gentleman, correct?

16   A.  Yes.

17   Q.  And then he also told you about everything that they were

18   wanting him to do?

19   A.  Yes.

20   Q.  You know, from looking up names on the list --

21   A.  Yes, sir.  He was very forthright.

22   Q.  -- the people that were facing extradition to --

23   A.  Yes, sir.

24   Q.  -- the savings bond.

25             Now, you never heard anything from Mr. Delgado that he

Justice – Cross by Mr. Velarde

1    thought that that money was cartel or the proceeds of illegal

2    activity.  He never told you that?

3    A.  No, he did not.

4    Q.  As a matter of fact, he said that he had been told that

5    this was part of an inheritance amount of money?

6    A.  Yes.  But we told him differently, that it wasn't.

7    Q.  That's what -- that's what he told you that he had been

8    told, correct?

9    A.  Yes.  That is what he said, yes, sir.

10   Q.  And Mr. Delgado, of course, agreed to cooperate with law

11   enforcement and to assist in the subsequent delivery; is that

12   correct?

13   A.  Yes, sir, he did.

14   Q.  And after these two individuals were approached at the

15   hotel here in El Paso, and after they boarded that car and they

16   were en route out of El Paso, they get stopped, they are taken

17   over to DPS.

18        You instructed -- you were part of the group that

19   instructed Mr. Delgado on how to go about securing their

20   release; is that correct?

21   A.  I don't recall that conversation.

22   Q.  You don't recall?

23   A.  No, sir.

24   Q.  How many more meetings did you have with Mr. Delgado

25   following that initial interview here in El Paso?

1    A.  I only recall personally being involved with one other

2    meeting with Mr. Delgado in Atlanta, Georgia.

3    Q.  He traveled all the way to Atlanta?

4    A.  Yes, sir, he did.

5    Q.  Okay.  Was that the only trip he made out there?

6    A.  I'm not sure if he made additional trips.  That's the only

7    trip I recall.

8    Q.  Okay.  And who paid Mr. Delgado to make these trips out

9    there?

10   A.  I'm not sure.  I don't recall if it was the U.S. Government

11   or if he paid out of his own pocket.

12   Q.  If you were the case agent, you wouldn't be able to control

13   over who paid?

14   A.  Yes.  I mean I could put somebody in for travel, yes, sir.

15   Q.  But you don't recall?

16   A.  I just don't recall if we paid for his travel or not.

17   Q.  Agent, the -- did there come a time when you instructed

18   Mr. Delgado to work with Agent Ascencio?

19   A.  Yes.

20   Q.  And when would that have been?

21   A.  That was whenever he came to visit us in Atlanta, Georgia,

22   that first meet where he was introduced to Alex.

23   Q.  Okay.

24   A.  He was working with Alex more than me on the phone calls,

25   because Alex was who he was trying to introduce into this

Justice - Cross by Mr. Velarde

1    organization.

2    Q.  Okay.  And you were made aware of the fact that Agent

3    Ascencio, with the assistance of Mr. Delgado, made direct

4    telephone contact with all these individuals in Mexico?

5    A.  I know they did make contact with some of the individuals.

6    I'm not sure if each -- everybody that we've talked about was

7    contacted.

8    Q.  Were you also made aware of the fact that there was an

9    actual meeting that took place in McAllen between Agent

10   Ascencio and at least two others, two other individuals?

11   A.  Yes.

12   Q.  Was Mr. Delgado put on some kind of a CI list?

13   A.  No, I do not believe so.  I think we considered him a

14   cooperator.

15   Q.  Okay.  And as a cooperator, was he instructed on what the

16   protocol was in order to carry out that function as a

17   cooperator?

18   A.  Yes, and when he met with us in Atlanta.  That's why the

19   group supervisor was there.

20   Q.  Okay.  And did there come a time when you yanked that

21   status from him?

22   A.  No.

23   Q.  Under what circumstances do you take that status away from

24   a cooperator?

25   A.  If we find out that they were lying to us or they're doing

1    deals behind our back.

2    Q.  And so between September of 2007 and July -- say July 2008,

3    there never came a time when you yanked that status from him

4    because he wasn't cooperating or he was doing something

5    contrary?

6    A.  That we were aware of, no.  I never pulled any...

7    Q.  Did you have any contact with Victor Pimentel?

8    A.  Yes.

9    Q.  Was Victor Pimentel also being handled as a cooperator out

10   of your office in Atlanta?

11   A.  I think initially he was.  But I believe we let El Paso

12   deal with him, because --

13   Q.  At what time point did you turn him over to El Paso?  Do

14   you know?

15   A.  It was -- I don't recall.  I really don't know, sir.  It

16   was in the beginning of the investigation, though.

