1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE WESTERN DISTRICT OF TEXAS

3                  EL PASO DIVISION

4
UNITED STATES OF AMERICA    )   No. EP-12-CR-2106-DB
5                           )
vs.                         )   El Paso, Texas
6                           )
MARCO ANTONIO DELGADO        )   October 23, 2013
7

8

9                  VOLUME 3 OF 6 VOLUMES
                        JURY TRIAL
10        BEFORE THE HONORABLE DAVID BRIONES
          UNITED STATES DISTRICT JUDGE, and a jury.
11

12

13   A p p e a r a n c e s:

14   FOR THE GOVERNMENT:    MS. DEBRA P. KANOF &
                            MS. ANNA E. ARREOLA
15                          Assistant United States Attorneys
                            700 E. San Antonio, Suite 200
16                          El Paso, Texas  79901

17   FOR DEFENDANT:         MR. RAY VELARDE
                            Attorney at Law
18                          1216 Montana Avenue
                            El Paso, Texas  79902
19
                            MR. RICHARD ESPER
20                          Attorney at Law
                            801 N. El Paso Street, 2nd Floor
21                          El Paso, Texas  79902

22

23

24        Proceedings recorded by mechanical stenography,

25     transcript produced by computer.

Ascencio – Direct by Ms. Kanof

3 –    2

```
 1              (Open court; jury present.)

 2              THE COURT:  Good morning, ladies and gentlemen.

 3              Members of the jury, I need to remind you again to

 4    abide by all the instructions that I gave you, please.

 5              Are you ready to proceed?

 6              MS. KANOF:  Yes, Your Honor.  The Government calls

 7    Special Agent Alex Ascencio.

 8              (Witnesses duly sworn.)

 9              THE WITNESS:  I do.

10              MS. KANOF:  May I proceed, Your Honor?

11              THE COURT:  You may proceed.

12         MANUEL ALEJANDRO ASCENCIO, GOVERNMENT'S WITNESS, SWORN

13                         DIRECT EXAMINATION

14    BY MS. KANOF:

15    Q.  What's your name?

16    A.  My name is Manuel Alejandro Ascencio, but I go by Alex.

17    Q.  By Alex.  How are you employed?

18    A.  I'm employed with Homeland Security.

19    Q.  How long have you been employed with Homeland Security?

20    A.  Since July of 2006.

21    Q.  And what is your position currently with Homeland Security?

22    A.  I'm a special agent.

23    Q.  And I know -- without saying where -- are you presently

24    assigned to a foreign country?

25    A.  Yes, ma'am.
```

Ascencio — Direct by Ms. Kanof

1    Q.   And does Homeland Security have agents in many foreign

2    countries?

3    A.   47 different offices.

4    Q.   Are you assigned to a Spanish-speaking country?

5    A.   Yes.

6    Q.   Where were you born?

7    A.   I was born in Mexico.

8    Q.   And when did you come to the United States?

9    A.   When I was four years old.

10   Q.   Was Spanish your first language?

11   A.   Yes, ma'am.

12   Q.   Where did you grow up?

13   A.   I grew up in Los Angeles, California.

14   Q.   Okay.  And when you started, you began work in law

15   enforcement before you went to Homeland Security, correct?

16   A.   Yes, ma'am.

17   Q.   Where did you begin that career?

18   A.   Actually, I began as a police officer with Statesville,

19   North Carolina.

20   Q.   Where is Statesville, North Carolina?

21   A.   Statesville, North Carolina, is a small city directly north

22   of Charlotte going up 77, where 77 and 40 meet.

23   Q.   Okay.  And what did you -- about when did you start working

24   as an officer for the Statesville police?

25   A.   I started in 2000.

Ascencio – Direct by Ms. Kanof

1   Q.  What were your duties and responsibilities with the

2   Statesville Police Department?

3   A.  For the initial first year I was a patrol officer.  After

4   the initial first year I was basically, on my anniversary date,

5   transferred to narcotics.

6   Q.  And for lack of a better word, did you enjoy a somewhat

7   meteoric career because you were the only one, perhaps in

8   Statesville, that spoke Spanish?

9   A.  Absolutely.  Actually, I was the first Hispanic ever hired

10  by Statesville, the city, on anything.  I'm actually in the

11  history books as the first Hispanic.

12  Q.  Okay.  And are there individuals that are arrested in

13  Statesville and neighboring communities in North Carolina that

14  are only Spanish speakers?

15  A.  Yes, ma'am.

16  Q.  So as soon as your year was up, what did they assign you to

17  do?

18  A.  To narcotics.

19  Q.  And how long were you handling narcotics?

20  A.  I actually handled narcotic investigations, money

21  laundering investigations, until I left the Statesville Police

22  Department.

23        But for the actual Statesville Police Department, I

24  did it for about six months, and then I was actually assigned

25  full-time to Customs, back when U.S. Customs actually started

Ascencio – Direct by Ms. Kanof                3  –    5

1    working transnational criminal organizations based on money

2    laundering and drug trafficking.

3    Q.  So that would be before 2002, when Customs became part of

4    Homeland Security, correct?

5    A.  Yes, ma'am.

6    Q.  Okay.  And you were task forced with the legacy agency of

7    Homeland Security, correct?

8    A.  Correct.

9    Q.  What were you doing on a task force as a local police

10   officer?

11   A.  One of my main functions for the task force was being an

12   undercover for them.

13   Q.  Okay.  And did you have any particular undercover training?

14   A.  No, not at that point.  Everything was basically

15   self-taught from the Statesville Police Department.

16   Q.  Okay.  But did they use you frequently as an undercover

17   because of your fluency in Spanish?

18   A.  Correct.

19   Q.  In addition to having been initially raised in the Spanish

20   language, were you also very familiar and are you still very

21   familiar with Spanish slang?

22   A.  Yes, ma'am.

23   Q.  And how about with drug dealer lingo?

24   A.  Yes, ma'am.

25   Q.  So how long were you working on the task force with Customs

Ascencio – Direct by Ms. Kanof

1    as an undercover?

2    A.   I was working with a task force for almost four years

3    before I got hired on and moved over to the federal side.

4    Q.   So the federal government stole you?

5    A.   Yes.  Basically.

6    Q.   Okay.  And where were you -- I'm assuming Homeland

7    Security?

8    A.   Yes, ma'am.

9    Q.   Where were you first assigned?

10   A.   I was first assigned, once I finished FLETC, to Atlanta,

11   Georgia.

12   Q.   Okay.  FLETC.  I'm going to ask you, please, not to use law

13   enforcement language, but that's the Federal Law Enforcement

14   Training Center, correct?

15   A.   Correct.

16   Q.   Okay.  So in order to become a federal agent you had to go

17   to school?

18   A.   Correct.

19   Q.   Did you go to undercover school?

20   A.   Yes, ma'am.

21   Q.   When did you go to undercover school?

22   A.   I went to undercover school three months after I graduated

23   the law enforcement training center.

24   Q.   What, if anything, about that is unusual?

25   A.   Because usually they required that agents have a three

1   year, you know, time under their belt to be able to prove that

2   they're mature enough and know what they're doing undercover.

3   But because of my history with the task force, already working

4   for the agency, I was able to get a waiver and go to undercover

5   school.

6   Q.   Okay.  And what kind of things do you learn about handling

7   informants in undercover school?

8   A.   Basically you learn how to talk to them, how to manipulate

9   them, if can be.  You know, it's always keep your distance

10  from -- basically they're not your friends.  They're there to

11  help you accomplish a goal.  And at that point, mainly as an

12  undercover, you want to keep that distance between yourself and

13  somebody cooperating.

14  Q.   In your experience, have you found that some of the people

15  undercover -- or informants.  Let's call them informants for

16  right now -- lie?

17  A.   Yes.

18  Q.   To you?

19  A.   Yes.

20  Q.   And how -- what do you do to distinguish whether or not you

21  feel they're telling you the truth or not?

22  A.   Well, at that point if we have a viable issue where we

23  believe there's a lack of honesty, then we start -- basically,

24  we put a filter of what's going on between us and whatever

25  investigation we're working and them, because we know they're

Ascencio – Direct by Ms. Kanof

1    playing both sides, for lack of better words.

2             If we can use them to continue to get -- extract

3    information, we do so.  But we definitely know to keep our

4    distance at that point.

5    Q.  Where were you assigned after you came out of undercover

6    school?

7    A.  I was assigned to the financial group.

8    Q.  What does the financial group do?

9    A.  The financial group actually investigates every type,

10   array, of money laundering scheme that is under our spectrum

11   for our agency.  But primarily, we investigate money laundering

12   and drug trafficking.

13   Q.  And through -- through the -- your experience both as a

14   narcotics police officer all the way to your experience in a

15   foreign country, have you become very familiar with drug

16   trafficking and money laundering?

17   A.  Absolutely.  With my case, I'm very familiar because I'm

18   actually in the middle of it most of the time, or I used to be,

19   before I went to a foreign country.

20            So I have firsthand knowledge directly from, you know,

21   the suspects, the bad guys, the guys that are actually pulling

22   the strings, whether it was in Mexico, Colombia, Venezuela,

23   learning the tactics, their ways of thinking, their mannerism.

24            So, yes, ma'am.

25   Q.  Where were you assigned -- what city were you assigned to

Ascencio – Direct by Ms. Kanof

1    when you first became an agent?

2    A.  I was assigned to Atlanta, Georgia.

3    Q.  Were you assigned to Atlanta, Georgia, from 2006 through

4    2008?

5    A.  Actually, I was assigned to Atlanta once I finished the law

6    enforcement center, which was in January of 2007, until I left.

7    And just in February of last -- of this year.

8    Q.  What were your duties and responsibilities with the Atlanta

9    office?

10   A.  Primarily was with the financial group investigating

11   transnational organizations based on money laundering, drug

12   trafficking.  Of course I was the main undercover for our

13   operation based out of Atlanta.

14   Q.  Okay.  So you were the main undercover agent in Atlanta; is

15   that correct?

16   A.  Yes, ma'am.

17   Q.  By the way, we talked about you going to undercover school.

18   About how many people are allowed in each class?

19   A.  24.

20   Q.  And about how many graduate and are certified undercover?

21   A.  I would say about 80 percent are actually certified to do

22   undercover.  And I would say out of 24, maybe one actually goes

23   out and does undercover.

24   Q.  So a lot of people go to that school that don't actually

25   use that education?

Ascencio – Direct by Ms. Kanof

1   A.  Correct.

2   Q.  But you're not one of them?

3   A.  No, ma'am.

4   Q.  When you were in Atlanta, did you just -- you continued

5   your undercover work?

6   A.  Yes, ma'am.

7   Q.  Now, when a case comes in -- and I'm talking about your

8   Atlanta experience.

9        When a case comes in, is the undercover ever the case

10  agent?

11  A.  Yes.

12  Q.  Okay.  Were you the case agent for a seizure that occurred

13  in Atlanta in September of 2007?

14  A.  No, ma'am.

15  Q.  Okay.  You had just -- you hadn't been in Atlanta very

16  long, correct?

17  A.  Correct.

18  Q.  Were you asked, however, to participate by the case agent

19  as an undercover in that particular seizure?

20  A.  Yes, ma'am.

21  Q.  Okay.  Do you recall when you first heard about a

22  million-dollar seizure by the Carroll County Sheriff's Office

23  outside -- immediately outside of Atlanta on I-20?

24  A.  Yes, ma'am.

25  Q.  Who contacted you?

Ascencio – Direct by Ms. Kanof

1   A.   Actually, I was contacted by my group supervisor, Bryan

2   Ramsey.  I was on my way home.  It was late that evening, and

3   he said for me to try to get up to Carroll County as soon as

4   possible.

5   Q.   Okay.  So you actually went to the Carroll County Sheriff's

6   Office?

7   A.   Yes, ma'am.

8   Q.   On the night of September 4th of 2007?

9   A.   Yes, ma'am.

10  Q.   Who else went?

11  A.   When I got there, Special Agent Tom Justice was already

12  there –– already at the scene.  One of our task force officers,

13  kind of like what I did for the Atlanta PD, was there, Ed

14  Christian.  And I believe we had several of the sheriff's

15  office officers on location also.

16  Q.   Okay.  And so basically, the whole financial group showed

17  up?

18  A.   Yes.  Yes.

19  Q.   Is that common?

20  A.   Yes, ma'am.  We're a very tiny group.  And once something

21  happened, everybody would go there.

22  Q.   Was a million dollars a large amount of money for that

23  corridor?

24  A.   Yes, ma'am.

25  Q.   Okay. And have you seen more?

Ascencio – Direct by Ms. Kanof

1   A.  Yes.

2   Q.  Have you seen less?

3   A.  Yes.

4   Q.  And I'm talking about cash.

5   A.  Yes.

6   Q.  In your education and in your experience to -- it can be

7   dangerous being an undercover, correct?

8   A.  Absolutely.

9   Q.  And what is the purpose of introducing an agent as an

10  undercover into an operation?

11  A.  Basically, introducing an undercover to any type of

12  operation plays a huge facet in the investigation, because it

13  leads into a realm that you would normally not see as law

14  enforcement.

15        You basically take on a persona of a bad guy, a

16  suspect, and you're able to win their rapport, their affection,

17  their friendship to a point, and be able to extract information

18  that would be vital for the investigation down the road.

19        Without that type of tool, because it really is a

20  tool, we would miss out on a lot of information that we would

21  use for successful prosecutions.

22  Q.  Do you determine whether or not the informant is a trusted

23  member of the organization and might successfully be able to

24  introduce you into that organization?

25  A.  Absolutely.  We take all that into account, because the

Ascencio – Direct by Ms. Kanof

1   last thing we want to do is introduce anybody into an

2   organization that would be in danger.  You know if the person

3   cooperated, the CI, is unable to do a proper

4   introduction, we wouldn't even consider that option.

5   Q.  Okay.  And for example, you're familiar with the case in

6   trial right now.  You-all did not use Victor Pimentel to

7   introduce you into the organization, correct?

8   A.  No, ma'am.

9   Q.  Who did you use?

10  A.  We used Marco Delgado (pointing).

11  Q.  Okay.  And when you said you used Marco Delgado, you

12  pointed at somebody.  Who were you pointing at?

13  A.  Pointing to the gentleman over there with the green striped

14  tie (indicating).

15         MS. KANOF:  May the record reflect he was indicating

16  the Defendant, Your Honor?

17         THE COURT:  The record will so reflect.

18  BY MS. KANOF:

19  Q.  And also, in order to successfully be introduced, do you

20  have to speak drug lingo?

21  A.  Yes.

22  Q.  You have to know, in this particular instance, how money is

23  laundered?

24  A.  A million dollars is what they were trying to launder.

25  Q.  I know.  But you need to have an education and you need to

1    act like you know how to launder money, correct?

2    A.   Absolutely.   Absolutely.

3    Q.   Okay.

4    A.   You have to be able to talk the lingo, talk the talk and

5    ultimately walk the walk.

6    Q.   Let me ask you.   What is a Title III?

7    A.   A Title III is basically a wiretap intercept of a –– in a

8    spoken communication or some type of communication.

9    Q.   And of course it takes a very long time to get

10   authorization from the Department of Justice to do a wiretap,

11   correct?

12   A.   Absolutely.  You have to present it before the AUSA.   It

13   goes up to OEO up in Washington.   It could take...

14   Q.   What, if any, role did you have in the Atlanta SAC office

15   with regard to writing affidavits to the Department of Justice

16   and to the Court in order to get them to allow an interception

17   of a telephone?

18   A.   Actually, for Atlanta, I was one of the main agents that

19   dealt with Title IIIs or wiretaps in Atlanta.   I was what they

20   considered the designated technical agent.

21        So I would do everything from setting up the servers,

22   the equipment, to writing for funding, writing the affidavits

23   to go to court.  So I was one of the main guys that dealt with

24   wiretap for my office in Atlanta.

25   Q.   And of course, do you –– are you ever a monitor?

Ascencio – Direct by Ms. Kanof          3   –    15

1    A.   Yes.   We have our own contract with the monitors that

2    actually sit down and do day-by-day.   But of course, I would

3    sit --

4    Q.   They sit in a windowless room and listen to conversations

5    all day?

6    A.   Basically.   Basically.   But we -- we always try to go in,

7    mainly with a Spanish speaker, just listening to the phone

8    calls.   But sometimes you miss little tidbits that you're used

9    to talking to face-to-face with these people.

10   Q.   Were you the only Spanish-speaking member of the financial

11   group in Atlanta?

12   A.   No.   I was the only Hispanic.   We did have a couple of

13   agents that spoke Spanish, but not clearly.

14   Q.   That were from a different company -- different country

15   like Cuba or Puerto Rico?

16   A.   No, ma'am.

17   Q.   No.   I mean the other Spanish speaking agents, they were

18   not Hispanics?

19   A.   They were not Hispanic.

20   Q.   Okay.   And while I'm on that subject matter, do you have to

21   be careful that the undercover has the accent and speaks the

22   language of a certain Spanish-speaking country?

23   A.   Absolutely.   Absolutely.   In the different investigations

24   that we've worked, actually several investigations now, not

25   only in the United States, but in Colombia, Hispanics --

Ascencio – Direct by Ms. Kanof

1    Mexicans are fine.  They are actually seen as an ally.

2            If they hear Puerto Ricans or something to that

3    extent, actually, that's a red flag to them.  And we've heard

4    them several times, and they've told me directly if they don't

5    sound Mexican, they don't sound Colombian, walk away.

6    Q.  So it's important to know the nationality of the

7    individuals you're investigating?

8    A.  Correct.

9    Q.  Okay.  And so -- because it would be dangerous if you

10   were -- infiltrated, say, a Dominican drug trafficking

11   organization, because they would immediately know you were not

12   Dominican?

13   A.  Correct.

14   Q.  And while we're on the subject, are Spanish-speaking

15   countries the only countries that traffic in drugs, illegal

16   drugs?

17   A.  Absolutely not.

18   Q.  What other countries have you investigated drug trafficking

19   organizations from?

20   A.  We've investigated Great Britain, Vietnamese, Canada, you

21   know, Vietnam, China, Iraq.

22   Q.  And of course you can't be an undercover in any of those

23   countries?

24   A.  Not directly.  No.

25   Q.  All right.  Now, with regard to the money laundering

Ascencio – Direct by Ms. Kanof

1    operations.

2            Do you ever -- when you're listening to conversations,

3    whether they be wired, body wired, or Title III, do you ever

4    hear them say, Oh, we need to go pick up our marijuana money?

5    A.  Absolutely not.  You know, they always speak in code.  The

6    last thing they want to do is, you know, explain what they're

7    doing, because they believe everybody listens to them anyway.

8            They don't want to explain verbatim what they're

9    doing.  Everything is going to be code to whether it's the

10   drugs, the money, the movement of that same thing or guns,

11   people.

12   Q.  Okay.  And so you sometimes don't know the type of drug; is

13   that correct?

14   A.  That's correct.

15   Q.  But from the code, you can discern that they're talking

16   about drugs, in your experience?

17   A.  Yes, ma'am.

18   Q.  And you sometimes don't know the amount of money.  But from

19   the code, you can ascertain they are talking about money?

20   A.  Correct.

21   Q.  Okay.  What is a mirror operation?

22   A.  A mirror operation is basically a scheme where there's a

23   transfer of money from one point to another between a group of

24   people that don't know each other.  The actual people handling

25   the money -- technically, you'll have -- in fact, to give a

Ascencio – Direct by Ms. Kanof

1    quick example.

2              You have somebody in Colombia, he has somebody that's

3    known in the States, but they're just the middleman.  The

4    people that are actually handling the money don't know each

5    other in Colombia and in the States, so they need this group to

6    be able to move the money quickly.

7              So it's basically -- a mirror operation in Spanish is

8    what we call a *contraentrega*.  Somebody delivers money in the

9    States and immediately, within minutes, pays it out in Colombia

10   or Mexico, Venezuela, wherever the --

11   Q.  Well, if they have the money in Colombia -- how do they

12   already have money in Colombia to basically reimburse the

13   people in the other country that is paying the money?

14   A.  Basically these money laundering cells, they will have

15   stores.  For example in Colombia there's a huge store in Cali,

16   Colombia, called *Del Monte.*

17             Basically, all the money launderers that we have

18   investigated have always had some type of office near, and they

19   keep large, large amounts of money in hand for this specific

20   reason, because they are able to do *contraentregas* in the

21   States, in Europe or wherever, and pay out right then and

22   there.

23             MS. KANOF:  Is he speaking too fast for you, Suky?

24             THE COURT REPORTER:  I needed the Spanish word.

25             THE WITNESS:  *Contraentrega.*

Ascencio — Direct by Ms. Kanof

1   BY MS. KANOF:

2   Q.  All right.  And in mirror operations, do they use banks?

3   A.  No.

4   Q.  Do drug dealers sometimes use banks to money launder?

5   A.  Yes.

6   Q.  About —— what kind of amounts of monies would be —— would

7   you see being deposited in a bank?

8   A.  No.  For deposits, we've always seen small, small amounts.

9        Many years ago they would actually smurf, or just

10   break down money, to keep it under the $10,000 mark.  That way

11   it wouldn't initiate any type of reporting requirements.

12        But the last few years we've seen what we consider

13   microsmurfing, where they're putting in a thousand, 1300.  I

14   mean, they're getting pretty smart at it.  They're trying to

15   step —— stay ahead —— stay a step ahead of us.  Excuse me.

16   Q.  Okay.  So you said something about $10,000?

17   A.  Yes, ma'am.

18   Q.  Are there reporting requirements?  I think you mentioned

19   something about a reporting requirement?

20   A.  Yeah.  Correct.  Any time you deposit or do some type of

21   transaction, monetary transaction with the bank, they have to

22   file what's called a CTR.

23   Q.  In what amount?  In what amount of money?

24   A.  Anything over $10,000.

25   Q.  Okay.  And what do they have to do?

Ascencio – Direct by Ms. Kanof

1    A.   They have to file a report called a Cash Transaction

2    Report, a CTR, or Currency Transaction Report.

3    Q.   And that's basically for the Internal Revenue Service?

4    A.   Yes, ma'am.

5    Q.   And how about in a store?  If somebody spends more than

6    $10,000 cash in a store, does the IRS have another form that

7    they have to report?

8    A.   Yes.  And if you go buy a car at a store –– or anywhere,

9    you spend anything over $10,000.  And even some money service

10   business they have to file a Form 8300 that reports you using

11   cash to do some type of financial transaction.

12   Q.   And the United States has a border with Canada and a border

13   with Mexico.  Does anything happen at the border if you have

14   $10,000 in cash or more?

15   A.   Yes, ma'am.  Any time you travel, when you're coming back

16   into the States or leaving the States, you have to report if

17   you're leaving or coming in with over $10,000.  And you file

18   what's called a CMIR, which is just a Currency Monetary

19   Instrument Report.

20   Q.   Okay.  So what is structuring?

21   A.   Structuring is whenever you take –– you have this knowledge

22   that you cannot put in more than $10,000 in the bank.  You have

23   $30,000.  So what you do is you structure.  You break it down

24   to 5,000, you know, 6,000, 8,000 under the $10,000 mark.  And

25   you just go from bank and bank, and you just deposit the money

1    in the same account or different accounts, you know, hoping

2    that you're going to keep the tellers from recognizing that

3    you're putting in more than $10,000, you know, in a time

4    period.

5    Q.  Do banks have, in this day and age, computer software to

6    detect structuring?

7    A.  Absolutely.

8    Q.  What is that called?

9    A.  The actual software, I don't --

10   Q.  Not necessarily the software.  But...

11   A.  The reporting.

12   Q.  Okay.

13   A.  The reporting that they have is called a suspicious

14   activity report.  And it could be initiated either by the

15   actual bank, by the teller themselves, or it could be

16   automatically initiated by the software that the bank uses.

17   Once it triggers a certain amount of, you know, transactions,

18   maybe, and cash.

19   Q.  So the actual human employees are trained to look out for

20   structuring, correct?

21   A.  Absolutely.

22   Q.  And there's a software system that automatically generates

23   a report if they detect a pattern --

24   A.  Correct.

25   Q.  -- of cash deposits, correct?

Ascencio - Direct by Ms. Kanof

1    A.  Correct.

2    Q.  And is it -- the bank obligated by law to provide the SAR

3    reports to federal law enforcement?

4    A.  Yes.

5    Q.  And a financial group like yours, or in any Homeland

6    Security investigations office, do you sometimes start

7    investigations based on a bank's SAR?

8    A.  Absolutely.  We actually have what's called a SAR committee

9    that encompasses several agencies, federal and local agencies,

10   that will sit down and review the SAR reports to help initiate

11   investigations.

12   Q.  You were using Colombia as an example.  Do drug dealers use

13   friendly countries to launder their money?

14   A.  Absolutely.

15   Q.  What's a friendly country?

16   A.  A friendly country is a country that does not have our

17   strict Bank Secrecy Act or something similar.  Something where

18   they could easily manipulate the infrastructure, the banking

19   infrastructure, to be able to introduce, you know, their money

20   from illicit funds.

21   Q.  Do you -- is the Turks and Caicos a friendly country?

22   A.  My understanding, it's -- to them it can be.  And really,

23   it all depends where their contacts are.

24        I mean there's Turks and Caicos, Colombia, Venezuela.

25   Wherever these organizations have their contacts, that's where

Ascencio – Direct by Ms. Kanof

1  they're going to usually move the money to.

2  Q.  So a lot of times when a large sum of money is being

3  laundered, does there have to be a friendly person to assist

4  them in that foreign country?

5  A.  Absolutely.  There's many facets to the actual money

6  laundering schemes, because there's several.  And you always

7  need that human element somewhere, somebody of confidence that

8  you could actually -- because you're confiding somebody with,

9  basically, your livelihood.

10        At the end of day, these money laundering

11  organizations and drug trafficking organizations do it for the

12  money.  So they're going to have somebody on the other side

13  that they trust with their money.

14  Q.  Do drug -- the people that actually handle the dope handle

15  the money laundering?

16  A.  Yes.

17  Q.  Okay.  And sometimes do they create fake corporations or

18  limited partnerships or LLCs to assist them in money

19  laundering?

20  A.  Absolutely.  We've seen that scheme many, many times in

21  Atlanta where they create just virtual companies.  Basically

22  they register a company online, and they're able to use it to

23  just facilitate the movement of money to make false, you know,

24  statements, invoices, whatever is necessary for the

25  organization to achieve their goal.

1  Q.  Okay.  And another method has arisen in this case, casinos?

2  A.  Yes, ma'am.

3  Q.  Are casinos used to launder money?

4  A.  Absolutely.

5  Q.  How does a casino assist?  And does the actual casino owner

6  have to be corrupt?

7  A.  No, no.  Absolutely not.  Casino money laundering is a ––

8  is an aspect where you take a large amount of money and you

9  take it into a casino, usually break it up between a group of

10 people that are going, and they go in and gamble for a few

11 minutes on the slot machines, put in, you know, $1,000, $2,000

12 in it, spend 20 of that, and cash out.  Then you grab your

13 ticket ultimately.

14         And usually it's done in border towns.  We've seen it

15 mainly in the northern border towards Canada.  They cash out

16 the ticket and ––

17 Q.  Are you aware that there are casinos in the state of

18 New Mexico?

19 A.  No, ma'am.

20 Q.  Okay.  Well, let's assume for a minute that there are

21 casinos in the state of New Mexico.

22         And for people who don't go to Sunland Park or take

23 their weekend vacation to Las Vegas, could you tell the jury

24 how a slot machine works nowadays?  Money doesn't come pouring

25 out of it, right?

Ascencio - Direct by Ms. Kanof

1   A.  No.  No.  I mean some do, but most of the time you're able

2   to push the button and get a ticket out that gives you the

3   amount that you've actually won or had in the machine.  So

4   that's not necessarily that you won the money.  Whatever you

5   put in, you print that out.  If it's $1,000, you spent 20, so

6   you got $980.

7         You walk up to the teller and they are able to give

8   you cash.  At that point you're starting to create a filter.

9   You're trying to -- you're starting to create a money trail

10  where you could articulate, Hey, I got this from the casino.

11  Q.  Okay.  So say you put a $100 bill in a slot machine and you

12  bet one dollar.

13  A.  Uh-huh.

14  Q.  And then you push cash out on the machine.  You get a

15  ticket that will have $99 on it?

16  A.  Yes.

17  Q.  Assuming you didn't win.

18  A.  Yes, correct.

19  Q.  Which is most of the time.

20  A.  Exactly.  Exactly.

21  Q.  Okay.  And so then they have the $99 and they spent only

22  one dollar to launder that money?

23  A.  Correct.

24  Q.  Is that -- that would be what, less than -- that's one

25  percent, right?

Ascencio — Direct by Ms. Kanof

1    A.   Absolutely.

2    Q.   So it's a cheap way of laundering money, correct?

3    A.   Actually, very cheap.   The cases we've had, we've actually

4    seen them tell them, whatever winnings you make, you keep.   So

5    they give them an allotted amount that they can spend.

6    Anything after that, you know, they have to stop and cash out.

7    But if they win, they keep it as part of their —— basically

8    part of the pay.

9    Q.   So physical money laundering, where you have to have people

10   that you trust move the money, how do the people that move the

11   money get paid?

12   A.   The people that actually move the money, they get paid from

13   the cash as it's being moved.

14          A lot of times *contraentregas*, which is a vital part

15   of money laundering, because it places the money where the

16   organization needs to get into some type of scheme.

17          They extract money from that to pay for everything:

18   Transportation, food, housing, medical expenses.   We've seen

19   that.   Paying off people to, you know, stay quiet.   Anything

20   you could imagine they'll break off from the money being moved.

21   Q.   Do they sometimes contract for a percentage of the money

22   they're laundering?

23   A.   Yes, ma'am.

24   Q.   Okay.   Now you said that on September 4th of 2007, you went

25   to the Carroll County Sheriff's Office.   And when you arrived,

Ascencio – Direct by Ms. Kanof

1    did they have an individual sitting in a room that had had a

2    million dollars in cash?

3    A.  Yes, ma'am.

4    Q.  And what was your responsibility, and what action -- what

5    did you participate in while you were at the Carroll County

6    Sheriff's Office?

7    A.  You know, basically, once I showed up, I -- I walked in and

8    I noticed that they had the kid just -- or excuse me, Victor

9    Pimentel -- just to the side, and they were talking --

10   Q.  You called him what, the kid?

11   A.  The kid, yes.

12   Q.  Is that, basically, a nickname that you-all developed for

13   him?

14   A.  Yes.

15   Q.  Why?

16   A.  Because he -- he was very, very young, naive.  My

17   understanding is whenever they stopped him and they asked him

18   if he had anything illegal in the car he said, No, no, no.

19         And when they said, Do you have any large of amounts

20   of money?

21         Yeah, I got a million dollars in the backseat.

22   Q.  Have you ever seen that before?

23   A.  Never.  Never in my whole career.

24   Q.  And what -- so Victor Pimentel was there.

25         And what did you do?

Ascencio – Direct by Ms. Kanof

1    A.   Basically, I just stood by on the outskirts because they

2    were already talking to him.  So I just kind of waited there

3    while they talked to him and figured out what was going to be

4    the next step.

5    Q.   Did Victor Pimentel speak English?

6    A.   Yes.

7    Q.   Okay.  Was he speaking –– was he talking to the agents in

8    English?

9    A.   Absolutely.

10   Q.   Okay.  So he didn't pretend like he didn't speak English?

11   A.   No.

12   Q.   Okay.  And after the agents –– who was interviewing him?

13   A.   At that point, if I recall correctly, it was Tom Justice.

14   I believe Jansen Brandon was already there.  Chad Elliott, with

15   the –– a deputy with the Carroll County Sheriff's Office.  And

16   they had one other investigator, which I cannot recall his

17   name.

18   Q.   With regard to Mr. Pimentel and you, what was your next

19   action?

20   A.   Basically, the next action that we decided as a group was

21   to reach out to El Paso, because the money was actually

22   ultimately destined for El Paso.

23   Q.   Okay.

24   A.   We reached out to that office, where we agreed to do what

25   we consider a controlled delivery, where we were going to

Ascencio – Direct by Ms. Kanof

1  actually take control of the money and physically bring it to

2  El Paso.

3  Q.  A bunch of the financial group traveled to El Paso with the

4  money, correct?

5  A.  Correct.

6  Q.  Did you?

7  A.  No.  No, no.

8  Q.  Why didn't you go to El Paso with everyone else?

9  A.  Because at that point we had Mr. Pimentel already

10  cooperating.  And we were hoping to be able to continue with

11  the investigation and ultimately try to, you know, see if they

12  could introduce me as an undercover to the organization

13  furthering the investigation.

14  Q.  So evidently it was never a consideration for Victor

15  Pimentel to introduce you?

16  A.  No, no.

17  Q.  Why?

18  A.  We -- with him cooperating at that point, we didn't even

19  talk to him about trying to do anything further when it came to

20  an undercover operation.  We just kind of, for lack of better

21  words, we left him in the dark.

22  Q.  Okay.  And at some point in time did you come to El Paso?

23  A.  I did not come to El Paso.

24  Q.  Did an individual by the -- that you've identified as Marco

25  Delgado go to Atlanta?

Ascencio – Direct by Ms. Kanof

1   A.   Yes.

2   Q.   Okay.  In order for you to be introduced as an undercover

3   compatriot of an individual, do you have to be thoroughly

4   familiar with what has happened up until that point?

5   A.   Correct.

6   Q.   And you had, by that time, familiarized yourself; is that

7   correct?

8   A.   Yes, ma'am.

9   Q.   So when did Mr. Delgado come to Atlanta?

10   A.   Mr. Delgado came to Atlanta after he had been encountered

11   by agents after he took possession of the million dollars here

12   in El Paso.

13   Q.   On the controlled delivery?

14   A.   Yes, ma'am.

15   Q.   Okay.  And were you aware there was a second controlled

16   delivery?

17   A.   Yes, ma'am.

18   Q.   Were you aware that at this point all four people that had

19   been encountered by federal law enforcement were let go?

20   A.   Yes.

21   Q.   Why?

22   A.   Basically, they let them go to be able to try to further

23   the investigation.

24   Q.   What was the ultimate end of the investigation?

25   A.   The ultimate end of the Atlanta investigation?  It went

Ascencio – Direct by Ms. Kanof

1   nowhere.

2   Q.  No.  But I mean, what did you all hope you were going to

3   find?

4   A.  Well, our hope was to actually get into the organization,

5   you know, introduce me as an undercover and start winning,

6   basically, what I was talking about earlier, doing money

7   pickups through the group to further identify the organization,

8   identify routes, banking accounts, other co-conspirators.

9   Q.  Okay.  And when -- do you remember independently when

10  Mr. Delgado came to Atlanta?

11  A.  It was just a few days after he was actually encountered in

12  El Paso.

13  Q.  Did you meet with him?

14  A.  Yes.

15  Q.  Did you debrief him?

16  A.  I was present while he was being debriefed, yes.

17  Q.  Okay.  And what language was he speaking in?

18  A.  English.

19  Q.  Okay.  So let me draw your attention to September 14th of

20  2007.

21       You were -- after they debriefed him, did they

22  introduce you to him?

23  A.  Yes.

24  Q.  I was ahead of myself.

25       And on September 14th of 2007, did Mr. Delgado attempt

```
 1   to introduce you to an individual in the organization?

 2   A.  Yes, ma'am.

 3   Q.  Who was that?

 4   A.  If I recall, Paco was the first one.

 5   Q.  Okay.  And did you know what Paco's real name was at that

 6   time?

 7   A.  At that time, no.

 8   Q.  What plan did you devise and instruct Mr. Delgado to do as

 9   a cooperating individual?

10   A.  At that point we wanted to throw some of the blame on the

11   two guys that were released at the end, that were encountered

12   here in El Paso.

13   Q.  Okay.  You're aware of the second controlled delivery,

14   correct?

15   A.  Correct.  Correct.

16   Q.  And a guy named -- do you remember the names of the second

17   controlled delivery guys.  Isidro?  Does that ring a bell?

18   A.  Yes.  Isidro, and I don't recall the second one.

19   Q.  Okay.  And you were wanting to put the blame on them.  Why?

20   A.  Basically, you know -- well, we wanted to create a filter

21   between the organization and Mr. Delgado to keep -- you know,

22   to save face.

23         Hey, it wasn't his fault, so we could try to once

24   again introduce us into the organization and further the

25   investigation.
```

Ascencio - Direct by Ms. Kanof

1  Q.  Okay.  What do you do to determine whether or not someone

2  who's going to introduce you, you know, can pull it of?

