1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE WESTERN DISTRICT OF TEXAS

3             EL PASO DIVISION

4

UNITED STATES OF AMERICA   )   No. EP-12-CR-2106-DB

5                   )

vs.                  )   El Paso, Texas

6                   )

MARCO ANTONIO DELGADO     )   October 24, 2013

7

8

9              VOLUME 4 OF 6 VOLUMES
                  JURY TRIAL

10       BEFORE THE HONORABLE DAVID BRIONES
        UNITED STATES DISTRICT JUDGE, and a jury.

11

12

13  A p p e a r a n c e s:

14  FOR THE GOVERNMENT:    MS. DEBRA P. KANOF &
                       MS. ANNA E. ARREOLA

15                    Assistant United States Attorneys
                    700 E. San Antonio, Suite 200

16                    El Paso, Texas  79901

17  FOR DEFENDANT:         MR. RAY VELARDE
                    Attorney at Law

18                    1216 Montana Avenue
                    El Paso, Texas  79902

19

                    MR. RICHARD ESPER

20                    Attorney at Law
                    801 N. El Paso Street, 2nd Floor

21                    El Paso, Texas  79902

22

23

24       Proceedings recorded by mechanical stenography,

25     transcript produced by computer.

Fry - Direct by Ms. Arreola

1          (Open court; jury present.)

2          THE COURT:  Ladies and gentlemen of the jury, as you

3   probably have determined by now, we always try to get started

4   at -- or on schedule.  Not only when we start in the morning,

5   but throughout the day.  So we are starting a little bit late

6   today, because as I informed you yesterday, I did have some

7   hearings this morning.  So we do intend to go by schedule,

8   though.

9          And again, I have to remind you to abide by all the

10  instructions that I gave you.  Okay?

11          Are you ready with your next witness?

12          MS. ARREOLA:  Yes, Your Honor.  The Government is

13  ready.

14          THE COURT:  Call your next witness.

15          MS. ARREOLA:  Your Honor, the Government calls Special

16  Agent Joshua Fry.

17          JOSHUA FRY, GOVERNMENT'S WITNESS, SWORN

18                  DIRECT EXAMINATION

19  BY MS. ARREOLA:

20  Q.  Please state your name for the record.

21  A.  Joshua Fry.

22  Q.  How are you employed, sir?

23  A.  I'm a special agent with U.S. Immigration and Customs

24  Enforcement, Homeland Security Investigations, ICE-HSI.

25  Q.  How long have you been a special agent with ICE-HSI?

Fry – Direct by Ms. Arreola

1    A.  Since March of 2004.

2    Q.  Are you assigned to any particular division of ICE?

3    A.  Yes, I am.  I'm currently assigned to the focus task force,

4    which is compromised of several agencies, and I'm in a

5    financial investigations group.

6    Q.  What are your duties and responsibilities as a member of

7    that group?

8    A.  My main responsibilities are to investigate crimes of money

9    laundering, crimes related to the Bank Secrecy Act, bulk cash

10   smuggling, bank fraud, wire fraud, mail fraud, and various

11   other financial crimes.

12          I'm also involved in asset forfeiture investigations

13   as well.

14   Q.  I'd like to direct your attention to November 2nd, 2012.

15   Were you involved in an arrest that day?

16   A.  Yes, I was.

17   Q.  Who did you arrest?

18   A.  The defendant, Marco Delgado.

19   Q.  What did you arrest him for?

20   A.  I arrested him pursuant to an Indictment in the Western

21   District of Texas.

22   Q.  Is that the Indictment that is pending in this trial?

23   A.  It is.

24   Q.  Where did you arrest Mr. Delgado?

25   A.  I arrested him at a local Mexican food restaurant on the

Fry - Direct by Ms. Arreola

1    west side of El Paso.

2    Q.  Who was with you?

3    A.  Myself, my co-case agent Gabriel Aguirre, my supervisor,

4    and several other members of my investigative group.

5    Q.  What did you do after the arrest?

6    A.  We transported Mr. Delgado to the ICE-HSI office located at

7    Executive and Mesa.

8    Q.  What did you do when you arrived?

9    A.  We transported Mr. Delgado into an interview room.

10   Q.  And what did you do in the interview room?

11   A.  We went through some administrative things, such as taking

12   his biographical information, a couple other forms and

13   paperwork.  Then we advised Mr. Delgado of his *Miranda* rights.

14   Q.  What did he do when you advised him of his *Miranda* rights?

15   A.  He indicated that he understood his rights and wished to

16   speak with us and cooperate with us.

17   Q.  In other words, he agreed to waive his rights and speak

18   with you without the presence of an attorney?

19   A.  That is correct.

20   Q.  Did you proceed to interview Mr. Delgado?

21   A.  Yes, ma'am, we did.

22   Q.  Who was present during the interview?

23   A.  My co-case agent, Gabriel Aguirre.

24   Q.  Was the interview in English or in Spanish?

25   A.  It was conducted in the English language.

Fry - Direct by Ms. Arreola

1   Q.  What was the first thing that you did during the interview?

2   A.  The first thing that I did was, I retrieved a Report of

3   Investigation, or ROI, that was prepared by Special Agent

4   Thomas Justice of the Atlanta division, Report Number 1.

5           And then I told Mr. Delgado that I was going to read a

6   report that was prepared after the interview that he gave on

7   September 7th, 2007.

8   Q.  What was in that report that you wanted to read to

9   Mr. Delgado?

10  A.  I wanted to read to Mr. Delgado the statements that he made

11  to Special Agent Justice, as well as other special agents

12  during that interview.

13  Q.  And those statements were documented in the report?

14  A.  They were documented in the Atlanta report, yes, ma'am.

15  Q.  Agent, I would like to take -- I would like you to take a

16  look at what has been marked for identification as Government's

17  Exhibit 84.  There should be a copy in front of you.

18  A.  There is.

19  Q.  Can you identify that document?

20  A.  Yes.  This document is (indicating) --

21  Q.  Oh, Agent, please don't show it to the jury.

22  A.  This document is a copy of the Atlanta Report of

23  Investigation.

24  Q.  Is that the same report that you showed to Mr. Delgado?

25  A.  It is.

1    Q.  Can you explain -- and you reviewed this report with the

2    Defendant?

3    A.  Yes, I did.

4    Q.  Can you explain what you did?

5    A.  I held it in my lap and told Mr. Delgado that I was going

6    to read his statements to him.  I also invited him -- that he

7    was welcome to read or follow along with me as I did it.

8         Then I proceeded to read, sentence by sentence, the

9    statements that he made.

10        After every couple sentences, or at a logical point in

11   the paragraph, I would ask Mr. Delgado, Is this correct?  Is

12   this true?  Do you agree with this?

13        At various times, of which each time I asked him that,

14   Mr. Delgado indicated that the statements were true.

15   Everything I was saying was correct.

16   Q.  Okay.  Now the copy that you're looking at that has been

17   marked for identification as Exhibit 84, there are some

18   redactions in this version, correct?

19   A.  That is correct.

20   Q.  The document that you showed him, did it contain

21   redactions?

22   A.  No, ma'am.

23   Q.  Okay.  And if you could take a look at page 4.

24   A.  (Witness complies.)

25   Q.  Is that where the statements that you read began?

Fry - Direct by Ms. Arreola

1    A.  Yes, ma'am.

2    Q.  And those are not redacted in this copy?

3    A.  They were not redacted.

4    Q.  And then can you proceed to page 5 and 6?

5    A.  (Witness complies.)

6    Q.  Are those also statements that you read?

7    A.  They are.

8    Q.  And then everything that's redacted is something that you

9    did not read to him?

10   A.  That is correct.

11          MS. ARREOLA:  Your Honor, the Government offers what's

12   been marked for identification as Government's Exhibit 84.

13          MR. ESPER:  Same objection, Your Honor.  It's a

14   document that's -- the agent who prepared the document -- or

15   may we approach sidebar?

16          THE COURT:  No.  No, I'm not going to admit it.

17          MR. ESPER:  Thank you.

18          THE COURT:  I'll let you -- I'll let you quote from

19   it, but I don't want to admit this as an exhibit.  In other

20   words, you can make reference to the paragraph that you want

21   to, but I'm not going to let -- admit it.

22          MS. ARREOLA:  Okay, Your Honor.

23   BY MS. ARREOLA:

24   Q.  Agent Fry, I'm going to read you a few paragraphs from this

25   and then ask you a question.

Fry – Direct by Ms. Arreola

1          (Reading:)  Delgado stated that Fernan- -- an

2     individual named Fernandez, Francisco Fernandez, advised we,

3     meaning Concha and Fernandez -- Lilian de la Concha and

4     Fernandez -- had been approached by some clients of the

5     accountant to handle a very delicate issue on some individuals

6     being extradited to the United States.

7          Fernandez -- and it appears there's a word missing in

8     the document.

9          Fernandez stated that these clients wanted to know if

10    Concha, Fernandez, and Delgado could prevent the extradition.

11         Delgado stated that Fernandez said he did not know how

12    much to charge, and that he was afraid to get involved with

13    these kind of people because if they pay us and it does not

14    come out the way they like, that it could cost them their life.

15         Delgado stated that Fernandez wanted to know if you

16    have the ability to get an extradition order put on the bottom.

17         Delgado stated that they use an analogy that they

18    basically want --

19         MR. ESPER:  Could we have, Your Honor, question and

20    answer?  This is just testifying.

21         THE COURT:  No.  Overruled.

22         Go ahead.

23    BY MS. ARREOLA:

24    Q.  Delgado stated that they used an analogy that they

25    basically wanted to know if Delgado could slow things down.

1           Delgado stated that some of the names he was provided

2    appeared on the kingpin's designation on the U.S. Treasury list

3    that is posted on the Internet.

4           Agent Fry, can you explain what slowing down an

5    extradition means?

6    A.  They were referring to seeing if he could get the -- stop

7    the extradition of individuals from Mexico to the

8    United States.

9    Q.  And so Delgado admitted to you that this group of

10   individuals, including de la Concha and Francisco Fernandez,

11   had been approached and asked to slow down the extradition of

12   individuals to the United States?

13   A.  Mr. Delgado said that everything you just read from this

14   report to me was correct, yes.

15   Q.  What is the kingpin's designation?

16   A.  The kingpin's designation -- the U.S. Treasury Department

17   Office of Foreign Asset Control, or OFAC, maintains a list

18   called the SDN list, or Specially Designated Nations list.

19          On that list are individuals that are designated as

20   drug kingpins.

21   Q.  Agent Fry, I'm going to read another paragraph and then ask

22   you a follow-up question.

23          (Reading:)  Delgado stated that sometime after

24   May 2007 Delgado, Fernandez, Concha, meaning Lilian de la

25   Concha, and Mendoza -- Mendoza Meneses, who's identified

 1   earlier in the report as Pedro Mendoza Meneses, met again.

 2          Mendoza Meneses brings up the idea of a mirror

 3   operation and stated that his clients want them to pick up

 4   money in the U.S. and pay out U.S. currency in Mexico

 5   simultaneously.

 6          Mendoza Meneses tells the group that his clients have

 7   $600,000 –– excuse me, $600 million to transfer.

 8          Did I read that statement correctly?

 9   A.  Yes, you did.

10   Q.  Did you ask Mr. Delgado, after reading him this report,

11   anything about the $600 million?

12   A.  Yes, I did.

13   Q.  What, if anything, did you ask and what did he say?

14   A.  I asked Mr. Delgado, after he initially met these people

15   and they asked him to interfere with an extradition order for

16   someone he did research on was a king drug –– or a drug kingpin

17   of the United States –– why, after he told them no and they

18   approached him to move $600 million in one of the subsequent

19   meetings, that he could believe that this wasn't drug money, or

20   if he had to have known that this was drug money.

21   Q.  What, if anything, did he say?

22   A.   Mr. Delgado stated that he did not know if the $600 million

23   was from drug money, and that he never knew –– or I'm sorry ––

24   he did not want to know if this was drug money.  He really

25   wanted this deal to go through.

1    Q.  Okay.  And you just said that he did not want to know.

2    A.  He did not want to know if it was drug money.

3    Q.  And those are the words he used?

4    A.  Yes, ma'am.

5    Q.  Did Delgado offer up any other explanation for the money

6    that was seized?

7    A.  Yes.  He said wealthy Mexican nationals are sometimes

8    unorthodox with their money, that they'll do strange things

9    with their money.  And that it was possible that this was money

10   they were trying to hide from their relatives or money they

11   wanted to hide from robbers.

12   Q.  Okay.  I would like now like to turn your attention to what

13   has already been admitted into evidence as Government's

14   Exhibit 57.

15         MS. ARREOLA:  Your Honor, the Government requests

16   permission to publish to the jury.

17         THE COURT:  You may publish.

18   BY MS. ARREOLA:

19   Q.  Agent Fry, do you recognize this document?

20   A.  Yes, I do.

21   Q.  What is it?

22   A.  This is a copy of the fake lawsuit agreement, settlement

23   agreement.

24   Q.  Has this version of the settlement agreement been altered

25   in any way?

Fry - Direct by Ms. Arreola

1   A.  Yes.  I learned at a later date, after this interview, that

2   the original sum of $1.5 million was changed to $5 million for

3   the second controlled delivery, where we conducted the ruse

4   traffic stop and ruse meeting.

5   Q.  Are you referring to the amount in paragraph 2?

6   A.  Yes.  It went off my screen.

7   Q.  Pardon?

8   A.  It went off my screen.

9          THE COURT:  Yeah.  You've got to put it back up.

10          MS. ARREOLA:  That's okay.  Your Honor, the Government

11   requests permission to continue to have it published.

12          THE COURT:  You may publish.  If it's been admitted,

13   you don't have to ask permission to publish it.

14   BY MS. ARREOLA:

15   Q.  That's okay.

16          Agent Fry, did you show -- or did you later learn why

17   this document had been altered from the original?

18   A.  Yes.  I learned that there was some reason why they wanted

19   the amount to be $5 million for the second controlled delivery.

20   I'm not exactly sure what the Atlanta case agents -- well, what

21   their reason for...

22   Q.  Okay.  Did you show this document to Mr. Delgado during the

23   interview in November?

24   A.  I showed him a copy of it, yes, ma'am.

25   Q.  What, if anything, did you ask him, and what did he say, if

1   anything?

2   A.  I asked Mr. Delgado if he remembered this document from the

3   original million dollar stop.

4   Q.  Okay.  And I see that it's back up on the screen.

5   A.  Yes, ma'am.

6   Q.  I've highlighted paragraph 2 on Exhibit 57.

7           Is that the number that was altered from the original?

8   A.  Yes.  My understanding of it, that's where it was altered.

9   Yes, ma'am.

10          MS. ARREOLA:  Okay.  Your Honor, may I have one

11  moment?

12          THE COURT:  You may.

13  BY MS. ARREOLA:

14  Q.  What, if anything, did Mr. Delgado say when you showed him

15  this settlement agreement?

16  A.  He said that he didn't remember this document.

17  Q.  Can you repeat that?  I didn't hear.

18  A.  He said that he did not remember this document, or did not

19  remember making it.

20  Q.  What else, if anything, did he say?

21  A.  He said that if Victor Pimentel had it, then either he

22  himself had prepared it or somebody else involved in the money

23  pickup operation.

24  Q.  When you say "he himself," who are you referring to?

25  A.  He was referring to himself, Defendant Marco Delgado.

Fry - Direct by Ms. Arreola

1   Q.  So in other words, just to be clear for the record, Delgado
2   was saying that if Victor had had it, Delgado himself or
3   somebody else would have prepared it?
4   A.  Yes, ma'am.
5   Q.  Okay.  Did you ask Mr. Delgado anything else about
6   Mr. Pimentel?
7   A.  Yes.  I asked Mr. Delgado why he would use Victor Pimentel,
8   a UTEP student.  Why he would employ this individual to go
9   across the country and pick up a million dollars.
10          Mr. Pimentel was in his 20s.  He was a college
11  student.  I didn't understand why Mr. Delgado was utilizing him
12  for this money laundering operation.
13  Q.  Did you ask him a question about that?
14  A.  Yes, I did.  I asked him why he used Mr. Pimentel.
15  Q.  What, if anything, did he say?
16  A.  He said that Mr. Pimentel was not just a simple college
17  student, but that he was a very savvy and educated grown man
18  who knew exactly what he was doing when it came to getting
19  involved with the money.
20  Q.  Did you ask Mr. Delgado anything about the Chicago pickup?
21  A.  Yes, I did.
22  Q.  What did you ask him and what, if anything, did he say?
23  A.  I asked Mr. Delgado, after he had been involved in the
24  million dollars and everything that followed it, how him and
25  everyone else involved in it had almost been killed.

Fry – Direct by Ms. Arreola

1          They had been threatened by the drug traffickers.  I

2     know that weapons had been involved and threats were made, from

3     listening to the calls.

4          I asked him why he would move money again with these

5     individuals without alerting ICE.  Why would he do something

6     like that.

7     Q.  And what did he have to say?

8     A.  Mr. Delgado said that, essentially, his life was in ruins;

9     that he had been very successful once, he had been doing very

10    well, and he was doing badly now.

11         He said that he just wanted this deal to go through

12    very badly, and he should have told us about the new money

13    pickup in Chicago, but he just didn't.

14    Q.  Did you ask Mr. Delgado whether or not he had any further

15    contact with Lilian de la Concha after the million dollar

16    seizure?

17    A.  Yes, I did.

18    Q.  What, if anything, did you ask, and what did he say?

19    A.  In relation to the Chicago money pickup operation, he

20    stated that after ICE conducted the second ruse traffic stop

21    where we arranged for Mr. Delgado to essentially bust into the

22    DPS room and arrange for the release of his co-conspirators,

23    that made him look very heroic.  It made him look like he had a

24    lot of power in the United States.

25         And that this ruse that we conducted with him, Lilian

Fry - Direct by Ms. Arreola

1    de la Concha and others were very impressed by this.  They
2    thought that he had the ability to corrupt U.S. law enforcement
3    and he had the ability to arrange for people's release from
4    prison.
5    Q.  Did he indicate to you whether or not de la Concha had
6    introduced him to anybody?
7    A.  Yes.  He said that Lilian de la Concha introduced him to a
8    family member by the name of Jose -- and excuse my
9    pronunciation -- Quezada -- and that he was a very wealthy,
10   powerful, and influential person.
11   Q.  What, if anything, did he say about Quezada with respect to
12   drug trafficking?
13   A.  Mr. Delgado stated that if anybody was involved in drug
14   trafficking, he believed that Jose Quezada would be the
15   individual.
16   Q.  Did he indicate to you if anybody else was involved in the
17   Chicago pickup?
18   A.  Yes.  He stated that Lilian de la Concha, himself, and Jose
19   Quezada were the ones that arranged and decided to conduct the
20   Chicago pickup operation.
21   Q.  Did he indicate anything to you about his belief regarding
22   whether or not the money was drug money?
23   A.  Yes.  Mr. Delgado stated that he didn't want to ever think
24   of himself as somebody that was part of a drug cartel or
25   anybody that would help a drug cartel.

1   Q.  Did you ask Mr. Delgado anything about the account of

2   Liliana Narvaez?

3   A.  Yes, I did.

4   Q.  What did you ask?  And what, if anything, did he say?

5   A.  I asked -- I told Mr. Delgado that approximately seven days

6   after the $1 million seizure in El Paso, Texas, that half a

7   million dollars was wired from a bank account in Switzerland to

8   the bank account of his girlfriend in El Paso, Texas, and did

9   not inform any of us that this had happened.  I had no

10   knowledge of it until a much later date in the investigation.

11          I asked him if this was related to the million dollars

12   and the $600 million that they were attempting to move.

13   Q.  What did he say?

14   A.  Mr. Delgado said that this $500,000 wire transfer came from

15   an ex-boyfriend of Lilian de la Concha, and that this money was

16   part of an operation *Mundial* -- again, excuse my

17   pronunciation -- *Mundial*.

18          And this operation was going to arrange for Mexican

19   burial insurance to be sold to Mexican nationals who were in

20   the United States, if they were to die with a -- pay for their

21   trip back to Mexico.

22   Q.  Did he indicate whose idea it was to put it in Liliana

23   Narvaez's account?

24   A.  It was his.  He went and asked his girlfriend, Liliana

25   Narvaez, if that was possible.

Fry - Direct by Ms. Arreola

1   Q.  Did you ask him what -- or did he say what, if anything, he

2   did with the money?

3   A.  He said that he spent it all on making the business happen.

4   He said the business wasn't successful and didn't happen, but

5   he had spent it on trying to make this business work.

6   Q.  Did you ask him why he had used her account?

7   A.  Yes, I did.

8   Q.  What did you ask, and what did he say?

9   A.  I asked Mr. Delgado, Why would you use your girlfriend's

10  account?  Why not use one of your own accounts?  You're an

11  attorney.  You have an IOLTA account, interest on lawyer's

12  trust account, made for this type of thing.  Why would you put

13  it in her account?

14  Q.  What did he say?

15  A.  Mr. Delgado got quiet and had no response, no -- no answer

16  to the question.

17  Q.  Did he say anything about providing you with further help?

18  A.  Yes, he did.

19  Q.  What did he say?

20  A.  Mr. Delgado said that he would do anything to keep from

21  having to go to jail.

22  Q.  Agent, I would like to show you what has already been

23  admitted into evidence as Government's Exhibit 34.

24          But before I move to that exhibit, I just want you to

25  take a look at what is already on display as Government's

1    Exhibit 57.

2         Do you see a cause number at the top right of the

3    page?

4    A.  Yes, I do.

5    Q.  And do you see the name of the court on the top of the

6    page?

7    A.  Yes, I do.

8    Q.  Is that Cause Number 2006-217?

9    A.  It is.

10   Q.  Agent, do you recognize exhibit -- Government's Exhibit 34?

11   A.  I do.

12   Q.  What is this?

13   A.  This is a document that I received from the El Paso

14   district clerk's office.  It is a lawsuit with the same cause

15   number as the fake lawsuit settlement agreement we were just

16   looking at.

17   Q.  Can you explain, very briefly, how you went about getting

18   this?

19   A.  I took that cause number over to the district clerk's

20   office.  I took it to that court.  I went around to several

21   courts until finally the vault records section of the district

22   clerk's office ran that cause number and retrieved documents

23   related to this settlement -- or this lawsuit in El Paso.

24   Q.  Okay.  And then this cause number has 2006-217, correct?

25   A.  That is correct.

Fry - Direct - Cross by Mr. Esper

1    Q.  And will you look at the caption?  Does the caption read a

2    Laura Montes versus City of El Paso?

3    A.  It does.

4    Q.  And on Government's Exhibit 34, same cause number -- excuse

5    me.

6           On Government's Exhibit 33, same cause number.  Does

7    the caption read Juan Hernandez versus Texas Oil Corporation?

8    A.  Yes, ma'am.

9           MS. ARREOLA:  Your Honor, may I have one second?

10          THE COURT:  You may.

11          MS. ARREOLA:  No further questions, Your Honor.

12          MR. ESPER:  May I proceed, Your Honor?

13          THE COURT:  You may proceed.

14                      CROSS-EXAMINATION

15   BY MR. ESPER:

16   Q.  Mr. Fry, you've been the case agent in this case from the

17   inception; is that correct?

18          MS. ARREOLA:  Objection, Your Honor.  Vague as to

19   inception.

20          THE COURT:  Overruled.  Let him answer.

21   A.  No, sir.  I was a case agent for El Paso for the controlled

22   delivery.

23          After the controlled delivery, I didn't have anything

24   to do further with the case for several years.

25

1   BY MR. ESPER:

2   Q.  Okay.  So let's start back in September of 2007.

3          You were contacted, were you not, by Atlanta ICE

4   concerning their intention of making a controlled delivery here

5   in El Paso, correct?

6   A.  Yes, sir.  Atlanta ICE contacted my supervisor; my

7   supervisor assigned me, yes, sir.

8   Q.  Okay.  And that controlled delivery involved an individual

9   who we've seen here in court, Victor Pimentel, correct?

10  A.  That is correct.

11  Q.  And so you participated, or were at least coordinating the

12  El Paso end of that controlled delivery, correct?

13  A.  That is correct.

14  Q.  Okay.  And Victor Pimentel is a person that not only have

15  we seen here in court, but you have met with him on a number of

16  occasions prior to him testifying here in court, correct?

17  A.  Yes, sir.

18  Q.  Okay.  Before I go any further with that controlled

19  delivery, I want to clarify something.

20          Victor Pimentel was actually paid monies or reimbursed

21  monies by ICE, was he not?

22  A.  He has been paid by ICE, yes, sir.

23  Q.  Okay.  And how much has he been paid?

24  A.  I believe it's a total of $8500.  Somewhere over $8,000.

25  Q.  Okay.  Now, is that payment in connection with this

Fry - Cross by Mr. Esper

1    investigation, or monies that were reimbursed to him, or both?

2            MS. ARREOLA:  Objection, Your Honor.  Lack of

3    foundation.

4            THE COURT:  Overruled.

5    A.  Well, it's monies that have been paid to him.  We -- we

6    can't direct him as to what he's going to do with the money.  I

7    was involved with paying him $5,000.

8            And I believe that my co-case agent, Gabriel Aguirre,

9    and others before me, had paid him some money related to travel

10   expenses.  And...

11   BY MR. ESPER:

12   Q.  Okay.  So whenever he was testifying here in court, however

13   clumsily I asked the question, he denied on both occasions that

14   he received any money from investigative agencies, correct?

15   A.  Yes, I believe that's correct.

16   Q.  Okay.  So he wasn't being truthful when he said, I haven't

17   received any money?

18           MS. ARREOLA:  Objection, Your Honor.

19           THE COURT:  Overruled.

20   A.  I do not know what Victor Pimentel's -- I don't know if he

21   was lying to you or not being truthful.  I don't -- I don't

22   know what Victor Pimentel's intent was.

23   BY MR. ESPER:

24   Q.  Well, you were here, and he said, No, I haven't been paid

25   anything.

 1    A.   I was here.   I did hear him say that.

 2    Q.   And the truth is, he has been paid money?

 3    A.   He has been paid, yes, sir.

 4    Q.   Okay.   Now on September 7th, Mr. Pimentel -- and we've seen

 5    the video, and I'm not going to go into depth about it.

 6         But he actually makes a delivery of the money to

 7    Mr. Delgado after Mr. Delgado exits his mother's home, correct?

 8    A.   Yes, sir.

 9    Q.   And they're stopped on Mesa Street by the trooper, correct?

10    A.   Yes, sir.

11    Q.   Okay.   And at that juncture, it was the -- it was the

12    intent of law enforcement to keep Victor Pimentel's identity as

13    cooperating secretive, correct?

14    A.   Yes.   That is always our intent, yes, sir.

15    Q.   Sure.   Just like whenever Mr. Delgado agreed to cooperate,

16    it was the intent of the law enforcement to keep that

17    cooperation secretive, correct?

18    A.   We always -- yes, sir.   We always keep operations secret.

19    Q.   Sure.   And as a matter of fact, after the -- after the

20    seizure, Mr. Delgado, indeed, attempted to cooperate with law

21    enforcement, correct?

22    A.   He attempted, yes, sir.

23    Q.   Okay.   And one of the first things that happened was, there

24    was an effort made, successfully, to contract two other

25    individuals who came to El Paso to pick up the money?

 1    A.  Yes, sir.

 2    Q.  Okay.  And those two individuals were an individual named

 3    Pedro Mendoza and Isidro Vega, correct?

 4    A.  Yes, sir.

 5    Q.  Okay.  And Mr. Delgado is the one that contacted them in

 6    his efforts to cooperate to come get the money, correct?

 7    A.  My understanding was is that they were already on their

 8    way.  They were already involved with this.

 9    Q.  Okay.  They were already in the area.  But was it their

10    intent to come to El Paso, if you know?

11    A.  Yes.  I mean, they were always coming to El Paso.

12    Q.  Okay.

13    A.  That's my understanding of it.

14    Q.  El Paso, as opposed to somewhere on the other side of

15    the -- in the Mex- -- in the country of Mexico, if you know?

16    A.  You know what?  I -- I'm not sure if they were stopping in

17    El Paso and then going to Mexico, or directly to Mexico through

18    El Paso first.

19    Q.  Okay.  So a -- so a kind of a ruse is created, with

20    Mr. Delgado's cooperation, to not only have these individuals

21    get here, but to actually have the DPS stop them and seize the

22    money, correct?

23    A.  Yes.  We created a ruse, yes, sir.

24    Q.  And of course Mr. Pimentel is not part of that ruse, is he?

25    A.  He is, sir.

1   Q.  Oh, he is?

2   A.  He was in the vehicle with the money for the second stop.

3   Q.  Okay.  But Mr. Delgado is not made aware that Mr. Pimentel

4   is cooperating, correct?

5   A.  Sir, when -- after Mr. Delgado began to attempt to

6   cooperate with us, we actually created another ruse, basically

7   a double blind, where Mr. Delgado agreed to cooperate with us,

8   and we told Mr. Delgado to go over and solicit cooperation from

9   Victor Pimentel, even though Victor Pimentel was already

10  cooperating with us.  And we did this -- it's a way to keep

11  everybody honest, sir.  Nobody knows who's working with us or

12  not.

13  Q.  Right.  Correct.

14          And so basically, Mr. Delgado got Mr. Pimentel to go

15  along with the fact that this vehicle was going to be stopped

16  by law enforcement, and these guys are going to be seized --

17  the money is going to be seized, and they're going to be

18  arrested?

19  A.  Mr. Delgado believed he got Mr. Pimentel to do it.

20  Mr. Pimentel --

21  Q.  Was already on board?

22  A.  -- was already on board with us.  Yes, sir.

23  Q.  Okay.  So in other words, any -- he didn't have to do much

24  convincing of Mr. Pimentel to participate, correct?

25  A.  No, sir.

Fry – Cross by Mr. Esper

1   Q.   Okay.   But at least in Mr. Delgado's mind, he didn't know

2   Pimentel was already on board?

3   A.   He did not, sir.

4   Q.   Okay.   So now what happens, part of the ruse is that once

5   these individuals are stopped, the money is seized.   They're

6   now detained by law enforcement, correct?

7   A.   Yes, sir.

8   Q.   And part of the ruse is, is that Mr. Delgado is going to

9   come to their aid as a lawyer and basically extricate them out

10  of the situation?

11  A.   Yes, sir.

12  Q.   Okay.   And that was the scenario, or the script that had

13  been created, correct?

14  A.   The scenario, yes, sir.

15  Q.   Okay.   And that was to not only protect Mr. Pimentel, but

16  it was also to protect Mr. Delgado as being a cooperator,

17  correct?

18  A.   Those were some of the goals, as well as allow us to

19  continue to --

20  Q.   Yeah.   And as a matter of fact, he was successful at

21  carrying through that scenario?

22  A.   He was successful.   He didn't do it exactly the way we

23  would have preferred, but he was successful.

24  Q.   Well, he went to DPS and he got them out and everybody was

25  happy about that, correct?

Fry - Cross by Mr. Esper

1    A.  Yes, sir.

2    Q.  And as a matter of fact, when counsel asked you about him

3    talking to Ms. de la Concha, Lilian de la Concha --

4    Mr. Delgado -- she was of the opinion, after Mr. Delgado talked

5    to her, that he had all these connections with which to bribe

6    local law enforcement by having gotten these guys out of

7    detention, correct?

8    A.  That's what Mr. Delgado told me, yes.

9    Q.  Yes.  And of course that's what he -- one of the scenarios

10   that law enforcement wanted to create, that he had that kind of

11   wherewithal to get things done with corrupt law enforcement

12   agents in the United States?

13   A.  It wasn't that he had the ability to work with corrupt law

14   enforcement.  It's that he had the ability to influence or

15   possibly corrupt law enforcement.

16   Q.  Right.  And by getting these guys out of jail and creating

17   the scenario that he was going to get the money back that was

18   seized, certainly led people in Mexico, or at least Ms. de la

19   Concha to believe, that he had that wherewithal?

20   A.  Yes.  According to Marco, yes, sir.

21   Q.  Okay.  Now -- and as a matter of fact, he made a number of

22   consensually recorded phone calls to a number of people that

23   we've already heard, between September 7th and September 10th

24   while he was here in El Paso, correct?

