1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE WESTERN DISTRICT OF TEXAS

3                     EL PASO DIVISION

4
  UNITED STATES OF AMERICA   )   No. EP-12-CR-2106-DB
5                            )
  vs.                        )   El Paso, Texas
6                            )
  MARCO ANTONIO DELGADO      )   October 25, 2013
7

8

9                   VOLUME 5 OF 6 VOLUMES
                         JURY TRIAL
10        BEFORE THE HONORABLE DAVID BRIONES
           UNITED STATES DISTRICT JUDGE, and a jury.
11

12

13   A p p e a r a n c e s:

14   FOR THE GOVERNMENT:     MS. DEBRA P. KANOF &
                             MS. ANNA E. ARREOLA
15                           Assistant United States Attorneys
                             700 E. San Antonio, Suite 200
16                           El Paso, Texas  79901

17   FOR DEFENDANT:          MR. RAY VELARDE
                             Attorney at Law
18                           1216 Montana Avenue
                             El Paso, Texas  79902
19
                             MR. RICHARD ESPER
20                           Attorney at Law
                             801 N. El Paso Street, 2nd Floor
21                           El Paso, Texas  79902

22

23

24        Proceedings recorded by mechanical stenography,

25     transcript produced by computer.

Delgado – Cross by Ms. Kanof          5  –     2

```
 1              THE COURT:  Good morning, ladies and gentlemen.
 2              Members of the jury, again I need to remind you,
 3     you're being required to abide by all the instructions.  We've
 4     been here all week, and any mistake by a juror could set us
 5     back and we would have to start all over again.  So please,
 6     please, for the sake of all of us, abide by all the
 7     instructions that I gave you.
 8              Are you ready to proceed, Ms. Kanof?
 9              MS. KANOF:  I am, Your Honor.  And I have a couple of
10     rebuttal exhibits.  Could I hand them to the witness so he can
11     read -- so he can look at them while I'm talking to him?
12              THE COURT:  You may.
13              MR. VELARDE:  May I see them?
14              MS. KANOF:  I have copies.  Let me give them to you.
15              THE COURT:  You may.
16              (Ms. Kanof hands document to Defendant.)
17         MARCO ANTONIO DELGADO, DEFENDANT'S WITNESS, SWORN
18                       CROSS-EXAMINATION
19     BY MS. KANOF:
20     Q.  Good morning, Mr. Delgado.
21     A.  Good morning.
22     Q.  On -- on December 3rd of 2012, when talking to Josh Fry,
23     you told him that after the seizure of the million dollars de
24     la Concha introduced you to her cousin-in-law, Jose Quezada,
25     correct?
```

Delgado – Cross by Ms. Kanof                    5 –      3

1     A.  Did you say December –– what was the date?

2     Q.  You told Josh –– forget the date.

3          When you talked to Josh Fry, Agent Josh Fry, you told

4     him that after the seizure de la Concha introduced you to her

5     cousin-in-law, Jose Quezada.

6     A.  No, ma'am.  I don't know any Jose Quezada.

7     Q.  Okay.  And then you told him Quezada was a very powerful

8     man, and that if anyone was involved with drug trafficking, he

9     would suspect him –– you would suspect him.

10         And you're denying that as well, correct?

11    A.  Correct.

12    Q.  Okay.  Lilian de la Concha was married to President Vicente

13    Fox, correct?

14    A.  She was.

15    Q.  And in fact, when you met her, she was?

16    A.  Correct.

17    Q.  And you're saying she never introduced you to Vicente Fox's

18    cousin, Jose Quezada?

19    A.  I don't know anybody by the name of Jose Quezada.

20    Q.  You have before you what's been marked as Government's

21    Exhibit Number 98?

22    A.  Yes.

23         MS. KANOF:  Your Honor, we'd like the Court to take

24    judicial notice of the Encyclopedia Britannica.

25         THE COURT:  I will.  But what –– are you tying to

Delgado – Cross by Ms. Kanof

1    admit it?

2            MS. KANOF:  Yes, Your Honor.  We would like to admit

3    Government's Exhibit Number 98.

4            THE COURT:  Counsel?

5            MR. VELARDE:  No objection, Your Honor.

6            THE COURT:  Government's Exhibit 98 will be admitted.

7    BY MS. KANOF:

8    Q.  And this is a biography of Vicente Fox, correct?

9    A.  I don't -- do you want me to read it?  Because I don't know

10   what it is.  I just received it right now.

11   Q.  Okay.  Well, it says Vicente Fox.  In full, Vicente Fox

12   Quezada, correct?

13   A.  Are you asking me to read it, ma'am?

14   Q.  No.

15   A.  Okay.  Then...

16   Q.  I'm asking you to agree or disagree that it says Vicente

17   Fox, in full, Vicente Fox Quezada.

18   A.  Yes.

19   Q.  Okay.  So it's true that Jose Quezada -- Quezada is de la

20   Concha's -- now ex, but at the time -- cousin-in-law, correct?

21           MR. VELARDE:  Your Honor, I have to object, because

22   this question assumes facts not in evidence.  There's nothing

23   to establish that there's a relationship between either

24   Quezada.  Quezada is a very common name.

25           THE COURT:  Overruled.

Delgado - Cross by Ms. Kanof

```
1   BY MS. KANOF:
2   Q.  Well, the report says you said that de la Concha introduced
3   you to the cousin-in law, Jose Quezada, correct?
4           That's what the report says.  I'm not asking if you
5   agree.
6   A.  Yes, correct.
7   Q.  Okay.  All right.  So you are saying that Josh Fry, in
8   December of 2012, lied when he said that you admitted to being
9   introduced to this man you thought might be a drug trafficker?
10  A.  I never saw Fry in December of 2012.
11  Q.  I'm sorry?
12  A.  I never saw Josh Fry in December of 2012.
13  Q.  I'm sorry.
14  A.  So yes, if you represented that, it's another one of those
15  concoctions.
16  Q.  I'm so sorry, sir.  It was November.  I misspoke.
17  November 2nd of 2012.
18  A.  Okay.
19  Q.  So now that we have the date correct, are you now admitting
20  that you told him this?
21  A.  I've never discussed nor met an individual by the name of
22  Jose Quezada.
23  Q.  Let's talk about September 4th, and I'm going to try to
24  straighten some things out here.
25          The one -- it's your testimony that the one --
```

Delgado – Cross by Ms. Kanof                    5  –      6

```
1   A.   September?  Could you give me a specific date, ma'am?

2              MS. KANOF:  Your Honor --

3              THE COURT:  September 4th of what?

4              MS. KANOF:  2007.

5              THE WITNESS:  Thank you.

6              THE COURT:  That's good enough.

7   BY MS. KANOF:

8   Q.   On September 4th of 2007, Victor picked up a million

9   dollars in cash in 5s, 10s and 20s from Atlanta.

10             Will you dispute that?

11  A.   I don't know denominations, so I wasn't privy to that.

12             I now know that he picked up money and it was in

13  different denominations.

14  Q.   Okay.  And you tell him and others that -- when you find

15  out he picked up money -- that you thought it was a cashier's

16  check, correct?

17  A.   He mentioned funds.  So funds could be in different forms,

18  at least to my understanding.

19  Q.   And that you didn't know he was in Atlanta?

20  A.   I didn't know that he left to Atlanta.  Eventually I found

21  out he was in Atlanta.

22  Q.   Okay.  I'm talking about September 4th.

23             What was the origin of the one million dollars?

24  A.   When he went to Atlanta, out there, I wasn't -- I didn't

25  even know.  I wasn't privy that he was going out there to pick
```

Delgado – Cross by Ms. Kanof                    5  –      7

```
 1   up any type of funds.
 2   Q.  I'm sorry, sir.  What was the source of the one million
 3   dollar funds?
 4   A.  I don't know.  I didn't know he was picking up funds.
 5   Q.  Okay.  But didn't you testify that the funds were related
 6   to the bond issue?
 7   A.  No.  What I testified is that my involvement with this
 8   group had to do exclusively with the bond.
 9   Q.  Okay.  So now you're telling the jury -- okay.  Let me try
10   again.
11           Do you know what the million dollars was from?
12   A.  The funds, once it was -- I was made aware of that they
13   were coming from Atlanta, were the ones that had been discussed
14   with me with regards to an inheritance.  So I assumed those
15   were the funds that we're talking about.
16   Q.  Okay.  So the funds were related to an inheritance?
17   A.  The funds that they had identified, or discussed with me in
18   the past when I asked, they told me, they're coming from an
19   inheritance.
20   Q.  Okay.  And who is "they"?
21   A.  When it was brought up to me, it was Vargas in one
22   conversation and then --
23   Q.  So when did Vargas tell you --
24           THE COURT:  Let him finish, Ms. Kanof.
25           MS. KANOF:  Okay.
```

Delgado - Cross by Ms. Kanof

1    A.   And then his CPA, Pedro.  I don't recall if he called me or

2    if it was when I saw him down in Mexico City.  He mentioned

3    that, and that's when I was telling him, You need to be able to

4    show paperwork for the -- you know, for the probate of the

5    estate or where the inheritance came.

6    BY MS. KANOF:

7    Q.   Please, Mr. Delgado, if you don't understand my question

8    ask me and I'll ask it again.

9    A.   Okay.  Thank you.

10   Q.   But I'll ask you to answer the question that is asked.

11   Your attorney has a -- if you think that you didn't get to

12   talk, your attorney gets to come back up and let you clarify.

13          Can we agree to that?

14   A.   We can.

15   Q.   Okay.  Now, when Victor showed up with the million dollars,

16   what was your understanding at that minute of the source of the

17   funds?

18   A.   In my mind, it was the funds that they were discussing as

19   part of the inheritance.

20   Q.   Okay.  And you just speculated that?

21   A.   No.  When the funds were discussed with me --

22   Q.   By whom?

23   A.   The first conversation that I had, I already put it on the

24   record, was with Vargas.  And he said, We want to make sure

25   that some funds that need to come into Mexico is done in such a

Delgado - Cross by Ms. Kanof                   5 -      9

1    way that we don't violate any law.

2    Q.  Okay.  And --

3    A.  How is it done from the U.S. side, because we already have

4    the information from the Mexican side.

5    Q.  Okay.  And this was an inheritance of some person from the

6    electric power company, right?

7    A.  I don't know.

8    Q.  I thought you -- before, you testified that Mr.- -- that

9    somebody that preceded Mr. Vargas at the union had died and

10   these were the inheritance funds of that guy.

11   A.  No.

12   Q.  You didn't testify to that?

13   A.  No, I did not.

14   Q.  Well, whose inheritance was it?

15   A.  I don't know, ma'am.  I wasn't involved in structuring the

16   transaction.  When I was asked, I told him, You need to

17   identify the source.  They discussed it in terms of an

18   inheritance.

19          He said, Okay.

20   Q.  Wait, wait, wait.  You told them, You need to identify the

21   source?

22   A.  Yes, for the paperwork, for the declarations.

23   Q.  Wait.  Now, you're saying you told them, You need to

24   identify the source?

25   A.  Yes.  You need to be able to establish the source of origin

Delgado – Cross by Ms. Kanof

1    of the funds.

2    Q.  I thought, before, you said what they needed to establish

3    was the source of origin of the treasury bond.

4    A.  They also needed to do that.  You see what happens is when

5    you have different instruments, whether --

6             MS. KANOF:  Your Honor --

7             THE COURT:  You answered the question.

8    BY MS. KANOF:

9    Q.  Again, your attorney will let you explain.

10            So you didn't know Victor was in Atlanta, correct?

11   A.  Not initially, no.

12   Q.  Okay.  And you testified that you did not find out that

13   Victor was in Atlanta until when?

14   A.  That, I don't recall, ma'am.

15   Q.  Okay.  This is September 4th, correct, of 2007?

16   A.  Correct.

17   Q.  Okay.  And when you talked to the Department of Public

18   Safety officer who stopped your car, you told them it was

19   Victor's money.

20   A.  I don't recall.

21   Q.  Well, that's what the -- Officer Carrasco testified to.

22            Was he telling the truth?

23   A.  I don't recall, ma'am.

24   Q.  Okay.  And you told DPS that Carrasco -- that you were

25   helping Mr. Carrasco to go to the Chase Bank, because you knew

Delgado - Cross by Ms. Kanof

```
1    an administrator at the Chase Bank?
2              MR. VELARDE:  I'm sorry --
3              THE WITNESS:  Ma'am, I don't know a Mr. Carrasco.
4              MR. VELARDE:  Your Honor, a point of clarification.
5    There's no testimony about who told Mr. Carrasco.
6              MS. KANOF:  I'm sorry.  Deputy -- Department of Public
7    Safety.  He -- Carrasco testified to this, Your Honor.
8              THE COURT:  Overruled.
9    BY MS. KANOF:
10   Q.  Okay.  That you told Trooper Carrasco you were helping
11   Victor, and you were going to Chase Bank because you knew an
12   administrator there, correct?
13   A.  No.
14   Q.  So --
15   A.  That's not correct.  I said my assistant was there.
16   Q.  Okay.  You answered the question, sir.
17             THE COURT:  Wait.  You've answered.
18   BY MS. KANOF:
19   Q.  So when Trooper Carrasco testified that you were going to
20   Chase Bank because you knew an administrator, he was not
21   telling the truth, that you told him that?
22   A.  He probably misunderstood.  The administrator was my
23   assistant that was waiting at the bank for me.  And I did
24   mention that.
25   Q.  What's that administrator's name that was waiting at the
```

Delgado - Cross by Ms. Kanof

1   bank?

2   A.  Miriam Guerrero.

3   Q.  Okay.  So you are saying that it wasn't the bank

4   administrator that you knew.  You were saying it was your

5   administrator that was at the bank?

6   A.  What I'm saying is that when Victor shows up with those

7   funds and tells me --

8   Q.  Were you saying it was your Miriam administrator, or did

9   you tell Carrasco it was the bank administrator and you knew

10  him, so you were helping Victor with --

11  A.  No.  I never said that to the officer.

12  Q.  And Miriam was your virtual secretary, correct?

13  A.  I don't know what "virtual secretary" is.

14  Q.  Well, I think they referred to virtual when something is in

15  the internet space or something like that.  That's what I mean.

16  Your office --

17  A.  No.  No, no.  She was my administrative assistant.

18  Q.  Oh, okay.

19  A.  A human being.

20  Q.  You didn't say administrative assistant.  You said

21  administrator.

22  A.  I don't recall.  I mean, you've got that taped.  So if you

23  want to, we can review it.

24  Q.  And when -- you told them you were going to help them at

25  Chase, right?

Delgado - Cross by Ms. Kanof

1    A.   That we were going to open an account for Pimentel, yes.

2    Q.   So on Friday afternoon you were going to take a million

3    dollars to Chase Bank, where Miriam was waiting for you, and

4    she -- why did you need her to help you open a bank account?

5    A.   Well, first of all, she's the one that did all my banking.

6    She was the one that had, you know, the relationship with the

7    administrators from the bank.

8         And I was going to be leaving town, so I wanted to

9    make sure that Victor was taken care of.

10   Q.   Okay.  She had a relationship with who?

11   A.   Well, with the bank.  She's the one that took care of my

12   banking.

13   Q.   Okay.  But you didn't bank at Chase.

14   A.   I did.

15   Q.   Really?

16   A.   Really.

17   Q.   Okay.  Can we see those records?

18   A.   Yeah.  Subpoena them or ask them or what have you.  Yeah.

19   Q.   You actually told DPS Officer Carrasco that you did not

20   have an account at Chase Bank.

21   A.   No, that's incorrect.  That's incorrect.  I banked there

22   for many years, and at that branch in particular, the one we

23   were headed to.

24   Q.   Well, you're aware that the Government subpoenaed your bank

25   records, correct?

Delgado – Cross by Ms. Kanof

1    A.  I'm sure you did.

2    Q.  All of them were at Wells Fargo.

3    A.  Currently, yes.  We're talking about six years ago, ma'am.

4    Q.  We subpoenaed your records from six years ago.

5    A.  Well, then, doublecheck.

6         THE COURT:  Wait a minute.  Let's get some order here.

7         Do you have a question?

8    BY MS. KANOF:

9    Q.  Sir --

10   A.  Ma'am.

11   Q.  -- you've -- in fact, you stipulated to the bank records.

12   You agreed those were your bank records, correct?

13   A.  I don't know which bank records you're referring to.  I

14   banked at Chase for many years and did my personal and business

15   banking from there, from that specific branch.

16        MS. KANOF:  May I publish, Your Honor, Government's

17   Exhibit Number 85?

18        THE COURT:  It's been admitted.  You may publish.

19        MS. KANOF:  Thank you, Your Honor.

20   BY MS. KANOF:

21   Q.  This is a stipulation of authenticity of records.  And at

22   the bottom is your signature, correct?

23   A.  Yes, ma'am.

24   Q.  Okay.  And -- okay.  And the records, you have stipulated

25   that the Wells Fargo Bank account records of Liliana Narvaez

Delgado - Cross by Ms. Kanof

1    and the Wells Fargo records of your IOLTA account are true

2    business records, correct?

3    A.  Yes.

4    Q.  Okay.  And you said you just -- you just started banking at

5    Wells Fargo; it that right?

6    A.  No.

7    Q.  Okay.

8    A.  What I told you is that I banked for many years at Chase.

9    My IOLTA account and another account was being held at Wells

10   Fargo and continues to be.

11   Q.  Okay.  You testified that you found out that Victor was in

12   Atlanta when the bond mediation was taking place in Mexico,

13   correct?

14   A.  Actually, it had to be postponed because he wasn't there.

15   We couldn't find him.

16   Q.  Sir, you did not tell Mr. Velarde that, did you?

17   A.  That's what it was, yeah.  Because he wasn't there,

18   correct.