17   Q.  Now, Mr. Delgado was never turned over to El Paso to Josh

18   Fry to work -- to work with him, correct?

19   A.  Not at the point where I left.  I don't know.  After July

20   of 2008 I don't know what happened.  Prior to -- no, sir.

21   Q.  In all fairness, I'm only going to ask questions that

22   relate to that period --

23   A.  Okay.

24   Q.  -- between September and July.

25   A.  No, sir.  During that time period, no, sir.

Justice - Cross - Redirect by Ms. Arreola

1           MR. VELARDE:  May I have a minute, Your Honor?

2           THE COURT:  You may.

3    BY MR. VELARDE:

4    Q.  Agent, are you aware of any payments advanced to either

5    Victor Pimentel and/or Marco Delgado for their cooperation in

6    this investigation?

7    A.  No, I'm not aware of any payments.

8           MR. VELARDE:  Thank you very much.

9           No further questions, Your Honor.

10          THE COURT:  Do you have anything, Ms. Arreola?

11          MS. ARREOLA:  Your Honor, may I have one moment?

12          THE COURT:  You may.

13                    REDIRECT EXAMINATION

14   BY MS. ARREOLA:

15   Q.  Agent Justice, I have a clarifying question.

16   A.  Yes, ma'am.

17   Q.  You were asked if Mr. Delgado had indicated that the money

18   that was seized, the million dollars, was inheritance money.

19          Did he indicate that that money, that particular money

20   that was seized, was inheritance money or did he, instead,

21   indicate that the people that he had been introduced to had

22   some inheritance money?

23          Can you just clarify?

24   A.  Yes, ma'am.  There was never a statement that that million

25   dollars that we seized on the side of the road was inheritance

1   money.  There was conversation that he said that these

2   individuals in Mexico had inheritance money and gambling money

3   that they needed to move to the U.S.

4   Q.  And I have a follow-up question about Mr. Pimentel.

5        Did Mr. Pimentel ever share with you his e-mail

6   password?

7   A.  He did.

8   Q.  Do you remember ever going into his account to look at the

9   e-mails?

10  A.  I don't recall ever actually looking at it.  It was

11  something I probably would have just -- I just requested to

12  have it because he was cooperating with me.

13  Q.  You do that as a practice?

14  A.  Yes.  In some cases we do that as a practice, yes.

15       MS. ARREOLA:  No further questions, Your Honor.

16       THE COURT:  Mr. Velarde?

17                  RECROSS-EXAMINATION

18  BY MR. VELARDE:

19  Q.  Agent, you were -- you were asked some questions regarding

20  the telephone toll records, and I neglected to ask a question

21  about that.

22  A.  Yes, sir.

23  Q.  What was the phone number that you gave Mr. Delgado to

24  contact you at?

25  A.  My phone number was 404-392-5199.

Justice – Recross by Mr. Velarde

1    Q.  392 --

2    A.  5199.

3    Q.  There's another 404 number there.  Would that have been

4    Agent Ascencio?

5    A.  It could possibly be.  I'm not sure.

6    Q.  Or Agent Walton?

7    A.  It could be.  I'm not sure.  That's the only number that

8    I'm familiar with, is my cell phone number.

9           MR. VELARDE:  Okay.  Thank you very much.

10          THE COURT:  Anything else?

11          MS. ARREOLA:  No further questions, Your Honor.  The

12   Government asks that this witness be released.

13          THE COURT:  Very well.  You may be excused, sir.

14   You're free to leave.

15          THE WITNESS:  Thank you, sir.

16          THE COURT:  I think it's time we break up for the

17   evening.

18          Ladies and gentlemen of the jury, please remember the

19   instructions that I gave you.  Do not discuss this case with

20   anyone, anyone whatsoever.  Do not read or listen to anything

21   having to do with this case in any way.

22          With that, we'll be in recess until 9:00 tomorrow

23   morning.

24          (Proceedings continued in Volume 3.)

25

1

I N D E X

2

GOVERNMENT'S EVIDENCE

3

WITNESSES:

4

VICTOR PIMENTEL ROJAS:

5

Direct Examination by Ms. Kanof  ...........................3
Cross-Examination by Mr. Esper ...........................109
6
Redirect Examination by Ms. Kanof .......................177
Recross-Examination by Mr. Esper ........................194
7
Redirect Examination by Ms. Kanof .......................199
Recross-Examination by Mr. Esper ........................206

8

SANTOS CARRASCO, JR.:

9

Direct Examination by Ms. Kanof  .......................215
10
Cross-Examination by Mr. Velarde .......................236

11

THOMAS JUSTICE:

12

Direct Examination by Ms. Arreola  .....................244
Cross-Examination by Mr. Velarde .......................266
13
Redirect Examination by Ms. Arreola ....................279
Recross-Examination by Mr. Velarde .....................280

14

15

16

17

18

19

20

21

22

23

24

25