3  A.  Basically, like I mentioned earlier, you know, we look at

4  every aspect.  We don't want to put anybody in there that's not

5  going to be able to do a proper introduction, that's going to

6  either leave us on the outskirts and not be able to win

7  their -- you know, their trust.  So we look at the fact that --

8  were they're involved, how much knowledge do they have, are

9  they actually able to introduce them, do they have the ability

10 to do it within the structure of the organization.

11        And at that point we knew Victor couldn't do it, but

12 Mr. Delgado could definitely do it.

13 Q.  Okay.  So what -- so part of the ruse was going to be to

14 blame the two individuals that received the million dollars in

15 El Paso?

16 A.  Correct.

17 Q.  Okay.  And how much instruction did give Mr. Delgado on

18 what to say?

19 A.  Basically, we -- we told him to try to put the blame on the

20 two guys, because one of them did have an issue in Atlanta with

21 a flight.  So we told him just to use that as the ruse that

22 these guys were initially looked at in Atlanta, and they just

23 continued looking at them after Atlanta.

24 Q.  One of two that had flown to Atlanta had an issue with a

25 flight?

Ascencio – Direct by Ms. Kanof

1    A.  Correct.  My understanding is that he had an issue with

2    identification.  He didn't have the proper identification when

3    he was trying to catch that flight.

4    Q.  Okay.  And by proper identification, was he a Mexican

5    citizen?

6    A.  Yes.

7    Q.  And Atlanta is an international airport?

8    A.  Absolutely.

9    Q.  So would it be likely that TSA, when he was trying to get

10   on the airplane, would have scrutinized him?

11   A.  Yes.

12   Q.  Okay.  But he did eventually get on the plane, correct?

13   A.  Yes.

14   Q.  So you decided to use that as a ruse to explain why these

15   people got caught?

16   A.  Absolutely.  It was an actual -- a factual event that we

17   could kind of hang our hat on and use it against them.

18   Q.  And did you instruct him to talk about a global -- a GPS?

19   A.  Yeah.  We talked about them renting a vehicle.  And we just

20   said, Hey a lot of these -- one of the vehicles will actually

21   have a GPS.  And it's feasible that law enforcement would be

22   able to use that GPS in the vehicle to -- to monitor it.

23   Q.  So you gave him a piece of infor- -- Mr. Delgado -- a piece

24   of information that he could use by saying, Look.  You rented a

25   car.

Ascencio – Direct by Ms. Kanof

1    A.   Yes.

2    Q.   So you could have been tracked?

3    A.   Correct.

4    Q.   And what other information did you provide to him?

5    A.   At that point the -- basically, to try and see if he could

6    introduce me as the person assisting him to, one, recover the

7    million dollars, so we could buy the time that we needed just

8    to kind of start winning some of the -- you know, the contacts

9    with them.

10          And two, if it looked -- it would actually happen, if

11   it was feasible, to try to introduce us to the organization to

12   try to help move the money, any further money they may need

13   moved, as compensation.

14          Basically, let us try to move some of your money that

15   you still have to pay you back while we're waiting to see if we

16   can recover the million dollars.

17   Q.   Okay.  So you were trying to claw your way up the

18   organization; is that correct?

19   A.   Yes, ma'am.

20   Q.   Because people that are at the bottom level are not as

21   important or why?

22   A.   Well, basically, you know, our goal is to reach the

23   ultimate owners of the drugs, the money, whatever schemes it

24   is.

25          You know our jobs, as federal agents, is to serve, you

1   know, the citizens of the United States, to try to sever the

2   head of the snake.  So we're always -- like Ms. Debra is

3   saying, we're always going to claw our way up as far as we can

4   until we can't do it anymore.

5   Q.  Did Mr. Delgado -- did you want him to try to introduce you

6   and make a phone call, consensually monitored phone call, to

7   each individual he was associated with?

8   A.  Initially -- I think we just wanted to start with Paco

9   initially, and see how far we could get with him.  And see --

10  because at that point we didn't really know, besides what he

11  was telling us, what the hierarchy was.

12  Q.  Who did he tell you Paco was?

13  A.  I don't recall exactly who he said -- what his position was

14  in the organization or what he did in the -- you know, in

15  the --

16  Q.  We're going to play some of the tapes.  If that refreshes

17  your memory, you let the jury know.

18  A.  Absolutely.

19  Q.  Okay.  And -- but somehow you know you wanted to start with

20  Paco because he appeared what?

21  A.  He appeared to be the first contact that -- that would

22  be -- the first contact that we needed to reach out to, or that

23  Mr. Delgado needed to reach out to at that point.

24  Q.  And when Marco Delgado was on the phone talking to his

25  co-conspirators, where was he physically located?

Ascencio – Direct by Ms. Kanof

1   A.  He was physically located in our office in Atlanta.

2   Q.  Okay.  And did he make a call -- successful calls with

3   Paco?

4   A.  Yes.

5   Q.  Did he tell you that there was another individual named

6   Chuy?

7   A.  Yes.

8   Q.  Did he make calls with Chuy?

9   A.  Yes.

10  Q.  Did he tell you that there was another individual by the

11  name of Isidro?

12  A.  Yes.

13  Q.  Did he tell you there was another individual by the name of

14  Lilian de la Concha?

15  A.  Yes.

16  Q.  Did he tell you she was part of the money movement

17  organization?

18  A.  Yes.

19  Q.  Did he also tell you he had a relationship with her?

20  A.  Yes.

21  Q.  And did he make several telephone calls to her?

22  A.  Yes.

23  Q.  All of these are recorded; is that correct?

24  A.  Yes, ma'am.

25  Q.  Okay.  Did he also tell you about an individual named

Ascencio − Direct by Ms. Kanof

1    Pedro?

2    A.  Yes.

3    Q.  And was an attempt made to talk to Pedro?

4    A.  I don't recall.

5    Q.  Okay.  I will draw your attention, then, to Government's

6    Exhibit Number 50A, which is a transcript.

7    A.  Yes, ma'am.

8    Q.  And I'm going to try not to put everybody to sleep and just

9    do snippets, but then I'll ask you about some of the

10   transcripts.

11         And again, in anticipation of testimony, did the

12   Government provide the transcripts to you so that you could

13   correct or read the Spanish and make sure that the translation

14   in English was consistent?

15         First of all it was right, because you're a native

16   Spanish speaker, correct?

17   A.  Yes, ma'am.

18   Q.  And secondly, was consistent with the understanding that --

19   of the way money launderers and drug dealers talk?

20   A.  Yes, ma'am.

21   Q.  Okay.  Drawing your attention first to 50A.

22         Did Mr. Delgado, on September 9th, 2007, at 10:19 in

23   the morning, at your behest, make a phone call to Lilian de la

24   Concha?

25   A.  Yes, ma'am.  A phone call for the duration of 16 minutes.

```
 1                 MS. KANOF:  Your Honor, may we publish?

 2                 (Call partially played.)

 3                 THE COURT:  Why don't you stop it for a second.

 4                 You have the transcript also?

 5                 MS. KANOF:  Yes, sir.

 6                 THE COURT:  Ladies and gentlemen of the jury, I'll

 7       remind you of the instruction I gave you previously.  Remember

 8       that the actual exhibit is the recording, not the transcript.

 9       The transcript is provided for you so you can go along and see.

10       But you're also to determine whether it's accurate.  Not only

11       for the -- what is said is on the transcript, but that it's

12       been -- if it's in Spanish, that it's been -- those of you that

13       know Spanish -- that it's been interpreted correctly.

14                 Go ahead.

15                 MS. KANOF:  Thank you, Your Honor.

16                 (Call played.)

17       BY MS. KANOF:

18       Q.  Okay.  First of all, let me ask you, Agent Ascencio.

19                 You were there with Mr. Delgado when he made this

20       call?

21       A.  Yes.

22       Q.  And was he talking in a low tone?

23       A.  Yes.

24       Q.  Is that unusual?

25       A.  To me it was, when he was making the phone call.
```

1   Q.  Okay.  He was trying to help you, and he was making a phone

2   call, but he was talking in a low tone?

3   A.  Yeah.

4   Q.  Do you know if maybe that's how talked to Ms. de la Concha?

5   A.  No, no.  I mean I recall making a comment to my fellow

6   agents when he did that, because I found him a little reluctant

7   initially with the caller.

8   Q.  I'm sorry?

9   A.  I found him a little reluctant initially to make this --

10  this phone call to her.

11  Q.  Okay.  But he did agree to do it?

12  A.  Yes.

13           (Call played.)

14  BY MS. KANOF:

15  Q.  Okay.  He's talking -- he refers to Pedro as the

16  accountant.

17  A.  Correct.

18  Q.  In drug trafficking do they sometimes give titles to

19  individuals based on their position in the organization?

20  A.  Absolutely.

21  Q.  So this doesn't necessarily mean that Pedro was an actual

22  accountant?

23  A.  No, it does not mean that he's a certified accountant.  It

24  just -- it means that he handled the money.  He was responsible

25  for counting it or having the people counting it.  It was

1    ultimately his -- you know, his responsibility.  Whatever

2    happens to the money until it gets to the second facet is his

3    baby, basically.

4              (Call played.)

5    BY MS. KANOF:

6    Q.  Is there any reason, based on this conversation, for you to

7    believe that he was not telling her the truth?

8    A.  Based on this conversation?

9    Q.  I mean with regard to who the accountant was and physically

10   what actually happened that day.

11   A.  No.  Because he -- he's actually speaking on -- on his own

12   accord, on -- based on his own knowledge, stuff that he's

13   actually done, seen, people that he knows.

14              We knew none of this, really, until he really started

15   cooperating and calling these people.

16   Q.  Okay.

17             (Call played.)

18   BY MS. KANOF:

19   Q.  Okay.  And that's -- now, many problems with the

20   identification, that's the ruse that you provided him?

21   A.  Correct.

22   Q.  He's beginning that ruse, correct?

23   A.  Correct.

24             (Call played.)

25

1    BY MS. KANOF:

2    Q.  When he talks about they gave us a chance to get ahead, and

3    these guys were already here in town, that's not information

4    you provided him?

5    A.  No.  No.

6    Q.  So that would be a reflection of what had actually

7    happened?

8    A.  Correct.

9    Q.  Because basically, if he was telling her something

10   different, she would know?

11   A.  Exactly.

12          (Call played.)

13   BY MS. KANOF:

14   Q.  Okay.  He's talking about making the movements for me, the

15   one from the currency exchange office.

16          Is that a common term, say, for money moving

17   organizations?

18   A.  Yeah.  Basically, they're either talking factually about a

19   change house, you know, a *casa de cambio*, or they're talking

20   about a house, a money house, somebody that has -- or that

21   holds the money while the transportation organization shows up

22   to pick it up.

23          (Call played.)

24   BY MS. KANOF:

25   Q.  Did Mr. Delgado know that Isidro had -- this was Isidro

 1    that got stuck, right?

 2    A.  Uh-huh.

 3    Q.  Okay.  Did he know that Isidro had a California

 4    identification with him?  Did you tell him that?

 5    A.  No, I don't recall telling him that.

 6    Q.  Okay.  And so that would have been something he already

 7    knew?

 8    A.  Quite possibly, yes, ma'am.

 9            (Call played.)

10    BY MS. KANOF:

11    Q.  Okay.  He talks about the dogs.  They bring the dogs.

12            Did you tell him to talk about the dogs?

13    A.  No.

14    Q.  Did you ever discuss narcotic detector dogs with him?

15    A.  I personally didn't.

16    Q.  Okay.

17            (Call played.)

18    BY MS. KANOF:

19    Q.  Are you aware that at some point Mr. Delgado was told by

20    ICE agents to be the -- pretend like he was going to be the

21    person that could help them get out of jail?

22    A.  I know that that was part of the ruse that was used.

23    Q.  Okay.

24    A.  Correct.  I don't know if he was told by one of my agents

25    or not.

Ascencio – Direct by Ms. Kanof

```
 1   Q.  But you didn't tell him to do that?
 2   A.  No.  No.
 3          (Call played.)
 4   BY MS. KANOF:
 5   Q.  Did you tell him to say that he couldn't afford for either
 6   of those members of the organization to have a criminal record?
 7   A.  No.
 8          (Call played.)
 9   BY MS. KANOF:
10   Q.  Okay.  Did you tell him anything about dropping phones?
11   A.  No.
12   Q.  You didn't discuss, Tell them that you drop phones, or you
13   were going to drop phones?
14   A.  No.
15   Q.  No.  And did you tell him that they have to do that
16   because, well, that you can guide you, that's another tracker?
17   A.  Yeah.  Actually, I would never tell him that initially
18   because we may want to try to get up on the phones.  So that
19   would defeat the purpose.
20   Q.  Okay.  And when he says another tracker, do you think he's
21   talking about the GPS, or he's just talking about they can --
22   from the language that he uses, that -- that you can get up on
23   a phone?  You can --
24   A.  Well, basically from this conversation, he knows -- he has
25   knowledge that we could actually tap into phones for locations,
```

Ascencio – Direct by Ms. Kanof

1    whether it's GPS or cell towers.  So he knows that we're able

2    to, you know, get that information from the providers.

3    Q.  Okay.

4           (Call played.)

5    BY MS. KANOF:

6    Q.  Okay.  Did you tell him anything about cloning phones?

7    A.  No.

8           (Call played.)

9    BY MS. KANOF:

10   Q.  So she tells him that we agreed that nobody was going to

11   answer except Pedro and Marco?

12   A.  Correct.

13   Q.  And Marco does -- does he appear surprised when she says

14   that?

15   A.  No.

16          (Call played.)

17   BY MS. KANOF:

18   Q.  Okay.  What's a plaza in drug lingo?

19   A.  It will be a facet, a person.

20   Q.  A plaza?

21   A.  Yeah.

22   Q.  Okay.  And did you -- when he says, Listen, Buddies.  You

23   guys are people.  And literally, there are six plazas.

24   A.  Yes.

25   Q.  Is he saying there's six people involved in this?

1   A.   Right.   Six people, six organizations, six groups.   You

2   know it depends on –– but there's six elements that got

3   involved in this specific business transaction.

4   Q.   And then he said, And Pedro is not a person.   Do I explain

5   myself?

6           So basically, there are six plazas, or entities, and

7   Pedro is not one of them, correct?

8   A.   Yeah.

9   Q.   Okay.

10  A.   Mainly since they already, you know, described him as an

11  accountant, he's probably an accountant on the outside.

12          (Call played.)

13  BY MS. KANOF:

14  Q.   Okay.   Now, because we have a lot to play, if you can look

15  at the transcript and we can just go over some parts of it so I

16  don't have to play all of it.

17          Look at page 16, please.   And the whole page is

18  Mr. Delgado talking, correct?

19  A.   Correct.

20  Q.   In the beginning does he say –– the second –– And what the

21  favor is costing me.   Do I explain myself?   I told him, If you

22  think I'm going to allow for me to lose this.

23          Did you instruct Mr. Delgado to talk about his

24  investment and the fact that they were causing him to lose his

25  investment?

Ascencio – Direct by Ms. Kanof

```
 1    A.  No.
 2    Q.  So that came from him?
 3    A.  Correct.
 4    Q.  And in the very middle of that, I'm not going to pay for
 5    this operation.
 6            Did you instruct him to say something like that?
 7    A.  No.
 8    Q.  Okay.  I'm going to try to fast-forward this a little bit.
 9            (Call played.)
10            MS. KANOF:  Let me back up just a little bit.
11            (Call played.)
12            MS. KANOF:  Okay.  Gosh.  I'm sorry I did that.
13            (Call played.)
14            MS. KANOF:  I'm sorry.  I started it over again.  Let
15    me just...
16            (Call played.)
17            MS. KANOF:  It's starting at the phone number, and I
18    have to take it back a whole page for it to -- okay.
19            Stop there.
20            (Discussion off the record.)
21            (Call played.)
22    BY MS. KANOF:
23    Q.  Is Mr. Delgado instructing Lilian to talk to Chuy?
24    A.  Yes.
25            (Call played.)
```

Ascencio – Direct by Ms. Kanof

1    BY MS. KANOF:

2    Q.  Does Liliana have Chuy's number?

3    A.  No.  She actually has to get it from Mr. Delgado.

4    Q.  And does he provide that to her?

5    A.  Yes, ma'am.

6    Q.  Okay.  And what does that indicate to you?

7    A.  It indicates that he knew that facet intimately, but Lilian

8    did not.

9    Q.  And although she was a member of the group, based on him

10   having this phone number, does that make you conclude anything?

11   A.  It makes me conclude that he was more of an orchestrator

12   than she was.

13   Q.  Okay.  I'm going to ask you to look now at Government's

14   Exhibit Number 51.

15           (Call played.)

16   BY MS. KANOF:

17   Q.  Is this phone call -- the recorded phone call that's

18   shortly after -- the phone call with Ms. de la Concha was at

19   10:19 and lasted 16 minutes, correct?

20   A.  Yes.

21   Q.  Do you do anything with the person that's assisting you, in

22   this case Mr. Delgado, in between phone calls?

23   A.  We talked to him just to kind of -- since we're already

24   getting this ruse built, start getting tidbits of what to say,

25   what not to say.

Ascencio – Direct by Ms. Kanof

1              At this point, if I recall correctly, we're telling

2    him not to be so long-winded.

3    Q.  Not to be so long-winded?

4    A.  Yes.

5    Q.  Okay.  So at 12:17 does he place a call for you to Chuy?

6    A.  Yes.

7              (Call played.)

8    BY MS. KANOF:

9    Q.  You notice that when Marco is talking, he says -- he gives

10   him a hug.  I give you a hug?

11   A.  Correct.

12   Q.  What, if anything, does that indicate to you?

13   A.  It means there's a connection there, a friendship.

14             (Call played.)

15   BY MS. KANOF:

16   Q.  Okay.  In this part, basically helping you.

17   A.  Yes.

18   Q.  He's -- okay.

19             He's telling -- he's telling you that because they're

20   interested in working with these people still, what I can do

21   is, I -- and then basically he's facilitating introducing you

22   now.  He's starting that process, correct?

23   A.  Correct.

24             (Call played.)

25

1    BY MS. KANOF:

2    Q.   Okay.  Chuy says that the other people, the owners?

3    A.   Yes.

4    Q.   Okay.  *Dueños.*  Who -- what is an owner in drug

5    trafficking?

6    A.   An owner is going to be the actual organization.  And we

7    see that several times where people will now refer to, Hey,

8    this belongs to this certain cartel or this certain individual.

9    They -- they keep that distance.  It's a persona.

10          These are the people that are the actual true owners

11   of the money.

12   Q.   And when he says, We can't tell him that -- We can't tell

13   them that that happened, because if I tell them that you have

14   to realize that then it's over; is that correct?

15   A.   Correct.

16   Q.   Did Mr. Delgado tell you that Chuy was the intermediary

17   between the money laundering group and the cartel?

18   A.   I don't remember.

19   Q.   But does it appear that he's the one that's talking to the

20   owners?

21   A.   Absolutely.

22          (Call played.)

23   BY MS. KANOF:

24   Q.   Is it common in drug trafficking organizations that they

25   work with family members?

1     A.   Absolutely.

2     Q.   And in this case it's his cousin, Chuy's cousin?

3     A.   Yes.

4     Q.   And it's Isidro that's Chuy's cousin, correct?

5     A.   Correct.

6     Q.   Okay.

7             (Call played.)

8     BY MS. KANOF:

9     Q.   He's -- you told him to take the role of the individual

10    that's trying to get the people out of jail in El Paso,

11    correct?

12    A.   Correct.

13    Q.   Okay.  And then when he says, Okay.  If it -- if the -- if

14    they say it can't be done tomorrow, is he referring about

15    getting the money back?

16    A.   Yes.

17    Q.   Were a lot of these conversations made to appease people

18    that Delgado had the power to get the million dollars returned?

19    A.   Correct.

20    Q.   Okay.  And holding himself out as a lawyer, he's saying

21    that he's going to be able to get the money.  If it doesn't

22    come tomorrow, on page 10 of the transcript, does Mr. Delgado

23    say, Okay.  Then like men, we will pay each other, and there it

24    is, in order to be able to keep working.

25    A.   Correct.

Ascencio – Direct by Ms. Kanof

1   Q.  What's he talking about?

2   A.  Basically, if it doesn't come to fruition and they're able

3   to get the money back, they're going to pay their part each.

4   Q.  Tell the jury about paying back lost money.

5   A.  Basically, once you get into a money contract with any type

6   of organization, they're going to know who you are, what your

7   assets are, who your family is.  And then it is imperative that

8   you pay them back for -- for those -- for those facts.

9   Q.  And if you don't?

10  A.  And if you don't, basically, I mean at that point you're

11  putting yourself, your family, your assets, your properties in

12  danger.

13  Q.  Now, if you look at Government's Exhibit Number 52, this is

14  a phone call that was made by Mr. Delgado at 1:55 p.m.,

15  September 9th, to Chilo, or Isidro, correct?

16  A.  I don't have that.

17  Q.  You don't have 52?

18  A.  No, ma'am.

19          52A.

20  Q.  Okay.  I'm sorry.  A means the transcript.  52 is the

21  actual call.

22  A.  Yes, ma'am.

23  Q.  Okay.  Without having to play this call, if you would turn

24  to page -- I'm sorry -- well, yes.  Page 7 of the transcript.

25  I think it begins at the bottom of page 6.

1          Does Mr. Delgado talk to him -- to Isidro -- about

2    wanting to continue the organization and what -- basically, not

3    failing?

4    A.  Correct.

5    Q.  If you could read Mr. Delgado's words starting at the very

6    bottom of page 6, just to the end of that box on the next page.

7    A.  Correct.  "If you want, tomorrow we will see about the ID,

8    right?  Because I am going to be frank.  We are not going to

9    let this fail.  And, two, we are not going to look bad in front

10   of these people.  But three, we need to -- we need you to be on

11   a straight line, because one loses credibility with stupidity

12   like this.  They get derailed operations.  It's ridiculous, but

13   let's see.  Do you have the number?"

14   Q.  Okay.  And let's just go a little bit further.

15          What does Chilo say?

16   A.  He says, "Yes, there -- there it goes."  And he starts

17   giving the number.

18   Q.  Okay.  Does -- and is that a phone number?

19   A.  Yes.

20   Q.  Okay.  Do you know whose phone number that was?

21   A.  No, ma'am.

22   Q.  Turn your attention to Government's Exhibit Number 53A, the

23   transcript of 53.

24   A.  Uh-huh.

25   Q.  On September 9th, after talking to Isidro at 8:56 p.m.,

Ascencio — Direct by Ms. Kanof

1    does the Defendant make another call to Chuy?

2    A.  Yes, ma'am.

3    Q.  Turn to page 3 of that transcript, please.

4    A.  (Witness complies.)

5    Q.  In the middle of page 3 does Mr. Delgado tell Chuy, "And

6    then our people, the money exchanger over there, appears like

7    the one who made the only statement"?

8    A.  Yes.

9    Q.  Do you know what that's about?

10   A.  No.

11   Q.  Okay.  And then, after Chuy says, "Yes."

12          "If they do accept it, as soon as it does not come out

13   with that, there will be no problem to recover the, um, the

14   issues, those products, right?"

15          Is that an example of code talking?

16   A.  Yes.  Exactly.  They're talking about trying to recover the

17   money.

18   Q.  Okay.  And on page 6, the first large paragraph with

19   Mr. Delgado, does he say, "Yes.  With these people we are not

20   going to burn them ourselves because of something dumb and even

21   less for that.  You would still be talking about -- about huge

22   amounts and all that."

23   A.  Yes, ma'am.

24   Q.  Is Chuy surprised?

25   A.  No.

Ascencio - Direct by Ms. Kanof

```
 1   Q.  What does he say?

 2   A.  No.

 3   Q.  He just says, uh-huh?

 4   A.  Yeah.  He just kind of...

 5   Q.  Okay.  Please turn to Government's Exhibit Number 54.  And

 6   again, is he talking to Lilian de la Concha?

 7   A.  Yes, ma'am.  September 7th, 2007.

 8   Q.  Okay.

 9   A.  September 10th, excuse me.

10   Q.  September 10th at 8:43 a.m.?

11   A.  Correct.

12         (Call played.)

13   BY MS. KANOF:

14   Q.  Wait.  Before we go on, when -- to your knowledge as a tech

15   agent --

16   A.  Yes, ma'am.

17   Q.  -- I'm going to your Title III tech agent experience.

18         To your knowledge, when a phone toll record shows the

19   amount of time that a call elapses --

20   A.  Correct.

21   Q.  -- does it start from the time that there's a connection to

22   the line?

23   A.  Correct.  It does.

24   Q.  Okay.  And so sometimes when voice mail picks up and --

25   when voice mail picks up, then you have to either hang up or
```

 1   the voice mail goes to the point where it lets you leave a

 2   message, correct?

 3   A.  Correct.

 4   Q.  And then you leave a message sometimes, correct?

 5   A.  Correct.

 6   Q.  Okay.  So does -- when does the -- on a toll record, when

 7   does the -- the time period elapse, and the end of the time

 8   period, at what point in the call?

 9   A.  It basically -- depending on the provider, as soon as you

10   dial the number and it starts, you know, what we call a

11   handshake, starts making a handshake with the actual system, it

12   starts the time clock then.

13            So sometimes it could take up to 13, 14 seconds just

14   to connect from one cell tower to a land line to another cell

15   tower to a cell phone.  And then -- then you have the voice

16   mails, and then if it's -- depending on the size of the voice

17   mail it could be substantial.

18   Q.  Okay.  And the farther away the cell towers are from -- or

19   what's a cell tower?  I'm sorry.

20   A.  A cell tower is the mechanism that transmits this data via

21   wave lengths, basically, is your cell tower -- cellular towers.

22   Q.  And for example in El Paso, if there are cell towers right

23   on the other side of the border in Mexico, does the -- the

24   cellular telephone look for the closest tower?

25   A.  Yeah.  Basically, every cell tower has what's called a

1   friend list.  So basically if you have a cell tower here, the

2   software itself will recognize other cell towers near it and it

3   will create a friend list.  So if it hits capacity, if it hits

4   a snag, it drops a call, it will -- your phone will actually

5   look into that friend list and be like, Okay.  I'm a cell

6   tower.  I just lost it.  I'll go to cell tower B through F.

7   Q.  Okay.  And does that take time?

8   A.  It -- we're talking about milliseconds.

9   Q.  Okay.  And then -- but does a cell tower distinguish

10  foreign countries?

11  A.  It will distinguish the actual phones, yes, the service.

12  Q.  Okay.  And does a cell tower distinguish separate states

13  like, say, in the United States?

14  A.  Yes.

15  Q.  It can distinguish between Texas and Georgia?

16  A.  Absolutely.

17  Q.  Okay.

18            (Call played.)

19  BY MS. KANOF:

20  Q.  Again, was he whispering?

21  A.  Yes.

22            (Call played.)

23  BY MS. KANOF:

24  Q.  Okay.  Delgado says, "I'm being honest, right?  And

25  hopefully it can get situated, at least Chuy's priorities."

Ascencio – Direct by Ms. Kanof

1    A.  Correct.

2    Q.  Okay.  Again, does that distinguish Chuy as someone who

3    has, maybe, different priorities than the laundering

4    organization?

5    A.  Basically, it distinguishes Chuy as having the most to

6    lose.

7              (Call played.)

8    BY MS. KANOF:

9    Q.  Did you -- he -- throughout the conversations with the

10   co-conspirators, Mr. Delgado talks about it being Isidro's

11   fault, correct?

12   A.  Uh-huh.  Correct.

13   Q.  First, the identification in the Atlanta airport, correct?

14   A.  Correct.

15   Q.  And then he starts talking about him having a backpack that

16   dogs hit on?

17   A.  Correct.

18   Q.  Did you tell him to throw that information in?

19   A.  I didn't, no.

20   Q.  Okay.  So he went -- as far as you know, when he starts

21   talking about Isidro also having a backpack that the dogs hit

22   on, that was his idea?

23   A.  It came from him, yes.  I'm not sure where the -- the

24   information came from.

25             (Call played.)

1    BY MS. KANOF:

2    Q.   Okay.  One.  She asks him, "Listen, sweetheart, how much

3    was it?"

4            He responds, "What was confiscated?" correct?

5            She acknowledges.

6            And what does he say?

7    A.   "One."  For the one million.

8    Q.   Okay.  So they use the word one for one million in this

9    organization, correct?

10   A.   Correct.

11   Q.   So then 600 would be 600 million?

12   A.   Yep.

13   Q.   500?

14   A.   500 million, correct.

15   Q.   Okay.

16   A.   If they were talking about any smaller, they would always

17   say, *uno chico, dos chicos.*  One small, two small.  100,000,

18   200,000.

19   Q.   In this case you know specifically that the one means one

20   million?

21   A.   One million.  They're talking large amounts.

22   Q.   Because that's what was confiscated, correct?

23   A.   Correct.

24           (Call played.)

25

1    BY MS. KANOF:

2    Q.  Okay.  I'm going to ask you to turn to page 15.  Let's see

3    if I can get it there.  It's not moving.

4            On page 15, does Lilian say in the middle of the page,

5    "Okay.  Perfect.  Listen.  In a little while I'm going to

6    activate another telephone."

7    A.  Correct.

8    Q.  Does that have any particular meaning to you in your job?

9    A.  Absolutely.  Unfortunately for us, a lot of times once

10   there's an actual event, a law enforcement event, people will

11   drop their phones.  They'll stop using them.  They'll get

12   another one in order to, you know, keep us from getting on the

13   phones, whether it's us or the Mexican authorities.

14   Q.  Okay.  And then when -- and he responds, "Perfect"?

15   A.  Exactly.

16   Q.  So this is something that he thinks is a good idea?

17   A.  Yes.

18   Q.  And then she says, "Just for us"?

19   A.  Correct.

20   Q.  Okay.  And what would that indicate to you?

21   A.  Basically, that she was going to get a phone that was going

22   to be used for the communication between her and Mr. Delgado

23   and nobody else.

24   Q.  Does she say on the bottom of page 15, "Yes, I'll give it

25   to you.  I bought it already.  I already have it, but I'm just

1    going to buy the card, because I saw that I don't have a

2    balance, because the balance expired because I hadn't used it.

3    So the card has a month."

4         What -- what kind of card is she talking about?

5    A.  She's talking about a SIM card, a prepaid SIM card, where

6    if --

7    Q.  What's that?

8    A.  It's basically a -- a SIM card is a chip that you put into

9    a cell phone that gives it a unique identifier to be able to

10   talk to the cell tower, so you could communicate.

11        Every SIM card is unique.  Every SIM card, prepaid

12   ones for the most part, will have -- you could add your own

13   amount of money.  And a lot of them will expire, because that's

14   how the providers make their money.

15        So you put in $20, you don't use it, in 30 days you

16   lose it.  You've got to put another $20 on it.

17   Q.  If you'd go to page 19.

18   A.  (Witness complies.)

19   Q.  The first place where Mr. Delgado talks on page 19, does he

20   tell her, "I don't want to let this fall apart"?

21   A.  Correct.

22   Q.  Now, part of him saying that is because they want to

23   introduce you, right?

24   A.  Correct.

25   Q.  But how does she respond?

Ascencio – Direct by Ms. Kanof

1    A.  She says, "No.  It cannot -- it cannot fall apart on us."

2            Basically she's agreeing with him, that she wants to

3    continue with it.

4    Q.  And like, "No, no.  No, that can't be"?

5    A.  Exactly.

6    Q.  "So much planning, so much thought, so much waiting, that

7    stupidity from them," and then he interrupts her, correct?

8    A.  Correct.

9    Q.  Okay.  And finally, if you would look to page 20 of that

10   particular transcript.

11   A.  (Witness complies.)

12   Q.  The last thing that Lilian says is, "Did you talk to *los*

13   *señores?*"

14   A.  Correct.

15   Q.  And for some reason, the person that transcribed it put it

16   in -- the word *los señores* in quotes.

17   A.  Quotes, correct.

18   Q.  Why is that?

19   A.  Apparently, they thought that the *los señores* what they

20   were talking about were important.  So probably talking about

21   the actual males that were involved in the conspiracy in this

22   particular currency transaction, they're involved in it.

23   Q.  Okay.  Turn your attention to Government's Exhibit Number

24   55A.

25   A.  (Witness complies.)

Ascencio – Direct by Ms. Kanof

1   Q.  Again, he's speaking with Ms. de la Concha; is that

2   correct?

3   A.  Correct.

4   Q.  And let me go ahead and turn it on.  It's not a long one.

5   I'm sorry.  This is on September 10th at noon, correct?

6   A.  Correct.  September 10th.

7           (Call played.)

8   BY MS. KANOF:

9   Q.  He's telling her he's already looking for a ring?

10  A.  Correct.

11          (Call played.)

12  BY MS. KANOF:

13  Q.  Okay.  So he's given -- in the first phone call with her

14  Mr. Delgado gave Lilian de la Concha Chuy's phone number, and

15  now it appears as though she used it?

16  A.  Yes.  She used it and contacted Chuy.

17          (Call played.)

18  BY MS. KANOF:

19  Q.  Okay.  What -- now, all of a sudden we're talking about

20  European Euros.

21  A.  Correct.

22  Q.  And 15 of them?

23  A.  Correct.

24  Q.  It's previously been established that one of these

25  individuals was a Spanish citizen.

1   A.  Correct.

2   Q.  Do they use the -- is Spanish -- is Spain one of the

3   countries that is part of the European area that uses Euros?

4   A.  Yes.

5   Q.  Okay.  And what are Euros?

6   A.  Euros is a currency used in that -- that country.

7   Q.  Okay.  And does this have any particular significance to

8   you what she says?

9   A.  Absolutely.  That they're going to try to make arrangements

10  for another 15 million Euros coming out of Spain.

11  Q.  Okay.  And actually, Euros are worth more than the American

12  dollar, correct?

13  A.  Correct.  One Euro is 1.23, I believe, dollars.

14  Q.  So another 25 percent, or 20 percent above that, would be

15  the actual amount in dollars?

16  A.  Correct.

17  Q.  More than $15 million?

18  A.  Correct.

19          (Call played.)

20  BY MS. KANOF:

21  Q.  She tells him no, that's what they're telling me now.  They

22  are going to say from now on they don't want proof.

23          What proof are they trying to acquire?

24  A.  They're trying to acquire the proof on the money that was

25  actually seized.

Ascencio – Direct by Ms. Kanof

1    Q.  Okay.  And what kind of proof is there to give a drug

2    trafficking or money laundering organization that money was

3    seized?

4    A.  Basically, initially, it would be an abandonment form that

5    we give people.

6          Once we seize money, if we do it through a local

7    police department, sheriff's office, they'll have them sign an

8    abandonment form or a receipt, if they don't want to sign an

9    initial receipt, receipt stating that the money was in

10   possession of whatever organization took it.

11   Q.  So is one of the things that Delgado is pretending to do is

12   to try to get evidence that the money was actually seized by

13   the Government and not stolen?

14   A.  Correct.

15   Q.  Okay.  And what do they do when they get this affirmation

16   that money has been seized from the Government?

17   A.  In this particular instance, I'm not sure.  But what

18   usually happens with these organizations, once they get

19   confirmation that the money was not -- was not stolen, one, it

20   saves face for the transportation cell that moved the money, so

21   they're able to work it off.  They're able to get other

22   pickups, other money.  And basically, they start paying the

23   organization for the money that was lost while they still try

24   to recover it.

25   Q.  In addition to trying get the million back, he's also

1    trying to get proof that it was actually seized and not stolen,

2    correct?

3    A.  Correct.

4    Q.  Are you aware –– or let me ask you this.

5        Sometimes, to facilitate an undercover operation, do

6    you provide a fictitious seizure report to the individual who's

7    introducing you into the organization?

8    A.  Yes.

9    Q.  Okay.  Do you know whether or not that was done in this

10   case?

11   A.  Yes.

12   Q.  And so what did ICE or HSI do with regard to this problem

13   with proving that the money was actually in the hands of the

14   federal government?

15   A.  Basically there was a receipt made, if I recall correctly,

16   by –– here in Texas –– that it was seized by a local –– either

17   police department or sheriff's office.

18   Q.  In this case the Department of Public Safety?

19   A.  Correct.

20   Q.  And why would you say that a local or state organization

21   took the money instead of the federal government?

22   A.  We always try to do that.  If we're involved, we try to

23   give them a receipt from a local organization, mainly if

24   they're working with us.  Or even if it's just a wall–off, or

25   we had a local stop them, but we had information.

Ascencio – Direct by Ms. Kanof

1     One, it keeps us out of their knowledge.  They don't

2  know that the federal government is working on it.  And at

3  least in Georgia, it was easier to explain that, you know, the

4  small little department in the middle of nowhere in Georgia

5  stopped them on a fluke, by accident.  So they don't --

6  Q.  That actually did happen in this case, right?

7  A.  Right, which actually happened in this case.

8  Q.  Okay.  And is it true -- I mean, who usually -- say you're

9  not doing an undercover.  Who usually asks for that proof once

10  somebody has been arrested?