25   A.  Yes.  I've listened to the calls, sir.

Fry – Cross by Mr. Esper

1    Q.  Okay.  And he's calling Ms. de la Concha to -- to inform
2    her what's going on and that his efforts to get these guys out
3    of jail had proven successful, correct?
4    A.  Yes.  There were a lot of calls, sir.  Yes, sir.
5    Q.  Yeah.  A lot of calls and a lot of -- a lot of verbiage in
6    those calls, correct?
7    A.  Yes, sir.
8    Q.  Okay.  Now, he then flies to Atlanta to assist Atlanta law
9    enforcement in his continued efforts to cooperate?
10   A.  That's my understanding of it, yes, sir.
11   Q.  Okay.  And of course is Atlanta keeping you apprised?  Or
12   are you basically now out of the picture for a while?
13   A.  Shortly after that I stopped working or communicating with
14   Atlanta.
15   Q.  Okay.  So basically, Atlanta has taken over Mr. Delgado, as
16   far as proceeding onward in trying to identify other people
17   that are involved in this situation?
18   A.  That wasn't the original arrangement.  But after -- shortly
19   after that trip, Atlanta took full control of the case.
20   Q.  Okay.  Were you kept apprized of it, or you were out in the
21   dark, so to speak?
22   A.  No.  After -- shortly after Marco Delgado came back, I no
23   longer wished to communicate with Atlanta or continue to work
24   with them.
25   Q.  Okay.  So actually, from about mid September of 2007 until

Fry - Cross by Mr. Esper

```
 1   maybe mid- -- or July of 2008, that 12-month period, you pretty
 2   much were not in the loop, so the speak?
 3   A.  At one point I heard somewhere that Marco's name had popped
 4   back up and he might want to move money, but I didn't follow
 5   up.  I was busy with other things and wasn't advised.
 6   Q.  Okay.  Fair enough.
 7        Now, Mr. Fry, there was a situation that we've heard
 8   about, and that is this matter in Chicago, correct?
 9   A.  Yes, sir.
10   Q.  Do you recall -- and if you don't, simply say so -- whether
11   Mr. Pimentel tried to call you or other local El Paso-based
12   Homeland Security agents that he had gotten a call and was off
13   to Chicago?
14   A.  Only what I've heard in this courtroom.
15   Q.  Okay.  You didn't -- your office does not have any type of
16   independent evidence that he, in fact, made that call or talked
17   to somebody?
18            MS. ARREOLA:  Objection, Your Honor.
19            THE COURT:  What is the objection?
20            MS. ARREOLA:  Your Honor, it was in the report.
21            THE COURT:  Overruled.
22   BY MR. ESPER:
23   Q.  You can answer.
24   A.  I'm sorry, sir.
25   Q.  You don't have any independent evidence that a call was
```

1    made by Mr. Pimentel to your office that -- that -- wherein he

2    says, I've been called by Mr. Delgado.  He wants me to go to

3    Chicago.  Do you guys know anything about this?

4    A.  I have no idea.

5    Q.  Okay.  There's nothing documented with respect to your law

6    enforcement agency?

7    A.  I can't speak for my whole agency.  I just know I do not

8    know about the Chicago details.  I was not part of any of that,

9    sir.

10   Q.  Okay.  Did you make any efforts to try to ascertain

11   whether, in fact, such a call was even made by him, other than

12   him saying it?

13   A.  I just read the reports and talked to the agents involved

14   in the Chicago.  I didn't go any further than what they had

15   done.

16   Q.  Okay.  He then says that he makes a call to Atlanta.

17            Well, let me ask you this.

18            He first makes a call to Atlanta, and they kind of

19   dust him off, correct?

20   A.  From the testimony I've heard, that's what's been testified

21   to.

22   Q.  Okay.  And then he supposedly calls El Paso and makes

23   contact with somebody here in El Paso.  And they assist him up

24   in Chicago, correct?

25   A.  Yes.  I've spoken to those agents, and I've also heard it

Fry - Cross by Mr. Esper

1    in this court, sir.

2    Q.  Okay.  And that was Agent Aguirre, correct?

3    A.  Gabe Aguirre spoke with him, yes, sir, as well as other

4    agents in Chicago and other Atlanta agents later.

5    Q.  Okay.  So I perhaps had my facts confused.  He calls

6    Atlanta first, they don't even respond to him.  Now he calls

7    El Paso, and someone from Homeland Security responds to him?

8    A.  Gabriel Aguirre calls Mr. Pimentel, yes, sir.

9    Q.  Okay.  Now you asked Mr. Delgado, when he was arrested in

10   November of 2012, correct?

11   A.  Yes, sir.  I interviewed him.

12   Q.  That was the date of the arrest?

13   A.  That was the date of the arrest.

14   Q.  Okay.  This is now a little over two years -- excuse me.

15   This is now almost four years after this incident in Chicago,

16   correct?

17   A.  Roughly, yes, sir.

18   Q.  Okay.  Well, the incident in Chicago was in July of 2008,

19   and we've all heard that testimony.

20        And do you, as a -- does your agency go out and try to

21   interview Mr. Delgado about that incident sometime shortly

22   after July of 2008?

23   A.  From the agents I've talked to and hearing testimony, yes,

24   sir.  That's my understanding of what happened.

25   Q.  There was an effort made?

Fry &ndash; Cross by Mr. Esper

1    A.   That they pulled Mr. Delgado into the office on

2    December 3rd, 2008.

3    Q.   Okay.  Let's talk about this December 3rd matter.

4         Were you, in fact, involved in the investigation at

5    that point?

6    A.   I was not involved.  I was in the office working on

7    something else, but I had no idea they were downstairs doing

8    this.

9    Q.   Okay.  Mr. Pimentel relates an incident where supposedly

10   Ms. de la Concha comes, actually, to the United States and

11   meets with him, correct?

12   A.   That's -- yes, my understanding.

13        MS. ARREOLA:  Objection, Your Honor.  This witness --

14   he hasn't established that this witness has any personal

15   knowledge of the events he's asking about.

16        THE COURT:  It's been testified to here in court.

17        Overruled.

18   BY MR. ESPER:

19   Q.   And you have reviewed numerous reports of -- that were

20   prepared by your fellow agents concerning that incident,

21   correct?

22   A.   I have reviewed reports, yes, sir.

23   Q.   Okay.  You didn't speak to him directly?

24   A.   Mr. Delgado?

25   Q.   No, Mr. Pimentel.

1    A.  During that day?

2    Q.  Yes.

3    A.  Oh, no, sir.

4    Q.  Nor did you speak to him wherever he came two months later

5    and reported these alleged threats on Mr. Delgado's life?

6    A.  No, sir.

7    Q.  Okay.  Now according to Mr. Pimentel, Ms. Lilian de Concha

8    [sic] comes to the United States, and he starts spilling the

9    beans that Mr. Delgado is -- has lied to her for a number of

10   years about a number of things.

11          MS. ARREOLA:  Objection, Your Honor.  Counsel is

12   testifying.

13          THE COURT:  Overruled.

14   A.  That's -- from what I've heard and my understanding, yes,

15   sir.

16   BY MR. ESPER:

17   Q.  Well, I mean, you -- as the case agent, you've reviewed --

18   A.  Yes, sir.

19   Q.  -- reports that were prepared?

20   A.  Yes.

21   Q.  And you also reviewed the fact that, according to

22   Mr. Pimentel, he told Ms. de la Concha that because he was --

23   he wanted Mr. Delgado to be punished for all his lying,

24   correct?

25   A.  Sir, I don't recall these parts of the reports.  I've heard

 1  it here in court, but I'm not familiar with this stuff, sir.

 2  Q.  Okay.  All right.

 3        Now, were you present when he was interviewed in

 4  December of 2008?

 5  A.  No, sir, I wasn't.

 6  Q.  Okay.  And this is where he is told two months, allegedly,

 7  after Mr. Pimentel meets with Ms. de la Concha, that somehow

 8  there's a threat communicated against him?

 9  A.  From what I've read and who I've spoken to, yes, that's my

10  understanding, sir.

11  Q.  Okay.  And we've heard that testimony here in court,

12  correct?

13  A.  We have, sir.

14  Q.  Okay.  And of course, obviously, nothing happened to him?

15  A.  He was not killed, no, sir.

16  Q.  Okay.  Now, let's go to November of 2012.

17        And the first thing that you did when you sat down

18  with Mr. Delgado was you read him his *Miranda* rights, correct?

19  A.  We took care of some other administrative stuff first.  But

20  yes, before the interview began, absolutely.  The first thing I

21  did was advise him of his rights.

22  Q.  Right.  And he understood, and even more so as a lawyer,

23  that you can remain silent and not answer questions, correct?

24  A.  Yes.  He indicated that he understood his rights, yes, sir.

25  Q.  And he said, No, no, I will answer your questions.

Fry - Cross by Mr. Esper

1    A.  He said, I will cooperate with you just like I did before,

2    yes, sir.

3    Q.  Okay.  And so you then begin reading him -- or going

4    through a report that you had previously seen that was prepared

5    by, I believe, Agent Justice out of Atlanta.  And you start

6    reiterating similar -- same or similar questions that had been

7    asked of him by Mr. Justice back in 2007, correct?

8    A.  The report -- I read Mr. Delgado the statements -- or I'm

9    sorry -- the section on his statements.

10           It's really more his statements as opposed to really

11   questions being asked, yes, sir.

12   Q.  Okay.  Now let me ask you this, Mr. Fry.

13           We've heard a lot of recordings in this case.  You, as

14   a person -- as an ICE agent -- know all about technology.  And

15   it's pretty easy to record conversations in this day and age,

16   is it not?

17   A.  It's easier for non-law enforcement to do it than law

18   enforcement, yes, sir.

19   Q.  Okay.  But as law enforcement, you have the very easy --

20   it's very easy for you to record interviews, is it not?

21   A.  If -- yes.  If I wanted to, it would be easy to record an

22   interview.

23   Q.  In this age of technology, it's not like you have to go out

24   and get equipment and bring it into the room and waste all that

25   time, correct?

Fry - Cross by Mr. Esper

1    A.  I would probably have to get some type of special ICE, you

2    know, sensitive -- something that's been blessed by the

3    government to utilize.  But, yes, sir.

4    Q.  Okay.  But I mean, you could take him to an interview room

5    at ICE.  I mean, that's where you take all people that you

6    arrest first, to your headquarters, correct?

7    A.  Most of the time.  We have other offices in this city,

8    but --

9    Q.  I understand.  I don't want to know where they're at.  But

10   you have other offices, and you go into, basically, a room to

11   interview --

12   A.  Yes, sir.

13   Q.  -- people, right?

14   A.  Yes, sir.

15   Q.  And it's very simple to set up recording devices in there,

16   correct?

17   A.  Yes.  I'm sure it would be, to do something like --

18   Q.  But you-all don't do that?

19   A.  Set up recording devices?

20   Q.  Record interviews with people that you've arrested and take

21   statements from them.

22   A.  Not as a normal practice, no, sir.

23   Q.  Okay.  And you would agree, would you not, that if there

24   was recordings made about what is asked and answered and later

25   brought into court, a jury wouldn't -- it would be very easy

Fry – Cross by Mr. Esper

1    for a jury to hear what was said and what wasn't said, correct?

2    A.  It would be easy for them to hear the recording, yes, sir.

3    Q.  Yes.  Okay.  Now this statement about $600 million,

4    allegedly, to be transported from the United States into

5    Mexico, when you asked Mr. Delgado about that he just said, I

6    just refuse -- I don't know whether that is drug money or not,

7    correct?

8    A.  He said that he did not know.

9    Q.  And he didn't want to know?

10   A.  And he didn't want to know.  Yes, sir.

11   Q.  He first said, I don't know whether it is or not, and very

12   candidly, I don't want to know.

13   A.  Yes, sir.

14   Q.  Correct?  All right.

15          That's what you have written down in a report that you

16   prepared, correct?

17   A.  I did write that.  Yes, sir.

18   Q.  Okay.  Were you the only agent that was interviewing?

19   A.  My co-case agent, Gabriel Aguirre, was also in the room

20   with me.

21   Q.  Okay.  And basically when you have two agents, one person

22   is asking the questions and the other one is kind of taking

23   notes and a little of both, correct?

24   A.  That's the best practice to do it, yes, sir.

25   Q.  Okay.  And you would agree that note-taking is not an exact

Fry – Cross by Mr. Esper

1   art, is it?

2   A.  If it is, I am not familiar with it, sir.

3   Q.  Okay.  And in fact, sometimes when you take notes, there

4   may be mistakes in notes.  You can't read them afterwards?

5   A.  It is possible, yes, sir.

6   Q.  Okay.  Now he also mentioned to you, in connection with the

7   question that you asked him, that people in Mexico who were

8   wealthy were somewhat unorthodox with their money and they were

9   suspicious, or they wanted to try to hide it from other family

10  members or people that were going to rob them, correct?

11  A.  That he made that statement?

12  Q.  Yes.

13  A.  Yes, sir.

14  Q.  Okay.  And do you know -- and if you don't simply say so --

15  whether there are a number of business people in Mexico,

16  wealthy people, who have been the subject -- or who have been

17  the recipients of robberies and kidnappings and extortions,

18  correct?

19  A.  I think every nation in the world, probably.

20  Q.  I'm not saying you have any personal knowledge of anything.

21  But as an agent, you're aware of that happening, correct?

22  A.  Yes, sir, I am.

23  Q.  Yeah.  And just like in any country, those who are wealthy

24  are always prime targets for people who want to engage in

25  kidnapping, ransoms, extortions, correct?

Fry - Cross by Mr. Esper

1   A.  Yes.  Wealthy people can always be subject or targets of

2   that type of activity.

3   Q.  Okay.  Now, let's talk about this government's exhibit --

4   this settlement agreement and general release.

5   A.  Yes, sir.

6   Q.  That was a document -- did you actually show Mr. Delgado

7   this document?

8   A.  Yes, sir.

9   Q.  Okay.  And when he looked at it, he said he didn't remember

10  if he wrote up the lawsuit or not, correct?

11  A.  Yes.  He said he -- absolutely.  What you just said, sir.

12  Q.  Did he deny ever having seen this, or he just said, I don't

13  remember if I wrote it up or not?

14  A.  He denied ever remembering having wrote it up or not.

15  Q.  Okay.  And then when -- did you show him the whole --

16  however many pages it is?

17  A.  No.  I didn't flip through the entire thing, no, sir.

18  Q.  Okay.  Did you show him the last page where it says,

19  Attorney for Plaintiff, Victor Pimentel?

20  A.  No.  I think I just held the --

21  Q.  Okay.

22  A.  -- it in my hand.

23  Q.  And he also indicated to you that if Victor had it, that

24  then either -- probably either he, Mr. Delgado, or somebody

25  else may have prepared the document?

Fry - Cross by Mr. Esper

1   A.   He told me that if Victor had it, that either he, Delgado,

2   had prepared it, or someone else involved in the money

3   operation would have prepared it, yes, sir.

4   Q.   Okay.  And he also said that Victor Pimentel was just not

5   some college kid.  He was kind of a pretty savvy, sophisticated

6   young man?

7   A.   Yes, sir.

8   Q.   Okay.  And certainly, he tried to portray that here in this

9   courtroom, didn't he?

10          THE COURT:  Portray what?

11   BY MR. ESPER:

12   Q.   That he was pretty savvy and sophisticated.

13          MS. ARREOLA:  Objection, Your Honor.

14          Your Honor, this is a question --

15          THE COURT:  I'll sustain the objection.

16          MR. ESPER:  What was the objection, Your Honor?

17          THE COURT:  What was the objection?

18          MS. ARREOLA:  Your Honor, that's a question for the

19   jury.

20          THE COURT:  Okay.  I'm sustaining the objection.

21          Go on, Mr. Esper.

22   BY MR. ESPER:

23   Q.   Okay.  Now, he also -- you also asked him again about the

24   Chicago matter, and he mentioned a man by the name of Quezada,

25   correct?

Fry – Cross by Mr. Esper

1    A.  Yes, sir, he did.

2    Q.  And he claimed that this was a relative of Lilian de Concha

3    [sic]?

4    A.  Yes.

5    Q.  And that if anybody was involved in illegal drug

6    trafficking, that possibly this guy was?

7    A.  Marco stated he –– if –– he believed if anybody was

8    involved in drug trafficking it would be this guy, Jose

9    Quezada.

10   Q.  Okay.  At no time did Mr. Delgado say to you, Yes, I know

11   this is drug proceeds.  These are drug trafficking funds that

12   were involved in this case?

13   A.  To the contrary, sir.  He said he never knew if this was

14   drugs and didn't want to know if this...

15   Q.  Okay.  Now, he also went on to relate to you this *Mundial*

16   life insurance scenario, correct?

17   A.  Yes, sir.

18   Q.  Okay.  And if I understand this correctly, they were trying

19   to set up some sort of program where people who came to the

20   United States could buy this life insurance, so that if

21   anything happened to them in the United States that they died,

22   they would have insurance to be transported back to Mexico and

23   be buried in their native country?

24   A.  My understanding was that it wasn't an option.  That any

25   Mexican national that came to the U.S. would have to buy this.

Fry – Cross by Mr. Esper

1   Q.  Okay.  So he was trying to get a program implemented

2   through authorities, Mexican authorities, that any person who

3   visited the United States with a visa had to buy this insurance

4   program?

5   A.  Yes.  Yes, sir.

6   Q.  And of course, according to what Mr. Delgado told you, that

7   Ms. Lilian de Concha [sic] had bought into this investment and

8   had sent him half a million dollars to get it off the ground?

9   A.  It was actually –– what Mr. Delgado told me –– an

10  ex-boyfriend of Lilian.  And he –– it was his money.  He bought

11  into the program.

12  Q.  Okay.  And he actually gave you the name of the person,

13  didn't he?

14  A.  I already knew the name of the individual and asked him

15  about this.

16  Q.  Okay.  And have you determined whether that individual is a

17  real person?

18  A.  I have heard that he may not be alive any- –– died of

19  natural causes, maybe.

20  Q.  That he may have died?

21  A.  Yes.

22  Q.  Subsequent to 2007 or before then, if you know?

23  A.  I'm not sure.

24  Q.  Okay.  And this money actually was wire transferred,

25  according to your investigation, from a bank in Switzerland,

Fry - Cross by Mr. Esper

1    correct?

2    A.  Yes, sir.  UBS bank, I believe.

3    Q.  Okay.  And the individual's name, did you determine

4    whether -- in your investigation, whether the -- who the

5    account belonged to in Switzerland?

6    A.  Well, the wire instructions, they give me the -- the

7    account number.

8    Q.  And the name -- and the holder of the account?

9    A.  That was the individual's name, yes, sir.

10   Q.  Okay.  His name was Isaac Cohen?

11   A.  Yes.

12   Q.  Okay.  And again, you believe that he has subsequently --

13   or he has -- at some point is deceased?

14   A.  I have heard he might have died of some type of natural

15   causes, that he was an older gentleman.

16   Q.  Okay.  And that Mr. Delgado told you this was the

17   ex-boyfriend of Ms. de la Concha?

18   A.  Yes, sir.

19   Q.  Okay.  Did he tell you that he put the money into his

20   girlfriend's account because he didn't want her, the

21   girlfriend, to know that this -- that he was involved with

22   Ms. de la Concha?

23   A.  No.

24   Q.  He didn't tell you that?

25   A.  No, sir.

Fry - Cross by Mr. Esper

1   Q.  Okay.  And Mr. Delgado represented to you that -- that all

2   that money had been spent trying to get this business off the

3   ground which never got off the ground?

4   A.  That's what he told me, sir.

5   Q.  Okay.  He also told you that he would do anything to keep

6   from going to jail, correct?

7   A.  Yes, sir.

8   Q.  Okay.  And that pretty much concluded that interview, did

9   it not?

10  A.  Yes, sir.

11  Q.  Okay.  Now, Agent Fry, as the case agent, you are

12  responsible for gathering evidence in any investigation for the

13  purpose of presenting it to the United States Attorney's Office

14  so they can make a determination whether to go forward with the

15  case, correct?

16  A.  Yes, sir.

17  Q.  And the other reason for gathering evidence is so that if

18  the case goes to trial, a jury can hear that evidence, correct?

19  A.  Yes, sir.

20  Q.  Okay.  And some of that evidence involves investigative

21  reports that are prepared, correct?

22  A.  That's part of the evidence, yes, sir.

23  Q.  Okay.  Recordings when possible, correct?

24  A.  Yes, sir.

25  Q.  And would -- you would agree that recordings can be a very

Fry - Cross by Mr. Esper

1  powerful form of evidence; is that right?

2  A.  I would absolutely agree that recordings can be a powerful

3  form of evidence.

4  Q.  Okay.  And the more recordings that you have, the more

5  evidence can be presented to a jury, both favorable and

6  sometimes unfavorable to the government's case, correct?

7  A.  Yes.  The more evidence -- or the more recordings, that is

8  more evidence.  I mean, the jury will decide --

9          THE COURT:  Haven't we been through this before?

10  A.  -- whether it's favorable or unfavorable.

11         THE COURT:  Where are he headed, Mr. Esper?

12         MR. ESPER:  May I have just a moment?

13         THE COURT:  You may.

14  BY MR. ESPER:

15  Q.  Mr. Fry, do you know -- and if you don't, simply say so --

16  whether you or any other law enforcement agents ever sent

17  somebody in an undercover capacity to Mr. Delgado's office

18  sometime between 2008 and 2012?

19  A.  Yes, sir, I did.

20  Q.  You did?  Okay.

21  A.  It wasn't an undercover.  It was a confidential informant.

22  Q.  Okay.  A person who was a confidential informant that you

23  sent over there to try to engage Mr. Delgado in participating

24  with some sort of money laundering operation, correct?

25  A.  Yes.  She went over there with -- I believe we sent her in

1    with a bank statement.  And she talked to Mr. Delgado about

2    money that she had received from her brother who had died, who

3    was involved in narcotics trafficking, and asked Mr. Delgado

4    the best way to -- what to do with that money.

5    Q.  Yeah.  And she actually told him, This is money from drug

6    trafficking, correct?

7    A.  She told him that he was involved in that life and that's

8    why he was killed.

9    Q.  Okay.

10   A.  Which was actually true.  Her brother actually --

11   Q.  Was?

12   A.  -- was involved and killed in drug trafficking.

13   Q.  Okay.  And Mr. Delgado just said, Look.  I -- that's

14   against the law.  I'm not going to do that, correct?

15   A.  Mr.- -- well, he made many statements on the recording.

16   But the summation of it is, is that that sounds like money

17   laundering, and he had gotten in a lot of trouble with ICE.

18          And she seemed like a nice girl and that she

19   shouldn't --

20   Q.  Be doing that?

21   A.  -- be messing around with stuff like that.

22          MR. ESPER:  Okay.  May I have just one more moment,

23   Your Honor?

24          THE COURT:  You may.

25

Fry - Cross - Redirect by Ms. Arreola

1    BY MR. ESPER:

2    Q.  You personally have never interviewed or talked with Lilian

3    de la Concha, have you?

4    A.  No, sir.

5    Q.  Okay.  And you don't know whether she was ever here in the

6    United States at any time, do you?

7    A.  I know -- I know that there are records of her crossing

8    into the United States.  I have not personally seen her here.

9    Q.  Okay.  When you say there are records of her crossing into

10   the United States, there is not a record of her crossing into

11   the United States on or about October of 2008, when

12   Mr. Pimentel says she crossed over?

13   A.  Not that I've seen, sir.

14   Q.  Pardon me?

15   A.  I have not seen a record of that.

16   Q.  Okay.  And as a matter of fact, you queried all entries

17   that she has made into the United States.  Is that fair?

18   A.  Yes.  We've done that several times, yes.

19        MR. ESPER:  Pass the witness, Your Honor.

20        THE COURT:  Ms. Arreola?

21                    REDIRECT EXAMINATION

22   BY MS. ARREOLA:

23   Q.  Agent Fry, Mr. Esper asked you if Mr. Pimentel had been

24   honest when he told you he hadn't been paid.

25        Isn't it a fact that when Mr. Esper asked Mr. Pimentel

1   if he had been paid, he asked him if he had been paid to

2   testify in this case?

3   A.  That is what I heard.

4   Q.  Was Mr. Pimentel ever paid to testify in this case?

5   A.  Absolutely not, nor would we ever pay somebody to testify.

6   That's illegal, by my understanding.

7          MR. ESPER:  Your Honor, I'm going to object.  Counsel

8   is misstating the first -- she stated correctly the first part

9   of the question.  But then I modified the question and asked

10  him if he had been paid in connection with this investigation.

11         THE COURT:  Overruled.

12  BY MS. ARREOLA:

13  Q.  Now, Mr. Esper also asked you if there was independent

14  evidence that Victor Pimentel had contacted El Paso about the

15  Chicago deal.  Do you recall those questions?

16  A.  Yes.

17  Q.  Well, isn't it independent evidence, given that El Paso did

18  contact Chicago to set up the deal?

19  A.  Yes.  There are lots of independent evidence:  The

20  recordings, reports, agents that have testified in this court,

21  that...

22  Q.  Would Chicago have become involved without Mr. Pimentel

23  alerting them?

24  A.  It's possible Victor could have just called the duty agent

25  in Chicago and asked for somebody, yes.

Fry - Redirect by Ms. Arreola

1  Q.  But all of this started because Victor Pimentel gave notice

2  to the agency?

3  A.  Yes.

4  Q.  Mr. Esper also asked you if it's sometimes possible that

5  mistakes are made in notes.

6         When you testified today, you were testifying to

7  actual statements that Mr. Delgado made during the interview

8  that you remember; is that right?

9  A.  Yes, ma'am.

10 Q.  Okay.  And you weren't testifying based on what's in your

11 notes?

12 A.  I'm testifying to things that are in my notes, things that

13 he said.  I'm testifying to many things, yes.

14 Q.  Those things may be in your in notes, but you're testifying

15 based on your memory sitting here today about what you recall

16 from that interview?

17 A.  Absolutely.  He told --

18        MR. ESPER:  Objection.  Asked and answered.

19        THE COURT:  Already answered again.

20        Go on.

21 BY MS. ARREOLA:

22 Q.  Mr. Esper also asked you, Isn't it true that there are

23 wealthy people in Mexico who get threats because they have

24 property in Mexico?

25        Do you recall that line of questioning?

Fry - Redirect by Ms. Arreola

1    A.  Yes, I do.

2    Q.  Wouldn't those wealthy people in Mexico be trying to take

3    their money from Mexico to the United States rather than the

4    other way around, if they're getting threats in Mexico?

5            MR. ESPER:  Calls for speculation on the part of this

6    witness.

7            THE COURT:  I'll sustain the objection.

8    BY MS. ARREOLA:

9    Q.  Mr. Delgado -- Mr. Esper also asked you questions about

10   Mr. Delgado's statements regarding that bogus settlement

11   agreement.

12           Do you recall those questions?

13   A.  Yes, I do.

14   Q.  I'm going to show you what's already been admitted into

15   evidence as Government's Exhibit 30 -- excuse me -- what's been

16   admitted into evidence as Government's Exhibit 31.

17           Do you recognize this document?

18   A.  Yes.

19   Q.  What is it?

20   A.  This is one of the e-mails that Mr. Delgado sent Victor

21   Pimentel in relation to the false oil settlement.

22   Q.  Okay.  And isn't this e-mail from Mr. Delgado sending the

23   settlement agreement to Mr. Pimentel?

24   A.  I'm not sure if -- does it have the attachment on here?

25   Q.  Yes.

1    A.  Yes.  That is that one, uh-huh.

2              MS. ARREOLA:  Okay.  Your Honor, request to publish to

3    the jury.  This one has already been admitted.

4              THE COURT:  You may publish.

5              MS. ARREOLA:  Okay.  Sorry, Your Honor.

6    BY MS. ARREOLA:

7    Q.  And I'm also going to show you what has already been

8    admitted into evidence as Government's Exhibit 32.

9              Do you recognize this?

10   A.  Yes, I do.

11   Q.  What is that?

12   A.  This is a screen shot from the iPhone of Victor Pimentel of

13   the e-mail that was sent back in September of 2007 asking if he

14   had received the settlement.

15   Q.  Okay.  And this is the screen shot showing the actual

16   settlement agreement attached to the e-mail from Mr. Delgado?

17   A.  This is the screen shot of the e-mail with the Word

18   document attached, yes, ma'am.

19   Q.  Were you present when this screen shot was taken?

20   A.  I was standing right next to him.

21   Q.  And this was at the U.S. Attorney's Office?

22   A.  Yes, ma'am, it was.

23              MS. ARREOLA:  Your Honor, may I have a moment?

24              THE COURT:  You may.

25              MS. ARREOLA:  Your Honor, no further questions.

1          THE COURT:  Mr. Esper?

2          MR. ESPER:  I have nothing further, Your Honor.

3          THE COURT:  Very well.  You may be excused, sir -- or

4   excused from testifying.

5          Call your next witness.

6          MS. KANOF:  Your Honor, the Government rests.

7          THE COURT:  Very well.  We need to take a break, don't

8   we?

9          Ladies and gentlemen of the jury, we need to take up

10   certain matters before we proceed, so we're going to let you go

11   for 15 minutes.

12          The jury is going to be excused for the next 15

13   minutes.

14          (Open court; outside the presence of the jury.)

15          THE COURT:  You may be seated.

16          Do you have a motion?

17          MR. ESPER:  Yes, Your Honor.

18          Comes now the Defendant, Marco Antonio Delgado, and

19   pursuant to Rule 29(a) of the Federal Rules of Criminal

20   Procedure and at the conclusion of the Government's

21   case-in-chief, moves for a Judgment of Acquittal as to the

22   one-count Indictment that is alleged in Case Number

23   EP-12-CR-2106 which is, of course, the case that we're here

24   before the Court.

25          It is the contention of the defendant that no rational

1    trier of fact could conclude beyond a reasonable doubt that all

2    of the elements alleged in the Indictment have been proven.

3         Specifically —— and of course it's a three-part

4    factual allegation with respect to money laundering —— the

5    defendant contends that a rational trier of fact could not

6    conclude beyond a reasonable doubt that the Government has

7    shown that Mr. Delgado knew or reasonably believed that the

8    proceeds of the money that was seized on September 7th, 2007,

9    and/or on July 22nd/23rd of 2008, were actually the proceeds of

10   specified unlawful activity; specifically, conspiracy to

11   possess with intent to distribute a controlled substance.

12        That was alleged in subparagraph A of Count 1.

13        Or —— and/or that he attempted, knowing that the

14   transaction was designed in whole or in part to conceal and

15   disguise the nature of the proceeds of the specified unlawful

16   activity, that he engaged in some sort of financial

17   transaction.

18        Subparagraph B, the defendant would contend also that

19   no rational trier of fact could conclude beyond a reasonable

20   doubt that the defendant, with respect to a monetary

21   instrument, or in this case funds, knew that the proceeds of ——

22   that the funds were derived from the proceeds of specified

23   unlawful activity, and that specified unlawful activity is the

24   conspiracy to possess with the intent to distribute a

25   controlled substance.

1          What the Government has done in this case is basically

2     argue circumstantially that these funds had to have come from

3     the distribution of controlled substances or a conspiracy to do

4     that, because nobody else would have those kinds of funds

5     available to them in bulk cash quantity.

6          And finally, number three, subparagraph 3, the

7     Government -- the defendant contends, pursuant to Rule 29(a),

8     that no rational trier of fact could conclude beyond a

9     reasonable doubt that the defendant, knowing that the proceeds

10    were derived from specified unlawful activity, again,

11    conspiracy to possess with intent to distribute a controlled

12    substance, moved or attempted to move from a place in the

13    United States through a place outside of the United States,

14    knowing that the funds involved in the transportation were

15    designed in whole or in part to avoid a transaction reporting

16    requirement.

17          I don't think there's been any evidence here that

18    there was any intent to avoid a transaction reporting

19    requirement.

20          And so for -- and so with respect to subparagraph C of

21    Count 1 of the Indictment, the defendant contends that no

22    rational trier of fact can conclude that the Government has

23    proven that paragraph or subparagraph of Count 1.

24          Move for judgment of acquittal on all three of the

25    subparagraphs A, B, and C of Count 1 of the Indictment.

1              THE COURT:  Motion for Judgment of Acquittal is

2     overruled.

3              Counsel, do you have anything?  I understand you

4     wanted to put something on the record?

5              MR. VELARDE:  I would like to request a brief recess

6     to visit with Mr. Delgado.

7              THE COURT:  Okay.  I'll give you a few minutes to

8     decide what we will proceed with.

9              We'll be in recess for the next 10 minutes.

10              (Recess; open court; outside the presence of the

11     jury.)

12              THE COURT:  What do we have, Counsel?

13              MR. ESPER:  May we approach the bench, Your Honor?

14              THE COURT:  You may approach.

15              (Bench discussion outside the hearing of the jury.)

16              MR. ESPER:  Your Honor, for the record, Mr. Delgado is

17     wanting to waive his right to remain silent and testify.

18     Having said that, that election is contrary to the professional

19     and legal advice that Mr. Velarde and I have expressed to him.

20              It is our belief, both professionally and legally,

21     that he should not testify.  However, it is his right, if he

22     chooses to testify, and that's the -- and he is exercising that

23     right.

24              But I want to make it clear for the record that both

25     Mr. Velarde and I have recommended to him, as his counsel, that

1    he not testify, that he remain silent and stand on his

2    constitutional right to remain silent.

3          THE COURT:  Do you want to put anything on the record

4    with him on here?

5          MR. ESPER:  No.

6          THE COURT:  It's up to you.

7          MR. ESPER:  No.

8          MS. KANOF:  You don't?  Okay.

9          MR. VELARDE:  Yeah.

10         THE COURT:  Call him up.

11         MR. VELARDE:  Judge, I also want to make known for the

12   record -- I also want to make known for the record, and the

13   Court can visit with Mr. Delgado about this matter.  We have

14   discussed this very subject with him on numerous times long

15   before this trial.

16         And just this morning, again I visited with him,

17   and -- just to make doubly sure that he understands what he's

18   doing -- I spoke to his mother, who is present in the

19   courtroom, accompanied by her first cousin.  And they advised

20   me that Mr. Delgado has also expressed to them a desire to

21   testify.  So consequently, it looks to me like he's very firm

22   on that decision.