19   Q.  The first time --

20   A.  You're correct.

21   Q.  The first time you testified why you did not know Victor

22   was in Atlanta is you said the bond mediation was taking place

23   in Mexico.

24   A.  Correct.

25   Q.  The second time you said you were at the mediation in

Delgado - Cross by Ms. Kanof

1   Mexico.

2   A.  Correct.

3   Q.  Okay.  You didn't tell Mr. Velarde, Ooh, and then we had to

4   cancel it because Victor wasn't there, did you?

5   A.  I suppose not.

6   Q.  I'm sorry?

7   A.  If you're --

8   Q.  You're agreeing with me that you didn't testify to that?

9   A.  If you want you could have the record be read to me,

10  because I don't have the specific recollection of what I said

11  yesterday.  I was here for two hours, so I could have said --

12          THE COURT:  Answer the question.  If you don't know,

13  say you don't know.

14          THE WITNESS:  I don't know.

15  BY MS. KANOF:

16  Q.  You also testified, I was responsible for the settlement of

17  the bond, correct?

18  A.  Yeah, placing the bond.

19  Q.  Okay.  No.  I'm quoting you.  Do you not recall that you

20  said, I was responsible for the settlement of the bond?

21  A.  I would like to see that, because I don't know.  I would

22  like to see that quote, actually, the context of it.

23  Because --

24  Q.  If you don't recall, please just say you don't recall.

25  A.  I don't recall.

1    Q.  Okay.  And so you're in Mexico on the 4th of September,

2    correct?

3    A.  No.  Actually, the mediation went through for several days.

4    There were several meetings independent.  I don't know if, on

5    the 4th, I was there on the ground present.

6    Q.  You said --

7    A.  I don't --

8    Q.  -- you found out Victor was in Atlanta when the bond

9    mediation was taking place in Mexico and you were in Mexico,

10   correct?

11   A.  Yes.

12   Q.  And Victor was only in Atlanta September 3rd and

13   September 4th?

14   A.  I don't know.

15   Q.  Okay.  Well, if he was, then we can place you in Mexico on

16   September 3rd and September 4th, correct?

17   A.  I mean if you assume that that's when he went, yes.

18   Q.  You e-mailed him Government's Exhibit Number 31 at

19   1:37 p.m. on September 4th of 2007, the settlement agreement.

20            Will you agree with me?

21   A.  Yes.

22   Q.  Government's Exhibit Number 31.

23   A.  Uh-huh.  Yes.

24   Q.  Okay.  First of all, you previously testified that you got

25   that settlement agreement -- and I want to be correct.

Delgado - Cross by Ms. Kanof

1          You got that settlement agreement from the people in

2     your office who had a library.  That was your testimony?

3     A.  No.

4     Q.  Okay.  That was not your testimony?

5     A.  My firm has a library of forms, so it was accessed from

6     there.

7     Q.  I'm sorry.  Your firm, which is just --

8     A.  My law firm --

9     Q.  Yeah.

10    A.  -- as part of its assets has an archive of forms, a

11    library.  And if somebody's assisting me, that's where they

12    would have accessed it, from our server.

13    Q.  So you're telling the jury you didn't say, on the first

14    time that Mr. Velarde asked you specifically, Someone in my

15    office did that.  We have a library of forms.

16    A.  I don't know if I -- I don't know.

17    Q.  And of course you can't identify who it was in your office

18    that did that, right?

19    A.  Correct.

20    Q.  That office on Remcon is what's known as a virtual office,

21    isn't it?

22    A.  All of our offices are virtual, yes, sir.

23    Q.  So it's not really an office, right?

24    A.  No, it is an office.

25    Q.  Did you sleep there at the office?

Delgado - Cross by Ms. Kanof

1   A.  Sometimes when we had closings, yes.

2   Q.  Was it your legal residence?

3   A.  Yeah.

4   Q.  The office was your legal residence?

5   A.  Yeah.  For my modifications and everything, yes.

6   Q.  You took a homestead deduction in your office?

7   A.  No.  Did I ever claim a homestead deduction?

8   Q.  Okay.

9   A.  No.

10  Q.  You're now telling this jury you lived at your office,

11  which was a virtual office?

12  A.  How are you defining "residence"?

13  Q.  The way the IRS does.

14  A.  Could you share that definition with me?

15  Q.  If you would look at Government's Exhibit Number 82, your

16  1040 individual tax return from 2008.

17  A.  Uh-huh.

18  Q.  The question is:  Home address number and street.

19          And you say 7362 Remcon.

20  A.  Correct.

21  Q.  That is not true, is it?

22  A.  That's my office.  That's the address where I will get all

23  my mail and where I would be located.  So you're right, that's

24  correct.  I did not live there.

25  Q.  So you lied to the IRS?

```
1   A.  I guess.  Yes, I guess the information is not --
2   Q.  Because from 2008 you were living with your mother?
3   A.  Probably, yes.  Uh-huh.
4   Q.  And that's because you were destitute and you had to live
5   with your mother?
6   A.  No.  It's a cultural thing.  I'm sure you wouldn't
7   understand.
8           THE COURT:  Wait a minute.
9           THE WITNESS:  Living with my mother is not an
10  indication of anything but respect.
11  BY MS. KANOF:
12  Q.  Okay.  Living with your mother is an indicator -- but
13  you -- but you didn't live with your mother after you got
14  divorced, did you?
15  A.  Yes.
16  Q.  Well, you lived with Victor after you got divorced.
17  A.  I got the -- no.  You're incorrect.  Your dates are
18  mistaken.
19  Q.  And you lived with Victor in a house, correct?
20  A.  I did not live with Victor after my divorce.  That was the
21  excuse I actually used to get rid of him.
22  Q.  Victor lived with you, right?
23  A.  Not after my divorce, no.
24  Q.  I didn't ask you.
25          Victor lived with you, correct?
```

Delgado - Cross by Ms. Kanof                    5 -    21

```
 1    A.  Correct.

 2    Q.  He lived with you for several years, correct?

 3    A.  Yes.

 4    Q.  He didn't -- your wife didn't live there when Victor was

 5    there, right?

 6    A.  No, she didn't.

 7    Q.  Okay.  Because you were already divorced?

 8    A.  No.

 9    Q.  Okay.

10    A.  I was separated.  The divorce took years.

11    Q.  Okay.  I'm sorry.

12    A.  You should be.

13    Q.  After you and your wife separated, your wife -- her name

14    was Sharon, right?

15    A.  Excuse me?

16    Q.  Your wife's name was Sharon, correct?

17    A.  I think it still is.

18    Q.  And you lived with Victor after you and Sharon were

19    separated?

20    A.  Yes.

21    Q.  Actually, Victor lived with you, correct?

22    A.  Yes.

23    Q.  At your home?

24    A.  Yes.

25    Q.  Your mother didn't live with you then, right?
```

Delgado – Cross by Ms. Kanof

1    A.  No.

2    Q.  Okay.  Well, you know, with regard to that, Government's

3    Exhibit Number 82, for the year of 2008, you declared $52,000

4    income?

5    A.  That was -- that was actually presented by an accountant.

6    And it was reviewed, and it had been amended, or in the

7    process, or should be amended.

8    Q.  Or is in the process?

9    A.  It was an oversight.

10   Q.  Okay.  Was it amended or not?

11   A.  It should be being amended.

12   Q.  Okay.  You're -- it should be being amended since you got

13   this in discovery, right?

14   A.  Excuse me?

15   Q.  It should be being amended because -- this is 2008.  How

16   long ago was that?

17   A.  I don't know.

18   Q.  Okay.

19   A.  Maybe five years.

20   Q.  '8, '9, '10, about five years ago?

21   A.  Uh-huh.

22   Q.  And you haven't corrected it yet?

23   A.  I don't know if it's reached the IRS offices yet or not,

24   but it should be.

25   Q.  Arely González is the one who did this return from Liberty

Delgado – Cross by Ms. Kanof

1   Tax Service, correct?

2   A.  I don't know.

3   Q.  Well, it says, Paid preparer's use only.  And it says Arely

4   González, Liberty Tax Service, correct?

5   A.  That's what it says.

6   Q.  Okay.  And of course for a tax service to file a tax return

7   you have to give them your information, right?

8   A.  Yes.  Uh-huh.

9   Q.  Okay.  Is that a yes?

10  A.  Yes.

11  Q.  Okay.  And so they would have gotten the fact that you

12  lived at your office from you, correct?

13  A.  I don't know if I was the one giving them the information.

14  I think that's why the income was also misstated, because it

15  went probably through my assistant or something like that.

16  Q.  Let's see.  Who's correcting -- who should be in the

17  process of filing a correct return right now?

18  A.  Actually, my attorneys -- my -- I'm sorry.  Let me restate

19  that.

20          Actually, I've hired two different CPAs.

21  Q.  Who?

22  A.  And two different times -- periods of times to take care of

23  this.

24          One of them I believe is Med- -- Linda Medlock.  She's

25  no longer doing that, but she was in charge of doing it.

Delgado - Cross by Ms. Kanof

5 -    24

1              And then subsequent to that, Mr. Chris Parker.  And he
2    was in charge of regularizing and cleaning up all the mess from
3    the previous accountant.
4    Q.  Okay.  So you've -- you hired two different accountants --
5    A.  Yes.
6    Q.  -- to fix this, right?
7    A.  Uh-huh.
8    Q.  Is that a yes or no?
9    A.  Yes.
10   Q.  I'm sorry.  The court reporter needs you to state some
11   words, not uh-huh or -- okay?
12   A.  Yes.
13   Q.  And neither of them have fixed it, right?
14   A.  Apparently so.
15   Q.  Okay.  Now by the way, how -- how is this being amended?
16   What are you changing?
17   A.  The income that's going to be disclosed, the amount of
18   income.
19   Q.  Okay.
20   A.  It was understated, apparently, is the oversight.
21   Q.  Oh.  They accidentally understated -- well, if income is
22   understated, you pay less taxes, right?
23   A.  It depends on what type of liabilities you have, what
24   expenses that year and other things, if you're carrying over
25   losses.  So, no.  I mean, it varies.

Delgado – Cross by Ms. Kanof

1    Q.   If income is understated you pay less taxes, don't you?

2    A.   It depends on the burden that you have.  If you don't have

3    an obligation then it wouldn't affect it.

4    Q.   How understated was this, now?

5    A.   I believe that it was in the magnitude of a couple of

6    hundred thousand dollars.

7    Q.   Oh.  So instead of 52,000, it should have been 252,000?

8    A.   I don't really know the amount, but I know it's in those

9    magnitudes.

10   Q.   Okay.  And I think your signature is on this.  Hold on.

11            Did -- it was Arely.  Did Ms. González --

12   A.   I don't know an Arely.

13   Q.   Did she -- this was not electronically filed.  So did

14   Ms. González not go over it with you before it was filed?

15   A.   This is not a form that I participated in the preparation.

16            Like I said, it was done through somebody that I

17   relied on in terms of getting the information to them.  But if

18   you show me the signature page, perhaps I can decipher it.

19            You did say there's a signature, right?

20   Q.   Well, I didn't know whether there was or not.  See --

21   A.   Because if you show it to me, then we could tell.

22   Q.   At least on this copy, even she did not sign it.  But it is

23   a certified copy from the IRS.  So they must have sent --

24   A.   So they received an unsigned return?

25   Q.   Now -- I'm sorry, sir, I'm asking the questions.

Delgado - Cross by Ms. Kanof

1          Now, you told this jury that you didn't know he was in

2     Atlanta until you were at the mediation in Mexico, correct?

3     A.  Correct.

4     Q.  And you were at the mediation in Mexico, then -- okay.

5          And we know that you're back in El Paso on the 6th,

6     because Victor picks you up in front of your mother's house,

7     right?

8     A.  No.  Victor didn't pick me up at my mother's house on the

9     6th.  It's incorrect, ma'am, the information.

10    Q.  I'm sorry.  The 7th.

11         We know you were in El Paso by September 7th.

12    A.  The 6th or the 7th.

13    Q.  Okay.  The 7th, sorry.

14    A.  The 7th?  Yes.  The 7th I was in El Paso.

15    Q.  Okay.  And you said that you were sending the document, the

16    settlement agreement, because Victor was going to do the

17    mediation.

18    A.  He was going to partake in the mediation.

19    Q.  Okay.  So he was going to partake in the mediation?

20    A.  Yes.

21    Q.  So it's already -- you send this to Victor on the 4th at

22    1:37.

23    A.  Yes.

24    Q.  And as we went through today, there is nothing about this

25    settlement agreement that has anything to do with this bond

Delgado - Cross by Ms. Kanof                          5 -   27

```
 1   business, correct?

 2   A.  It's a form, like the e-mail says.

 3   Q.  My question --

 4   A.  It identifies the --

 5              THE COURT:  Just answer the question.

 6              THE WITNESS:  It does.  Yes, it does.

 7   BY MS. KANOF:

 8   Q.  Okay.  It's before you, because you show a page that it

 9   references a bond settlement?

10   A.  No.  It's just a transaction.  It describes how to finish,

11   how to settle a dispute.

12   Q.  Okay.  And before -- and this has a lawsuit number and

13   everything.  And before, you said --

14   A.  It does.

15   Q.  Okay.  And so on the 4th you're in Mexico for the

16   mediation, correct?

17   A.  No, I don't know if I'm there.  The mediation actually

18   started the week -- the prior week.

19   Q.  Wait.  The mediation started the prior week?

20   A.  Yes.

21   Q.  I thought you just testified that it had to be postponed

22   because Victor wasn't there.

23   A.  No.  The component -- when I said he partakes in it, his

24   part was going to take place the following week when he was no

25   longer there.
```

Delgado — Cross by Ms. Kanof

1  Q.  You testified that you had to postpone the meeting --

2  A.  Well, I'm correcting that statement.

3  Q.  Okay.  And so if you -- well, let's -- let's say that it

4  did start the week before.

5         Why did you take the settlement agreement with you to

6  Mexico?

7  A.  That wasn't the part I was responsible for.

8  Q.  Okay.  What part were you responsible for, now, in the

9  mediation?

10  A.  My big contribution had to do with ascertaining the value

11  of the instrument and identifying the best way to settle it

12  from a financial perspective, in terms of cashing it, selling

13  it, mortgaging it.

14  Q.  Well, if that's your only aspect and Victor is a lawyer,

15  why are you sending him the settlement agreement he needs to

16  use?

17  A.  He asked for guidance, probably.

18  Q.  Probably?

19  A.  Yeah, probably.  I don't know.  Uh-huh.

20  Q.  I draw your attention to Government's Exhibit Number 34.

21         Now at the top, this is Laura I. Montes versus The

22  City of El Paso, correct?

23  A.  Correct.

24  Q.  And it was filed on January 13th of 2006, correct?

25  A.  Yes.

Delgado – Cross by Ms. Kanof                    5 –   29

1  Q.  And it was filed in the 205th Judicial District Court,

2  El Paso County, Texas, correct?

3  A.  Correct.

4  Q.  And the Cause Number is 2006 -- meaning the year, correct?

5  A.  Correct.

6  Q.  Dash 217, correct?

7  A.  Correct.

8  Q.  Government's Exhibit Number 31, the settlement -- the thing

9  that was in your files that they used, that you sanitized, has

10 the exact same Cause Number on it, doesn't it?

11 A.  Yes.

12 Q.  And says the 41st Judicial Court, doesn't it?

13 A.  That's what it says.

14 Q.  Okay.  And so this cause number has nothing to do with even

15 this sanitized document, does it?

16 A.  I don't follow -- I don't understand your question.

17 Q.  2006-217 belongs to Ms. Montes versus The City of El Paso,

18 correct?

19 A.  Correct.

20 Q.  And you testified that this was just in your virtual form

21 library to use for the purpose of the bond settlement, correct?

22 A.  As a template for any release and settlement that could get

23 some language from it.

24 Q.  Okay.  How is it that in your files you have a template

25 that has a cause number that belongs to a lawsuit that has

Delgado – Cross by Ms. Kanof

1   nothing to do with your practice?

2   A.  For the following reason.  At times you're not going to

3   find specific language for a specific type of transaction.  So

4   what you do is you get the closest thing to it.

5           So if something catches your eye in the form of, Look,

6   this identifies the issue in a succinct fashion, you do that

7   and you probably use it for several transactions, not just one.

8   Q.  Okay.  That didn't answer my question.

9           Let me -- if you don't understand my question --

10  A.  The document was probably useful, and that's why.

11  Q.  No.  How did a template in your library get a cause number

12  from Montes versus City of El Paso on Juan Miguel Hernandez

13  versus Texas Oil Company?

14  A.  That, I don't know, now.

15  Q.  Now, you testified that you were sending Victor to mediate.

16  A.  No, I wasn't sending -- Victor was part of the mediation.

17  Q.  Okay.  So now you're denying that you --

18  A.  I wasn't sending Victor, no, to mediation.  He was part of

19  it.

20  Q.  And you're sending him this form, when the mediation's

21  already been gone -- going on for a week, right?

22  A.  Not -- not a week, but for some days, yes.

23  Q.  Isn't it kind of cutting it close to be sending -- they've

24  already been in mediation for a week, and you said the rest of

25  it was postponed because Victor didn't show up.

Delgado &ndash; Cross by Ms. Kanof

1        So he must have -- you must have expected him to show

2   up on the 3rd or 4th of September, correct?