11  A.  Oh.  Actually, we've had several occasions on several cases

12  where we've seized money and the transportation members, the

13  cells that actually move this money, are aware of this.  And

14  they'll ask us up front.  They will tell us, I'm not going to

15  talk to you.  I want nothing to do with you.  I'm not going to

16  cooperate, but give me my receipt.  So they know to ask for it.

17     (Call played.)

18  BY MS. KANOF:

19  Q.  He says, So then I'm telling you our people are fulfilling

20  their part for us.

21     And she doesn't deny that?

22  A.  Yeah, correct.

23     (Call played.)

24  BY MS. KANOF:

25  Q.  He says, I'll even put it in the bank for them.

1    A.  Yeah.

2    Q.  What did you think about that comment?

3    A.  Basically at that point, we had already talked about some

4    of the facets of the -- our operation, which would be to use

5    banks to move the money.

6    Q.  Did they put a million dollars in cash in banks?

7    A.  Absolutely not.

8    Q.  Because that would generate reports, correct?

9    A.  Correct.  Correct.

10   Q.  So you -- you talked to him.  You instructed him that

11   sometimes banks are used?

12   A.  Yes.

13   Q.  Did you tell him what amounts of money were used at banks?

14   A.  No.

15   Q.  Okay.

16          (Call played.)

17   BY MS. KANOF:

18   Q.  Okay.  So she tells him -- first of all, he talks about

19   Pedro managing him.

20          And she starts talking about her conversation with

21   Chuy again, right?

22   A.  Correct.

23   Q.  And she says, in fact, they are still at the border waiting

24   for news from you that -- does that mean on the other side of

25   the border?

Ascencio – Direct by Ms. Kanof

1    A.  I --

2    Q.  Or you don't know?

3    A.  I don't know.  But they're basically -- they're at the

4    border waiting to figure out what the outcome is --

5    Q.  Okay.

6    A.  -- either on the Mexican side or the U.S. side.

7    Q.  And they want to know what they should do?

8    A.  Correct.  Correct.

9    Q.  And they're waiting for who to tell them what to do?

10   A.  Marco.

11          (Call played.)

12   BY MS. KANOF:

13   Q.  Okay.  So we're talking about a rental car here, right?

14   A.  Correct.

15   Q.  And it's pretty clear that de la Concha and Chuy have also

16   discussed them using a rental car?

17   A.  The rental car and the location, yes.

18   Q.  And where did you get the location from?

19   A.  That they're at the border.

20   Q.  Okay.  And we thought that it was already in its place of

21   origin.

22          What does that refer to?

23   A.  We thought that they were at their place of origin, that

24   they were back wherever they came from in Mexico, whatever

25   their residence is.

Ascencio - Direct by Ms. Kanof

1    Q.  Okay.  Last transcript.

2            THE COURT:  Before you start.

3            MS. KANOF:  Okay.

4            THE COURT:  It's time for our morning break.

5            MS. KANOF:  Yes, Your Honor.

6            THE COURT:  We'll be in recess for the next 15

7    minutes.

8            (Recess taken; open court.)

9            THE COURT:  You may continue, Ms. Kanof.

10           MS. KANOF:  Thank you, Your Honor.

11   BY MS. KANOF:

12   Q.  Agent Ascencio, if you would look at Government's Exhibit

13   58A.

14   A.  (Witness complies.)

15   Q.  On September 14th of 2007, at 4:00 p.m., did you -- did

16   Mr. Delgado have a lengthy conversation with Francisco

17   Fernandez, also known as Paco?

18   A.  Yes.

19   Q.  Okay.  And by this time -- this is four days later.  Most

20   of the other calls were on September 9th and September 10th,

21   correct?

22   A.  Correct.

23   Q.  Did anything happen between the 10th and the 14th?  Were

24   there any -- anything of significance?

25   A.  Nothing of significance.

Ascencio – Direct by Ms. Kanof

1   Q.  Okay.  And so now it's the 14th of September, and this call

2   is between Paco and the Defendant, correct?

3   A.  Correct.

4           (Call played.)

5   BY MS. KANOF

6   Q.  Okay.  Who is Rafa Solis?

7   A.  Rafa Solis is one of my UC personas.

8   Q.  And in this particular -- you said one of.  Do you -- when

9   you're going to play the part of an undercover infiltrating

10  into an organization, do you actually have identification made

11  and a back story about your life and all of that kind of stuff?

12  A.  Yeah.  Correct.  Once you go through the undercover school

13  that we were speaking about earlier, you actually build a

14  persona.  You get credit cards, you get library cards, you get

15  a credit history, criminal history if it's necessary.

16          You get every facet that you would need, depending on

17  the investigation, to corroborate who you are, where you've

18  been, and where you're going.

19  Q.  Okay.  Do you have more than one?

20  A.  For Atlanta I only had one that was -- that was

21  backstopped.

22  Q.  Okay.  So for Atlanta, Rafa Solis was your most complete

23  persona?

24  A.  Correct.

25  Q.  And so it's Rafa Solis that he's going to try to introduce

Ascencio – Direct by Ms. Kanof

1    into the organization, correct?

2    A.  Correct.

3    Q.  Agent Ascencio, did you ever tell Victor Pimentel about

4    Rafa Solis?

5    A.  No.  No, we wanted to keep them separate.

6    Q.  Okay.  And is that policy?

7    A.  It is actually not policy by the agency.  It's policy that

8    we teach at the -- or suggest we teach in UC school.

9          You want to keep your persona to the people that

10   you're working with, not the people on the outside.

11   Q.  To your knowledge, was Victor Pimentel ever part of the

12   undercover?

13   A.  No.

14   Q.  All right.  And he's going to try to introduce you, right?

15   A.  Yes.

16          (Call played.)

17   BY MS. KANOF:

18   Q.  All right.  When you make a decision -- who makes the

19   decision?  The person, the informant that's introducing you, or

20   the agents, as to who to target to introduce you to?

21   A.  It will be the agents.

22   Q.  Okay.  So who made the decision that it should be Paco that

23   you're introduced to?

24   A.  It was us.

25   Q.  And what was that based on?

Ascencio – Direct by Ms. Kanof

1    A.  It was based on who we would have a more chance of actually

2    reaching our goals, initially.

3    Q.  Do you recall why you picked Paco?

4    A.  I don't.

5            (Call played.)

6    BY MS. KANOF:

7    Q.  For some reason we're not hearing Paco.  We hear him better

8    later.  But...

9    A.  Basically, he has the phone to his ear and it's not being

10   recorded all the way around until he puts it on the speaker

11   phone.

12   Q.  Oh, okay.  Who has his phone to his ear?

13   A.  Mr. Delgado.

14   Q.  Okay.  And you needed for it to be on speaker phone to

15   record it?

16   A.  Yeah.  Actually, I remember the initiation of this phone

17   call.  We gave him a recorder to put on.  He put it in the ear

18   here, and he put the phone on the other ear.  So the whole time

19   that this is going on I'm trying to tell him, you know, to

20   switch it to the other ear.

21   Q.  And while we're talking about phones and technical

22   problems, what's a push-to-talk?

23   A.  Push-to-talk is a technology where cell phones are able to

24   use a type of radio to talk one -- you know, one person to

25   another.

Ascencio — Direct by Ms. Kanof

1    Q.   Is it sort of a very modern advanced walkie-talkie?

2    A.   It basically is.  Actually, a push-to-talk is not like an

3    analogue phone.  It's actually a digital signal that is able to

4    be interpreted pretty quickly.  But because of that aspect,

5    it's also to be encrypted severely.

6    Q.   It's what?  I'm sorry?

7    A.   It's able to be encrypted.

8    Q.   What do you mean?

9    A.   Encrypted means that they could actually get third-party

10   software and encrypt the digital audio from push-to-talk, or it

11   can it be easily obtained.

12   Q.   Was Nextel the company that provided push-to-talk services?

13   A.   Yes, ma'am.

14   Q.   And in push-to-talk services, did you actually have to dial

15   a phone number?

16   A.   No.

17   Q.   So the only person that you could communicate with would be

18   another person that had the Nextel push-to-talk feature?

19   A.   You would be able to communicate to the -- with the person

20   that had the actual push-to-talk number, or a group of people

21   if you had a group talk.  But it would be specific to those

22   people.

23   Q.   And for some period of time, including the period that's

24   covered by the conspiracy in this case, who was the primary

25   user of Nextel push-to-talk other than law enforcement?

Ascencio – Direct by Ms. Kanof

1    A.   During this time period was usually Hispanics.

2    Q.   And Hispanics doing what?

3    A.   Hispanics doing illicit criminal activities.

4    Q.   Okay.  Why is that?

5    A.   Because you know, just like us, they have a means of

6    database where they know what's able to be used.  You know,

7    they always try to keep a step ahead of us.  So they know the

8    technology, to be honest with you, as well as we do.

9    Q.   Okay.  So you're saying that drug trafficking

10   organizations, money laundering organizations, keep current

11   with the technology available?

12   A.   Absolutely.

13   Q.   And you said that Nextel push-to-talk could be encrypted.

14   Was that one of the reasons law enforcement used it, correct?

15   A.   Correct.

16   Q.   And also, was that a reason that illegal conduct was often

17   communicated over Nextel push-to-talk?

18   A.   Yes, ma'am.

19   Q.   They don't use it so much anymore?

20   A.   Nextel has been a dying technology, mainly, in the

21   United States.

22            (Call played.)

23   BY MS. KANOF:

24   Q.   Okay.  That basically indicates that he finally got your

25   signals and...

Ascencio – Direct by Ms. Kanof

1  A.  At that point I actually put the phone on speaker phone.

2          (Call played.)

3  BY MS. KANOF:

4  Q.  Okay.  You notice that —— first of all, what does the he

5  mean by he had the tourist visa in back in his house?

6  A.  Basically, he's talking about Isidro and the gentleman

7  coming into the States.

8  Q.  Okay.  And ——

9  A.  And that they're back at their house because of what he was

10  able to accomplish.

11  Q.  But he refers to the money as confiscated merchandise,

12  correct?

13  A.  Correct.

14  Q.  Is there any time, in any of the undercover calls that

15  Mr. Delgado did for you, that they ever used words that are ——

16  other than the Euros, that are money?

17  A.  They —— no.  Not actual currency, no.

18          (Call played.)

19  BY MS. KANOF:

20  Q.  Did you think he was testing you when he said he preferred

21  to say it in Spanish?

22  A.  No.  I think he was more comfortable with his native

23  language.

24  Q.  Okay.  So now you're part of this conversation; is that

25  correct?

1    A.  Yes.  Correct.

2              (Call played.)

3    BY MS. KANOF:

4    Q.  Did you tell him to switch from talking about Isidro's

5    documentation problem at the airport to talking about drug --

6    narcotics?

7    A.  No.  He's basically flying solo on that one.

8              (Call played.)

9    BY MS. KANOF:

10   Q.  That's you?

11   A.  (No verbal response.)

12   BY MS. KANOF:

13   Q.  Okay.  Certainly you have Skype at HSI?

14   A.  Yes.  Yes.

15   Q.  Okay.  Why didn't you want to use it?

16   A.  Because we don't want to put face -- face with face at that

17   point.

18   Q.  At this point, until you're --

19   A.  Correct.

20              (Call played.)

21   BY MS. KANOF:

22   Q.  So those two pages, pages 12 and 13, are you basically

23   explaining to him what the scheme was for you to infiltrate

24   that you explained with Delgado?

25   A.  Yeah.  Basically, we're giving him the ruse of what we

Ascencio – Direct by Ms. Kanof

1    believe took place.  Once again, all we're trying to do is just

2    build that filter, just buy the time to be able to, one,

3    continue saving face, and continuing working with the

4    organization.

5    Q.  Because I notice you don't say anything about dogs.  You go

6    back to the problem of the airport, correct?

7    A.  Correct.

8    Q.  You even named Hartsfield, which is the Atlanta airport,

9    correct?

10   A.  Correct.

11          (Call played.)

12   BY MS. KANOF:

13   Q.  Okay.  When you say certain threats that have been put on

14   him, how do you know that there were threats?

15   A.  Actually Mr. Delgado, at that point, had informed us that

16   he had been in contact and there had been some threats that

17   Lilian and Chuy had gotten.

18   Q.  Had received?

19   A.  Yes.

20   Q.  At this point?

21   A.  Yes.

22   Q.  Okay.

23          (Call played.)

24   BY MS. KANOF:

25   Q.  When Marco introduced you, he doesn't say what you do for a

Ascencio – Direct by Ms. Kanof

1    living.

2    A.   No.

3    Q.   He –– what does he say?  How are you related to him?

4    A.   Basically, that we've known each other for years.

5    Q.   And he's the one that helps you out?

6    A.   Yeah.  Correct.

7    Q.   Okay.  So is that common, when they introduce somebody as

8    an undercover?

9    A.   Absolutely.  We do that for several different reasons.  The

10   main reason is because, you know, we're building an ally.  And

11   any time you build an ally it's easier to slip up as an

12   undercover.  So you want to just –– we instruct everybody to be

13   as vanilla or as, you know, plain as possible.  Don't get into

14   too many details that could stump him or I and ultimately put

15   the investigation in some type of jeopardy, or worse, put the

16   UC agent in some type of jeopardy.

17   Q.   So if they label you like –– if he said you were an

18   accountant and you're not good with accounting ––

19   A.   Exactly.

20   Q.   –– you'll get caught?

21   A.   Absolutely.

22   Q.   So they're instructed to be very general?

23   A.   Correct.

24            (Call played.)

25

Ascencio – Direct by Ms. Kanof

1    BY MS. KANOF:

2    Q.  Okay.  When you're telling them it might take some months,

3    are you buying time so that you can go undercover and

4    investigate?

5    A.  Absolutely.  We're planting the seed already, letting them

6    know it's going to be a long process.  And at that point we're

7    able to start talking about, Well, it's going to take this

8    long.  Let us start making money.  Let us start paying it back.

9           (Call played.)

10   BY MS. KANOF:

11   Q.  Delgado is referring to the fact that Paco is fluent in

12   English, correct?

13   A.  Yes.  Actually, when we first started the phone call we

14   were hoping to do it in English the whole way to avoid having

15   to do a transcription -- translation.

16   Q.  Okay.  Expensive, time-consuming?

17   A.  Absolutely.

18          (Call played.)

19   BY MS. KANOF:

20   Q.  Okay.  He verifies, in fact, that there have been death

21   threats?

22   A.  Yes, ma'am.

23   Q.  When do -- when money is -- a large amount of money is

24   seized, is that common?

25   A.  Yes.

Ascencio – Direct by Ms. Kanof

1   Q.  And is there an expectation from the drug organization,
2   when you -- oh.
3           Are there death threats, in your knowledge and
4   experience as an agent, when somebody has lost someone's
5   inheritance?
6   A.  No.
7   Q.  Are there death threats, in your experience, when somebody
8   has lost somebody's gambling money?
9   A.  No.
10  Q.  So this is consistent and typical of a drug organization?
11  A.  Yes, ma'am.
12  Q.  Is there an expectation that the people who participated in
13  the trans- -- either the transportation of the drugs or the
14  transportation of the money make good on it?
15  A.  Absolutely.  Once you get into a contract, like I mentioned
16  earlier, they know who you are.  They either get your IDs or
17  figure out where you live.  You have to take them to your
18  house.  So that expectation is there from the beginning.
19          If anything happens, you default on that contract, as
20  they call it, you're required to pay, either liquidate your
21  properties, pay cash, or pay with something else.
22          (Call played.)
23  BY MS. KANOF:
24  Q.  When Paco says that there's a problem that's separate from
25  us, did you ask Mr. Delgado later what he meant by that?

1    A.  I don't recall.

2    Q.  Okay.  And did you have an understanding of what that might

3    have meant?

4    A.  No, ma'am.

5            (Call played.)

6    BY MS. KANOF:

7    Q.  Okay.  Delgado says that Chuy is –– feels helpless during

8    the time he meets with these people.

9            And again, does that verify that Chuy is the

10   intermediary with the DTO, with the drug trafficking

11   organization?

12   A.  Absolutely.  It shows that Chuy was the conduit between the

13   actual owners of the money, the drug cartel, and this group of

14   people that took on this contract.

15           (Call played.)

16   BY MS. KANOF:

17   Q.  So when Paco says everybody has to pay for this, that,

18   again, is corroborating that it's a drug trafficking

19   organization?

20   A.  Absolutely.  He's complaining, because of a mistake, they

21   all have to pay for it.

22           (Call played.)

23   BY MS. KANOF:

24   Q.  Okay.  You –– what are you doing here?

25   A.  At this point, I'm actually –– I'm planting the seed about

Ascencio – Direct by Ms. Kanof

1    if we're able to continue doing business, getting money

2    contracts, that I have the ability, through my company's bank

3    accounts, to move this money electronically.  You know, like I

4    said, without doing it in cash, because it's just dangerous

5    walking around with cash.

6    Q.  So did Mr. Delgado ever tell you that this was not drug

7    money?

8    A.  No.

9              (Call played.)

10   BY MS. KANOF:

11   Q.  When he's talking about these people think we stole from

12   them and who could begin using violence, how does Mr. Delgado

13   react?

14   A.  He continues with the conversation.

15   Q.  Worried?  Shocked?  Anything?

16   A.  No, just normal.

17              (Call played.)

18   BY MS. KANOF:

19   Q.  Okay.  Is it -- does it have any significance to you that

20   two of the members of the conspiracy, Pete and Chuy, are

21   willing to put up property value to $3 million?

22   A.  Correct.

23   Q.  How does that happen?

24   A.  Basically, you know, they know who they are, and they

25   probably know about these properties.  So if they default on

Ascencio – Direct by Ms. Kanof

1    this contract, you know, they're already expecting that they're

2    going to have to turn over the property or liquidate it to be

3    able to pay back the contract that was lost.

4    Q.  Okay.  And is it common that they would pledge something

5    that they owned to the cartel so -- to take place of the money

6    they lost?

7    A.  Absolutely.  Look.  You're always going to have somebody

8    that introduces you to a money laundering organization.  But

9    with that introduction, you have to build your own rapport.

10   You have to build your own confidence.

11        So until you do that, they're going to want some type

12   of collateral to know that, hey, you're going to do good on

13   this contract, which is usually money.

14        (Call played.)

15   BY MS. KANOF:

16   Q.  Okay.  Do you know whether or not Lilian actually told

17   Mr. Delgado that someone had chambered a round on Chuy?

18   A.  I don't know.

19   Q.  You don't.  Okay.  It didn't occur in the any of the

20   conversations.

21   A.  Correct.

22   Q.  Okay.  But does it appear that he understands what happens

23   when you lose money?

24   A.  Yes.

25        (Call played.)

Ascencio – Direct by Ms. Kanof

1   BY MS. KANOF:

2   Q.  Okay.  Colima.  Were you present when Victor Pimentel told

3   ICE agents that he and his -- and Marco were going to drive to

4   Colima to take the million dollars?

5   A.  No.  I knew that it was going to Mexico from the Atlanta

6   stop, but not specifically where.

7   Q.  Okay.  So this -- so you heard Colima for the first time?

8   A.  Yes.

9   Q.  But does Colima have any kind of significance to you?

10  A.  Yes, ma'am.

11  Q.  What significance does it have?

12  A.  Well, Colima has always been known as a drug state for us,

13  a narco state.  It's one of the states that's controlled by the

14  cartels, specifically the Sinaloa, because they still control

15  one of the ports of entry, which is a vital port of entry,

16  which is Manzanillo.  That's where, for years, we've been

17  investigating where they get a lot of precursors.

18  Q.  What's a precursor?

19  A.  Precursor is what they use to make drugs.  For example,

20  methamphetamine.  They need certain, you know, ingredients to

21  be able to make this type of drug.  So it's always been a state

22  of interest, you know, to the federal government.

23  Q.  So when Delgado mentioned Colima is where they were going

24  to meet, would you have been able to go to Colima, Mexico, to

25  make that meet?

Ascencio – Direct by Ms. Kanof

1    A.  No.  Actually, not.

2    Q.  And why is that?

3    A.  Because of the safety, the safety factor.  I mean

4    basically, you're going into a lion's den.  That's where your

5    boss is, the people working -- you know, pulling the strings in

6    these organizations are stationed, working -- residing there.

7    And the last thing you want to do is get somebody from an

8    agency, whether it's federal or state, and put them in danger.

9    We would never do that.

10   Q.  And so are there rules and regulations about you actually

11   leaving the United States?

12   A.  Yes.

13   Q.  And what are those?

14   A.  Basically, before you do any type of travel it needs to be

15   vetted through not only your law enforcement undercover liaison

16   that you're fit for that type of travel and that type of

17   undercover meeting, but that you're safe.  You know, that

18   you're able to articulate what's going on, you're able to, you

19   know, talk the talk, walk the walk, like I mentioned earlier.

20           So we're not going to throw anybody into anything

21   that's going to put them in any type of danger.

22   Q.  And in fact, Marco Delgado himself says, Why walk into a

23   lion's den?

24   A.  I don't recall.

25   Q.  Okay.  We haven't gotten there.  It's just a little bit

1    down.

2            (Call played.)

3    BY MS. KANOF:

4    Q.   There we go.

5    A.   Exactly.

6    Q.   And what is he referring to?

7    A.   The same.  You know, why go somewhere where you're going to

8    put yourself in danger?  You're going to be outmanned, you

9    know, at that point.

10           (Call played.)

11   BY MS. KANOF:

12   Q.   Okay.  Back at the beginning of this part of the

13   conversation, when Paco is talking to Delgado in the middle of

14   page 44, he asks him if he would be willing to get in for the

15   part proportional to the commission that he would have taken.

16   I mean, 50 percent.

17           What commission is he talking about?

18   A.   The commission of moving the money.

19   Q.   Okay.  And is 50 percent kind of a high commission or

20   how...

21   A.   Extremely high.  Exactly.  I think they're probably talking

22   about maybe the actual commission was split.  Maybe 50 went to

23   a certain group, and 50 went, and they would disburse it to the

24   members.

25   Q.   So that wouldn't be 50 percent of the entire amount.  It

Ascencio – Direct by Ms. Kanof

1    would be 50 percent of what Mr. Delgado received?

2    A.  Potentially, yes.

3    Q.  Okay.

4    A.  Because that's a large amount for my type of pickup.

5    Q.  Okay.  And Mr. Delgado responds, "That's because you were

6    not there, but it was in equal parts."

7          So it appears as though Mr. Delgado is in a meeting

8    that Paco was not at, correct?

9    A.  Correct.

10   Q.  Where they split up the money?

11   A.  Correct.  From the conversation, Mr. Delgado was present

12   during the meeting.  And Paco had a representative there

13   basically, you know, on his behalf.

14   Q.  Okay.  And when basically Delgado responds, Let's see how

15   much A, B, C, and D and the one, in fact, who said that you

16   were a participant was Pete.

17         He said, Yes, here, the five.

18         Would that be the five co-conspirators who are

19   splitting the money?

20   A.  Correct.

21         (Call played.)

22   BY MS. KANOF:

23   Q.  Back before we go too much farther, on the beginning of

24   page 47, Mr. Delgado says, Okay.  Then send them, if you want,

25   with tools.

1              What does tools mean, if you know?

2    A.  I don't know.

3              (Call played.)

4    BY MS. KANOF:

5    Q.  Okay.  Paco refers to Mr. Delgado as the leader of us; is

6    that correct?

7    A.  Correct.

8    Q.  Is there a special connotation to being the leader?

9    A.  Basically, he's the one that orchestrated this pickup.  And

10   a lot of times he would have more to gain from it.

11   Q.  And back on page 47 Paco tells him, "You are the smartest

12   amongst all of us and the one who knows the most about this."

13   A.  Correct.

14   Q.  Did you get that impression as well, that Mr. Delgado knew

15   the most about this transaction?

16   A.  Yes.  And that's the reason, when we first initiated the

17   investigation, we decided to use Mr. Delgado instead of, you

18   know, Mr. Pimentel.  Because we saw that he was intimate with

19   these people, knew what was going on.  He was manipulative.  He

20   was able to talk to these people.  So he would have been

21   perfect for us to use to infiltrate the organization.

22             (Call played.)

23   BY MS. KANOF:

24   Q.  Okay.  So now he's saying there's six people in the

25   conspiracy?

Ascencio – Direct by Ms. Kanof

```
1    A.  Correct.

2    Q.  He's adding someone?

3    A.  He's correcting Marco on the people who were involved.

4            (Call played.)

5    BY MS. KANOF:

6    Q.  After your introduction into this organization, did you, in

7    fact, have a meeting?

8    A.  Yes.

9    Q.  Tell the jury how that came about.

10   A.  Actually, in talking to the different co-conspirators in

11   this investigation, we were able to lure Isidro -- and I can't

12   recall the second gentleman's name -- up to McAllen, Texas, for

13   the purpose of talking to them about where we stood with the

14   seizure of the million dollars, if we could -- you know, if we

15   could just continue on with the ruse.  And then -- but

16   specifically, to try to lure them into opening up more

17   contracts, where we could get involved with the contracts.

18           So they came up to meet us and see what we had to

19   offer.

20   Q.  Did -- we're not putting them into evidence.

21           But did you have conversations with the

22   co-conspirators alone, without Mr. Delgado being participating

23   in the conversation?

24   A.  Yes.

25   Q.  Okay.  And do you recall how many different individuals you
```

1   spoke with?

2   A.  I spoke to Chuy, I spoke to Paco, and Lilian de la Concha.

3   Q.  Okay.  And between those three conversations you set up a

4   meeting in McAllen, Texas?

5   A.  Correct.

6   Q.  Let me just ask you.

7            The city of Laredo has come up in some questioning.

8   Was there ever a mention of the city of Laredo?

9   A.  No.  I think it -- it started somewhat by mistake, and it's

10  just -- kind of was a landslide.  We never went to Laredo.  We

11  never hit Laredo.

12  Q.  Okay.

13  A.  It was Atlanta, El Paso, and McAllen for the meeting.

14  Q.  Did you travel to McAllen to meet with the co-conspirators?

15  A.  Yes, ma'am.

16  Q.  Were you with or without Mr. Delgado?

17  A.  Without.

18  Q.  Who was with you?

19  A.  I had another UC agent with me.

20  Q.  Another what?

21  A.  Undercover agent.

22  Q.  And who did you hold him out to be?

23  A.  Just an associate.

24  Q.  Is that required, or you were -- why were you doing that?

25  A.  No, no.  There's always strength in numbers.  We weren't

Ascencio - Direct by Ms. Kanof

```
 1   worried about anything, but it's always best to have somebody
 2   there with you.
 3   Q.  And where did you meet?  Who do you meet with?
 4   A.  We meet with Isidro and with this other gentleman whose
 5   name escapes me.
 6   Q.  Okay.  And what was the nature of the meeting?
 7   A.  The nature of -- the purpose, once again, was to talk about
 8   the million dollars that was seized, where supposedly the
 9   process lied [sic] at that time, and to continue to try to see
10   if we could get other contracts, where we could infiltrate the
11   organization.
12   Q.  Is it your understanding that Isidro is a central
13   individual in the organization?
14   A.  He is basically the face, or the arm, for lack of a better
15   word, in the States for Chuy.  He's able to come and go pretty
16   easily.  So they used him to come up here and be the face for
17   the organization.
18   Q.  In fact, he -- when you were provided with Isidro's phone
19   number, I believe it was a phone number in the United States?
20   A.  Correct.
21   Q.  Where did you meet in McAllen?
22   A.  In a restaurant.
23   Q.  Did you have other agents that were present in the
24   restaurant watching for your security and safety?
25   A.  Yeah.  We actually had Special Agent Tom Justice, the case
```

Ascencio – Direct by Ms. Kanof

1   agent, there with me and another McAllen agent.

2   Q.  What happened at that meeting?

3   A.  Basically, we discussed the options where the ruse lied at

4   that time discussed how we would, you know, facilitate the

5   movement of the money if we were able to win another contract.

6           And basically, it was more of a type of feel --

7   feel-out for both groups, us as undercover, and them coming up

8   to talk to us.

9   Q.  Okay.  Did you know about -- or by the way, did it go

10  anywhere?

11  A.  No, ma'am.

12  Q.  Was that the only meeting that occurred?

13  A.  Yes, ma'am.

14  Q.  Did you try to go further?

15  A.  Yes.

16  Q.  What efforts did you take in order to try to infiltrate the

17  organization?

18  A.  Well, we continued -- we continued several talks with --

19  with all the members of the organization.  I -- you know,

20  several phone calls with them.

21          We talked large amounts of money being moved from the

22  United States, large amounts of money being moved from Europe.

23          Basically, it looked like we were almost there, about

24  to get a contract.  Everything was going basically to plan.

25  And from one day to another it just ceased.  I mean,

Ascencio – Direct by Ms. Kanof                3 –    94

1   communication almost came to a complete stop.

2   Q.  You have no idea why?

3   A.  We speculated.

4   Q.  Well, in your experience as an agent, is it uncommon that

5   all of a sudden things will stop?

6   A.  No, not as long as everything is being fluid and moving

7   forward.  If something gets thrown in, they throw a monkey

8   wrench into the equation, that usually stops, and it stops

9   quickly, kind of what happened here.

10  Q.  Okay.  Now, what's a telephone toll record?

11  A.  A telephone toll record?  It's a record that the telephone

12  provider, you know, registers in the system.

13  Q.  I'm going to show you what's -- it hasn't been marked, but

14  it's going to be Government's Exhibit 85, and it's Defense

15  Exhibit 2.

16  A.  Okay.

17  Q.  Okay.  And you recognize these as -- do you recognize this

18  as AT&T toll records?

19  A.  It's not coming up yet.

20          MS. KANOF:  Oh, Your Honor, can we publish?

21          THE WITNESS:  Here it is.  It just came up.

22          MS. KANOF:  Oh, okay.

23  BY MS. KANOF:

24  Q.  As AT&T toll records, correct?

25  A.  Yes, ma'am.

Ascencio — Direct by Ms. Kanof

1    Q.  And they begin on July 9th of 2008, correct?

2    A.  I cannot see the date.

3         Yes, ma'am.

4    Q.  Okay.  And turning to page 7 of the exhibit, there are

5    highlighted -- on page 7 of this document, there is highlighted

6    a call on the 16th of July of 2008.

7    A.  Okay.

8    Q.  And the number that is being called is 404-427-7179.

9         Whose phone was that?

10   A.  That was my phone.

11   Q.  Was that your actual government phone or your undercover

12   phone.

13   A.  No, that was my government phone for the six years I was

14   there.

15   Q.  Okay.  And the -- I'll just tell you the originating number

16   is Mr. Delgado's cell phone.

17   A.  Okay.

18   Q.  His AT&T cell phone.

19   A.  Okay.

20   Q.  And it appears as though on July 16th of '08 there was a

21   conversation -- or excuse me.

22         The elapsed time period from the time that the cell

23   phone connected with the tower and the time that it terminated

24   with the tower was 11 minutes and 57 seconds, correct?

25   A.  Correct.

Ascencio – Direct by Ms. Kanof

1   Q.  Did Mr. Delgado have your official government cell phone?

2   A.  He did.

3   Q.  And did he call you?

4   A.  Yes.

5   Q.  Between -- do you remember, by the way, when the McAllen

6   meet was?

7   A.  I don't.

8   Q.  Okay.  Was it within -- between your conversations that

9   we've been listening to today that Mr. Delgado participated in,

10  was it months?  Years?

11  A.  Oh, no.  No, no.  No, it was just fairly quickly after

12  that.  You know, within probably a couple of weeks.

13  Q.  Okay.  And how fast did it take for it to fizzle?

14  A.  Pretty quickly.

15  Q.  Okay.  And after it fizzled, did you continue to have

16  communications with Mr. Delgado?

17  A.  No.

18  Q.  Did you call him?

19  A.  No.

20  Q.  Would he call you?

21  A.  No.

22  Q.  So now we're -- since September 14th of 2007, we're in July

23  of 2008.  So about nine months later?

24  A.  Okay.

25  Q.  And during that nine-month period of time between your

Ascencio – Direct by Ms. Kanof

1  McAllen meeting and the middle of July of 2008, did you have

2  communication with Mr. Delgado?

3  A.  Not that I recall, no.

4  Q.  Were you using him for any other reason?

5  A.  No, ma'am.

6  Q.  Did he come to Atlanta to talk to you?

7  A.  No.

8  Q.  Did you go to El Paso to talk to him?

9  A.  No.

10  Q.  Well, on July 16th of 2008, at 6:16 p.m., it appears as

11  though the two phones connected for 11 minutes and 57 seconds.

12        Did you talk to Mr. Delgado at that time?

13  A.  I don't recall.

14  Q.  If you had talked to him, would you have made a report?

15  A.  If it was of substance, yes.

16  Q.  Okay.  And what would substance be?

17  A.  Substance would be if he was giving us information that

18  would further our investigation, something that would actually

19  be of importance.

20  Q.  Okay.  So if Mr. Delgado called you and said, I've been

21  asked to pick up $100,000 in two $50,000 lots in Chicago, would

22  that have been of significance?

23  A.  Absolutely.

24  Q.  Okay.  And would you have done something about it?

25  A.  Yes, ma'am.

Ascencio — Direct by Ms. Kanof

1    Q.  Did he do that?

2    A.  No.

3    Q.  Okay.  That you would remember?

4    A.  Oh, of course.  Yes.

5    Q.  And is it possible it went to voice mail and he left a

6    message?

7    A.  Yes, ma'am, very possible.

8    Q.  Did there come a time when -- do you know who else's phone

9    number he had in Atlanta?

10   A.  He had several of our phones.

11   Q.  Okay.  And you were all in the same financial group?

12   A.  Yes, ma'am.

13   Q.  Would you have discussed that kind of phone call with

14   someone else in the group?

15   A.  Absolutely.  Yes.

16   Q.  Telling them that something was going to happen Chicago?

17   A.  Correct.

18   Q.  Okay.  There's also -- but by this time, were you trying to

19   avoid Mr. Delgado?

20   A.  Yes.

21   Q.  Why?

22   A.  Because the way that the investigation came to a quick end,

23   I personally speculated that he had compromised me.

24   Q.  Is an individual that is cooperating with you permitted to

25   tell other people he's cooperating with you?

Ascencio - Direct by Ms. Kanof

1    A.  No.

2    Q.  Okay.  And if they do tell people that they're cooperating

3    with you, what happens?

4    A.  Well, they -- they could actually be charged for

5    obstruction; deactivated, if they're actually signed on as

6    sources.

7    Q.  Was Mr. Delgado actually signed on as a source?

8    A.  I don't believe so.

9    Q.  Okay.  You actually entered into some kind of a contract,

10   correct?

11   A.  Correct.

12   Q.  But was he told that he should not tell anybody that he was

13   participating?

14   A.  Absolutely.

15   Q.  And did you tell him?

16   A.  Yes.

17   Q.  On the next day, the 17th of July, there appears to be a

18   call originating from his cell phone to your cell phone at

19   12:03 p.m. for 50 seconds.

20   A.  Uh-huh.

21   Q.  Is that a yes?

22   A.  Yes.

23   Q.  She's good, but I don't know if she knows how to spell --

24   A.  I'm sorry.

25   Q.  And would that indicate to you that any conversation

1    occurred?

2    A.   No.  It means that there was a connection made.

3    Q.   Turning to page 9 of the exhibit, there's a -- on the

4    21st -- I'm sorry.  That's not you.

5              On the 21st of July at 6:01 p.m., a call is placed

6    from Mr. Delgado's cell phone to your cell phone, and the

7    elapsed time is 3 minutes and 52 seconds again.

8              Did you receive -- did you actually talk to

9    Mr. Delgado on that day?

10   A.   I don't recall.

11   Q.   With regard to the next one at 6:08, just seven minutes

12   later, another call placed between the two phones for 1 minute

13   and 34 seconds.

14   A.   I don't recall.

15   Q.   Correct?

16   A.   Yeah.

17   Q.   Did you check your voice mail all the time?

18   A.   Yes.

19   Q.   Okay.  And if a message had been left that they were going

20   to do something substantiative, like tomorrow I'm going to pick

21   up -- or the day after tomorrow we're going to pick up

22   $100,000, would you have made a report?

23   A.   Absolutely.

24   Q.   Did you make a report?

25   A.   No.

Ascencio — Direct by Ms. Kanof

1    Q.  The next page of the -- and I'll do this kind of quickly.

2           The next page, the highlighted areas on the 22nd of

3    July for your phone for a minute and 18 seconds, that could

4    just be the connection time?