23         THE COURT:  Okay.  I understand.  I understand

24   perfectly.  But I want to hear it from him too.  Get him up

25   here.  I think you all should have it on the record.

```
1                 (Defendant at the bench.)

2                 THE COURT:  You have to speak in here so we can have

3       it on the record.

4                 It's my understanding, Mr. Delgado, that your

5       attorneys have -- have advised you that, quite frankly, that

6       you shouldn't testify.  Do you understand that?

7                 THE DEFENDANT:  I do.  And it's correct that they

8       have.

9                 THE COURT:  Okay.  And it's my understanding also that

10      you are not taking their advice and you wish to testify.

11                THE DEFENDANT:  I wish to exercise my right to do so,

12      yes, sir.

13                THE COURT:  You understand that you will be subject to

14      not only questions from them, you'll be subject to questions

15      from the Government and you must answer them.

16                THE DEFENDANT:  I'm clear on that.

17                THE COURT:  Okay.

18                MS. KANOF:  May I add something, Your Honor?

19                THE COURT:  Yes.

20                MS. KANOF:  Mr. Delgado, you understand that there are

21      legal consequences to your testimony as well, that any defect

22      in the record by the Government -- or many of the defects, if

23      there are any in the record by the Government, will no longer

24      exist and will no longer be the basis of an appeal -- or

25      success on an appeal if you testify.
```

1           That you're basically also eliminating a lot of issues

2   that your counsel could bring up on appeal that would assist

3   you.

4           THE DEFENDANT:  My counsel has thoroughly advised me

5   of consequences.

6           THE COURT:  Okay.  Okay.  We'll get started in five

7   minutes.

8           THE DEFENDANT:  Thank you, sir.

9           MR. ESPER:  Thank you, Your Honor.

10          (End of bench conference.)

11          THE COURT:  We'll be in recess for the next five

12   minutes.

13          The Government has rested, and I understand you have a

14   witness, Mr. Velarde?

15          MR. VELARDE:  Yes, sir, I do.

16          THE COURT:  Okay.  We'll get started in five minutes.

17          (Recess taken; open court; jury present.)

18          THE COURT:  You may be seated.

19          Is the defense ready to proceed?

20          MR. VELARDE:  Yes, Your Honor.

21          THE COURT:  Call your witness.

22          MR. VELARDE:  Marco Antonio Delgado.

23          (Defendant duly sworn.)

24          THE DEFENDANT:  I do.

25          THE COURT:  You may proceed, Mr. Velarde.

```
1            MR. VELARDE:  Thank you, Your Honor.

2            MARCO ANTONIO DELGADO, DEFENDANT, SWORN

3                   DIRECT EXAMINATION

4    BY MR. VELARDE:

5    Q.  Mr. Delgado, how are you employed?

6    A.  I'm an attorney.

7    Q.  And when -- what year were you -- did you graduate from law

8    school?

9    A.  '93.

10   Q.  And you became a member of the bar what year?

11   A.  '96.

12   Q.  You graduated from which law school?

13   A.  Texas Tech University, in a joint program with a French

14   university, Université Jean Moulin.

15   Q.  And so following your successful bar examination, did you

16   initiate your legal career here in El Paso?

17   A.  I did.

18   Q.  And who did you go work for?

19   A.  For a law firm, a local law firm, Delgado & Acosta, back

20   then.

21   Q.  Very well.  And how long did you work at that firm?

22   A.  10 years.

23   Q.  So you started in what year again?

24   A.  '90- -- at the end of '95.

25   Q.  And you worked there for 10 years?
```

Delgado – Direct by Mr. Velarde

1   A.  Yes.

2   Q.  Until the end of 2005?

3   A.  It was approximately March of '05.

4   Q.  So approximately nine and a half years?

5   A.  Uh-huh.

6   Q.  Very well.  Now following your departure from this law

7   firm, did you continue practicing law?

8   A.  Yes.

9   Q.  Where was that?

10  A.  Here in El Paso on my own, under Delgado & Associates.

11  Q.  And what kind of work were you primarily involved with --

12  A.  Strictly --

13  Q.  -- as on attorney?

14  A.  Sorry.

15       Strictly corporate, focusing on energy matters.

16  Q.  Okay.  Did your work take you to Mexico City?

17  A.  Yes.  Uh-huh.

18  Q.  And did you develop a practice in Mexico City also?

19  A.  I did.

20  Q.  And in connection with the work that you started in Mexico

21  City, did you come to meet people down there?

22  A.  Yes.

23  Q.  Political people?

24  A.  Yes.  Uh-huh.

25  Q.  Labor people?

1    A.  Yes.

2    Q.  Let me ask you.

3         With regards to the political people that you came to

4    meet, who are some of the people that you met in connection

5    with your work?

6              MS. KANOF:  Objection, Your Honor, relevance.

7              THE COURT:  Well, I'll permit it.

8              Overruled.

9    BY MR. VELARDE:

10   Q.  Sir, answer the question.

11   A.  Because of the type of work that we were doing for our

12   clients, it would be very common to be dealing with the

13   minister of energy, for instance, with the CEO of a state-owned

14   electric or other utilities in place.

15        Obviously, the labor unions that play a big role in

16   the political life of Mexico and the decisions that are made,

17   part of the administration.

18   Q.  Did you meet Lilian de la Concha during this time period?

19   A.  Yes.  I was actually still at the old firm -- in my old

20   firm when I first met Ms. de la Concha.

21   Q.  And when you first met Ms. de la Concha, was she already --

22   was she still married to Vicente Fox at that point?

23   A.  Yes.

24   Q.  Very well.  And then subsequent to that, did you continue

25   your contacts with Ms. de la Concha?

Delgado - Direct by Mr. Velarde

1    A.  Yes.

2    Q.  When you left Delgado Acosta and you went to go work -- or

3    develop a business down in Mexico City -- did you have contacts

4    with her?

5    A.  Yes.

6    Q.  And once you developed these contacts with her did she, in

7    turn, introduce you to other business people down there?

8    A.  Uh-huh.

9              THE COURT:  Yes?

10   BY MR. VELARDE:

11   Q.  Is that yes?

12   A.  Yes.

13   Q.  Okay.  And I'd like to ask you to please visit with me

14   about events that you went to with Lilian de la Concha.

15             Did you visit -- did you have an occasion to

16   participate at a wedding with Ms. de la Concha?

17   A.  Several.

18   Q.  Very well.  And during the course of these visits, or these

19   social events, did she, in turn, introduce you to other people

20   like Paco Fernandez?

21   A.  Amongst others, yeah, uh-huh.

22   Q.  Amongst others?

23   A.  Yes.

24   Q.  Okay.  So she introduced you to Paco Fernandez.  Who else

25   did she introduce you to?

Delgado - Direct by Mr. Velarde

1    A.  Well, a lot of, you know, entrepreneurs from Mexico,

2    business leaders.  She was somebody that was helping me develop

3    my practice.

4    Q.  Did she introduce you to Nareo Vargas, or how did you meet

5    Nareo Vargas?

6    A.  Well, Nareo Vargas I knew from before because of the work

7    that I did with a Mexican state-owned electric company, him

8    being one of the key leaders of the labor union.

9    Q.  Which labor union does he -- is he a -- what rank or

10   position does he hold with the labor union?

11   A.  He's currently the secretary of labor of work within the

12   labor union.

13   Q.  Okay.  I'd like for you to bear with me.  We're talking

14   about the year 2005 and thereafter, okay?

15          So when you first met Mr. Vargas, was he a labor

16   leader already?

17   A.  Yes.

18   Q.  Okay.  And which labor union is that?

19   A.  It's the SUTERM, which is the state-owned electric

20   company's labor union.

21   Q.  And approximately what time period did you meet Mr. Vargas?

22   A.  Probably late '90s.

23   Q.  Did you meet anybody else through your association with

24   Mr. Vargas?  Did he introduce you to other people?

25   A.  Yes.  Actually, his -- his staff or his employees.

Delgado – Direct by Mr. Velarde

1    Q.  Among those employees that he introduced you to, did he

2    introduce you to Victor Pimentel?

3    A.  Yes.

4    Q.  How was Victor Pimentel associated with Nareo Vargas?

5    A.  He was actually his -- his assistant for his personal

6    things outside of the -- of the labor union.  So if we were

7    going to have a meeting, for instance, regarding the company

8    that he represented, then we would deal directly with -- with

9    Vargas or his other assistants.

10            If it was a personal issue of Mr. Vargas, then we

11   would go through Victor.

12   Q.  And when did you first meet Victor, Victor Pimentel,

13   approximately?

14   A.  I don't know.  Around 10 years ago.

15   Q.  That would have been 2003?

16   A.  Yeah, around there.  Uh-huh.

17   Q.  So you met Victor before you left Delgado Acosta?

18   A.  Yes.

19   Q.  And you had already met Nareo Vargas before you left

20   Delgado Acosta?

21   A.  Yes.

22   Q.  Okay.  As well as Lilian?

23   A.  Yes.

24   Q.  Okay.  Now, fast-forward to 2006.  She introduced you to

25   Paco Fernandez?

1    A.  She did.

2    Q.  And how -- who was Paco Fernandez, when she introduced you,

3    or how did she introduce Paco Fernandez to you?

4    A.  Well, first of all, this was at her daughter's wedding, and

5    he was part of the center table, the table of honors, so to

6    speak.  So obviously, amongst him it was President Fox, other

7    political figures in Mexico, so he had some hierarchy.

8          So he was presented to me as the representative of a

9    management consultant firm that had strong links with the

10   European Union.

11   Q.  Following this introduction to Mr. Fernandez, did you have

12   any business contact with him?

13   A.  Yes.  Uh-huh.

14   Q.  What was the nature of the business discussions that you

15   engaged in with Mr. Fernandez?

16   A.  Well, there were several.  They do a lot of consulting in

17   terms of real estate.  And at that time was when we were at the

18   market peak.  I mean, real estate was in a real boom, so they

19   had very interesting leverage opportunities using European

20   currency, so those were the initial contacts that we had.

21          Eventually, whenever he needed some sort of assistance

22   from the U.S. in terms of a question or a recommendation or --

23   he would, you know, shoot an e-mail or we would discuss what

24   could be done.

25   Q.  Okay.  And did Mr. Fernandez, in turn, introduce you to

1    other people?

2    A.  He did.

3    Q.  Who are those people that he introduced you to?

4            Well, let me rephrase my question.

5            Did he introduce you to Pedro Mendoza Meneses?

6    A.  He did.

7    Q.  And who is -- how did Mr. Fernandez introduce Mr. Mendoza

8    Meneses?  What line of work was he supposed to be in?

9    A.  He actually did -- or at least it was represented to me --

10   that he did tax work, so he was an adviser.  He's a CPA, from

11   what I understand.

12   Q.  And did you engage -- did you have any more contacts with

13   any other people associated with Mr. Fernandez?

14   A.  Just with Ms. de la Concha.

15   Q.  Very well.  Now, does Ms. de la Concha have children of her

16   own?

17   A.  She has.

18   Q.  Were any of those children involved with Girl Scouts in

19   Mexico?

20   A.  When President Fox takes office -- this is after the

21   separation with his wife, Ms. de la Concha -- he designates his

22   elder daughter to be the first lady, of sorts, of the country.

23   So for the first two or three years of the Fox administration

24   you see his daughter taking that center stage --

25           MS. KANOF:  Objection, Your Honor, nonresponsive.

1          THE COURT:  Overruled.

2   A.  -- and being the actual figurehead, you know, honorary

3   chairman of the Red Cross, of the children's welfare fund, of

4   the Girl Scouts of Mexico chapter.

5   BY MR. VELARDE:

6   Q.  Did you have a -- did you speak to this lady?  Were you --

7   did you have a relationship with this lady?

8   A.  No.  I mean, I attended some of her events.

9   Q.  Okay.  And of course she knew that you were dating her mom?

10  A.  Yes.

11  Q.  Okay.  Was your relationship with Ms. de la Concha an open

12  relationship down in Mexico City?

13  A.  Yeah.

14  Q.  Okay.  Now, did there come a time when -- when there were

15  discussions between you and Nareo Vargas regarding business

16  activities that he had here in the United States?

17  A.  From the very beginning.

18  Q.  What exactly was discussed by you -- by you and Mr. Vargas?

19  A.  Well, a lot of it had to do with the presence of the labor

20  union in the U.S. with its sister chapter, so with their U.S.

21  counterpart.

22          It also had to do a lot -- he knew that I was deeply

23  vested in terms of relationships with bankers and what have

24  you.  So they also wanted to consult with regards to investment

25  strategies of their pension funds, and issues that would come

Delgado - Direct by Mr. Velarde

```
 1   up once in a while when they were preparing their audited
 2   statements.  So it was an ongoing relationship.
 3           And he would also use me to secure information in
 4   terms of market forecasts, what could be expected, hedging in
 5   terms of parity of the dollar with the peso, which at that time
 6   wasn't as stable as it is now.
 7   Q.  And all this service that you provided, not only for Nareo
 8   Vargas but for Paco Fernandez, were you compensated for that?
 9   A.  Well, not directly.  It was kind of reciprocal, in regards
10   to Nareo Vargas in particular.  Because when I needed something
11   in turn in Mexico, he would steer me in the right direction.
12   Q.  Okay.  Now, how was Victor Pimentel involved, if at all, in
13   these conversations that you had with Mr. Vargas?
14   A.  No, Victor Pimentel was strictly his -- his representative.
15   So whenever he needed information from me, he would actually
16   send Victor -- kind of like a messenger so to speak, so I
17   could, you know, provide the information or the service that he
18   might request.
19   Q.  You heard Mr. Pimentel discuss meetings that took place
20   down in Mexico City at the Camino Real, Le Cirque restaurant in
21   particular, where you were supposed to be present with Paco
22   Fernandez and Pedro Mendoza Meneses.
23           Do you have a recollection of those events?
24   A.  Those events never took place.  Those meetings that
25   supposedly were attended by members of shady organizations, if
```

1    he did have him, it wasn't with me present there.

2    Q.  There's a number of e-mails that have been offered into

3    evidence that touch upon some of the activities that you were

4    doing in Mexico.

5           And I'd like to visit with you about some of the

6    e-mails, not all of them.

7           Can you turn to Exhibit Number 4?

8           Now, in this e-mail dated August the 6th --

9    A.  Am I supposed to -- is it supposed to appear here or --

10   Q.  Is it on your screen?

11   A.  No.

12          Now it is.  Okay.

13   Q.  First of all, let me ask you.

14          Are you familiar with this e-mail?

15   A.  I am.

16   Q.  Have you seen it before today?

17   A.  Yes.

18   Q.  Okay.  I'd like to ask you a question or two about that.

19          Did you generate or participate in this e-mail

20   correspondence?

21   A.  Yes.

22   Q.  There's talk here about Girl Scouts, as a matter of fact.

23          (Reading:)  And, My love, in relation to the cookies

24   that you will look to see if you can place for the Girl Scouts,

25   they tell me that hopefully you can help them in schools to

Delgado – Direct by Mr. Velarde

```
 1   place more than five boxes.
 2          Did you -- were you privy to this?  Did you engage in
 3   this e-mail conversation?
 4   A.  I did.  And this is what happened.
 5          MS. KANOF:  Objection, Your Honor.
 6          THE COURT:  I'll sustain the objection.
 7   BY MR. VELARDE:
 8   Q.  The matters that you were touching upon, the Girl Scout
 9   cookies, what did that relate to?
10   A.  Donations to the organization.
11   Q.  Were you asked to provide a donation?
12   A.  For several years, yes.
13   Q.  Okay.  Now, did you make monetary donations or how were
14   these donations made?
15   A.  And that was part of the problem.  It wasn't just a matter
16   of cutting a check.  They actually wanted you to take
17   possession of the cookies.  And as you can imagine, after, you
18   know, a couple of years, they don't -- you know, they're not as
19   tasty as you would want.
20          And if you're making a sizeable contribution -- and
21   that's not very large.  But even $300, whatever it was, you
22   would end up with a big stack, and they wouldn't want that.
23          As part of the promotion strategy, they would want you
24   to be placing it with people that you would know, so the
25   following year you could actually be tapping into that -- that
```

Delgado - Direct by Mr. Velarde

1    network that was developing.

2    Q.  And so in this e-mail, where there's talk about five boxes

3    per school each week, were you supposed to deliver --

4              MS. KANOF:  Objection, Your Honor, leading.

5              THE COURT:  Overruled.

6    BY MR. VELARDE:

7    Q.  Mr. Delgado, answer the question.

8              Were you supposed to place these five boxes yourself?

9    A.  Or find people that would place them.  I would become

10   responsible.

11   Q.  Did you have people that were placing these boxes at these

12   schools?

13   A.  You know, at times I would.  I would have friends,

14   relatives, or actually my employees at that time to try to just

15   distribute them.

16   Q.  So whenever you made a contribution to Girl Scouts of

17   Mexico, let's call them, you in turn would get a big batch of

18   boxes.  And your responsibility was to place them, correct?

19   A.  To place them and also, according to the timetable of the

20   donation campaign.  So you would end up sitting for three

21   months with cartons with boxes of cookies.

22   Q.  And how many years did you do this?

23   A.  I don't know.  Probably six, seven.

24   Q.  Okay.  Did Girl Scout cookies -- was that a code word for

25   drugs and/or money?

 1   A.  No.

 2           MR. VELARDE:  Mr. Livingston, can I ask you to please

 3   pull up Exhibit 8A?

 4   BY MR. VELARDE:

 5   Q.  I would like you to draw your attention to this exhibit,

 6   Mr. Delgado.

 7           It's an exhibit from you to Victor Pimentel; is that

 8   correct?

 9   A.  Yes.

10   Q.  And you can see the translation:  You would question the

11   power.  Tell Ready.

12           Who is Ready?

13   A.  Ready is Isaac Ochoa, who's another employee –– or was

14   another employee at that time –– of Nareo Vargas.

15   Q.  Okay.  So this says, "Tell Ready to start preparing.  Next

16   week we are going to recommend him.  I need his résumé."

17   A.  Yes.

18   Q.  Okay.  What exactly were you contemplating when you said

19   that?

20   A.  Part of the business organization in which he operated with

21   Vargas was in the industrial restaurant business.  He was

22   employed there.  And he was seeking to move away from that, you

23   know, a step up.  A very competent individual, highly

24   qualified.

25           MS. KANOF:  Excuse me, Your Honor, I'm confused.  Is

Delgado - Direct by Mr. Velarde                    4 -    73

```
1    he talking about Rede?
2                MR. VELARDE:  Ready.
3                THE COURT:  Ready.
4                MS. KANOF:  Oh, okay.
5    BY MR. VELARDE
6    Q.  Go ahead, Mr. Delgado.  Finish.
7    A.  So he was kind of moving up.
8            And usually, just like here in the United States,
9    there are mentor/mentee relationships.  And Ready is one of
10   Nareo Vargas' -- or at the time, protégés.
11   Q.  Was Ready and Nareo and Victor Pimentel involved in the
12   same line of work for the union?
13   A.  Yes.  Restaurants for the labor union.
14   Q.  Now I notice that you said you would question the power.
15           Did you also attach to it a picture?
16   A.  Yes.
17   Q.  Is that picture in front of your screen?
18   A.  Yes.
19   Q.  Is that you on the left?
20   A.  It is.
21   Q.  And the lady in the middle is?
22   A.  Ms. de la Concha.
23   Q.  And the gentleman on the right?
24   A.  Ex-President Vicente -- Calderon, at that time,
25   president-elect.
```

Delgado - Direct by Mr. Velarde

1   Q.  Meaning that he had already been elected into office?

2   A.  Yes.

3   Q.  But he hadn't been sworn in?

4   A.  Correct.

5   Q.  And this picture was taken where?

6   A.  I think Mexico City.

7   Q.  Yes.  Okay.  Was it taken at or near the time of the

8   e-mail, which is September 2006?

9   A.  Yes.  Uh-huh.

10  Q.  And you were a guest at this function, I suppose, and

11  Ms. de la Concha was your -- was your date?

12  A.  Yes.

13  Q.  Okay.  When you talk about Ready and power, what were you

14  contemplating for Ready?

15  A.  It was very straightforward.  We wanted to see if he could

16  be placed because of his training, the degree that he had, in

17  the Customs Service.

18  Q.  And were you -- did you have an objective to place him at a

19  certain place, get him appointed to a certain place?

20  A.  He had been applying for some time and actually had a

21  stint, based on what he told us, working for them.

22          So he wanted to see if he could get a permanent

23  appointment to that.  And I actually got the message from

24  Vargas, via Pimentel, to see if there's any way we could

25  facilitate that.

Delgado - Direct by Mr. Velarde

1   Q.  And so you were -- was Ms. de la Concha going to help you

2   make the recommendation, or advance that recommendation further

3   up the --

4   A.  Yeah.  This is before the incoming administration took --

5   took office, so it's when you're having a lot of shuffling.

6   And yes, she was actually going to be a conduit to the agency

7   that would be able to receive it to help us --

8   Q.  Was Ready ever promoted to any position with Mexican

9   Customs?

10  A.  No.  No, no, no.

11  Q.  Now, I'd like to direct your attention to Exhibit 8B.

12          Can you see that e-mail up there?

13  A.  Yes.

14  Q.  If you go to the top of the e-mail -- first of all, you're

15  familiar with this e-mail?

16  A.  Yes.

17  Q.  If you go to the top it says, "She wants a new Suburban and

18  for us to pay her."

19          What do you --

20  A.  That's not on my screen.

21          MR. VELARDE:  Is it on the screen, 8B?  It's

22  Exhibit 8B.

23  A.  I have that, an e-mail, but not reading what you just said.

24  BY MR. VELARDE

25  Q.  Okay.  Does it have -- does it bear the mark, the Exhibit

1    Number 8B?

2    A.  It does.

3    Q.  Okay.  Okay.  I understand.

4            Go -- scroll down.

5            There's talk about a Suburban.  Let me cut to the

6    chase.  In this e-mail there's mention of a Suburban.

7            Do you have a recollection of what was meant, what you

8    meant by that?

9    A.  No.  That was actually the purchase of a vehicle for

10   operations in Mexico.

11   Q.  And whose responsibility was it to buy this Suburban?

12   A.  It was Pimentel's.

13   Q.  Okay.  And were you going to be involved in the purchase of

14   the Suburban?

15   A.  Yes.  I was actually asked to see if I could help him

16   secure the -- the vehicle.

17   Q.  And so was this Suburban for Mr. Pimentel?

18   A.  No.

19   Q.  That's what I meant.  Who ultimately was this Suburban for?

20   A.  An individual that was promoting a candidacy for a state

21   office.

22   Q.  And do you recall who that individual was, if you do recall

23   at all?

24   A.  I believe Raul Aceves.

25   Q.  Okay.

Delgado - Direct by Mr. Velarde

1  A.  From the state of Mexico.

2            MS. KANOF:  I'm sorry.  Who?

3            MR. VELARDE:  Raul Aceves.

4  BY MR. VELARDE:

5  Q.  And so what -- what was the significance -- why -- why a

6  Suburban to Mr. Aceves?  Was that supposed to be a gift?

7  A.  No.  That was actually supposed to assist for his

8  pre-campaign, so he would have a vehicle to move around.  In

9  other words, we were being asked by individuals who were asking

10 their support, in turn.

11 Q.  Well, inasmuch as this was a gift -- was it a gift to this

12 political candidate or --

13 A.  No, it was --

14 Q.  -- just a loaner?

15 A.  Yeah, until the end of the campaign.

16 Q.  This -- this Suburban had nothing to do with a payoff to

17 a --

18 A.  No.

19 Q.  -- an organization?

20 A.  Nothing.  And as a matter of fact, that's why I was asking

21 Victor to do it, to make sure that in no way were we

22 contravening the Foreign Corrupt Practices Act or any

23 ramification of that nature.

24 Q.  Did you assist in the purchase of that vehicle?

25 A.  Well, just relaying the information.

 1   Q.  Now, go to Exhibit 9.

 2           Are you familiar with this exhibit, with this e-mail,

 3   Mr. Delgado?

 4   A.  Yes.

 5   Q.  In this e-mail there's reference to newspaper coverage

 6   involving an event that took place in Bogota, Colombia.

 7   A.  Yes.

 8   Q.  Did you send that e-mail to Victor?

 9   A.  No.  That's an e-mail that Mr. Pimentel is sending to me.

10   Q.  Mr. Pimentel sent it to you?

11   A.  Yes.

12   Q.  And what was the significance?  Is there a reason behind

13   him sending you that?

14   A.  I actually think because of the timetable that I related --

15           MS. KANOF:  Objection, speculation, Your Honor.

16           THE COURT:  I'll sustain the objection.

17   A.  It relates to the fact that during that period of time

18   Mr. Pimentel was courting a lady from Colombia, and she was

19   asking him to visit down there.

20           And I don't recall if he did or not end up going.

21   BY MR. VELARDE

22   Q.  Okay.  Did you have any dealings with the person referenced

23   in that article?

24   A.  No.  No, no, no.

25   Q.  Manuel Rivera-Niebla?

Delgado – Direct by Mr. Velarde                    4 –    79

```
 1    A.  No.

 2    Q.  Was that person known to you?

 3    A.  No.

 4    Q.  Was that person associated with anybody that you were

 5    working with?

 6    A.  No, sir.

 7    Q.  This person, according to this newspaper account, is from

 8    the town of Guadalajara, Mexico.

 9         Did you have any contacts with anybody there in

10    Guadalajara?

11    A.  Yes.

12    Q.  People that were involved in this line of work?

13    A.  No.  It was a U.S. company base.

14    Q.  Thank you very much.

15         Okay.  Now, let me refer you to Exhibit Number 12.

16         Are you familiar -- is the exhibit up there, first of

17    all, on your screen?

18    A.  It is.

19    Q.  Are you familiar with this exhibit?

20    A.  I am.

21    Q.  You are?

22    A.  Yes.

23    Q.  Okay.

24    A.  Let me just -- (reading).

25         Yes, I am.
```

Delgado - Direct by Mr. Velarde

1   Q.  What is the significance of this -- of this e-mail?  You --
2   did you send that e-mail to Victor?
3   A.  It appears so.
4   Q.  And who is the author of that e-mail?  Or who sent you that
5   e-mail?
6   A.  Ms. de la Concha.
7   Q.  So she sent you the e-mail and then you, in turn, sent it
8   to Victor?
9   A.  Yes.
10  Q.  Why would you do that?
11  A.  I needed to inform Nareo Vargas of the progress we were
12  making.
13  Q.  And so Victor -- you assume that Victor would be the one
14  taking the word to Mr. Vargas?
15  A.  No, I didn't assume.  That's the procedure that we have.
16  That's how we -- we got information to -- to Nareo.  I mean,
17  he's somebody, you know, very busy, and to make sure that it
18  reached him when it needed to.
19  Q.  Now, let me go to Exhibit Number 14.
20          Is that exhibit up on your screen?
21  A.  It is.
22  Q.  Are you familiar with this e-mail?
23  A.  Yeah, I am.
24  Q.  Okay.  Again, this e-mail is from -- who orig- -- who
25  initiated, or who authored this e-mail?

1   A.  Ms. de la Concha.

2   Q.  And you sent that e-mail to?

3   A.  Nareo, via Pimentel.

4   Q.  Okay.  And in there, there's mention about -- let me see.

5        What -- what message was being relayed through this

6   e-mail, in your words?

7   A.  The labor union co-owns a plant that fabricates power

8   towers.  And they actually had the opportunity to place,

9   without a bid, with the Mexican state-owned electric company.

10        Those power towers require some insulators in order

11  for the conductors to -- to be laid on the -- on the structure.

12  They do not fabricate that.  They're actually imported from

13  different countries of the world.

14        They were trying to get an exclusive distribution of

15  some of those insulators so they could integrate it into their

16  production scheme.

17  Q.  This e-mail makes reference to ironworks.

18  A.  Well, the truth of the matter is that if you go through all

19  the -- all the transcripts and all the translations, they take

20  a lot of liberties with it.  I don't know why they came up with

21  it.  It's a specific term of art, and it's technical in nature.

22  Q.  The word used here is -- is there -- *herrajes*?

23  A.  *Herrajes*, yeah.

24  Q.  What does that mean?

25  A.  It's the insulator on which you lay the -- the cable.

Delgado – Direct by Mr. Velarde

1    Q.  So it's the insulator.  And as far as you're concerned,

2    that's not ironworks; is that correct?

3    A.  No.  No.  It's some sort of ceramic, actually, that is what

4    attaches to the -- to the metal part of the structure.

5    Q.  So -- so this ultimately was supposed to go to Nareo

6    Vargas?

7    A.  It went to him.

8    Q.  Thank you.

9          Now, let me draw your attention to Exhibit Number 17.

10          Is that up on your screen?

11    A.  Yes, it is.

12    Q.  Are you familiar with this e-mail?

13    A.  I am.

14    Q.  Who originated this e-mail?

15    A.  Ms. de la Concha.

16    Q.  Ms. de la Concha sent that e-mail to you?

17    A.  Correct.

18    Q.  And then you, in turn, sent it to?

19    A.  Vargas, via Pimentel.

20    Q.  And what -- what are you talking about in this e-mail, or

21    what is being discussed in the e-mail?

22    A.  The labor union has a housing fund for its employees.  And

23    they actually assigned, as one of the benefits to the employee

24    at a discount, or subsidized the ability to purchase certain

25    houses.  Those houses are, in turn, built, you know, in the

Delgado - Direct by Mr. Velarde

1    form of low income through a very competitive process.

2          And what they were trying to do here was to actually

3    create some sort of alliance with one of the principal builders

4    in Mexico that participates in that -- in that housing fund.

5    Q.  Mr. Delgado, there's a number of e-mails that Lilian de la

6    Concha authored, sent to you, and then you in turn sent them to

7    Victor?

8    A.  Yes.

9    Q.  And your testimony is so that Victor would give them to

10   Mr. Vargas?

11   A.  Yes.

12   Q.  Let me ask you this, then.

13         Why wouldn't you send these e-mails directly to

14   Mr. Vargas?

15   A.  Well, a lot of it is generational.  Mr. Vargas is very

16   dynamic.  He's no spring chicken.  So I don't believe that he

17   is very used to, you know, e-mails or Smartphones or what have

18   you.  So he depends on his staff for that.

19         And also for purposes of prioritation [sic].  You know

20   if I really wanted to get his attention, I would go through

21   Pimentel.

22   Q.  Were there any discussions between you and Mr. Vargas

23   regarding some money that he had inherited that was here in the

24   United States?

25   A.  At some point I was asked a question regarding funds in the

1   United States, yes.

2   Q.  What was the question that was asked of you?

3   A.  They wanted me to convey to him --

4          MS. KANOF:  Objection, Your Honor.  Could you clarify

5   who "they" is?

6          THE COURT:  Clarify.

7          MR. VELARDE:  Yes, sir.

8   A.  Mr. Vargas asked me what were the requirements to ensure

9   that any movement of funds from the U.S. into Mexico was done

10  in complete compliance with applicable laws from the U.S.

11         And from the Mexico part, Pedro Meneses was, in turn,

12  giving him his recommendation as well.

13  BY MR. VELARDE:

14  Q.  Did you participate in any discussions with -- was Victor

15  Pimentel privy to these discussions you were having with

16  Mr. Vargas?

17  A.  Victor was always there, and he would actually be the one

18  that would help with followup.  So even if he wasn't present at

19  that instant, he would hear right away, We need to do A, B, or

20  C.  So he would have knowledge of this and was responsible for

21  followup.

22  Q.  Okay.  Now let me fast-forward, now, to the events that

23  happened in September 2007.

24         Did you have anything to do with -- well, let me --

25  before I go there, let me ask you another series of questions

1   regarding other activities that were discussed with these

2   business people down in Mexico, one of them being a U.S.

3   Treasury bond.

4              Do you recall that?

5   A.  Yes.

6   Q.  Okay.  What is the translation for bond in Spanish?

7   A.  *Bono*.

8   Q.  *Bono*.  Okay.

9              So those e-mails that have already been offered into

10  evidence that make reference to *bono* relate to that U.S.

11  Treasury bond?

12  A.  The bond, yes.

13  Q.  Okay.  What specifically were you tasked with in connection

14  with this treasury bond?

15  A.  It was trying to ascertain how marketable, as an

16  instrument, it was.  To see if, because of the date when it was

17  issued -- it was an old instrument -- if it could still be

18  cashed.  The best way to do it in such a way that we would

19  minimize the tax on the appreciation, and also the best way to

20  do it, if it was done by a foreign national versus a U.S.

21  person or U.S. entity.

22  Q.  And who was the holder?  Who had this treasury bond?

23  A.  Actually, it was co-owned by Ariel Camacho, who I believe

24  had received it as part of an inheritance by individuals

25  associated with the labor union who were recipients of an

Delgado – Direct by Mr. Velarde

1   inheritance of the recently-deceased leader of the union.

2   Q.  Who was that leader of that union?

3   A.  Leonardo Rodriguez Alcaine.

4   Q.  So Don Leonardo?

5   A.  Don Leonardo.  Thank you.

6   Q.  Was Don Leonardo a superior to Nareo Vargas?

7   A.  Yes.

8   Q.  Okay.  When he dies --

9   A.  Actually his mentor, Nareo's mentor.

10  Q.  Okay.  So again, the holder of this U.S. Treasury bond was

11  this gentleman that you've already identified?

12  A.  Uh-huh.

13  Q.  Anybody else in particular?

14  A.  Well, like I said, just the ones that had an ownership

15  interest were those individuals.

16  Q.  Am I correct in assuming -- was Don Francisco the original

17  owner of this bond or...

18  A.  We never got that to that stage.  But it...

19  Q.  Okay.  Let me fast-forward.

20  A.  Yeah.

21  Q.  Did Victor Pimentel ever bring this bond to your office

22  here in El Paso?

23  A.  No.  I believe, actually, the custodian of the -- the

24  custodian of the instrument was the one that delivered it to

25  us.  And basically, so they could comply with the notification

Delgado – Direct by Mr. Velarde

1    when they were exporting the actual document to the U.S.  And I

2    would assume, also, the import requirement of declaring it.

3    Q.  You spoke in the third person, "us."  Who is "us"?

4    A.  They were bringing it to me in particular, for what I'd

5    already been requested to assist.