3   A.  He probably just announced he wasn't going to be there.  I

4   don't recall the specifics of --

5   Q.  Okay.  That wasn't my question.

6        You said that the mediation was postponed because

7   Victor wasn't there to do his part, correct?

8   A.  Correct.

9   Q.  And that you already expected him to be there at that time.

10  A.  Yes, it was expected.  He was responsible for that.

11  Q.  And Victor was in Atlanta the evening of the 3rd of

12  September, correct?

13  A.  I don't know that.

14  Q.  Well, let's assume that all of the agents are not lying and

15  that Victor was in Atlanta on the 3rd of September.

16  A.  Let's assume that.

17  Q.  Okay.  And so Victor got the settlement mediation template,

18  with the cause number from a different lawsuit against the

19  city, the date after he was supposed to be in Mexico for the

20  mediation, right?

21  A.  I didn't follow your sequence, ma'am.  I'm sorry.

22  Q.  You said that the mediation was postponed because Victor

23  wasn't there.

24  A.  Correct.

25  Q.  And you had expected Victor to already be there, correct?

Delgado - Cross by Ms. Kanof

1   You just said that a minute ago, correct?

2   A.  I -- he was supposed to be at the mediation.  Yes, correct.

3   Q.  Okay.  And that you found out, when you were in Mexico, he

4   was in Atlanta, correct?

5   A.  Yes.

6   Q.  So wouldn't that mean that you found out he was in Atlanta

7   on September 3rd or 4th of 2007?

8   A.  Yeah, probably -- I don't know if it was the 4th or what

9   date, but yeah.

10  Q.  Well, previously you testified that when -- that you didn't

11  even know Victor was in Atlanta on the 6th of September.

12  But --

13  A.  I don't recall those dates.

14  Q.  -- obviously you did know, correct?

15  A.  I don't -- yeah, but I...

16  Q.  Okay.  And again, if this is -- you said -- I'm trying to

17  cut my question in pieces.  So --

18  A.  Thank you.

19  Q.  -- Victor was supposed to be there by the 3rd, correct?

20  Because that's -- that's when you found out that you had to

21  postpone, right?

22  A.  I don't remember if it was the 3rd when we found out, what

23  day.  But he was supposed to be partaking in a mediation that

24  was going on the week of the 3rd.

25  Q.  You never -- you never told us -- this jury on direct or on

Delgado - Cross by Ms. Kanof

1    my cross from yesterday that you waited for days for Victor to

2    show up and then postpone the mediation.

3    A.  Your questions are close-ended.  You don't allow for

4    expansion or clarification.  It's just yes or no.  Yes or no.

5    Q.  You're an attorney, correct, Mr. Delgado?

6    A.  I am, ma'am.

7    Q.  And you know the difference between direct and

8    cross-examination?

9    A.  Not the -- the rules that govern it, no.

10   Q.  Oh, okay.  Well, you know that when someone sponsors a

11   witness you can only direct them, correct?

12   A.  I don't know the technicalities.  If you want to explain

13   them to me...

14   Q.  Okay.

15          THE COURT:  No, no.  Don't start explaining, please.

16          MS. KANOF:  Yeah.

17   BY MS. KANOF:

18   Q.  This is cross-examination, in other words, sir.

19   A.  Yes.  I'm aware of that.

20   Q.  So right now, based on your testimony, Victor was supposed

21   to be in Mexico City on the 3rd of September, correct?

22   A.  He was supposed to be in the mediation that week of the

23   3rd, yes.

24   Q.  Okay.  And on the 4th you sent him a settlement agreement,

25   correct?

Delgado – Cross by Ms. Kanof

1    A.  Correct.

2    Q.  Okay.  And you sent him a settlement agreement which

3    doesn't even come close to being ready.

4    A.  I didn't send them a settlement agreement.  I sent them a

5    form so he could use language from it and identify issues.

6    Q.  Okay.  Where was his office?

7    A.  Whose office?

8    Q.  Victor's.

9    A.  Probably at the SUTERM, at the labor union.

10   Q.  Okay.  So --

11   A.  I suppose so.

12   Q.  So now you're saying that Victor was a lawyer for the labor

13   union and had an office there?

14   A.  Could you --

15   Q.  Yesterday, you --

16   A.  Did I -- did I say that?  No, I didn't say that, ma'am.

17   Q.  Yesterday you testified that Victor went to law school with

18   Vargas's daughter.

19   A.  Yes.

20   Q.  Okay.  Vargas's daughter went to culinary school.  She

21   didn't go to law school.

22   A.  Victor's girlfriend, the daughter of Nareo Vargas, went to

23   law school, to the Anahuac University and actually clerked --

24          MS. KANOF:  Your Honor --

25   A.  -- in my law firm here in the United States in the late

Delgado - Cross by Ms. Kanof

```
 1   '90s.
 2           THE COURT:  That's enough.  That's enough.
 3   BY MS. KANOF:
 4   Q.  So when Victor testified he had gone to culinary school, he
 5   wasn't telling the truth?
 6   A.  Excuse me?
 7   Q.  When Victor testified that he went to culinary school, he
 8   wasn't telling the truth?
 9   A.  How am I supposed to know if he went to culinary school or
10   not?
11   Q.  Well, you knew he went to law school, don't you?
12   A.  Yes.  Because that's something he would discuss, he would
13   proffer, he would put forth.
14           I didn't know his background as a culinary student or
15   what have you.
16   Q.  So he went to law school, but then was living in a dorm at
17   UTEP as an undergraduate student?
18   A.  He wasn't living -- he was living at my house.
19   Q.  Well, he testified that when he deposited the funds into
20   your Wells Fargo account in July of 2008 he was living in the
21   dorm.
22   A.  Yes.
23   Q.  Right?  Right?
24   A.  Yes.  That's after he had lived with me.
25   Q.  Right.  After -- and he was not a graduate student, was he?
```

Delgado – Cross by Ms. Kanof

1    A.  I don't know.  I don't know.  Just because he got a

2    different degree here doesn't mean that he didn't have another

3    one.

4    Q.  You testified that you did not know that Victor had picked

5    up money, correct?

6    A.  That -- well, depends on what time.  At what time?

7    Q.  In Atlanta.

8    A.  When?

9    Q.  You testified that on August 6th of 2007, you did not know

10   that Victor had picked up money in Atlanta, correct?

11   A.  I didn't know he had picked up money in Atlanta, yeah.  I

12   don't know.

13   Q.  Okay.

14   A.  As a matter of fact until right now, I understand that he

15   picked up the money.

16   Q.  Okay.  I'm going to draw your attention to Government's

17   Exhibit Number 38.

18   A.  Yes.

19            (Exhibit 38 playing.)

20            MS. KANOF:  For some reason it's not playing.  It's

21   probably me.

22            Oh, it's playing, we're just not hearing it.

23            According to this, the little bar at the bottom is

24   moving, but we're not hearing anything.

25            Is there something we can do about the audio?

Delgado – Cross by Ms. Kanof                   5  –    37

1              Let me see if we can just do it with the transcript

2    for right now, if I can scroll it down.

3              No, it's not scrolling.  Is that one scrolling?

4              (Discussion off the record.)

5    BY MS. KANOF:

6    Q.  I'll just use this transcript.  Let's go back.

7              You said you did not know that Victor had picked up

8    money, correct?

9    A.  Could you stop scrolling, please?

10   Q.  No, I'm just -- no, I'm going to the part I want to ask you

11   about.

12   A.  Okay.

13   Q.  Okay.  You testified that you did not know that Victor had

14   picked up money on the 6th of September, correct?

15   A.  No.  You were asking the 6th of August in your document.

16   If you scroll down, it says August 6th.

17             And no, I had no knowledge of him on August 6th.

18   Q.  On September 6th of 2007.  The front of Government's

19   Exhibit Number 38A says September 6th of 2006, correct?

20   A.  Yes.

21   Q.  And you claim to have made a lot of these tapes.  So you

22   know that that's how it's done, right?

23             MR. VELARDE:  Objection.  He did not make this tape.

24             THE COURT:  I'll sustain the objection.

25

Delgado – Cross by Ms. Kanof

1    BY MS. KANOF:

2    Q.  Okay.  But it says the 6th, right?  Oh, in fact --

3    A.  It's right there.  Go to the second page.

4    Q.  It says September 6 -- yes, I know there's --

5    A.  Go to the second page.

6    Q.  On September 6th --

7            MS. KANOF:  I'm going to have to play this, Judge,

8    because he's going to dispute -- the agent made a mistake and

9    put August instead of September, when he was doing the

10   preamble.  And the Government could prove in spades this

11   happened on September 6th of 2007.  But because he's disputing

12   it, I would like to play it.

13           THE COURT:  Call David.

14           Let's take a break.  We'll get the technician in here.

15           We'll be in recess for the next 10, 15 minutes.

16           (Recess taken; open court.)

17           MS. KANOF:  May I proceed, Your Honor?

18           Your Honor, during the break the defense counsel

19   informed me that they're willing to stipulate the phone call

20   occurred on September 6th of 2007.

21           THE COURT:  With the preparation, the document states

22   August the 6th, right?

23           MS. KANOF:  No.  The document states September.  But

24   in the preamble that's typed up it says August.

25           THE COURT:  Okay.  So it should have said September?

Delgado - Cross by Ms. Kanof

1           MS. KANOF:  It should -- it's a typo.  They're

2    agreeing it's a typo.

3           THE COURT:  Okay.

4    BY MS. KANOF:

5    Q.  So, Mr. Delgado, on -- you previously testified that you

6    did not know that Victor had brought cash money from Atlanta,

7    correct?

8    A.  Not cash.  I knew he had funds with him.

9    Q.  Okay.  You thought it was a cashier's check, right?

10   A.  But I don't have a specific recollection; just funds.

11   Q.  Well, you testified --

12   A.  An instrument.

13   Q.  -- you thought it was a cashier's check.

14   A.  Well, it could have been a cashier's check.  It could have

15   been a CD.  You know, just an instrument.

16   Q.  Well, you were going to help him deposit it in the bank.

17   What were you going to help him deposit?

18   A.  No.  Actually, he was heading out of the country when he

19   was coming.  He didn't tell me that he needed some help,

20   actually, until he got there the following morning and says

21   that his people are still not ready or what have you to do the

22   Mexican part.

23          And that's when I said, Okay.  Let's go to the bank

24   and either get a cashier's check or an escrow account or

25   whatever.

Delgado - Cross by Ms. Kanof

1   Q.  And get a cashier's check.  That would imply that you knew
2   there was cash, right?
3   A.  Cashier's check does not mean it's cash, ma'am.  You can
4   actually get a cashier's check with a regular bank with a
5   credit card, with a wire transfer.
6   Q.  But you said you know --
7   A.  It's just a name.
8   Q.  -- he brought something.
9   A.  Funds.  Yes, ma'am.
10  Q.  Okay.  He brought funds.  Okay.
11          Is the credit card funds?
12  A.  No.  But the credit line backing it is.
13  Q.  You testified you knew he brought funds, but you didn't
14  know it was cash, correct?
15  A.  I didn't know the form of it, correct.
16  Q.  Okay.  And just now you said that -- and you did testify
17  that you thought it was a cashier's check, correct?
18  A.  I didn't know the form of it.  It could have been a
19  cashier's check.
20  Q.  But you're sure you did not know that it was a million
21  dollars in cash, correct?
22  A.  That, I am sure.
23  Q.  Okay.  How much space does a cashier's check take up?
24  A.  I -- I don't -- I don't know.
25  Q.  It's just a little piece of paper, right?

Delgado — Cross by Ms. Kanof

1    A.   Yeah.  Uh-huh.

2    Q.   You put in your pocket, right?

3    A.   Uh-huh.

4    Q.   Is that a yes?

5    A.   Yes.

6    Q.   So in this conversation, which is very short, first Victor

7    asks you to go to Target for him, correct?

8    A.   Yes.  That's what it says.

9    Q.   And he had a two-month old baby, right?

10   A.   Yes.  Uh-huh.

11   Q.   And he asked you to pick up one of those swings that they

12   use so the little girl could bounce on the floor, correct?

13   A.   Yes.

14   Q.   And you said, Let me see.  No, no.  The ones that you wind

15   and it moves, or the ones that you hang on the door?

16          You asked him to clarify, correct?

17   A.   Yes.

18   Q.   And he said, No, no.  You hang it on the door.  Exactly,

19   correct?

20   A.   Yes.

21   Q.   And you said, Yes, I know which one it is.

22          Is that correct?  Is that correct?

23   A.   I mean, it doesn't appear at the -- could you scroll down?

24          (Call played.)

25   A.   I see it now.

Delgado - Cross by Ms. Kanof

1   BY MS. KANOF:

2   Q.  Okay.  He says, It is a big box and we can store the money,

3   no?  Please?

4           And you respond, Okay, then.  Sure.

5           Right?

6   A.  Yeah.  Uh-huh.

7   Q.  Okay.  Yes?

8   A.  Yes.

9   Q.  Okay.  But you testified you didn't know that he was

10  bringing money.

11  A.  No, I didn't know an amount or anything.  I thought this

12  was just part of the banter.

13  Q.  I'm sorry.  You just thought this was banter?

14  A.  Yes.  Uh-huh.

15  Q.  He says, It is a big box, and there we can store the money,

16  no?  Please?

17          And you say, Okay.

18          Right?

19  A.  Well, no.  I don't say okay.  He doesn't say "the money."

20  He uses a slang term.

21  Q.  Uh-huh.

22  A.  Kind of like in jest.

23          Oh, okay.

24          So I tell him, *Orale pues*, which means let's go with

25  it.  I said, *No, claro*, of course.

 1          It was just banter.

 2    Q.  So you just now said, I didn't know how much money.

 3          What is it, Mr. Delgado?  Did you know he had cash or

 4    not?

 5    A.  I knew he had funds.  I did not know the form.  I did not

 6    know the amount.

 7    Q.  You told --

 8    A.  But I will tell this --

 9          MS. KANOF:  Your Honor --

10          THE COURT:  You've answered the question.

11    BY MS. KANOF:

12    Q.  You told DPS Trooper Carrasco, when you were stopped on the

13    way to Chase Bank, you told him that you were going to the

14    airport, right?

15    A.  Yes.

16    Q.  Right.  You were going to fly to Mexico City, right?

17    A.  Correct.

18    Q.  And you claimed all of the clothing, luggage in the car was

19    yours, right?

20    A.  Yes.

21    Q.  Okay.  And your intent, then, was to fly on an airplane,

22    right?

23    A.  Yes.

24    Q.  Did you know how Victor had gotten to Atlanta?

25    A.  No.

Delgado - Cross by Ms. Kanof                    5 -    44

```
1    Q.  Did you know how Victor got back from Atlanta?

2    A.  Yes.  From this conversation, I knew he was on the road.

3    Q.  No, I'm not asking from this conversation.  I'm sorry, sir.

4    A.  Yes.  I did know he drove to El Paso.

5    Q.  You did?  How did you find that out?

6    A.  I guess he told me.  I mean, I remember him calling me and

7    saying, I'm heading there, and it was part of the conversation.

8            When I found out he was out of town, that he was in

9    Atlanta, we started talking, and said, Okay.

10   Q.  Okay.  But you told -- okay.

11           First of all, if you come down North Resler to Mesa

12   and make a right, right before you get to the freeway there's a

13   Chase Bank, right?

14   A.  If you come down --

15   Q.  You -- the DPS officer said you came down Resler and you

16   made a right on Mesa.

17           You remember that testimony?

18   A.  We didn't come down Resler.

19   Q.  So --

20   A.  It was Bartlett, I believe, or something, a parallel

21   street.

22   Q.  He specifically told you that he was waiting at a --

23   A.  Oh, yes.  We did make a right on Mesa.

24   Q.  From Resler, correct?

25   A.  One of those streets, ma'am, coming from the north side,
```

Delgado – Cross by Ms. Kanof                          5  –   45

1    yeah.

2    Q.  And right after you make a right -- well, first of all, on

3    the left at the corner of North Mesa and Resler is a Wells

4    Fargo Bank, correct?

5    A.  Okay.  Then it's a fact that we did not come down Resler

6    and make a right.

7    Q.  So Deputy Carrasco lied --

8    A.  Or he just --

9    Q.  -- that you were coming down Resler?

10   A.  Or he just got his streets wrong.  But no, we did not come

11   down -- now that I know which one is Resler, I know we did not

12   come down that street.  We came down -- must have been -- I

13   don't know if it's the subsequent street, on Bartlett or

14   some --

15   Q.  You're saying that a person that does traffic for a living,

16   is from El Paso, and has to write a report, didn't know what

17   street you came down, correct?

18   A.  I'm telling you that based on my recollection it was not

19   Resler.

20   Q.  Well, whatever street, you took a right on Mesa --

21   A.  Yes.

22   Q.  -- toward the freeway?

23   A.  Towards the bank.

24   Q.  Right.

25   A.  Yes.

Delgado - Cross by Ms. Kanof

1  Q.  Because there's a bank near the corner of the freeway?

2  A.  Yes, a Chase Bank.

3  Q.  And that's where you were stopped?

4  A.  No.  I was stopped before that, three blocks or four blocks

5  before that.

6  Q.  But you told him that you were going to fly, right?

7  A.  Yes.  Uh-huh.

8          (Call played.)

9  BY MS. KANOF:

10  Q.  Okay.  I will go for you or whatever.  But to do it, no.

11          And Pimentel says to you, Okay, my friend.  I will

12  call you later.

13          Correct?

14  A.  Let me just read real quick.

15          Yes.

16          (Call played.)

17  BY MS. KANOF:

18  Q.  And then -- so you knew he was driving by this time, right?

19  A.  Yes.  Uh-huh.

20  Q.  And then Government's Exhibit Number 37 -- okay.

21          First of all, before I click on it, let me just get

22  the transcript up.

23          Okay.  Government's Exhibit Number 37 happened a

24  couple of hours before Government's Exhibit Number 38, correct?