5    A.  Correct.

6    Q.  For a minute and one second at 2:31, again, a connection?

7    A.  Correct.  Correct.

8    Q.  At 6:19 on the 22nd, the connection time is 9 minutes and

9    33 seconds?

10   A.  Correct.

11   Q.  Did you ever talk to Mr. Delgado about anything during this

12   time?

13   A.  No.

14   Q.  What were you doing during this time?

15   A.  During this specific time?

16   Q.  Yes.

17   A.  I was in Atlanta.

18   Q.  Were you working on anything in particular?  Were you

19   working as an undercover, do you remember?

20   A.  I don't remember exactly what I was doing this day.

21   Q.  Okay.  On that same -- on July 22nd at 6:33, another call,

22   a minute and two seconds.  Did you participate in a

23   conversation?

24   A.  No, ma'am.

25   Q.  Okay.  And the 7179 number -- I accidentally highlighted

Ascencio — Direct by Ms. Kanof

1  the 5199.  You recognize the 5199 as Tom Justice's number?

2  A.  Yes, ma'am.

3  Q.  But at this time he was already leaving for DC, correct?

4  A.  Correct.  Correct.

5  Q.  And when you leave -- he was getting promoted and was

6  transferring -- do you basically stop talking to informants in

7  Atlanta, because now you're going to do something else in

8  Washington, D.C.?

9  A.  Yeah.  Basically, like when I left Atlanta, the sources

10  that I did have still in Atlanta activated, they were

11  transferred to another agent.

12  Q.  Okay.  At 9:21 a.m., for 2 minutes and 10 seconds, you

13  don't -- you didn't talk to him?

14  A.  No, ma'am.

15  Q.  At 9:59 for 50 seconds?

16  A.  No, ma'am.

17  Q.  Okay.  And -- okay.  And the next two are Mr. Justice's.

18         At -- okay.  Now, we're talking the 23rd of July.

19         Are you now aware that on the 23rd of July victor

20  Pimentel picked up $50,000?

21  A.  Yes, ma'am.

22  Q.  Okay.  And that would have been something of concern to

23  you?

24  A.  Yes.  Definitely.

25  Q.  On that date, at 10:48, the phones connect for 4 minutes

1    and 56 seconds.

2              Do you recall whether or not you received a voice mail

3    or you spoke to Mr. Delgado regarding a pickup in Chicago?

4    A.  No, ma'am.

5    Q.  Let me ask you.

6              In your experience as an undercover and as someone who

7    handles informants, is it unusual for individuals engaged in

8    criminal conduct to try to cover their tracks?

9    A.  Absolutely.  It's happened to me personally.

10   Q.  Okay.  Explain that.

11   A.  I've had informants where, for example, when I was with the

12   task force in North Carolina, they would call me and find out

13   what we're doing, if we had anything going on, where we were

14   located.  And meanwhile, going behind our back, they are

15   meeting another one of our informants to sell cocaine.

16             Right before they did this transaction they're calling

17   me, Hey, what's going on?  I have some information for you, but

18   it's –– they would give this location way off from where they

19   were actually at.

20             And most of the time we would just blow them off.  No,

21   no, we're busy.  We're at this other location, just to

22   contin- –– just to, you know, kind of put them at ease, and

23   they would usually do the transaction.

24             We actually, in my career, we've arrested –– signed up

25   CIs, at least four of them, in a similar situation.  And they

Ascencio – Direct by Ms. Kanof

1    always call because they're afraid at the -- in the back of

2    their mind they're always thinking, Is it them?  Can I trust

3    them?  Where are they at?  It's very common.

4    Q.  So in other words, trying to find out if they can figure

5    out if you know what's going on?

6    A.  Absolutely.

7    Q.  Is it common for an informant to continue in illegal

8    conduct and not tell you about it?

9    A.  Yes.  Yes.

10   Q.  It's very common, correct?

11   A.  Yeah.  And the day of this pickup, as you mentioned,

12   Atlanta was already aware.  We were already aware that there

13   was something going on.  So more than likely I was just letting

14   it go to voice mail, just ignore, ignore, ignore.

15   Q.  Okay.  By the 23rd of July at -- let's see.  By the 23rd of

16   July at 11:23, were you aware that there had already been a

17   money pickup?

18   A.  I was not aware that it had already taken place, but I knew

19   that Chicago was working on it.

20   Q.  Okay.  And so who informed you of that, Chicago or El Paso?

21   A.  No.  Actually, it was informed by -- I was informed by -- I

22   was informed by Jeff Walton.

23   Q.  That would have been somebody in your own office?

24   A.  Special Agent Jeff Walton, correct.

25   Q.  Okay.  And somebody had told him?

Ascencio – Direct by Ms. Kanof

1   A.   Yeah.   Because he was taking over the case, since Tom was

2   leaving.

3   Q.   Oh, that's right.   It was going to be assigned to him,

4   correct?

5   A.   Yes, ma'am.   Yes, ma'am.

6   Q.   Okay.   And when –– when individuals who are –– who are

7   continuing, and that –– they also want to see if you're

8   available, correct?

9   A.   Absolutely.

10  Q.   Make sure you're not on surveillance on somewhere else.

11  A.   Yes.

12  Q.   Would that be fair to say?

13  A.   Yes.

14  Q.   But there is no question in your mind that you did not talk

15  to Mr. Delgado in July of 2008 regarding anything that was

16  occurring in Chicago; is that correct?

17  A.   Absolutely not.   I was still under the impression that he

18  had comprised me; and, therefore, putting me in jeopardy.   So I

19  wanted nothing to do with him.

20  Q.   Okay.   Did he have your e-mail address?

21  A.   No.

22  Q.   Okay.   When you go undercover, do you sometimes create

23  fictitious e-mail addresses?

24  A.   Yes, ma'am.

25  Q.   And did you have a fictitious e-mail address?

Ascencio – Direct by Ms. Kanof

1    A.  Yes.

2    Q.  What -- what was your fictitious e-mail address, if you can

3    recall?

4    A.  During that time?

5    Q.  Well, first of all, let me ask you.

6    A.  Yeah.

7    Q.  Are there favorite providers for criminal activity?  Do

8    drug dealers generally use certain providers?

9    A.  Absolutely.  One of the main e-mails I would use mainly,

10   with dealing with the Mexican organizations or Colombian

11   organizations, is Hotmail.

12          So I would also try to mimmick what they do, just --

13   you know, you're just building that comfort level with them.

14   Q.  So Hotmail is a favorite of the --

15   A.  Yes.

16   Q.  And what other IP user is a favorite?

17   A.  Gmail.

18   Q.  Hotmail and Gmail?

19   A.  Yes.

20   Q.  So did you use Hotmail and Gmail?

21   A.  That was my primary two ISPs, yeah.

22   Q.  Okay.  And did you send Marco Delgado an e-mail in --

23          I'm going to show you what is Defense Exhibit

24   Number 1.

25          Did you receive -- first of all, did you receive an

Ascencio - Direct by Ms. Kanof

1    e-mail from Marco Delgado?

2           Well, this e-mail doesn't have a date on it, correct?

3    A.  No, ma'am.

4    Q.  And you -- have you ever seen an e-mail that didn't have a

5    to, a from, regarding, and a date?

6    A.  Only when they've been copied and pasted.

7    Q.  Okay.  And there's no time there as well?

8    A.  Correct.

9    Q.  But in your recollection, there's a response here,

10   allegedly, on August 3rd of 2008.

11          So let me ask you.  You were aware of what happened in

12   Chicago in July, correct?

13   A.  Yes, ma'am.

14   Q.  And did you become aware that Mr. Delgado was involved?

15   A.  Yes.

16   Q.  And would that have affected your use of him as an

17   informant?

18   A.  Absolutely.

19   Q.  How would it have affected it?

20   A.  He would be not used by us.

21   Q.  Okay.  But you wouldn't be surprised?

22   A.  No.

23   Q.  And this particular e-mail is in Spanish?

24   A.  Yes, ma'am.

25   Q.  Okay.  Would it be common or uncommon for you to e-mail

Ascencio - Direct by Ms. Kanof

1   Mr. Delgado in Spanish?

2   A.  No, it would be in Spanish more than likely.

3   Q.  Okay.  And it purports to be an e-mail, except that it

4   doesn't have a header that says what, if you can just

5   translate.

6   A.  The friend -- the female friend contacted him about a

7   consultation about future operations, and that -- she was

8   saying, there, you can see of it, four people.  That they want

9   to know what could be done to initiate the jobs afterwards.

10  Q.  Okay.

11  A.  And that they couldn't see each other the following week in

12  Chicago.

13        It says, I ask you to inform me.  Hope you're well.

14  Q.  Okay.  Especially if you met in Chicago, you would have

15  remembered this, correct?

16  A.  Yes.  Yes.

17  Q.  Did you ever receive this e-mail?

18  A.  No.

19  Q.  Okay.  And there purports to be a response from you, but

20  it's in English.

21  A.  Correct.

22  Q.  Okay.  The other one was allegedly from Mr. Delgado in

23  Spanish.

24        And it says Rafa Solis at Bellsouth.net, correct?

25  A.  Correct.

Ascencio — Direct by Ms. Kanof

1   Q.  You used Hotmail and Gmail?

2   A.  Correct.

3   Q.  Not Bellsouth?

4   A.  Correct.

5   Q.  Is one of the reasons you use Hotmail and Gmail also

6   because it's web based?

7   A.  It's web based.  It's a server.  I wouldn't use -- and I

8   teach not to use Internet service providers because each -- we

9   don't know how savvy the person is, whether they're going to be

10  able to follow your IP to, you know, a server.

11  Q.  Okay.  Let's break this down a little bit.

12          First of all, you said you teach?

13  A.  Yes, ma'am.

14  Q.  What do you teach?

15  A.  Undercover school.

16  Q.  And where do you teach undercover?

17  A.  At the Federal Law Enforcement Training Center.

18  Q.  Okay.  Thank you for not saying FLETC.

19  A.  Yes, ma'am.

20  Q.  And you teach -- okay.  When they use an IP address like

21  Bellsouth, how does that make it easier for somebody to

22  basically figure out whether -- where you are and who you are?

23  A.  You know, basically, we do it in an excess of caution.

24  Just you -- you never know what kind of contacts they have,

25  what kind of, you know, technology, what kind of, you know,

Ascencio – Direct by Ms. Kanof

1   background they have, where they could easily figure out where

2   this IP is located at.

3           Even though our -- all our UC accounts are

4   backstopped, there's also still that little bit of unknown, so

5   we always try to, you know, use the big servers, use the big,

6   you know, Hotmail or Gmail.

7   Q.  Okay.  When I talked about web based, Hotmail and Gmail

8   are -- work differently, correct, as -- like IP addresses?

9   A.  Yes.  Because Hotmail and Gmail are primarily a

10  communication, you know, system for e-mail, for -- like Google

11  voice for communication.

12          Bellsouth is more an Internet service provider.  So

13  that's actually the company giving you the service, and they

14  give you an auxillary e-mail attached to that account.  So that

15  gives -- you know for us, it gives us that little facet that we

16  don't want people to be able to get to.

17  Q.  Okay.  So like if I like go to an Internet cafe at

18  Starbucks and I want to send an e-mail it -- first, I'd have to

19  get into Gmail, correct?

20  A.  Correct.

21  Q.  And then transmit, correct?

22  A.  Correct.

23  Q.  And that's a little bit harder for individuals who want to

24  find out about you to find out?

25  A.  Absolutely.  Because once you subpoena Gmail, it will just

1   show up that the originating IP was at this cafe.  So at that

2   point we were's not worried about it.

3   Q.  When -- do you ever -- do you ever remember communicating

4   with Mr. Delgado on e-mail?

5   A.  I do.  I do.

6   Q.  Okay.  And you'll see that this e-mail has on it -- the one

7   from him, allegedly, that this came from Delgado & Associates?

8   A.  Yes, ma'am.

9   Q.  Okay.  And when you communicated with him, what -- did he

10  use his Delgado & Associates office e-mail or did he use his

11  AOL account, his personal account, if you can recall?

12  A.  I don't recall.

13  Q.  You don't remember?  Okay.

14          In December of 2008 --

15          THE COURT:  Ms. Kanof, we need to break for lunch.

16  So...

17          MS. KANOF:  Okay.

18          THE COURT:  Ladies and gentlemen, we'll be at lunch

19  for an hour and 15 minutes.  So we'll reconvene at 1:40.

20          We'll be in recess until 1:40 in the afternoon.

21          (Recess taken; open court.)

22          THE COURT:  Ms. Kanof, you may continue.

23          MS. KANOF:  Yes.

24  BY MS. KANOF:

25  Q.  Agent Ascencio, you understand you're still under oath?

Ascencio — Direct by Ms. Kanof

1    A.  Yes, ma'am.

2    Q.  In -- later in 2008, in December of 2008, did there come a

3    time that you became involved with Mr. Delgado again?

4    A.  Yes.

5    Q.  Do you recall whether or not it was December 3rd of 2008?

6    A.  That is correct.

7    Q.  How did that happen?

8    A.  Basically, I was informed that El Paso was trying to get

9    ahold of Mr. Delgado, and they were unable to.  And they wanted

10   us to try to reach out and get ahold of him, because he

11   actually had what they described as a viable threat to his

12   life.

13   Q.  What's a viable threat?

14   A.  They actually had strong beliefs that he was in danger.

15   Q.  Okay.  So they reached out to you to reach out to him?

16   A.  Correct.

17   Q.  And were you able to connect with him?

18   A.  Yes.

19   Q.  And what happened next?

20   A.  Basically, we -- I was talking to Mr. Delgado and I said,

21   You need to go to our office and see a particular agent.  I

22   said, You need to get there as soon as possible.

23          After discussing it a few more times I gave him the

24   severity of what was going on and, This is serious.  You need

25   to get over there.

Ascencio – Direct by Ms. Kanof

```
1              And finally he agreed and went to our office here in
2    El Paso.
3    Q.  And at some time were you included in a conference call
4    with El Paso and Mr. Delgado to discuss the threat?
5    A.  Yes.
6    Q.  Was that around 7:20 p.m. of December 3rd of 2008?
7    A.  Yes, ma'am.
8    Q.  And in the process of -- did you participate in that
9    conference call?
10   A.  Yes, ma'am.
11   Q.  Did you speak with Mr. Delgado as well?
12   A.  Yes.
13   Q.  And at the beginning of the conference call, was
14   Mr. Delgado advised of the threat?
15   A.  Yes.
16   Q.  What exactly did you tell -- or how was he advised?  What
17   was he advised of?
18   A.  Basically, what we advised him is just that El Paso had
19   information that they were looking for him for the money that
20   he owed that hadn't been paid yet.
21   Q.  And did you specifically say that -- that they were
22   looking -- that the threat was because the drug trafficking
23   organization was owed approximately $2,050,000?
24   A.  Yes, ma'am.
25   Q.  And how did he respond?
```

Ascencio - Direct by Ms. Kanof

1   A.  I think he was just in -- you know, in awe.  He didn't know

2   what to expect, what to say.

3   Q.  Did he say anything -- would it refresh your memory if you

4   saw your report?

5   A.  Yes, it would.

6   Q.  Okay.

7   A.  I do recall him saying he was -- he was kind of in awe.

8   But he was just saying that all he owed was the $1 million that

9   was seized.

10  Q.  Okay.  So he responded that he only owed $1 million?

11  A.  Correct.

12  Q.  But did he say that he owed the whole million dollars or

13  just part of it?

14  A.  Just his share.  His share of the contract.

15  Q.  And what was his share, if you recall?

16  A.  Whatever was broken up between the group.  I believe he

17  said six.

18  Q.  Okay.  And do you recall him saying $200,000?

19  A.  Yes, ma'am.

20  Q.  Did he contest the fact that you called it a drug

21  trafficking organization?

22  A.  No, ma'am.

23  Q.  And further on in the conversation, did Mr. Delgado start

24  talking about Ms. de la Concha?

25  A.  Yes.

Ascencio – Direct by Ms. Kanof

1    Q.  What did he say?

2    A.  Basically, that -- if I recall correctly, that he was going

3    to talk to her, or that he was worried about it.

4    Q.  Okay.  And did he say that he was no longer romantically

5    involved with her?

6    A.  I don't recall.

7    Q.  Would it help you to refresh your memory if you saw the

8    report that you wrote back in 2008 regarding this?

9    A.  Yes, ma'am.

10   Q.  Or the report that ICE wrote?

11   A.  Yes, ma'am.

12           MS. KANOF:  Approach the witness, Your Honor?

13           THE COURT:  You may.

14           (Witness handed report.)

15           THE WITNESS:  Thank you.

16   BY MS. KANOF:

17   Q.  On page 3, with regard to what he said about Lilian de la

18   Concha, starting in the middle of page, if you could refresh

19   your memory, please.

20   A.  Yeah.  Basically, he stated that he stopped seeing Lilian

21   de la Concha on a romantic basis.

22   Q.  Okay.  And go ahead and read the paragraph to yourself.

23   A.  (Witness complies.)

24   Q.  Let me know when you are finished.

25   A.  Okay.

Ascencio – Direct by Ms. Kanof

1   Q.   Does that refresh your memory?

2   A.   Yes, ma'am.

3   Q.   Okay.  What else did he say about Lilian de la Concha?

4   A.   Basically, that she had been trying to get ahold of him,

5   was sending him -- you know, sending e-mails, trying to call

6   him, and actually started calling his ex-wife and girlfriends.

7   Q.   And did he tell you that -- okay.  He was actually

8   calling -- or Lilian de la Concha was actually calling his

9   ex-wife and girlfriend; is that correct?

10  A.   Correct.

11  Q.   And throughout the conversation, did he persist in the fact

12  that he only owed $200,000?

13  A.   Yes, ma'am.

14  Q.   And did he tell you whether or not he had paid back part of

15  it?

16  A.   I don't recall.

17  Q.   Did he -- in the -- would it refresh your memory to read

18  the last paragraph of your report?

19  A.   Yes, of course.

20  Q.   I know it's been a long time ago.

21  A.   Yes, ma'am.

22  Q.   Go ahead and read that whole paragraph, including -- it

23  ends, I guess, on the next page.

24  A.   Well, basically, it just states that he still owed the

25  $200,000, as some of the other parties had already paid their

Ascencio – Direct by Ms. Kanof

1   part.

2   Q.  So he was aware of the fact that the other parties had paid

3   their part?

4   A.  Yes, ma'am.

5   Q.  And he indicated to you that he was the only one that had

6   not paid?

7   A.  Correct.

8   Q.  Did you talk -- did -- in this conversation, was he asked

9   questions about the Chicago $100,000 deal?

10  A.  Absolutely.  Actually, right before we placed the phone

11  call to Mr. Delgado, we decided to try and question him about

12  it to see if we would catch him, you know, in a lie, or what

13  his response would be to the actual Chicago pickup.

14  Q.  Agents are always looking to get information from

15  individuals, correct?

16  A.  Absolutely.

17  Q.  And so you had -- you, together, planned to bring up

18  Chicago; is that correct?

19  A.  Yes, ma'am.

20  Q.  And when he was asked about the $50,000 Chicago pickup,

21  what was the first thing he said?

22  A.  That he knew nothing of it.

23  Q.  Okay.  And then after continued questioning about the money

24  in Chicago, did he change his story?

25  A.  Yes.  Once we were, you know, pushing him on the topic he

Ascencio – Direct by Ms. Kanof

1   said yes, that Lilian de la Concha had arranged the money

2   pickup in Chicago.

3   Q.  And did he say anything about other deals?

4   A.  No.  He just said that he arranged this one and did not

5   notify ICE or us.

6   Q.  He actually said he -- he arranged the Chicago deal and did

7   not notify ICE?

8   A.  Correct.

9   Q.  Okay.  And -- but did he -- did he claim he didn't know

10  about owing, other than his $2,000 [sic], to the drug

11  trafficking organization?

12  A.  Correct.

13  Q.  Okay.  Is that the end of your participation in that

14  particular call?

15  A.  Yes, ma'am.

16  Q.  Do you know whether or not, after you hung up the phone,

17  ICE El Paso continued to talk to him?

18  A.  I knew he was at the ICE El Paso office.  I'm not sure

19  what -- what took place.

20  Q.  And did you ever hear from Mr. Delgado again?

21  A.  No.

22         MS. KANOF:  Pass the witness.

23         THE COURT:  Mr. Velarde or Mr. Esper?

24         MR. VELARDE:  Yes, Thank you.

25

Ascencio – Cross by Mr. Velarde

1                          CROSS-EXAMINATION

2    BY MR. VELARDE:

3    Q.  Agent Ascencio, good afternoon.

4    A.  Good afternoon, sir.

5    Q.  Agent, let me begin -- I'm not going to address your

6    background anymore.  Enough has been said about that.

7            Let me address -- hone in on my questions with regards

8    to the events --

9    A.  Yes, sir.

10   Q.  -- that happened on September 5th of 2007.

11   A.  Okay.

12   Q.  As I recall your testimony, you said that you were asked to

13   participate in this seizure by Brian Ramsey?

14   A.  Yes, sir.

15   Q.  Okay.  Was Brian Ramsey the case agent or was it --

16   A.  No, sir.  Brian Ramsey was our group supervisor.

17   Q.  And the case agent in the investigation dating back to

18   then?

19   A.  The initial one was Tom Justice.

20   Q.  Okay.  Were you ever the case agent in this case?

21   A.  No, sir.

22   Q.  Okay.  And you testified that you made -- you went to the

23   substa- -- you went to the station there at Carroll County?

24   A.  Yes, sir.

25   Q.  And you got to observe Victor Pimentel?

1    A.  Yes, sir.

2    Q.  Did you interview Victor Pimentel?

3    A.  Not for the interview.  I did speak to him briefly.

4    Q.  Okay.  Now you learned, from what Victor Pimentel was

5    saying, that he was willing to cooperate; is that correct?

6    A.  Yes, sir.

7    Q.  And as part of his cooperation, he agreed to accompany the

8    agents to El Paso?

9    A.  Yes, sir.

10   Q.  And to make the delivery to Marco Delgado?

11   A.  Correct.

12   Q.  You learned all of that?

13   A.  Yes, sir.

14   Q.  And I also –– I also recall that you said you did not

15   accompany that group of agents that came with Mr. Pimentel.

16   A.  That is correct.

17   Q.  As a matter of fact, you didn't come to El Paso at all.

18   A.  No, sir.

19   Q.  Okay.  That brings me, then, to the next series of

20   questions.

21        This morning you testified at length about Exhibit 50,

22   a conversation that Mr. Delgado had with Lilian de la Concha;

23   51, an exhibit regarding a conversation he had with Chuy; 52,

24   the one he had with Chilo, Isidro?

25   A.  Yes, sir.

Ascencio — Cross by Mr. Velarde

1  Q.  53, with Chuy; 54, with Lilian; and 55, with Lilian.

2       There were one, two, three, four, five, six

3  conversations that took place between September the 9th and

4  September the 10th?

5  A.  Yes, sir.

6  Q.  You weren't here in El Paso?

7  A.  No, sir.  He was in Atlanta with me.

8  Q.  No.  He was in Atlanta with you?

9  A.  Yes, sir.

10  Q.  When did he go to Atlanta?

11  A.  After the seizure.

12  Q.  Which seizure?  We've had a number of seizures.

13  A.  After the initial seizure in Atlanta, once they came to

14  El Paso to do the controlled delivery?

15  Q.  Yes, sir.

16  A.  After the seizures here in El Paso, he flew to Atlanta.

17  Q.  Okay.  I'm going to visit with you, because the time is

18  very, very important.

19  A.  Yes, sir.

20  Q.  Okay?

21       The first -- the delivery was made here in El Paso and

22  seized on September the 7th.

23  A.  Yes, sir.

24  Q.  Okay.  Then the following day, on September the 8th, was

25  the other seizure --

1    A.  Yes, sir.

2    Q.  -- here in El Paso.

3    A.  Yes, sir.

4    Q.  And you were not here on those dates?

5    A.  No, sir.

6    Q.  Okay.

7         On those dates, when Mr. Delgado was being interviewed

8    by agents of your agency, as well as local agents, Mr. Delgado

9    was placing phone calls.

10   A.  Yes, sir.

11   Q.  Did you know that?

12   A.  No, sir.

13   Q.  You didn't know that?

14   A.  Not initially, no, sir.

15   Q.  Okay.  Well, you need to know that the conversation to

16   Lilian -- the first one, Exhibit 50, relates to a conversation

17   that was made on September the 9th.

18   A.  Yes, sir.

19   Q.  He was here in El Paso.

20   A.  Okay.  So --

21        MS. KANOF:  I would object, Your Honor.  Is he asking

22   a question or is he telling that he was -- he's testifying that

23   he was here in El Paso, and I don't...

24        THE COURT:  I'll sustain the objection.

25

1    BY MR. VELARDE:

2    Q.  Mr. Ascencio --

3    A.  Yes, sir.

4    Q.  -- I've already given you two dates, September the 7th and

5    September the 9th, as the dates of the seizures.

6    A.  Yes, sir.

7    Q.  The first phone call to --

8            MS. KANOF:  Objection, Your Honor.  September the 7th

9    and September the 8th.

10   BY MR. VELARDE:

11   Q.  September the 7th and 8th.  Okay?

12           MS. KANOF:  You just said the 9th.

13   A.  Okay.

14   BY MR. VELARDE:

15   Q.  Now, on September the 9th -- if you will please refer back

16   to Exhibit Number 50.

17   A.  Yes, sir.

18           I don't have Exhibit 50.

19           THE COURT:  50 or 50A?

20           MR. VELARDE:  50.

21   BY MR. VELARDE:

22   Q.  50.  And 50A is the transcript.

23   A.  Yes, sir.

24   Q.  Is there a 50A there?

25   A.  No, sir.

 1          MR. VELARDE:  May I approach the witness, Your Honor?

 2          THE COURT:  You may approach.

 3          THE WITNESS:  Thank you, sir.

 4          MR. VELARDE:  Yes, sir.

 5   BY MR. VELARDE:

 6   Q.  The face cover of this transcript reflects that this

 7   transcript, or this conversation, took place on September the

 8   9th at 10:19 a.m.

 9   A.  Yes, sir.

10   Q.  Were you in El Paso?

11   A.  No, sir.

12   Q.  Okay.  There's nothing here to indicate that this

13   conversation took place in Atlanta, because it didn't take

14   place in Atlanta, correct?

15   A.  Correct.

16   Q.  So you weren't here?

17   A.  I was not in El Paso, no.

18   Q.  You were not privy to anything that was discussed in this

19   conversation, correct?

20   A.  Not during the conversation, just after the fact.

21   Q.  After the fact?

22   A.  Yes, sir.

23   Q.  As a matter of fact, in the -- in this transcript he starts

24   out by talking to Lilian de la Concha and saying that the

25   accountant, Pedro, dropped in on us yesterday.

1    A.  Yes, sir.

2    Q.  Meaning September the 8th, the same day he got arrested

3    here in El Paso?

4    A.  Yes, sir.

5    Q.  So earlier, when you were testifying about whether or not

6    you had told Marco Delgado what to say, you said, I never said

7    that.

8    A.  Correct.

9    Q.  Okay.  Well, the fact is you were not participating in

10   this?

11   A.  Correct.

12   Q.  Okay.

13          Who was participating with Mr. Delgado when this

14   conversation took place, if you know?

15   A.  That would be a question for the case agent.

16   Q.  Okay.  But you were not participating with this?

17   A.  I was not in El Paso, sir, no.

18   Q.  Now, there is reference in this same transcript at page

19   13 -- if you would, please?

20   A.  Of course.  Okay.

21   Q.  That portion that starts out with, Pedro is an idiot.  I'm

22   telling you just like that, on Friday it occurred to him that

23   he should come over here.  He is an idiot.  I had him in

24   Mexico, and then one of us is going with you.  I told him,

25   Listen, Buddy.  You guys are people and have -- literally,

1   there are six plazas, right?  And Pedro is not a person.  Do I

2   explain myself, in any event?

3   A.  Correct.

4   Q.  You talked about plaza as meaning what?

5   A.  Plaza is a group.  It's a group of people.  Six facets that

6   got involved in this.

7   Q.  Mr. Ascencio --

8   A.  Yes, sir.

9   Q.  -- were you aware that Pedro and Chilo were en route to

10  Mexico by car?

11  A.  No, sir.

12  Q.  Okay.  Were you aware that the agents here in El Paso

13  instructed Mr. Delgado to call them to tell them to come to

14  El Paso because he had a plane with six seats in it?

15  A.  No, sir.

16  Q.  You weren't aware of that?

17  A.  No.

18  Q.  The same goes to the conversations that took place that

19  same day with Chuy and Chilo and Chuy again?

20  A.  Correct.

21  Q.  On September 9th?

22  A.  Yes, sir.

23  Q.  You were not here?

24  A.  I was not in El Paso, no.

25  Q.  So that means that you weren't a witness to what was being

1    discussed or anything, correct?

2    A.  Correct.

3    Q.  And then let me take it forward to the following day,

4    September the 10th.

5    A.  Yes, sir.

6    Q.  There were two conversations with Lilian on that same day.

7    A.  Yes, sir.

8    Q.  Again, you weren't here in El Paso.

9    A.  The conversation where you actually see me a part of --

10   Q.  Sir, you were not in El Paso when those recordings were

11   being recorded.

12   A.  Correct.  The conversation you see, where you actually have

13   me in the transcripts whenever we were in Atlanta prior to

14   that, I was not in El Paso.

15   Q.  Okay.  So your testimony about what was discussed on those

16   occasions, why did you testify to being here in El Paso, then?

17   A.  I did not testify to being here in El Paso.  I testified to

18   the content of the calls and my understanding, due to my

19   experience.

20   Q.  Okay.  Well, when you were engaged with Mr. Delgado in

21   making phone calls to the different people, Chuy and Paco --

22   A.  Yes, sir.

23   Q.  -- before -- before he initiated those phone calls, you

24   debriefed him in Atlanta?

25   A.  He was debriefed by us at the office, yes, sir.

Ascencio – Cross by Mr. Velarde

1   Q.   When I say "you," not you only, but all of you in Atlanta.

2   A.   Yes, sir.  Yes, sir.

3   Q.   And that debrief took place over a period of hours?

4   A.   I would imagine.

5   Q.   Okay.  And prior to him debriefing with Atlanta, he was

6   debriefed here in El Paso by Tom Justice and the people here in

7   El Paso, correct?

8   A.   I don't know.

9   Q.   Well, let me ask you this.

10          Before you started making a telephone call, a

11  consensually-monitored recorded phone call --

12  A.   Yes, sir.

13  Q.   -- you make it a point to visit with the person that's

14  going to be participating, and you basically give them

15  instructions?

16  A.   Yes.  To a point, correct.

17  Q.   So you gave him a script?

18  A.   Yes.

19  Q.   Okay.  When you had Mr. Delgado calling up Chuy and then

20  Paco, before he said, I've got to leave, you made sure that you

21  told Mr. Delgado, This is what I want you to ask about.

22  Correct?

23  A.   Absolutely.  What we do is I take the information that I

24  get from the agents in El Paso, our agents in Atlanta, figure

25  out what -- what the best way -- best angle of approaching

 1    this.  And we've tried to make it as concise without going

 2    overboard.  We -- like I say, we don't -- we don't spoonfeed

 3    them anything.  We just say, Hit these highlights.  This is

 4    what we need.

 5    Q.  Hit the highlights.  That's exactly what I'm driving at.

 6    A.  Correct.

 7    Q.  All this sinister talk that you were interpreting about

 8    what he was saying here in El Paso was part of that script that

 9    he was given?

10    A.  No.

11    Q.  How do you -- how can you attest to that?

12    A.  Because I didn't have knowledge of it.  I just told him

13    what we had in Atlanta, that we needed to go ahead and try to

14    infiltrate the organization.  That, you know, we had this ruse

15    going on, which he understood.  We talked about the vehicle.

16    Q.  Agent Ascencio --

17    A.  Yes, sir.

18    Q.  -- you testified about the meaning of the conversation that

19    Mr. Delgado was carrying on with all these folks on September

20    the 9th and September the 10th?

21    A.  Correct, based on my training and experience.

22    Q.  I understand.  Based on your training.  Okay?

23         And you passed judgment over what was being talked

24    about based on your training?

25    A.  And experience, because I've seen it --

Ascencio - Cross by Mr. Velarde

1   Q.  I understand that.

2   A.  -- personally and heard it.  Yes, sir.

3   Q.  I understand that.  But will you agree with me that that

4   conversation was staged, that that conversation took place

5   after Mr. Delgado was told, We want you to hit on these

6   highlights?

7   A.  Certain highlights, not all of them.

8   Q.  Okay.  So if Mr. Delgado is talking to all these people and

9   sounding sinister, certainly you cannot attribute that to the

10  fact that he was being sinister, correct?

11  A.  No, because we can only teach so much.  We can only

12  emphasize so much.  It always falls back on the person, on what

13  they know, the actual facts, what they've lived, what they've

14  experienced.  We cannot personally portray that, or we can't

15  instruct them.

16       But as somebody -- some -- somebody that we look at

17  and assess whether they're going to be a good person to

18  cooperate or not.

19       In this -- in this instance he was, because he already

20  had the background, the knowledge, and the intimate knowledge

21  of it.  So basically, we gave him a little bit, highlights, and

22  he went on his own.

23       And like I testified earlier, a lot of times we would

24  actually have to tell him, Tone it down.  Don't go overboard.

25  You know, just keep it short.

Ascencio — Cross by Mr. Velarde

1    Q.  Agent, I don't want to talk about the other cases.  I want

2    to talk about this one.  Okay?

3    A.  Yes, sir.

4    Q.  So bear with me.

5    A.  Talking about one, yes, sir.

6    Q.  Okay.  The fact is, you don't know what the agents here in

7    El Paso told Mr. Delgado to tell these folks that he was

8    recording.

9    A.  Correct.  I was not privy to that.

10   Q.  And so whatever -- whatever discussion took place, you

11   cannot tell these members of the jury that that was all -- that

12   was all sinister, that that was his doing?

13   A.  No.  Because if we gave -- give these highlights, it's

14   based on a factual instance, something that took place.

15          Whether it sounds sinister or not, whether it came

16   directly from him or from us as a highlight, it's still

17   something that took place, that's taken place, that we're

18   basically exploiting at that point -- at the moment.

19   Q.  You were asked about the dogs hitting on the pieces of

20   luggage containing the money.

21   A.  I was --

22   Q.  You were specifically asked, Did you tell him that?

23          And you said, No, I never told him that.

24   A.  Correct.  I didn't, no, sir.

25   Q.  You weren't there present to begin with.  But...

Ascencio – Cross by Mr. Velarde

1   A.  That's why I didn't tell him.

2   Q.  You know that Mr. Delgado was coached to go to DPS and

3   stage a little drama scene there so that he could obtain the

4   release of Pedro Mendoza-Meneses, or Meneses-Mendoza, and

5   Isidro Vega-Rubio?

6   A.  Yes, sir.  I was not aware of that.

7   Q.  You were not aware of that?

8   A.  No, sir.

9   Q.  Okay.  Well, if Mr. Delgado is under arrest and he goes to

10  DPS, certainly that has to be staged, correct?

11  A.  If he's cooperating, correct.

12  Q.  And he was?

13  A.  Yes, sir.

14  Q.  Okay.  He was -- in other words, when -- here in El Paso,

15  starting here in El Paso.  And then we'll touch on those

16  conversations that you handled in Atlanta.

17  A.  Yes, sir.

18  Q.  But here in El Paso, based on your experience, you know

19  that he was coached on what to tell these people, so that they

20  could -- he could lure them into talking about drug

21  trafficking?

22  A.  Based on my experience, I know that he was instructed on

23  certain highlights, correct.

24  Q.  So just to finish up this line of inquiry, it's safe to say

25  that whatever Mr. Delgado is heard saying or talking about in

1    those conversations on September the 9th to September the 10th,

2    it is what it is, as the saying goes?

3    A.  What he's saying is the facts, because this had to -- the

4    ruse that we're building has to be based on fact.  If you don't

5    base it on fact it will be divulged, and basically the

6    investigation would have ended right then and there.

7    Q.  And then subsequent to that, a couple of days later,

8    Mr. Delgado goes to Atlanta?

9    A.  Yes, sir.

10   Q.  The first phone call from Atlanta, to Chuy first, and then

11   Paco and then later on a whole bunch of other people --

12   A.  Okay.

13   Q.  -- started out on September the 14th?

14   A.  Yes, sir.

15   Q.  And you've already told me that before he got on that

16   phone, again you debriefed him, and you gave him the highlights

17   that he was supposed to touch upon?