6         And as part of what we were supposed to do was to

7    identify investors that would be willing to create either a

8    bridge loan, so we could do all the due diligence on it and we

9    could take it to market, assuming that it was doable, or that

10   would want to take an ownership interest in it.

11   Q.  Were there any discussions about setting up a group that

12   would buy an ownership interest in this bond?

13   A.  Not to buy the bond directly, but to benefit from any

14   appreciation once a sale or redeeming of the instrument was

15   made.

16        At the time, bear in mind that the possibility existed

17   that this would have had to be litigated with the

18   United States, you know, resulting in very high fees.

19   Q.  So did you take custody of the bond?

20   A.  Yes.

21   Q.  And what assessment, or what -- what determination, if any,

22   did you make about proceeding further with this bond matter?

23   A.  Okay.  All through the summer, for several months, we

24   started working together on the basic documentation that would

25   allow for different parties to come together to move forward in

Delgado – Direct by Mr. Velarde

1  placing this bond, so we had an outline of the best way to do

2  it.

3         We knew we wanted it to be a U.S. entity for purposes

4  of taxation of the Mexican nationals that owned it.

5         We also knew that we wanted to do it in a jurisdiction

6  in the U.S. that was tax friendly and not as expensive from an

7  administrative perspective.

8         And we also had commitments from individuals that

9  would be willing to come in and float the due diligence

10  component of it.  In other words, what it would cost from our

11  table to the market, assuming that we could place it or

12  somebody would be willing to buy it.

13  Q.  Now, let me ask you this.

14         Did you follow through with your due diligence?

15  A.  Well, in the sense that we started preparing some rough

16  drafts of the document underlying them, yes, and that we

17  started knocking on doors, in terms of individuals that could

18  assist us.

19         And we went as far as actually identifying potential

20  investment banks that were interested in it.

21  Q.  How much was this bond worth?

22  A.  Oh, I don't remember the face value, but it was, in my

23  mind, close to $100 million or so.

24  Q.  Okay.  Did -- was this bond ever negotiated?

25  A.  No.  No, no.

Delgado – Direct by Mr. Velarde

1   Q.  Why not?

2   A.  Actually, it was —— the partnership broke up before we

3   actually put it together, before people signed on the dotted

4   line.

5         And actually, it ended up being very contentious in

6   nature, and there was a process of mediation that was required

7   in order for the people to be able to walk away with their

8   ownership interest and liquidating, in part, some of the work

9   that had been done by some of the professionals advising on the

10  transaction.

11  Q.  There was testimony from Victor Pimentel regarding some

12  articles of incorporation or some reference to a corporation

13  that was started in the state of Nevada.

14        Do you know anything about that?

15  A.  Yes.  Those are the —— the draft, the orig- —— you know,

16  the general outline that we started preparing for this

17  transaction.

18  Q.  Okay.  Now, let me take it —— what happened to the bond?

19  Was it actually negotiated?

20  A.  It was not.  Some of the monies were disbursed at the

21  requirements of some of the owners.

22        But then it just —— you know, things fell apart.  The

23  timetables were not working with individuals.  The cash

24  commitments were not there.

25        So the original owner of the bond decided to walk away

4 —    90

1   from it, and that's when the mediation started.

2   Q.  So all that work didn't result in anything?

3   A.  Correct.

4   Q.  Did you set up this corporation?

5   A.  No.

6   Q.  Pardon me?

7   A.  No, no.  It was never set up.

8   Q.  Well, the preliminary paperwork --

9   A.  Yes.

10  Q.  -- that was started along those lines, was it initiated for

11  the purpose of promoting, advancing a money laundering scheme?

12  A.  No, sir.

13  Q.  Okay.  Now, let me fast-forward to September 2007.

14          Were you aware that Victor Pimentel was going to be

15  go- -- was going to be in Atlanta?

16  A.  No, I was not.

17  Q.  Okay.  When did you learn for the first time that Victor

18  had been in Atlanta?

19  A.  I actually think he was there.  We were going through

20  the --

21          MS. KANOF:  Objection, nonresponsive, Your Honor.

22          THE COURT:  I'll sustain the objection.

23  BY MR. VELARDE:

24  Q.  When -- okay.

25  A.  Well, we were going through the mediation --

Delgado - Direct by Mr. Velarde

1    Q.  Hold on.  Let me rephrase the question.

2         The question was, When did you learn that Victor

3    Pimentel was in Atlanta?

4         And you responded, It was then.

5         Is that correct?

6    A.  Yes.

7    Q.  So you learned that Victor Pimentel was there sometime in

8    September 2008 -- 2007?

9    A.  Yes, which is when the mediation on the bond was taking

10   place.

11   Q.  Were you -- were you a member of this mediation group?

12   A.  Yes.

13   Q.  Okay.  And where were -- where was the mediation taking

14   place?

15   A.  In Mexico, in the state of Puebla, which is --

16   Q.  I don't care about details.

17   A.  -- Mexico.

18   Q.  So you were in the mediation during that time?

19   A.  Yes.

20   Q.  Okay.

21   A.  And Victor was supposed to be there as well.

22   Q.  Was Victor there?

23   A.  No, he wasn't.

24   Q.  After that mediation, did you stay in Mexico City -- in

25   Mexico, or what -- did you come back?

1    A.   No, I came back.

2    Q.   Okay.  And "back," meaning here in El Paso?

3    A.   Yes.  Uh-huh.

4    Q.   Okay.  Well, shortly after Victor is in Atlanta, he's

5    picking you up at home.  Do you remember that?

6    A.   Yes.

7    Q.   And on that occasion you were going -- where were you

8    going?

9    A.   Mexico City.

10   Q.   So you were going back to Mexico City?

11   A.   Yes.

12   Q.   You had been there and now you were going back?

13   A.   Yes.

14   Q.   When Victor shows up at your house on that September day in

15   2007, did you already know he had been in Atlanta?

16   A.   Yes.

17   Q.   Did you know that he had picked up money in Atlanta?

18   A.   I figured that he was doing that because -- yes, I did.

19   Q.   And the money that Victor was picking up in Atlanta, did

20   you have any notion of where it came from?

21   A.   Well -- and let me restate that.

22            MS. KANOF:  Objection, Your Honor.

23            THE COURT:  I'll sustain the objection.

24   BY MR. VELARDE:

25   Q.   Sir, when Victor showed up at your house, did you have any

Delgado - Direct by Mr. Velarde

1    idea that he had been in Atlanta?

2    A.  Yes.

3    Q.  Did you know that he had picked up money in Atlanta?

4    A.  No.

5    Q.  Okay.  Had you been made aware that there was money to be

6    picked up in Atlanta prior to that day in September of 2007

7    when you got arrested?

8    A.  I had been asked about the requirements for the movement of

9    currency from the U.S. into Mexico, so that was the extent of

10   the knowledge that I had.

11           And I was also asked if there were state requirements.

12   Q.  So when Victor shows up at your house, did you know that he

13   had money with him?

14   A.  No.

15   Q.  When you got stopped, you told the trooper that you were on

16   your way to the bank?

17   A.  Correct.

18   Q.  Okay.  And what was the purpose for going to the bank?

19   A.  I get a call in the morning from Victor telling me that

20   they were transporting the funds.

21           At this point, I was -- I thought it was a cashier's

22   check or something in that nature.

23           When he shows up, he's actually going to take me to

24   the airport and we're going to catch up to whatever.  He

25   informs me that he has the funds there.

Delgado - Direct by Mr. Velarde

1              And I actually asked him, Where?

2              And he tells me he has them in the -- in the -- it's

3    an SUV, so in the trunk of the vehicle.

4    Q.  And so did -- did you tell him anything or --

5    A.  He had actually told me that he was making arrangements for

6    somebody to come to the Santa Teresa bridge and meet him there.

7              This person was not there.  They were going to notify

8    him.

9              So I just told him, I said, We need to go to the bank.

10   And from there you can either get a cashier's check or you can

11   actually open an escrow account.  And when you make all the

12   arrangements, you can move forward.

13   Q.  Okay.  And before you got stopped by the troopers, where

14   were you headed to?

15   A.  To the airport.  But we were going to stop at the bank.

16   Q.  Victor testified that you were en route to Santa Teresa,

17   presumably to go across.  Was that your understanding?

18   A.  No.  No, no.

19   Q.  So now -- now, you're stopped.  They take you into custody?

20   A.  Yes.

21   Q.  What time of day were you -- were you stopped at?

22   A.  It was -- I believe it was in the morning, around

23   10:00-ish.

24   Q.  And -- and after you get stopped, where did they take you?

25   A.  They take me to the offices of -- of the Immigration and

1   Customs Enforcement agency.

2   Q.  ICE?

3   A.  ICE, on Executive and Mesa.

4   Q.  Did you -- were you interviewed by these agents there at

5   that office?

6   A.  Yes.

7   Q.  Did they make you aware that this was -- that these were

8   drug proceeds?

9   A.  No.  They actually told me that they wanted to talk to me

10  because they suspected that these funds could be money from --

11  from an illegal source.

12  Q.  Okay.  Did you volunteer to help them with their

13  investigation?

14  A.  Not only did I volunteer to help them, we actually get on

15  the line with Vargas.  And he's trying to get ahold of his

16  accountant, so they can provide the paperwork on the source of

17  the -- of the funds.

18  Q.  And did any -- did anything develop from those telephone

19  calls to Nareo?

20  A.  Well, yes.  You know, get ahold of the accountant.

21          So at that point we called Pedro Meneses.

22  Q.  Hold on.  Get ahold of the accountant.

23          Who was the accountant?

24  A.  Pedro Meneses.

25  Q.  Okay.  And then what happened?

Delgado – Direct by Mr. Velarde

1    A.  We get ahold of him.  He's still in the U.S.  He had -- I

2    learned he had been in Atlanta with them, because he was the

3    one that had the powers of attorney to discuss and actually

4    secure the release of the funds from the custodian of those

5    funds in Atlanta.

6    Q.  Okay.  And were you successful in your telephone contact to

7    the accountant?

8    A.  Eventually, he called back.  We were at ICE, so we were

9    able to talk to him.

10   Q.  And when you talked to Pedro Meneses, where was he headed

11   to?

12   A.  They were actually headed to Laredo.

13   Q.  Were you coached by these agents to bring this person to

14   El Paso?

15   A.  Yeah.  They asked -- they asked me if we could bring him

16   here.

17   Q.  Did you tell him to come to El Paso?

18   A.  Yes.

19   Q.  Did he, in fact, come to El Paso?

20   A.  He did.

21   Q.  Okay.  So --

22        THE COURT:  Mr. Velarde, hold it right there.

23        MR. VELARDE:  Thank you, sir.

24        THE COURT:  We need to break up for lunch at this

25   time.

Delgado – Direct by Mr. Velarde

```
 1              We'll be in recess for lunch until 1:30.

 2              (Recess; open court; jury present.)

 3              THE COURT:  Mr. Velarde, you may continue.

 4              MR. VELARDE:  Your Honor, thank you very much.

 5    BY MR. VELARDE:

 6    Q.  Mr. Delgado, right before the break I asked you some

 7    questions concerning Pedro Mendoza, the accountant.

 8    A.  Uh-huh.

 9    Q.  But before you -- before we proceed on that line of

10    questions, I would like us to revisit -- I would like you to

11    revisit with me the events that happened on September the 4th,

12    2007.

13              And in that regard, I would like you to please draw

14    your attention to Exhibit 29.

15              Is Exhibit 29 on your screen?

16    A.  Yes.

17    Q.  Okay.  Do you remember that?

18    A.  Yes.

19    Q.  This e-mail is dated 9-4-2007, time 12:46?

20    A.  Correct.

21    Q.  And in here you say, Please find sanitized settlement --

22              MS. KANOF:  Objection, Your Honor, leading.

23    BY MR. VELARDE:

24    Q.  Would you please tell me --

25              THE COURT:  Overruled.  Go ahead.
```

Delgado – Direct by Mr. Velarde

1    BY MR. VELARDE:

2    Q.  In this e-mail you say, "Attached, please find sanitized

3    settlement form for purposes of your negotiations."

4              This e-mail went to Victor Pimentel.

5              What did you mean by that?

6    A.  We were in the middle of a mediation.  He was responsible

7    for the settlement directly with the counter-parties, still

8    dealing with the bond at hand.

9              We were facing steep issues, and we were going to try

10   to buy out one of the owners.  And if not, we were going to

11   have them try to buy us out at a premium.

12             So he needed a basis on what to craft in terms of what

13   would be the key points of any type of settlement or what would

14   be acceptable.

15             It says there settlement form, because that's what it

16   is.  I mean, it's like a slate for you to make the changes and

17   the adjustments that you need.

18             MR. VELARDE:  Mr. Livingston, would you please pull up

19   Exhibit 31?

20             Can you pull up the attachment to that?

21   BY MR. VELARDE:

22   Q.  Is this the document that you sent Mr. Pimentel?

23   A.  Yeah.  If it's the attachment to the e-mail, yes.

24   Q.  Did you create this document?

25   A.  My office created -- well, this is probably a document in

Delgado – Direct by Mr. Velarde

1    existence that somebody in my office ran into that thought was

2    well crafted and it could be used repeatedly.

3           So instead of starting from scratch every time, you

4    just have form documents and you make adjustments.  You change

5    the date.  You change the -- the date, you know, the basics.

6           And in some cases -- I don't know if it's in this one

7    in particular -- you actually convert them into a macro, so

8    automatically you just change one name and all of them change

9    at once.  That's for the sake of expediency and efficiency.

10   Q.  So somebody in your office created this document or did you

11   create this document?

12   A.  It would have been -- to be honest with you, I don't have a

13   specific recollection of when the document was created or when

14   it became part of our library of forms.

15   Q.  Was this the document that you sent him to help him in his

16   negotiations?

17   A.  It appears to be, yes.  Because it would have been a

18   general release and a settlement agreement.  So...

19   Q.  Did you send -- what was the purpose, again, that you sent

20   him this document?

21   A.  We were going to try to finalize the acquisition, or buying

22   out a co-owner of the bond.  Or having them, in turn, buy us

23   out.

24   Q.  Victor Pimentel testified that you gave him this document

25   so that in case he got stopped he could show this to justify

Delgado – Direct by Mr. Velarde

1    that money.

2    A.  I never gave Victor any document.  The e-mail is

3    self-explanatory.  I sent it to him when we were supposed to be

4    in the middle of a mediation.  I was under the impression that

5    he was conducting that and he needed the documentation.

6    Q.  Maybe I didn't understand.

7         Did you send this document to Mr. Pimentel?

8    A.  Yes.

9    Q.  Did you send this document to Mr. Pimentel so that he could

10   show it to peop- —- to law enforcement in case he got stopped?

11        MS. KANOF:  Objection, leading.

12        THE COURT:  Sustained.

13   BY MR. VELARDE:

14   Q.  Did —- what was the purpose, again, for you sending it —-

15   well, let me cut to the chase.

16        Did you instruct him to show this to somebody else,

17   like law enforcement?

18   A.  No.  The e-mail that you first alluded to in the exhibit

19   specifically tells him, This is a guide and points for

20   negotiation.

21        In other words, when you're in a mediation, you

22   identify what's common ground, what are our standing issues.

23        And that's the only thing.  Because when you reduce it

24   to writing, you want to have a basis on what to go for, already

25   a template.  That's what I referred to when I say it's a form

Delgado – Direct by Mr. Velarde

1   document.

2           And when I say it's sanitized –– and it says that ––

3   it means that it already replaced –– if we borrow it from

4   somebody else, right, somebody else used it, it was, you know,

5   the corporate entity or something, you change those names.

6   That's what I mean by sanitized.  We already changed that.

7   Q.  Okay.  Before –– before September the 4th, did you see

8   Victor Pimentel here in El Paso?

9   A.  No.

10  Q.  Did you talk to Victor Pimentel on the phone?

11  A.  Yes, more than likely.

12  Q.  And you've already testified you didn't know that Victor

13  Pimentel was in Atlanta, correct?

14  A.  No.  Correct.

15  Q.  So now, Victor Pimentel shows up at your house on

16  September 7th, correct?

17  A.  Yes.  But he –– he probably called on his way the previous

18  day.

19           MS. KANOF:  Objection, Your Honor.  Nonresponsive to

20  the question.

21           THE COURT:  I'll sustain the objection.

22  BY MR. VELARDE:

23  Q.  Before he got to your house, did he call you?

24  A.  Yes.

25  Q.  You've heard here that he called you at least twice.

1    A.  Correct.

2    Q.  And those were the calls that he placed to your house?

3    A.  Or my cell phone.

4    Q.  Yes.  In which he was asking you to please go to Walmart or

5    Target and buy him some --

6    A.  Yes.  Uh-huh.

7    Q.  Okay.  Now, you get arrested.  That's on September the 7th.

8    You're taken to ICE?

9    A.  Yes.

10   Q.  Were you -- and you were interrogated?

11   A.  Yes.

12   Q.  And you acknowledged that you wanted to cooperate?

13   A.  I did.

14   Q.  And in connection with that, you told them about Pedro

15   Mendoza Meneses, the accountant?

16   A.  I told them everything, yes.

17          MS. KANOF:  Objection, leading, Your Honor.

18          THE COURT:  I'll sustain the objection.

19   BY MR. VELARDE:

20   Q.  Who did -- which people did you identify for them once you

21   started cooperating?

22   A.  Everybody related with the bond transaction and everybody

23   associated with the SUTERM that would have some knowledge, for

24   instance, Victor or Isaac or whomever.

25   Q.  Okay.  As a result of those conversations, did you call

1  somebody?

2  A.  Yes.

3  Q.  Who did you call?

4  A.  I'm sure we called -- I called Lilian.

5  Q.  No.  Before -- before you talk to Lilian.  This is right

6  after the first -- after you've been stopped and before the

7  second controlled delivery the following day.

8       Did you place any calls that same day, which would

9  have been September 7th?

10  A.  When I was already at their office?

11  Q.  Yes, sir.

12  A.  Yeah.  I mean, I know I spoke with Nareo Vargas.

13  Q.  Okay.

14  A.  He was one of the --

15  Q.  Okay.  Let me -- let me ask the question another way.

16       Do you know how it was that Pedro Mendoza wound up

17  here in El Paso?

18  A.  Oh.  Yes.  Yes, I actually called him.

19  Q.  Did you engage him in any conversation regarding the money

20  that was the subject of this investigation at that point?

21  A.  Yeah.  I actually told him that in order for him to get the

22  funds into Mexico, he should come here.

23       At that point we already represented that we were

24  working with an exchange house, a *casa de cambio*, who was one

25  of the agents they wanted us to -- to position or build some

1    sort of persona around.

2    Q.  This conversation that you undertook with Pedro on that

3    occasion, was this something that the agents told you to tell

4    him?

5    A.  Yes.

6    Q.  Okay.  Did you also tell them something about flying out of

7    Santa Teresa?

8    A.  Yes.

9    Q.  Whose idea was it to say that?

10   A.  I believe it was --

11   Q.  Was it the agent's idea?

12   A.  Yes.  Uh-huh.

13   Q.  Okay.  And so as a result of your phone calls, Pedro

14   Mendoza and somebody else came to El Paso, correct?

15   A.  Yeah.  We actually --

16   Q.  Who is "we"?

17   A.  Myself.  Victor, independently, had to exert pressure for

18   them to come over here.  This was never their intended

19   destination.

20   Q.  In other words, was Victor there with you making those

21   phone calls?

22   A.  No.  We were in separate, you know, holding -- or offices,

23   if you would.

24   Q.  And how did you verify that Victor was also exerting

25   pressure?

Delgado – Direct by Mr. Velarde

1   A.   Because they told us, You're going to say this, you're

2   going to say that.   Tell them Victor is going to be calling.

3   Q.   Once they got here, did you continue making telephone

4   contact with him?

5   A.   No.   I think it was Victor and the agents.

6   Q.   And were you let go, or did you stay there at their

7   offices?

8   A.   No.   I was -- I went home.

9   Q.   Okay.   So how long after you get arrested are you kept in

10  their offices, approximately?

11  A.   Probably until 8:00 p.m.   8:00, 9:00 p.m.

12  Q.   How many hours is that?

13  A.   Probably ten.

14  Q.   Okay.   During that time period, were you being debriefed?

15  A.   Yes.

16  Q.   And talked to?

17  A.   Uh-huh.

18  Q.   And they were instructing you on how to conduct yourself?

19  A.   Yes.   But they were also trying to see if I could be --

20  assist -- be of assistance to them on a couple of other

21  matters.

22        And they were also telling me that the possibility

23  existed for remuneration to come out from my involvement with

24  them.

25  Q.   Okay.   And the agents that you were talking to, do you

Delgado – Direct by Mr. Velarde

1   recall their names?

2   A.  Yes.

3   Q.  Who were they?

4   A.  Tom Justice and Jose de Jesús.  They would refer to him as

5   DJ.

6   Q.  DJ.  Okay.  That evening, did you go home?

7   A.  Yes.

8   Q.  Did you make contact with anybody in Mexico regarding

9   the -- this matter?

10  A.  No.

11  Q.  Okay.  The following day, which would have been -- well,

12  the following day is the 8th.  Did anything happen?

13  A.  Yes.  They asked me to go back to their offices early in

14  the morning.  And we stayed there until the -- you know, the

15  next show, the next -- you know --

16          THE COURT:  Event?

17  A.  -- deception, yeah, was to take place.

18  BY MR. VELARDE:

19  Q.  And did that event take place?

20  A.  Yes.

21  Q.  Approximately what time?

22  A.  Between 5:00 and 7:00 p.m.

23  Q.  This is on Saturday, the 8th?

24  A.  Yes.

25  Q.  And as a result of this event what, if anything, did you

Delgado - Direct by Mr. Velarde

1   do?

2   A.  Let me make sure I understand.

3        You mean what role did I take?

4   Q.  No.  Let me rephrase myself.  Okay?

5        On Saturday, September the 8th --

6   A.  Yes.

7   Q.  -- something happened at around 6:00 or so?

8        MS. KANOF:  Objection, Your Honor.  Leading the

9   witness.

10       MR. VELARDE:  I'm just restating what he has already

11  said.

12       THE COURT:  I'll sustain the objection.

13  BY MR. VELARDE:

14  Q.  Sir, again, please bear with me.  And if you don't

15  understand my question, speak up.  Let me know.  I'm trying to

16  keep this chronologically.

17       On September the 8th, Saturday, what, if anything,

18  happened?

19  A.  We had already contacted Pedro, the CPA, and his partner.

20  They had already agreed that they were going to be coming to

21  El Paso.

22       So during the morning, we were preparing -- or they

23  were preparing me on what needed to happen for that -- for the

24  show that was going to be put together to arrest them or seize

25  the funds.

Delgado - Direct by Mr. Velarde

1              We also made a couple of calls to Mexico.  And I

2     believe they received a call.  And by "they," I mean Victor

3     received a call.

4              MS. KANOF:  Objection, Your Honor, speculation.

5              THE COURT:  I'll sustain the objection.

6     BY MR. VELARDE:

7     Q.  Don't speculate, unless you know for a fact.  You can

8     testify to facts.

9     A.  Victor received a call from Chuy regarding --

10             MS. KANOF:  Objection, Your Honor.  I would like to --

11    it's probably hearsay.  So my objection is hearsay, unless a

12    different foundation is laid.

13             THE COURT:  I'll sustain the objection.

14    BY MR. VELARDE:

15    Q.  Mr. Delgado, unless you know that Victor is receiving that

16    phone call and you're privy to it, you can't testify to that.

17    Okay?

18             Just to matters that you personally witnessed.  Okay?

19    A.  Victor received a call from Chuy.

20    Q.  Did you witness that?

21    A.  Yes.

22    Q.  Okay.  And that would have been late Saturday?

23    A.  No, it wasn't late.  It was around noon.

24    Q.  Did Chuy call you on Saturday?

25    A.  No.

Delgado - Direct by Mr. Velarde

1   Q.  Okay.  Now following those events, did anything happen that

2   would cause you to go to another office?

3   A.  Yes.

4   Q.  Okay.

5   A.  The -- the plan was put into action.  I had been requested

6   by the officers to be ready to try to facilitate the release of

7   the individuals that were to be arrested once the money was

8   found in the vehicle they were driving.

9          So I remained at their office until 6:00 or so.

10  During this time they discussed -- DJ in particular -- a couple

11  of other operations that he was involved in.

12  Q.  I don't care to hear about that.  I just want to stay to

13  these facts.  Okay?

14  A.  Okay.  Around 7:30 p.m. they told me I needed to go to the

15  police station in Pebble Hills.  I went there.

16  Q.  Let me stop you there.  Did you go on your own account or

17  did the agents take you there?

18  A.  No, I went on my own.

19  Q.  Okay.  Before you went out there to the Pebble Hills

20  substation, were you coached on how to undertake this talk,

21  this discussion with these subjects?

22  A.  Everything.  Yes.

23  Q.  And the subjects I'm talking about were?

24  A.  The CPA, Mendoza, and Isidro.

25  Q.  Chilo?

Delgado - Direct by Mr. Velarde

1    A.  Uh-huh.

2    Q.  Pedro and Chilo, right?

3    A.  Uh-huh.

4    Q.  Okay.  So --

5    A.  But --

6    Q.  Hold on.  So now you're coached on what to say.  You have a

7    script; is that correct?

8    A.  Yes.

9    Q.  Do you actually make contact with them in the cell blocks

10   or wherever they're being detained?

11   A.  Yes.

12   Q.  Did you talk to them?

13   A.  I did.

14   Q.  Was that conversation recorded?  Were you wearing a body

15   mic?

16   A.  I was not.

17   Q.  Okay.  And I specifically discussed --

18           MS. KANOF:  Objection, Your Honor, nonresponsive.

19           THE COURT:  I'll sustain the objection.

20   BY MR. VELARDE:

21   Q.  Okay.  Once -- once you made contact with them, you let

22   them know that you're there to --

23           MS. KANOF:  Objection, leading.

24   BY MR. VELARDE:

25   Q.  Did you advise them as to what was going to happen next?

1    A.  No.

2    Q.  Okay.  Did you extract any information from them?

3    A.  Not at first.

4    Q.  Okay.  Did -- did you make any kind of representation on

5    their behalf to obtain their release?

6    A.  What I did is I specified that I wasn't acting as their

7    attorney.  I told them, This can be very serious.  In your

8    shoes, I would cooperate.  If this is the product of an illegal

9    operation, you need to get a lawyer and not cooperate, but you

10   will be detained.

11          Working together, my people -- and by "my people," I

12   meant the exchange house individual, this guy DJ --

13          MS. KANOF:  Objection, nonresponsive.

14          THE COURT:  I'll sustain the objection.

15   BY MR. VELARDE:

16   Q.  Okay.  Sir, let me ask the question this way.

17          You engaged them in conversation.  What did you tell

18   them?  What were you telling them?

19   A.  I wasn't their attorney.  This could be serious.  If this

20   were illegal funds -- and I specifically mentioned drug

21   origin -- you're going to need an attorney.  I would not

22   recommend you to say anything, but you will be incarcerated.

23          And given that one of them was a tourist, I

24   wouldn't --

25          MS. KANOF:  Objection, Your Honor, narrative.

Delgado – Direct by Mr. Velarde

```
 1              THE COURT:  I'll sustain the objection.

 2              You've answered the question.

 3              Go on.

 4   BY MR. VELARDE:

 5   Q.  Okay.  Now, Mr. Delgado, did there come a time when you, on

 6   your own account, made a request for their release?

 7   A.  Yes.

 8   Q.  When you made that -- that request, was that request

 9   granted to you?

10   A.  Yes.

11   Q.  Did they witness the fact that you were able to spring them

12   out of this arrest?

13   A.  Yes.

14   Q.  Did they agree to cooperate at that point?

15   A.  Yes.

16   Q.  Did -- were they interviewed by the agents, to your

17   knowledge?

18   A.  Yes.

19   Q.  Okay.  And were they subsequently released?

20   A.  That night they went to a hotel in El Paso.  The next day

21   they still met with the agents, but they were allowed to

22   leave --

23              MS. KANOF:  Your Honor, I would object to how he knows

24   this.

25              THE COURT:  I'll sustain the objection.
```

1    BY MR. VELARDE:

2    Q.  Sir --

3          THE COURT:  Just answer the question, please.

4    BY MR. VELARDE:

5    Q.  Okay.  Now, you've alluded to events that happened on the

6    9th, so I would like to ask you.

7          Did you go back -- what did you do on the morning of

8    the 9th?

9          Well, let me -- before we cease questions regarding

10   the events of the 8th, following that scene out there at the

11   Pebble Hills substation, did you do anything else with the

12   agents that evening?

13   A.  No.

14   Q.  Okay.  Where did you go?

15   A.  I went home.

16   Q.  Okay.  Did you make any contacts with the people in Mexico?

17   A.  I don't believe so.

18   Q.  Okay.  Now the following day is a Sunday, September the

19   9th?

20   A.  Yes.

21   Q.  What, if anything, happened that day?

22   A.  I met with the agents again.

23   Q.  At what time did this start?

24   A.  Morning.

25   Q.  Morning.  6 a.m.?  9 a.m.?  10 a.m.?  That's morning, if

1    you recall.

2    A.  9-ish.

3    Q.  Where was that meeting at?  Where did you meet them?

4    A.  In their office.

5    Q.  Okay.  When you went to their offices, were you the only

6    person there?

7    A.  No.

8    Q.  Was there somebody else?

9    A.  Yes.

10   Q.  Did you talk to the agents?

11   A.  Yes.

12   Q.  Did you learn anything from the agents about what was

13   happening?

14   A.  With regards to me, yes.

15   Q.  Okay.  Now at that point what, if anything, did you

16   undertake to carry out at their request?

17   A.  I helped instruct -- or translate instructions to Mendoza

18   and Isidro.  And I made some phone calls that were recorded.

19   Q.  Now, when they have you talking to Isidro and Pedro,

20   right --

21   A.  Uh-huh.

22   Q.  -- the agents are there?

23   A.  Yes.

24   Q.  And which agents were there?

25   A.  DJ was there.  The Atlanta case agent was there for a part,

1    because he was leaving town.

2    Q.  Based on the conversation you had with these people, was it

3    apparent to you that they had agreed to cooperate?

4            MS. KANOF:  Objection, leading.

5            THE COURT:  I'll sustain the objection.

6    BY MR. VELARDE:

7    Q.  What did you learn from talking to these people?

8    A.  They were cooperating.

9    Q.  Okay.  Following that --

10           MS. KANOF:  I'm sorry, Your Honor.  Who was

11   cooperating?

12           MR. VELARDE:  Pedro and Chilo.

13   BY MR. VELARDE:

14   Q.  Following this development what, if anything else,

15   happened?

16   A.  They provided us with a storyline.

17   Q.  Who is "they"?

18   A.  The agents that were working with us.

19   Q.  When you say they provided us, that's third person.  Who

20   was -- who are the other people besides you?

21   A.  Chilo and Isidro.  Mendoza was there.  I know that the

22   agent that was to be the -- the exchange agent was also there.

23   Q.  And so they give you instructions.  What were those

24   instructions?

25   A.  To put pressure on certain individuals in Mexico to see if

Delgado - Direct by Mr. Velarde

1    there could be another cash infusion.

2    Q.  Was that it?  Anything else that was asked of you --

3    A.  Yes.

4    Q.  -- from them?

5    A.  To be ready to substantiate information that was to be

6    provided to people in Mexico, when they would ask me on

7    separate calls to confirm the information that was being

8    provided to them by Pedro and by Isidro.

9    Q.  Okay.  If you know, following this development what

10   happened to the other two subjects?  Did they remain there with

11   you making phone calls?

12   A.  No.  I remained there making phone calls.

13   Q.  Okay.

14   A.  I didn't see them.  I don't know what happened, but I know

15   they were in the -- they were still in El Paso.

16   Q.  Yesterday we heard Agent Alex Ascencio -- I'm sorry -- yes,

17   Alex Ascencio -- testify to some phone calls that occurred on

18   September the 9th, which would have been Sunday.

19            Those phone calls were to Lilian, Chuy, Chilo, Isidro,

20   and then again, Chuy.

21            Did you make all those phone calls?

22   A.  Yes.

23   Q.  And you've already heard Agent Ascencio say he was not

24   present on that occasion.

25   A.  Yes.

Delgado – Direct by Mr. Velarde

1   Q.   Okay.   Who was present with you when you made these phone
2   calls?
3   A.   At least the very first one, or at least the morning ones,
4   people from Atlanta and the Agent DJ, this guy, the --
5   Q.   And that's Jose de Jesús, right?
6   A.   Jose de Jesús, yes.
7   Q.   The discussions that can be heard on those consensual
8   monitored telephone calls was -- were you instructed on what to
9   say?
10  A.   Yes.
11  Q.   And what exactly were you trying to -- what -- in your
12  mind, what were you trying to accomplish through these phone
13  calls?
14  A.   Personally, I wanted to ascertain if, in reality, these
15  were illicit funds tied to drug trafficking.
16        With regards to the Government's objective, as stated
17  to me, was to see if we could create enough pressure, enough
18  concern, enough fear, so to speak, to see if these individuals
19  would be willing to try to infuse more cash.
20  Q.   Were you ever admonished or scolded about not doing your
21  job the way they wanted you to do it?
22  A.   Yeah, a couple of times.
23  Q.   Exactly what did they tell you?
24  A.   One was the pace at which I would be speaking in Spanish
25  with -- with Mexico, and words that couldn't be readily

Delgado – Direct by Mr. Velarde

1    understood.

2            They actually wanted to see if it was possible for me

3    to conduct some of those conversations with the Mexican

4    nationals in English.