25  A.  Yes.

Delgado – Cross by Ms. Kanof                    5 -    47

```
 1    Q.  Okay.  And in Government's Exhibit Number 38 -- I'm going
 2    to try to just go straight to the part.
 3         In Government's Exhibit 38 -- so by this time you know
 4    he's driving.  But two hours earlier, did you know he was
 5    driving?
 6    A.  Two hours early --
 7    Q.  Before the --
 8    A.  Being the previous -- the transcript that we just saw?
 9    Q.  Uh-huh.
10    A.  In the transcript that we just saw, I knew he was driving.
11    He tells me.
12    Q.  Okay.  So at 2:26, I think it was, you're talking to him a
13    little earlier that day.
14         And I'm trying to find that.
15         Okay.  And in this conversation you say you're going
16    to drive with him, right?
17    A.  In which one, ma'am?
18         (Call played.)
19    BY MS. KANOF:
20    Q.  Okay.  You say you're concerned about him falling asleep,
21    correct?
22    A.  Yes, ma'am.
23    Q.  And he says, Oh, but if you help me to drive down there, it
24    won't be a problem, correct?
25    A.  Correct.
```

Delgado - Cross by Ms. Kanof

1    Q.  And so you didn't want to help your friend drive?  You

2    decided to let him drive and you would fly?

3    A.  What happened is that --

4            (Call played.)

5    BY MS. KANOF:

6    Q.  You agree, No, no.  I'm fresh.  I'm fresh, right?  Correct?

7    A.  I'm not -- I didn't follow the question.

8    Q.  Did you say, No, I'm fresh?

9    A.  I do say --

10   Q.  Well, this sounds --

11   A.  -- I'm fresh, yes.

12   Q.  I'm sorry for interrupting.

13          This sounds like it's an agreement for you to drive

14   with him.

15   A.  Yes.  When he was driving into town, we had contemplated

16   when he got there, and I realized he had the funds, and he had

17   to take care of them.  He couldn't leave town without that.  We

18   still had the mediation.  I headed to -- I needed to head down

19   to Mexico.

20   Q.  Well, what changes --

21   A.  But that was the following day, on the 7th.

22   Q.  Well, you talk about him being tired and you know he has to

23   drive all the way to Colima.  So...

24   A.  I did not know he was going to Colima, ma'am.

25   Q.  Well, you tell Chuy that you were going to Colima, in

Delgado — Cross by Ms. Kanof

1    Government's Exhibit Number 58A, don't you?

2    A.  I'm sure that's when I was already being coached.

3    Q.  Oh.  When you say, We have to go to the meeting in Colima,

4    Alex Ascencio told you to say Colima?

5    A.  If you show me the exhibit, I can refresh my recollection.

6    But I --

7    Q.  Then you say --

8    A.  I already said that I had not met Alex Ascencio during this

9    time.

10              MS. KANOF:  Your Honor --

11              THE COURT:  That's enough.  That's enough.

12   BY MS. KANOF:

13   Q.  Then you said, The only thing I can tell you is that --

14   remember that -- I think the volume will triple.  I think that

15   if now there are about 20 sheets --

16         (Taped played.)

17   BY MS. KANOF:

18   Q.  The volume of what was going to triple?

19   A.  The purchase orders.

20   Q.  Oh.  The only thing he's discussed in here is money.  This

21   will be a big enough box to put the money in.

22              But you're telling the jury that what's going to

23   triple is the purchase orders?

24   A.  No.  That was a different conversation, wasn't it?  This is

25   a different phone call.  It's not the same phone call, correct?

Delgado – Cross by Ms. Kanof

1    Q.  Sir, what purchase orders were going to triple?

2    A.  The contract that we were looking at.  I don't remember the

3    specifics of it.

4    Q.  What contract were you looking at?

5    A.  Well, we were doing some work for insulators, electric

6    insulators for towers.  And those are -- you know each contract

7    is a -- each one has a purchase order, and they're the *hojas*.

8    Those are the sheets.

9    Q.  Well, okay.

10   A.  But I --

11   Q.  Maybe this is the time to talk about your insulators.

12         Oh, you know what?  I actually want to talk about the

13   DPS and Chilo first.

14         You told Mr. Velarde twice that you went to Pebble

15   Hills on the night of September 7 to meet with Chilo and Pedro,

16   correct?

17   A.  Amongst others, yes.

18   Q.  I'm sorry?

19   A.  Amongst others, yes.

20   Q.  Okay.  But specifically, you told this courtroom that you

21   went to Pebble Hills, correct?

22   A.  Yeah.  Around that area, you know, where the DPS office is.

23   Q.  Oh, no.  You didn't say around that area, did you?  You

24   said Pebble Hills repeatedly.

25   A.  Yes.  That's the area I associate it with.

Delgado – Cross by Ms. Kanof

1   Q.  Okay.  And you met with Chilo and Pedro, and you convinced

2   them to cooperate.  That's why they were set free, correct?

3   A.  No.

4   Q.  Well, that's what you testified to in direct, isn't it?

5   A.  No.  I testified that I was a part of a double blind, as

6   described by Agent Fry.  They had me approach them kind of

7   trying to convince them, just like I had done with Victor

8   before.

9   Q.  Trying to convince them to cooperate?

10  A.  Yes.

11  Q.  Oh.  Now you're saying --

12  A.  Just like I had done with Victor.

13  Q.  -- you convinced Victor to cooperate also?

14  A.  They asked me --

15  Q.  No.

16  A.  -- to approach them --

17  Q.  I asked you a question.

18        Are you now saying you convinced Victor to cooperate?

19  A.  He was already cooperating.  I was --

20        MS. KANOF:  Your Honor, it's a yes or no.

21        THE COURT:  Just answer the question, yes, no.

22        THE WITNESS:  No.

23  BY MS. KANOF:

24  Q.  Okay.  Well, you just said, just like -- that you went down

25  there and you played a script to get them to cooperate just

1   like you did Victor.

2   A.   Yes.

3   Q.   Okay.

4   A.   I also approached Victor that way.

5   Q.   And you approached Victor to get him to cooperate?

6   A.   Yes.

7   Q.   On September 4th of 2007, about 20 minutes out of Atlanta,

8   Victor cooperated with the federal Government.

9   A.   I wasn't aware of that, ma'am.

10  Q.   And -- and he was already in the ICE office when you were

11  taken after the controlled delivery, correct?

12  A.   No.  Actually, he came with me.

13  Q.   All right.  So now you're saying that you didn't know that

14  he was already cooperating?

15  A.   Correct.

16  Q.   Okay.  And when, exactly, was it that you convinced Victor

17  to cooperate with the Government?

18  A.   I was asked by the agents to approach him there at the

19  office --

20  Q.   What office?

21  A.   In his -- the ICE office on Executive.

22          And just like Agent Fry testified, they were testing

23  me.  So they said, approach Victor to see if you can convince

24  him.  And he defined it as double blind.

25  Q.   Yes.  But he didn't say he did a double blind with you and

Delgado - Cross by Ms. Kanof

```
 1   Victor, did he?

 2   A.  Yes, he did.

 3   Q.  He did not say that?

 4   A.  He did.  Check the transcript.  Ask him.  He's sitting

 5   right there.

 6          THE COURT:  That's enough.

 7   BY MS. KANOF:

 8   Q.  You -- so -- okay.  So you convicted Victor to cooperate,

 9   correct?

10   A.  No, ma'am.  I just did the double blind pursuant to

11   instructions from ICE agents, and I did it also with Chilo and

12   Pedro.

13   Q.  Okay.  And you did that with Chilo and Pedro --

14   A.  Yes.

15   Q.  -- the night of September 7, correct?

16   A.  Correct.

17   Q.  And on the night of September 7, you went to Pebble Hills?

18   A.  Yes.

19          MS. KANOF:  May I approach the witness, Your Honor?

20          THE COURT:  You may.

21          MS. KANOF:  I'd ask the Court to take judicial notice

22   of the El Paso phone book.

23   BY MS. KANOF:

24   Q.  Let me show you, sir, the address on Pebble Hills.

25          It's not the Department of Public Safety, is it?  It's
```

Delgado – Cross by Ms. Kanof                    5 –    54

1    the El Paso police office.

2    A.  Yes.

3    Q.  The Department of Public Safety is on a different street,

4    correct?

5    A.  Is it on the east side?

6    Q.  Well, I don't know.

7    A.  Is it close by –– is it close to Pebble Hills?

8    Q.  And in fact, a document was prepared at that time for you

9    to use in your organization to show them that the money had

10   been seized, correct?

11   A.  No.  Or not that I'm aware of.

12   Q.  Government's Exhibit 56.

13          Government's Exhibit 56 –– okay, it won't get big.

14          Will you agree with me it says September 8 of 2007?

15   A.  I do.  I will.

16   Q.  Now, the agents wanted you and –– I don't want to do a

17   compound question.

18          The agents wanted you to act like you could get them

19   out of jail, right, Chilo and Pedro?

20   A.  Yes.

21   Q.  Okay.  And to do that, you talked repeatedly in the

22   conversations about needing to get the paper to show there was

23   a seizure, correct?

24   A.  Yes.

25   Q.  Okay.  And Government's Exhibit Number 56 is called

Delgado - Cross by Ms. Kanof

1    Certificate of Seizure, right?

2    A.  Yes.

3    Q.  And it says $999,860 was seized, correct?

4    A.  Correct.

5    Q.  And it says that it was located at 11612 Scott Simpson

6    Road, correct?

7    A.  Yes, ma'am.

8    Q.  Okay.  And that's the Department of Public Safety, not the

9    police department on Pebble Hills, correct?

10   A.  Correct.

11   Q.  Okay.  That's -- and then it shows that -- is DPS filing

12   forfeiture, correct?

13   A.  Yes.

14   Q.  And they're filing a federal forfeiture?

15   A.  Yes.

16   Q.  And this document was generated to show that DPS was taking

17   custody of the money, correct?

18   A.  Yes.

19   Q.  Okay.  Because in a drug trafficking organization, if you

20   don't prove the Government actually has the money, people get

21   killed, correct?

22   A.  Yes.

23   Q.  Now, you testified that the source of the money you learned

24   was an inheritance; is that correct?

25   A.  Yes, that's correct.

Delgado – Cross by Ms. Kanof

1  Q.  Okay.  And the seizure in Chicago.  You said specifically

2  that the source of the seizure in Chicago --

3  A.  I'm sorry, ma'am.  I'm not familiarized with the seizure in

4  Chicago.

5  Q.  Okay.  The -- first of all, there was testimony that Victor

6  was going to go get $100,000, right?

7  A.  From Victor, yes.

8  Q.  Victor was going to go get $100,000, right?

9  A.  Uh-huh.  He testified to that.

10  Q.  Okay.  And you also testified, right after you talked about

11  Pebble Hills, that -- Mr. Velarde asked you, What were the

12  funds from?

13       And you said they were from -- that the funds belonged

14  to friends, from a builder in Mexico who wanted to engage in

15  some work in the United States.

16       That's what you told Mr. Velarde, correct?

17  A.  Correct.

18  Q.  Okay.  Well, first of all, what's wrong with builders'

19  funds?  It's legitimate money, isn't it?

20  A.  Excuse me?

21  Q.  Builders' funds are legitimate money, aren't they?

22  A.  I don't understand the question.

23  Q.  Well, I just don't understand why you had to go undercover

24  with ICE if this money was -- belonged to builders from Mexico.

25  A.  Which transaction are we talking about, ma'am?  I'm sorry,

Delgado – Cross by Ms. Kanof

1    I don't follow.

2    Q.  Chicago.  July 2008.  In response -- in fact, Mr. Velarde

3    started the questioning, July 2000- -- July 22nd to 23rd, 2008.

4         And he asked you the source of the funds, and you said

5    friends -- they were -- they belonged to friends from a builder

6    in Mexico who wanted to engage in some work in the

7    United States.

8         And now you've agreed, right?

9    A.  Yes.

10   Q.  Okay.  And so my question is:  What's illegal about that?

11   A.  I never said there was anything illegal.

12   Q.  Okay.  Well --

13   A.  The Government is alleging that.

14   Q.  Well --

15   A.  I agree with you.

16   Q.  Then why is ICE having you record conversations with Victor

17   for legitimate money?

18        MR. VELARDE:  Your Honor, I have to object.  This is a

19   misstatement of the evidence.

20        The questions that are being posed relate to events

21   that happened in September 2007.  The conversations that were

22   recorded by Mr. Delgado and these individuals happened in

23   September of 2007.  The incident regarding the funds in Chicago

24   occurred 10 months later.  They're not related.

25        MS. KANOF:  Well, the --

Delgado – Cross by Ms. Kanof                          5 –   58

1           THE COURT:  What is not related?  There was testimony.

2           MR. VELARDE:  Counsel is misstating facts.

3           THE COURT:  There was testimony that he had

4   conversations with his people.  Were they recorded?

5           MS. KANOF:  They were recorded by Victor, yeah.

6           MR. VELARDE:  That's correct.  But that happened in

7   September 2007.  The question that's being posed relates to

8   what happened in July 2008.

9           THE COURT:  Right.

10          MS. KANOF:  Right.

11          THE WITNESS:  So what's the question again?  I'm

12  sorry.

13  BY MS. KANOF:

14  Q.  I'm going to show you some pictures.  I think that will

15  help.

16  A.  Okay.

17  Q.  Government's Exhibit Number 47.  That's the cash that was

18  in the duffel bags that were in the back of the rented vehicle

19  when DPS stopped you, correct?

20  A.  I -- I never saw the -- the contents of the bags, ma'am.

21  Q.  Well, I know you think that all the law enforcement were

22  not being truthful.  But --

23          MR. VELARDE:  Your Honor, I'm going to object to

24  sidebar.

25          THE COURT:  I'll sustain the objection.

Delgado – Cross by Ms. Kanof

1          Just ask the question.  And can you put a reference?

2    What time is this?  What occasion is this?

3          MS. KANOF:  Oh, I'm sorry, Your Honor.

4    BY MS. KANOF:

5    Q.  September 7 of 2007.  This is the duffel bag full of money

6    that Victor had in the back of the Jeep.  Okay?

7    A.  Okay.

8    Q.  Now you see there's five-dollar bills, correct?

9    A.  Yes.

10   Q.  And they have two rubber bands on each stack?

11   A.  I do, uh-huh.

12   Q.  Is that a yes?

13   A.  Yes.

14   Q.  And they're in, like, shrinkwrapped plastic, correct?

15   A.  Correct.

16   Q.  Okay.  So who transports inheritance money like that?

17   A.  Apparently Victor and the labor union individuals from

18   SUTERM.

19   Q.  Well, if it's inheritance money from Mexico, why is it in

20   the United States?

21   A.  You know, actually, it's not uncommon for Mexican nationals

22   to have relatives who have migrated to the United States or to

23   have investments or to have a business presence.

24   Q.  Okay.  Why is this money, if it's an inheritance for this

25   person that you named, why is it going into Mexico?

Delgado - Cross by Ms. Kanof                    5 -   60

1    A.  You know, probably because they needed to access the funds.

2    Q.  Well, there's banks all over the United States, right?

3    A.  Yeah, there's banks all over the United States.  I would

4    agree with that comment.

5    Q.  And you're now saying that these builders -- well, no.  Let

6    me go back to this.

7         The people -- the person who inherited this million

8    dollars would rather keep his money shrinkwrapped in 5s, 20s,

9    and 10s than put it in a bank and earn interest, correct?

10   A.  What I'm saying --

11   Q.  No, I asked --

12   A.  I'm not saying that, no.

13   Q.  Okay.

14   A.  No.

15   Q.  Government's Exhibit Number 74.

16        MS. KANOF:  Government's Exhibit Number 74,

17   Your Honor, for the record, was July 23rd of 2008, in Chicago.

18   BY MS. KANOF:

19   Q.  So you saw how the other money was packaged.  And it's your

20   testimony that this money is from friends from a builder in

21   Mexico who wanted to engage in some work in the United States,

22   correct?

23   A.  Correct.

24   Q.  So friends of builders in Mexico put cash -- shrinkwrapped

25   cash and put two rubber bands around it just like people do

Delgado - Cross by Ms. Kanof

```
 1    inheritance.
 2              Is that what you're telling this jury?
 3    A.  I have no idea how they do it or not.
 4    Q.  Okay.
 5    A.  Victor coordinated the pickup and he probably coordinated
 6    the way he wanted the funds delivered and probably the way it
 7    was packed.  I have no knowledge of it.
 8    Q.  Victor coordinated --
 9    A.  Yes.
10              MS. KANOF:  Your Honor --
11    BY MS. KANOF:
12    Q.  Victor coordinated --
13    A.  Yes.
14    Q.  -- the Chicago pickup?
15    A.  Yes.
16    Q.  We have a ton of phone calls where you're telling Victor
17    what to do in Chicago.
18    A.  No.  He had already been there.  He had already made the
19    calls.  I thought he was just going for a meeting, and it is in
20    those phone conversations where I said I thought it was just a
21    meeting.
22    Q.  You kept telling him to wait for you to get --
23    A.  Instructions from ICE.
24              THE COURT:  Wait.
25    A.  From ICE, yes.
```

Delgado - Cross by Ms. Kanof                    5 -   62

```
 1              THE COURT:  That's enough.  Wait for the question.
 2   BY MS. KANOF:
 3   Q.  He's asking you what to do.  You're not asking him what to
 4   do in all of those calls, correct?
 5   A.  He's asking for an account number.
 6   Q.  No.  He's also -- you ask him what happened.
 7              And he tells you, I just counted the money.
 8              And you ask him -- and he asks you, When is the next
 9   one going to be?
10              And you say, I don't know.  I'm waiting for a call.
11              So how can he organize this when he doesn't even know
12   when the money is coming?
13   A.  He's the one that coordinated the trip.  I didn't even know
14   what time he was leaving or anything.  Period.  I thought he
15   was going to meet and discuss terms of engagement.
16   Q.  Terms of engagement.  You -- wait.  Before, you said you
17   didn't even know he was going to Chicago, right?
18   A.  I knew there was this operation in place, like I informed
19   Atlanta of it.  And he was spearheading it with Lilian
20   directly.
21              There had been a lot of false starts, so I thought
22   this was going to be another one of those false starts.
23   Q.  False starts to what?
24   A.  To being engaged by these builders.  There's always the --
25   yeah, well, tomorrow we'll hire him.  We'll send the retainer.
```

Delgado - Cross by Ms. Kanof

1    We'll cover expenses.

2    Q.  Okay.  So again, the builder has their money in the

3    United States, correct?

4    A.  The builder wanted us to assist them with collections --

5            MS. KANOF:  Yes or no, please, Your Honor.

6    A.  Yes.

7            THE COURT:  Answer the question.

8    BY MS. KANOF:

9    Q.  The builder has the money in the United States --

10   A.  Yes.

11   Q.  -- that's shrinkwrapped in 20s, correct?

12   A.  Well, I don't know how he has it, the funds.

13   Q.  And you have to physically take the money to Mexico, right?

14   A.  The Chicago money?  No.

15   Q.  Okay.  Now -- all right.

16          So you testified this was -- and you're agreeing --

17   that it's money from friends from a builder in Mexico who want

18   to engage in some work in the United States, right?