18   A.  Correct.

19   Q.  So again, whatever he was talking about, as sinister

20   sounding as it sounded, that was part of the coaching that he

21   was subjected to?

22   A.  No, sir.  Once again, that was not.  We gave him certain

23   highlights to try to introduce our operation into the

24   organization.

25           The sinister part of it as you described, Counselor,

1    it was already there.  It's factual.  That's what took place,

2    so we exploited it.

3    Q.  But the reality is that he had already been coached here in

4    El Paso.

5    A.  To what extent, I don't know.

6    Q.  And you don't know that?

7    A.  No, sir.

8    Q.  Okay.  Now, you started in Atlanta on September the 14th,

9    when you became acquainted with Mr. Delgado?

10   A.  Yes, sir.

11   Q.  You started a series of phone calls?

12   A.  Yes, sir.

13   Q.  Okay.  On 9-14 you placed approximately seven calls.  He

14   either called or they called you, right?

15   A.  Okay.

16   Q.  And by the second call you were already being introduced to

17   Paco?

18   A.  Yes, sir.

19   Q.  The first call went to Chuy, right?

20   A.  Yes, sir.  Correct.

21   Q.  And then you talked to Paco, and we've heard that

22   discussion here?

23   A.  Yes, sir.

24   Q.  And then Mr. Delgado was taken out of the loop?

25   A.  Yes.  Which is ultimately our goal, to use him to a point

1    and try to get him out of the investigation.

2    Q.  There were approximately, by my count, about 21 phone

3    calls.  Some of them didn't -- sometimes it wouldn't pick up,

4    so no conversation took place.  But there were approximately 21

5    phone calls between September the 14th --

6              MS. KANOF:  Objection, Your Honor.  Is he testifying

7    or is he asking?

8              MR. VELARDE:  I'm going to ask.

9              THE COURT:  Ask the question, then.

10   BY MR. VELARDE:

11   Q.  Did you place those phone calls, approximately 21 phone

12   calls, between September the 14th and October 1st?

13   A.  I know I talked to him several times during the initial

14   time he was in Atlanta.  I don't recall af- -- you know, what

15   length after that.  It wasn't very long after that.

16   Q.  No.  I'm talking about the conversations, just the

17   conversations with the folks in Mexico.

18   A.  Oh, the recorded ones?

19   Q.  The recorded ones.

20   A.  Yes, sir.

21   Q.  So you recorded conversations starting on September 14th?

22   A.  Yes, sir.

23   Q.  And it ended when?  Like October?

24   A.  I can't recall, to be honest with you.

25   Q.  You wrote a report, correct?

1   A.  Yes, sir.

2   Q.  And in this five-, six-page report, you summarized all the

3   different conversations you had with the people?

4   A.  Right.  Just a quick synopsis, correct.

5   Q.  You will agree with me that there is no reference, per se,

6   in this report that these people in Mexico told you, That money

7   belongs to the cartel?

8   A.  Based on the conversations I had with them, as I recall

9   them, yes.  They -- they were -- they feared for their life.

10  They feared for what was going on.  And based on my experience,

11  they're not dealing with somebody that --

12  Q.  Sir, my question is very cl- - very specific.  Did they

13  specifically -- specifically -- tell you, That money belongs to

14  the cartel?

15  A.  Sir, once again, I wrote a synopsis of the calls.  But

16  based on the synopsis, as you see, and based on the

17  recollection I have of the actual phone calls I made with them,

18  they were fully aware that this money belonged to somebody they

19  feared that was involved in drug trafficking.

20  Q.  Mr. Ascencio, I'm not asking for your interpretation of

21  what they were talking about.

22        I'm asking you whether or not they specifically told

23  you, This money belongs to a cartel.

24        Yes or no?

25  A.  Your Honor --

Ascencio – Cross by Mr. Velarde

```
 1              THE COURT:  No, just answer the question.
 2    BY MR. VELARDE:
 3    Q.  Yes or no.  Did they tell you, This money belongs to the
 4    cartel?  Yes or no?
 5    A.  No.  But --
 6    Q.  Thank you.
 7              THE COURT:  You've answered the question.
 8    BY MR. VELARDE:
 9    Q.  Thank you.
10              Now, there was a subsequent meeting that took place in
11    McAllen?
12    A.  Correct.
13    Q.  And you were present there with Pedro Mendoza-Meneses?
14    A.  Yes, sir.
15    Q.  Who did you meet with?
16    A.  I met with Isidro and I believe --
17    Q.  Chilo and Pedro?
18    A.  Yes, sir.
19    Q.  That conversation was not recorded?
20    A.  It was.
21    Q.  It was recorded?
22    A.  If I recall correctly, yes, sir.
23              MR. VELARDE:  May I visit with counsel, Your Honor?
24              THE COURT:  You may.
25              (Attorneys conferring.)
```

Ascencio - Cross by Mr. Velarde

1    BY MR. VELARDE:

2    Q.  Agent Ascencio, I'd like to -- I'd like to ask you --

3    A.  Of course.

4    Q.  -- when was the last time that you saw a recording of the

5    meeting in McAllen on October 10th?

6    A.  Sir, to be honest with you, I don't think I've ever seen

7    it.  And the only reason I'm saying that it was is because I

8    don't think I would have done the undercover without it --

9    without myself being wired.

10            (Attorneys conferring.)

11   BY MR. VELARDE:

12   Q.  Agent Ascencio, if no recording was produced, then you'd

13   be -- you'd be in error that a recording was actually made?

14   A.  Sir, like I -- like I testified, I would have pushed to

15   have the actual meeting recorded for my safety, being the

16   undercover.

17            But once again, like I said earlier, I'm a -- I'm a

18   tech agent also.  I'm unaware of if there's any technical

19   issues, why there's no recording.

20            But me not remembering the exact time, date, just

21   based on what I would normally do, I would -- I would push to

22   have the call recorded for my safety.  But outside of that,

23   whatever -- because we were in McAllen.  We were not in our

24   service, so it was their equipment.

25   Q.  After you identified all the five parties that were

Ascencio - Cross by Mr. Velarde

1    identified in these telephone conversations to Paco and Chuy,

2    starting with Paco, Chuy, Chilo, Lilian, and somebody else, did

3    you put out an all-point request to stop these folks if they

4    ever came back?

5    A.  That would be a question for the case agent.

6    Q.  For the case agent?

7    A.  Yes, sir.

8    Q.  Okay.  You didn't do anything?

9    A.  No, sir.  I was not involved in that.

10   Q.  You were asked shortly after lunch about a meeting -- no,

11   about a conference call that took place on December the 3rd.

12   A.  Yes, sir.

13   Q.  Was that conversation -- was that telephone conversation

14   recorded?

15   A.  I don't believe so.

16   Q.  Sir?

17   A.  I don't believe so, no.

18   Q.  Now, you testified that when Mr. Delgado was initially

19   asked -- was initially told about the hit, that he was -- he

20   did not know what to say and that he was baffled.

21   A.  Basically, I testified that he -- I had to tell him over

22   and over.  And it goes back to the history we had.  Any time I

23   would talk to him he would go around in circles and just talk

24   my ear off about, really, nothing and everything, and me trying

25   to convey to him the importance that he needed to, one, be

1    quiet, listen to me, get to our office, because there's a

2    viable threat.  After several seconds, he finally, you know,

3    agreed to it and went to our office.

4    Q.  But again, you weren't there?

5    A.  No.  I was in Atlanta.

6    Q.  There's been a lot of questions regarding the toll records.

7    And based on your testimony, there was a phone call placed on

8    July the 6th, July the 17th.  There were four more calls placed

9    on July 22nd.

10        MS. KANOF:  Objection, Your Honor.  He didn't testify

11   to that.  I asked him about --

12        THE COURT:  I'll sustain the objection.

13        MR. VELARDE:  Okay.  Can you please pull up Exhibit

14   Number 85?

15        MS. KANOF:  This is not the exact exhibit.  This is my

16   copy with my highlighting on it.  But I'm sure -- I don't mind.

17        THE COURT:  It's not 85 -- well...

18        MS. KANOF:  It hasn't been admitted as 85.  It's

19   Defendant's Exhibit Number 2.

20        MR. VELARDE:  Exhibit Number 2.

21        MS. KANOF:  And if he needs to use my copy, I'm more

22   than happy to loan it to him.

23        MR. VELARDE:  May I approach this witness, Your Honor?

24        THE COURT:  Why?

25        MR. VELARDE:  So he can consult this record.

1          THE COURT:  Well, can you show him –– you can show him

2    from there.

3    BY MR. VELARDE:

4    Q.  Can you see that on your screen?

5    A.  No, sir.

6          I got it, sir.

7    Q.  Pardon?

8    A.  Yes, sir, I got it.

9    Q.  Okay.  You see the two highlighted?

10   A.  Yes, sir.  July 16th, 2008.

11   Q.  That's correct?

12   A.  Correct.

13   Q.  So there was one on the 16th and one on the 17th?

14   A.  Yes, sir.

15   Q.  And that's your phone number, correct?

16   A.  Yes, sir.  That's my old phone number in Atlanta.

17   Q.  Is that your direct office number or is that the general

18   office number?

19   A.  No, sir.  That's my cell phone.

20   Q.  That's your cell phone?

21   A.  Yes, sir.

22   Q.  Okay.  Now if we go to page 9, can you see that?

23   A.  Yes, sir.

24   Q.  Again, there's two more phone calls?

25   A.  Correct.

1    Q.  One lasted 3 minutes and 52 seconds.  And the other one?

2    A.  A minute and 34 seconds.  Yes, sir.

3    Q.  And then on the following day, on the 22nd, would you mind

4    telling me how many phone calls are recorded to this same phone

5    number?

6    A.  There's one, two --

7    Q.  On the 22nd.

8         MS. KANOF:  Your Honor, I just wanted to advise that

9    that's my highlighting.  And both his number and Tom Justice's

10   numbers are highlighted, so it would be a mistake to count the

11   highlights.  He would have to look at which numbers are his.

12   BY MR. VELARDE:

13   Q.  Well, I'm looking at --

14   A.  7179.

15   Q.  I stand corrected, because your phone number -- let me go

16   back to page 7.

17   A.  Yes, sir.

18   Q.  This is your phone number, correct?

19   A.  7179.  Yes, sir.

20   Q.  Okay.  Now on the following day, there's another series of

21   telephone calls on the 22nd to a dif- -- to 7179?

22   A.  Yes, sir.

23   Q.  Is that still your number?

24   A.  Yes, sir.

25   Q.  Okay.  So on the 22nd, how many times is your number --

Ascencio – Cross by Mr. Velarde

1   does your number appear?

2   A.  Four.

3   Q.  Okay.  And the phone calls range from a minute 18 seconds

4   to a minute -- one 9 minutes and 33 seconds, and again one

5   minute.

6   A.  Correct.

7   Q.  Okay.  Now, if you look further down --

8   A.  Yes, sir.

9   Q.  -- on July 23rd, there's more phone calls coming in at 9:21

10  in the morning.  Was that the day of the Chicago incident?

11  A.  Yes, sir.  Correct.

12  Q.  Okay.  That took place sometime in the late morning hours?

13  A.  I'm unaware.

14  Q.  You're not aware?

15  A.  Yes, sir.

16  Q.  Are you on the same time zone in Chicago?  You're Eastern

17  Standard Time?

18  A.  Correct.

19  Q.  Okay.

20  A.  I believe they are, yes.

21  Q.  You believe what?

22  A.  Chicago is Eastern Standard, right?

23  Q.  Eastern?

24  A.  Yes, sir.

25  Q.  Not Central?

Ascencio - Cross by Mr. Velarde

1    A.  No, I don't believe so.

2    Q.  Okay.  We'll get to that.

3         In any event, there's -- on the 23rd, starting at

4    9:21, 9:59, 10:01, and 10:02, there's four phone calls right

5    there?

6    A.  Yes, sir.

7    Q.  And of course the time is anywhere from 2 minutes 10

8    seconds to 38 seconds?

9    A.  Correct.

10   Q.  Okay.  And your testimony was that you never received those

11   phone calls.

12   A.  No.  My testimony was I didn't ever talk to him.

13   Q.  Oh.  You never talked to him?

14   A.  No, sir.

15   Q.  Okay.  And so can you explain why a phone call would last 3

16   minutes 52 seconds, 9 minutes 33 seconds, and you wouldn't talk

17   to him?

18   A.  No.  A phone call could last, you know, whatever the length

19   of the actual voice mail is, plus the time that it takes for

20   the handshake to take place between the cell towers and phones.

21   It could be a substantial amount.

22        Mainly Mr. Delgado, as I've mentioned earlier,

23   testified, he would leave these long ranting voice mails.

24   Q.  But you can't testify whether or not those were actual

25   voice mails?

Ascencio – Cross by Mr. Velarde

1   A.  Correct.

2   Q.  So you won't dispute the fact that those records indicate

3   that your phone was called?

4   A.  No, no.  I had a chance to review the records.  They are

5   all outgoing calls to my phone.

6   Q.  And that the calls lasted as is reflected in that --

7   A.  That is correct, sir.  Yes, sir.

8   Q.  On December the 3rd, when El Paso contacted you --

9   A.  Uh-huh.

10  Q.  -- El Paso made you aware that there had been a report made

11  to their office, correct?

12  A.  Correct.

13  Q.  Regarding Mr. Delgado?

14  A.  Correct.

15  Q.  And were you made aware of the nature, the background of

16  this information that was received by them?

17  A.  No.  The actual background, I was not privy to it until

18  actually I came here for the trial.

19  Q.  Okay.  So if Lilian de la Concha came to El Paso to check

20  out Mr. Delgado's residence, place of work and what have you,

21  obviously, she came through one of the ports of entry.

22          Wouldn't you agree with me?

23  A.  No.

24  Q.  Okay.  Were you handling -- or were you made aware that

25  Victor Pimentel was an informant?

Ascencio — Cross by Mr. Velarde

1   A.  I knew Victor was working with us, yes, sir, as a source.
2   Not an informant yet.
3   Q.  Well, but --
4   A.  My awareness.
5   Q.  When an individual gets enlisted as an informant, is he
6   actually written up?  Is there some kind of report?
7   A.  There's actually documentation to document somebody as an
8   informant.  A source is somebody that's not documented.
9   Q.  Okay.
10  A.  So my knowledge of it, he was a source.
11  Q.  Okay.
12  A.  Correct.
13  Q.  So a source would not be written up?
14  A.  No, not initially.  A source would be assessed.  And if
15  he's valuable, then we'll go ahead and sign him up as an
16  informant.
17  Q.  And your understanding is that Victor Pimentel was just a
18  source?
19  A.  From my understanding, dealing with him in Atlanta, yes,
20  sir.
21  Q.  Was Victor Pimentel being monitored by your office or by
22  the El Paso office, if you know?
23  A.  Not by my office that I'm aware of, sir.
24  Q.  And you were asked about the e-mail address?
25  A.  Yes, sir.

Ascencio – Cross by Mr. Velarde

1   Q.  The south?

2   A.  Bellsouth.

3   Q.  South Bell?

4   A.  Yeah.

5   Q.  Yes, sir.

6       And your testimony is that's not your e-mail.

7   A.  No, sir.

8   Q.  Did Mr. Delgado correspond with you by e-mail?

9   A.  I recall emailing, but I believe it was on my government

10  e-mail.

11  Q.  Pardon me?

12  A.  I recall e-mailing back and forth with Mr. Delgado, but it

13  was on my government e-mail.

14  Q.  And you don't have a copy, or you don't have access to

15  those e-mails?

16  A.  No, sir.

17  Q.  You don't?

18  A.  No.

19  Q.  You never saved them?

20  A.  No, sir.  Once again, if they were of any substance, of

21  course we would have saved them.  But I think it was more of

22  just checking up on that initial stage of the investigation.

23  Q.  Well, I understand that what happened in Chicago, in

24  July 2008, was significant to your service office; is that

25  correct?

Ascencio – Cross by Mr. Velarde

1   A.  No, sir.

2   Q.  It wasn't?

3   A.  It had nothing to do with us.

4   Q.  Okay.  What happened in September 2007, was that

5   significant?

6   A.  The actual seizure of the million dollars?

7   Q.  Yes, sir.

8   A.  Yes, sir.

9   Q.  Did you start up a file on Marco Delgado?

10  A.  I didn't.

11  Q.  Did your office start one?

12  A.  Yes, sir.

13  Q.  Okay.  Who would have been handling that file?

14  A.  The investigative report would be the case agent.

15  Q.  Who was the case agent?

16  A.  Tom Justice, initially.

17  Q.  So he would have access -- or he would have control over

18  that file?

19  A.  Not necessarily, because he's no longer in the office.

20  Q.  He would have --

21  A.  He would have, yes, sir.

22  Q.  -- in the past?

23  A.  Correct.

24  Q.  Now in addition to Mr. Delgado visiting with you, did he

25  visit -- or did he have contact with Tom Justice?

1   A.  Yes.

2   Q.  Did he have contact with anybody else in the office?

3   A.  Yes.  Our group.

4   Q.  With who?

5   A.  Our group, the financial group.

6   Q.  And who -- was Jeff Walton a member of your group?

7   A.  Yes, sir.

8   Q.  Prior to testifying here this afternoon, did you consult

9   with him to verify if he had any information regarding Marco

10  Delgado?

11  A.  No, sir.

12  Q.  More specifically, whether or not he had any information

13  about any contacts that Marco Delgado had with the Atlanta SAC

14  office?

15  A.  I haven't talked to Special Agent Walton in several months.

16  Q.  How many reports did you generate regarding this

17  investigation?

18  A.  If I recall correctly just the one, UC phone call reports.

19  Q.  Just the phone calls?

20  A.  Yes, sir.

21  Q.  And your alias was Rafa Solis?

22  A.  One of my aliases, yes, sir.

23  Q.  At least in this investigation?

24  A.  Yes, sir.

25  Q.  Rafa Solis.

1         Have you used that alias before in other

2    investigations?

3    A.  Several.

4              MR. VELARDE:  May I just have a minute?

5              THE COURT:  You may.

6              MR. VELARDE:  Agent, I believe that concludes my

7    questions.  Thank you very much.

8              THE WITNESS:  Thank you, sir.

9                      REDIRECT EXAMINATION

10   BY MS. KANOF:

11   Q.  Agent Ascencio --

12   A.  Yes, ma'am.

13   Q.  -- did the prosecutor before me, Juanita Fielden;

14   prosecutor and my co-counsel, Anna Arreola; or myself ask you,

15   Could you please review all these calls because you're an

16   expert in undercover?

17   A.  Yes, ma'am.

18   Q.  And did we ask you -- in fact you were on vacation, out of

19   the country?

20   A.  Yes, ma'am.

21   Q.  Even then we reached out to you in Italy --

22   A.  Yes.

23   Q.  -- to -- we e-mailed you the transcripts for you to review

24   them, correct?

25   A.  Correct.

Ascencio – Redirect by Ms. Kanof

1    Q.  And you reviewed them.  Did you tell us what you found?

2    A.  Yes, ma'am.

3    Q.  And you testified to it?

4    A.  Yes, ma'am.

5    Q.  Okay.  And in regard to that, would you also have reviewed

6    them to know -- to learn about what had happened in the

7    investigation to continue pushing Mr. Delgado to introduce you?

8    A.  Yes, ma'am.

9    Q.  Okay.  So you would have had the knowledge that you needed

10   from what happened in El Paso?

11   A.  Yes.  To make an educated move, correct.

12   Q.  Okay.  Now, Mr. Velarde asked you about the toll records.

13        Did you testify on direct that you were present in the

14   December 8th conference call with Mr. Delgado when he was

15   advised of the threat?

16   A.  Yes.

17   Q.  And did he tell all of the agents involved in that

18   conversation that he participated in Chicago without telling

19   ICE?

20   A.  He did.

21   Q.  Did he say, I tried to get ahold of you to tell you that it

22   was going to happen in Chicago, but you didn't pick up the

23   phone?

24   A.  No.

25   Q.  Did he say, I tried to get ahold of Agent Justice, but he

Ascencio — Redirect by Ms. Kanof

1    didn't pick up the phone?

2    A.  No.

3    Q.  Did he say, Don't you remember, Mr. Ascencio, that there

4    was a 9-minute phone call where I told you all about what was

5    going to happen in Chicago?

6    A.  No.

7    Q.  Did he tell you he did Chicago without informing ICE?

8    A.  He did.

9    Q.  Do you have Exhibit 58A in front of you?

10   A.  58A, yes, ma'am.

11   Q.  The transcript to the September 14th 4:00 call.

12   A.  Correct.

13   Q.  This is the call where you're introduced, correct?

14   A.  Correct.

15   Q.  Okay.  If you would first turn to page 5.

16   A.  (Witness complies.)

17   Q.  At the bottom, where Mr. Delgado is talking and says, and

18   that our friend, the one that had the tourist visa, is back in

19   his house.

20        Do you recall that he said that?

21   A.  Yes.

22   Q.  Did Paco not know what he was talking about?

23   A.  No.  He knew exactly what he was talking about.

24   Q.  So you -- if ICE had provided that information without

25   knowing about the organization, would Paco have said, What are

1    you talking about, Delgado?

2    A.  No.  Absolutely not.  No.

3    Q.  If you would turn, please, to page 19.

4    A.  (Witness complies.)

5    Q.  And now, let me ask you.  You had access to Mr. Delgado.

6    Did you have access to Paco?

7    A.  As a -- in what fashion?

8    Q.  Did Paco know he was being taped by ICE?

9    A.  No, ma'am.

10   Q.  Did ICE brief Paco and give him a story?

11   A.  No, ma'am.

12   Q.  And on page 19, when Paco says, Marco, it's logical that

13   these men, these clients, are very nervous thinking that we

14   deceived them.

15          What does Mr. Delgado say?  It's on the next page, top

16   of 20.

17   A.  20?

18   Q.  Uh-huh.

19   A.  He says, Yes.

20   Q.  He says, Yes.

21          Okay.  That's Paco that's talking, not Mr. Delgado,

22   correct?

23   A.  Correct.

24   Q.  And on page 20, is it -- who says, and there have been --

25   there have been threats.  There have been death threats.  And

1    what I've told Chuy, and now I tell you, is how we can resolve

2    this.  Meanwhile, or while we get or don't get the money back,

3    how can we, with your experience in these matters?

4              Who's saying that?

5    A.  Paco, to Delgado.

6    Q.  Okay.  And nobody at ICE told Paco to say they were death

7    threats and imply that this was a drug cartel, correct?

8    A.  Correct.

9    Q.  On page 26.

10             Are you there?

11   A.  Yes, ma'am.

12   Q.  Who says, At the time -- at the same time, I don't want to

13   mention that -- nothing.  But I've told Chuy, You can't expose

14   me and your cousin.  The truth, with all respect, because of --

15   because all of that means that when one is involved in a

16   business whatever others do in the -- in the sloppy form that

17   they have done without obviously consulting anyone about the

18   procedure, everyone has to pay for this.

19   A.  It's Paco talking to Delgado.

20   Q.  Turn to page 28.

21   A.  Yes, ma'am.

22   Q.  And if you look before, you'll see it's you talking that

23   I'm going to ask about.

24   A.  Correct.

25   Q.  Okay.  With Paco, it's Rafael again.  That's you, correct?

1    A.  Yes.

2    Q.  On page 28 do you say, I'm willing to help you and Marco to

3    move this easily electronically via my companies?

4    A.  Correct.

5    Q.  That's you?

6    A.  Yes, ma'am.

7    Q.  Correct.  That's not Marco?

8    A.  No.

9    Q.  On page 29.

10            At the bottom who says, I agree.  But like I told

11   Marco, that is the proposal, a thought, that today I think is

12   secondary, in the sense that right now the situation, as I see

13   it, is that some very nervous people who think we stole from

14   them and who could begin using violence.  Okay?

15            Who's talking?

16   A.  Paco.

17   Q.  And later in that same conversation who says, And they

18   have -- and Marco knows it well -- the documentation of the

19   identity of everyone except mine because, by chance, I wasn't

20   there.

21   A.  Correct.  Paco.

22   Q.  Okay.  You didn't give Paco that information?

23   A.  No.  He's relaying it to me directly.

24   Q.  And in fact, Paco says, And Marco knows it very well,

25   correct?

Ascencio – Redirect by Ms. Kanof

1    A.   Correct.

2    Q.   On page 31.  Who says that Pete and Chuy -- Let me tell you

3    something.  Pete and Chuy are willing to place tomorrow --

4    tomorrow -- today on the table, properties valued at

5    $3 million?

6    A.   Paco, once again.

7    Q.   So it wasn't you that gave that information?

8    A.   No, ma'am.

9    Q.   Okay.  And on page 33?

10   A.   Yes, ma'am.

11   Q.   In the middle of the page who says, And let's say that

12   we're normal people who would never kill anyone for money?

13   A.   Paco.

14   Q.   And that's a hypothetical, correct?

15   A.   Yes, ma'am.

16   Q.   You heard the tone?

17   A.   Exactly.

18   Q.   Does Paco also say in that, It's Pete, it's Chuy.  Pete and

19   Chuy are willing to say, you know, we will put up the money.

20   A.   Correct.

21   Q.   Who says on that same page, I don't know, Marco, if you

22   with your influence, with your power.  I understand what you

23   just told me, that the option of having already the product

24   ready and go tomorrow and return the product to its final

25   destination is impossible?

Ascencio – Redirect by Ms. Kanof

1    A.  Paco.

2    Q.  Okay.  And we went over this, so I'm not going to belabor

3    it a whole lot more.

4            But does Paco say in this, You are our leader?

5    A.  Yes.

6    Q.  Does Paco say, Marco, you are the smartest one of all of

7    us?

8    A.  He does.

9    Q.  Did you tell Paco to say that?

10   A.  No.

11   Q.  Turn, please, to page 40.

12   A.  Yes, ma'am.

13   Q.  You'll need to refer to 39 to see who was speaking.

14   A.  Okay.

15   Q.  Is it Mr. Delgado who is speaking?

16   A.  Yes, ma'am.

17   Q.  And does he say on page 40, She told me that someone had

18   chambered a round on Chuy?

19   A.  Correct.

20   Q.  What does "chambered a round" mean?

21   A.  Basically, somebody got an actual threat.  Probably a gun

22   was pulled on somebody.

23   Q.  Okay.  I'm not talking euphemistically.

24   A.  Yes.

25   Q.  I'm talking -- what is a round and what is a chamber?

Ascencio — Redirect by Ms. Kanof

1    A.   Chamber a round is chambering -- pulling back on the slide
2    of a gun and inserting a bullet into the actual barrel ready to
3    be fired.
4    Q.   Okay.  This is -- you're there.  This is September 14th.
5    And up to this point -- up to this conversation violence has
6    not been discussed, correct?
7    A.   Correct.
8    Q.   And did you suggest to put violence into this conversation
9    by talking about a chamber and a round?
10   A.   Absolutely not.
11   Q.   After he talks about the chambered round, does Mr. Delgado
12   say, And who knows what?  I don't doubt it, because these are
13   really serious people.
14   A.   Yes, ma'am.
15   Q.   But one thing is to be speaking amongst businessmen;
16   another is when we are not, correct?
17   A.   Correct.
18   Q.   If this had not been -- I mean, Paco did not respond, I
19   don't know what you're talking about.
20   A.   No.
21   Q.   These aren't serious people.
22   A.   No.  He understood it as it was said.
23   Q.   On page 43, again, Paco.  On page 43, does Paco talk about
24   Chuy's people?
25   A.   Yes, ma'am.

Ascencio – Redirect by Ms. Kanof

1   Q.  And does he say, No, no.  We do not want more business.  We

2   don't want to do anything more with you.  We want our money and

3   we want it now.

4   A.  Yes, ma'am.

5   Q.  And he's quoting Chuy, correct?

6   A.  Correct.

7   Q.  And you know that Marco Delgado was also in contact with

8   Chuy?

9   A.  Yes.

10  Q.  You know that Marco Delgado was the one who provided Chuy's

11  phone number to Lilian de la Concha?

12  A.  Correct.

13  Q.  And does Marco Delgado dispute what Paco says?

14  A.  No.

15  Q.  And at page 47, just for reference, that's where Paco says,

16  At least you are the smartest amongst all of us and the one who

17  knows the most about this?

18  A.  Yes, ma'am.

19  Q.  And what does Mr. Delgado respond?

20  A.  Yes.

21  Q.  On page 48 Paco says, Yes, you are -- you, as leader,

22  this -- okay.  As my leader.

23        And what does Delgado respond?

24  A.  "Yes."

25  Q.  And in fact, Paco asks Mr. Delgado what to do next on that

Ascencio – Redirect by Ms. Kanof

1  page, correct?

2  A.  He's looking for guidance, correct.

3  Q.  And Mr. Delgado gives that guidance?

4  A.  Yes, ma'am.

5  Q.  Finally on page 50, at the bottom, Paco is the one that

6  counts the number of people in the conspiracy to determine who

7  owes how much money, correct?

8  A.  Correct.

9  Q.  Okay.  In McAllen -- was Delgado in McAllen?

10  A.  No, ma'am.

11  Q.  So there aren't any of Delgado's statements if, indeed,

12  that was recorded and the recording came out.  There wouldn't

13  be any statements about Mr.- -- or Mr. Delgado would not be

14  talking?

15  A.  No.

16  Q.  Okay.  And were you talking in McAllen about what had

17  happened in the past or --

18  A.  Yes.

19  Q.  -- or were you talking about what you were going to do in

20  the future?

21  A.  We talked about what had happened in the past with the

22  seizure of the money.  And in the future to try to, you know,

23  see if we could get the money back, as the ruse, and to try to,

24  you know, get pickups from this organization.

25  Q.  Mr. Velarde asked you whether or not the Mexican people --

Ascencio - Redirect by Ms. Kanof

1  the question was posed to you -- The Mexican people never told

2  you the money came from the cartel.

3  A.  Correct.

4  Q.  Have you ever, in your experience as a Title III agent, as

5  an undercover, in your vast narcotics experience, heard anybody

6  in a recording in an organization say the money came from the

7  cartel?

8  A.  No.  That's what I was trying to explain.  They never will

9  admit to that facet.  That's a big no-no.  It's an unwritten

10 rule between these organizations.  You don't talk about who

11 runs it.

12 Q.  I think you also testified that they suspect that they're

13 always being listened in on?

14 A.  Yes, ma'am.

15 Q.  And would it make sense for them to outwardly say, Well,

16 here, us guys in the XYZ cartel, that's our money?

17 A.  Exactly.  They would never do that.

18 Q.  Okay.  You spent a lot of time testifying about code this

19 morning, correct?

20 A.  Yes, ma'am.

21 Q.  Also, Mr. Delgado introduced you as a trusted lifelong

22 person, right?

23 A.  Correct.

24 Q.  Why would they even want -- or have to talk about it?

25 Wouldn't they assume that you knew what the source of the money

1    was?

2    A.  Yes.  Correct.

3    Q.  Okay.  Agent Ascencio, you testified that you were not

4    picking up or interested in talking -- his calls -- interested

5    in talking to Mr. Delgado by the middle of 2008, correct?

6    A.  Correct.

7    Q.  Basically, were you blowing him off?

8    A.  Yes.

9    Q.  Do you ever recall receiving a voice mail of anything

10   specific that he would give you?

11   A.  No.

12   Q.  Several times you've testified that he -- you would have to

13   instruct him to shut up, correct?

14   A.  Yes.

15   Q.  Did you have -- you had to do that when you were monitoring

16   him on the consensual calls to the cartel, right?

17   A.  Correct.

18   Q.  You had to do that in December -- on December 3rd of 2008,

19   when you -- when ICE was telling him his life was in danger.

20   You couldn't shut up him up, correct?

21   A.  Correct.

22   Q.  So does that provide a picture of how your agency, assuming

23   Special Agent Justice had the same opinion, how your -- what

24   your agency thought about the information that Mr. Delgado had

25   to give to you?

Ascencio – Redirect by Ms. Kanof

```
 1              MR. VELARDE:  Your Honor, I'm going to object to the
 2     question.  It calls for speculation on the part --
 3              THE COURT:  I'll sustain the objection.
 4     BY MS. KANOF:
 5     Q.  What was your government IP address?
 6     A.  IP address?
 7     Q.  When you were in Atlanta, what was your government --
 8     A.  Service provider.
 9     Q.  Okay.  Service provider, let's start there.
10              No, but the -- it's like you know in my office, we're
11     @doj.gov.
12     A.  Correct.
13     Q.  So you would have been what?
14     A.  My government would be @dhs.gov.
15     Q.  Okay.  You were actually already DHS at that time?
16     A.  Yes, ma'am.
17     Q.  And so if an e-mail had come from your government account,
18     it would have said something like Alex, underscore, Ascencio,
19     @dhs.gov?
20     A.  Correct.
21     Q.  It would not have said Bellsouth?
22     A.  No.
23     Q.  Because Bellsouth is not the government provider, correct?
24     A.  Correct.
25              MS. KANOF:  Okay.  I think that's all.
```

1        Thank you.

2                        RECROSS-EXAMINATION

3    BY MR. VELARDE:

4    Q.  Agent Ascencio --

5    A.  Yes, sir.

6    Q.  -- the whole purpose for conducting consensual monitored

7    recorded conversations is so that you can establish facts that

8    will lead to a successful investigation; is that correct?

9    A.  Well, the recording of those conversations is to have them

10   for prosecution purposes.

11   Q.  Well, yes.  But obviously, you have an objective to get the

12   people on the other end to say those things that you want to

13   hear?

14   A.  Correct.

15   Q.  Okay.

16        So -- and you already told me it's a lot of role

17   playing.  You were projecting yourself as a -- as a drug

18   trafficker.

19   A.  As a businessman, yes, sir.

20   Q.  As a businessman that also dealt in drugs?

21   A.  Correct.

22   Q.  Or were you?  Did you tell them that?

23   A.  No.

24   Q.  Okay.  So you were just a businessman?

25   A.  Correct.

1  Q.  But in the process -- in the course of trying to get into

2  their circle, you are projecting yourself as the most credible

3  person out there to help them out?

4  A.  Somebody that they could trust, correct.

5  Q.  That's right.  Now when you co-opted Mr. Delgado to assist

6  you, you debriefed him and you gave him a script.  And you

7  basically told him, This is what we want, for you to get on the

8  phone and to talk to these people and get something out of

9  them, correct?

10 A.  Correct.

11 Q.  So if they're saying, Marco Delgado, you're great, you

12 don't expect Mr. Delgado to say, No, no, no, I'm not great,

13 right?

14 A.  Correct.  They're talking --

15 Q.  You want him to play along?

16 A.  Yeah.  They --

17 Q.  You want to him to play along?

18         MS. KANOF:  Objection, Your Honor.

19         THE COURT:  Let him answer.  Let him answer.

20 BY MR. VELARDE:

21 Q.  You want Mr. Delgado to play along with whatever they are

22 saying?

23 A.  To whatever facts they were giving us at that time, yes.

24 Q.  Now, the fact is that on September the 8th you weren't

25 here.

Ascencio – Recross by Mr. Velarde

```
 1    A.  Not in El Paso.

 2    Q.  The second delivery?

 3    A.  Correct.

 4    Q.  They made a controlled delivery and they were subsequently

 5    stopped.  Isidro Rubio -- Vega-Rubio and Pedro Mendoza-Meneses?

 6    A.  Yes, sir.

 7    Q.  Okay.  And they were taken into custody?

 8    A.  Okay.

 9    Q.  And then Mr. Delgado is coached.  You go in there and

10    release -- get these guys released, right?

11    A.  I wasn't here.

12    Q.  Okay.  Well, did you learn that they got released?

13    A.  I learned they were released, yes, sir.

14    Q.  And that they were released to Mr. Delgado?

15    A.  No.  I didn't learn it until after the fact.

16    Q.  You didn't -- okay.  Well, he got them released?

17    A.  Yes, sir.

18    Q.  Now, if people -- Pedro Mendoza-Meneses gets released on

19    September the 8th --

20    A.  Yes, sir.

21    Q.  -- this conversation takes place on September the 14th.

22    A.  Uh-huh.

23    Q.  I think it's a safe assumption --

24         MS. KANOF:  Objection; testifying, Your Honor.  I

25    think it's a safe assumption.
```

1          THE COURT:  I'll sustain the objection.

2   BY MR. VELARDE:

3   Q.  If Mr. Mendoza-Meneses and Isidro Vega are back in Mexico,

4   do you have any doubt that they were in contact with each

5   other, with the people down there?  Do you have any doubt?

6   A.  I really don't know.

7   Q.  Pardon me?

8   A.  I really don't know.

9   Q.  Well, they got released.

10  A.  Okay.

11  Q.  And this phone call happened some six days later.

12  A.  Yes, sir.

13  Q.  The conversation that took place on December 2008, how long

14  did this conversation last?