5            And -- I don't know.

6    Q.  Okay.  After the -- all these telephone -- these

7    conversations, were you told -- were you told anything about

8    you're now going to get charged for conspiracy to commit money

9    laundering?

10   A.  Yes, definitely.  Since the -- since the first day, since

11   Friday.

12   Q.  Okay.  So you were trying to cooperate?

13   A.  Yes.

14   Q.  Incidentally, you've already told us that you didn't call

15   anybody in Mexico.

16           MS. KANOF:  Objection, Your Honor.  Repeating other

17   testimony.

18           THE COURT:  Overruled.

19           Go ahead.

20   BY MR. VELARDE:

21   Q.  Did you make any phone calls on the evening of September

22   the 9th, once you got --

23   A.  Yes.

24   Q.  -- to those same people?

25   A.  To some of them, yes.

Delgado – Direct by Mr. Velarde

1    Q.  And those conversations obviously were not recorded, right?

2    A.  Some of them were.

3    Q.  No, no.  Following -- after you finished making these

4    consensual monitored phone calls -- after, okay?  Go back with

5    me a little bit.  September the 9th, Saturday.

6         What happened after you finished making these phone

7    calls?

8    A.  I went home.  And Pimentel called, touching base with me.

9    Q.  Okay.  I don't want you to tell me what he said.  Okay?

10        In any event, my question to you is, did you make any

11   more phone calls to people in Mexico on the -- that evening?

12   A.  I can't recall.

13   Q.  Okay.  Now -- again, now this is Sunday, September the

14   10th.

15   A.  Monday, September 10th.

16   Q.  Monday, September the 10th.  Okay.

17        You placed two more phone calls to Lilian de la

18   Concha, correct?

19   A.  Uh-huh.

20        THE COURT:  Yes?

21   BY MR. VELARDE:

22   Q.  Where did those phone calls --

23        THE COURT:  Wait a minute.

24        Did you answer yes or no?

25        THE WITNESS:  "Yes."

Delgado - Direct by Mr. Velarde                    4 - 120

```
1              THE COURT:  Okay.
2    BY MR. VELARDE:
3    Q.  On September the 10th, you placed -- did you make any phone
4    calls?
5    A.  I did.
6    Q.  Who did you call?
7    A.  Lilian.
8    Q.  Under what circumstances did you make those phone calls?
9    Were you at ICE offices or DPS?
10   A.  I believe one of them was at a Village Inn with the El Paso
11   agent, DJ.
12   Q.  You made a phone call from your cell phone?
13   A.  Yes.  Uh-huh.
14   Q.  And that phone call got recorded, correct?
15   A.  Yes.
16   Q.  And you made how many phone calls, you said?  Two?
17   A.  I believe so.
18   Q.  Again, were you coached on what to talk about?
19   A.  Yes.
20   Q.  After these phone calls on September the 10th, did they
21   tell you anything else?
22   A.  I was told to expect calls from Mexico because the people
23   in Mexico were, in turn, going to be receiving calls of
24   desperation from Pedro and from Isidro.
25   Q.  Did you get any phone calls, if you remember?
```

Delgado - Direct by Mr. Velarde

1    A.  I don't recall.

2    Q.  Okay.  Following -- following these events of these couple

3    of days, did there come a time when you went to visit ICE in

4    Atlanta?

5    A.  Yes.

6    Q.  When was that?

7    A.  That same week.

8    Q.  And who paid for your trip to Atlanta?

9    A.  I did.

10   Q.  And when you went to Atlanta, who did you speak to?

11   A.  Tom Justice.  His supervisor, Brian -- I don't remember his

12   last name.

13   Q.  Ramsey?

14   A.  Ramsey.  There were a couple of other people that would

15   come in and out.

16   Q.  Okay.  You saw Agent Ascencio here yesterday.  Was he one

17   of those individuals that you met?

18   A.  Eventually, yes.

19   Q.  Now, there is -- there are exhibits in evidence that

20   document that you made some phone calls on the 14th.  I would

21   like to ask you, however, before we get into those phone calls,

22   were you debriefed again by those agents in Atlanta?

23   A.  Yes.

24   Q.  Were you instructed -- or were you told what they wanted

25   you to do?

1    A.  Yes.

2    Q.  Did that include making phone calls?

3    A.  Yes.

4    Q.  Did they give you a script on what to say in these phone

5    calls?

6    A.  They did.

7    Q.  Did you follow that script?

8    A.  I recommended changes.

9            MS. KANOF:  Objection, nonresponsive.

10           THE COURT:  I'll sustain the objection.

11           Just answer the question.

12   BY MR. VELARDE:

13   Q.  Did you --

14   A.  I did follow the script they gave me.

15   Q.  Okay.  Thank you.

16           On September the 14th, the evidence already shows that

17   you made seven phone -- no -- that there was seven phone calls.

18   Okay?

19           But how many of those phone calls did you actually

20   participate in?

21   A.  On September --

22   Q.  September the 14th, when you're in Atlanta.

23   A.  If memory serves me right, it was just one that I

24   conducted.

25   Q.  Okay.  And that conversation was with -- do you remember --

```
1    it was with Paco Fernandez.  The evidence is already there.

2              That's when you introduced Agent Ascencio?

3    A.  Yes.

4    Q.  And then after that, did you continue making phone calls

5    with Agent Ascencio on the phone?

6              Or better yet, let me rephrase it.

7              After that phone call to Paco Fernandez, did you

8    participate -- actively participate -- in phone calls to other

9    people with Agent Ascencio present?

10   A.  I don't recall.

11   Q.  You don't recall.

12             Agent Ascencio testified that he made subsequent calls

13   on the 17th.

14             MS. KANOF:  Objection, Your Honor.

15             THE COURT:  I'll sustain the objection.

16   BY MR. VELARDE:

17   Q.  Did you participate with Agent Ascencio in any other phone

18   calls placed after the 14th?

19   A.  After -- subsequent to the 14th, yes, there were several

20   conversations that we were party to, Ascencio and I and...

21   Q.  And were you participating -- were you actively involved in

22   the conversations with the people that Agent Ascencio was

23   talking to?

24   A.  Yes.

25   Q.  Okay.  The purpose of you introducing Agent Ascencio to the
```

Delgado – Direct by Mr. Velarde

1    group was what?

2    A.  They wanted to substitute the agent that they originally

3    were going to use as the contact, the agent from the El Paso

4    office.  So they wanted this -- Ascencio to be built up the

5    same way that DJ was being built up.

6    Q.  Okay.  And did you introduce Agent Ascencio to Paco

7    Fernandez?

8    A.  Yes.

9    Q.  Of course you had never met Agent Ascencio, correct?

10   A.  Correct.

11   Q.  And when you talk about he's a long-time friend of mine and

12   so forth, who told you to say that?

13   A.  Probably Tom Justice was the one that suggested how to

14   approach it.

15   Q.  What was the reason for you introducing Mr. Ascencio to

16   this -- to Paco Fernandez?

17   A.  One, to see if they could force that new transaction that

18   would allow them to ascertain if, in fact, it was a drug

19   laundering operation.

20   Q.  How long were you there in Atlanta?  How many days?

21   A.  I just -- I arrived the previous night and I left that --

22   that evening.

23   Q.  So you left on the 14th?

24   A.  I believe so.

25   Q.  Did you go back to Atlanta to conduct any more phone calls?

Delgado - Direct by Mr. Velarde

1    A.  No.

2    Q.  Did you -- were you conferenced from Atlanta to Mexico on

3    phone calls, if you remember?

4    A.  Yes.

5    Q.  And who did you talk to in Mexico when these phone calls

6    were being placed?

7    A.  I know that Lilian.  I know that Mr. Fernandez.  I know

8    that Chuy.  I know with Victor.  And I know that with -- with

9    Pedro.  I don't remember with Chilo.

10   Q.  Mr. Delgado, did you do anything to tip off any of these

11   people to the fact that these were ICE agents that were

12   investigating this activity --

13   A.  No.

14   Q.  -- as being criminal?

15   A.  No.

16   Q.  You heard testimony yesterday about an event that took

17   place in McAllen --

18   A.  Yes.

19   Q.  -- with Pedro and Isidro and Agent Ascencio and another

20   agent.

21   A.  Yes.

22   Q.  Did you know anything about them meeting in McAllen on the

23   10th?

24   A.  I did not.

25   Q.  Okay.  So following the events of September the 7th and

Delgado – Direct by Mr. Velarde

1   your talks on September the 14th in Atlanta, did you go back to

2   Atlanta?

3   A.  I did not.

4   Q.  So you only went to Atlanta once?

5   A.  Correct.

6   Q.  And did you maintain telephone contact with Atlanta?

7   A.  Yes.

8   Q.  And who did you talk to when -- following September the

9   14th, who were you directing yourself to?

10  A.  The case agent.

11  Q.  And that was?

12  A.  Tom Justice.

13  Q.  Okay.  Now on September the 14th, you had dealt with Agent

14  Ascencio.  Did you call him?  Were you also calling him?

15  A.  When they needed me to get somebody on the line or put some

16  pressure or help him discern what was -- you know, reading the

17  landscape, I would.

18  Q.  So those were conducted via telephone conference?

19  A.  Yes.  But on one occasion, Agent Ascencio was working -- or

20  at least he represented to me he was on a task force in Texas.

21  So on one occasion, I met with him in San Antonio.

22  Q.  Okay.  And time period, do you know more or less when that

23  meeting would have taken place?

24  A.  Probably November.

25  Q.  Of that same year, 2007?

Delgado - Direct by Mr. Velarde

1    A.  Uh-huh.  Yes.

2    Q.  Did Agent Ascencio ever tell you that -- that he was

3    frustrated with --

4            MS. KANOF:  Objection, leading.

5            THE COURT:  I'll sustain the objection.

6    BY MR. VELARDE:

7    Q.  Did Agent Ascencio have you do anything else for him

8    besides -- did he specifically direct you to do anything for

9    him?

10   A.  Not him, no.

11   Q.  You had contact with him.  Did you ever have other contact

12   with Tom Justice, and if so, on what occasions, if you can

13   recall?

14   A.  The contact with Agent Justice was of a constant nature,

15   probably two or three times a month, basically, because he was

16   asking me to do things.

17   Q.  And during these occasions when you were talking to him,

18   were you actually talking to him or leaving messages or sending

19   him text messages?  What exactly were you -- how were you

20   conveying your messages?

21   A.  I would leave a voice message and then he would call right

22   back.  I would actually text to him, and sometimes he would

23   answer, or he would call me.

24   Q.  During this time period did you have any contact with

25   El Paso ICE?

1    A.  No.

2    Q.  Okay.  Did Agent Justice advise you that he was moving on,

3    ever?

4    A.  Eventually, many months after that.

5    Q.  Many months after that.  And when he told you that, how --

6    how did he communicate that to you?

7    A.  He was introducing me to his replacement.

8    Q.  And that was?

9    A.  Jeffrey -- Jeff Walton, I believe.

10   Q.  Okay.  And did he instruct you to stay in touch with

11   Mr. Ascencio?

12   A.  He said that it would be the same process.  I would work

13   with the case agent and when needed, you know, Ascencio

14   would -- would come on board.

15   Q.  Okay.  Now let me take you to the events some days prior to

16   July 22nd/23rd, Chicago.

17          Did you undertake to go pick up money in Chicago?

18   A.  No.

19   Q.  Okay.  The money that was picked up in Chicago, whose money

20   was it, if you know?

21   A.  Those were funds from a builder in Mexico that wanted to

22   engage us, through Lilian de la Concha, in some work in the

23   U.S.

24          At this point, I had already undertaken many trips

25   trying to assist the Atlanta office that resulted in expenses.

Delgado – Direct by Mr. Velarde

1   So I had already said, Without funding, Lilian, I'm not going

2   to move forward.  I need my expenses covered.

3           And this was agreed with Atlanta, and Atlanta saw it

4   as an opportunity for them --

5           MS. KANOF:  Objection, Your Honor.

6           THE COURT:  I'll sustain the objection.

7   BY MR. VELARDE:

8   Q.  Did you let Atlanta know about that money?

9   A.  Yes, in advance.

10  Q.  And who did you speak to on that occasion?

11  A.  Tom Justice.

12  Q.  And so Tom Justice told you what?

13  A.  That Alex Ascencio was out of the city, and that we needed

14  to delay the operation.

15  Q.  Did you delay the operation?

16  A.  The original, yes.

17  Q.  Okay.

18  A.  Subsequent to that --

19          THE COURT:  You've answered the question.

20          Go ahead.

21  BY MR. VELARDE:

22  Q.  Thank you.

23          Did you have any contact with Victor Pimentel

24  regarding the money that ultimately was picked up in Chicago --

25  that he picked up in Chicago?

1    A.  Prior to him picking it up?

2    Q.  Yes, sir.

3    A.  Yes.  He was -- he told me there was going to be some

4    meetings, not that the funds were going to be ready.

5           MS. KANOF:  I'm sorry, Your Honor.  I don't understand

6    who "he" is.

7    BY MR. VELARDE:

8    Q.  Who is "he"?  Victor Pimentel?

9    A.  Pimentel, uh-huh.

10   Q.  Thank you.

11          Finish.

12   A.  So it was part of the process of creating that type of

13   pressure, to see if funds could be liberated from this new

14   source, from this individual.

15   Q.  Did you buy tickets for Victor Pimentel to go up there?

16   A.  No.  No, no.

17   Q.  And so there was telephone contact between you and Victor,

18   as evidenced by the exhibits already in evidence?

19   A.  Yes.

20   Q.  How did those conversations come about?  What caused you to

21   start calling -- talking to him?

22   A.  He told me he was in -- in Chicago, and that they were

23   getting ready to -- to pay.

24   Q.  An individual by the name of Martel -- that's his alias,

25   Martel -- ultimately made contact with Victor and gave him --

Delgado - Direct by Mr. Velarde

1   gave him the money?

2   A.  Correct.

3   Q.  Were you in touch with either Mr. Martel and/or people

4   working with him?

5   A.  No.

6   Q.  The telephone conversations that are already in evidence,

7   Mr. Delgado, you are talking to Victor about those people up

8   there.  They want to talk to you, he says.

9           Who was he referring to when he said these people want

10   to talk to you?  Do you know anything about that?

11   A.  No, I don't.

12   Q.  When did you learn that Victor had, in fact, picked up the

13   money or that he was going to pick up money?

14   A.  I think the fact that he picked money up, when he picked it

15   up, because there were always those false starts.

16   Q.  Well, had there been occasions before where you had picked

17   up money?

18   A.  No.

19   Q.  Okay.  And so after you picked it up, there was more

20   telephone communication between you and him?

21   A.  Yes.

22   Q.  Did you learn in those telephone conversations that he had

23   picked up money?

24   A.  Yes.

25   Q.  Did you instruct him to put the money in the -- in

Delgado - Direct by Mr. Velarde

1   somebody's account?

2   A.   Eventually, I did.  But in the beginning, I was waiting for

3   instructions from Atlanta.

4   Q.   Mr. Pimentel testified that when he returned back from that

5   trip he gave Special Agent Aguilera Liliana Narvaez' bank

6   account number.

7           Did you give that bank account number to Victor?

8   A.   I've gone through all the recordings, everything to refresh

9   my memory --

10          MS. KANOF:  Objection, nonresponsive.

11  A.   No.

12          THE COURT:  I'll sustain the objection.

13  A.   No, not...

14  BY MR. VELARDE:

15  Q.   And so when -- did Atlanta ever give you instructions on

16  where to put that money?

17  A.   Yes.

18  Q.   Okay.  The telephone toll records that are in evidence show

19  that there were phone calls made on several days before and on

20  that day.

21  A.   Correct.

22  Q.   And on those occasions when you were close to July

23  22nd/23rd, who were you talking to, if you recall?

24  A.   Tom Justice and Alex Ascencio.

25  Q.   Okay.  Do you know if Alex Ascencio was in Atlanta on --

Delgado - Direct by Mr. Velarde

1    when you were calling him?  Did -- were you able to verify if

2    he was in Atlanta?

3    A.  He would represent that he was in Texas, but I wasn't able

4    to verify it.

5    Q.  Okay.  Now, let's fast-forward to December 2008.

6            Well, let me -- before -- before I leave that Chicago

7    scene, was the money brought back to El Paso as far as you

8    know?

9    A.  Yes.

10   Q.  Was that money placed in your account?

11   A.  Yes.

12   Q.  And you kept the money?

13   A.  Yes.

14   Q.  And you kept the money for what reason?

15   A.  That was a reimbursement of expenses incurred and all the

16   trips and dining and everything on behalf of this effort by

17   Atlanta to have more access into various groups into Mexico.

18   Q.  Okay.  Which brings me to the next subject.

19           Following your trip to Atlanta in September, and all

20   the way up to July, some 10 months later, did you make trips to

21   Mexico?

22   A.  Yes.

23   Q.  Did you make those trips on behalf of Atlanta?

24           MS. KANOF:  Objection.

25   A.  I did.

1    BY MR. VELARDE:

2    Q.  And so you incurred -- you incurred expenses as a result of

3    that?

4    A.  Yes.

5    Q.  And so the money that was deposited on -- following --

6             THE COURT:  Wait a minute.  Let him testify.

7             That's leading.

8             Let him testify.

9    BY MR. VELARDE:

10   Q.  Sir --

11            MR. VELARDE:  I'm trying to speed up, Judge.

12   BY MR. VELARDE:

13   Q.  Okay.  The money -- the money was deposited into your

14   account?

15   A.  Correct.

16   Q.  Okay.  Let me fast-forward now to December of 2008.

17            Do you recall being called into the ICE office here in

18   El Paso?

19   A.  Yes.

20   Q.  Did you visit with ICE people there in El Paso?

21   A.  I did.

22   Q.  Were you involved in a telephone conference call?

23   A.  Yes.

24   Q.  Do you remember some of the people that were involved in

25   that conversation?

1    A.   There were actually two conference calls.

2    Q.   Okay.  I would like you to direct your attention to the

3    first conference call sometime in December.  Okay?

4    A.   Yes.

5    Q.   When would that conference call have taken place?

6    A.   I believe it was in the evening.

7    Q.   Okay.  And what was the nature of that call?  What, if

8    anything, was discussed with you?

9    A.   That I had been instructed to interact strictly with

10   Atlanta, but that there was a recent development that they

11   needed me to be aware of, and that I was going to be informed

12   of by ICE El Paso.

13   Q.   Was that the gist of that telephone call?

14   A.   Yes.

15   Q.   Was there a followup to that phone call?

16   A.   Not with Atlanta, no.

17   Q.   But was there another phone call from --

18   A.   There was another conference call.

19   Q.   And the other conference call?

20   A.   It was to Mexico with Lilian de la Concha.

21   Q.   Okay.  This conference call to Lilian de la Concha, who --

22   where was it placed from?

23   A.   From the ICE office in El Paso.

24   Q.   Okay.  Before we talk about that, I want you to bear with

25   me.

Delgado - Direct by Mr. Velarde

1           Did you meet with these agents to discuss some
2   developments involving you?
3   A.  Yes.
4   Q.  Okay.  When did that meeting take place?
5   A.  It was also in the evening when that conference --
6   Q.  Okay.
7   A.  Right after the first conference call.
8   Q.  Okay.  After this conference call, did you have a
9   physical --
10  A.  Yes.
11  Q.  -- meeting?
12          Where?
13  A.  In their -- in the ICE office.
14  Q.  Here in El Paso?
15  A.  In El Paso.
16  Q.  Okay.  And who did you meet?
17  A.  DJ and another -- there was another agent there.  I don't
18  remember.
19  Q.  Did you -- did they -- you and them participate in a
20  conference call?
21  A.  In both, actually.
22  Q.  Okay.  This conference call with these two people took
23  place with who else?
24  A.  I'm not sure I...
25  Q.  Okay.  Did Atlanta, Georgia, participate in this conference

Delgado – Direct by Mr. Velarde

1  call?

2  A.  On the first one, yes.

3  Q.  Oh.  In the first one.

4       Was any –– any warning communicated to you?  Were you

5  told about a threat?

6  A.  Not by Atlanta.  Atlanta told me that El Paso would tell

7  me, and they told me subsequent to hanging up.  And they

8  informed me of a threat.

9  Q.  Okay.  The threat was communicated to you via a conference

10  call?

11  A.  No, face-to-face.

12  Q.  Face-to-face.  And when this threat was communicated to

13  you, was Atlanta also present on that phone call?

14  A.  No.

15  Q.  Okay.  When you had this face-to-face meeting with El Paso

16  ICE, what was discussed?

17  A.  They identified the source of the threat as being Lilian de

18  la Concha.  They told me to expect a call from someone I was

19  very close to, to meet them at a Walmart.  And if they did

20  that, not to show up.

21       It was recommended to me to leave town, to contact

22  them if I saw any suspicious activity.  They asked me if I

23  thought where this might be coming from.

24  Q.  Okay.  You testified that you identified Lilian de la

25  Concha as a source of the threat?

Delgado - Direct by Mr. Velarde

1    A.  They did.  They told me.

2    Q.  They told you?

3    A.  Yes.

4    Q.  Did they inquire of this Chicago trip?  Did they make

5    inquiry about what happened up in Chicago?

6    A.  No, not -- no.  No.

7    Q.  Did Atlanta -- go ahead.

8    A.  If I may?

9    Q.  Yes, sir.

10   A.  I was actually --

11        MS. KANOF:  Objection, Your Honor.

12        THE COURT:  I'll sustain the objection.

13   BY MR. VELARDE:

14   Q.  Sir, at either meeting, did anybody probe you about what

15   happened in Chicago?

16   A.  No.

17   Q.  And so following that meeting in December 2008, did you

18   continue to have any more contact with El Paso ICE?

19   A.  I might -- yes, two calls.

20   Q.  Two calls, meaning what?

21   A.  They asked -- Atlanta -- I called Atlanta, and Atlanta

22   asked me to call an agent in El Paso to inform him that I was

23   under the impression that I was being followed.

24        It turned out that I was being followed.

25        MS. KANOF:  Objection, Your Honor.

Delgado - Direct by Mr. Velarde

1   BY MR. VELARDE

2   Q.  That's responsive enough.  Thank you.

3        Mr. Delgado, 11 months ago or so, last November, you

4   were again confronted by ICE -- encountered, correct?

5   A.  Yes.

6   Q.  And you were taken into custody?

7   A.  Yes.

8   Q.  And Special Agent Fry, who testified this morning, talked

9   about those events.  I would like to visit with you about those

10  matters.

11  A.  Okay.

12  Q.  Did Agent Fry pull out the statement you had given Agent

13  Justice and review that with you?

14  A.  No.

15  Q.  Did you ever tell Agent Fry you didn't want to know if the

16  money was from drugs, the money that was seized in

17  September 2007?

18  A.  No.  But we did discuss -- there was a series of questions

19  along those lines.  But that was not the answer that I gave.

20  Q.  Okay.  As best as you recall, what did you tell Agent Fry

21  on that occasion?

22  A.  After the seventh time of being asked, I actually just told

23  him, I don't know why I didn't ask.  It didn't occur to me,

24  because of the group involved, that it could be remotely

25  possible as an illicit drug operation.

Delgado - Direct by Mr. Velarde

1    Q.  Did you identify a person by the name of Jose Quezada for

2    him?

3    A.  No.

4    Q.  Do you know Jose Quezada?

5    A.  I don't know a Jose Quezada, no.

6    Q.  Did you identify any family members, any of Lilian de la

7    Concha's family members, to Agent Fry?

8    A.  No.

9    Q.  Now, with respect to some funds that were deposited in your

10   girlfriend's account --

11   A.  Yes.

12   Q.  -- did you touch on that subject with Agent Fry about that?

13   A.  Yes.

14   Q.  Okay.  What specifically did you tell him about that?

15   A.  The source of the funds, the use.

16   Q.  And who was the source of the funds?

17   A.  It was Mr. Cohen, Isaias Cohen.

18   Q.  Okay.  And who was Isaias Cohen?

19   A.  He's an entrepreneur in Mexico, a businessman.

20   Q.  Okay.  And what relationship, if any, did he have to Lilian

21   de la Concha?

22   A.  Extreme -- a very close relationship.

23   Q.  Continue.

24   A.  We discussed what use I gave him.  We discussed -- he

25   wanted to know why I hadn't mentioned to my girlfriend -- to my

Delgado - Direct by Mr. Velarde

 1    fiancée -- the source of the funds.

 2            And he wanted to convince me that those funds were

 3    also from some sort of drug trafficking organization.

 4    Q.  Okay.  Is Mr. Cohen involved in drug trafficking, as best

 5    as you know?

 6    A.  No, he's not.

 7    Q.  Okay.  How much money was deposited into your girlfriend's

 8    account?

 9    A.  $500,000.

10    Q.  And why did you put the money in her account?

11    A.  When this loan was secured, I was actually overseas, work

12    related, for an extended period of time.

13            And my girlfriend has always been very supportive in

14    terms of assisting me with the logistics of the payments that I

15    have to make, when I have to make them.  So I gave her the

16    money, she takes care of it.

17            But in addition to it, we were in the process of

18    looking for a house.

19    Q.  Did you tell your girlfriend where the money came from?

20    A.  No.

21    Q.  The money originated -- do you know where the money

22    originated from?

23    A.  Yes.

24    Q.  Where?

25    A.  UBS, in Switzerland.

1    Q.  Okay.  So was this money wire transferred?

2    A.  Yes.  Uh-huh.

3    Q.  From bank to bank?

4    A.  Yes, sir.

5    Q.  And the money was for what -- the money, this money, this

6    loan was extended to you in connection --

7            MS. KANOF:  Objection, Your Honor.  Assuming facts not

8    in evidence.

9            MR. VELARDE:  He testified --

10           MS. KANOF:  He never said it was a loan.

11           MR. VELARDE:  He testified it was --

12           THE COURT:  Rephrase your question.  Rephrase the

13   question.

14           Let me hear it.

15   BY MR. VELARDE:

16   Q.  Sir, the money -- the loan that was extended to you -- you

17   did testify it was a loan?

18   A.  I did, sir.

19   Q.  Okay.  So the loan that was extended to you, did it involve

20   any -- you performing any kind of activity or anything of that

21   nature?

22   A.  The terms of the loan called for a loan in lieu of fees.

23   In other words, once I started pulling for a project, it would

24   be discounted from the loan amount.  And there would also be a

25   service, obviously, of a debt, and a corresponding interest

Delgado - Direct by Mr. Velarde

1   payment.

2   Q.  Well, what service did they -- were you supposed to

3   perform?

4   A.  Well, actually perform, they wanted my assistance, my legal

5   assistance, in structuring a program to assist migrant workers

6   in the United States coming from Mexico.

7   Q.  Did it involve any kind of insurance?

8   A.  Yes.

9   Q.  What kind of insurance was this?

10  A.  It was insurance for the repatriation of the remains of any

11  immigrant that happened to perish in the United States.

12  Q.  There's been -- well, we touched upon the threat.  We

13  didn't talk about representations made in connection with that,

14  so I would like to ask you about that.

15         Did you ever tell -- did ICE ever tell you that these

16  were cartel funds, any of the funds that you had ever received?

17  A.  No.  And the term "cartel" was not mentioned to me until I

18  was arrested in November of last year.

19  Q.  Do you know anything about the *Milenio Valencia* cartel?

20  A.  Now, I do.  But at that time, I did not.

21  Q.  Did -- you've heard the town of Colima mentioned several

22  times.  Do you attribute any significance to that town as being

23  a cartel town?

24  A.  I attribute a lot of significance to that town because of

25  the major electric power plant that's being developed there;

1   not as a source of a cartel base.

2   Q.  Mr. Delgado, did you know that the funds that Victor

3   Pimentel brought were drug proceeds?

4   A.  No.

5   Q.  That they were the -- that they -- that these were illegal

6   proceeds?

7   A.  No.

8   Q.  Did you know that the funds that were picked up in Chicago

9   were illegal proceeds, drug proceeds?

10  A.  No.

11  Q.  And of course, you've already told us about the half a

12  million from Mr. Cohen.

13          MR. VELARDE:  May I just have a minute, Your Honor?

14          THE COURT:  You may.

15          MR. VELARDE:  Mr. Delgado, thank you very much.

16          No further questions, Your Honor.

17          Pass the witness.

18                    CROSS-EXAMINATION

19  BY MS. KANOF:

20  Q.  Mr. Delgado, on September 7th of 2007, you were detained by

21  the Department of Public Safety with a million dollars in cash

22  in the back of a vehicle that you were driving, correct?

23  A.  That's incorrect.

24  Q.  You weren't detained by the Department of Public Safety?

25  A.  I was not driving the vehicle and was detained by the

Delgado - Cross by Ms. Kanof

1    Department of Public Safety, no.

2    Q.  Oh, they didn't detain you?

3    A.  You asked if I was driving and I was detained.

4    Q.  I didn't say you were driving.

5    A.  You did.

6    Q.  I said on September 7th, were you -- you were detained by

7    the Department of Public Safety?

8    A.  Yes.

9    Q.  And when you were detained, you told them that all the

10   luggage in the back of the vehicle except the red duffel bags

11   was yours, correct?

12   A.  Correct.

13   Q.  Okay.  The black luggage was not yours, was it?

14   A.  It is, actually.

15   Q.  No.  Well --

16   A.  Yes.

17   Q.  Victor had just come from Atlanta, hadn't he?  Hadn't

18   Victor just come from Atlanta?

19          MR. VELARDE:  Your Honor, the question has been asked

20   and answered.  He's answered it's not.

21          THE COURT:  Let him answer.

22   BY MS. KANOF:

23   Q.  Victor had just come from Atlanta, correct?

24   A.  Yes.

25   Q.  And he would have had luggage, because he spent the night

Delgado — Cross by Ms. Kanof

1    in Atlanta, correct?

2    A.  I don't really know the logistics of his travel or

3    anything.

4    Q.  Well, let's assume for a minute he did spend the night in

5    Atlanta.  He would have had luggage, right?

6    A.  Yes.

7    Q.  You lived with Victor for years, correct?

8    A.  He lived within my house, yes.

9    Q.  So he wouldn't go somewhere overnight and not take a change

10   of underwear, would he?

11   A.  That, I don't know.  I didn't travel with him.

12          THE COURT:  Do you have an objection?  Speak up.

13          MR. VELARDE:  Yes, I do, Your Honor.

14          The questions are not relevant, and she hasn't laid a

15   foundation to establish that that luggage is Victor's.  There's

16   no evidence.

17          THE COURT:  Overruled.

18   BY MS. KANOF:

19   Q.  Well, on the 7th, after you were arrested, you were

20   interviewed by ICE Atlanta, correct?

21   A.  Yes.

22   Q.  And you told the -- first of all, you speak English very

23   well, don't you?

24   A.  I consider myself fluent.

25   Q.  Well, you were on the board of trustees of Carnegie Mellon

Delgado — Cross by Ms. Kanof

1    University, weren't you?

2    A.  Yes, but there's not a language requirement as far as I

3    know.

4    Q.  Well, you took the Texas bar in English, didn't you?

5    A.  I'm agreeing.  I don't have a problem with English.  I'm

6    not...

7    Q.  Okay.  But you spoke to Tom Justice in Spanish?

8    A.  No.  I don't think Tom speaks Spanish, no.

9    Q.  You were interviewed in Spanish, correct?

10   A.  Partially.

11   Q.  When you were stopped by the DPS officer, you spoke to him

12   only in Spanish, correct?

13   A.  I don't believe so, no.

14   Q.  So he was not telling the truth when he said you spoke to

15   him only in Spanish?

16   A.  Who?

17   Q.  The Department of Public Safety officer that testified.

18   A.  I don't recall.  You've got the recording, but I feel

19   comfortable in English and Spanish.  I don't have an issue with

20   that.

21   Q.  And you told Agent -- the agents from Atlanta, right after

22   you were taken by the DPS officers and the ICE agents -- you

23   told them that -- that in 1999 you worked with someone named

24   Lino Korrodi, K-O-R-R-O-D-I, correct?

25   A.  Yes.

Delgado - Cross by Ms. Kanof

1  Q.  And that -- you advised him that you were a licensed

2  attorney in El Paso, correct?

3  A.  I don't recall.

4  Q.  Well, you told the ICE agents that's how you met Lilian de

5  la Concha, is through this individual Korrodi, correct?

6  A.  Yes.  Uh-huh.

7  Q.  Is that true?

8  A.  Yes.

9  Q.  Okay.  And then you told the ICE agents that you went to

10  Mexico because Lilian wanted to introduce you to Francisco

11  Fernandez, who is Paco, correct?

12  A.  She mentioned that she wanted me to meet Paco Fernandez,

13  yes.

14  Q.  Okay.  No, I'm not asking what she said.  I'm asking what

15  you told ICE.

16       You told ICE that you weren't sure, but at some time

17  in 2006 you were told by Concha to met with Fernandez at his

18  office in Mexico City, correct?

19  A.  I don't recall.

20  Q.  You told ICE that when you arrived at the office, Concha

21  was sitting next to Fernandez on the side of the table that he

22  was sitting on across from you, correct?

23  A.  Okay.  I believe so, yes.

24  Q.  You told ICE that Fernandez advised that he has an

25  accountant named Pedro Mendoza who has very good clients that

Delgado - Cross by Ms. Kanof

1    are having problems with their accounts, correct?

2    A.  Correct.

3    Q.  And you stated that he -- so, so far, ICE is telling the

4    truth in their report, right?

5    A.  Not if they say I was speaking Spanish to Tom Justice.  I

6    know for a fact he's not bilingual.