19   A.  Builders in Mexico that wanted to retain my services to

20   assist them with collection work in the U.S.

21   Q.  I'm quoting, sir.  I'm sorry.

22          Do you not recall saying it was from friends of a

23   builder in Mexico who wanted to engage in some work in the

24   United States?

25          That is what you told this jury, correct?

Delgado - Cross by Ms. Kanof

1   A.  If --

2   Q.  Yes or no, please.

3   A.  I don't recall if I said those in that sequence.

4   Q.  Who is the builder?

5   A.  The actual individual is based out of Monterrey, or at

6   least it was represented to me that he was based out of

7   Monterrey.  The company was GEO.  I don't remember the name of

8   the individual that owned it.

9   Q.  Well, you got to keep this $45,000, and you don't even

10  remember who the builder was?

11  A.  Correct.

12  Q.  And what were they going to build in the United States?

13  A.  They were already building in the United States.  They

14  needed me just to do --

15  Q.  No.  My question --

16  A.  -- collections work.

17          MS. KANOF:  Your Honor --

18  BY MS. KANOF:

19  Q.  What were they building?

20  A.  They built homes in the United States.

21  Q.  In the United States?

22  A.  Yes.

23  Q.  Oh, okay.  I thought before you said building homes for the

24  poor in Mexico.  Now you're changing it to the United States?

25  A.  Low income.  And they also have operations in the U.S.

Delgado - Cross by Ms. Kanof                    5 -    65

1    It's a big shop.

2    Q.  Well, you didn't tell Mr. Velarde that.  You said that the

3    100 houses referred to in the e-mails were for poor people in

4    Mexico, right?

5    A.  Yeah.  That's a different transaction altogether.

6    Q.  Oh, okay.  And they're building it in the United States?

7    A.  Yes.  They had a presence in the United States and they

8    needed assistance in collecting --

9    Q.  And they're giving this money -- by the way, it was

10   supposed to be $100,000, right?

11   A.  Yes, it was going to cover the expenses of Atlanta, which

12   was Victor and mine.

13           MS. KANOF:  Your Honor --

14           THE COURT:  Just answer the question, please.

15           THE WITNESS:  Yes.

16   BY MS. KANOF:

17   Q.  Okay.  And on the phone conversations, you and Victor are

18   talking about the second pickup, right?

19   A.  Yeah.  They would discuss the amount, yes.

20   Q.  Okay.  So the first pickup is dropped off by somebody in a

21   Hollister shopping bag on the ground of a mall in Chicago,

22   Illinois, and then he speeds off, correct?

23   A.  That's what was represented to me, and it was coordinated

24   by Victor.  I wasn't present, and those weren't the

25   discussed --

Delgado – Cross by Ms. Kanof                    5 –   66

1   Q.  But you were in the courtroom --

2   A.  -- instructions.

3   Q.  You were in the courtroom when ASAC -- Assistant Special

4   Agent in Charge McCabe testified that that's what happened,

5   weren't you?

6   A.  Well, he testified that he lost sight or what have you, so

7   I heard some version of it.

8   Q.  Okay.

9   A.  I have heard that's the testimony, yes.

10  Q.  Okay.  But you're disputing that that's what happened?

11  A.  I wasn't there, ma'am.  I didn't coordinate it.  I have no

12  idea.

13  Q.  Well, if this --

14  A.  This is --

15  Q.  If that happened, that's kind of a strange way for a big

16  building corporation in Monterrey, Mexico, to handle their

17  money, isn't it?

18  A.  Yes.  Unless they're being framed or set up or being part

19  of a production or entrapment.

20  Q.  Okay.  So they were being entrapped by somebody?

21  A.  Well, obviously, Victor told him how to deliver the funds

22  and what...

23  Q.  Victor told them how to deliver it?

24  A.  Yes.  He even coordinates the place and the time and

25  everything.  Yes.

Delgado - Cross by Ms. Kanof

1   Q.  Then why, if he coordinates the place and the time, then on

2   the phone calls when he's asking you about the next delivery?

3   Is he just confused?  Did he forget what he planned?

4   A.  I don't know what he -- his state of mind, ma'am.

5   Q.  Okay.  And then the funds arrive in El Paso, right?

6   A.  Yes.

7   Q.  And they arrive -- Victor has the cash when you meet with

8   him?

9   A.  I don't meet with Victor, no.

10  Q.  You didn't tell Victor you'd meet him at the Pastry Chef?

11  A.  I did not meet with Victor and the cash, no.

12  Q.  Oh, okay.  Let's take the cash out of it.

13         To talk to Victor about the money, you told him to

14  meet at the Pastry Chef initially, right?

15  A.  I don't recall that.

16  Q.  Okay.

17  A.  No.

18  Q.  And then you thought that there were --

19  A.  No.  Actually, I told him at the bank.  I said, Let's meet

20  in the bank, when he was going to make that deposit.

21  Q.  And then you told him that there were federal agents in the

22  Pastry Chef, people that looked like federal agents at the

23  Pastry Chef, so you should switch to the Starbucks?

24  A.  No.  That's what he testified, but that's incorrect.

25  Q.  So you told him that you would meet him at the bank across

Delgado – Cross by Ms. Kanof

1   the street from his dorm?

2   A.  In the bank.  I don't know -- the Wells Fargo branch that I

3   go to was not in his dorm.

4   Q.  Well, he -- he -- I didn't say it was in his dorm.  I said

5   it was across the street from his dorm.

6        Are you disputing that the deposit was made at the

7   Wells Fargo Bank across the street from his dormitory in

8   El Paso?

9   A.  No.

10  Q.  Okay.  So you didn't meet him to make the deposit, did you?

11  A.  No.

12  Q.  Okay.  But you did give him an account number to make the

13  deposit?

14  A.  Yes.

15  Q.  Okay.  It was your IOLTA account?

16  A.  Yes.

17  Q.  Why are you putting funds from a builder -- or a friend of

18  a builder who wants to do business in the United States in your

19  IOLTA account?

20  A.  Because that is the purpose of an IOLTA account, to hold

21  the funds of a client until he or she authorizes the

22  disbursement.

23  Q.  What was the name of your client?

24  A.  I already told you.  GEO.

25  Q.  Okay.  And -- oh.  So your client was GEO and Victor was

Delgado - Cross by Ms. Kanof

1    picking up the funds?

2    A.  Yes.

3    Q.  And -- okay.  And your client is GEO.  But without you

4    knowing it, Victor arranges the pickup of $100,000, right?

5    A.  Victor and Lilian were coordinating the --

6    Q.  Yes or no --

7    A.  -- engagement.

8    Q.  -- please, Mr. Delgado.

9    A.  Yes.  He coordinated it, uh-huh.

10   Q.  Okay.  And you didn't even know about it?

11   A.  Yeah.  Not the specifics, no.

12   Q.  Okay.  Well, you testified you didn't know anything about

13   the fact that he was going to pick up two loads of $50,000.

14   A.  That is correct.  I did not know that.

15   Q.  So it's your client, you put it in your IOLTA -- oh, can

16   I -- did you give your attorneys the contract with GEO?

17             MR. VELARDE:  Your Honor, again I'm going to object,

18   because this is assuming facts not in evidence.

19             THE COURT:  I'll sustain the objection.

20             Go on.  Go on to something else.

21   BY MS. KANOF:

22   Q.  So if this was GEO's money, right?  This was GEO's money?

23   A.  Yes.

24   Q.  Okay.  And it was put into your IOLTA account, correct?

25   A.  Yes.

Delgado – Cross by Ms. Kanof                    5 –    70

1    Q.  Why did you keep it?

2    A.  Because at that point we celebrated an engagement

3    agreement, and it allowed me to make use of the funds.  We

4    started working for them.

5    Q.  You testified that you got to keep the $45,000 as a result

6    of working for ICE, didn't you?

7    A.  Not as a result of working for ICE.  I had told Lilian that

8    in any project I would be involved I needed a retainer in

9    advance because I was --

10             MS. KANOF:  Your Honor --

11             THE WITNESS:  -- taught that.

12             No.

13             THE COURT:  That's enough.  That's enough.

14   BY MS. KANOF:

15   Q.  Now, Government's Exhibit Number 14.  This is an e-mail

16   that was sent to Victor Pimentel -- no, from you -- on

17   February 7th of 2007, correct?

18   A.  Yes.

19   Q.  Okay.  Now, you talked about the semiconductor thing.  And

20   specifically what you told Mr. Velarde is that you were trying

21   to negotiate for insulators for conductors to be imported into

22   the United States because they were currently imported by

23   different countries, correct?

24   A.  No.  I never mentioned any importation into the

25   United States.

Delgado – Cross by Ms. Kanof                    5 –    71

```
 1   Q.  Oh, I'm sorry, into Mexico.  Excuse me.

 2           You testified, then, that the labor union had a plant

 3   that had -- that made -- "fabricated" is the word you used --

 4   power towers, correct?

 5   A.  Yes.

 6   Q.  And that they required insulating -- insulation for the

 7   conductors, correct?

 8   A.  Insulators to lay the conductors on.

 9   Q.  Okay.  Insulators to lay the conductors on.

10   A.  Yes.

11   Q.  What color are those insulators?

12   A.  I don't know, ma'am.

13   Q.  Does it matter what color they are?

14   A.  I don't know.

15   Q.  And that they were currently imported from different

16   countries, right?

17   A.  Yes.

18   Q.  So you were trying to get distribution rights for somebody

19   in the United States, right -- or somebody in Mexico.  Sorry.

20   A.  Yeah.  Actually the concession, yes.

21   Q.  Look at Government's Exhibit Number 14.  And this is

22   February 7th of 2007, correct?

23   A.  Uh-huh.

24   Q.  And Liliana -- or Lilian de la Concha tells you, Hello,

25   Marco.  Today I spoke with Pete in relation to the ironworks
```

Delgado - Cross by Ms. Kanof

1   they want to bring to Mexico.

2            Were the ironworks the conductors?

3   A.  No, ma'am.  We weren't involved in anything having to do

4   with the conductors.

5   Q.  Well, there's no e-mails talking about conductors.

6   A.  Are you asking me or are you telling me?

7   Q.  No.  I mean there were no e-mails about the conductors?

8   A.  Where were -- there were no e-mails.

9   Q.  He said for us to be patient, since he had made several

10  business deals with these contractors and it had taken them

11  around three months to complete.  Correct?

12  A.  Yes.

13  Q.  Okay.  What were these ironworks for, then?

14  A.  The ironworks are the insulators so you can lay conductors

15  on.

16  Q.  Oh, okay.  So the ironworks are the insulators, and then

17  you lay -- so ironworks and insulators are the same thing,

18  then?  No, the ironworks are below the insulators.  That's what

19  you're saying.  You lay the insulators on the ironworks?

20  A.  They refer to it as *herrajes*.  It's a piece --

21  Q.  So this is about the conductors, then, right?

22  A.  What's a conductor?  Because this doesn't mention a

23  conductor at all, so I'm lost.

24  Q.  Okay.  The ironworks, you're testifying, are what's laid

25  down first before the insulator, correct?

Delgado - Cross by Ms. Kanof

1    A.  What I'm testifying is the following.

2         Ironworks is not even a term that's being used.  It's

3    *herrajes*.  And *herrajes* is a component that you use in power

4    plants.

5    Q.  Okay.  And she tells you -- he said for us to be patient,

6    since he had made several business deals with these contractors

7    and it had taken them around three months to complete.

8    Correct?

9    A.  Yes.

10   Q.  Who were the contractors that you made -- well, first of

11   all who is "he," Pete?

12   A.  I -- I don't -- I mean, there's an e-mail.  You tell me.

13   Q.  Pete is Pedro, right?

14   A.  Yes.

15   Q.  Okay.  Pete is the same guy that you talked out of jail in

16   El Paso, right?

17   A.  The CPA, yes, for Nareo.

18   Q.  And so he said that you should be patient.  And that when

19   they say no, it's no.  But when they say yes, even though it

20   takes time, they do it, correct?

21   A.  That's what it says.

22   Q.  What happens is that he has to study various key points

23   because the things for that industry are difficult, correct?

24   A.  Yes.

25   Q.  They owe him a large sum, and the director told him that as

Delgado - Cross by Ms. Kanof

1   soon as they brought the ironworks they would pay him, correct?

2   A.  Yes.

3   Q.  Okay.  Well, first of all, it says Pete in relation --

4   A.  Yes.

5   Q.  -- to the ironworks they want to bring to Mexico.  He said

6   for us to be patient.  So Pete is the one that is purchasing

7   the ironworks?

8   A.  Is that a question?

9   Q.  I'm asking you.  Was Pedro the one that was purchasing the

10  ironworks?

11  A.  He wanted to get the distribution.  Actually, his people in

12  the union, his client, Nareo Vargas.

13  Q.  There we are with Mr. Vargas again.

14          But it's -- but right here it says -- who is the

15  director, then?

16  A.  Probably the CFE general director.

17  Q.  Okay.  Now the CFE general director, then, owes who a large

18  sum of money?

19  A.  Probably the union.  The one who is going to be supplying

20  it to them.

21  Q.  Okay.  And told him that as soon as they brought the

22  ironworks they would pay him, correct?

23  A.  That's what it says.  Uh-huh.

24  Q.  Okay.  So who's bringing the ironworks?

25  A.  I don't know who was going to be bringing them.  I wasn't

Delgado — Cross by Ms. Kanof

1    involved in the transportation.  My role was just paperwork so

2    they could get the distribution.

3    Q.  Okay.  So --

4    A.  Maybe the contracts and the purchase orders.

5    Q.  Okay.  So let's not despair, Marco.

6            Why would you despair?

7    A.  Excuse me?

8    Q.  She signs it off, So let's not despair, Marco.

9            Why would you despair, Mr. Delgado?

10   A.  The truth of the matter is that when you're dealing with a

11   bureaucratic agency like the CFE, time is of the essence.  And

12   if the window of opportunity closes it might be years, a new

13   administration, before it opens.

14   Q.  Okay.  So now we have you facilitating the importation with

15   Pedro, the accountant, of ironworks that are supposed to hold

16   the insulation, correct?

17   A.  No.

18   Q.  No?

19   A.  I already told you.  My participation was helping them

20   secure distribution rights and put in place the contracts and

21   the purchase orders that they would be using.

22           I don't know how they were going to transport them.  I

23   don't know anything about the rest.

24   Q.  Okay.  Government's Exhibit Number 17, an e-mail from

25   Liliana [sic] to you that you -- by the way what -- you're

Delgado – Cross by Ms. Kanof

1    sending all these to Victor, right?

2    A.  No, to his boss.

3    Q.  I'm sorry?

4    A.  To his boss.

5    Q.  Okay.  It says from Delgado to Victor at Hotmail.

6         You're sending Lilian's e-mails to Victor, correct?

7    A.  No, to his boss.

8    Q.  It says, Hello, Marco.  I'm resending you a mail from Paco,

9    correct?

10   A.  It says that.

11   Q.  That supports the telephone conversation you and I had,

12   correct?

13   A.  Correct.

14   Q.  At the same time I'm sending a copy of this to Paco so that

15   the dream team is clear on everybody's position, right?

16   A.  Correct.

17   Q.  Like you told me, the thing is to start.  And once the

18   contractor sees the quality of the ironworks and material we're

19   handling, you can be sure that they will stay with us.

20   Correct?

21   A.  Yes.  In that area in particular.

22   Q.  It's yes or no.

23   A.  Yes.

24   Q.  I thought you said you were facilitating a distribution of

25   this.

Delgado - Cross by Ms. Kanof

1    A.  Yeah.  That's what it says.

2    Q.  You agree to provide the service to each of the three

3    groups:  Ironworkers, carpenters, and construction workers.

4    Right?

5    A.  Yes.

6    Q.  Okay.  So there's -- you're testifying to this Grand Jury

7    [sic] that this whole -- that your role in this is to help

8    them, as a lawyer, get this -- to help Pedro get this

9    distribution of insulators, right?

10   A.  Yes.

11   Q.  Okay.  And then you somehow, for some reason, you have to

12   know about the ironworks, right?