15  A.  When we called him about the threat?

16  Q.  Yes, sir.

17  A.  Not very long.

18  Q.  Not very long?

19  A.  Not very long, no.  Once we got to the point where he

20  needed to get to the office ASAP, I hung up the phone, and my

21  agents called El Paso to let them know that he was on his way

22  to the office.

23  Q.  Would it be safe to say that the main reason for getting

24  him to the office was to alert him to this threat?

25  A.  Yes.

Ascencio – Recross by Mr. Velarde

1    Q.  That was the main objective of getting him there?

2    A.  Our objective was to save his life.

3    Q.  Yes, sir.

4    A.  We had a viable threat, so we're going to do everything we

5    could to keep him alive.

6    Q.  And that subject was touched upon seriously?

7    A.  Yes, very seriously.

8    Q.  And in the context of that conversation, you also inquired

9    about other things, you said.

10   A.  Correct.

11   Q.  And of course, you were just a participant.  Were you the

12   one leading the discussion or was somebody else leading that

13   discussion?

14   A.  We were there as a group.  So...

15   Q.  Well, my question is very simple.

16         Were you asking questions?

17   A.  We were all asking questions as a group.

18   Q.  Were you asking questions?

19   A.  We were all --

20         THE COURT:  He said we all are.

21   BY MR. VELARDE:

22   Q.  Were the ques- -- was El Paso in the lead or were you guys

23   in the lead, in Atlanta?

24   A.  For the conference call?

25   Q.  Yes, sir.

Ascencio – Recross by Mr. Velarde

```
 1   A.  It was us.

 2   Q.  And was Tom Justice involved in that discussion?

 3   A.  At that point, I don't believe so.  I think he was gone.

 4   Q.  Was Jeffery Walton involved?

 5   A.  Yes, sir.

 6   Q.  Okay.

 7            On December 3rd, was there a conference call or a

 8   meeting of sorts, an interview of Mr. Delgado?

 9            MS. KANOF:  Your Honor, asked and answered.

10            MR. VELARDE:  Okay.

11   BY MR. VELARDE:

12   Q.  That wasn't recorded, correct?

13   A.  Not that I know of.

14            MR. VELARDE:  Okay.  Thank you very much.  Nothing

15   further.

16            THE WITNESS:  Thank you, sir.

17            MR. VELARDE:  I have nothing further of this witness,

18   Your Honor.

19            THE COURT:  May this witness be excused?

20            MS. KANOF:  Please.

21            THE COURT:  Okay.  You're excused.  You're free to

22   leave.

23            THE WITNESS:  Thank you, Your Honor.

24            THE COURT:  Call your next witness.

25            MS. KANOF:  John McCabe.
```

McCabe — Direct by Ms. Kanof

1                    (Witness duly sworn.)

2                    THE WITNESS:  I do.

3                    MS. KANOF:  May I proceed, Your Honor?

4                    THE COURT:  You may proceed.

5                JOHN MCCABE, GOVERNMENT'S WITNESS, SWORN

6                         DIRECT EXAMINATION

7    BY MS. KANOF:

8    Q.  What's your name?

9    A.  John McCabe.

10   Q.  How are you employed?

11   A.  I am an agent with the Immigration and Customs Enforcement.

12   Q.  Do you hold a titled position?

13   A.  I do.  I'm currently Assistant Special Agent in Charge for

14   the Office of Professional Responsibility in Chicago.

15   Q.  Okay.  That's a lot.  You're the assistant.

16            What's the Office of Professional Responsibility?

17   A.  It's internal affairs for ICE.

18   Q.  Okay.  Every law enforcement agency has people that

19   investigate their own, correct?

20   A.  Correct.

21   Q.  And you're the Assistant Special Agent in Charge of that in

22   Chicago?

23   A.  Yes.  For the northeast region, which covers 19 states in

24   the U.S.

25   Q.  Okay.  And where did you come from before you went to

McCabe – Direct by Ms. Kanof

1   internal affairs, so to speak?

2   A.  I was a special agent in the Chicago office of Homeland

3   Security Investigations for seven years.  My initial two years

4   as an investigator, and the last five as a group supervisor.

5   Q.  Okay.  And before that you were also law enforcement?

6   A.  Yes.  I was -- I spent five years prior to coming into ICE

7   as a special agent with the Secret Service in Chicago.

8           And prior to that, I had local law enforcement

9   employment with the City of Chicago for five years and the City

10  of Dallas for two years prior to that.

11  Q.  Okay.  So other than the mistake of coming to Texas for two

12  years, you've been in Chicago the whole time?

13  A.  Yes, ma'am.

14  Q.  In July of 2008, what was your assignment in the Chicago

15  Homeland Security office?

16  A.  I was group supervisor of the financial and money

17  laundering group.

18  Q.  Okay.  How many people were in your group?

19  A.  At that time I had approximately 12 special agents and 8

20  task force officers assigned to me, a group of about 20.

21  Q.  And your responsibilities as a financial group were to do

22  what?

23  A.  Oversaw the daily investigations and the undercover

24  activities of the group.

25  Q.  Let me draw your attention to July 22nd, 23rd, and 24th of

McCabe — Direct by Ms. Kanof

1   2008.  And of course you know what we're talking about?

2   A.  Yes, ma'am.

3   Q.  Did you receive a call from Marco Delgado at any time

4   telling you that there was going to be a $100,000 drug money

5   pickup in Chicago?

6   A.  From Mr. Delgado, no.

7   Q.  Okay.  Who did you receive a call from?

8   A.  Initially, we received a call from the El Paso ICE office

9   asking us if we would help them coordinate an undercover pickup

10  in Chicago utilizing one of their informants.

11  Q.  Okay.  And what did you say?

12  A.  Absolutely.

13  Q.  What happened after you received that phone call?

14  A.  On the 22nd, we made contact with the El Paso ICE office

15  again.  They informed us that they had coordinated and that

16  informant was going to travel to Chicago.

17  Q.  What happened next?

18  A.  The informant, we gave out --

19  Q.  Well, let me ask you something -- a little bit about that.

20       Normally, would informants travel with law

21  enforcement?

22  A.  It depends.  It depends on how much faith that office has

23  in their informant.

24  Q.  Would it also depend on when they received the information,

25  that they had time to get their vouchers and their requests for

McCabe - Direct by Ms. Kanof

1    travel and money and all that?

2    A.  Correct.

3    Q.  Okay.  So he came by himself, regardless of why?

4    A.  He did.

5    Q.  And what happened when he arrived in Chicago?

6    A.  Approximately 9:00 in the evening he called us from O'Hare

7    airport, said he had just landed.

8    Q.  What was his name?  I don't know if we said that.

9    A.  The informant's name was Victor Pintana.

10   Q.  Pimental?

11   A.  Pimental.  I apologize.

12   Q.  Pimentel?

13   A.  Pimentel.

14   Q.  Okay.  Do you speak Spanish?

15   A.  None.

16   Q.  Okay.  Do you have any Spanish -- in 2008 did you have any

17   Spanish-speaking agents?

18   A.  I did.

19   Q.  Okay.  Okay.  So he called you from the airport or you met

20   him at the airport?

21   A.  He called us when he landed at the airport and informed us

22   that he had just gotten in Chicago.  And he also informed us

23   that -- prior to calling us -- he had been called by an

24   individual who -- by the name of --

25            MR. ESPER:  Your Honor, I'm going to object as

1    hearsay.

2              MS. KANOF:  It's --

3              THE COURT:  But he's not --

4              MS. KANOF:  It's not offered for the truth of the

5    matter asserted, Your Honor.  It's offered to show why they

6    acted in the manner that they did.

7              THE COURT:  The objection is overruled.

8    BY MS. KANOF:

9    Q.  Go ahead.

10   A.  He had -- prior to contacting us, he had received a call

11   from an individual that identified himself as Martel and said

12   that --

13             MR. ESPER:  I'm going to object to that, Your Honor,

14   as being hearsay.

15             THE COURT:  Overruled.

16             MR. ESPER:  Your Honor, it's hearsay upon hearsay.

17   BY MS. KANOF:

18   Q.  Go ahead.  It's okay.

19   A.  That Martel was ready to deliver $50,000 in currency to

20   him.

21   Q.  Okay.  So since he provided that information to you, did

22   you instruct him about his phone?

23   A.  Yes.  At that point we told Victor not to have any contact

24   with -- with Martel.

25             We also advised him to pick a hotel.  We gave him a

1    few choices in the Oakbrook Terrace area of Chicago and told

2    him that we would meet him -- to get a hotel, and we would meet

3    him at that hotel in the next hour and a half.

4    Q.  Did that happen?

5    A.  Yes.  He -- he got a hotel room at the Doubletree in

6    Oakbrook Terrace, and we met him at about 10:30 in the evening

7    on July 22nd.

8    Q.  Is Oakbrook Terrace like a suburb of Chicago?

9    A.  It is.  It's about 10 miles west of the city.

10   Q.  Is there a mall in Oakbrook Terrace?

11   A.  There is, very close to the hotel.

12   Q.  And is it -- is there a McDonald's next to the Doubletree?

13   A.  It's very close.  It's also the international headquarters

14   of McDonald's, is in Oak Brook.

15   Q.  I know that -- well, I'll get there, to the pictures.

16        So did you meet him at the hotel?

17   A.  We did.  We met him that evening.

18   Q.  Who went?

19   A.  Myself, Agent Mike Plossell, and task force officer Jairo

20   Gutierrez.

21   Q.  Okay.  So at least your task force officer was Hispanic,

22   correct?

23   A.  Yes.  He's a naive Spanish speaker.

24   Q.  Do you know what agency your task force officer was from?

25   A.  From Alsip, Illinois, a suburb -- also a suburb of Chicago,

McCabe – Direct by Ms. Kanof

1   Alsip.

2   Q.  Sheriff or police officer?

3   A.  Police department.  He's a police officer.

4   Q.  So he was part of a task force?

5   A.  Yes.  He was assigned to the financial group as a task

6   force officer.

7   Q.  And so the three of you went to see Victor Pimentel?

8   A.  Correct.

9   Q.  What happened next?

10  A.  We spoke to Victor briefly about what he knew and what he

11  was sent up there to do.  And then we had him initiate a call

12  to Martel.

13  Q.  So you told him, Don't call him back until we're with you?

14  A.  Correct.

15  Q.  And now he's calling him.  And what happened next?

16  A.  When he made the phone call to Mr. Martel, Martel was upset

17  that Victor had missed two calls between 9:00, when he called

18  us, and 11:00, when he made the call from the hotel in our

19  presence.  And Martel told him that -- that he needed to

20  contact -- that Victor needed to contact his people and that

21  Martel was going to contact his people.

22  Q.  And then what happened?

23  A.  At that point we had Victor call the Defendant Delgado, as

24  he was instructed.  And as -- I believe that call went

25  unanswered.

McCabe – Direct by Ms. Kanof

1    Q.  It went unanswered?

2    A.  It did.

3    Q.  Okay.  And then what happened next?

4    A.  At that point, with no further contact and it was 11:00 at

5    night, we instructed Victor to turn off his phone and not to

6    have any contact with anybody until we got back with him the

7    next morning.

8    Q.  What happened the -- the next morning, fairly early in the

9    morning, what did you do?

10   A.  We met with Victor at his hotel at around 8:30 in the

11   morning.

12   Q.  Is this July 23rd --

13   A.  Yes, ma'am.

14   Q.  -- of 2008?

15   A.  Yes, ma'am.

16   Q.  When you say "we," it includes you?

17   A.  Myself, the case agent Mike Plossell, and Task Force

18   Officer Gutierrez.

19   Q.  Okay.  And I understand Mike Plossell is out of the country

20   now unable -- was unable --

21   A.  He is.

22   Q.  So when you get there, what do you do?

23   A.  We --

24   Q.  Do you go into -- actually into his hotel room?

25   A.  Yes, ma'am.

McCabe – Direct by Ms. Kanof

1    Q.  Okay.

2    A.  We have him initiate another call with Martel.  During that

3    conversation Martel tells Victor that he had not had any

4    contact with his people.  And Victor relayed the same, that he

5    hadn't had any contact with his people.

6    Q.  Okay.  And what happened next?

7    A.  They agreed that they were both going to try to contact

8    their prospective handlers again.

9    Q.  And then?  Now -- it's still pretty early in the morning,

10   right?

11   A.  It's around 9:00.

12   Q.  Okay.  And you stay with him in his hotel room, basically,

13   until this thing gets going?

14   A.  Yes, ma'am.

15   Q.  And were there other calls that were placed?

16   A.  Yes.  Shortly after his call with Martel, we have -- we had

17   Victor initiate another call with the Defendant Delgado, and

18   Victor explained the situation with -- with Martel.

19          Defendant Delgado told Victor that he would -- he

20   would make some calls and figure something out.

21   Q.  During the process, were there also text messages being

22   sent between Delgado and Pimentel?

23   A.  Yes.  As I recall, shortly after the phone conversation, he

24   received a text from -- Victor received a text from the

25   Defendant Delgado, stating that -- that Martel was upset about

McCabe - Direct by Ms. Kanof

1    the way things had happened the evening earlier, with not

2    getting contacted, and that he may wait -- he may make Victor

3    wait for a while until he got to the --

4    Q.  You got an opportunity to read the text message, or

5    somebody from ICE?

6    A.  Yes.

7    Q.  Okay.  "You," the generic you.

8         And based on that, did you conclude that Delgado was

9    in contact with Martel or somebody who was in contact with

10   Martel?

11   A.  Yes.

12   Q.  At some point in time did Martel finally call to make the

13   delivery?

14   A.  A short time after the initial text, there was another text

15   from Defendant Delgado saying, Go ahead and call Martel there.

16   He's ready to start with the pickup.

17   Q.  And did you instruct Victor to do that?

18   A.  He did.  Shortly after getting that text, he did call

19   Martel again.

20   Q.  What was the substance of that phone call?

21   A.  The substance of the phone call was that -- that they

22   wanted to set up a meeting location where Martel could deliver

23   the currency to Victor.  They -- they agreed to meet at the

24   McDonald's a short distance from the hotel.

25         And the -- and Martel said that he was in the area,

McCabe – Direct by Ms. Kanof

1   and he would be at that McDonald's in about five minutes.

2   Q.  Did this whole scenario happen very fast for you --

3   A.  It did.

4   Q.  -- for ICE?

5   A.  It did.  Because to our knowledge, the location of where

6   Victor was staying was never given out.  So there would be no

7   reason to believe that Martel would know that we were in the

8   Oak Brook area.

9   Q.  And were photographs taken on that date of the McDonald's

10  and the mall?

11  A.  Not on that date, no.

12  Q.  Okay.  So in order to assist the prosecution last week, did

13  you go take photographs?

14  A.  I did.

15  Q.  But they're not a fair and accurate reflection of the

16  ac- -- there's all kinds of street work, and they're not really

17  an accurate reflection of the way it looked on that day?

18  A.  Correct.

19  Q.  Okay.  But we have them, if Defense Counsel would like to

20  see them.

21          So they were going to meet at the McDonald's, right?

22  A.  Correct.

23  Q.  And how far was the McDonald's from the Doubletree?

24  A.  A couple of blocks.

25  Q.  What happened next?

1    A.  After that phone call, we placed a body wire on Victor and

2    placed a recording device with him.  And shortly before he

3    left, in the window of about five or ten minutes, Martel had

4    called Victor again and said -- and saying that he was at the

5    McDonald's and he was waiting for him, and wanted to know where

6    he was.

7    Q.  Okay.  Why did you wire up Victor?

8    A.  For his safety in case something...

9    Q.  I mean, did you assume that he would be meeting with

10   Martel?

11   A.  We did.

12   Q.  Okay.  That never happened, right?

13   A.  Yes and no.  There was -- there was conversation between --

14   there was no long conversation between them.

15   Q.  Okay.  But both for his safety, and also to gather

16   evidence, he was wired?

17   A.  Yes, he was.

18   Q.  Okay.  What happened -- when Victor left the Doubletree,

19   did he walk to the McDonald's?

20   A.  He did, because he had portrayed to Martel that he did not

21   have a vehicle.

22   Q.  And did ICE Chicago set surveillance?

23   A.  We did.  Upon learning that Martel was in the area and that

24   they were going to go to the McDonald's, yes, there was a

25   surveillance team of probably no less than 10 agents waiting at

McCabe – Direct by Ms. Kanof

1    that McDonald's.

2    Q.  Was anybody in your surveillance team parked at McDonald's

3    in a white SUV?

4    A.  More than likely.

5    Q.  Okay.  Did your surveillance observe whether or not Victor

6    Pimentel actually stopped in the McDonald's?  Did he stop at

7    the McDonald's?

8    A.  Did Victor stop?  I don't -- I don't recall.

9    Q.  Okay.  Did he proceed walking and cross the street to the

10   mall?

11   A.  He did.

12   Q.  Okay.  But you aren't privy to why that happened?

13   A.  I believe at some point --

14          MR. ESPER:  Objection, Your Honor.  Nonresponsive to

15   the question.

16   BY MS. KANOF:

17   Q.  As part of your investigation, did you determine why Victor

18   Pimentel kept walking and -- past the McDonald's and crossing

19   the street to the mall parking lot?

20   A.  Yes.

21   Q.  Why?

22   A.  He was instructed by Martel that he felt that people were

23   watching the McDonald's lot, and that he -- he wanted to do the

24   exchange across the street in the mall -- in the mall parking

25   lot.

McCabe – Direct by Ms. Kanof

1   Q.   Now, was ICE -- and Victor did go to the mall parking lot?

2   A.   He did.

3   Q.   Was ICE able to actually see the dropping of the bag and

4   the picking up of the money?

5   A.   No.

6   Q.   Why?

7   A.   For a number of reasons.  It happened very quickly after

8   Victor was instructed to go into the mall lot.  We were -- we

9   told our team to get over there as fast as we did.

10          But we also alerted them that Martel was surveillance

11   conscious, and that there were a lot of shrubs and stuff in

12   between the street and the mall that made it difficult to view

13   into the mall.

14   Q.   Chicago is not a desert like El Paso, right?

15   A.   No, ma'am.

16   Q.   And there's -- there's tall bushes and trees that impeded

17   the ability to actually see what was happening?

18   A.   Yes.  All along the road where he had to cross over into

19   the mall area.

20   Q.   And if you had -- if an agent had driven into the lot

21   following them, it might have scared the drop?

22   A.   Absolutely.  Given -- given Martel's being surveillance

23   conscious, that he had already felt that people were watching

24   him in the McDonald's lot.

25   Q.   So you didn't drive into the parking lot either?

1    A.  No, ma'am.

2    Q.  Okay.  How long was it -- between the time you lost sight

3    of Mr. Pimentel and you heard from him again, how long was it?

4    A.  Probably less than five minutes.

5    Q.  What happened next?

6    A.  The surveillance teams were able to identify the car that

7    Martel was in.  They initiated surveillance.  And as Martel --

8    or as Victor walked back to the hotel, we maintained

9    surveillance on him.

10   Q.  Okay.  And did you go back to the hotel eventually, back to

11   his room?

12   A.  Yes.  Myself and Agent Plossell and TFO Gutierrez all went

13   back to the hotel.

14   Q.  And what happened in his room?

15   A.  He turned over to the -- the bag that he had received from

16   Martel to us.  We photographed it and then counted the currency

17   inside the bag.

18   Q.  Okay.  I'm going to show you -- is it on your screen?

19   A.  No, ma'am.

20        MS. KANOF:  Display, please?

21   BY MS. KANOF:

22   Q.  -- what's been marked and admitted into evidence as

23   Government's Exhibit Number 73.

24        And what are you looking at?

25   A.  The bag that the -- that Victor had received from Martel.

3 — 185

McCabe — Direct by Ms. Kanof

1   Q.  And where is it located?

2   A.  It's on the bed of the hotel room, in -- where Victor was

3   staying.

4   Q.  And now, I'm going to show you what's been marked and

5   admitted into evidence as Government's Exhibit Number 74.

6         Do you recognize what's depicted in that picture?

7   A.  Yes, ma'am.

8   Q.  Okay.  It doesn't want to get bigger.

9         What is it?

10  A.  It's a picture of the bag and the contents which was, I

11  believe, two bundles -- only two bundles, but it was all

12  vacuum-packed currency.

13  Q.  There we go.

14        Did you count the money?

15  A.  We did.

16  Q.  How much was there?

17  A.  $50,000.

18  Q.  And in that picture, that -- is that all of the money?

19  That's what $50,000 looks like?

20  A.  Yes, ma'am.

21  Q.  What kind of denominations were there?

22  A.  They were mostly 20s.  I don't recall any big

23  denominations.

24  Q.  How was it packaged?

25  A.  It was bundled in, I believe, $10,000 denominations and

McCabe — Direct by Ms. Kanof

1   heat sealed to make it compact.  And it's also a way that

2   they -- quality assurance, so they know no one has messed with

3   it.  And it's also -- they -- it's believed that the

4   drug-sniffing drugs won't smell it.

5   Q.  You say it's believed that the drug-sniffing dogs won't

6   smell it.  Why do you say it's believed?

7   A.  Because I've never seen a dog not hit on currency.

8   Q.  That was shrinkwrapped like that?

9   A.  Correct.

10  Q.  I also notice that in the picture there's two rubber bands

11  on each package; is that correct?

12  A.  Correct.

13  Q.  Okay.  Were there rubber bands inside the plastic

14  shrinkwrap, or FoodSaver shrinkwrap, or were they outside?

15  A.  They're inside.

16  Q.  Okay.  Did you break any of them open?

17  A.  The --

18  Q.  Any of the shrinkwrapped packages.

19  A.  Yes.  We broke -- we broke -- we broke all the shrinkwraps

20  open and we un-rubber banded everything and hand counted the

21  money right there in the hotel room.

22  Q.  So this photo was taken before you did that?

23  A.  Yes, ma'am.

24  Q.  Okay.  And what did you do next, basically?

25  A.  After we counted the money, we had Victor initiate another

1    call to Defendant Delgado and informed him that we had

2    successfully picked up the first $50,000, and that we were

3    waiting on instructions to pick up another $50,000.

4    Q.  Okay.  And in waiting upon the other $50,000, did you

5    remove any money from the bunch of $50,000?

6    A.  Yes.  I believe we removed $2,000, which was going to be

7    seized as fees for what Victor would have been paid to conduct

8    the currency.

9    Q.  So Victor told you, I'm supposed to get $2,000?

10   A.  Yes, ma'am.

11   Q.  And of course, you didn't -- at that time he wasn't given

12   that $2,000, correct?

13   A.  He was not.

14   Q.  Okay.  What -- but you took $2,000 out to be consistent

15   with what the deal was?

16   A.  Correct.

17   Q.  What did you do with the $2,000?

18   A.  It was seized by the SAC Chicago office, so it was

19   inventoried and placed into evidence.

20   Q.  Did you wait there for that phone call for the second

21   $50,000 pickup?

22   A.  We did.

23   Q.  Did something unusual occur that inhibited the ability for

24   Mr. Martel to do the other $50,000 pickup?

25   A.  There was a series of calls between Victor and the

McCabe – Direct by Ms. Kanof

1  Defendant Delgado, at which point he said that he was having

2  problems getting ahold of people in Mexico, and specifically

3  Rafa Solis, in order to conduct -- to get information on the

4  second $50,000.

5  Q.  Okay.  You remember that name that Mr. Delgado -- I mean,

6  were you overhearing the calls between Delgado and --

7  A.  I was in the room, and Victor would discuss the content of

8  the calls after making them.

9  Q.  Okay.  But you remember the name Rafa Solis?

10 A.  I do.

11 Q.  Do you know that Rafa Solis was the undercover name of

12 Special Agent Alex Ascencio in Atlanta?

13 A.  Not at that time, no.

14 Q.  Okay.  Did Victor appear to know that?

15 A.  I don't recall.

16 Q.  He didn't say, Oh, my gosh.  He's talking to an ICE agent?

17 A.  He -- I don't recall that, no.

18 Q.  No.  But if he had said that, would you have remembered?

19 A.  Oh, I would have remembered.  But he did not say that.

20 Q.  Okay.  And so then what happened in those telephone calls

21 while they were waiting to hear from the people?

22 A.  There was a series of calls.  In one of the phone calls

23 between the Defendant and Victor, he asked what had happened.

24       And Victor described what had happened, why Martel had

25 told him to go across the street, that he felt it was being

McCabe – Direct by Ms. Kanof

1    watched.  So he described this in the phone conversation.

2    Q.  He's telling Delgado, so you can hear Victor telling

3    Delgado?

4    A.  Right.

5    Q.  Okay.  Go ahead.

6    A.  And at which point the Defendant told Victor that he still

7    wasn't able to get ahold of anybody, specifically Rafa Solis,

8    and that he was working on getting an account number for Victor

9    to deposit the money into.

10   Q.  Let's go back to the scene.

11            THE COURT:  Well, we'll do that after the break.

12            MS. KANOF:  Okay.

13            THE COURT:  We'll be in recess for the next 15

14   minutes.

15            (Recess taken; open court.)

16            MS. KANOF:  May I proceed, Your Honor?

17            THE COURT:  You may.

18            MS. KANOF:  Your Honor, during the break I found out

19   from our paralegal that we actually did provide the photos in

20   discovery as soon as we got them.  And I've marked just a few

21   of the photos Government's Exhibit 86.  I think it would be

22   helpful to Government's Exhibit 93, and I have shown them to

23   Defense Counsel.

24            May I proceed and add these exhibits?

25            THE COURT:  What have you marked them as?

1          MS. KANOF:  86 through 93.

2          THE COURT:  86 through 92?

3          MS. KANOF:  93.

4          THE COURT:  You may.

5          MS. KANOF:  And if the Court wants to take objections

6    and admit them before I proceed?

7          THE COURT:  Any objections, Counsel?

8          MR. ESPER:  Your Honor, even though they don't -- the

9    circumstances have changed, we don't object.  Even though they

10   don't fairly and accurately depict the scene back in 2002, we

11   don't object.

12          THE COURT:  Well, are they really necessary?

13          MS. KANOF:  I think they -- just a couple of them

14   explain the situation, Your Honor.  There's an aerial photo.

15   And the buildings haven't moved, the mall hasn't moved, the

16   McDonald's hasn't moved.  So I think they -- the only thing

17   that's not fair and accurate is there is some road

18   construction.

19          THE COURT:  86 -- Government's Exhibits 86 through 93

20   will be admitted.

21   BY MS. KANOF:

22   Q.  Agent McCabe, I'm going to show you what's been marked and

23   admitted as Government's Exhibit Number -- it's not up on the

24   Elmo -- okay.

25          Government's Exhibit Number 86.  And what does that

McCabe – Direct by Ms. Kanof

1    depict?

2    A.   That's a picture of Spring Road.

3    Q.   And the building that's depicted in that picture, is that

4    the Doubletree?  Or the one behind it, is that the Doubletree?

5    A.   The Doubletree is on the other side of the light.  It's

6    down the block quite a bit.

7    Q.   But in the direction that you're looking at?

8    A.   Yes, ma'am.

9    Q.   Behind those buildings?

10   A.   Yes, ma'am.  Correct.

11   Q.   Let me show you Government's Exhibit 87.

12          What does that depict?

13   A.   It depicts Spring Road, from -- the picture is taken from

14   the corner of Spring and Cermak, looking into the mall.

15   Q.   Well, if you look at the right-hand side of Government's

16   Exhibit Number 87, do you see the golden arches?

17   A.   I do.

18   Q.   Okay.  So this would be the view that Mr. Pimentel would

19   have had when he left the Doubletree and was walking down the

20   street?

21   A.   Correct.

22   Q.   Toward McDonald's, correct?

23   A.   Correct.

24   Q.   Government's Exhibit Number 88.

25          And you said that's like the national training center

1    of McDonald's?

2    A.   Across the way from Oak Brook, but that's the main training

3    McDonald's they have for their corporate people.

4    Q.   And the construction sign and the orange -- I don't know

5    what you call --

6    A.   Construction cones?  Construction barrels?

7    Q.   Barrels.  Okay.  Those weren't there on that day?

8    A.   No, ma'am.

9    Q.   Okay.  But is this view from McDonald's looking towards the

10   mall?

11   A.   Yes.

12   Q.   Okay.  And does it accurately depict the manner of the

13   foliage in July of 2008?

14   A.   Yes.

15   Q.   So you can't really even see the mall, correct?

16   A.   No, you can't.

17   Q.   Or the parking lot?

18   A.   You cannot.

19   Q.   Government's Exhibit Number 89.

20            Is that an aerial photograph of the area?

21   A.   Yes, ma'am.

22   Q.   Okay.  And basically, you have indicated that -- on the

23   lower right-hand corner, that area that I've circled is the

24   Doubletree?

25   A.   Yes, ma'am.

McCabe - Direct by Ms. Kanof

1   Q.  Okay.  And would McDonald's then be here (indicating)?

2           Sorry.  Is this -- is the McDonald's here

3   (indicating)?

4   A.  Yes, ma'am.

5   Q.  Okay.  And then crossing -- you pointed to the mall parking

6   lot where the pickup took place.

7           Are these (indicating) the bushes?

8   A.  That would be the roadway.

9   Q.  Oh, sorry.  It's the roadway.

10  A.  The bushes would be immediately -- correct.

11  Q.  Okay.  Right where I'm pointing.  So those (indicating) are

12  the bushes.

13          So from the street, the bushes obstructed the view of

14  the parking lot, correct?

15  A.  Yes, ma'am.

16  Q.  And you testified that you did not have the agents take the

17  street and go into the parking lot, correct?

18  A.  Correct.

19  Q.  And do you know what store this is?

20  A.  I believe that's a Macy's.

21  Q.  Okay.  The money was in a Hollister bag, correct?

22  A.  Yes, ma'am.

23  Q.  Is there -- do you know whether or not there's a Hollister

24  store in that mall?

25  A.  I do not know.

McCabe – Direct by Ms. Kanof

1   Q.  Okay.  Government's Exhibit Number 90.

2           Is that now a view inside the parking lot?

3   A.  Yes.

4   Q.  I'm sorry.  With the bushes, that are on the right side of

5   the photograph, the bushes that we saw that obstructed the view

6   from McDonald's?

7   A.  Yes, ma'am.

8   Q.  Government's Exhibit Number 91.

9           Is that -- is this photo also inside the parking lot?

10  A.  Yeah.  The picture inside the parking lot looking at the

11  mall.

12  Q.  Okay.  And why did you take this particular view?

13  A.  Just to show how -- the relationship of the parking lot to

14  the mall.

15  Q.  Okay.  And Government's Exhibit Number 92.

16          What was the purpose of putting that SUV in the --

17  this isn't an SUV that was involved in the transaction?

18  A.  No.  No, it was not.

19  Q.  What was the purpose of you placing an SUV there to take

20  the photographs?

21  A.  To show how high the foliage was from the parking lot.

22  Q.  And just because we live in El Paso and we don't get to see

23  this very often, is that a picture of the foliage?

24  A.  That's the picture of -- from Spring Road looking into the

25  mall -- of the foliage as you go down the street.

1    Q.  Thank you.

2          Now, you -- when we left before the break, you were

3    talking about how Delgado and Pimentel were talking to each

4    other and texting each other waiting for that other $50,000,

5    correct?

6    A.  Correct.

7    Q.  At some time in the morning, going back to the surveillance

8    of the individual who dropped the money, did people follow him?

9    A.  Yes.

10   Q.  Who followed him?

11   A.  We had a surveillance team of approximately eight agents

12   follow the individual known as Martel from the mall parking

13   lot.

14   Q.  Did -- were task force officers included in that?

15   A.  Yes, ma'am.

16   Q.  Okay.  And what did you instruct, or someone from ICE,

17   instruct those officers to do with regard to Martel's vehicle?

18   A.  At some point, one of the task force officers called me and

19   let me know that -- that the vehicle that Martel was driving

20   was driving erratically and appeared to be evasive, and that

21   they had run the plate, and that the license plate on the

22   vehicle came back stolen.

23   Q.  So what did they do?

24   A.  At that point I told him to initiate a traffic stop based

25   on the stolen license plate, but they were to make no mention

McCabe – Direct by Ms. Kanof

1   of the currency transaction between Martel and Victor.

2   Q.  Did that happen?

3   A.  Yes, it did.

4   Q.  Okay.  So how -- how much time elapsed between the drop of

5   the money and his getting stopped for a traffic stop?

6   A.  I believe it was, like, 15 or 20 minutes.

7   Q.  So was Mr. Pimentel even back at the hotel by the time that

8   Martel was stopped?

9   A.  I believe he had -- he was -- he had been back at the hotel

10  by that time.

11  Q.  Okay.  But not for very long?

12  A.  No.

13  Q.  So when the -- the transactions were occurring on the phone

14  and the text, was there any -- ever any discussion between

15  Pimentel and Delgado that something had happened?

16  A.  One of the later conversations that they had, yes.

17  Q.  Okay.  How long did you wait at the hotel for that call

18  that now you knew Martel was not going to make?

19  A.  I'm sorry.  One more time?

20  Q.  Okay.  Once -- did you know that Martel was supposed to

21  drop the second 50,000 as well?

22  A.  We did not.  We -- we had thought that Martel was not going

23  to be involved in the second drop of $50,000, which was another

24  reason that we initiated the traffic stop.  We believed that

25  the source of the other $50,000 was going to be from a separate

McCabe – Direct by Ms. Kanof

1    individual.

2    Q.   Okay.  So you still waited at the hotel, thinking that a

3    call would come in for Victor to pick up the other 50,000?

4    A.   Correct.  And that was the -- the first call that we had

5    Victor initiated, after we counted the money to Defendant

6    Delgado, was that we had received the money, that there was

7    $50,000, and we were ready -- he was ready.  Victor was ready

8    to pick up the other $50,000, because he was sent up there to

9    pick up $100,000.

10   Q.   Do you know how long you waited in the hotel?

11   A.   There was a series of calls between approximately noon and

12   2:30, 3:00, that we waited.

13          In one of those calls Defendant Delgado made -- made

14   reference that he was trying to get an account number from Rafa

15   Solis.  And Victor had informed us that he did have an account

16   number for a Wells Fargo account.

17   Q.   So when Victor arrived in Chicago, he already had a Wells

18   Fargo account number, correct?

19   A.   Correct.

20   Q.   Did you know what the source of that number was?

21   A.   We did not know.

22   Q.   Okay.  So what happened next?

23   A.   At that point, knowing that there were no Wells Fargo banks

24   in Chicago -- the closest one was in Racine, Wisconsin, which

25   is just over the border from Illinois, Agents Plossell and Nate

1   Cravata and Task Force Officer Gutierrez took Victor and they

2   went to that Wells Fargo up in Wisconsin.

3   Q.  What happened at the bank?

4          MR. ESPER:  Excuse me.  It's not within his personal

5   knowledge.  It's hearsay.

6          THE COURT:  I'll sustain the objection.

7          MS. KANOF:  As part of the --

8          I'm sorry, Your Honor?

9          THE COURT:  I'll sustain the objection.

10         MS. KANOF:  Okay.

11  BY MS. KANOF:

12  Q.  Ultimately, was Victor able to deposit the money in the

13  bank account in Racine?

14         MR. ESPER:  Objection, Your Honor.  Not within his

15  personal knowledge.

16         MS. KANOF:  Oh, that he would know, Your Honor.

17         THE COURT:  Overruled.

18  A.  No, he was not.

19  BY MS. KANOF:

20  Q.  So as the group supervisor, were you required to secure the

21  money?

22  A.  I was.

23  Q.  What did you do?

24  A.  They brought the money back from Wisconsin, and it was

25  secured in my safe overnight.

McCabe – Direct by Ms. Kanof                    3  -  199

1    Q.   Okay.  And what happened the next day?

2    A.   The next day, around 11:00, 11:15, we had Victor initiate

3    another call to Defendant Delgado.

4    Q.   Where was -- where was he located when these calls were

5    taking place?

6    A.   I believe they were back in the hotel room.

7    Q.   Okay.

8    A.   And at that point, Mr. Delgado had told them that he still

9    couldn't get ahold of anybody.

10          And Victor told Defendant Delgado that he was going to

11   drive the money back to El Paso.

12   Q.   Okay.  And who -- did he make that decision on his own?

13   A.   No.  That decision -- the decision that that's what we

14   would tell Defendant Delgado was made in consultation with the

15   El Paso HSI office.

16   Q.   Did he -- and did you rent him a car to drive back to

17   El Paso?

18   A.   No.  He flew back from O'Hare airport.

19   Q.   Okay.  Before he flew back, was more money removed from the

20   now $48,000 stash?