7    Q.  Well, Tom Justice testified that you were speaking Spanish.

8    So he was not telling the truth, then?

9    A.  They claim I wasn't in contact with them over the phone,

10   and the phone records show otherwise.  So I guess so.  Yes,

11   you're right.  There is a pattern there.

12   Q.  I'm sorry?

13   A.  I think you're right.  Yeah, he is misrepresenting the

14   facts.

15   Q.  Okay.  I'm talking about the very first interview after

16   your stop by DPS.  We're not going to talk about telephones,

17   okay, right now.

18   A.  Okay.

19   Q.  Okay?

20         And Agent Justice testified you were speaking Spanish.

21   He needed an interpreter, correct?

22         So now you're saying -- correct?  Yes or no?

23   A.  No.

24   Q.  Okay.  He didn't say that?

25   A.  Well, yeah, he did say that.

Delgado — Cross by Ms. Kanof

1    Q.  Okay.

2    A.  But it's not correct.

3    Q.  And you're saying that's not true.

4    A.  I didn't need an interpreter into English.

5    Q.  Well, that's true.  You don't, do you?

6    A.  I don't.

7    Q.  And Agent Justice said you were speaking Spanish.

8    A.  I was responding in Spanish to questions being asked by an

9    Hispanic agent in Spanish.

10   Q.  And that was because you asked for an interpreter, correct?

11   A.  That's a blatant lie.  I do not need, nor needed back then,

12   an interpreter.

13   Q.  You were asked, What would you prefer to be interviewed in,

14   English or Spanish?

15          And you said Spanish, correct?

16   A.  Okay.  That's very different than saying I need an

17   interpreter.

18   Q.  Yes or no.

19   A.  I don't -- I don't believe that's the case.  I don't

20   recall.

21   Q.  Okay.  So he -- he testified falsely, correct?

22   A.  Yeah, if that's...

23   Q.  You told ICE that de la Concha and Fernandez had been

24   approached by some clients of Pedro's to handle a delicate

25   issue on some individuals being extradited to the U.S.,

1    correct?  You told them that, right?

2    A.  No.  What I told them is that they asked me if I knew

3    anybody that could assist them with some individuals from

4    Mexico that were being extradited.

5    Q.  Okay.  And if you could prevent the extradition, correct?

6    A.  No.

7    Q.  So when the agent wrote that you said that these clients

8    wanted to know if you could prevent the extradition, the agent

9    did not tell the truth in the report?

10   A.  Correct.  I said slow down the process.

11   Q.  You told the agents that Fernandez said he did not know how

12   much to charge and that he was afraid to get involved with

13   these kinds of people because if they pay us, and it does not

14   come out the way they like, it could cost you your lives.

15          You told ICE that, didn't you?

16   A.  Yes.

17   Q.  And then you told ICE that Fernando [sic] wanted to know if

18   you had the ability to get an extradition order put on the

19   bottom.

20          So first you said if you could get them out of the

21   extradition, then you said if you could slow it down?

22   A.  No.

23   Q.  Okay.  So he -- he -- that one paragraph about getting him

24   out of it was a lie, correct?

25   A.  Not just that one.  Also about the Spanish and the previous

Delgado — Cross by Ms. Kanof

1    ones so far.

2    Q.  I wasn't talking about testimony then.  I'm talking about

3    what you told ICE on this -- an attorney is an individual that

4    retains a lot of details, correct?

5    A.  I guess so.

6    Q.  It's part on an attorney's job to be succinct, right?

7    A.  I really don't understand the question.

8    Q.  Isn't it part of an attorney's job to recall facts?

9    A.  Yes.

10   Q.  And so you then told ICE that some of the names that were

11   provided by Fernandez appeared on the kingpin's designation on

12   the U.S. Treasury list that is posted on the Internet, correct?

13   A.  Yes.

14   Q.  So you did some research?

15   A.  Yes.

16   Q.  And in fact, there was a name on that list that was on the

17   kingpin's list, right?

18   A.  I was under the impression that -- yeah, that several -- I

19   mean, I don't recall how many names.

20   Q.  So you're dealing with this man Fernandez who's asking you

21   to help drug kingpins prevent extradition to the United States,

22   correct?

23   A.  No.  I was asked if I knew somebody that could assist with

24   that type of cases.

25   Q.  Right.  And they gave you a list of names when you were

Delgado — Cross by Ms. Kanof

1   asked?

2   A.  Yes.

3   Q.  And you compared those names on the Internet to the

4   treasury drug kingpin list, correct?

5   A.  Correct.

6   Q.  And you found some of those names?

7   A.  Yes.

8   Q.  So now you know that Mr. Fernandez and Ms. de la Concha

9   have clients who are drug kingpins, correct?

10  A.  No.  I mean they didn't say "my clients."  They said, Do

11  you know somebody that can assist with this type of case?

12          It's as if somebody asked me, Do you know a criminal

13  lawyer that can help that?

14  Q.  So they weren't their clients?

15  A.  (No verbal response.)

16  Q.  When you told ICE, Fernandez said that these clients wanted

17  to know if we could prevent the extradition, the agent lied

18  when he said you said clients?

19  A.  That, I don't know.  I don't recall.

20  Q.  No, I'm asking you.  You're now saying that they didn't

21  represent them as their clients.

22  A.  No.  They didn't come and say, Hey, I have a client that

23  needs this service.  They were looking for a criminal attorney

24  that could assist with that type of legal matter.

25  Q.  Well, they obviously knew some drug kingpins if they were

Delgado – Cross by Ms. Kanof

1   giving you a list of them, didn't they?

2   A.  Or somebody that they knew, knew them.  It doesn't

3   necessarily follow that they knew them.

4   Q.  You told -- you told ICE that you even told de la Concha

5   that they were on the drug kingpin list, didn't you?

6   A.  Yeah.  Right after that, I actually said, No, this is not

7   something that we can get involved with because of that,

8   because they were individuals associated with illegal activity.

9   Q.  You told ICE on that same date in that same interview, in

10  Spanish, that you met again near the end of 2006 with de la

11  Concha, Pedro, and Paco, correct?

12  A.  Ma'am, I did not conduct an interview in Spanish.

13  Q.  Okay.  Regardless of the language, you told ICE that you

14  met again with de la Concha, Pedro, and -- and Paco at the end

15  of 2006 in Mr. Fernandez' office, correct?

16  A.  Yes.

17  Q.  And you told them -- that is ICE, on this same

18  September 7th evening -- that they wanted advice on how to

19  invest a lot of money that was in cash, correct?

20  A.  Yes.

21  Q.  And then you told them -- so they're telling the truth when

22  they say this, the ICE agents, in the report?

23  A.  I thought I had answered.  I mean...

24  Q.  Okay.  You stated that Pedro told you the money was from an

25  inheritance and from gambling winnings, correct?

Delgado - Cross by Ms. Kanof

1    A.  Yes.

2    Q.  Okay.  Pedro told you the money was an inheritance, right?

3    A.  When I was asked --

4    Q.  Yes or no, please.

5    A.  Yes.

6    Q.  And you testified, on direct with Mr. Velarde, that it was

7    Mr. Vargas who told you about an inheritance, correct?

8    A.  Yes.

9    Q.  Okay.  So now two different people have told you about an

10   inheritance?

11   A.  Yes.

12   Q.  Mr. Vargas never met with you, Lilian de la Concha, Paco,

13   and Pedro in Fernandez' office in Mexico City, did he?

14   A.  I don't know if -- if with Lilian.  But yeah, with Pedro --

15   yeah.  Pedro is his accountant.  Of course.

16   Q.  Pedro is Mr. Vargas' accountant?

17   A.  He's one of the advisers of the tax accountants there that

18   they use.

19   Q.  Oh, okay.  Isn't the word accountant in Mexico -- it's not

20   necessarily a meaning for CPA.  You kept referring to him as a

21   CPA, correct?

22   A.  An accountant?

23   Q.  Yeah.

24   A.  The term in Spanish is *contador*.  And the translation, if

25   it's a *contador publico*, is a CPA.

Delgado - Cross by Ms. Kanof

1    Q.  Excuse me, sir.

2    A.  This individual is --

3            MS. KANOF:  Your Honor, nonresponsive.

4            THE COURT:  Go ahead.  Ask the question again.

5    BY MS. KANOF:

6    Q.  Never once does it say *contador publico* in any e-mail, does

7    it?

8    A.  I don't know.  I can check, but he is a *contador publico*.

9    He's a CPA.

10   Q.  Well, you knew him pretty well, right?

11   A.  No.

12   Q.  Oh, you didn't know him pretty well?

13   A.  No.  But we shared, you know, relationships in common.

14   Q.  Okay.  And I'm sure you have some witnesses or something

15   that are going to also corroborate your testimony that he was a

16   CPA and that he was Vargas' CPA.  Do you?

17   A.  I'm not sure I'm following your question, ma'am.

18   Q.  Okay.  I'll go on.

19           You also told ICE that between the end of 2006 and

20   April of 2007 you had not conducted any transactions.

21           Transactions.  Did you tell them that?

22   A.  I don't recall.  I don't believe so.

23   Q.  But that in May -- April or May of 2007, Pedro gave you a

24   U.S. Treasury bond from the 1940s and wanted to know if you

25   could get it cashed.

Delgado - Cross by Ms. Kanof

```
 1              You told them that, correct?
 2    A.  Yes.
 3    Q.  That's not what you told this jury.  You didn't tell this
 4    jury that he wanted to know if you could cash it, did you?
 5    A.  I told them --
 6    Q.  You told some elaborate story about looking for investors
 7    and -- oh, and by the way, you referred a lot to "us."  You
 8    implied, in us, that you were one of the owners of the bond.
 9    A.  I had an interest in the bond, in terms of what would be
10    realized from its sale or from its placement or from mortgaging
11    it.
12    Q.  Well, we'll talk about the bond a little bit later.  Let's
13    continue with the statement.
14              And then you told ICE that Pedro says, as long as you
15    could provide verification of ownership it would not be a
16    problem; is that correct?
17    A.  Yeah.  That I told him that, yeah.
18    Q.  And then you told ICE that you still have the bond and that
19    you suspect the bond is counterfeit or stolen, correct?
20    A.  No, that's -- I had heard the comment that was brought to
21    me by one of the agents.  But, no.  I mean, the process --
22    Q.  So they made that up in the report?
23              MR. VELARDE:  Your Honor, I object.
24              THE COURT:  Let him answer.
25              MS. KANOF:  Okay.
```

Delgado - Cross by Ms. Kanof

1    BY MS. KANOF

2    Q.  Go ahead.

3    A.  The process is very cumbersome, so it's not just, Let's

4    sell it, you know, because there was no --

5    Q.  The question is --

6              MR. VELARDE:  Let him answer, Your Honor.

7              MS. KANOF:  I'm sorry, Your Honor, he's nonresponsive.

8              THE COURT:  He's got to answer the question,

9    Mr. Velarde.

10             MR. VELARDE:  But she's interrupting him.

11             MS. KANOF:  He's not answering the question.

12             THE WITNESS:  Could you repeat the question, please?

13             MR. VELARDE:  I object to the comment.

14             THE COURT:  That's enough.

15             You just answer the question that's posed to you.

16             THE WITNESS:  Okay.

17    BY MS. KANOF:

18    Q.  You told ICE that you still have the bond and you suspect

19    it's either counterfeit or stolen, correct?

20    A.  No, that that was one of the risks.

21    Q.  I'm sorry?

22    A.  I didn't say I suspected.  I said it's one of the risks

23    associated with this type of transaction.  That's why it's so

24    complex.

25    Q.  So ICE misunderstood you then, when they put this in here?

1    A.  Or they distorted it on purpose.  I don't know.

2    Q.  They distorted it on purpose.

3         You were about to say they distorted it on purpose,

4    correct?

5    A.  No, I actually said it.

6    Q.  Okay.  You think ICE distorted this on purpose?

7    A.  I think they oversimplify ideas.  And in doing so --

8         MS. KANOF:  Your Honor, it was a yes-or-no question.

9    BY MS. KANOF:

10   Q.  You think ICE --

11        THE COURT:  Wait a minute.  Let's take a 15-minute

12   break and cool off.  Okay?

13        We'll be in recess for the next 15 minutes.

14        (Recess taken; open court.)

15        MS. KANOF:   May I proceed, Your Honor?

16        THE COURT:  You may continue, Ms. Kanof.

17   BY MS. KANOF:

18   Q.  Mr. Delgado, you're an attorney, correct?

19   A.  Yes, ma'am.

20   Q.  What is discovery?

21   A.  Excuse me?

22   Q.  What is discovery?

23   A.  I guess it's a function of the jurisdiction that you're

24   referring to.

25        THE COURT:  You've got to speak into the microphone.

Delgado - Cross by Ms. Kanof

1    We can't hear you.

2    A.   It's a function of the jurisdiction that you're referring

3    to how discovery is defined, ma'am.

4    BY MS. KANOF

5    Q.   Well, you were a civil practitioner, correct?

6    A.   Yes.

7    Q.   So let's talk about federal court in El Paso, Texas, the

8    Western District of Texas.   Okay?

9          What obligations do you have as a civil lawyer in

10   discovery in a civil lawsuit?

11   A.   Ma'am, I'll be honest with you.   In all of my years of

12   practice it was strictly focused on corporate matters.   I have

13   no experience in litigation, let alone courtroom procedures.

14   Q.   You were strictly focused on corporate matters and you have

15   no litigation experience; is that correct?

16   A.   Not as a practitioner, correct, ma'am.

17   Q.   Now, you previously said that -- that sometimes your people

18   in your law firm would make a mistake.

19          First of all, you didn't have people.   You just had a

20   secretary, correct?

21   A.   No.

22   Q.   You had other people that worked for you at Delgado &

23   Associates?

24   A.   Contract, yeah.

25   Q.   Who?

1    A.  Contractors.

2    Q.  Who?

3    A.  Benjamin Fernandez.

4    Q.  What did he do?

5    A.  He helped with all the banking matters that we had to do.

6           In Mexico we had two litigators, Ulises de la Serna

7    and Carlos Aguirre.  And they did all the regulatory work for

8    that.

9           But you're right, they weren't employees.  They were

10   contractors that I depended on.  That's the business model that

11   I adopted.

12          Even the secretary, even the receptionist, they're all

13   part of a --

14   Q.  Well, you had a secretary and a receptionist?

15   A.  Yeah.  My offices have a re- --

16   Q.  Your offices have a sec- --

17   A.  -- receptionist.

18   Q.  Well, that's a good question.

19          You had offices in Mexico?

20   A.  Yeah.  We had a presence in the form of --

21   Q.  I didn't ask if you had a presence.

22   A.  -- intelligence office.

23          MS. KANOF:  Your Honor, could you ask the witness to

24   perhaps answer my question?

25          THE COURT:  Answer the question, please.

1    BY MS. KANOF:

2    Q.  You had an office in Mexico?

3    A.  Yes, ma'am.

4    Q.  Okay.  And how many people were employed there?

5    A.  Employed, in the sense of being on the payroll, none.  The

6    business model that I had is depending and relying on

7    contractors, on freelancers.

8    Q.  So why did you need an office?

9    A.  Well, to follow up with clients, to have meetings, to

10   prepare work.

11   Q.  Why didn't you ever meet at your office in Mexico City?

12   A.  Excuse me?

13   Q.  Why didn't you ever meet at your office in Mexico City?

14   Why at Paco's?

15   A.  You mean the meetings with him, why we were at his office

16   and not mine?

17   Q.  Correct.

18   A.  That's where they would be called.  And I guess --

19   Q.  What was the address -- I'm sorry.

20        What was the address of your office in Mexico City?

21   A.  300 Reforma, 7th Floor, Suite 103.

22   Q.  And how did you pay for that rental service?

23   A.  For the use of the conference room, I depended on a client

24   that -- that was next door.  Actually, that's why we ended up

25   there.

Delgado - Cross by Ms. Kanof

1          For the two offices that we used, I'm sure we just cut

2    a check for the year-round or wire transferred or --

3    Q.  Well, I started this with asking about discovery.

4          And all of these documents that have been provided to

5    the jury today, you've had them for a long time as part of

6    criminal discovery, have you not?

7    A.  No, not for a long time.

8    Q.  Okay.  Some of them only for a couple of weeks, some of

9    them for a year, correct?

10   A.  Some of them for a year?  No.  No, no.

11          I know for a fact that --

12   Q.  Well, you've certainly --

13   A.  I was actually arrested in November, ma'am.

14   Q.  Okay.  I'm sorry.

15   A.  So, no.

16   Q.  You have had all of these documents, say, at least a month;

17   is that fair?

18   A.  No.  No, no.  I -- I disagree.

19   Q.  Okay.  Please tell the jury which documents we used you've

20   never seen before, including the ICE reports.

21   A.  The *Giglio* reports.

22   Q.  I'm sorry?

23   A.  *The Giglio* reports I have never seen before.

24   Q.  Do you know whether or not they were properly provided on

25   May 17th of 2013 by Juanita Fielden in our office?  Because --

```
 1              MR. VELARDE:  Your Honor, he's already answered the
 2   question.  Objection.
 3              THE COURT:  Overruled.
 4   BY MS. KANOF:
 5   Q.  So your attorneys didn't show you the Giglio letter sent by
 6   Juanita Fielden?
 7              MR. VELARDE:  Forgive me for interjecting myself.  I'm
 8   going to object based on relevance.
 9              THE COURT:  Overruled.
10   BY MS. KANOF:
11   Q.  Is that correct?
12   A.  Could you repeat the question, ma'am?
13   Q.  You don't recall seeing a letter from Juanita -- Assistant
14   United States Attorney Juanita Fielden, in May of this year,
15   that had the Giglio information in it?
16   A.  No.  I said I got the report a little while ago.
17   Q.  Well, the ICE reports that we're talking about right now,
18   you've seen those, haven't you?
19   A.  Yes, ma'am.
20   Q.  Okay.  And you've had these reports for quite some time.
21   In fact, you've had these reports from 14 days after your
22   Indictment, correct?
23   A.  I don't -- I don't remember the date of the Indictment.
24   Could you tell me when it was?
25   Q.  Do you remember when you were arraigned?
```

1    A.  Yes.  It was probably around the 6th of November.

2    Q.  Okay.  The 6th of November, did you say?

3    A.  I would think so.

4    Q.  I wasn't part of the case.  So the 6th of November; is that

5    right?

6    A.  Uh-huh.

7    Q.  Okay.  And you're familiar with the judge's Standing

8    Discovery Order that we have to turn over every and any

9    statement that you made within 14 days of your arraignment,

10   correct?

11   A.  I was not aware of that.

12   Q.  Did your attorneys ever complain to you that the Government

13   hadn't provided, timely, the ICE statements, your statements?

14   A.  I don't re- -- I don't have a recollection of them

15   discussing that with me.

16   Q.  But regardless, you've had them since at least January of

17   this year, correct?

18   A.  I honestly don't know.  I don't have a recollection of when

19   I received some of the reports.  They would be streaming in

20   periodically.

21   Q.  But you've received them?

22   A.  Yes.  Uh-huh.  Yes.

23   Q.  We were talking about the bond, and I asked you whether or

24   not you told ICE that you still had the bond.

25            Did you tell them that?

1    A.   When?

2    Q.   On the 7th of September of 2007.

3    A.   I don't recall.

4    Q.   Where's the bond?

5    A.   It was actually restituted to one of the -- of the owners.

6    One of the...

7    Q.   I thought you were one of the owners.

8    A.   No.  I wasn't actually -- I had an interest in the profit

9    associated with that, in the income stream that was going to be

10   generated, but not in the instrument itself.

11   Q.   When you told the agents you suspected it was either

12   counterfeit or stolen, why didn't you give it to them?

13   A.   Because I did not suspect that it was stolen or fraudulent.

14   I explained to them at length that one of the risks

15   associated --

16        MS. KANOF:  Your Honor, it was a yes or no.  I mean, I

17   think he's answered.

18        THE COURT:  I'll let him answer.  I'll let him answer.

19        MS. KANOF:  Whatever.

20   A.   The risks associated with that type of transaction rely on

21   that, on the bond being fraudulent or being stolen.

22   BY MS. KANOF:

23   Q.   Next you told the ICE agents, the same day, September 7th,

24   that Meneses -- that you met again in May of 2007 with Paco, de

25   la Concha, and Pedro.

1          Is that the truth?  You told them that?

2    A.  Yes, uh-huh.

3    Q.  I'm sorry.  I didn't hear you.

4    A.  Yes.

5    Q.  Okay.  And you said that Pedro brought up the idea of a

6    mirror operation, correct?

7    A.  No.  The mirror operation is a term that I learned recently

8    from your agents, you know, within the last year or so.

9    Q.  So ICE did not tell the truth in their report when they

10   said you -- that Pedro, in May of 2007, brought up the idea of

11   a mirror operation?

12   A.  They might have misstated.  But the term mirror operation

13   is not a term I was familiarized with.  So I mean, I couldn't

14   have --

15   Q.  Okay.  Further, you stated that his clients, meaning

16   Pedro's, want to pick up money in the U.S. and pay out U.S.

17   currency in Mexico simultaneously, correct?

18   A.  No.

19   Q.  You didn't say that?

20   A.  No, ma'am.

21   Q.  Agent Justice made it up?

22   A.  Yeah.  I mean, if you say so.

23   Q.  Then you told ICE that Pedro told the group his clients

24   have $600 million to transfer.

25   A.  No, that's incorrect.

Delgado – Cross by Ms. Kanof

1   Q.  Then you told ICE that around June of 2007 Paco paid for

2   your ticket to fly to Mexico City to talk again about moving

3   the money.

4   A.  When you refer to the money, are you referring to --

5   Q.  The $600 million.

6   A.  I've never engaged in a conversation with any party

7   regarding $600 million.

8   Q.  Okay.  So you did -- so again, you're saying that the ICE

9   agent was wrong when they wrote the report?

10  A.  I'm saying that it's incorrect, yes.

11  Q.  You told ICE that at this meeting Pedro brought a new

12  person to the table identified as Chuy, correct?

13  A.  I believe so, yes.

14  Q.  And that Chuy advised the money he needed to move was from

15  an inheritance, correct?

16  A.  I believe so, yes.

17  Q.  Well, I thought before you said the inheritance was from

18  Vargas.

19  A.  No.  What I'm saying is that there may be more people

20  passing away than just one.  I mean it is conceivable that

21  several of us in this room will receive an inheritance.  It's

22  not just limited to one person.

23  Q.  Did you or did you not tell this jury that the inheritance

24  that you were discussing was from Vargas?

25  A.  Yes.

Delgado — Cross by Ms. Kanof

1   Q.  Well, you told ICE that it was Chuy that had people who

2   needed to move money from an inheritance, correct?

3   A.  Estate planning is a big need in Mexico.  So, yes, there

4   was other --

5           MS. KANOF:  Your Honor, nonresponsive.

6           THE COURT:  Just answer the question, please.

7   A.  Yes.  There are several parties that require those

8   services.

9   BY MS. KANOF:

10  Q.  You told the ICE agents that Fernando called you in July of

11  2007 and advised that Chuy is willing to work without

12  collateral but would only allow a 5 percent fee for moving the

13  money.

14  A.  Ma'am, I'm sorry.  I don't know who Fernando is.

15  Q.  I'm sorry.  Fernandez.  Fernandez.  I'm very thirsty.  I'm

16  sorry.  Fernandez.

17          According to the report, you told ICE that Fernandez

18  called you in July of 2007 and advised that Chuy's willing to

19  work without collateral but would only allow a 5 percent fee

20  for moving the money.

21          You told that to ICE?

22  A.  I'll take your word for it.  That, I don't --

23  Q.  No, I'm asking.

24          Did you tell that to ICE?

25  A.  I don't recall having said that, no.

Delgado – Cross by Ms. Kanof

1   Q.  Okay.  Now if you had said that, that would be consistent

2   with what Victor testified to about getting a percentage for

3   moving the money, correct?

4   A.  You see when you refer to moving the money, that's where I

5   get confused.

6   Q.  Well, let me see if I can be a little clearer.

7   A.  Please.

8   Q.  Delgado stated Fernandez called him in July of 2007 and

9   advised that Chuy is willing to work without collateral but

10  would only allow a 5 percent fee for moving the money.

11  A.  But collateral -- you see, I get lost.  I don't know what

12  they were -- the agent was referring to when he wrote down

13  collateral.  Collateral for what?  I was selling a service, so

14  I wouldn't have to pledge anything.

15  Q.  Were you selling the service of moving money?

16  A.  Well, not moving, but structure -- structuring

17  transactions, yeah.  That's pretty much what I do.

18  Q.  Oh.  I thought you were a corporate attorney that was an

19  expert in energy law.

20       Now, you're telling the jury that what you do for a

21  living is structure money transactions?

22  A.  No.  I'm saying that transaction planning is being a

23  corporate lawyer, and focusing on energy is being a transaction

24  planner of energy businesses, yes.

25  Q.  So they misunderstood you when you were talking about

Delgado - Cross by Ms. Kanof

1   moving money for Chuy, the ICE did?

2   A.  (No verbal response.)

3   Q.  Correct?

4   A.  Yes.

5   Q.  And then you stated that you told Fernandez -- that would

6   be Paco, correct?  Is that correct?

7   A.  Yes.

8   Q.  That Pedro would need to provide some kind of documentation

9   for the source of the money.

10          Do you recall that?

11  A.  That is correct.

12  Q.  And that Pedro said he would provide documentation for 6-

13  or $7 million, correct?

14          Is that correct?

15  A.  Yeah.  I mean -- I don't have a specific recollection of

16  that, but that would be an amount that would be reasonable, not

17  the 600.  I had never heard the 600.

18  Q.  Six or seven this time.  Six or seven.  That Pedro would

19  provide documentation so you could get 5 percent for moving

20  money, 6- or $7 million, correct?

21  A.  Okay.  Yes.

22  Q.  And you're calling this structuring, right?

23  A.  Okay.

24  Q.  You didn't -- you never, by the way --

25          MR. VELARDE:  Let him answer.  Objection.

1    BY MS. KANOF:

2    Q.  Are you calling this structuring?

3            MR. VELARDE:  Let him answer.

4    A.  Any operation that involves the exchange --

5            MS. KANOF:  I'm sorry, Your Honor.  It was a yes-or-no

6    question.

7            THE COURT:  Let him finish.

8    A.  Any operation that involves the exchange of services, of

9    goods, including leverage, including interest hedging,

10   including funds, is considered structuring, transaction

11   planning.

12   BY MS. KANOF:

13   Q.  Okay.  So you did tell them that you told Chuy he had to

14   have documentation for the source of the money, correct?

15   A.  Yeah.  Any transaction that involves funds, it's a

16   requirement, you know, source of origin.

17           MS. KANOF:  Is it -- is it publishing, Judge?  I don't

18   see it on the screen over here.

19           Okay.  My younger co-counsel has gotten it

20   straightened out for me.

21   BY MS. KANOF:

22   Q.  I'm showing you Government's Exhibit Number 32.  And it's

23   an e-mail that was sent on September 4th, 2007, from you to

24   Victor Pimentel, correct?

25   A.  Correct.

Delgado – Cross by Ms. Kanof

1   Q.  And that e-mail had an attachment, correct?

2   A.  Yes, ma'am.

3   Q.  Okay.  And the attachment -- what was the number on it?

4        The attachment -- oh, this is the actual e-mail.  The

5   other was the screen shot of the sending.  But the actual

6   e-mail is the beginning of Exhibit 31 where you say, I'm

7   resending it.  Please confirm, correct?

8   A.  Yes.

9   Q.  Okay.  And you testified that you get ponies.

10  A.  Ponies?  I'm sorry.

11  Q.  That you used documents for another case as a sort of a --

12  a boilerplate for you to create other documents, correct?

13  A.  I have a library --

14  Q.  Yes or no, sir?

15  A.  -- if that's your term for boilerplates, yes.

16  Q.  Okay.  And you've also testified that you do not do

17  anything but -- I'm sorry.  Energy law and what else?

18  A.  Transaction planning, which is corporate law.

19  Q.  Corporate law?  This is a personal injury lawsuit, isn't

20  it?

21        "The settlement agreement and general release."

22        It has Body Matters, which I think is a massage

23  parlor, on page 2.

24        Del Sol Physical Therapy Center.

25        El Paso Physical Therapy Services.

Delgado - Cross by Ms. Kanof

```
1                  Edward Juárez, M.D.

2                  Dwayne Marrott, Ph.D.

3                  Orthopaedic Surgeons Associates.

4                  Rio Grande Health Center.

5                  And open MRI of Texas.

6                  This is a personal injury lawsuit settlement, correct?

7    A.  Yes, ma'am.

8    Q.  And you don't do that kind of work?

9    A.  No.

10   Q.  You sent this to Victor Pimentel?

11   A.  I don't understand your question.  I'm not a constitutional

12   lawyer, but I also have a draft of our Constitution.

13   Q.  Oh.  So you have --

14   A.  I don't do securities law, but I also have contracts of

15   securities agreements.

16                 I have a library of forms.

17   Q.  Well, you can get them on the Internet, can't you?

18                 You can get all those forms on the Internet, can't

19   you?

20   A.  You're telling me or --

21   Q.  I'm asking you.  Isn't it true?

22                 You don't have to have a library nowadays, right?

23   A.  Okay.  I don't know.  I'm telling you my situation in

24   particular.  I have a library of those forms.

25   Q.  Okay.  Well, you previously said that one of your people
```

Delgado - Cross by Ms. Kanof

1    used this as a form, and this was actually supposed to be part

2    of a mediation that Victor was doing about what?

3    A.  You're going to need to repeat the question.  I'm sorry.

4    Q.  Okay.  Your previous testimony was that somebody in your

5    office sent you this which you sent to Victor, correct?

6    A.  Yes.

7    Q.  Okay.  And you explained that there might be some mistakes

8    in there because, you know, there's these spaces and they just

9    fill in the blanks, correct?

10   A.  No, that's incorrect.

11   Q.  You didn't say that?

12   A.  Ma'am, what I said -- and it's specified in that e-mail

13   that I sent them -- that this is a form document.  Okay?

14          You look at it --

15   Q.  You didn't say that in your e-mail, did you?

16   A.  Could we look at the attachment?

17   Q.  Sure.

18   A.  Thank you.

19   Q.  Okay.  Here's the e-mail.

20   A.  I'm going to read it as it is, okay, in English, so it's

21   not a translation:

22          "Attached please find sanitized settlement form for

23   purposes of your negotiations.  Best of luck."

24          So yes, I did tell him it was a form for purposes of

25   negotiations.

1   Q.   Okay.

2   A.   So in that form there are no mistakes, ma'am.

3   Q.   But in actual testimony, you described a form as something

4   where you fill in the blanks, correct?

5   A.   It's a template.  It's a document that you use in your --

6   Q.   Exactly.  A template --

7   A.   -- you create it.

8   Q.   A template is something that all lawyers have that they can

9   pull out of their form bank and fill in the blanks, right?

10  A.   No.  It's a document that you use as a guide.  Some of them

11  will have blanks, some of them you'll substitute the words

12  manually.  It's a function of the system that you have.

13  Q.   Well, you sent this, you said.  And it's -- has absolutely

14  nothing to do with the subject matter you testified to.

15       This is a personal injury suit that has, on page 2,

16  all these healthcare companies -- healthcare providers, it

17  says.

18  A.   Yes.  So I guess that's why it was referred to as a form

19  that he should use, know what sections, like the release part,

20  what language they should include or what have you, not for him

21  to include the parties that are associated with it.

22  Q.   There is no language in this document that is corporate,

23  correct?

24  A.   Well, I beg to differ.

25  Q.   Okay.  On the last page --

1    A.  Yes, ma'am.

2    Q.  -- it says:

3          "Given under my hand and seal of this office the 31st

4    day of August of 2007."

5          Correct?

6    A.  Yes.

7    Q.  That would have been four days before you sent it to

8    Mr. Pimental [sic]?

9    A.  Correct.

10   Q.  I mispronounced.  I'm sorry.

11         Okay.  And it says in this agreement that:

12         "Texas Oil Corporation agrees to pay for medical

13   expenses incurred by Juan Miguel Hernandez from the following

14   medical providers between the date of September 24th, 2005, and

15   June 11th of 2007, for treatment and medication rendered and

16   provided as a result of the incident occurring on

17   September 24th of 2005."

18         Now, how does that guide -- how is that a template for

19   these corporate negotiations that Victor was helping you on?

20   A.  Okay.  It's very simple.  You see that first disclaimer,

21   you see that first paragraph?  So now you know you've got to

22   substitute your fact scenario into that.

23         Saying, okay.  This is going to serve as the

24   settlement for an incident that happened between 2006 and 2010

25   involving breach of a fiduciary duty or requiring a bond to be

Delgado — Cross by Ms. Kanof

1    posted or defining leverage.

2              So that's how you take it --

3    Q.  Well, you previously testified that -- what exactly was the

4    mediation he was going to do on your behalf?

5    A.  There's actually -- some of the discovery that you provided

6    us, with some documentation that relates to the breakdown of

7    the negotiations, with some of the owners of the bond.

8              The issue at hand that I was involved exclusively at

9    that period of time with the individuals -- Meneses, de la

10   Concha, Fernandez -- was the bond.

11   Q.  So he was going to go testify -- or he was going to go

12   participate in the mediation of this bond for you, and this is

13   the settlement agreement you wanted him to follow, correct?

14   A.  No.  And if you want to, if I may, we could go back to the

15   e-mail that accompanied that document.