13   A.  I don't understand the question.

14   Q.  This e-mail to you is about the quality of ironworks,

15   right?

16   A.  No.  They're just updating me.  And they do mention that

17   the quality will make a difference in its placement.

18   Q.  Okay.  But you don't have anything to do with placement of

19   ironworks, do you?

20   A.  When you contract, you have to have --

21            MS. KANOF:  Your Honor --

22            THE COURT:  Answer the question.

23   BY MS. KANOF:

24   Q.  You agreed to provide the service to each of three groups.

25   What service are you providing to the ironworkers?

1    A.   What do you mean?  I don't understand.

2    Q.   The e-mail says you agree to provide the service to each of

3    these three groups.

4           You remember that Victor said these are the three

5    different cells of the cartel.  And I know you disagree with

6    that, correct?

7    A.   Correct.

8    Q.   Okay.  But what service did you agree to provide to the

9    ironworkers?

10   A.   The actual *herrajes*, the insulators.  It's saying they're

11   going to be receiving it.  The various sections that are going

12   to be in charge of building, of putting the structure in

13   place --

14   Q.   Sir --

15   A.   -- and actually the setting of it.

16           MS. KANOF:  Excuse me.  Your Honor --

17           THE COURT:  All right.  That's enough.

18   BY MS. KANOF:

19   Q.   You agree to provide the service to the carpenters.

20           What service are you, as an attorney who is trying to

21   get a distribution of insulators, providing to carpenters?

22   A.   They are referring to a service that's going to be provided

23   by the people that end up owning that concession, or those

24   distribution rights.

25           And your translation doesn't reflect that.  But if you

Delgado - Cross by Ms. Kanof

1    read it, that's what it says.

2    Q.  What service were you going to provide to the construction

3    workers?

4    A.  The service of helping them secure this distribution of the

5    insulators.

6    Q.  Okay.  So when you testified before, you said that the

7    reason Colima was significant was because they were building a

8    power plant there, right?

9    A.  Probably the largest power plant in Mexico.

10   Q.  Yes or no, please, Mr. Delgado.

11   A.  Yes.

12   Q.  And these insulators were -- and ironworks -- were supposed

13   to go to build that power plant, correct?

14   A.  That, I don't know.

15   Q.  Oh.  Because the next line says that you do not have any

16   problems with handling the materials and -- within the Republic

17   of Mexico and making color adjustments, correct?

18   A.  Is that a question or does it say that?

19   Q.  And making color adjustments.

20   A.  Yes.  Uh-huh, it says that.

21   Q.  So you already testified you don't need to make color --

22   that the color doesn't matter on ironworks, right?

23   A.  No, I didn't say that.  You asked me if I knew what color

24   they were.

25   Q.  You said that color doesn't matter on insulators, right?

Delgado - Cross by Ms. Kanof

1    A.  It's a different intention, yeah.  The ceramic has

2    different degrees of capacity, yeah.

3    Q.  Well, when I asked you what difference does the color make

4    of an insulator, you said, I don't know.

5            But now you're changing your testimony, right?

6    A.  I don't know which one is which.  I don't.  So the first

7    time it's correct.  I don't know how it works.

8    Q.  And in the next paragraph she says, Well, like I told you,

9    because we had the prices a little higher, they had to purchase

10   the materials elsewhere.

11           You had the prices higher?  When were you the owner of

12   these things to be able to price them?

13   A.  You don't have to own anything to price anything.

14   Q.  And you understand what Victor said that meant, right, that

15   your percentage was too high?

16   A.  I understand what he said, yeah.  It's incorrect, though.

17   Q.  Okay.  So you're -- okay.  So you're trying to help Pedro

18   get the distribution.

19           But here, it looks like there's another source that's

20   cheaper, right?

21   A.  Apparently, yes.

22   Q.  No, I'm not asking you apparently.  It says "we."

23   A.  Let me see.  Where exactly?

24   Q.  In the one, two -- third paragraph from the bottom starting

25   with, "Do you agree."

Delgado – Cross by Ms. Kanof

1    A.  Okay.

2    Q.  You agree to adjust the price again, right?  So you're

3    going to lower your price.

4    A.  No.  She said -- there's a question there.  The price can

5    be adjusted.

6    Q.  Okay.  It says, in the event that the contract is not

7    convenient for you to adjust the prices again, right?

8    A.  Let me just read it, ma'am.

9            No.  It's saying that if it's necessary you can

10   explore price adjustments in the future.

11   Q.  Okay.  That implies you're the owner, right?

12   A.  No, it doesn't.  I'm counsel for these individuals.

13   Q.  Oh, yeah.  You're counsel for these individuals.

14           Who were you counsel for?  I mean, this is not GEO

15   anymore.  GEO is the people building the hundred houses for the

16   poor in Mexico and the houses in the United States.

17           So who exactly are you counsel for now with regard to

18   the ironworks?

19   A.  The group.

20   Q.  What group is that?

21   A.  That includes Nareo Vargas, and they want to buy the

22   distribution rights in Mexico.

23   Q.  I thought you said Pedro wanted them.

24   A.  Pedro, the CPA, works for Nareo Vargas.  He's his adviser.

25   Q.  By the way, Mr. Vargas is never mentioned in these,

Delgado — Cross by Ms. Kanof

1    correct?

2    A.   Incorrect.  He is.

3    Q.   In the e-mails?

4    A.   Yeah.  Uh-huh.

5    Q.   Could you give me the number of the Government's Exhibit

6    that he's mentioned in?

7    A.   I don't know if in your exhibits.  I don't know if your

8    exhibits.  But in the e-mails he is, and the ones that you

9    provided as discovery.

10   Q.   Government's Exhibit Number 16, an e-mail between you and

11   Victor.

12         Starting at the bottom he calls you "my dear

13   attorney," and says that he believes that the only way he can

14   continue to delay the construction is if you cover the cost of

15   the construction workers that I have idle.

16   A.   Okay.

17   Q.   Okay.  That I have idle.

18         So now, Victor has a team of construction workers,

19   right?

20   A.   Actually, his boss does.  Victor is just a mouthpiece.

21   Q.   You're telling me that Mr. Vargas couldn't afford to pay

22   the construction workers?

23   A.   I'm telling you that any shrewd businessman tries to

24   minimize expenditures.  And if it's an idle situation, you

25   don't want to be incurring those expenses.  You want your

Delgado - Cross by Ms. Kanof

1    workers to be active.

2    Q.  Okay.  In one of the exhibits there's a reference to the

3    ironworks weighing 50 kilograms.

4              Do you remember that --

5    A.  I do not.

6    Q.  -- from Liliana [sic] de la Concha?

7    A.  I do not.

8    Q.  Okay.  Government's Exhibit Number 9.

9              On October 13th of 2006 Victor sends you an e-mail

10   about the leader of a Guadalajara drug cartel being captured in

11   Colombia, correct?

12   A.  Correct.

13   Q.  And you respond, The plaza is hot/under surveillance.

14             What was that about?

15   A.  No.  That's part of the problem.  Your translations are

16   shady.  You know, you want to give it that text.

17             *Sitiada*, it just means, you know, that it's

18   overcrowded, that it's chaotic.

19   Q.  Okay.  But it does say "plaza," right?

20   A.  Yeah.

21   Q.  Okay.  Well, why are you concerned about -- you know that

22   plaza is a word that drug -- that drug trafficking

23   organizations use for the areas that they control, right?

24   A.  I do not know that.  Well, now I do.

25   Q.  Government's Exhibit Number 19.  Again, this is

Delgado - Cross by Ms. Kanof

1   February 26th, 2007, an e-mail from you to Victor, where you're

2   forwarding an e-mail from Lilian, correct?

3   A.  Correct.

4   Q.  Very late last night Paco called me to tell me that Pete

5   had just called him to tell him that the contractors had called

6   him and they wanted to eat with Paco.  Right?

7   A.  That's what it says, yes.

8   Q.  Okay.  With the owners -- if you wanted to eat with them

9   and the owners of the construction company, right?

10  A.  That's correct.

11  Q.  In order to meet each other, right?

12  A.  And define terms, yes.  Uh-huh.

13  Q.  Okay.  So --

14  A.  Yes.

15  Q.  -- she's asking you, do you want to eat with them to meet

16  the construction company, right?

17  A.  Correct.

18  Q.  Okay.  And now apparently, finally, 50 kilograms of

19  ironworks, like I mentioned on Wednesday.

20          So you're going to tell this jury -- are you going to

21  tell this jury that you discuss ironworks by their weight?

22  A.  Actually, the purchase orders come weight-based, yes.

23  Q.  Okay.  50 kilograms isn't very much, is it?

24  A.  I don't -- I don't know.

25  Q.  Well, you live in the United States.  2.2 kilos to a pound,

Delgado - Cross by Ms. Kanof

1    so we're talking about 25 pounds of ironworks, right?

2    A.   No, ma'am.  You're talking about a hundred.  You got your

3    math --

4    Q.   Oh.  It goes the other way around?  Okay.

5    A.   Yes.

6    Q.   You do know.  So you do know, right?

7    A.   Yes, I do know how to convert pounds to kilos.

8    Q.   Well, the first time I asked you said you didn't.

9         Okay.  So a hundred pounds of ironworks is not very

10   much, right?

11   A.   No.  I think -- I actually think that's the unit that you

12   order, the purchase order.

13   Q.   And --

14   A.   You can -- if I recall correctly, it's three units, you

15   know, standard units.

16   Q.   Okay.  This is February of 2007, right?

17   A.   Yes.

18   Q.   Okay.  And so she tells you, like she mentioned on

19   Wednesday, that there'll be 50 kilos another day that week,

20   correct?

21   A.   Yes.

22   Q.   And from then on 10 kilos -- how many pounds is 10 kilos?

23   20 pounds?

24   A.   It's actually 25.  But, yeah.

25   Q.   Well, first of all, I thought you said they came in 50-kilo

1   lots.

2   A.   No.  I said there are three different units that they're

3   transported in and they come in.  And I just said that --

4   Q.   And from then on -- I'm sorry.

5        And from then on 10 every week until the end of this

6   year, correct?

7   A.   That's what it says, yes.

8   Q.   Okay.  So you're talking about kilos, right?

9   A.   You're actually talking about --

10  Q.   Right or not?

11  A.   -- a purchase order of --

12       MS. KANOF:  Your Honor --

13       THE WITNESS:  -- those units.

14       THE COURT:  I'll let him answer.

15  BY MS. KANOF:

16  Q.   Okay.  It says 50 kilos, though, right?

17  A.   Yes.

18  Q.   And then it says 50 another day, right?

19  A.   Yes.

20  Q.   And then it says 10 every week until the end of the year,

21  right?

22  A.   Yes.

23  Q.   It's February, right?

24  A.   Yes.

25  Q.   You're telling this jury that it was going -- that you were

1    only going to get 20 pounds of ironworks every week until the

2    end of 2007?

3    A.  No.

4    Q.  I mean -- yes.

5    A.  What I'm telling you is that those numbers that you see

6    reflect the unit.  The purchase orders would define what --

7    that's the availability of what they have, and these are

8    commodities.

9    Q.  She asks you if there's any other news, because this is

10   going to make a hole in our liver and wallet.  Right?

11   A.  Yes.

12   Q.  That you and she are going to be paying out a lot of money,

13   doesn't that mean?

14   A.  Let me -- if I may?

15          Yes.  Uh-huh.

16   Q.  Okay.  Who are you buying these ironworks from?

17   A.  Ma'am, I wasn't buying any ironworks.

18   Q.  Okay.

19   A.  Like I said, there was a distribution agreement.

20   Q.  Okay.  Who was distributing the ironworks?

21   A.  Vargas's group would be undertaking the distribution and

22   the supply.

23   Q.  Vargas was distributing to himself?

24   A.  To the company that he's unionized with.  Yes, he was going

25   to supply them.

Delgado – Cross by Ms. Kanof

1   Q.  No –– you –– Vargas –– okay.

2          You're saying that these are –– that Vargas is

3   distributing to his own company, right?

4   A.  It's not his company.  To the company he's affiliated with.

5   They wanted to be supplying, and they wanted to be supplying to

6   the contractors of that company.

7   Q.  But it's going to cost you and Liliana a hole in your

8   wallet?

9   A.  No, it doesn't tell me –– say that it's going to cost me

10  and her.

11         It says that it's going to cost her and the group.

12         MS. KANOF:  Turn to Government's Exhibit Number 38 ––

13  I mean 58.

14         And I think it will be faster if we just do this by

15  transcript.

16  BY MS. KANOF:

17  Q.  On September 15th –– oh, you know what?  There was

18  something I forgot.

19         You testified that you –– on September 7 you went to

20  Pebble Hills, and that night Chilo and Pedro were released,

21  correct?

22  A.  I did.

23  Q.  And that you got them released by talking them into

24  cooperating, correct?

25  A.  That that was the production that was put in place by ICE.

Delgado – Cross by Ms. Kanof

1    Q.  Okay.  And on September 9th, however, at 1:55 p.m., you

2    tape a conversation with Chilo, don't you?

3    A.  Yes.

4    Q.  Okay.

5             (Call played.)

6    BY MS. KANOF:

7    Q.  Okay.  You got them to cooperate, and two days later you

8    are taping, on behalf of ICE, Chilo, correct?

9    A.  Yes.

10   Q.  And you're going to tell this jury --

11   A.  All conversations -- all conversations related to this

12   incident I was asked to tape record.

13   Q.  Okay.  You were asked to call Chilo?

14   A.  I don't know if I called or he called me.  I'm pretty

15   sure -- I don't know.  Does it show there?  I don't know.

16   Q.  Let's see.  Let's see.

17            You're the first one who speaks.  So that doesn't help

18   you remember who called who?

19   A.  No, ma'am.

20   Q.  Well, it doesn't sound like Chilo is cooperating when you

21   call, does it?

22   A.  No, I think it does.  Yeah.  Uh-huh.

23   Q.  You testified that you did not tell Lilian de Concha that

24   you were dying of cancer, correct?

25   A.  Yeah.  Dying, no.  Correct.

Delgado – Cross by Ms. Kanof

1    Q.  Was her e-mail address coel50@gmail.com?

2    A.  No.  I think it was -- no, I don't -- I don't believe so,

3    no.

4    Q.  Was your e-mail mdelgadoil@aol.com?

5    A.  Yes.  Uh-huh.

6    Q.  And in fact, you stipulated that it was, in that document

7    we showed the jury earlier in the morning?

8    A.  Correct.

9           MS. KANOF:  May I approach the witness, Your Honor?

10          THE COURT:  You may.

11   BY MS. KANOF:

12   Q.  Do you recognize this document as a document that was

13   provided to you on October 16th of this year?

14   A.  Let me just go over it, because I don't recognize it.

15          Yeah -- no.  Actually, I don't recognize that.

16   Q.  Well, if we had -- whether you recognize it or not, on the

17   12th of June of 2008, at the bottom of the first page?

18   A.  At the bottom of the first -- okay.

19   Q.  And I understand it's in Spanish.  But you speak Spanish,

20   right?

21   A.  I do, ma'am.

22   Q.  Okay.  And can you simultaneously translate into English if

23   I read it in English instead of Spanish?

24   A.  Yeah.

25   Q.  You tell Lilian, I'm distracted with a couple of things

Delgado - Cross by Ms. Kanof

1    relating to me -- to my -- like I told you, the mother of my
2    child is dying of leukemia.
3             That's what it says, right?
4    A.  Yes.
5    Q.  There is no escape, correct?
6    A.  There is no escape.  It doesn't say there's no escape, no.
7    Q.  Okay.  The second e-mail on Friday, the 13th of June of
8    2008, from Lilian de la Concha to you.
9    A.  Yes.
10   Q.  The second line where it says *salgo a Houston*.
11   A.  Yes.
12   Q.  You say you're leaving to Houston before noon, correct?
13   A.  Yes, ma'am.
14   Q.  You told her that, didn't you?
15   A.  That's what it says here, yes.
16   Q.  Well, you -- you -- you went to Houston, didn't you?
17   A.  I don't recall.
18   Q.  Okay.  And if you count down from that page one, two,
19   three, four -- the fifth page from that --
20            THE COURT:  Is this an exhibit, Ms. Kanof?
21            MS. KANOF:  Oh, I haven't marked it.  Let me make it
22   99.  Government's Exhibit Number 99.
23   BY MS. KANOF:
24   Q.  The e-mail would be on the 12th of October of 2008.
25   A.  The 12th of October 2008.  Okay.  Yeah.

Delgado - Cross by Ms. Kanof

1   Q.  You found it?  Okay.  It says, *Mi Vida, buenos dias* --

2   A.  Okay.

3   Q.  -- on the bottom of the page?

4        And you tell her -- and she tells you, Be careful.

5   Remember they did not operate on your tonsils, doesn't she?

6   A.  Where does she -- I don't see that.

7   Q.  It's the very first line.  *Cuidate mucho*.

8   A.  Okay.  No, I don't...

9   Q.  Maybe we're not on the same page.

10  A.  Yeah.

11  Q.  Well, let me try to admit it and I can put it on the

12  overhead.  You stipulated --

13  A.  You said the 11th of October?

14  Q.  The date is the 12th of October 2008.

15       You stipulated with your signature, that document I

16  showed you, that -- the AOL account, mdelgadoli@aol.com was, in

17  fact, yours, correct?

18  A.  Yes, ma'am.

19  Q.  And these pages that I've given you purport to be e-mails

20  that were sent between you and Liliana [sic] using that e-mail

21  address, correct?

22  A.  I mean, it I can see here.  But I'm not -- I don't

23  recognize them as e-mails that were exchanged.