21   A.   Yes.  It was a total of $5,000.  So $2,000 previously, and

22   another $3,000 was taken from the stash.

23   Q.   Why did you remove another $3,000?

24   A.   It was for additional expenses for Mr.- -- for Victor to

25   get back to El Paso.

McCabe - Direct - Cross by Mr. Esper

1  Q.  And who instructed Victor to take the extra money?

2  A.  Defendant Delgado.

3  Q.  What actually happened to the money?  How did it leave

4  Chicago?

5  A.  I believe the following day it was -- in consultation again

6  with the agents in El Paso -- was deposited into an ICE account

7  in Chicago and wire transferred to an El Paso account, HSI

8  El Paso account, here in El Paso.

9  Q.  And what happened to Victor?

10  A.  Victor was put on an airplane and sent back to El Paso.

11  Q.  Was that -- did that end ICE Chicago's responsibility with

12  regard to this transaction?

13  A.  Yes, ma'am.

14       MS. KANOF:  Pass the witness.

15                    CROSS-EXAMINATION

16  BY MR. ESPER:

17  Q.  Mr. McCabe, what is the -- what time is Chicago on?  Is it

18  Eastern or Central?

19  A.  Central Standard Time, sir.

20  Q.  Okay.  And actually, right now, it would still be Central

21  Daylight Time, correct?

22  A.  Yes, sir.

23  Q.  Okay.  But when you go off of daylight savings, it becomes

24  Central Standard Time, correct?

25  A.  Correct.

McCabe – Cross by Mr. Esper

1    Q.   Okay.  And it's not Eastern?

2    A.   No.  No, sir.

3    Q.   Okay.  And you've lived there for many years, and you would

4    know that, correct?

5    A.   Yes, sir.

6    Q.   Now whenever you were contacted by ICE, this came as a

7    total surprise to you and your fellow agents up there in

8    Chicago, did it not?

9    A.   We didn't have -- we didn't have previous knowledge about

10   the case until they contacted us, no.

11   Q.   So actually, they contacted you the same day that

12   Mr. Pimentel arrived, correct?

13   A.   They did.  We had conversations with them the week prior,

14   and they told us they had anticipated something, but it was

15   still in the works.

16   Q.   Okay.  So you had received a call a week prior to July 22nd

17   from El Paso ICE that there may be a pickup of currency in

18   Chicago?

19   A.   Yes, sir.

20   Q.   But they were not -- it was not a confirmed thing in

21   their -- to you all?

22   A.   No.

23   Q.   And did they mention names to you at that time?

24   A.   Not at that time.  It was very preliminary.

25   Q.   Okay.  And do you know -- and if you don't simply say so --

```
 1   who was the agent that you were in contact with?

 2   A.  I -- I don't recall.

 3   Q.  You don't recall?

 4   A.  No.

 5   Q.  Okay.

 6           Now, on the morning that -- Mr. Pimentel arrives that

 7   evening, correct?

 8   A.  Yes, sir.

 9   Q.  That would have been July 22nd?

10   A.  Yes, sir.

11   Q.  Okay.  And so you get a call sometime earlier in the day

12   that, in fact, he's on his way up there?

13   A.  Correct.

14   Q.  Okay.  So now it's -- there's some kind of confirmation

15   that, indeed, he's up there to pick up some money?

16   A.  Yes, sir.

17   Q.  Okay.  And you meet him at the hotel, at the Doubletree?

18   A.  Yes, sir.

19   Q.  Okay.  And what type of telephone is he utilizing, if you

20   recall?

21   A.  He had a cellular phone.

22   Q.  Pardon me?

23   A.  He had a cellular phone.

24   Q.  Okay.  And was it one of those push-to-talk phones?

25   A.  That, I don't recall.
```

1    Q.  Okay.  When you say you were able to hear the

2    conversations, were you actually able to hear the conversations

3    that Mr. Pimentel was having with Mr. Martel and/or

4    Mr. Delgado?

5    A.  In realtime?

6    Q.  Yes.

7    A.  No, sir.

8    Q.  You could hear Mr. Pimentel, obviously, speaking, correct?

9    A.  Yes.

10   Q.  But you couldn't hear the voices on the other end speaking

11   to him in realtime?

12   A.  No, sir.

13   Q.  Was he recording those conversations?

14   A.  Yes.

15   Q.  Okay.  And who gave him the recording device?

16   A.  I believe Agent Plossell brought a recording device with

17   him.

18   Q.  Okay.  And he's with -- out of the Chicago office?

19   A.  Yes, sir.

20   Q.  Okay.  And is it -- is it a fairly simple device to put on

21   a phone?

22   A.  Yes, sir.

23   Q.  And you would agree, would you not, Mr. McCabe, that in

24   these times it's easy to record conversations, is it not?

25   A.  Depends on your level of technology.  But, yes, it's not

McCabe — Cross by Mr. Esper

1    very difficult.

2    Q.  Yeah.  Well, if you're a dinosaur like me, it's hard.  But

3    most young people know how to record?

4    A.  I would put myself in the dinosaur category also.  But,

5    yes.  It's —

6    Q.  It's good to meet a fellow dinosaur.

7           But in any event younger people, with the technology

8    now, they can record from a cell phone, can't they?

9    A.  Correct.

10   Q.  Okay.  And that, certainly with respect to law enforcement,

11   has helped law enforcement record conversations much easier

12   than they could in the past, correct?

13   A.  Correct.  As technology advances, yes.

14   Q.  Sure.  It makes it — and years ago, it made it much more

15   difficult to record conversations, didn't it?

16   A.  Correct.

17   Q.  Okay.  Now in the hotel room, you're not recording the

18   conversations Mr. Pimentel is having because he's got a

19   recording device on his phone, correct?

20   A.  I don't recall whether we brought a recording device or —

21   I know they were recorded.

22   Q.  Okay.  They were recorded, because there was an attachment

23   on his phone, correct?

24   A.  I — that, I don't recall.

25   Q.  Well, you said that one of your fellow agents brought a

1    device for him to record --

2    A.  He did.

3    Q.  -- conversations that he was having on -- "he," being

4    Mr. Pimentel -- on his phone?

5    A.  Correct.

6    Q.  Okay.  But you don't recall whether any of you or fellow

7    agents were recording, using their cell phones or any other

8    technological device, the conversations that you-all were

9    having in the hotel room?

10   A.  No.  The conversation was strictly recording what was being

11   said on the phone.

12   Q.  Okay.  And then Mr. Pimentel would, in turn, tell you what

13   was being said to him, correct?

14   A.  Correct.

15   Q.  Okay.  Now this Mr. Martel, whenever he is stopped after --

16   let me ask you this.

17            You didn't observe the actual handing of the bag to

18   Mr. Pimentel?

19   A.  No, sir.

20   Q.  Okay.  And whenever Mr. Pimentel -- did he contact you by

21   phone to tell you that he had received the money?

22   A.  We heard something over the body wire, and then we observed

23   him walk out of the foliage with the bag.

24   Q.  Okay.  Did you -- did any of you -- did you or your fellow

25   agents ever advise him to clear yourself, go into the mall

```
1   first and then come out?
2   A.  No.
3   Q.  Did not?
4   A.  Did we advise him to go into the mall?
5   Q.  Yeah.  In other words, he picks up the money.  Okay?
6   A.  Correct.
7   Q.  And now he all of a sudden disappears into the mall,
8   correct?  Or do you know?
9   A.  He never goes into the mall, no.
10  Q.  He never goes into the mall?
11  A.  Mr. Pimentel?
12  Q.  Yes.
13  A.  Not that I have knowledge of, no.
14  Q.  And does he ever tell you or contact you or your fellow
15  agents and is advised, Go into the mall and clear yourself
16  there first, and then meet us at the Doubletree?
17  A.  I don't recall that conversation, no.
18  Q.  Okay.  Would that have been a significant conversation if
19  it had happened?
20  A.  No.  It would be -- we have done that in times where we
21  think that the -- and it may have been done without my
22  knowledge, because he may have contacted Agent Plossell.
23  Q.  Okay.
24  A.  Agent Plossell might have told him, Hey, listen.  Maybe you
25  need to clear yourself before you come back.
```

McCabe - Cross by Mr. Esper

1   Q.  Okay.

2   A.  Especially being that Martel appeared to be surveillance

3   conscious.

4   Q.  Okay.  Did you -- were you surprised when you saw him

5   coming out of the foliage?

6   A.  I did.

7   Q.  Okay.  In other words, he kind of disappeared for a while

8   after there was a -- after the body mike recorded that he had

9   picked up the money?

10  A.  It was -- it was very short.

11  Q.  Okay.  And then all of a sudden he disappears and you guys

12  don't know where he's at?

13  A.  Well, we didn't know where he was at because we -- he was

14  out of our view because of the foliage.

15  Q.  Right.  And then all of a sudden he comes out of the

16  foliage, and you-all meet up back at the Doubletree?

17  A.  Correct.

18  Q.  Is -- Mr. Martel, he is stopped by a Chicago police marked

19  unit, correct?

20  A.  No.  He's stopped by one of the task force officers.

21  Q.  Oh, he is?

22  A.  Yes, sir.

23  Q.  Okay.  So the task force officer is in plain clothes,

24  correct?

25  A.  Yes.

1    Q.   Okay.  And the vehicle -- the license plate comes up not

2    matching that vehicle, correct?

3    A.   I don't recall the circumstances.  I remember being told by

4    the task force officer, when they were following him, that that

5    plate was stolen.

6    Q.   Okay.  So then you gave the authorization to go ahead and

7    stop him.  And they arrested him, did they not?

8    A.   He was detained.  I don't -- I don't know what the further

9    charges was.  As I recall, the plate was recovered, but never

10   taken out of the system.

11   Q.   Okay.  Well, it was recovered, but never taken out of the

12   system, meaning?

13   A.   So the car was listed as stolen at some point.  But when it

14   was recovered, it was never taken out of the NCIC system, so it

15   maint- -- it was -- remained in the system as stolen.

16   Q.   Okay.  So in answer to my question, you don't know whether

17   he, Martel, was arrested or not, do you?

18   A.   He -- he was detained and taken back to a station, to the

19   police station.

20   Q.   Okay.

21   A.   But what happened to him beyond that, I don't recall, no.

22   Q.   Okay.  So in other words, there's a period of time where,

23   after he allegedly drops off this money, he now drives off and

24   he is stopped within about five minutes, correct?

25   A.   As I recall, it was a little bit longer, maybe 15.  But...

McCabe - Cross by Mr. Esper                    3 - 209

1   Q.  But 15 minutes later he's stopped?

2   A.  Yes, sir.

3   Q.  Okay.  And now he's not only stopped, he's now detained and

4   taken to a PD substation?

5   A.  Correct.

6   Q.  Would that have been in Oak Forest?

7   A.  I -- I don't recall what jurisdiction they were in when

8   they stopped him.

9   Q.  Okay.  Am I pronouncing it correctly?  Is it O-A-K, Oak,

10  Forest?

11  A.  Yes.

12  Q.  Okay.  It's not Old Forest?

13  A.  No, it's -- there's an Oak Forest.

14  Q.  Pardon me?

15  A.  There is an Oak Forest, yeah.  I don't know of an Old

16  Forest.  So --

17  Q.  Okay.

18  A.  -- it would be Oak Forest.

19  Q.  Okay.  So in other words, when he is -- when Mr. Martel is

20  detained and taken to the police station, he's not able to make

21  a phone call, is he?

22  A.  Not that I know of, no.

23  Q.  Okay.  And you don't know how long he was detained at the

24  police station, do you?

25  A.  I do not.

1    Q.  Okay.  And you don't know whether or not, before he's

2    stopped by the task force officer, he gets on the phone and

3    tells -- calls somebody to tell them he's being -- the cops are

4    on him?

5    A.  I -- yeah.  I don't know that he did or not.

6    Q.  But nevertheless there is a phone call, according to

7    Mr. Pimentel, that after he gets to the hotel room, supposedly

8    Mr. Delgado tells him there was some sort of mishap with

9    Mr. Martel?

10   A.  Correct.  In one of the -- in one of the phone

11   conversations Mr. Delgado asks Victor what -- what went on.

12   Q.  Okay.  And that's within about, what, within an hour after

13   all this happened?

14   A.  I believe that phone call took place around 2:00 in the

15   afternoon.  So...

16   Q.  Within a few hours?

17   A.  Within a few hours.

18   Q.  Now, the next day -- in other words, you wait the whole day

19   for another phone call to pick up, allegedly, another $50,000?

20   A.  Yes, sir.

21   Q.  And it never happens?

22   A.  Correct.

23   Q.  Okay.  And you testified that you don't know who Rafa Solis

24   is.

25   A.  I did not at the time, no.

1   Q.  Okay.  And of course, living in the Chicago area, Chicago

2   has a large Hispanic population, does it not?

3   A.  It does.

4   Q.  And Solis is a fairly common name in Chicago for Hispanics?

5   A.  It is.

6   Q.  Okay.  So to hear the name Rafa Solis, or Rafael Solis, is

7   not uncommon in law enforcement circles, is it?

8   A.  The surname Solis is not.  Rafa Solis is...

9   Q.  Okay.  But you had no idea that Rafael Solis could have

10  been Agent Ascencio?

11  A.  I did not know that at the time.

12  Q.  Okay.  Now, Mr. Pimentel spends the night -- that night in

13  the same Doubletree Hotel?

14  A.  Yes, sir.

15  Q.  Doesn't come back to El Paso?

16  A.  Not that evening, no.

17  Q.  Okay.  That afternoon is when he goes up to Racine,

18  Wisconsin?

19  A.  Yes, sir.

20  Q.  You don't go with him?

21  A.  No, sir.

22  Q.  Okay.  And he goes up there because he's attempting to

23  del- -- to deposit money into a bank account?

24  A.  Correct.

25  Q.  Okay.  And you've seen this $45,000, haven't you?

McCabe – Cross by Mr. Esper

1    A.  The $50,000 that we --

2    Q.  The $50,000, I'm sorry.

3    A.  That we -- yes.

4    Q.  Okay.  You counted it?

5    A.  Yes, sir.

6    Q.  Okay.  Now, let me get to the -- before I get to the

7    deposit procedure, or the attempted deposit, does Mr. Pimentel

8    try to take 2,000 bucks out of the money?

9    A.  Oh.  We -- he had made us aware that he was supposed to

10   receive $2,000.

11   Q.  Okay.  So --

12   A.  He doesn't attempt to take it.  We take it, again in

13   consultation with El Paso agents, that we were going to seize

14   that money up in Chicago.

15   Q.  Okay.  In other words, when you're counting the money he

16   tells you, Hey, I'm supposed to get 2,000 bucks?

17   A.  No, not -- not in the case -- not in the sense that he

18   thought he was going to receive $2,000 there.

19   Q.  He thought he was going to get $2,000 when he was there in

20   Chicago?

21   A.  No.  My understanding, through El Paso, was he was aware

22   that he was supposed to get paid.  But he was aware that that

23   money was going to be seized by law enforcement.

24   Q.  Okay.  And did somebody give him money to go buy a ticket

25   to come back to El Paso?

1    A.  I don't -- I don't rem- -- I don't recall how his travel

2    was paid for.

3    Q.  Okay.  You-all didn't give him any money?

4    A.  No, sir.

5    Q.  The $5,000, that was deposited into an ICE account?

6    A.  Yes, sir.

7    Q.  As well as the 45,000?

8    A.  Into a separate account.

9    Q.  Okay.  5,000 was taken out and 45,000 was put into a

10   separate account?

11   A.  Correct.

12   Q.  Were they both wire transferred to ICE in El Paso?

13   A.  No.  The $5,000 was seized in Chicago, and the $45,000 was

14   wire transferred from an ICE account to an El Paso account.

15   Q.  What happened with the 5,000?

16   A.  It was seized by Chicago.

17   Q.  Okay.  That money was not used to give to Mr. Pimentel at

18   all?

19   A.  Not that I'm aware of, no.

20   Q.  Okay.  Now, you have -- do you -- as a law enforcement

21   officer, are you engaged in banking deposits or investigations

22   involving structuring?

23   A.  I am.  At times, yes, I am.

24   Q.  And this particular transaction that's -- it's in a

25   Hollister bag.  Walking into a bank with 45,000 bucks in a

1   Hollister bag would certainly arouse a lot of suspicion, would

2   it not?

3   A.  It would.

4   Q.  Okay.  And have you, in the past, received phone calls from

5   banks saying, Hey, there's some guy trying to deposit a bunch

6   of cash into this account, and he looks suspicious?

7   A.  Not typically.  What the banks would usually do is do a

8   report and send it off to law enforcement.

9   Q.  Okay.  But the plan was was for Mr. Pimentel to take this

10  Hollister bag with 45,000 bucks in cash and deposit it into an

11  account?

12  A.  If you're asking us if we brought the money up there in a

13  Hollister bag, that's not how we did it.  We --

14  Q.  No.  What I'm asking --

15  A.  We packaged it different and brought it up there.

16  Q.  When he went up to Racine, Wisconsin, with the fellow

17  agents --

18  A.  Yes.

19  Q.  -- the plan was, he was going to walk into a Wells Fargo

20  bank and deposit 45,000 in cash into an account?

21  A.  Whose plan?

22  Q.  Pardon me?

23  A.  Whose plan was that?

24  Q.  No.  When Mr. Pimentel went to -- you said you went to

25  Racine, Wisconsin, didn't you?

1    A.  We did.  We transported him up there.

2    Q.  Okay.  And you transported him up there.  Was it his

3    intention -- was it your all's intention to allow him to

4    deposit that money into an account?

5    A.  Correct.

6    Q.  Okay.  And that didn't happen, did it?

7    A.  It did not.

8    Q.  Okay.  And do you know why it didn't happen?

9    A.  He was -- I believe he was told that he couldn't deposit --

10   Q.  Victor?

11   A.  The bank told him he was not allowed to deposit that money

12   to an account without authorization from the account holder.

13   Q.  Okay.  And did you get clearance from ICE El Paso that that

14   was okay for him to do that?

15   A.  I'm sure we had a conversation that that's how it was going

16   to happen.

17   Q.  Okay.

18        MR. ESPER:  May I have just one moment, Your Honor?

19        THE COURT:  You may.

20   BY MR. ESPER:

21   Q.  Mr. McCabe, Mr. Pimentel, did he tell -- did he use the

22   word "mishap" when he was explaining?  Subsequent to a

23   conversation he had with Mr. Delgado, was he the one that used

24   the word "mishap"?

25   A.  I don't recall "mishap."  As I -- as I recall, the

1   conversation back then was, when he had a conversation with

2   Mr. Delgado, Mr. Delgado said, What happened?  Words to the

3   effect, What happened?

4           And Victor explained, you know, that we had -- what

5   had happened, that they -- that initially they were set up to

6   do it at McDonald's.  That Martel felt that he was -- the

7   parking lot was being watched, and asked him to go over to the

8   mall parking lot to do the -- the exchange, or the transaction.

9   Q.  So that's the quote, mishap, that Mr. Pimentel is referring

10  to in explaining it to you?

11  A.  Correct.

12  Q.  He doesn't know anything about Mr. Martel being stopped 15

13  minutes later and then taken to the substation?

14  A.  No.

15  Q.  Okay.  Nor does he infer that Mr. Delgado knows about

16  Mr. Martel being arrested either?

17  A.  I don't know how Mr.- --

18  Q.  Okay.  It's -- so it's clear that mishap that they're

19  talking about is they're supposed to get the money there at the

20  McDonald's, Martel feels that there's law enforcement in the

21  area.

22          MS. KANOF:  Your Honor, I'm going to object as to what

23  Mr. Delgado thought about the word "mishap," because we don't

24  know what communication Mr. Delgado had with people that knew.

25          THE COURT:  Rephrase your question.

1              MR. ESPER:  I'll rephrase the question.

2    BY MR. ESPER:

3    Q.  Mr. Pimentel is explaining the mishap to you as being what

4    occurred prior to the pickup, correct?  That there was -- that

5    Martel felt that there was law enforcement in the area?

6    A.  Yes.  He explained the conversation that he had with

7    Martel.

8    Q.  Okay.  And Martel is telling him that he thinks there's law

9    enforcement in the area?

10   A.  Correct.

11   Q.  And in fact, there was?

12   A.  Yes, there was.

13   Q.  Okay.  And so now Martel directs Pimentel to start walking

14   towards the mail, and that's when you lose sight of what

15   happens?

16   A.  He -- all he does is -- it's just crossing the street.

17   That's all it is.  It's right across the street.

18   Q.  And what's what he is telling Mr. Delgado on the phone as

19   to what the mishap was, correct?

20   A.  Well, he explained the whole process, that --

21   Q.  Okay.  "He," being Mr. Pimentel, doesn't know anything

22   about Martel subsequently being arrested in a stolen car and

23   taken to the police station, any of that?

24   A.  Not to my knowledge, no.  We never shared any of that with

25   him.

1           MR. ESPER:  That's all I have, Your Honor.

2                   REDIRECT EXAMINATION

3    BY MS. KANOF:

4    Q.  Quickly, Agent McCabe.

5           Do you know whether one of your officers might have

6    told Mr. Pimentel at some point in time that that happened?

7           MR. ESPER:  Objection, Your Honor, speculation.

8           THE COURT:  Does he know?

9    BY MS. KANOF:

10   Q.  Do you know?

11          MS. KANOF:  I asked if he knew.

12          MR. ESPER:  He might have known.

13          THE COURT:  No, no, no.  Does he know?

14   BY MS. KANOF:

15   Q.  Do you know whether or not one of your other agents might

16   have told Mr. Pimentel?

17   A.  I don't know that we –– that we told him that.  I don't

18   know.

19   Q.  Okay.  You didn't go to the bank in Racine?

20   A.  I did not.  Shortly after, he would have made the call at

21   around 2:30 or so, I would have taken myself out of it because

22   it was clear at that point that there was going to be no more

23   operational things; that it was clearly a –– an operation of

24   getting the money up to Wisconsin to deposit, which did not ––

25   did not need my supervision.  So...

1  Q.  What is walking money?  Walking?

2  A.  Letting it go.

3  Q.  Okay.  Could -- did -- is this a law enforcement term?

4  A.  Yes.

5  Q.  And do you sometimes walk money?

6  A.  Yes.  We'll -- we'll let the -- we'll let the money go

7  through as planned.  Typically, it's done -- we do -- we've

8  done a lot of it in Chicago, where we would have money

9  transferred into bank accounts down in Mexico, to identify the

10 accounts that it will go into.

11 Q.  So it isn't unusual, then, to allow money to be deposited

12 in an account that you don't control?

13 A.  No.  We do it -- we do it quite often.

14 Q.  Do you know whether or not El Paso asked Chicago to let the

15 money walk?

16 A.  It was -- well, we were -- we were in consultation with

17 El Paso.  It was agreed upon that if he could deposit that

18 money into this account at Wells Fargo that was okay.

19 Q.  Okay.  And it was okay that ICE no longer could control

20 that $45,000?

21 A.  Yes.

22 Q.  That's part of a legitimate law enforcement investigation?

23 A.  Yes, ma'am.

24         MS. KANOF:  Pass the witness.

25         THE COURT:  Mr. Esper?

Aguirre – Direct by Ms. Kanof

```
 1              MR. ESPER:  Nothing further, Your Honor.
 2              THE COURT:  Very well.  I'm going to excuse the
 3    witness unless you let me know why not.
 4              MS. KANOF:  Yes, Your Honor.  Please.
 5              THE COURT:  You may be excused.  You're free to go,
 6    sir.
 7              Call your next witness.
 8              MS. KANOF:  Gabe Aguirre.
 9              (Witness duly sworn.)
10              THE WITNESS:  I do.
11              THE COURT:  You may proceed.
12              GABRIEL AGUIRRE, GOVERNMENT'S WITNESS, SWORN
13                        DIRECT EXAMINATION
14    BY MS. KANOF:
15    Q.  State your name, please.
16    A.  Gabriel Aguirre.
17    Q.  And how are you employed?
18    A.  I'm a special agent with Homeland Security Investigations.
19    Q.  Where are you from?
20    A.  I'm from El Paso.
21    Q.  What part of El Paso?
22    A.  The Lower Valley.
23    Q.  Okay.  And what is your background and experience and
24    education?
25    A.  I have a bachelor's degree from the University of Texas at
```

1  El Paso in Spanish.  I was a teacher at Montwood High School,

2  taught Spanish, and I was also a soccer coach there.  I was

3  there for a little bit over five years.

4  Q.  I'm sorry.  You need to speak up and a little bit clearer.

5  A.  I was there for a little bit over five years.

6  Q.  At Montwood High School?

7  A.  Yes.  And then I got employment with, back then, the

8  Customs Service, which is now Customs and Border Protection, as

9  an inspector at the ports of entry.  I did that for a little

10  bit over five years as well.

11       And then in 2007 I got hired as a special agent with,

12  back then, Immigration and Customs Enforcement.

13  Q.  And now Homeland Security Investigations?

14  A.  Yes, ma'am.

15  Q.  And what groups have you worked in here in El Paso with HSI

16  and ICE?

17  A.  When I started with HSI, I was assigned to a narcotics

18  conspiracy group, which we did narcotics investigations.

19       And then in 2009, I was –– I was transferred over to a

20  work site group, which is an immigration –– a group that

21  specializes in immigration investigations.

22       And then in 2011, I was transferred into the

23  counter-proliferation investigations group.

24  Q.  Okay.  In September of 2007, what group were you in?

25  A.  I was not in a group yet.

Aguirre – Direct by Ms. Kanof

1    Q.  Okay.

2    A.  I was at the academy.

3    Q.  You were -- I'm sorry.  In September of 2007, you were

4    still at the academy?

5    A.  Yes, ma'am.

6    Q.  When do you start working in -- as an agent?

7    A.  I was -- I came back to El Paso.  I started working in -- I

8    believe December 5th of 2007.

9    Q.  So by the time that you started working, Marco Delgado and

10   Victor Pimentel had already done the Atlanta million dollars?

11   A.  Yes.

12   Q.  And were you assigned any portion of that case, or how did

13   you come to know about the case?

14   A.  I came to know about the case because in July of 2008, I

15   was contacted by my supervisor to -- who instructed me to call

16   a specific number that he gave me and make contact with the

17   individual who was later identified as Victor Pimentel.

18   Q.  Okay.  And did you make that call?

19   A.  Yes, I did.

20   Q.  Do you remember when it was?

21   A.  Yes.  It was on July 22nd, 2008.

22   Q.  And on July 22nd, 2008, did you speak with Victor Pimentel?

23   A.  Yes, I did.

24   Q.  What did he tell you?

25   A.  He told me that he was at the El Paso International Airport

Aguirre — Direct by Ms. Kanof

1  about to board a flight to Chicago, where he was supposed to

2  pick up $100,000 in cash, under the direction of Mr. Marco

3  Delgado.

4  Q.  Okay.  What did you do --

5  A.  Well, he --

6  Q.  -- after he told you that?

7  A.  Well, he told me -- he also told me that he was supposed to

8  deposit that money at a Wells Fargo bank in Chicago under a

9  bank account number that Mr. Delgado had provided for him.

10  Q.  Okay.  And did he provide that bank account number for you

11  eventually?

12  A.  Yes.  Yes, he did.

13  Q.  Okay.  And did you review that bank account number with me?

14  A.  Yes, I did.

15  Q.  The bank account number that he provided you initially

16  was -- do you know whose bank account it was?

17  A.  Yes.  It was -- later, I was informed that it was -- it

18  was -- belonged to a female named Liliana Narvaez.

19  Q.  Okay.  I'm going to show you what's been marked as

20  Government's Exhibit Number 78.

21       And you actually wrote a report concerning this

22  conversation you had with Victor Pimentel in 2008, correct?

23  A.  Yes, I did.

24  Q.  On July 22nd, 2008.

25       And is that bank account number actually in your

1    report?

2    A.  Yes, it is.

3    Q.  Okay.  And drawing your attention to the exhibit, is the

4    number -- the bank account number -- sorry.  Is the bank

5    account number located right there (indicating)?

6    A.  I can't see anything.

7             MS. KANOF:  Oh.  Could we publish, Your Honor?

8             THE COURT:  You may publish, yes.

9    A.  Yes, it is.

10   BY MS. KANOF:

11   Q.  And this -- the number reflected in Government's Exhibit

12   Number 78, is that 1356440196?

13   A.  Yes, it is.

14   Q.  And did I ask you to compare Government's Exhibit Number 78

15   to your report to see if it was the same number?

16   A.  Yes, you did.

17   Q.  Is that the bank account of Liliana -- how do you say her

18   last name?

19   A.  Narvaez.

20   Q.  Narvaez?  Is that her bank account?

21   A.  Yes, it is.

22   Q.  And how did ICE obtain this bank account statement?

23   A.  It was provided to me by Victor, Mr. Pimentel.

24   Q.  Okay.  No, the bank account statement, Government's Exhibit

25   Number 78.  Was it subpoenaed?

Aguirre — Direct by Ms. Kanof

1    A.  Yes, it was.

2    Q.  Okay.  By the case agent, Josh Fry?

3    A.  Yes.  Yes.

4    Q.  Okay.  So -- and in addition to that have you interviewed

5    Liliana Narvaez, who verified that that was her bank account?

6    A.  One of our agents did.  I did not myself, but somebody did.

7    Q.  Okay.  Yeah.  I meant the royal you --

8    A.  Yes.

9    Q.  -- in your -- okay.

10          And so he, at that very time, provided you with this

11   bank account number.  And where did he say he got the number?

12   A.  He said it was provided to him by Mr. Delgado.

13   Q.  And he already had that number on the 22nd of June; is that

14   correct?

15   A.  Whether -- he either had it -- yes, he said he did.

16   Q.  Okay.  What happened next?

17   A.  We -- I tried -- I told him that we were not going to be

18   able to fly with him to provide protection or record any

19   conversations that he had, but that we would make contact with

20   some of our agents, HSI agents in Chicago, so that they could

21   pro- -- assist him with the money pickup.

22   Q.  You know, I may have -- I may have misspoken about when

23   that number was provided to you.

24          He did provide a bank account number to you, correct?

25   A.  Yes.

Aguirre – Direct by Ms. Kanof

1   Q.  And do you know which -- there were two bank account

2   numbers in your report.  Do you know which one of the two he

3   provided before he went to Chicago?

4   A.  Well, he said, when -- I didn't speak to him about the bank

5   account number after he came back from Chicago.  And that was

6   the number that he said -- this number, the 135 number, was the

7   one that he said that was provided to him originally.

8   Q.  Okay.  And that was -- when he tried -- the number that he

9   used to try to deposit the funds in Racine, Wisconsin?

10  A.  Yes.

11  Q.  Okay.  Now with regard to your conversations with him when

12  he was at the airport, what did you tell him?

13  A.  We told him --

14  Q.  The El Paso airport.

15  A.  Yes.  We told him to -- that we would make contact with our

16  agents in Chicago, and that they would assist him once he

17  landed in Chicago.

18  Q.  Okay.  And did you make the arrangements with the Chicago

19  SAC office to meet him, or did someone else make those

20  arrangements?

21  A.  I did.

22  Q.  Okay.  What did you do?

23  A.  I talked to Special Agent Michael Plossell, out of our

24  office in Chicago, and gave him the information:  Victor

25  Pimentel is his name, his contact info.  And I told him that he

Aguirre – Direct by Ms. Kanof

1  was going to arrive in Chicago to make a money pickup of

2  $100,000, and asked him if he could please assist with

3  recording any conversations that Victor had, and if he could

4  provide protection, also, during the money pickup as well.

5  Q.  Okay.  And when you -- normally, if you had had more

6  notice, would you have gone with him?

7  A.  Yes, I would have.

8  Q.  Okay.  When he was in Chicago, did you try -- did your

9  office try to control what was going on in Chicago, or did you

10  just let SAC Chicago do it?

11  A.  No, we let them do it.

12  Q.  Okay.  And at some point in time did your office have to

13  take an active role in the investigation, after the money had

14  been delivered in Chicago?

15  A.  Yes, after he came back.

16  Q.  Okay.  What happened?

17  A.  Well, before that, I was informed also by my supervisor

18  that Victor and Mr. Delgado had been apprehended a year --

19  almost a year before -- with a million dollars, and that

20  Mr. Delgado was cooperating with our agents in Atlanta.

21       So I called them, just to make sure that we were not

22  interfering in their investigation.  I spoke to two other

23  agents, which informed me that this was not an investigation --

24  or this was not a money pickup that was being supervised by

25  them.

Aguirre – Direct by Ms. Kanof

1  Q.  Okay.  So as soon -- when were you informed that Pimentel

2  and Delgado had been caught with a million dollars the

3  preceding year?

4  A.  It was during the process of -- after I spoke to them, and

5  the process of speaking with Chicago as well.

6  Q.  Okay.  So by this time everybody was made aware.  You

7  called Atlanta?

8  A.  Yes, I did.

9  Q.  When did you call Atlanta to find out whether or not this

10  was their deal?

11  A.  I believe it was shortly after speaking with Mike Plossell

12  in Chicago.

13  Q.  Okay.  And as far as the interaction between the various

14  offices, if Atlanta was doing a deal with people that were

15  coming from El Paso, what would the rule have been?

16  A.  We would not have been involved.  Because we -- see,

17  Atlanta at that point, they would have coordinated any cover,

18  any protection for -- for whoever was picking up the money.

19  And they would, obviously, be recording the conversations.  It

20  wouldn't be us.

21  Q.  So it would have been Atlanta and Chicago --

22  A.  Yes.

23  Q.  -- and not El Paso and Chicago.

24  A.  Correct.

25  Q.  Is that correct?

Aguirre — Direct by Ms. Kanof

1          Do you remember who you talked to in Atlanta when you
2  called them?
3  A.  I spoke to Special Agent Alex Ascencio.  And I also spoke
4  to Special Agent Jeff Walton.
5  Q.  And they assured you that it wasn't their deal?
6  A.  Yes, correct.
7  Q.  Okay.  What happened next?
8  A.  Once again, Victor flew to Chicago, where he made contact
9  with Special Agent Plossell in Chicago, and they coordinated
10  the money pickup.
11  Q.  Okay.  Did Chicago keep you informed of what was happening
12  as it was happening?
13  A.  Not every single detail.  But yes, during intervals, they
14  would let me know what was occurring.
15  Q.  Okay.  At some point in time you did become involved again?
16  A.  Yes.
17  Q.  When was that?
18  A.  It was after Victor arrived in El Paso on July 24th.
19  Q.  And so he came back, basically, the day after the money
20  delivery?
21  A.  Yes, correct.
22  Q.  Did you know when he was coming back?
23  A.  Yes.  I was informed by Special Agent Plossell.
24  Q.  What did you do?
25  A.  We -- he was -- we took him into the office, HSI office

1    here in El Paso, and we interviewed him as to the events that

2    had occurred not only during the money pickup in Chicago, but

3    prior -- what led to the money pickup in Chicago.

4    Q.  Okay.  And what -- you interviewed Victor?

5    A.  Yes, I did.

6    Q.  Did you bring him into the offices on the 24th?

7    A.  Yes, I did.

8    Q.  And you debriefed him, and he gave you the information?

9    A.  Yes, he did.

10   Q.  And because he hadn't had a lot of time with you before,

11   did he give you the background information?

12   A.  Yes, he did.

13   Q.  Did he tell you whether or not he had attempted to call

14   Atlanta to tell them about this transaction?

15   A.  Yes, he did.

16   Q.  Did he tell you he tried more than once?

17   A.  Yes, he did.

18   Q.  Did he tell you he began trying as soon as Mr. Delgado had

19   contacted him to do this?

20   A.  That's what he stated, yes.

21   Q.  Okay.  And did he tell you he had no luck?

22   A.  Excuse me?

23   Q.  Did he tell you he had no luck?

24   A.  Well, he said he spoke to Special Agent Justice, out of

25   Atlanta, and told him that there was a scheme to go back to

1    Chicago and pick up money.

2              And that Special Agent Justice told him that he would

3    get back to him, but that he never did.

4    Q.   Okay.  And so he called El Paso?

5    A.   Yes.

6    Q.   And El Paso responded?

7    A.   Yes.

8    Q.   When -- after he got back, did you make a decision to do

9    something about the $45,000 that was sitting in the ICE account

10   in Chicago?

11   A.   Yes.

12   Q.   What?

13   A.   The following day, on the 25th, there was conversation

14   when -- when Victor came back to the office on the 24th, he

15   called Mr. Delgado and told him that he -- because he had not

16   been able to deposit the money, he had rented a vehicle and

17   would arrive in El Paso on the 25th, approximately 9:00 or

18   10:00 in the afternoon.

19   Q.   So even though he was already in El Paso, he -- you had him

20   tell Delgado that he would come the next day?