16   Q.  On the first paragraph -- first of all, let me ask you.

17             In this bond thing, who filed suit?

18   A.  Excuse me?

19   Q.  Who had filed a lawsuit?

20   A.  Actually, all parties had threatened to file a lawsuit.

21   Q.  But nobody had filed a lawsuit, correct?

22   A.  Actually they had in Mexico, I'm under the impression.

23   Q.  In the 41st Judicial District Court of El Paso County,

24   Texas, no one had filed a lawsuit, correct?

25   A.  No.  No, no.

Delgado - Cross by Ms. Kanof

1  Q.  Well, if --

2  A.  This was just a form, ma'am.  This is basically --

3          MS. KANOF:  Your Honor --

4          THE COURT:  You answered the question.

5  BY MS. KANOF:

6  Q.  You have a cause number, which means a cause number comes

7  with a suit that is filed, correct?

8          Don't you get a cause number from the district clerk's

9  office when you file a lawsuit?

10  A.  Yes.

11  Q.  And it's put into a court, correct?

12  A.  Correct.

13  Q.  Okay.  And this says that Hernandez agrees to dismiss

14  forthwith with prejudice the lawsuit styled Juan Miguel

15  Hernandez versus Texas Oil Company, correct?

16  A.  Yes.

17  Q.  Okay.  And you sent this to Victor, right?

18  A.  Yes.

19  Q.  He wasn't a lawyer, was he?

20  A.  He purported to be a *licenciado*, so -- and he studied with

21  the daughter of Nareo, who is a lawyer.  They were classmates.

22  So, yeah.  I don't know if he's licensed or not.

23  Q.  I'm sorry?  You're telling this jury that Victor told you

24  he was a lawyer?

25  A.  I'm telling this jury that Victor studied at the Mexican

Delgado — Cross by Ms. Kanof

1   university with the daughter of Nareo Vargas, who graduated

2   from law school, and they were classmates.

3   Q.  He went to law school in Mexico?

4   A.  That's what he represented, yeah.

5           Why do you think I referred to him as *abogado*?

6   Q.  Because you're covering up.

7   A.  Or *licenciado*?

8           I'm covering up?  No.  Look at the e-mails.

9   Q.  Let's go --

10  A.  I resent that.

11  Q.  So you thought -- well, wait a minute.  If he was a lawyer,

12  why did he need this?

13  A.  Because he should have that language.  Like where it says

14  this, we agree to dismiss this pending in such jurisdiction, so

15  you're just put in the courthouse.  It's that simple.

16  Q.  Well, there was no lawsuit, and this is a form dismissing a

17  lawsuit.

18  A.  It's a settlement agreement and a release.  It's not

19  dismissing a lawsuit.  It's a settlement.

20  Q.  "The payment of the dollar amount and medical bills

21  referred to in paragraphs 2 and 3 above shall be the entire

22  obligation of Texas Oil Corporation."

23          Correct?  That's what it says, right?

24  A.  That's what it says, yes, ma'am.

25  Q.  Okay.  Let me go back up.

1           On the first page -- by the way, who was it that
2   prepared this?
3   A.  Like I said, I -- I know I sent it, but I don't have a
4   recollection of who sanitized it.  Because it wasn't prepared,
5   it was just sanitized, like the e-mail states.
6   Q.  Okay.  The e-mail that you've had in discovery for quite a
7   while, correct?
8   A.  The e-mail that you have as attachment 30, I believe --
9   Q.  With regard --
10  A.  -- or 31.  I'm not sure.
11  Q.  So whoever sent it, but you don't remember, because --
12  A.  No.  No, no, no, no.  Let's be very clear.
13          I told you that this document was sent to Victor.
14  When you asked who prepared it, I told you this is a form
15  document.  It's not prepared; it's sanitized.
16          Well, who sanitized it?  I told you, I don't know.  I
17  don't remember.
18  Q.  It's sanitized?  There's -- sanitized means taking things
19  out of something, cleaning something up, correct?
20  A.  Well, that's your definition.
21  Q.  Oh.  Now --
22  A.  I'm a corporate attorney.  I see it differently, and I used
23  it in that term during that time.
24  Q.  Okay.  Sanitization means cleaning, does it not?  Doesn't
25  it?

1    A.  It means separating, if you go to the root of the word.

2    Q.  So the El Paso Sanitization Department doesn't pick up

3    trash.  They separate trash; is that correct?

4    A.  I don't know.

5    Q.  And you said that in -- on the first page -- okay.  Let me

6    go back.

7         How many contract workers did you have?

8    A.  It's really a function of the project.  If we have a big

9    RFP for a public bid, for instance, or if we're working on a

10   major contract, we can have up to 13 people.

11   Q.  You were living with your mother --

12   A.  Yes.

13   Q.  -- for quite a long time.

14        And you told the agents you were destitute, correct?

15   A.  What agent did I tell that to?  Because that's a blatant

16   lie.

17        MS. KANOF:  Your Honor --

18        THE COURT:  You've got your answer.

19   BY MS. KANOF:

20   Q.  How many -- okay.  So you said it depends on the project on

21   how many people you contract with, right?  Is that right?

22   A.  Yes, ma'am.

23   Q.  That's your testimony.  Okay.

24   A.  Yes.

25   Q.  And so how many people were you contracting with to handle

Delgado - Cross by Ms. Kanof

1   the bond situation?

2   A.  Actually, we were contracting or getting ready to

3   contract --

4   Q.  We?  Who is "we"?

5   A.  The group of individuals that were reflected in the

6   operation.  As you can see in the draft, in form, bylaws or

7   regulations that were being prepared for it.

8   Q.  Okay.  You said you, as an attorney, contract with people,

9   correct?

10  A.  Yes, ma'am.

11  Q.  Okay.  And in direct you said that one of your people sent

12  this to you to send to Victor, correct?

13  A.  No.  I said I sent this to Victor.  I don't recall who

14  prepared it.  I don't recall if somebody sent it to me and I

15  resent it or if I pulled it out.

16  Q.  You said one of your people sent it.

17  A.  No.  I'm telling you I sent it to Victor.

18  Q.  Isn't it true you said that your office created the

19  document?

20  A.  Yes.

21  Q.  Okay.  And then you said --

22  A.  And when I say created, I mean sanitized it.

23          MS. KANOF:  Your Honor --

24          THE COURT:  You've answered the question.

25

1    BY MS. KANOF:

2    Q.  Your testimony was someone in your office created the

3    document, correct?

4    A.  Sanitized it, yes.

5    Q.  You did not use the word sanitize on direct, sir.

6            Didn't you say someone in your office created the

7    document?

8    A.  I recall having said sanitized and referring you to the

9    e-mail that says that.

10   Q.  And someone in your office -- and then a second time, again

11   to Mr. Velarde, you said, Somebody in my office created the

12   document, correct?

13   A.  Yes.

14   Q.  And then you said, Our library of forms, correct?

15   A.  Yes.

16   Q.  And that you said that the purpose of the mediation was to

17   finalize the acquisition to get the bond, correct?

18   A.  Or to be bought out of the interest and the income stream

19   of the bond.

20   Q.  Well, that was at a different time in your testimony.  I'm

21   talking about the original time that Mr. Velarde asked you

22   about this.

23           You said that you were going to finalize the

24   acquisition by -- of the bond, correct?

25   A.  From one party or the other, yes, uh-huh.

Delgado — Cross by Ms. Kanof

1   Q.   How can this be -- first of all, you said someone in your

2   office sent this.

3        So who in your office sent this?

4   A.   Like I said, I don't remember.

5   Q.   Well, you said, My office created the document.

6        Who created the document?

7   A.   If it came from my server to me, regardless of who sent it,

8   it's the office that sent it.  I don't know which individual at

9   the time would have pulled this out.

10  Q.   Okay.  Who did you have working -- you said you do

11  contract.  Who did you have working on the bond settlement?

12  A.   We had a couple of investment bankers out of New Jersey.

13  Q.   And they were in your office?

14  A.   They were actually part of our team.  They were not

15  physically in the office.  But when I refer in the office, I'm

16  referring to part of that group that's undertaking the action.

17  Q.   Okay.  So when you say, My office created the document,

18  you're referring to some investment bankers in New Jersey?

19  A.   No.  What I'm referring is that it could have been a

20  paralegal, who's a freelancer working out of her house or out

21  of her basement, and is the one that pulled it out and sent it.

22  Q.   Okay.  That's pretty hypothetical.  It could have been a

23  paralegal --

24  A.   No, it's not pretty hypothetical.  I work, like I told you,

25  with freelancers who operate as contractors.  I don't employ

1    people directly.

2    Q.  So I asked you, Who were your contractors on the bond deal?

3    And you said investment bankers out of New Jersey.

4    A.  No, I was giving you a list when you interrupted me.  But

5    there were some individuals --

6    Q.  I'm sorry I interrupted you, sir.

7            Who else was there that was in your office at the time

8    that, according to you --

9    A.  Physically in the office or working as a contractor with

10   me?

11   Q.  You said that person went to our -- our -- you used the

12   word our -- library of forms.

13   A.  May I explain?

14   Q.  Didn't you say that person in your office --

15   A.  Yes.  May I explain?

16   Q.  No, sir.  I'm asking you a question.

17           Your attorney has every opportunity to let you explain

18   when I'm finished.

19           Didn't you say, Someone in my office created the

20   documents by going to our library of forms, correct?

21   A.  Yes.

22   Q.  Okay.  Now you're telling the jury, when I asked you who

23   you had under contract that would do this, first of all, two

24   investment bankers in New Jersey, and now someone in their

25   basement as a paralegal, right?

Delgado - Cross by Ms. Kanof

1  A.  What I'm telling you is that I work with freelancers that

2  operate from remote locations.  But since all they need is

3  access to our server or to our documents, it's that simple.

4          So if I hire somebody --

5  Q.  I'm done --

6          MS. KANOF:  Your Honor --

7  BY MS. KANOF:

8  Q.  This bond, you testified, was worth how many million

9  dollars if it was real?

10  A.  It's a function of two things.

11  Q.  You testified the value of the bond was $100 million, did

12  you not?

13  A.  No, I didn't.

14  Q.  Okay.

15  A.  I said that was the face denomination, not the value of it.

16          That was part of the work we were going to do,

17  ascertain what would be the market value of that.  Just because

18  something says 10 million doesn't mean that it's worth that.

19  Q.  I recall you saying -- and isn't it true that what you said

20  is -- you don't remember what the face value was?

21  A.  That's true.

22  Q.  But just now you said, I said the face value was

23  $10 million.

24  A.  I'm just giving you an example.  I gave you the face value,

25  not what it would be sold in market conditions.

1    Q.  Okay.  Regardless, it was certainly more than a million

2    dollars, correct?

3    A.  If we could force the U.S. Government ––

4            MS. KANOF:  It's a yes-or-no question, Your Honor.

5            THE COURT:  Yes or no?

6    BY MS. KANOF:

7    Q.  Correct?

8    A.  Could you repeat the question?

9    Q.  I think I'll move on.

10           You –– you never told –– during the process of you

11   saying you sent this to him because he was going to assist in

12   the mediation of the bond, do you remember that?

13   A.  I do.

14   Q.  Okay.  That would make Victor working for you as one of

15   your contract people, right?

16   A.  No.

17   Q.  Oh, really?  He was freelancing also?

18   A.  No.  Victor has been employed –– or at least this period of

19   time –– with Nareo Vargas directly, helping him on his private

20   affairs and helping him with his industrial diners.

21   Q.  Okay.  You never told anyone, not even this jury, that this

22   bond had anything to do with Mr. Vargas, did you?

23   A.  I already told you that Meneses is the accountant or the

24   fiscal adviser to Nareo.  And I did tell you that, and you

25   asked, Is he a CPA?

1   Q.  So this -- how much money were you going to make if this

2   all worked out for you?

3   A.  It's a function of the income stream, ma'am.

4   Q.  What did you hope to make on this deal?

5   A.  It's a function of the discount rate, what interest rates

6   are doing.

7   Q.  What did you hope --

8   A.  There's a curve, a yield curve, that tells us what could

9   possibly be made.

10  Q.  You hoped to make a whole lot of money on this, right?

11  A.  Yeah.  I hoped to make money, yes.

12  Q.  Okay.  And it could have been worth $10 million, maybe,

13  right?

14          Yes or no, please.

15  A.  Or zero.  Yes.

16  Q.  And so you would have made a lot of money, right?  If it

17  went through, you would have made a lot of money?

18  A.  If it was worth 10 million, and if we assume that the

19  discount rate was 8 percent, you probably would have stood

20  to --

21  Q.  I'm not asking about --

22  A.  -- yield a good 16 percent.

23  Q.  Mr. Delgado, how much money did you think you were going to

24  make?

25  A.  Like I said, it's a function of what the interest rates

 1   would have been if the bond was cashable, what have you.

 2           But I would have been comfortable with anything

 3   between 6 or –– or 9 percent from the investment.

 4   Q.  You never told anyone this bond belonged to Vargas, did

 5   you?

 6   A.  I actually said it.  I mentioned it to you at –– well, I'm

 7   sorry.  Let me take that back –– to my attorney, that there

 8   were some individuals from the labor union that had an

 9   ownership interest in this bond.

10   Q.  You didn't say it was Mr. Vargas, though, did you?

11   A.  I –– I said several individuals.

12   Q.  But you didn't say it was Mr. Vargas, did you?

13   A.  You're probably right.

14   Q.  So now you're telling the jury it was this Mr. Vargas, who

15   you never mentioned to ICE, correct?

16   A.  No, that's incorrect.  We actually called ––

17           MS. KANOF:  He answered the question, Your Honor.

18           THE COURT:  Just answer the question, please.

19   BY MS. KANOF:

20   Q.  There are many times you talked to ICE, right?

21   A.  Yes.

22   Q.  Okay.  And you made phone calls for them, right?

23   A.  Yes.

24   Q.  And in all of the documentation there is absolutely no

25   reference to Mr. Vargas, correct?

Delgado – Cross by Ms. Kanof

1    A.  I don't know, because I don't believe I have access to all

2    your records.

3    Q.  So now you're saying that the Government didn't give you

4    all of these records?

5    A.  I'm convinced there are certain records that you're not

6    obligated to turn over.

7    Q.  Okay.  But we are obligated to turn over all the

8    statements, right?

9    A.  Yes.  But you said all the records.

10   Q.  Okay.  And in everything that we turned over, Vargas is

11   never mentioned, correct?

12   A.  Not by you -- not by ICE, no.

13   Q.  And in every single phone conversation Vargas is never

14   mentioned, right?

15   A.  No.  Actually the first phone conversation that we made on

16   that Friday the 7th, it was to Vargas.

17   Q.  It was to Vargas?

18   A.  Yes.

19   Q.  You know your counsel, in Defense Exhibit Number 2,

20   provided a whole bunch of telephone tolls from your phone.

21        I'm sure you wanted them to do that, right?

22   A.  Whatever they think would assist my defense.

23   Q.  And they subpoenaed what you asked them to subpoena, I'll

24   assume; is that correct?

25   A.  Like I said, they're the strategists.  I...

Delgado – Cross by Ms. Kanof

1   Q.   Okay.  They have the power of subpoena, correct?

2   A.   Yes.

3   Q.   And in order to know what to subpoena they have to talk to

4   you, correct?

5   A.   Yes.

6   Q.   And please don't testify about any confidential

7   communications with them.

8           But they didn't subpoena any of your phone records

9   before July --

10          MR. VELARDE:  Your Honor, I'm going to have to object

11  to this line of questioning.

12          First of all, it's not relevant.

13          Secondly, she's shifting the burden on the Defense,

14  and we don't have a burden of production.

15          THE COURT:  Rephrase your question.

16  BY MS. KANOF:

17  Q.   Okay.  Who was present when you called Mr. Vargas?

18  A.   Actually, the two agents that I already mentioned.

19  Q.   And it's not in any of the reports, right?

20  A.   Agent --

21  Q.   It's not in any of the reports, correct?

22  A.   Not in the ones that I've seen, no.

23  Q.   And it's not in any of the telephone conversations that

24  were provided to you in discovery, correct?

25  A.   Correct.

Delgado – Cross by Ms. Kanof

1    Q.  So you're telling this jury that the ICE agents

2    intentionally did not provide the Vargas phone call.

3         Is that what you're telling the jury?

4    A.  I'm saying that for whatever reason, ICE has chosen to not

5    include those comments in their reports.  It could have been a

6    mistake, an oversight, or what have you.

7    Q.  But your phone records would have shown if you had made

8    that call, wouldn't they?

9    A.  I guess so.  I mean, you have them.

10   Q.  You told -- again, back to September 7th, after you talked

11   about the 5 percent fee, that Pedro said he would provide

12   documentation for 6 or 7 million, correct?

13   A.  I believe so, yes.

14   Q.  Okay.  So Pedro was going to provide the documentation,

15   right?

16   A.  Yeah.  I mean --

17   Q.  Where is it?

18   A.  I -- I don't know.

19   Q.  You told ICE that --

20   A.  But --

21        MS. KANOF:  Your Honor?

22        THE COURT:  Go ahead.

23   BY MS. KANOF:

24   Q.  You told ICE that more time went by and nothing happened

25   until September 3rd of 2007, correct?

Delgado – Cross by Ms. Kanof

1   A.  Okay.  Yes, correct.

2   Q.  And then you said that Lilian -- and it's last names in the

3   report, but I'm trying to cut through all the names -- that

4   Lilian, Pedro, Paco, Victor, Isidro, and you and Chuy and

5   Chuy's cousin met in Mexico to discuss you picking up

6   $1 million in Atlanta, Georgia.

7   A.  That's incorrect.

8   Q.  Okay.  So again, they're lying; is that right?

9   A.  Yes.  They're misstating, actually, what was told to them.

10  Q.  And then you said Chuy wanted to make copies of everyone's

11  identification in case the money falls, correct?

12  A.  That is not a misrepresentation.  That's a -- that's an

13  erroneous, incorrect, misleading statement.  No, it's not

14  correct.  That's never something I would have testified to.

15  Q.  Okay.  Well, this is an -- you weren't testifying with ICE.

16  You were just talking to them, right?

17  A.  Yes.  And I never said that to them.

18  Q.  Okay.  And you probably also didn't say that Chuy said that

19  he was going to send someone to shadow the operation in

20  Atlanta, right?

21  A.  To shadow?

22  Q.  Yes.

23  A.  I don't know, ma'am.

24  Q.  Okay.  You stated that you were introduced to an Hispanic

25  male that Chuy said was his nephew, correct?

Delgado – Cross by Ms. Kanof

1    A.  Yes.

2    Q.  And you testified to your attorney's questions that you

3    didn't know these people went to Atlanta, right?

4    A.  Correct.

5    Q.  Okay.  But on the 7th of September, this is three days

6    after Victor was stopped by the Carroll County Sheriff's

7    Office, you told ICE that Chilo, along with Pedro, was going to

8    Atlanta to watch over the money operation, correct?

9    A.  No.  That's not how I would describe their participation.

10   Q.  You didn't say that either?

11   A.  Not in those words -- no.  Actually, no.

12   Q.  Okay.  During the interview, you received several calls

13   from Chuy, didn't you?

14   A.  I actually think there were -- at least one of them was

15   from Nareo returning the phone call.

16   Q.  Did I ask you that question?  Did I say, Did you receive a

17   call from Vargas?

18          Did I?

19   A.  You were inquiring if I received calls.

20          MR. VELARDE:  Your Honor, this is argumentative.  I

21   object.

22          THE COURT:  Overruled.

23   BY MS. KANOF:

24   Q.  You just volunteered, when I asked about you receiving

25   calls from Chuy, that you received one from Vargas, right?

1    A.  Yes, ma'am.

2    Q.  Okay.  And you told the ICE agents that -- or the ICE

3    agents -- actually you didn't tell them, they observed -- that

4    you received several calls from Chuy, who asked when the money

5    would arrive in Mexico, correct?

6    A.  No.

7    Q.  Okay.  So they're lying about that too; is that correct?

8    A.  (No verbal response.)

9    Q.  You also received several calls from Pedro.  And Pedro told

10   you that since Rubio did not have proper identification --

11   that's Isidro -- that he and Rubio were not able to fly from

12   Atlanta to Mexico, correct?

13   A.  Correct.

14   Q.  You told this jury that it was ICE who told you to make up

15   this story about the people being stopped in the airport

16   because someone didn't have identification, correct?

17   A.  I told this jury --

18   Q.  That it was Alex or Justice or someone, when you were going

19   to make the phone calls, that -- I think the words you used

20   were story and deception, that they helped create that for you,

21   correct?

22   A.  Wait.  Which one?  That he didn't have ID to fly to Mexico?

23   Q.  That it was identification that caused the problem.

24          MR. VELARDE:  Your Honor, I object.  There's no

25   testimony regarding this on direct.

Delgado – Cross by Ms. Kanof

1        THE COURT:  Overruled.

2   A.  I didn't testify, no, ma'am.

3   BY MS. KANOF:

4   Q.  Okay.

5   A.  I didn't testify to that.

6   Q.  You told ICE that Pedro told you that they had rented a

7   vehicle and would be driving to El Paso, correct?

8   A.  Yes.

9   Q.  Okay.  This is before you are cooperating, correct?

10        They have to get this information from you in order to

11   help you cooperate on the phone, right?

12   A.  No.  I was already cooperating with them.  The minute I

13   went into their office I told them I was willing to assist in

14   any effort to prevent any --

15   Q.  Before you made one phone call on behalf of law enforcement

16   they needed to know something about what happened in order to

17   direct you, correct?

18   A.  Yes.

19   Q.  Well, you testified that it was law enforcement who told

20   you to say that -- I'm sorry.

21        You told the jury that these individuals were -- that

22   you were directed to tell Pedro and Isidro to come to El Paso,

23   right?

24   A.  Yes.

25   Q.  Okay.  But you're giving them the information before

Delgado – Cross by Ms. Kanof

1    they've directed you to do anything, correct?

2    A.  No.

3    Q.  Okay.  So when the ICE agent wrote:

4         "Pedro Mendoza told Delgado that they had rented a

5    vehicle and would be driving to El Paso," they're lying,

6    correct?

7    A.  No.  They did rent a vehicle and they were going to come to

8    El Paso at our request.  Our request being ICE's request

9    through me.

10   Q.  Okay.  You're telling the jury it was you that told them to

11   rent the vehicle and drive to El Paso?

12   A.  To come to El Paso.  I didn't tell them to rent a car.  I

13   said come.  They couldn't fly because they had some sort of

14   issue with ID.

15   Q.  So when you told ICE in this very same interview, the very

16   first interview, Mendoza Meneses told you that they had rented

17   a vehicle and would be driving to El Paso, the author of this

18   report is not telling the truth, correct?

19   A.  I think he has the time sequence mixed up.

20   Q.  Okay.  But you remember it from that time?

21   A.  Yes.

22   Q.  You have the time sequence correct; is that correct?  Is

23   that what you're telling this jury?

24   A.  Yeah.  I mean, I was there --

25   Q.  You were interviewed again -- well, you were interviewed a

Delgado - Cross by Ms. Kanof

1   bunch.  But you were interviewed again by ICE on December 3 of

2   2008, when you got the threat, correct?

3   A.  Yes.

4   Q.  Okay.  And you heard both Gabe -- Agent Aguirre and Agent

5   Ascencio testify about this, right?

6   A.  Yes.

7   Q.  Okay.  And they made reports, correct?  They made reports?

8   You received them in discovery, right?

9   A.  Yes.

10  Q.  Okay.  And the report -- one of the reports that was made

11  by ICE indicates that they informed you that you received a

12  threat due to the fact that you owed the drug trafficking

13  organization approximately $2,050,000, correct?  They told you

14  that?

15  A.  I did not discuss the threat with Ascencio.  Atlanta told

16  me, El Paso is going to tell you something.

17  Q.  Okay.  Well, let's just say El Paso then.  Okay?

18          Gabe was present, correct?

19          Actually, what I'm asking about was on a conference

20  call.  Because at approximately 7:20 on December 3rd, Ascencio,

21  Ramsey, and Walton joined a conference call with SAC El Paso,

22  and this is actually what was told to you during that

23  conference call, correct?

24  A.  No.

25  Q.  Correct?

Delgado – Cross by Ms. Kanof

1    A.  They just told me El Paso needs to tell you something.

2    Q.  Okay.  No, I —— that happened before.

3            Now at 7:20 p.m., a conference call is initiated

4    between SAC Atlanta and SAC El Paso.  And the first thing that

5    happens in that conference call, specifically at the beginning

6    of the conversation, ICE agents advised you that a threat of

7    bodily harm had been made on you and that you should contact

8    them if anything happens that may be related to or a result of

9    this threat, correct?

10   A.  El Paso ICE told me that, yes.

11   Q.  During this conference call?

12   A.  No.

13   Q.  So again, when they say on December 3rd, 2008, at

14   approximately 7:20 the conference call occurred and then the

15   conversation, they're not telling the truth?

16   A.  When the conversation regarding that alleged threat took

17   place, Atlanta was no longer on the line.  It was done with

18   Agent DJ, and there was somebody else present.

19   Q.  You were in the courtroom when Agent Ascencio said that

20   during the conference call that you were advised of this, so he

21   was not telling the truth on the stand?

22   A.  Is Ascencio the one that supposedly was with me during the

23   phone calls, out of El Paso?

24   Q.  He lied?  Did he lie in all of his testimony or just some?

25   A.  I think you would know that better than I.

Delgado - Cross by Ms. Kanof

1    Q.  Well, you're the one that's testifying that this is wrong.

2         The next sentence on the conference call is, ICE

3    agents informed Delgado that we received information that the

4    threat was due to the fact that you owed the drug trafficking

5    organization approximately $2,050,000.

6         And you're saying that that wasn't on a conference

7    call?

8    A.  They told me that the one that had the hit on me was Lilian

9    de la Concha.  They didn't mention any drug trafficking

10   organization or anything like that.

11   Q.  So this is a complete lie?

12   A.  It's the new version that -- that's being presented --

13   Q.  Okay.

14   A.  -- here.

15   Q.  Well, the -- so when these documents were given to you 14

16   days after you were indicted, which would be sometime in

17   November or December of last year, they had already concocted

18   this story?

19   A.  I don't know when it happened.  I mean I think, like I

20   said, you have more access to them than I do.

21        They told me that it was Lilian de la Concha.  They

22   didn't mention any drug trafficking organization or anything

23   like that.

24   Q.  Didn't they tell you that -- oh, I'm sorry.

25        They told you about the drug trafficking organization,

Delgado - Cross by Ms. Kanof

1    and your response was that you understood and stated that you

2    only knew about the first one million dollars from the original

3    seizure, the one that we were talking about on the other

4    report, and you stated you owed the drug trafficking

5    organization $200,000 from that, correct?

6    A.  That's incorrect.

7    Q.  Well, on the phone calls that you tape after the -- after

8    the event -- and I don't remember who you're talking to.  But

9    don't you sort of refer to everybody owing money for the loss

10   of this million dollars?

11   A.  Yes.  That was part of the deception plan that was provided

12   to me in the form of a --

13   Q.  So you get a threat for --

14   A.  I don't get a threat.  You guys represented that to me, the

15   case, because you drank Victor's Kool-Aid.

16   Q.  Well, you told Lilian --

17   A.  And Lilian wasn't even here.

18   Q.  You told Lilian de la Concha that you were dying of cancer,

19   correct?

20   A.  No.

21   Q.  Okay.  You were provided e-mails between you and Lilian de

22   la Concha --

23   A.  And I said I'm dying of cancer?

24   Q.  Yes, sir.

25   A.  That's incorrect.

Delgado – Cross by Ms. Kanof

1    Q.  And --

2    A.  That's a distortion.

3    Q.  And that your ex-wife, Sharon, had leukemia, correct?

4    A.  Could I see the e-mails?

5    Q.  You -- well, we gave them to your lawyer, so if they didn't

6    show them to --

7            MR. VELARDE:  Your Honor, again, I'm going to object.

8    This is not relevant and she's shifting the burden to us.  It's

9    their burden.

10           THE COURT:  Overruled.  Overruled.

11           MR. VELARDE:  Well, we were not furnished that one.

12   And plus, Your Honor, she's testifying.

13           THE COURT:  Overruled.

14           MS. KANOF:  Ms. Arreola will get the receipt,

15   Your Honor.

16   BY MS. KANOF:

17   Q.  You're saying that they told you to lie and tell Paco that

18   you all owed money for the million dollars?

19   A.  They told me to assist in creating a scenario of pressure

20   against Paco, Lilian, and Chuy, and to be assisted by Isidro

21   and Pedro Meneses regarding the risk associated with that money

22   that had been seized.

23   Q.  You know while we're talking about this, you kept referring

24   to a script.  Did they put something in writing?

25   A.  At times they would scribble, Say this, when we were in the

1    conversation.

2    Q.  No, no, no.  I mean a script.  You know, a script is like

3    to a play or a movie script.

4            Did they give you a script?

5    A.  No.  Actually, it was like, Say A, B, C, and D.  Yes, they

6    would give you the specific points.

7    Q.  You didn't keep that script?

8    A.  They would tell me when I was there.  They would, you know,

9    discuss it with me.

10   Q.  Okay.  They were telling you.  They didn't give you a

11   written script?

12   A.  Not a written.  At times they would scribble.

13           (Call played.)

14           MS. KANOF:  I'm sorry.  I'm going to have to use the

15   Elmo, because I really don't want the conversation.

16           Government's Exhibit Number 58A.

17   A.  When you say Elmo, I don't follow.

18   BY MS. KANOF:

19   Q.  Okay.  Government's Exhibit Number 58A.  It's Paco who

20   says:

21           "Pete and Chuy -- let me tell you something.  Pete and

22   Chuy are willing to place tomorrow -- tomorrow, today, on the

23   table, properties valued at $3 million.  Here, the problem is

24   not a problem that everyone, everybody is without money."

25           All throughout Government's 58A, which is the

Delgado - Cross by Ms. Kanof

```
 1   transcript of the call that you made to Paco for 33 minutes,
 2   Paco is acknowledging that he owes the money and that everyone
 3   in this conspiracy owes the money, correct?
 4   A.  He was, yes.  He's been led to believe that that's the
 5   case.
 6   Q.  Well, where did you lead him to believe that?
 7   A.  No, I wasn't the one.  It was the other two cooperating
 8   individuals, Pedro Meneses and Isidro.  Their role, when they
 9   were here and when they were prepared by ICE agents, were to
10   assist.
11        They're the ones that tell Paco, Marco has the
12   connections there.  He's in with all these corrupt ICE agents.
13   They can make things happen.  We need to have him work with
14   them.
15   Q.  You testified that Paco and Isidro were cooperating with
16   ICE, correct?
17   A.  No.  No, ma'am.
18   Q.  You just said that.  You just said that it was Paco and
19   Isidro that told them this?
20   A.  No, I said Pedro.
21   Q.  Oh, Pedro.
22   A.  And Isidro.
23   Q.  They were the ones that were arrested, right?
24   A.  Yes.
25   Q.  And they -- you're testifying that they were cooperating?
```

1    A.  Why do you think they were released?

2            They arrest Victor.  He cooperates, he's released.

3            They arrested me.  I cooperate, I'm released.

4    Q.  You heard Victor --

5    A.  Isidro and Pedro were cooperating.  That's why they were

6    released.

7    Q.  You know this how?

8            THE COURT:  That's enough.  One at a time.

9    BY MS. KANOF:

10   Q.  You know this how?

11   A.  I was asked to approach them, just like I was asked to

12   approach Victor, to see if they were willing to assist.

13   Q.  Oh.  You became the agent of ICE, and ICE relied on you to

14   ask them to help?

15   A.  No, no, no.  Agent Fry testified today that it's called a

16   double-something.

17   Q.  What Agent Fry testified to was that they don't tell people

18   that each other is assisting.

19   A.  No.  He testified that they were trying to test me by

20   having me go to Victor and say, You should cooperate.

21           They did that exact same thing with Meneses, Pedro,

22   and with Isidro.

23   Q.  On page 30 Paco says -- now, you're saying Paco was

24   cooperating?  No?  Right?

25   A.  I've never mentioned Paco as a cooperator.

1    Q.  On page 30 Paco says:

2            "And they have -- and Marco knows it well -- the

3    documentation of the identity of everyone except mine because,

4    by chance, I wasn't there when none of that happened."

5            Correct?

6    A.  That's part of the ruse.  Yes.  Exactly.  That's what they

7    made him believe.

8    Q.  They made him believe it and you were there when they made

9    him believe it?

10   A.  No.  When they leave El Paso, they go and they talk to

11   Chuy, they talk to Lilian, and they talk to Paco.  And they

12   tell them, This is what's happening.  It's very serious.  Let's

13   rely on Marco.  He can make this thing disappear.

14   Q.  You have made yourself an agent of ICE.  You are telling

15   this jury ICE had you talk them into cooperating, correct?

16   A.  No, ma'am.  Agent Fry testified --

17   Q.  I'm not asking about Agent Fry.

18   A.  -- that they asked him --

19           THE COURT:  Just answer the question.  Yes or no?

20   A.  No, I'm not an agent of ICE.

21   BY MS. KANOF:

22   Q.  You testified you were asked by ICE to sign up those two

23   guys that were arrested on this --

24   A.  Not to sign them.  To have them cooperate, yes.

25   Q.  Okay.  Where is that in any of the documentation?

1    A.  It's not there.

2    Q.  And that's completely contrary to every single piece of

3    evidence Alex Ascencio discussed with this jury.

4            THE COURT:  Is that a question?

5    BY MS. KANOF:

6    Q.  Isn't it?

7    A.  We already know where his credibility is, Mr. Ascencio.

8    So...

9    Q.  Oh, we do?

10   A.  It's consistent with him --

11           Yes.

12   Q.  We already know what his -- you heard him testify that he

13   teaches at FLETC, correct?