24  Q.  Well --

25  A.  But it is my address, the Delgado -- mdelgadoli is my

Delgado – Cross by Ms. Kanof

1    address.

2    Q.  Well, they –– they look like e-mails, don't they?  To,

3    subject, from, date, just like an e-mail header, right?

4    A.  Well, yeah.  They look just awfully fishy.  I mean, I

5    don't...

6    Q.  They look fishy?

7    A.  I don't know.

8         MS. KANOF:  Your Honor, we move the admission of these

9    e-mails.  And the fishiness would be the weight, not the

10   admissibility.

11        THE COURT:  Counsel?

12        MR. VELARDE:  Your Honor, we respectfully object.  The

13   witness does not recognize those e-mails.

14        THE COURT:  Let's get a foundation for them.

15        MS. KANOF:  That his e-mail address and the fact that

16   she basically says who she is.  I mean, she's referencing

17   him ––

18        MR. VELARDE:  "She" meaning who?

19        MS. KANOF:  Lilian de la Concha.

20   BY MS. KANOF:

21   Q.  Actually on the first front page, it actually says Lilian

22   de la Concha, coel50@gmail, 10th of November 2008, the very

23   first one.

24   A.  Yes.  But if you go down, the e-mails come from a Hotmail

25   address, not from that Gmail account.  That's why I tell you

Delgado - Cross by Ms. Kanof

1    it's kind of fishy.  Maybe we would know the cell tower where

2    they hit or something to determine that.

3    Q.   Well, you and she were lovers, right?

4    A.   Yes.

5    Q.   And so this is your e-mail account.  You stipulated to it,

6    right?

7    A.   Yes, but it's not hers.  The other one, the Hotmail, is not

8    an account that I recognize for her.

9    Q.   Okay.

10   A.   The one on top, yes.  The one, the Gmail, you're correct.

11   But --

12   Q.   Well, the one on top is what -- how she transmitted the

13   rest of them, correct?

14   A.   To be honest with you, I don't recognize the e-mails, and

15   that e-mail address that's supposed to be hers is incorrect.

16   At least it's not one that I knew, so I do think it's --

17   yeah -- a fabrication.  No.

18           THE COURT:  Where were these obtained, Ms. Kanof?

19           MS. KANOF:  They were given to us from Lilian de la

20   Concha through an intermediary.

21           THE COURT:  I'm going to go ahead and admit

22   Government's Exhibit 99.

23   BY MS. KANOF:

24   Q.   We were on the e-mail that was -- by the way, the

25   Calgary.El Paso.Mexico DF, that's exactly how you sign off on

Delgado – Cross by Ms. Kanof

1    your AOL account, correct?

2    A.  Yes, that's how I sign off.

3    Q.  And that's your address and everything else, correct?

4    A.  Yes.  Uh-huh.

5           MR. VELARDE:  Your Honor, with respect to the markings

6    that appear on this exhibit, we have to object to that because

7    that does not relate to --

8           MS. KANOF:  I can use a clean one now, Judge, since I

9    can use the Elmo now.

10   BY MS. KANOF:

11   Q.  Can I get it back from you, please?

12   A.  Uh-huh.

13          THE COURT:  There's another one up there.

14   BY MS. KANOF:

15   Q.  The very first one we talked about was on the 12th of June

16   of 2008.  And that's the one where you say that your ex-wife is

17   dying of leukemia, right?

18   A.  Can I see the e-mail, ma'am?

19   Q.  Well, it's up on your screen.

20   A.  No.  Like I said, that's not an account.  That's a

21   fabrication.  That's not an exchange that I had with Ms. de la

22   Concha.

23          I know for a fact that's not her e-mail account.

24   Q.  And on the 12th of October 2008, that's when she tells you,

25   Be very careful because you didn't have a tonsillectomy, right?

1   A.  Who is "she"?

2   Q.  Lilian de la Concha.

3   A.  No, they're not coming from her.  I already told you.

4   Q.  Somebody told you that, right?

5   A.  Or somebody fabricated these documents.

6   Q.  And on October 12th, 2008, at 6:01 -- well, you're

7   responding, though.  Aren't you responding to these?

8   A.  No.  Just because you have a document that has my name

9   doesn't mean that I generated it.  That's why I was asking you.

10  Give us access, so we can see the electronic file, like we did

11  in case -- when you had doubts about our e-mails.  This could

12  just be another cut and paste job.

13  Q.  Another cut and paste job?

14  A.  Yes.

15  Q.  Like the cut and paste job of --

16          MR. VELARDE:  Your Honor, I'm going to object to

17  Counsel's sidebar remarks.

18          THE COURT:  I'll sustain the objection.

19          You're denying that these had anything to do with you?

20          THE WITNESS:  I'm denying that these were prepared or

21  received by me.  I don't recognize them.

22          And I'm also stating that the e-mail address that she

23  purports to belong do Ms. de la Concha I do not recognize.

24          MR. VELARDE:  I renew my objection, Your Honor.

25          THE COURT:  Overruled.

Delgado - Cross by Ms. Kanof                    5 -   97

1    BY MS. KANOF:

2    Q.  The exhibit that -- on the pages of the exhibit for the

3    e-mail in this case, doesn't she say, Surely you are tired,

4    because getting out of the hospital makes you tired?

5    A.  I don't know if she's saying that.  That's not -- like I

6    said, this is not --

7              THE COURT:  Wait a minute.

8    BY MS. KANOF:

9    Q.  Does the document have written on it words in Spanish that

10   can be interpreted, Surely you are tired because getting out of

11   the hospital makes you tired.  I believe you've never been

12   sick, and that makes things more difficult for you to

13   understand.

14             Am I translating it correctly?

15   A.  Yes.

16   Q.  Okay.  On the next page, on Monday, October 13th, does the

17   document reflect on the highlighted portion starting with,

18   *Ahora*.  Right now I don't think it would be a good time to

19   travel because you get very tired, correct?

20   A.  That's what is highlighted, yes.

21   Q.  And then below in the green, does it say, Anyone who had

22   been in a hospital all that time and full of medicine and

23   treatment, et cetera, without sun in a hospital, would look

24   like a ghost, correct?

25   A.  Yes.  Uh-huh.  Roughly, yes.

1   Q.  On the next page, in an e-mail dated Tuesday, the 14th of

2   October of 2008, does the document reflect, translated from

3   Spanish to English, Little thing, did you see the mail with the

4   aloe vera that I sent you?

5   A.  I can't see the heading.

6   Q.  Is that better?  Oh, there you go.  Is that better?

7   A.  Yes.  Uh-huh.

8   Q.  Okay.  Little thing, did you see the mail with the aloe

9   vera that I sent you?  Yesterday I resent it.  Four people that

10  responded told me, said that their uncle, brother, grandfather,

11  et cetera, had been cured with the aloe vera, having terminal

12  cancer.

13          Is that what it says?

14  A.  That's what it says.

15  Q.  You're a vegetarian, aren't you?

16  A.  I am.

17  Q.  Okay.  And so then the part at the bottom, the document

18  reflects that from Spanish to English, Since you're a

19  vegetarian, surely you would like to eat plants.

20  A.  Can I see where that part -- I don't see the...

21  Q.  That's what it says, right?

22  A.  Yes.  Uh-huh.

23  Q.  And then down at the bottom, on October 15th of 2008, it's

24  from you.  This e-mail -- I mean, this document purports to be

25  an e-mail from you to someone at hotmail.com on Wednesday, the

Delgado - Cross by Ms. Kanof

1  15th of October of 2008, at 3:00 -- a little after 3:00,

2  correct?

3  A.  Yes.

4  Q.  And translated, I cannot even move, but I feel 100 times

5  better than in the hospital.

6  A.  Uh-huh.  Yes.

7  Q.  Now, I'm showing you a page where the document purports to

8  be an e-mail written October 19th of 2008, early -- in the

9  early hours of the morning.  And it purports to be from your

10  e-mail address, correct?

11  A.  Yes.

12  Q.  Okay.  In the highlighted part does it say, They never sent

13  you what I left for you in Houston; is that correct?

14  A.  It says that, yes.

15  Q.  Answer me, please, in relation to the aloe vera, correct?

16  A.  Yes.

17  Q.  Okay.  I beg you to do it.

18  A.  Yes.  Uh-huh.

19  Q.  You don't lose anything.  Please, let's try.

20        That's what it says, right?

21  A.  Yes.

22  Q.  On October 28th of 2008, again the document purports to be

23  an e-mail from you, correct?

24  A.  Correct.

25  Q.  And the first highlighted portion -- sorry.  Let's see.

1          I ended up taking a certain medication that knocked me

2    out, correct?

3    A.  That's what it says.

4    Q.  And below that in the next one, again purporting to be from

5    you on Wednesday, the 28th, of 2008.  I was with the doctor

6    yesterday, and which I hope will be the last treatment,

7    correct?

8    A.  Correct.

9    Q.  I'm not going any further with it.

10         But, Mr. Delgado, in October of 2008, Victor Pimentel

11   testified that he took -- in October of 2008 -- that he told

12   Lilian de la Concha that you were lying when you said you were

13   dying of cancer.

14         Do you remember that testimony?

15   A.  I do.

16   Q.  And he said that she came over and wanted him to show her

17   where you lived and where your girlfriend lived, correct?

18   That's what he said?

19   A.  No, I don't think he mentioned that -- my girlfriend.  No,

20   she didn't -- he didn't.

21   Q.  And in December -- on December 3rd of 2008 you were

22   contacted by ICE Atlanta to contact ICE El Paso, correct?

23   A.  Yes.

24   Q.  And ICE El Paso told you that the reason they called you in

25   is because your life had been threatened, correct?

1    A.   Yes.

2    Q.   And they found it to be a credible threat, correct?

3    A.   Yes.

4    Q.   And you said, I think it was Liliana [sic] de la Concha,

5    because I broke up with her, correct?

6    A.   No.

7    Q.   Oh, you didn't say that?

8            They tell you to be careful, right?

9    A.   Yes.

10   Q.   Okay.  And they don't tell you the source of the threat,

11   correct?

12   A.   No, they do.  We get on the phone and called Ms. de la

13   Concha from the ICE offices.

14           MS. KANOF:  Pass the witness, Your Honor.

15           MR. VELARDE:  May I have a minute, Your Honor?

16           THE COURT:  One minute.

17           Do you have redirect?

18           MR. VELARDE:  None, Your Honor.

19           THE COURT:  No?  Okay.  I'm just asking because I'll

20   give you an opportunity.

21           MR. VELARDE:  Your Honor, for purposes of the record,

22   we have no redirect.

23           THE COURT:  Very well.

24           MR. VELARDE:  Thank you.

25           THE COURT:  You may sit down over there, Mr. Delgado.

Delgado - Cross by Ms. Kanof

```
1              I think -- we might as well take our lunch break at
2     this time.
3              MR. VELARDE:  Yes, sir.
4              THE COURT:  Ladies and gentlemen of the jury, we'll be
5     in recess until, let's say, 1:20.  That will give you an extra
6     five minutes.  1:20 in the afternoon.
7              And again, I remind you of the instructions that you
8     are under.  We'll be in recess until 1:20 in the afternoon.
9              (Open court; outside the presence of the jury.)
10             THE COURT:  You indicated that you have two rebuttal
11    witnesses.
12             MS. KANOF:  No, I think we have only one.
13             THE COURT:  Okay.  Make sure they're here at 1:20.
14             MS. KANOF:  Liliana Narvaez.
15             THE COURT:  I'm sorry?
16             MS. KANOF:  Liliana Narvaez.
17             THE COURT:  Be sure they're here by 1:20.
18             MR. VELARDE:  Thank you.
19             THE COURT:  We'll be in recess until 1:20.
20             (Recess taken; open court.)
21             MR. VELARDE:  Your Honor --
22             MS. KANOF:  Oh, they need to rest.  This is a rebuttal
23    witness.
24             MR. VELARDE:  Your Honor, right before lunch we had
25    the last witness and only witness that we're going to present;
```

 1    so, therefore, we rest.

 2              THE COURT:  You have a rebuttal witness, I understand?

 3              MS. KANOF:  Your Honor, the Government calls Liliana

 4    Narvaez.  She has not been sworn.

 5              (Witness duly sworn; answered, "I do.")

 6              MS. KANOF:  We redacted some stuff by agreement,

 7    Your Honor, from this, so I'm going to use the Elmo instead of

 8    the computer.

 9              THE COURT:  Okay.  You may.  You may proceed.

10              MS. KANOF:  Thank you, Your Honor.

11              LILIANA NARVAEZ, GOVERNMENT'S WITNESS, SWORN

12                          DIRECT EXAMINATION

13    BY MS. KANOF:

14    Q.  Can you tell us your name, please?

15    A.  Liliana Narvaez.

16    Q.  And do you know an individual by the name of Marco Delgado?

17    A.  Yes, I do.

18    Q.  Is he here in the courtroom?

19    A.  Yes, he is.

20    Q.  Could you indicate where he is, just by briefly saying

21    where he's sitting and what he's wearing?

22    A.  He's sitting next to Mr. Velarde, and he's wearing a blue

23    navy suit.

24              MS. KANOF:  Let the record reflect this witness has

25    identified the Defendant.

Narvaez - Direct by Ms. Kanof

1          THE COURT:  The record will so reflect.

2    BY MS. KANOF:

3    Q.  How do you know him?

4    A.  I was his girlfriend, or dated him on and off for six

5    years.

6    Q.  Okay.  And when did you first meet him?

7    A.  December 2nd, 2006.

8    Q.  And you said you were -- on and off you were his girlfriend

9    for six years; is that correct?

10   A.  Correct.

11   Q.  At some point in time were you actually engaged to be

12   married?

13   A.  Yes, we were.

14   Q.  When did that occur?

15   A.  A few times.

16   Q.  A few times?  Okay.

17          And was there a time that he lived with you?

18   A.  Yes.  On and off we lived together as well.

19   Q.  Okay.  And you said on and off you lived together.  But

20   sometimes you had a good relationship; is that correct?

21   A.  Yes.

22   Q.  And during those times did you provide him with your bank

23   account number?

24   A.  Yes.

25   Q.  What was the purpose of you providing him with your bank

1  account number?

2  A.  He asked me for my bank account number because we had had

3  some issues with infidelity on his part, and I didn't trust

4  him, and I didn't want a relationship with him.

5       So he told me it was a way of him showing me that we

6  would really have a life together and that we would, you know,

7  be married, and that it was –– he was showing me, by depositing

8  this money into my account, that we were –– he was going to buy

9  me a house and that I could now have the money.  Because we had

10  been house hunting before, never got anything.

11       And he said that with this money I could go ahead and

12  go and purchase the house and the furniture that I needed for

13  our life together.

14  Q.  So about when do you think you first provided him with your

15  bank account number?

16  A.  It was the summer of 2007.

17  Q.  And did sometimes he put money into your account for bills,

18  other than the big amount that we're going to talk about in a

19  minute?  Did he put money into your account frequently?

20  A.  Not before that big transaction.

21  Q.  Okay.  Let me show you what's been marked and admitted into

22  evidence as Government's Exhibit 78.  And it will pop up on the

23  screen in front of you.  Okay?

24       Do you recognize that as being your bank account?

25  A.  Yes.

Narvaez - Direct by Ms. Kanof

1    Q.  And at the top, does it indicate that this -- or your bank

2    statement, correct?

3    A.  (No verbal response.)

4    Q.  Is that yes?

5    A.  Yes.

6    Q.  She has to take down what you say, so a nod is not --

7    A.  Oh, I'm sorry.

8    Q.  That's okay.  You probably have never testified before.

9    A.  Never.

10   Q.  And this bank statement appears to be from June 21 through

11   July 20, 2007, correct?

12   A.  Correct.

13   Q.  And you just testified that you first gave him your number

14   in the summer of 2007.

15        So would this be around the time you actually gave him

16   your number?

17   A.  Yes.

18   Q.  And if you look at what I've highlighted -- of course it's

19   not on the one that's in evidence.

20        But if you look at what I've highlighted on July 20th,

21   did you receive $4,612.55 from someone you did not know?

22   A.  Yes.

23   Q.  Did you know Mr. Meneses -- Mendoza-Meneses?

24   A.  No.

25   Q.  And it appears as though the transfer was from Mexico,

Narvaez - Direct by Ms. Kanof

1    *Monex Casa De Bols*; is that correct?

2    A.  Yes.  That's what it says.

3    Q.  Okay.  And do you remember seeing this deposit on your

4    account?

5    A.  No, I don't.

6    Q.  Okay.  So you trusted him?

7    A.  Absolutely.

8    Q.  And when he traveled, did you help him out financially by

9    paying his bills?

10   A.  After the money was transferred into my account, yes.

11   Q.  Okay.  Well, we haven't -- not after this money was

12   transferred?

13   A.  No.  After the other amount.

14   Q.  Okay.  Well, let's talk about that money that was

15   transferred into that account.

16          First of all, Mr. Delgado, what did he do for a

17   living?

18   A.  He's an attorney, energy law attorney.

19   Q.  All right.  Did he have -- by the time you started seeing

20   him, was he still with Delgado & Acosta?

21   A.  No.

22   Q.  So at least by December of 2006 he was no longer with

23   Delgado Acosta?

24   A.  No, he had separated.

25   Q.  Okay.  And did you ever visit his office on Remcon?

1    A.  Yes.

2    Q.  Could you describe that office, please?

3    A.  It's actually a virtual office, so it's not like an of- --

4    a regular office setting where you would have a suite or a unit

5    for each business.

6           This is kind of like an office that takes your

7    correspondence.  It's an office that takes your calls.  So they

8    have ladies in the front reception that have a switchboard.