21   A.   Yes, correct.

22   Q.   And did you -- did Victor tell Mr. Delgado that he was

23   driving?

24   A.   Yes.  That's correct.

25   Q.   Okay.  Go on.  What happened next?

Aguirre – Direct by Ms. Kanof

1    A.  So the following day, on the 25th, Victor called

2    Mr. Delgado again and told him that he was going to arrive in

3    El Paso, to which Mr. Delgado told him not to arrive before he

4    called him, and that they would transfer the money in a

5    restaurant here in El Paso.

6    Q.  Okay.

7    A.  And later on that afternoon, the 25th, Victor called him

8    again and told him that he was here in El Paso, to which

9    Mr. Delgado told him not to –– the money transfer would not

10   occur, for him to keep the money, and that he would have him

11   deposit the money the following day, on the 25th –– on the

12   26th, I'm sorry –– at a Wells Fargo bank under the account

13   number –– the second account number that he had provided to

14   Victor.

15   Q.  And that account number also appears in your report; is

16   that correct?

17   A.  Yes, it does.

18   Q.  Where did you get that account number?

19   A.  From Victor.

20   Q.  And displaying Government's Exhibit Number 79 –– publish,

21   please, Number 79.  Oops.  No, it should be Number 80.

22            Government's Exhibit Number 77.

23            Okay.  Did I have you review your report for a bank

24   account number that appears on Government's Exhibit Number 77?

25   A.  Yes, you did.

Aguirre – Direct by Ms. Kanof

1   Q.  And is that the Delgado & Associates IOLTA account?

2   A.  Yes, it is.

3   Q.  Do you know what an IOLTA account is?

4   A.  You had explained to it to me.  But...

5   Q.  Okay.  Don't say what I said.

6   A.  Okay.

7   Q.  And -- but the address is 7362 Remcon Circle, in El Paso?

8   A.  That's what it says here, yes.

9   Q.  Okay.  And the number that -- when -- when Victor came back

10  to El Paso, he already had that number?

11  A.  Yes, he did.

12  Q.  And you -- you have -- and you wrote it in your report,

13  correct?

14  A.  Yes, I did.

15  Q.  Back in July of 2008, correct?

16      Whenever you wrote the report?

17  A.  Yes.  But it was in 2008, yes.

18  Q.  You don't write the report the same day you get the

19  information, right?

20  A.  Yes.

21  Q.  You write them when you have time, right?

22  A.  Correct.

23  Q.  And -- but the number that's in your report, did I ask you

24  to -- to see whether or not it's the same number that appears

25  on the Delgado & Associates IOLTA account from Wells Fargo bank

Aguirre – Direct by Ms. Kanof

1    in Exhibit 77?

2    A.  Yes, you did.

3    Q.  Does it?

4    A.  Uh-huh.

5    Q.  Same number?

6    A.  Yes, ma'am.

7    Q.  Okay.  So what did you do with the money, now?

8    A.  On the 26th, the morning of the 26th, Victor called

9    Mr. Delgado once again.

10        And Mr. Delgado instructed him to deposit the money at

11   the Wells Fargo bank that's located on Mesa.

12        Victor was escorted with the money.  And he, indeed,

13   deposited the money in that account number.  And he brought us

14   a receipt stating -- receipt, stating that he had, indeed,

15   deposited the money.

16        Afterwards, Victor called Mr. Delgado, and he told him

17   that they were going to meet at the Pastry Chef cafe here on

18   the west side in El Paso.

19   Q.  The Pastry Chef?

20   A.  Yes.

21   Q.  Off Shadow Mountain and North Mesa?

22   A.  Yes, ma'am.

23   Q.  Okay.

24   A.  And once they got there, Mr. Delgado suggested that they

25   move to the Starbucks, across the street on Mesa, because he

Aguirre — Direct by Ms. Kanof

1   suspected that people at the cafe were agents.

2           Once they moved, they discussed the money pickup.

3   Mr. Delgado asked Victor if he was comfortable depositing more

4   money, and Victor said yes, and further money pickups were also

5   discussed.

6   Q.   Okay.  What's walking money?

7   A.   Letting the money —— not seizing the money by a government

8   agency.

9   Q.   What's the purpose of walking the money?

10  A.   To further the investigation, with the hopes of maybe later

11  picking up more money.

12  Q.   Who makes the decision of whether or not to walk money?

13  A.   Normally, a group supervisor would.

14  Q.   And did your group supervisor concur in the decision to

15  walk the $45,000?

16  A.   Yes, he did.

17  Q.   Okay.  At that point in time, did you have any other ——

18  engage in any other transactions with Victor Pimentel?

19  A.   Yes.  We gave him a recording device so that he could

20  record any future conversations with Mr. Delgado, which he did.

21  But the recordings were not audible, but they had several other

22  meetings.

23  Q.   What do you mean they were not audible?

24  A.   You could not listen to the recordings.  Either there was

25  too much background noise or Mr. Delgado was speaking in more

Aguirre – Direct by Ms. Kanof

1    of a whisper.

2    Q.  Have you had an opportunity to view, as part of your

3    investigation, the -- the controlled delivery stop of when

4    Mr. Delgado was caught with the money?

5    A.  Yes.

6    Q.  And a lot of it's inaudible?

7    A.  Yes.

8    Q.  It's not a perfect world for law enforcement when they wire

9    people up?

10   A.  Well --

11   Q.  Okay.  In fact, it doesn't work as often as it works,

12   correct?

13   A.  Exactly.

14   Q.  With regard to -- you said he had a couple of other

15   meetings with Mr. Delgado; is that correct?

16   A.  Yes, he did.

17   Q.  And did anything come of those?

18   A.  No.  Basically the meetings were to discuss, once again,

19   future money pickups.  The only thing was that in one of the

20   meetings Mr. Delgado was instructing Victor on what to say if

21   he was detained with the money coming back from anywhere they

22   had picked up money, saying that if he --

23   Q.  Not -- not Chicago or Atlanta, but in the future?

24   A.  In the future, yes.

25   Q.  Okay.  And what did Mr. Delgado tell Victor?

Aguirre — Direct by Ms. Kanof

1   A.  Told him that if he was detained by law enforcement

2   officers to not consent to a search of a vehicle, and to let

3   them know that he was being represented by an attorney in

4   El Paso, including that Mr. Delgado wanted to set up a meeting

5   with one of the attorneys so that they could get instruction on

6   how to justify the large sums of money that was being deposited

7   in the bank accounts.

8   Q.  Okay.  Who was that attorney?

9   A.  I believe it's Gary Hill.

10  Q.  Do you know whether or not that meeting ever occurred?

11  A.  No.  According to Victor, Mr. Delgado told him that they

12  had scheduled a date, but that Mr. Hill was out of the city,

13  and so the meeting never actually -- it got postponed.

14  Q.  Okay.  Did basically the case, again, fizzle?

15  A.  Yes.

16  Q.  Even though you had walked $45,000?

17  A.  Yes.

18  Q.  On December 3rd of 2008, did you have contact with -- or

19  somewhere around that time -- with Victor Pimentel again?

20  A.  Yes, I did.

21  Q.  How did that occur?

22  A.  He called me and informed me that there was a possible

23  threat to the life of Mr. Delgado.

24        So we brought Victor over to the HSI office in El Paso

25  and asked for the details of the threat.

Aguirre — Direct by Ms. Kanof

1           And he told us that sometime in October of '08 Lilian

2    de la Concha had called him and inquired as to the health of

3    Mr. Delgado, because he had told her that he was sick, that he

4    had cancer.

5           Victor proceeded to tell Lilian de la Concha that not

6    only was Mr. Delgado not sick, but that he had lied to her

7    about several other matters as well.

8    Q.  Okay.  And what happened next?

9    A.  He said that two days later Lilian de la Concha called

10   Victor again and instructed him to pick her up at the Juárez

11   Mexico, airport, which he did.  He brought her over to El Paso

12   and then subsequently dropped her off at a hotel here in

13   El Paso.

14          The following morning he called -- Lilian de la Concha

15   called Victor, and he picked her up.  And she wanted him to

16   drive her to Mr. Delgado's home address, to his business

17   address, and to the home of his ex-wife, which he did.

18          And after they drove to these places, Lilian de la

19   Concha made a telephone call to an unknown male in Mexico and

20   relayed the information that Victor had just given to her, and

21   had also told -- that Lilian de la Concha also told that male

22   that she had deposited a million dollars at Mr. Delgado's Wells

23   Fargo bank account for American visas.

24   Q.  Okay.  There was another scam dealing with American visas,

25   correct?

Aguirre — Direct by Ms. Kanof

1   A.  Yes.

2   Q.  And did Mr. Pimentel tell you that de la Concha indicated

3   that a million dollars had been deposited in Mr. Delgado's

4   account to bribe an ambassador?

5         MR. VELARDE:  Your Honor, I'm going to -- I'm going to

6   object to any questions concerning this matter.  We have not

7   been noticed.

8         MS. KANOF:  It explains the $2 million, Judge, that's

9   owed to him.

10        THE COURT:  I'll sustain the objection.

11        MS. KANOF:  Okay.

12  BY MS. KANOF:

13  Q.  So you debriefed Victor Pimentel.

14        And do you have an obligation to determine whether

15  a -- whether a threat is credible?

16  A.  Yes, we do.

17  Q.  What does that mean, "credible"?

18  A.  To see if the threat actually had been -- had come to

19  fruition.

20  Q.  Did you make that determination after --

21  A.  Yes.

22  Q.  -- Mr. Pimentel --

23  A.  Yes, we did.

24  Q.  And then if you do make a determination that a threat is

25  credible, do you have rules, regulations, that require you to

1   do something about it?

2   A.  Yes.

3   Q.  What do you have to do?

4   A.  We have to let the person -- the subject of the threat,

5   notify them that there is a threat.

6   Q.  Okay.  Even if it messes up an investigation?

7   A.  Yes.

8   Q.  Safety is your primary concern?

9   A.  Correct.

10  Q.  So what did you do on December 3rd regarding your

11  obligation because of the credible threat?

12  A.  We tried to make contact with Mr. Delgado, which -- with

13  the assistance of our agents, HSI agents in Atlanta, we were

14  able to.  Mr. Delgado arrived at our office.

15  Q.  Why did you need Atlanta's assistance to call Mr. Delgado

16  in El Paso?

17  A.  Because he was not answering his phone.

18  Q.  Okay.

19  A.  So eventually, our agents in Atlanta were able to get ahold

20  of him.  He drove to the office here in El Paso, where he was

21  informed that there was a possible threat to his life from a

22  drug cartel.

23          And Mr. Delgado wanted to know why anybody would want

24  to kill him.

25          And he was informed that a drug cartel wanted to

1    recover $2,050,000 from him.

2             And he said that he did not know why he -- or who he

3    owed $2,050,000 to.  He said the only money that he was aware

4    that he could possibly owe was his share of the million dollars

5    that was seized by our agency a year prior, which amounted to

6    $200,000.

7    Q.  In fact, when -- when you informed him that the car- -- a

8    cartel thought he owed them $2,050,000, did you name the

9    cartel?

10   A.  Yes.

11   Q.  Okay.  And did -- and it was actually not *Milenio*, but it

12   was actually the name of an individual?

13   A.  Yes.

14   Q.  That's the head of the cartel, correct?

15   A.  Yes.

16   Q.  And did Mr. Delgado say, I don't know what you're talking

17   about?

18   A.  Yes.  Once again, he was stating that he -- the only money

19   that he thought that he might owe was his share of the million

20   dollars that was seized the year before.

21   Q.  But did he question that the money was owed to a cartel?

22   A.  No.

23   Q.  Okay.  What happened next?

24   A.  He wanted to know what he could do.  Because -- since he

25   believed this threat as well.  And he asked us what he could do

Aguirre — Direct by Ms. Kanof

 1   to resolve the problem.

 2            And we told him that we could not tell him what to do.

 3   The only thing that we could tell him is that normally in these

 4   situations people tend to move out of the city.

 5            But that knowing that Mr. Delgado had prior --

 6   previously worked with our agents in Atlanta, we suggested that

 7   he make contact with them, which we did there at the office.

 8            And he was on a speaker phone with our office -- with

 9   other agents in El Paso and three agents out of our office in

10   Atlanta.

11   Q.  And did SAC Atlanta -- do you remember who the agents were

12   in Atlanta?

13   A.  Yes.  Group supervisor Bryan Ramsey, Special Agent Jeff

14   Walton, and Special Agent Alex Ascencio.

15   Q.  And all of you from Atlanta and El Paso at ICE participated

16   in this conference call?

17   A.  Yes, we did.

18   Q.  And did Mr. Delgado also participate in the conference

19   call?

20   A.  Yes, he did.

21   Q.  Okay.  Did ICE Atlanta ask Mr. Del- -- or tell

22   Mr. Delgado -- or try to talk to him about the Chicago

23   $100,000?

24   A.  Yeah, it was brought up.

25   Q.  And initially, how did Mr. Delgado respond?

Aguirre — Direct by Ms. Kanof

1   A.  He stated that he did not know that Victor was in Chicago

2   to pick up money.  That he did not know there was an operation

3   to pick up money in Chicago.  And that he did not know how

4   Victor had arrived in Chicago.

5   Q.  So because you walked the $45,000, Mr. Delgado was not

6   arrested, correct?

7   A.  Yes.

8   Q.  And was never made aware that his phone calls with Victor

9   had been taped?

10   A.  No, he was not aware.

11   Q.  So he initially denies knowing anything about Chicago,

12   correct?

13   A.  Correct.

14   Q.  Did the agents in Atlanta persist?

15   A.  Yes, they did.

16   Q.  And what happened next?

17   A.  Eventually, after the conversation was over with the agents

18   in Atlanta, he admitted to us, just the agents in El Paso, that

19   he was aware that -- he was aware that Victor had flown to

20   Chicago to pick up money, and that subsequently $45,000 had

21   been placed in his bank account, and that he had already spent

22   that money, and that that transaction was done without the

23   knowledge of our agents.

24   Q.  He admitted that transaction was done without the knowledge

25   of ICE?

1    A.  Yes.

2    Q.  Did he tell you that he tried to contact ICE to tell them

3    it was going to happen?

4    A.  No.  He stated that -- actually, that the whole money

5    pickup had been under the direction of Atlanta, which we knew

6    wasn't true, because we had talked to the agents.  Plus, we

7    were on the speaker phone previously with them.

8    Q.  Okay.  Initially, when he was -- when -- when he -- okay.

9           First he denied it, then he admitted it.  And when he

10   admitted it, he said that he was doing it for SAC Atlanta?

11   A.  Well, it was during the course of the interview.  I don't

12   recall whether he admitted it first or what happened.

13          But initially, when we were on the phone, on the

14   speaker phone, he said -- with Atlanta, he said, No, I don't

15   know why Victor was out there.

16          And then he admitted that he had done it, that they

17   had deposited the 45,000.  But during the conversation, once

18   again, he had mentioned that it was under the direction of

19   Atlanta.  But subsequently he stated no, it was -- that he had

20   done it without the knowledge of the agents.

21   Q.  Okay.  And talking to the agents in Atlanta, did -- when he

22   said -- was -- were there agents in Atlanta on the phone when

23   he said, I did it with the knowledge of the agents in Atlanta?

24   A.  No, I don't believe so.

25   Q.  So it was after you hung up from Atlanta that he said that

Aguirre – Direct by Ms. Kanof

1  to you, correct?

2  A.  Yes.

3  Q.  And then he took that back as well?

4  A.  Yes.

5  Q.  And ultimately admitted that he did it without the agents'

6  knowledge; is that correct?

7  A.  Correct.

8  Q.  What else did he tell you?

9  A.  Well, he -- after that, he -- we -- once again, we spoke

10  with Lilian de la Concha.  She was on the speaker phone.  And

11  he informed her that there was a threat to his life, and that

12  he was moving from El Paso.

13        And then he went on to explain about project *Mundial*

14  which was a -- *Mundial*, according to Mr. Delgado, is an

15  insurance company that was trying to sell insurance to people

16  who -- in Mexico, who obtained nonimmigrant visas, and the

17  insurance would cover the cost of transportation and funeral

18  services in case they were here and happened to pass away while

19  visiting the United States.

20  Q.  Did he tell you that he was in meetings with the American

21  ambassador in Mexico and a representative of *Mundial* for the

22  feasibility of that implementation?

23  A.  Yes, I believe so.

24  Q.  Was he able to prove it?

25  A.  No.  And we didn't pursue it either.

Aguirre – Direct by Ms. Kanof

1    Q.  Okay.

2         Before he started telling you about *Mundial*, back when

3    you talked about the $45,000 that was deposited in his account,

4    did he tell you what the purpose of the trip to get that money

5    was?  Did he tell you that it was standing on its own, or that

6    it was a trial run?

7    A.  Yes.  He said it was a trial run, I believe, to eventually

8    be able to transport, I believe, $3 million into Mexico.

9    Q.  Okay.  On the next day, December 4th, did you interview

10   Pimentel again?

11   A.  Yes, I did.

12   Q.  Okay.  And after you informed -- and that was basically to

13   verify the information on the threat; is that correct?

14   A.  Correct.

15   Q.  Okay.  And what did you tell Mr. Delgado to do because of

16   the threat?

17   A.  Well, the day before, on the 3rd, once again we -- he asked

18   us what to do.

19         And we told him we could not tell him to do anything.

20   But normally in these cases, people usually move out of the

21   city.

22   Q.  Okay.  Did you hear from him again?

23   A.  Excuse me?

24   Q.  Did you hear from him again?

25   A.  Yes.  I heard from him again approximately -- I believe

Aguirre – Direct by Ms. Kanof

1    it's sometime in the summer of 2010.  He called me and said

2    that he was afraid, because he had seen a vehicle parked

3    outside of Liliana Narvaez's house, a black pickup truck, I

4    believe.  And the same pickup truck had been parked in front of

5    his mother's house, so he was afraid for his safety.

6           And an agent and myself from this office tried to make

7    contact with him just to verify his safety.  And we went over

8    to his mother's house, and we were not able to get ahold of

9    her.

10          We spoke to the mother, and she wasn't able to provide

11   any information.

12          But later on that afternoon we spoke to Mr. Delgado

13   once more and just told him, I think -- I believe if he feared

14   for his safety, to make sure he called 911.

15          MS. KANOF:  Okay.  Pass the witness.

16          Wait.

17   BY MS. KANOF:

18   Q.  Oh.  The Mr. Delgado that you were talking to, is he here

19   in the courtroom?

20   A.  Yes, he is.

21   Q.  Identify him, please.

22   A.  He is sitting next to defense counsel with a suit and a

23   green tie.  A black or blue suit with a green tie.

24          MS. KANOF:  Let the record reflect the witness has

25   identified the Defendant.

Aguirre — Cross by Mr. Velarde

1        THE COURT:  The record will so reflect.

2                   CROSS-EXAMINATION

3   BY MR. VELARDE:

4   Q.  Agent Aguirre, good afternoon.

5   A.  Good afternoon.

6   Q.  Agent, how did you verify the threat that Victor Pimentel

7   revealed to you?

8   A.  We –– basically what we do, if we think the threat is

9   viable, then we take action.  We never talked to anybody else,

10  but we just took the information that Mr. Pimentel gave us.

11  Q.  The threat that was made in this –– that was related to you

12  by Mr. Pimentel –– occurred in October of 2008; is that

13  correct?

14  A.  That's when the conversations were ––

15  Q.  That's right.

16  A.  –– with Ms. Lilian de la Concha, but we were not aware of

17  it.

18  Q.  And then she calls your office in December 2008, some two

19  months later, right?

20  A.  Yes.

21  Q.  So how did you verify the threat, if it's already two

22  months late?

23  A.  Well, the reason was –– it's in my report –– that on

24  December the 2nd, the day before, Lilian de la Concha had

25  called, again, Victor, and let him know that there was a threat

1    to Mr. Delgado's life by a drug cartel.

2            And he called us the following day.

3    Q.  Now, you testified that Victor Pimentel actually went to

4    the Juárez airport to pick up Ms. de la Concha?

5    A.  That's what he told me.

6    Q.  Did you verify a crossing by both of them or...

7    A.  I tried to, but there was no record of a crossing.

8    Q.  No record of crossing.

9            So under what circumstances can people make it across

10   without a record?

11   A.  Back then, in 2008, I believe it was not mandatory to -- by

12   Customs and Border Protection -- to scan every single person

13   that came into the country.

14   Q.  Now, Victor had already worked -- you had already worked

15   with Victor, going back to the July 2008 incident up in

16   Chicago; is that correct?

17   A.  Yes, I did.

18   Q.  So he knew you?

19   A.  Yes, he did.

20   Q.  In fact, were you the one he called up about this alleged

21   threat?

22   A.  Yes, I was.

23   Q.  Did you ask him, Why didn't you tell me, Victor, that

24   Lilian de la Concha was here back here in October?

25   A.  No, I didn't.

Aguirre - Cross by Mr. Velarde

1  Q.  This phone call that Lilian de la Concha made to Victor

2  sometime in December, did you verify whether or not a phone

3  call was being placed?

4  A.  No, I didn't.

5  Q.  You prepared a report regarding the events of July 2008; is

6  that correct?

7  A.  Yes, I did.

8  Q.  You testified in -- on direct that back then, in July 2008,

9  you talked to Atlanta.

10  A.  Yes, I did.

11  Q.  Actually, your words were you talked to them shortly after

12  you got the information from Victor that he was going up there.

13  A.  Yes.

14  Q.  Did you call up Atlanta while Victor was up there?

15  A.  I don't recall.  It was after I talked to him, but I don't

16  know if he was already out there.

17  Q.  Or you don't -- is it possible you called them after the

18  fact?

19  A.  No.  It was after I made the phone call with Victor, and

20  after I talked to the agents in Chicago as well.

21  Q.  Okay.  That aspect of your investigation is not revealed in

22  your report?

23  A.  No, it's not.

24  Q.  Is there a reason why?

25  A.  No.

Aguirre - Cross by Mr. Velarde

1   Q.  Now, Victor did let on -- and by that I mean he told you

2   that Lilian de la Concha was involved in coordinating the money

3   transfer to Mexico.

4   A.  That's what he told me, yes.

5   Q.  And the meeting that took place at the local SAC office in

6   December 2008 involved a number of agents talking to

7   Mr. Delgado on a telephone conference with agents from Atlanta;

8   is that correct?

9   A.  That is correct.

10  Q.  To the best of your knowledge, was that conference --

11  telephone conference recorded?

12  A.  No, it wasn't.

13  Q.  Were you there present?

14  A.  Yes, I was.

15  Q.  Did you make a report about that?

16  A.  Yes, I did.

17  Q.  Oh, you did?

18  A.  I made a report about the conversations.

19  Q.  About the December 2008 conference call?

20  A.  Not the details.  It was stated in the report that it was

21  made, but not the details.  It was Atlanta who made the

22  specific details in the report.

23  Q.  Okay.  And who was in the lead in that conference call,

24  local SAC or Atlanta?

25  A.  Both were.

Aguirre - Cross by Mr. Velarde

1   Q.  And it's your testimony that they asked questions of
2   Mr. Delgado regarding the events that had taken place up in
3   Chicago?
4   A.  Yes, the subject was brought up.
5           MR. VELARDE:  May I just have a minute, Your Honor?
6           THE COURT:  You may.
7   BY MR. VELARDE:
8   Q.  Let me ask you a question or two about the procedure that
9   was in place back in October 2008, when Lilian de la Concha
10  came across.
11          Assuming she's a Mexican national with just a tourist
12  visa, would that have been scanned at the bridge?
13  A.  Possibly, yes.
14  Q.  But did you attempt to verify whether or not?
15  A.  Yes, I did.
16  Q.  And you couldn't find any record?
17  A.  No, I couldn't.
18  Q.  As best as you know, was there a lookout for Lilian de la
19  Concha in October 2008 as a possible suspect in a money
20  laundering conspiracy?
21  A.  There might have been.
22  Q.  And if there had been one, she would have been stopped
23  there at primary; is that correct?
24  A.  Correct.
25  Q.  Of course that didn't happen?

Aguirre – Redirect by Ms. Kanof

1    A.  No, it didn't.

2            MR. VELARDE:  Thank you very much.

3                    REDIRECT EXAMINATION

4    BY MS. KANOF:

5    Q.  Agent Aguirre, you just testified that you didn't put the

6    substance of a conference call in your report?

7    A.  Not the details.  I put in that the conference call had

8    been -- it occurred.  But it was actually Atlanta who put the

9    details of what the conference call was.

10   Q.  Well, I understand that Alex Ascencio wrote a more detailed

11   one than you.  But do you recall that you did put some of what

12   occurred in the call?

13   A.  Yes.  That's what we testified to, that he had denied

14   knowing that Victor was in Chicago, yes.  But not the whole

15   details.  I put in part of the substance of the call.

16   Q.  Okay.  But because it was Alex Ascencio's, basically,

17   relationship to the case, you let him write the report about

18   the conference call?

19   A.  That's correct.

20   Q.  Okay.  And -- but you did put in your report that Delgado

21   told GS Ramsey he was not involved in any operation that

22   involved picking up money in Chicago?

23   A.  That's correct.

24   Q.  And it was after you hung up that he started admitting bits

25   and pieces, and then finally admitted he did it without ICE's

Aguirre — Redirect by Ms. Kanof

1   involvement?

2   A.  That's correct.

3   Q.  Agent Aguirre, you testified that when you first started

4   working for the federal government you were at the bridge,

5   right?

6   A.  Yes.

7   Q.  Okay.  And what did you do at the bridge?

8   A.  I was an inspector.

9   Q.  What's an inspector?

10  A.  It's -- basically, we admit people into the country on the

11  primary booth.

12  Q.  Okay.  So when you come to the bridge and you have to

13  declare your citizenship and all that kind of stuff, you did

14  that?

15  A.  Correct.

16  Q.  Okay.  Right now, today, if a car comes through that

17  primary *garrita*, that little booth, is all kinds of information

18  taken about the vehicle?

19  A.  That's correct.

20  Q.  Are there cameras?

21  A.  That's correct.

22  Q.  Were there cameras in 2008?

23  A.  That's correct.

24  Q.  No.  In 2008, were the cameras that are there now there?

25  A.  There were cameras yes, sir.

Aguirre – Redirect by Ms. Kanof

1    Q.  Okay.  And did they take a picture of a license plate?

2    A.  The -- in 2008, I believe the license was recorded.  But I

3    don't recall if there was an actual picture, a photograph of

4    the license plate itself.

5    Q.  Well, who recorded the plate?

6    A.  Well, from what I understand, Victor told us that him and

7    Lilian de la Concha crossed through a pedestrian lane.

8    Q.  Oh, okay.  So if you cross through a pedestrian lane,

9    there's no evidence of a car or a license plate or anything

10   like that?

11   A.  That's correct.

12   Q.  Okay.  And people show their ID.  Do they just -- in 2008,

13   people show that they have the right kind of visa, green card,

14   or a vacation visa or something like that, they just waved them

15   through?

16   A.  Yes.  They -- it was necessary to show the documentation,

17   but not -- it was not always standard procedure to make sure

18   that 100 percent of the people that entered the United States

19   were scanned into the computer system.  As long as they were in

20   possession of an entry document the majority of time they were

21   let through.

22   Q.  Okay.  So the fact that you didn't find any evidence, the

23   absence of a documentation doesn't mean it didn't happen?

24   A.  Exactly.

25   Q.  Today, that's different?

Aguirre — Redirect by Ms. Kanof

1   A.   Yeah.  It's different today.

2   Q.   Today, the documents have lasers and you stick them in a

3   machine and everyone is documented, correct?

4   A.   Exactly.

5   Q.   Okay.

6           The question was asked to you —— just one other thing.

7           You were asked whether or not there was a lookout for

8   de la Concha, but you didn't get an opportunity to explain what

9   a lookout is.

10          What's a lookout?

11  A.   It's a —— it's a record which gives information how to

12  proceed if a person is encountered at one of the primary booths

13  at a port of entry or at an airport, or somebody that's queried

14  for some reason or another.

15  Q.   Okay.  So there's a computer that is called the Treasury

16  Enforcement Computer System, correct?

17  A.   Yes, there is.

18  Q.   It used to be Customs, which is why it's called Treasury?

19  A.   Uh-huh.

20  Q.   Is that yes?

21  A.   That's correct.

22  Q.   And say you're an FBI agent and you're investigating a

23  case, and you think that maybe a witness or a subject or

24  somebody is going to cross the bridge.

25          Could you input that information so that it would pop

Aguirre – Redirect by Ms. Kanof

1   up if that person crossed the bridge?

2   A.  No, not an FBI agent.  He would have to have somebody who

3   works either with the Treasury Department, or now Customs and

4   Border Protection, or the Department of Homeland Security, put

5   that hit into that system -- that specific system.

6   Q.  Okay.  And what about in 2008, when you're crossing through

7   the pedestrian lane?  If there -- if there's a hit in TECS, or

8   a lookout -- actually, it's called a lookout --

9   A.  Uh-huh.

10  Q.  A lookout in TECS, in the computer system --

11        MS. KANOF:  T-E-C-S, Suky.

12  BY MS. KANOF:

13  Q.  -- if there's a lookout in TECS, might the person get

14  through if they walked through the pedestrian lane in 2008?

15  A.  If their identification is not scanned, if their

16  information is not put into the computer, then yes, they would

17  go ahead and be able to go through without knowledge of that

18  lookout.

19  Q.  Okay.  Did you put a lookout in TECS?

20  A.  No, not on Lilian de la Concha.

21  Q.  Okay.  And back in 2007, do you know whether or not the --

22  the attempt at finding -- or dealing with the million dollars

23  was to find -- to basically crawl up the scale to get the big

24  guys?

25  A.  I believe that's what the intent was.

1   Q.  Okay.

2           MR. VELARDE:  Your Honor, I'm going to object because

3   that calls for speculation, and he's speculating.

4           THE COURT:  I'll sustain the objection.

5   BY MS. KANOF:

6   Q.  And are you aware of whether or not anybody from the

7   El Paso SAC ICE office put a lookout in for Lilian de la

8   Concha?

9   A.  No, it wasn't from the SAC El Paso.

10          MS. KANOF:  Thank you.

11                    RECROSS–EXAMINATION

12  BY MR. VELARDE:

13  Q.  Mr. Aguirre, 2008 came after 9/11; is that correct?

14  A.  Yes, sir.

15  Q.  And after 9/11, those entry inspections became very rigid;

16  isn't that true?

17  A.  Yes, they did.

18  Q.  So if a person presents themselves at the bridge, are you

19  telling this jury that just presenting your card was going to

20  do it in 2008?

21  A.  Yes, sir.  Because I started working as a Customs inspector

22  in 2003 –– in 2002, I'm sorry.

23  Q.  And so ––

24          THE COURT:  Well, let him finish.  Did you finish?

25          THE WITNESS:  Yes, sir.

1           THE COURT:  Okay.  Go ahead.

2     BY MR. VELARDE:

3     Q.  And so your testimony is that this is -- this probably

4     accounts for her not being --

5     A.  Well, it had to be a legitimate entry document.  And the

6     inspector could actually hold the document and look at it and

7     verify if it belonged to the person, and if it was a legitimate

8     entry document and it was valid, and then they could let them

9     through.

10          It doesn't mean that they were not looking at the

11    document, it's just that it wasn't entered into the system.

12    Q.  I'm going to ask you to make this assumption.

13          The woman is a Mexican national and she has legitimate

14    papers.  She presents them.

15          Is it your testimony that they're not scanned, or back

16    then they weren't scanned?

17    A.  It depended on the inspector.  I'm not saying that

18    everybody -- nobody was scanned, but it was possible.

19    Q.  Now when you interviewed Mr. Pimentel in December 2008, he

20    made known to you that the reason that he was coming up with

21    this information about this alleged threat was that he wanted

22    Delgado to be punished.  He didn't want --

23          MS. KANOF:  Objection, Your Honor, outside the scope

24    of redirect.

25          THE COURT:  Mr. Velarde, where are you headed?

1              MR. VELARDE:  Sir?

2              THE COURT:  You're beyond the scope.

3     BY MR. VELARDE:

4     Q.  The lookout that's normally placed on people can be done by

5     ICE agents; is that correct?

6     A.  That's correct.

7     Q.  The question was asked about FBI agents.  We're not talking

8     about FBI.  We're talking about ICE.  And ICE is an agency of

9     H -- Homeland Security; is that correct?

10    A.  That's correct.

11    Q.  So back in 2007, when this information revealed the

12    identity and the names of all these people, are you saying that

13    that infor- -- you don't know whether or not that information

14    was inputted as a lookout?

15    A.  I don't recall when that information was inputted.

16    Q.  Who would know?

17    A.  The owner of the record.

18    Q.  Would the case agent be involved -- would the case agent

19    have information about that?

20    A.  I --

21    Q.  Whether or not --

22    A.  I would assume he would.

23    Q.  Okay.  You wouldn't have known?

24    A.  Once again, I -- I don't recall who -- who was the record

25    owner.

```
1              MR. VELARDE:  Thank you very much.

2              MS. KANOF:  Nothing further.

3              THE COURT:  It's 5:01, Counsel.  It's time to take a

4    break.

5              Ladies and gentlemen of the jury, remember all the

6    instructions that I gave you, and please abide by them.

7              We're going to get started just a little bit later

8    tomorrow, okay, because I do have some hearings at 8:30.  So

9    we'll get started at 8- I'm sorry -- at 9:15 instead of 9:00.

10   I don't want to keep you there waiting too long; that's why.

11   You know, be prepared to come into court at 9:15.

12             And again, please remember all the instructions that I

13   gave you.

14             You-all hold on.  I want to talk to you.

15             The jury is being excused at this time.

16             (Open court; outside the presence of the jury.)

17             THE COURT:  Ms. Kanof, how many more witnesses do you

18   anticipate.

19             MS. KANOF:  Two.

20             THE COURT:  Two more?

21             MS. KANOF:  Yes, sir.

22             THE COURT:  Any idea how long your direct would be?

23             MS. KANOF:  Maybe an hour and a half at the most.  An

24   hour and a half, including cross.

25             THE COURT:  Okay.  So you would more than likely be
```

```
 1    through by noon?
 2              MS. KANOF:  I hope so.
 3              THE COURT:  And be able to rest by noon?
 4              MS. KANOF:  Yes, Your Honor.
 5              THE COURT:  Okay.  Do we have a draft, Jayna?
 6              LAW CLERK:  Yeah.
 7              THE COURT:  We have a draft of the Charge.  Okay?  I
 8    want you to come in tomorrow with any requests or any objection
 9    that you have.  I'm going to resolve them.  I'm going to
10    resolve them, hopefully, by the morning.  Okay?
11              So with that, we'll be in recess until --
12              MR. ESPER:  Your Honor, do you want us before you
13    start your hearings at 8:30?
14              THE COURT:  You know what?  Yes, I think so.  If you
15    will get together with Jayna.  Get all your requests in.
16              MR. ESPER:  In other words, meet with her at 8:30?
17              THE COURT:  8:30, yes.
18              MR. ESPER:  In not -- obviously not in the courtroom
19    because you'll be --
20              THE CLERK:  Right outside.
21              THE COURT:  Okay.
22              We'll be in recess, then, until 9:15 tomorrow morning.
23              (Proceedings continued in Volume 4.)
24
25
```

1                          I N D E X

2                   GOVERNMENT'S EVIDENCE

3    WITNESSES:

4    MANUEL ALEJANDRO ASCENCIO:

5       Direct Examination by Ms. Kanof  ...........................2
        Cross-Examination by Mr. Velarde .......................119
6       Redirect Examination by Ms. Kanof .......................150
        Recross-Examination by Mr. Velarde ......................164
7
     JOHN MCCABE:
8
        Direct Examination by Ms. Kanof  .......................170
9       Cross-Examination by Mr. Esper .........................200
        Redirect Examination by Ms. Kanof .......................218
10
     GABRIEL AGUIRRE:
11
        Direct Examination by Ms. Kanof  .......................220
12      Cross-Examination by Mr. Velarde .......................248
        Redirect Examination by Ms. Kanof .......................253
13      Recross-Examination by Mr. Velarde ......................258

14   Jury in Evening Recess ...................................261

15

16

17

18

19

20

21

22

23

24

25

GOVERNMENT'S EXHIBITS

| NO. | DESCRIPTION | ADMITTED |
|-----|-------------|----------|
| 86 | Photograph | 190 |
| 87 | Photograph | 190 |
| 88 | Photograph | 190 |
| 89 | Photograph | 190 |
| 90 | Photograph | 190 |
| 91 | Photograph | 190 |
| 92 | Photograph | 190 |
| 93 | Photograph | 190 |