14   A.  I heard him testify that he was with me making phone calls

15   when he was in Atlanta and I was in El Paso.  He described my

16   gestures, my subtleties.  He described --

17           MS. KANOF:  Your Honor --

18   A.  -- even what he told me.

19           THE COURT:  Let him finish.

20   BY MS. KANOF:

21   Q.  Go ahead.

22   A.  He went into detail for over an hour describing not one,

23   several phone calls where he purported to be coaching me

24   because I was in Atlanta.

25           When those phone calls took place on the 9th I was

Delgado - Cross by Ms. Kanof

1    here in El Paso.  I was working with SAC El Paso.  I had never

2    met Ascencio.  Ascencio had not been around here.

3            There was never --

4    BY MS. KANOF:

5    Q.  So when --

6            THE COURT:  That's enough.

7    BY MS. KANOF:

8    Q.  So when I said, Agent Ascencio, did we ask you to go over

9    these as an expert to help explain to us the language that's

10   used, and that we even sent them to you in Italy when you were

11   on vacation with your family, you're not including the part

12   when he said and admitted he wasn't with you?

13   A.  He was forced to admit he wasn't with me.  That's the

14   issue.

15   Q.  On -- during that conversation that was with ICE Atlanta in

16   a conference call --

17   A.  Which one, ma'am?

18   Q.  During the conversation that we are discussing when you

19   stated that you only owed the DTO $200,000, that's not true,

20   correct?  You never said that?

21   A.  That's correct.

22   Q.  And you also told ICE that you believe that the drug

23   trafficking organization were referring to two million pesos

24   not $2 million, right?

25   A.  I have never discussed involvement with a drug trafficking

1    organization with ICE.  Those statements are incorrect,

2    assuming the agents did make them or put them in writing.

3    Q.  You've told this jury that they told you the threat was

4    from Liliana [sic] de la Concha or you told them?

5    A.  They told me.  They had me call her there.

6    Q.  I'm sorry?

7    A.  They had me call Lilian de la Concha from their office,

8    right there.

9    Q.  This is another call we don't have a transcript of, right,

10   because we're withholding it from you; is that true?

11   A.  Look.  I don't know why you're withholding it or if you

12   recorded it or not.  You guys are very selective in what you

13   do.  And that's just the reality, and it's sad for us.

14   Q.  You know, the State Bar of Texas monitors what attorneys

15   do, don't they?

16   A.  Yes.

17   Q.  And if an attorney violates the disciplinary rules, they

18   could lose their law license, right?

19   A.  Yes.

20   Q.  And you used your IOLTA account to deposit all kinds of

21   money that had absolutely nothing to do with your practice of

22   law?

23   A.  False.

24   Q.  With regard -- by the way, an IOLTA account is an account

25   that a private attorney has to keep, right?

1    A.  Yes.

2    Q.  It's pretty sacrosanct, isn't it?  There's many, many rules

3    on what kind of money you can put in there and what the purpose

4    of the money is?

5    A.  Uh-huh.  Yes.

6    Q.  And you're telling this jury you didn't violate the bar

7    disciplinary rules with regard to that?

8    A.  Well, can you identify the rules exactly, which ones you're

9    referring to?

10   Q.  On December 3rd, when the agent writes that it was you that

11   stated that you believe the source of the threat is Lilian de

12   la Concha, due to the fact that you had recently quit seeing

13   her on a romantic basis, that's not true?

14   A.  They told me it was Lilian de la Concha.  That's why they

15   had me call her.  Why else would we have called her?

16           And you told me you have the phone records.  Look at

17   it.

18   Q.  No.  I don't have the phone records.  You have the phone

19   records.

20           When the agent then wrote that you went further and

21   said you claim that de la Concha had been persistently trying

22   to get you to come to Mexico and trying to find out where you

23   live, that's not true.  You didn't tell them that?

24   A.  Lilian de la Concha had no need to find out where I lived

25   because she knew where I lived.

Delgado - Cross by Ms. Kanof

1   Q.  Then when you told the agents that de la Concha sent

2   e-mails to your ex-wife and current girlfriend, you didn't tell

3   them that?

4   A.  I found out --

5   Q.  Did you tell them that?

6   A.  I don't recall.

7   Q.  And did you tell ICE agents that you had been receiving

8   hang-up calls and that your girlfriend noticed a strange car in

9   the neighborhood?

10          Did you tell them that?

11  A.  I told them the following.  No -- not that.

12  Q.  No.  I just asked you --

13  A.  Not that.  No.

14  Q.  -- if you told them that.

15          When the agents wrote:

16          "Throughout the conversation Delgado reiterated that

17  he only knew about the $1 million from the original seizure,

18  and stated he owed the drug trafficking organization $200,000

19  of that, and that the other parties involved had already paid

20  back their part," they were lying?

21  A.  Or misstating the facts, yeah.  Or their recollections,

22  yeah.

23  Q.  And then when ICE wrote that after questioning you several

24  times about the money, you finally stated that you and de la

25  Concha arranged a pickup in Chicago and that you had done other

Delgado - Cross by Ms. Kanof

1   deals without notifying ICE.

2          You told them that?

3   A.  That is untrue.

4   Q.  Okay.  However, you continued to claim that you did not

5   know about the other money, correct?

6   A.  I was never asked of any other money or anything like that.

7   I don't -- that's why --

8   Q.  Well, according to ICE, this is when the conference call

9   ended.  And after that, you admitted to SAC El Paso that you

10  did know about Chicago and that you had paid -- that you were

11  paid $45,000 for the deal, and that you tricked the drug

12  trafficking organization into giving you a million dollars,

13  correct?

14  A.  No.  That's fabrication.

15  Q.  You testified --

16  A.  Complete fabrication.

17  Q.  You testified about some kind of a thing that you wanted,

18  about if people die in Mexico -- some kind of insurance thing,

19  right?

20  A.  I don't understand your question.

21  Q.  Did you testify about some kind of insurance?

22  A.  Oh, like wills, when somebody dies?

23  Q.  Yes.  Yes.

24  A.  Like a will?  Yes.

25  Q.  Yeah.  You testified about that, right?

Delgado – Cross by Ms. Kanof

1  A.  Yeah.  And Mexico has needs for that.

2  Q.  And on the 8th –– on the 3rd of December, didn't you tell

3  ICE that you tricked them into giving you a million dollars for

4  guaranteeing that you would get a bill passed in Mexico for

5  some type of insurance plan for traveling back and forth from

6  Mexico to the United States?

7  A.  No, because that project was for a different fee amount,

8  not a million dollars.  That information is ––

9  Q.  So they just have the money amount wrong?

10  A.  They actually have the information incorrect, yes.

11  Q.  And that you claimed that the drug trafficking –– to the

12  drug trafficking organization –– you told the drug dealers that

13  you were friends with an ambassador, and that if they gave you

14  a million dollars you would get the ambassador friend to pass

15  this bill.

16  A.  Yeah, that's more of their deception.  That's incorrect,

17  ma'am.

18  Q.  On December 4th of 2008, the next day, you contacted Walton

19  in Atlanta and told him you had talked to de la Concha,

20  correct?

21  A.  Yes.

22  Q.  Why would they put that in if they were there when you

23  contacted de la Concha?

24  A.  You'd have to ask them.  I didn't prepare the report,

25  ma'am.  You have to realize that.  I don't know the

1   personalities involved.

2   Q.  On -- I'll skip this next one.

3        Josh Fry's report.  I think you just wholeheartedly

4   said that you didn't tell Josh Fry any of this, right?

5   A.  You've got to run by me, because there are some things that

6   he was correct --

7   Q.  Oh, okay.  Well, I'll go through it then.

8        Paragraph 4.  You told him -- he asked you if you knew

9   that the $600 million was drug money or not, and you said you

10  really wanted the deal to go through and didn't want to know if

11  the money was from drugs.

12  A.  Like I said, I've never discussed $600 million with any ICE

13  agent.

14  Q.  Okay.

15  A.  So it's incorrect what he stated.

16  Q.  You know, you told him that rich Mexican people are

17  unorthodox with their money, right?  The way they handle money,

18  right?

19  A.  No.  I said that Mexico is a cash-driven economy and it's

20  not uncommon, because of security risks, for individuals to

21  have access to large sums of cash.

22  Q.  Are you still maintaining --

23  A.  That's one.

24        Two, I also mentioned --

25        MS. KANOF:  Your Honor --

1          THE COURT:  Just answer the question.

2   BY MS. KANOF:

3   Q.  You have said the source of this money is Mr. Vargas'

4   inheritance money, correct?

5   A.  No.  What I told you is that I -- I do not know.  It's been

6   represented to me.  I wasn't involved in organizing this.

7          Mr. Vargas' employee, his right-hand man, showed up,

8   represented they were having a problem.  And to assist,

9   individuals that I rely on, I tried to resolve the issue.

10  Q.  Okay.  Agent Fry, in both the video of the Carroll County

11  stop of Victor and the video of the DPS stop of both of you,

12  you can see the settlement agreement, correct?

13  A.  I -- I haven't seen it.  I mean, I know that in the El Paso

14  one there's a document that Victor is waving.

15  Q.  And the agents testified that that document was the

16  settlement agreement, correct?

17  A.  Were they there?  They weren't in the vehicle with us.  How

18  would they know?

19  Q.  Well, they confiscated it, didn't they?

20  A.  I didn't know that.

21  Q.  In Georgia.  You sat here and you watched -- everybody got

22  to see some of that video, correct?

23  A.  Yes.

24  Q.  And Victor immediately provides that settlement agreement

25  as the source of the million dollars of cash that he has in his

Delgado – Cross by Ms. Kanof

1   vehicle.

2   A.  No.  Actually, it's until the second officer arrives that

3   he produces it.

4   Q.  But he produces it?

5   A.  Yeah.  The first officer discussed it, saying --

6   Q.  So he is so cunning and so smart that he took a document

7   that you sent him for a mediation about the bond and used it to

8   justify having the million dollars that you didn't know about,

9   right?

10  A.  I don't really know what he did or didn't.  But that

11  document was for the specific purpose stated in the e-mail by

12  which I delivered it to him.  Negotiations, settlement --

13          THE COURT:  You've answered the question.

14  BY MS. KANOF:

15  Q.  You told Agent Fry that after the seizure of the

16  $1 million, Lilian de la Concha believed you had the ability to

17  bribe and corrupt U.S. law enforcement, correct?

18  A.  No.  That was the ruse that we perpetrated on the Mexican

19  individuals.

20  Q.  You told Agent Fry that this was because of the ruse, just

21  like you're saying here, correctly, where you pretended to

22  arrange for the release of Pedro and Isidro, correct?

23  A.  Yes.  Uh-huh.

24  Q.  And then you told Agent Fry de la Concha introduced you to

25  her cousin-in-law -- cousin-in-law, Jose Quezada, right?

Delgado – Cross by Ms. Kanof

```
 1   A.  I don't know any Jose Quezada, nor have I heard in my life
 2   of a Jose Quezada.
 3   Q.  So Josh Fry completely made that up?
 4   A.  You know what?  If you go back to the original reports from
 5   ICE Atlanta --
 6   Q.  My question was --
 7   A.  I don't know where he came up with that name.
 8   Q.  Okay.  Well, didn't you tell him that it was Quezada,
 9   Lilian, and you who decided to conduct the money pickup
10   operation in Chicago?
11   A.  No.
12   Q.  Okay.  You were asked by Agent Fry why you would move
13   money -- oh, sorry.
14          Didn't you tell Agent Fry that Quezada was a very
15   powerful man, and that if anyone was involved with drug
16   trafficking it was him?
17   A.  One, I don't know which Quezada you're discussing.
18   Q.  Well, I'm discussing the Quezada that you talked about.
19   A.  I don't -- I didn't mention a Jose Quezada.
20   Q.  If Jose Quezada is a drug trafficker and you did mention
21   him to ICE, your life would be in danger, wouldn't it?
22   A.  If Jose Quezada what?  I'm sorry.  I don't know who Jose
23   Quezada is.  So I don't know, ma'am.
24   Q.  Well, if Jose Quezada is a drug trafficker and you
25   mentioned his name to ICE, your life would be in danger,
```

Delgado — Cross by Ms. Kanof

1   correct?

2   A.   I -- I don't know.  I mean, if it's a fact that --

3   Q.   You told Josh that your life and business were in ruins,

4   correct?

5   A.   No.  That's a lie.

6   Q.   That you had been successful previously, and that you

7   desperately needed the --

8   A.   That's part of the deception.  Incorrect.

9   Q.   And you told Josh that you never wanted to believe that you

10  were laundering drug money, because you didn't want to ever

11  think of yourself as someone who was a part of a drug cartel or

12  help them, correct?

13  A.   It's incorrect.

14  Q.   They talk -- Josh talked to you a little bit about Chicago

15  as well, right?

16  A.   Yes.

17  Q.   Okay.  Didn't you admit to him that you should have

18  immediately called HSI to alert them of the new conspiracy to

19  launder money, but you didn't?

20  A.   No.

21  Q.   You know, you heard Agent Fry -- wait.

22          You heard the agent testify that in September you --

23  or I'm sorry.

24          That in -- after Chicago, the Chicago transaction

25  which was in July of 2008, that you claimed that you didn't

Delgado – Cross by Ms. Kanof

1    know anything about it, right?

2            You heard them testify to that?

3    A.  I'm sorry, ma'am.  I -- which agent?

4    Q.  I'm being a little bit confusing.

5            Okay.  We went over an ROI from ICE, where they put in

6    the ROI that you admitted that you were involved in the Chicago

7    money transport and that you didn't tell ICE.

8            And you dispute that, correct?

9    A.  That's correct.

10   Q.  Okay.

11   A.  Yes.

12   Q.  And you heard Agent Fry testify that he had nothing to do

13   with the case then, right?

14   A.  Yes.

15   Q.  And in fact, in 2000- -- in July of 2008, when this

16   occurred, that's when the report was written, correct?

17   A.  Yes.

18   Q.  Okay.  So back in 2008, when the report was written at or

19   near the time they interviewed you, they say that you admitted

20   to doing Chicago.

21           And you dispute that, correct?

22   A.  No.  I've told you I was working with Atlanta.  Of course

23   they knew about Chicago, and I'm not denying it.  They were

24   involved.

25   Q.  When Agent Justice said that you never -- that you were not

1    working with Atlanta, he was not being truthful?

2    A.  When he said that I wasn't in contact with him, he was not

3    being truthful.  You have my phone records.

4    Q.  Well --

5    A.  Multiple.  Multiple.

6    Q.  Well, you heard Alex Ascencio talk, that that's pretty

7    common when you try to cover tracks, right?

8    A.  Is Ascencio the one that supposedly was with me --

9          MS. KANOF:  Your Honor --

10   A.  -- on the phone calls --

11         THE COURT:  Answer the question, please.

12         If you don't know, just say you don't know.

13   BY MS. KANOF:

14   Q.  So Agent Fry, who had absolutely nothing to do with

15   anything about Chicago, is now asking you about Chicago.  And

16   you tell him that you should have immediately called HSI to

17   alert them of the new conspiracy to money launder, but you

18   didn't, correct?

19   A.  I -- I didn't discuss that with -- with Fry.

20   Q.  All right.  Let's talk about the half million dollars into

21   Liliana's account, Liliana Narvaez's account.

22         Isn't it true that you told Liliana Narvaez that the

23   $500,000 was from the sale of a family apple orchard in Mexico?

24   A.  I don't know if -- from a sale from a Mexican operation,

25   yeah, a business.

Delgado – Cross by Ms. Kanof

1   Q.  No.  Specifically --

2   A.  I don't remember.

3   Q.  -- an apple orchard.

4   A.  I don't recall specifically.  But I did tell her it was

5   from a Mexican family business.  That, I'm sure.

6   Q.  Okay.  So you lied to her?

7   A.  Yes.

8   Q.  Okay.  And you lied to Liliana?

9   A.  Yeah.

10  Q.  Okay.  And -- but -- but you didn't lie to the agents or

11  you did lie to the agents?

12  A.  To all law enforcement authorities since this incident

13  began, I've been truthful and they've been able to verify it

14  with bank statements.

15  Q.  Isn't it true --

16  A.  They knew where the funds were coming from.

17          THE COURT:  That's enough.

18  BY MS. KANOF:

19  Q.  Isn't it true that you told Agent Fry that the half million

20  dollars was wire transferred from Switzerland from Issac Cohen,

21  an ex-boyfriend of de la Concha, who was a Jewish businessman

22  in -- or who was a businessman involved in the Jewish business

23  community in Mexico City?

24          Isn't that what you told him?

25  A.  I don't know if he's Jewish or not, ma'am.

Delgado — Cross by Ms. Kanof

1   Q.  Oh.

2   A.  I'm sorry.

3   Q.  You didn't tell them that?

4   A.  I don't know if he's Jewish.  I mean, I don't —— that's not

5   something I would ——

6   Q.  No.  The question isn't whether you knew he was Jewish or

7   not.  The question is ——

8   A.  I did not ever discuss anybody's religion or ethnic

9   background.  It's an identifying factor.  I would have

10  discussed other features.

11          And I did mention that it was coming from a bank in

12  Switzerland and who was the owner of the account.

13  Q.  You told your girlfriend —— you told ICE that you asked

14  your girlfriend to receive the wire transfer and disburse the

15  money at your direction.

16          That's what you told ICE, correct?

17  A.  Yes.

18  Q.  And what were you going to use this money for?

19  A.  Several things.  Starting to pay off some debt.

20  Q.  Because you were destitute, right?

21          MR. VELARDE:  Your Honor, let him answer.

22  A.  No.  Debt is part of how you manage your investments.

23  BY MS. KANOF:

24  Q.  Did you tell ICE that ——

25  A.  I never told them that I was destitute.

```
1              THE COURT:  Let him answer.
2              MS. KANOF:  Okay.
3    A.  No.  I never said -- I also was going to use it for the
4    purchase of our home.  I also was going to use it for travel,
5    also for working capital, for expenses associated with our
6    seven kids.
7    BY MS. KANOF:
8    Q.  You -- you prom- -- you promised -- you don't have seven
9    kids, do you?
10   A.  Yeah.  Between Liliana and I, yes.  Between Liliana and I,
11   we have seven kids.
12   Q.  No.  Between Liliana and you, there was a total of seven
13   kids, but they're not yours?
14   A.  Between Liliana and I, we have seven kids.
15   Q.  You said our seven kids, correct?
16   A.  Yes.
17   Q.  You --
18   A.  I have seven children.
19   Q.  Most of whom are grown.  At least yours are grown, right?
20              Right?  Your children are grown, correct?
21              MR. VELARDE:  I'm going to object to relevance.
22              MS. KANOF:  He brought it up, Your Honor.
23              THE COURT:  I'm going to sustain the objection.
24   BY MS. KANOF:
25   Q.  The loan was to help start up a business known as *Mundial*,
```

Delgado - Cross by Ms. Kanof

1   which was going to sell burial insurance to Mexican nationals

2   when they came to the United States.

3           That's what you told ICE, right?

4   A.  No.  Do you want me to explain?

5   Q.  They made that up?

6   A.  They probably misunderstood.  I can clarify if you wish.

7   Q.  The deal didn't go through, but you spent the money anyway

8   on expenses related to the business.

9           That's what you told ICE, right?

10  A.  I didn't say that the deal did not go through.  I said it

11  hadn't materialized.  It was still being worked on.  And some

12  of the funds were also used to pay --

13  Q.  You told this Grand Jury [sic] that the Suburban was for

14  some politician.  What was his name?

15  A.  Enrique Acevedo.

16  Q.  I'm sorry?

17  A.  Acevedo or Aceves.

18  Q.  Okay.  We have that e-mail up on the -- up here.

19          At the top of Government's Exhibit 8B it says --

20  A.  It's not up here, ma'am.

21          THE COURT:  You've got to get it on the screen.

22          MS. KANOF:  Oh, sorry.

23          (Discussion off the record.)

24          MS. KANOF:  There we go.  There it came.

25

1    BY MS. KANOF:

2    Q.  Okay.  At the top of this e-mail -- this is from you to

3    Victor.  It says, "She wants a new" -- new all in caps --

4    "Suburban, and for us to pay her.  What do you say?  With the

5    power she brings, she deserves that, my little treasure, and

6    more.  I ask you to respect her."

7           That doesn't -- what did you say the man's name was

8    that you wanted the Suburban for?

9    A.  Aceves.

10   Q.  Okay.  It's a man, right?  Aceves is a man?

11   A.  A Suburban.  What I said was to be lent to his

12   pre-campaign.  And it was somebody that Lilian was going to be

13   supporting.

14   Q.  This e-mail is to Victor about getting a Suburban for

15   Lilian de la Concha, correct?

16   A.  Yes.  That's what the e-mail says.

17   Q.  Okay.  And it is from you, correct?

18   A.  Yes.

19   Q.  And now you're saying the Suburban was for some guy that

20   was running for office in Mexico?

21   A.  You see, you're going by the translation.  If you look at

22   the Spanish original it doesn't say the Suburban is for her --

23   for her use.  It says she is requesting a new vehicle and a

24   payment.

25   Q.  And for us to pay her?

Delgado – Cross by Ms. Kanof

1    A.  Yeah.  And a payment.

2    Q.  But you refer -- you say that she deserves it and you call

3    her *tesorito*.  I don't speak Spanish as well as you,

4    Mr. Delgado.  But isn't that properly translated as "my little

5    treasure"?

6    A.  Yeah.

7    Q.  You say she deserves the Suburban, your little treasure,

8    correct?

9    A.  She deserves us to accommodate her request.

10   Q.  That's not what the e-mail says, does it?

11   A.  Yeah.  She says -- she deserves -- yeah.

12   Q.  It says she wants --

13   A.  *Tesorito* deserves it.

14   Q.  Okay.  Let's go line by line.

15        She wants a new Suburban and for us to pay her,

16   correct?

17   A.  Yes.

18   Q.  Okay.  It doesn't say she wants us to loan a Suburban to

19   somebody who's running for office in Mexico?

20   A.  That's correct.  Victor already knew that and Nareo knew

21   that.  Yes.

22   Q.  It says that she deserves that new Suburban for the power

23   she brings, correct?

24   A.  It says that she deserves -- yes.

25   Q.  Okay.  And she deserves it partially because she's your

Delgado - Cross by Ms. Kanof

1   little treasure and more, correct?

2   A.  No.  It doesn't say that at all.

3   Q.  "With the power she brings, she deserves that, my little

4   treasure, and more."

5           Am I misreading it?

6   A.  It's -- yes, you are.

7   Q.  I am?

8   A.  Yes.

9   Q.  Could you read it then?

10  A.  Not because she's my -- the sentence doesn't say that

11  because she is my *tesorito* she deserves it.  It says because of

12  her power she deserves that and more.

13  Q.  What you're talking about here is a bribe to Lilian de la

14  Concha, correct?

15  A.  A bribe to Lilian de la Concha?

16  Q.  Correct.  She wants a Suburban and she wants us to pay her.

17  A.  Lilian de la Concha had committed to offering this service,

18  this vehicle, to an individual running for office.

19  Q.  That's not anywhere in any e-mail, is it?

20  A.  Actually, I'm sure it is.  Not in the ones that you

21  selectively presented, but...

22  Q.  Well, we gave you --

23  A.  Because you did receive other e-mails from --

24  Q.  We gave you a disk of all of the e-mails downloaded from

25  Victor Pimentel.

Delgado – Cross by Ms. Kanof

1   A.   Yes.  But you only -- you only chose some to produce here.

2   Q.   No.  We give you a disk of all --

3   A.   Did you produce all of them?

4          THE COURT:  That's enough.  That's enough.

5          Go on to something else, Ms. Kanof.

6          MS. KANOF:  Yes, Your Honor.

7   BY MS. KANOF:

8   Q.   Okay.  Let's talk about Girl Scout cookies.

9          Now, could you please explain what this whole -- what

10  your obligation was about Girl Scout cookies again?

11  A.   Actually, I have no obligation to -- regarding Girl Scout

12  cookies.

13  Q.   Okay.  Let's see.  Girl Scout cookies is 4, I think.  Okay.

14         I'm asking you that we focus -- this is on August 16th

15  of 2006 from Liliana [sic], and you're sending it to Victor.

16         First of all, why do you have to send Victor an e-mail

17  about Girl Scout cookies?

18  A.   Excuse me?

19  Q.   Why do you have to send Victor an e-mail from Lilian about

20  Girl Scout cookies?

21  A.   To be honest with you, I was actually sending it to his

22  boss.  And it was informing him that he better get ready,

23  because we're going to be stuck again distributing and having

24  to cut checks.

25  Q.   So you weren't sending this to Victor?

Delgado - Cross by Ms. Kanof

1   A.  No.

2   Q.  Oh.  So --

3   A.  Victor was the intermediary with his boss, with Nareo

4   Vargas.  And that's something I already testified in --

5   Q.  Well, that's kind of interesting.  Because in the end of

6   your testimony you talked about you specifically talking to

7   Vargas yourself.

8   A.  Yes.  Uh-huh.

9   Q.  Okay.  So you didn't always have to use him as an

10  intermediary; is that right?

11  A.  Not always.

12  Q.  So Lilian says:

13          "I'm asking that we focus as much as possible.  The

14  potential is great."

15          Right?

16  A.  Yes.

17  Q.  And it's your testimony she's talking about the potential

18  of Girl Scout cookies, right?

19  A.  No, not the potential of Girl Scout cookies.  My testimony

20  is of the fundraising campaign.  If you read the context --

21  Q.  What fundraising campaign?

22  A.  For the Girl Scout cookies, where she says it's a charity.

23  It's an act of charity.

24  Q.  Okay.  And she says, "Love, in relation to the cookies that

25  you will look to to see if you can place for the Girl

Delgado - Cross by Ms. Kanof

1    Scouts" -- when were you going to do this?

2    A.  Well, I was hoping I could unload the responsibility with

3    Vargas with other people that were on the ground there.

4    Q.  Okay.  How were you going to unload that responsibility?

5    A.  Calling whoever I knew, getting them to commit to at least

6    taking five boxes or whatever.

7    Q.  Okay.  So these cookies are already in the warehouse,

8    right?

9    A.  I'm sure -- yeah -- well, I don't know.

10   Q.  She says, "And right now they have in the warehouse 500

11   instead of 300," right?

12   A.  Yes.  That's what it says.

13   Q.  "And with the donations that they are receiving, the figure

14   will increase."

15          So she's talking about other people donating cookies

16   to the warehouse, right?

17   A.  No.  What she's saying is that the funds from the cookies

18   allow them to buy more and fundraise more.

19   Q.  Okay.  It says:

20          "Because right now they have in the warehouse, 500

21   instead of 300.  And with the donations that they are

22   receiving, the figure will increase."

23          She is referring to the 500 and 300, is she not?

24   A.  I would think so.  Yeah, that's --

25   Q.  Okay.  So she's saying that somebody's donating extra Girl

Delgado - Cross by Ms. Kanof

1    Scout cookies to the warehouse?

2    A.  No.  Nobody is saying that.  Okay?  She's saying that

3    because of the revenue of the fundraiser they're able to buy

4    more and expand their base of donors.

5    Q.  Now, she never says anything about a fundraiser, does she?

6    A.  That's what she's -- yeah.

7    Q.  No.  She doesn't say fundraiser anywhere on here, does she?

8    A.  Well, it's *obra de caridad*.

9    Q.  Does she say fundraiser in here?

10   A.  Well, that's how I understand it.

11   Q.  "You can tell that you gave them confidence."

12            Who's she talking about?

13   A.  Their board.

14   Q.  What board?

15   A.  Of the organization that was conducting the fundraising.

16   Q.  "Because they almost -- almost want to turn all of it over

17   to you."

18            All of what?

19   A.  The fundraising aspect.

20   Q.  Oh.  Not all of the cookies?  Not all of the cookies?

21   A.  The campaign is a fundraising campaign.

22   Q.  All right.  Mr. Delgado, first of all, this is August 16th

23   that you're talking about cookies in a warehouse, correct?

24   A.  Yes, ma'am.

25   Q.  Okay.  500 boxes of Girl Scout cookies.  So let's talk

Delgado - Cross by Ms. Kanof

```
1    about Girl Scout cookies.
2              You live here in the United States, don't you?
3    A.  I do, ma'am.
4    Q.  And you know that in March of every year Girl Scouts go to
5    people and ask them to order cookies, correct?
6    A.  I do not know that.
7    Q.  Well, that's how it happens, isn't it?
8    A.  I do not know that.
9              MR. VELARDE:  He doesn't know.
10             THE COURT:  Go ahead.  Go.  Go on.
11   BY MS. KANOF:
12   Q.  You did not order, in March of 2006, 500 boxes of Girl
13   Scout cookies, correct?
14   A.  This is referring to Mexico Girl Scouts, not in the U.S.,
15   ma'am.
16   Q.  You're saying that 500 boxes of cookies sit in the heat in
17   Mexico in August, when Girl Scout cookie month is March?
18   A.  The heat in August?  Mexico City is temperate, the climate.
19   Q.  Okay.  According --
20   A.  I don't know when it's Girl Scout cookie month in Mexico.
21   Do you?
22   Q.  Okay.  You say you don't know how Girl Scout cookies are
23   purchased?
24   A.  No.  I know how it worked here.
25   Q.  Okay.  So you're saying that for this purpose that -- okay.
```

Delgado - Cross by Ms. Kanof

1   Where are Girl Scout cookies made?

2   A.  I have no idea, ma'am.

3   Q.  They're made in the United States, correct?  They're made

4   in a bakery in the United States?

5   A.  I don't know, ma'am.

6   Q.  And before Girl Scout cookies are sent anywhere they take

7   orders, correct?

8   A.  I don't know.

9        MR. VELARDE:  Your Honor, Counsel is testifying and I

10  object.

11       THE COURT:  I'll sustain the objection.

12  BY MS. KANOF:

13  Q.  Okay.  You weren't asked to order any Girl Scout cookies,

14  right?

15  A.  No.  I was asked to commit to five boxes per school and to

16  help identify people that were going to be doing that.

17  Q.  And a box of -- and you were going to pay for these

18  cookies; is that right?

19  A.  I was hoping I could just cut a check.  They force you to

20  actually take them.

21  Q.  Okay.  And so you didn't cut a check?

22  A.  No.  Actually, yeah.  I mean this went on for several

23  years.

24  Q.  This what?

25  A.  This fundraiser has gone on for several years.

Delgado — Cross by Ms. Kanof

1   Q.  You're telling the Grand Jury [sic] that at any time of the
2   year you –– that for several years you were selling or you were
3   taking five boxes of cookies and giving them to a school every
4   week?
5   A.  No.  I'm telling you that this fundraiser, and the request
6   that I support it, had gone on for several years.
7   Q.  Where are the checks to the Girl Scouts of Mexico?  Where
8   are the checks?
9   A.  No.  Actually, it's –– I don't have the checks or anything.
10  It was a contribution that was made at times, I guess with a
11  credit card.
12  Q.  Where's the credit card statement?
13          MR. VELARDE:  Your Honor, again I object.  She's
14  shifting the burden to us.
15          THE COURT:  I sustain the objection.  I sustain the
16  objection, and I'm going to break up for the evening.
17          Ladies and gentlemen, I told you we would be here
18  until –– just this week.  Well, that may change.  We may be
19  here until Monday, so start making plans.
20          You-all stick around.  We need to talk.
21          Members of the jury, please remember all the
22  instructions I gave you and abide by all of them.
23          And I do have some matters in the morning, so we're
24  going to get started at 9:15 again tomorrow morning.
25          The jury is going to be excused until 9:15 tomorrow

```
 1    morning.
 2                (Jury excused for the day; open court.)
 3                THE COURT:  You may be seated.
 4                How much more do you anticipate you'll have,
 5    Ms. Kanof?
 6                MS. KANOF:  Your Honor, as long as it takes to undo
 7    his lies.
 8                THE COURT:  Can you give me some idea in reference of
 9    time?
10                MS. KANOF:  I want to go through all of the calls and
11    go through a couple more e-mails.  So maybe an hour and a half,
12    two hours.
13                THE COURT:  Okay.  Then you all be here at 8:30 to go
14    over this Charge.  I want to have it completed by tomorrow
15    morning.
16                And some of the things that you have requested -- that
17    the Government has requested, I'm not going to include in here,
18    okay?  I'll just give you a warning right now.
19                And I understand you may have a rebuttal witness.
20                MS. KANOF:  Yeah.  Actually two, Your Honor.
21                THE COURT:  Huh?
22                MS. KANOF:  Actually two.
23                THE COURT:  Two?  Okay.  Then we may be here until
24    Monday, then.  You-all be here at 8:30 to go over the Charge.
25                MR. ESPER:  Yes, Your Honor.
```

1          THE COURT:  We'll be in recess until 9:15 tomorrow

2   morning.

3          (Proceedings continued in Volume 5.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2                  GOVERNMENT'S EVIDENCE

3    WITNESSES:

4    JOSHUA FRY:

5        Direct Examination by Ms. Arreola  ........................2
         Cross-Examination by Mr. Esper ...........................20
6        Redirect Examination by Ms. Arreola ......................47

7    Government Rests .........................................52

8    Motion for Judgment of Acquittal ...........................52

9                      DEFENSE EVIDENCE

10   WITNESSES:

11   MARCO ANTONIO DELGADO:

12       Direct Examination by Mr. Velarde ........................59
         Cross-Examination by Ms. Kanof ..........................144
13
     Jury in Evening Recess ...................................236
14

15

16

17

18

19

20

21

22

23

24

25