9    And depending on the light that turns on, that's the business

10   that they're calling, so that's what they answer.  That's the

11   name of the business that they answer.

12   Q.  So basically, it's a communal place so that -- for many

13   businesses, correct?

14   A.  Correct.

15   Q.  And they know who's being called by their switchboard?

16   A.  Yes.

17   Q.  And they -- and so then they save the calls or receive the

18   mail for that individual, correct?

19   A.  Correct.

20   Q.  And -- but have you gone there and physically seen it?

21   A.  Yes.

22   Q.  Is there a place there where you can sleep?

23   A.  I guess if you want to sleep on the floor, yes.  I don't

24   know.  But, yeah, there's no...

25   Q.  So did Mr. Delgado physically have an office that you

1   could, like, say, lock the door?

2   A.  (No verbal response.)

3   Q.  Is that a no?  Because she has to --

4   A.  Well, it's -- okay.  It has different conference rooms.

5   And if he needed to meet with clients, he would call the office

6   and say, I need a room for four or a room for ten for an hour

7   or for three hours, and then they would reserve that little

8   conference room.

9        So technically you could close the door, I guess, yes.

10  Q.  But to the conference room.

11  A.  To the conference room, but not to the whole office, yes.

12  Q.  Okay.  So there weren't like individual offices that had

13  desks for the lawyers or anything like that?

14  A.  No.

15  Q.  Okay.  And when -- when you were involved -- the times that

16  he was living with you, did he explain to you how he ran his

17  law office?

18  A.  Yes.  He mentioned to me that he didn't need an office,

19  per se, that -- you know, because of the over- -- you know, the

20  cost of -- yes, the cost of running an office and having

21  somebody working all the time.

22       Because of his traveling and because of the business

23  that he was in, it was -- you know, putting energy bits

24  together for many companies and internationally, you know, he

25  only needed an office on and off.  So that's why he chose that

1    setting.

2    Q.  Did he have an office in Calgary, Canada?

3    A.  No, he did not.

4    Q.  Did he have an office in Mexico City?

5    A.  When I was with him, no.

6    Q.  And who is Miriam?

7    A.  Miriam is his former secretary.

8    Q.  Okay.  Did she work at the physical location at Remcon?

9    A.  No.

10   Q.  Where does she work?

11   A.  I guess at her house.

12   Q.  So what other employees did he have?

13   A.  That's it.

14   Q.  Did he -- when he needed employees to do things like draft

15   pleadings or documents or agreements, did he hire them on a

16   contract basis?

17   A.  I have no idea.

18   Q.  Okay.  Now, the second exhibit that the Government wants to

19   show you is Government's Exhibit 79.

20          It's the bank account -- it's that same bank account.

21   Do you remember -- do you recognize your statement?

22   A.  Yes.

23   Q.  Okay.  This one is from -- this is Government's Exhibit

24   70- -- oh, okay.  Sorry.  I want to make sure I have the right

25   one.  79, yeah.

Narvaez — Direct by Ms. Kanof

1          Okay.  This particular statement, it appears, was for

2    the period of August 21 through September 21 of 2007.

3    A.  Correct.

4    Q.  Did Mr. Delgado tell you that he was detained by the

5    Department of Public Safety on September -- the first week of

6    September -- I don't remember if it was the 6th or 7th -- that

7    he was detained and taken down to the Department of Public

8    Safety on that day?

9    A.  No.

10   Q.  Did he tell you that -- did you know Victor Pimentel?

11   A.  I met him -- or I got to -- I met him once.  And of course

12   I got to see him maybe three times.

13   Q.  Okay.  Did he ever tell you that Victor was stopped with a

14   million dollars in cash in his car?

15   A.  No.

16   Q.  Okay.  But -- and that -- again, look at what I've

17   highlighted, please, from your statement.

18          On September 13th of 2007, there is a deposit for

19   $270,000, correct?

20   A.  Yes.

21   Q.  And then the next day a deposit for $230,000, correct?

22   A.  Yes.

23   Q.  And they appear to be wire transfers, don't they?

24   A.  Yes.

25   Q.  And they appear to be wire transfers from Isaias Cohen,

Narvaez - Direct by Ms. Kanof

1   correct?

2   A.  Correct.

3   Q.  Who is Isaias Cohen?

4   A.  I don't know.

5   Q.  Did you give Isaias Cohen your bank account number?

6   A.  No.

7   Q.  Back to Government's Exhibit Number 78.

8        Did you give Pedro Mendoza-Meneses your bank account

9   number?

10  A.  No.

11  Q.  Okay.  So what did Mr. Delgado tell you about -- did you

12  notice these deposits on your own, or did he tell you --

13  A.  Well, he told me, remember that I could go buy my house

14  now.

15  Q.  Okay.  So he -- how did that happen?  You got a statement

16  and noticed it or he came and told you, I put all this money in

17  your account?

18  A.  No.  He was out of the country.  And like I said, we were

19  having a lot of issues in our relationship.

20       And he told me, you know, he was trying to reconcile,

21  and that he wanted to show me that he was serious about our

22  life together and forming a family.  So that instead of --

23  because whenever he would mention the house, I would say,

24  You're lying, you know.  You haven't bought me a house and

25  you've been telling me that for a long time.

1           So he would say, Okay.  I'm going to show you that

2    it's true.  I'm transferring the money into your account so you

3    can go and do it yourself.

4           And I said, Okay.  Great.

5    Q.  So he told you that he had this money put in your account

6    so that you could find the house you wanted.

7    A.  Correct.

8    Q.  Is that correct?

9           What happened with that money?

10   A.  He spent it.

11   Q.  Now, did he tell you where the money came from?

12   A.  He told me that the money was from the sale of the apple

13   orchard of their family in Cuauhtemoc, Mexico.

14   Q.  And did he tell you who Isaias Cohen was?

15   A.  He told me it was the person in charge, that managed the

16   operations of the orchard.

17   Q.  So he said Isaias Cohen was the manager of the family apple

18   orchard, correct?

19   A.  Correct.

20   Q.  Now, you said he spent it.  How did that happen?  I mean,

21   you -- did you start looking for a house?

22   A.  Oh, yes.

23   Q.  Okay.  And did you tell him, Come look at this house.  I

24   found a house.

25   A.  Oh, we spent, with my aunt, many, many weeks searching for

Narvaez – Direct by Ms. Kanof

1    houses, putting contracts on houses.

2    Q.  I'm assuming your aunt is a realtor?

3    A.  Yeah, she's a realtor.  And we would put a lot of bids on

4    different houses, and -- for a very low amount, so they were

5    all rejected.

6    Q.  Okay.  And now the money, does it just stay in your

7    account?

8    A.  No.

9    Q.  What happens to it?

10   A.  Marco starts asking me to please send all these payments

11   for him.

12   Q.  What kind of payments?

13   A.  For example, for his children's tuition, university

14   tuition.  He asked me to -- he bought a Jeep with it.  He asked

15   me to -- for his child support checks.

16   Q.  Child support checks to his ex-wife?

17   A.  To his ex-wife.

18   Q.  And what's her name?

19   A.  Sharon Delgado.

20   Q.  Okay.  And did you do that?

21   A.  Yes, I did.

22   Q.  And was there money left for a house?

23   A.  Well, no.  After six months it was dwindled down to

24   nothing.

25         And I kept on telling him, We're running out of this

1    money.

2             And he said, Don't worry, you know, I'll put that

3    money back or I'll finance the rest.

4             And I said, Okay.

5    Q.  And that didn't happen?

6    A.  No.

7    Q.  Do you know who Lilian de la Concha is?

8    A.  I know of her, but I don't know her.

9    Q.  Okay.  You haven't met her personally?

10   A.  No.

11   Q.  But has she communicated --

12   A.  No.  No, I'm sorry.  I did meet her once in Mexico City

13   with Marco.

14   Q.  Okay.  Did you communicate with her by e-mail?

15   A.  She -- yes.

16   Q.  Okay.  I showed you, during the break, Government's Exhibit

17   Number 99, correct?

18   A.  Yes.

19   Q.  Okay.  And you paged through it, correct?

20   A.  Yes.

21   Q.  Did you recognize these pages?

22   A.  Absolutely.

23   Q.  How did you recognize them?

24   A.  Because she sent these --

25   Q.  Who is "she"?

Narvaez – Direct by Ms. Kanof

1   A.  Lilian de la Concha.

2   Q.  Okay.

3   A.  Sent this e-mail and added her little summary before all

4   this as proof of her having a relationship with Marco.

5           And she sent it to Sharon Delgado and to myself, so

6   that we would realize -- well, I would realize that he was

7   cheating on me.

8   Q.  Okay.  And the -- you actually -- the e-mail address that

9   it's from, that's the e-mail address that she was using at the

10  time?

11  A.  Yes.

12  Q.  Okay.  And the -- do you recognize Mr. Delgado's e-mail

13  addresses?

14  A.  Oh, yes.

15  Q.  They seem to be from June of 2008 through October of 2008.

16  Is that the same ones that you received?

17  A.  Yes.

18  Q.  Did you know Mr. Delgado at that time?

19  A.  Yes.  I was his fiancée.

20  Q.  Was he dying of cancer?

21  A.  No.

22  Q.  Did he have an operation at a hospital?

23  A.  No.

24  Q.  Did he have continuous treatments with a doctor?

25  A.  No.

1  Q.  Was his ex-wife, Sharon Delgado, dying of leukemia?

2  A.  No.

3          MS. KANOF:  Pass the witness.

4          MR. ESPER:  I have no questions, Your Honor.

5          THE COURT:  Very well.

6          You may be accused.  You're free to leave.

7          THE WITNESS:  Thank you.

8          MS. KANOF:  Your Honor, the Government closes.

9          MR. ESPER:  The Defendant closes, Your Honor.

10          THE COURT:  Ladies and gentlemen of the jury, you have

11  heard all the evidence.

12          Let me do this.  It's almost 2:00 in the afternoon,

13  ladies and gentlemen.  We need to work on the Court's

14  instructions, and the attorneys have requested, what, 30 to 40

15  minutes each side to present you their side of arguments.  And

16  by the time you would get it, it probably would be about 5:00,

17  and it would be time to leave.

18          So instead of keeping you here all that time, I'm

19  going to go ahead and excuse you.  And we can, at our leisure,

20  work on whatever we need to do.

21          I'm sorry to have to tell you, but you're going to

22  have to come back on Monday.  Okay?  I think I kind of warned

23  you about that yesterday, because I could see we were going to

24  take longer than I anticipated.

25          So you're going to be free for the weekend, ladies and

```
 1    gentlemen.  I do want you to come back at 9:00 on Monday
 2    morning, and we intend to get started with reading you the last
 3    set of instructions and have the attorneys address you in their
 4    final arguments, and then you will be sent to deliberate.
 5            Now the fact that you're going to be on your own for
 6    the next two days, it just makes it more important for you to
 7    comply with all the directions that I've given you, with all
 8    the instructions I've given you.  We have spent a whole week in
 9    this trial, and we don't want anything to happen where we have
10    to start all over again.
11            So abide by all the instructions.  You're not to
12    discuss this case with anyone.  You're not to listen to any
13    news or otherwise program or view any program that has to do
14    anything with this case in any way whatsoever.
15            So with that, ladies and gentlemen, thank you for your
16    service this whole week, and hopefully we won't have to keep
17    you here more than Monday.
18            All rise for the jury.
19            (Open court; outside the presence of the jury.)
20            MR. ESPER:  Your Honor, since both sides have now
21    rested and closed with the presentation of evidence, the
22    Defendant Marco Delgado moves once again, pursuant to Rule
23    29(a) of the Federal Rules of Criminal Procedure, for a
24    Judgment of Acquittal as to Count 1, Subparagraphs A, B, and C.
25            And I would renew the same grounds that I had alleged
```

1    when the Government rested its case-in-chief, coupled with the
2    fact that the evidence that was presented by the Defendant
3    establishes that no rational trier of fact could conclude
4    beyond a reasonable doubt that all elements of the charged
5    offense have been proven; and, therefore, he's entitled to a
6    Judgment of Acquittal, Your Honor.
7             THE COURT:  Motion for Judgment of Acquittal is
8    overruled.  It will go to the jury.
9             Get your Charge and go over it.  I'll come back and
10   take any objections or requests that you may have.  Let's say
11   10 minutes.
12            We'll be in recess for the next 10 minutes.
13            (Recess taken; open court.)
14            THE COURT:  Counsel, you've been provided with the
15   latest version of the Court's instructions.
16            I had previously requested that you try to make them
17   as simple as possible because --
18            MR. ESPER:  Your Honor, if I could go first, mine
19   would be much shorter for sure.
20            THE COURT:  What's that?  I'm sorry.
21            You've got to get by the microphone.
22            MR. ESPER:  Okay.
23            THE COURT:  You know, I've conveyed to you before, I
24   don't think this jury is really too sophisticated.  Okay?  I
25   think they're going to have problems.

1          MR. ESPER:  Your Honor, all the money laundering

2     instructions are, to me, complex.

3          THE COURT:  Yeah.

4          MR. ESPER:  I had one objection, Your Honor, and I'll

5     sit down.

6          THE COURT:  Okay.

7          MR. ESPER:  The Defendant objects to the deliberate

8     ignorance instruction.  I think that based on -- his testimony

9     was that this was not deliberate ignorance, that he was not --

10    he was engaging in lawful activity, and he was not blinding

11    himself to that which was obvious.

12         I know the Government's theory is that he

13    deliberate- -- he engaged in deliberate ignorance.

14         But his testimony revealed that this was not -- from

15    his standpoint -- a --

16         THE COURT:  If you believe his testimony.

17         MR. ESPER:  Well, I think that's going to be up to the

18    jury, obviously.  And so I --

19         THE COURT:  It's also up to me, whether I -- whether I

20    submit this.  I think this is a prime case of deliberate

21    ignorance, quite frankly, Mr. Esper.

22         MR. ESPER:  Well, I think -- I think -- I wouldn't

23    quarrel with that, absent the defendant's testimony.  His

24    testimony did not say, I blinded myself.  This was an -- he's

25    saying this was not a -- was not a drug money laundering

```
1    transaction.
2            I think his testimony was unequivocal that that was
3    his position.
4            Now absent that testimony, then I think deliberate
5    ignorance probably would be applicable.  But when you factor in
6    his testimony, at no time did he say he deliberately blinded
7    himself to anything.
8            THE COURT:  Okay.  Who's going to say that?  No.
9            MR. ESPER:  All right.
10           THE COURT:  Your objection is overruled.  I think this
11   is a prime case for this type of instruction.
12           MR. ESPER:  All right, Your Honor.
13           THE COURT:  Government?
14           MS. ARREOLA:  No objections, Your Honor.
15           THE COURT:  Very well.
16           Now, you had requested 40 minutes, Ms. Kanof?
17           MS. KANOF:  Yes, I did, Your Honor.  I requested that
18   before he testified.
19           THE COURT:  Before.
20           MS. KANOF:  I think, really, the real reason that we
21   wanted more time is the complexity of the Charge and hooking up
22   some of the facts to the Charge for the jury, as an example.
23           Otherwise, I guess 30 minutes would be okay.  But we
24   really feel like we need a little bit of extra time.
25           THE COURT:  You know, I don't intend to give too much
```

```
 1   time for final arguments, but we've gone a whole week.  I guess
 2   I can live with an extra 10 minutes or so.
 3           MR. VELARDE:  For both sides?
 4           THE COURT:  You're all entitled to the same.
 5           MR. ESPER:  40 minutes?
 6           THE COURT:  I'll give you 40 minutes.
 7           MS. KANOF:  Thank you, Your Honor.
 8           MR. ESPER:  Thank you, Your Honor.  I have to say
 9   that's a first, for us -- for me, anyway, with the Court.
10   Thank you.
11           THE COURT:  Do you know how you're going to divide
12   that?  And how much a warning do you want?  You don't have to
13   tell me now.  You can tell me Monday.
14           MS. KANOF:  Oh, okay.
15           THE COURT:  You can tell me Monday.  If you all want a
16   warning, I'll...
17           MR. VELARDE:  Five minutes before, Judge.
18           THE COURT:  So you can let me know Monday how you're
19   going to divide that and how much of a warning you want.
20           MS. KANOF:  Your Honor, Ms. Arreola is going to do the
21   opening portion of closing.  She wants a 10-minute warning.
22           THE COURT:  20 minutes with a 10-minute warning?
23           MS. ARREOLA:  A five-minute warning.
24           MS. KANOF:  And I'll take a three-minute warning,
25   Your Honor.
```

1          THE COURT:  Three minutes?

2          20 minus 5, and 20 minus 3.  Okay.

3          Anything else at this time, Counsel?

4          MR. ESPER:  No, Your Honor.

5          MS. KANOF:  Nothing further from the Government,

6    Your Honor.

7          THE COURT:  You may be excused, then.  We'll be in

8    recess until Monday morning.

1                       I N D E X

2                   DEFENSE EVIDENCE

3   WITNESSES:

4   MARCO ANTONIO DELGADO:

5     Cross-Examination by Ms. Kanof ............................2

6   Defense Rests ..........................................103

7              GOVERNMENT'S REBUTTAL EVIDENCE

8   LILIANA NARVAEZ:

9     Direct Examination by Ms. Kanof  ......................103

10  Government Closes ......................................117

11  Defendant Closes ......................................117

12  Jury in Evening Recess ................................118

13  Motion for Judgment of Acquittal ......................118

14  Objections to the Charge ..............................119

15

16

17

18

19

20

21

22

23

24

25

1                    GOVERNMENT'S EXHIBITS

2   NO.   DESCRIPTION                              ADMITTED

3   98    Encyclopedia Britannica                         4

4   99    E-Mail String                                  94

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25