1                IN THE UNITED STATES DISTRICT COURT

2              FOR THE WESTERN DISTRICT OF TEXAS

3                       EL PASO DIVISION

4

UNITED STATES OF AMERICA    )   No. EP-12-CR-2106-DB
5                           )
vs.                         )   El Paso, Texas
6                           )
MARCO ANTONIO DELGADO       )   October 28, 2013
7

8

9                    VOLUME 6 OF 6 VOLUMES
                         JURY TRIAL
10          BEFORE THE HONORABLE DAVID BRIONES
              UNITED STATES DISTRICT JUDGE, and a jury.
11

12

13   A p p e a r a n c e s:

14   FOR THE GOVERNMENT:      MS. DEBRA P. KANOF &
                              MS. ANNA E. ARREOLA
15                            Assistant United States Attorneys
                              700 E. San Antonio, Suite 200
16                            El Paso, Texas  79901

17   FOR DEFENDANT:           MR. RAY VELARDE
                              Attorney at Law
18                            1216 Montana Avenue
                              El Paso, Texas  79902
19
                              MR. RICHARD ESPER
20                            Attorney at Law
                              801 N. El Paso Street, 2nd Floor
21                            El Paso, Texas  79902

22

23

24        Proceedings recorded by mechanical stenography,

25      transcript produced by computer.

```
 1              (Outside the presence of the jury.)

 2              THE COURT:  Counsel, we have a problem.  One of jurors

 3    is missing.  I wanted to give him 15 minutes to get here.  He's

 4    not here yet.  So my proposal is we replace him with one of the

 5    alternates.  That's what they're here for.

 6              Any objections?

 7              MS. KANOF:  No objections from the Government,

 8    Your Honor.

 9              MR. VELARDE:  No objection, Your Honor.

10              THE COURT:  He may just have arrived.

11              You know, what?  Even if he did, I want to get rid of

12    him.  He's so undependable not to be here.  He's kept us

13    waiting almost half an hour.

14              MR. ESPER:  Which juror is it, Your Honor?  The

15    number?

16              THE COURT:  I think it's Number 34, Jose Zamora,

17    sitting up there on the top.

18              Any objection?

19              MS. KANOF:  Not from the Government.

20              THE COURT:  State your objection and your reason if

21    you have one.

22              MR. ESPER:  If he's here, Your Honor, I think he's one

23    of the original jurors and probably should stay on.

24              THE COURT:  Well, maybe I'll bring him in and ask him

25    what the holdup was.
```

1          Is he on his way up?

2          COURT SECURITY OFFICER: That's my understanding, yeah.

3          THE COURT:  He's going to keep us waiting some more.

4          COURT SECURITY OFFICER:  Your Honor, may I go check?

5          THE COURT:  Yes, please, John.

6          (Court Security officer exits courtroom.)

7          THE COURT:  Have you all been provided with a copy of

8    the verdict form?  We went over the Charge the other day, but I

9    didn't go over the verdict form with you.  I just want to be

10   sure that you have a copy and you've been provided with it.

11         MS. KANOF:  Yes, Your Honor.

12         MR. ESPER:  Yes, Your Honor.

13         THE COURT:  And there's no objections?

14         MR. ESPER:  No.

15         MS. KANOF:  No.

16         COURT SECURITY OFFICER:  Your Honor, they're all here.

17         THE COURT:  They're all here?

18         COURT SECURITY OFFICER: Yes, sir.

19         THE COURT:  I want you to bring him in.

20         COURT SECURITY OFFICER: Just him?

21         THE COURT:  Yes, just him.

22         (Juror brought into courtroom; open court.)

23         THE COURT:  Mr. Zamora, I want to know why you kept us

24   waiting for half an hour.

25         THE JUROR:  I was stuck in traffic, sir, on the border

```
1    freeway.  It was at a standstill.  I was there for over an
2    hour, probably.
3            THE COURT:  Okay.  Okay.  You can join your other
4    jurors.
5            (Juror leaves the courtroom.)
6            THE COURT:  Go ahead and bring them in.
7            I'm going to leave him on the jury, then.
8            (Open court; jury present.)
9            THE COURT:  Members of the jury, as you know, we're
10   getting started a little bit late, and I'm sure you probably
11   know why also.  So please excuse the delay.
12           And I want to remind you of your obligation to follow
13   all the instructions that I gave you, ladies and gentlemen.
14   We're almost at the end of this trial, and we don't want
15   anything to happen that would make us have to start over again.
16           Now, you've heard all the evidence already.
17           Have they been provided with a copy of the Charge?
18           LAW CLERK:  Yes, sir.
19           THE COURT:  You've got a copy of the instructions
20   there?  Okay.
21           You've heard all of the evidence in this case.  Okay?
22   Before you may start your deliberations, though, I am obligated
23   to give you the last set of instructions.  You have all been
24   provided with a copy of the instructions, and some of it is a
25   little bit complicated.  Okay?  It's a little bit more
```

1    complicated than just coming up with a simple answer.  Okay?

2    And you'll see why, probably, as I read it to you.

3              (Court's Charge read.)

4              THE COURT:  Is the Government ready to proceed?

5              MS. ARREOLA:  Yes, Your Honor.

6              THE COURT:  You may.

7              MS. ARREOLA:  May it please the Court.

8                          CLOSING STATEMENT

9    BY MS. ARREOLA:

10             Ladies and gentlemen of the jury.

11             During the course of this trial you have heard

12   overwhelming evidence that the Defendant Marco Delgado

13   conspired to launder over $600 million of illegal drug proceeds

14   for the *Milenio* cartel.

15             My purpose today, and that of Ms. Kanof, is to review

16   with you the evidence that you've heard during the course of

17   this trial and to organize it so that you can see how it proves

18   beyond a reasonable doubt that the Defendant Marco Delgado is

19   guilty of the crime charged in the Indictment.

20             Now at the beginning of this trial, you heard from

21   Victor Pimentel, who testified that he, Marco Delgado, Lilian

22   de la Concha, and others spent over a year meeting with members

23   of the cartel in order to set up a deal to launder drug money.

24             As the trial progressed you heard other evidence that

25   consistently supported what Victor Pimentel told you.

1          For example, you heard the testimony of four agents
2     who heard the defendant's confessions.
3          You heard the defendant's own words on recorded calls.
4          And you saw the defendant's e-mails, including the
5     fake settlement agreement.
6          The Government submits that all of this evidence was
7     consistent, it was logical, it made sense.  The evidence fit
8     together.
9          But as you know at the end of last week, you heard a
10    different version of events.  You heard Marco Delgado's
11    version.
12          He told you that Victor Pimentel and four agents from
13    the El Paso and Atlanta HSI offices -- Alex Ascencio, Joshua
14    Fry, Gabe Aguirre, and Thomas Justice -- he told you that they
15    all lied.
16          Ladies and gentlemen, the Government submits that the
17    defendant contradicted himself, that his testimony was
18    inconsistent with the overwhelming evidence, and that his
19    testimony simply did not make sense.
20          We will take a look at a few of the major flaws in his
21    testimony in a few minutes.  But first, let's take a look at
22    how the Government has proven beyond a reasonable doubt that
23    the defendant conspired to commit the offense of money
24    laundering.
25          As Judge Briones just instructed you, in order for you

1   to find the defendant guilty of this crime, the Government must

2   prove beyond a reasonable doubt two elements.

3           First, that the defendant and at least one other

4   person agreed to commit the crime of money laundering, as

5   charged in the Indictment.

6           And second, that the defendant knew of the unlawful

7   purpose of the agreement and joined in it with intent to

8   further that purpose.

9           Let's take a look at some of the evidence that proves

10   these elements beyond a reasonable doubt.

11          First, as just was mentioned, you heard from Victor

12   Pimentel who testified that he, Marco Delgado, Lilian de la

13   Concha, and others spent over a year meeting with members of

14   the cartel to get this deal to launder money.

15          They finally kicked off their operations in September

16   of 2007 with the one million dollar pickup that was ultimately

17   seized.

18          Victor Pimentel explained to you that this was a trial

19   run so that they could prove that they could do what they'd

20   been telling the cartel that they could do for over a year.

21          And Mr. Pimentel also testified that in July 2008,

22   Marco Delgado sent him to Chicago in order to pick up an

23   additional hundred thousand dollars of drug money.

24          What evidence did you hear that corroborated, in other

25   words supported, what Mr. Pimentel told you?

1          Well, let's start with the defendant's own words.

2          You heard from three different agents that Delgado

3    confessed about the Chicago pickup.  First, you heard from

4    Agents Alex Ascencio and Gabe Aguirre.  They told you about the

5    December 2008 conference call.  Do you remember that call?

6    That's when HSI met with Delgado in order to warn him about the

7    threat that had been made on his life.

8          During that call the agents also asked him about the

9    Chicago pickup.  Initially, the defendant denied it.  He said

10   he didn't know anything about it.  But eventually, he admitted

11   that he had done it and that he had not notified the agents.

12         That's not the only time that Marco Delgado confessed

13   about the Chicago pickup.

14         You also heard from Joshua Fry.  Agent Fry interviewed

15   Marco Delgado at the end of last year after his arrest.  Agent

16   Fry asked Mr. Delgado about the Chicago pickup.

17         And Delgado told him that Delgado, Lilian de la

18   Concha, and somebody named Quezada had decided to conduct the

19   money pickup in Chicago.

20         And Delgado further told Agent Fry that if anyone was

21   involved with drug trafficking it was Quezada.

22         Agent Fry also asked Mr. Delgado why he would move

23   money behind the backs of HSI agents, when the last deal had

24   almost got them killed.

25         And Mr. Delgado responded that his life was in ruins

1   and that he should have called HSI, but he didn't.

2            But, ladies and gentlemen, the evidence doesn't stop

3   there.

4            In addition to the testimony of Mr. Pimentel and the

5   agents who heard Mr. Delgado's confessions, you also saw

6   Mr. Delgado's e-mails.  That's Government's Exhibits 1 through

7   32.

8            These are the e-mails that Mr. Delgado sent from his

9   law firm account to Mr. Pimentel, and they corroborate what

10  Mr. Pimentel told you they went through in order to get this

11  deal with the cartel.

12           You'll recall, for example, Government's Exhibits 29

13  and 31, in which Delgado sent the fake settlement agreement to

14  Mr. Pimentel so that he would have paperwork to show the police

15  in case he got stopped.

16           And there were also Government's Exhibits 7B and 9, in

17  which Pimentel and Delgado spoke about the arrest of cartel

18  members.

19           And of course there were the e-mails with coded

20  language about ironworks, construction contracts, and Girl

21  Scout cookies.

22           Now the defendant had a different explanation for all

23  of this, but we'll talk about that in a few minutes.

24           In addition to all of this evidence, you also heard

25  Mr. Delgado's voice on recorded calls.

1          Remember how Victor Pimentel said they spent over a

2     year trying to get this deal with the cartel?  Well, the

3     defendant admitted the efforts that they made in some of the

4     recorded calls.

5          For example, Government's Exhibit 50.  This is the

6     September 9th, 2000 [sic], call between Mr. Delgado and Lilian

7     de la Concha.

8          Mr. Delgado said to her, I told Pedro if this falls

9     apart because of his stupidity, I told him that he's going to

10    have to answer to me, because I have been trying to arrange

11    things for a long time.

12         And later that same day in a conversation with Chuy,

13    which is Government's Exhibit 51 -- the transcript's at 51A --

14    Mr. Delgado told Chuy, We will fight just like we came in, and

15    we will fulfill our duty to these people and we will begin

16    working like crazy in order to recuperate.  I'm very invested

17    for this to fall apart.

18         And remember that conversation that Victor Pimentel

19    told you about the meeting at the Chicago airport, where Chuy

20    asked all of them for their IDs, so that they would be

21    responsible in case something happened to the money?

22         Well, Mr. Delgado -- that was spoken about in the

23    meeting with Rafa Solis, the undercover, Marco Delgado, and

24    Paco.

25         That was Government's Exhibit 58.  The transcript is

1  at 58A.

2          This is where Paco says -- and he's very worried,

3  because the million dollars has been seized, and he's worried

4  about violence.

5          He says, Right now the situation, as I see it, is that

6  some very nervous people who think we stole from them and who

7  could begin using violence.  I don't know.  I don't know in

8  what manner or with whom they would start or how, amongst all

9  of us.  They -- they have -- and Marco knows it well -- the

10  documentation of the identity of everyone except mine because,

11  by chance, I wasn't there when none of that happened.

12          And Marco Delgado was present during that call.  And

13  he didn't interrupt and say, No, that didn't happen.  I don't

14  know what you're talking about.

15          And at that same call Paco expresses his concern over

16  what's going to happen and who's going to pay back the million

17  dollars if they can't recover it.

18          And they have a conversation, and Marco admits that he

19  was involved in organizing it and that they were going to agree

20  to split the commission.

21          Marco Delgado says, Look.  I was very clear with Chuy.

22  And I told him, just as we all sat around and organized this,

23  well, then, each one -- come on, we are many.  We jump in and

24  come on.

25          And Paco asked him if he would be willing to get in

1    for the part of the commission he was going to take.

2             And Marco says -- it's not 50 percent.  He disagrees.

3    He says, Well, look.  I don't think with that.  Because

4    literally what we discussed -- and that's because you were not

5    there, but it was in equal parts.  That question was made

6    without any jokes.

7             And we said, Let's see how much A, B, C, and D.  And

8    the one, in fact, who said that you were a participant was

9    Pete.  He said, Yes, here, the five.

10            Ladies and gentlemen, that's just some of the evidence

11   that you heard during the course of this trial that shows that

12   Marco Delgado conspired to commit the offense of money

13   laundering.

14            Now, the defendant also testified on Thursday and

15   Friday of last week.  But the Government submits that he

16   contradicted himself and that his testimony didn't make sense.

17            First, for example, there was the July 2008 Chicago

18   pickup.

19            Mr. Delgado told you initially -- on Thursday, during

20   direct examination by Mr. Velarde, he told you that he was

21   working with two agents from the Atlanta office to pick up this

22   money and that the agents let him keep $45,000 of the seized

23   money to pay for expenses that he had supposedly incurred while

24   helping HSI.

25            But he couldn't keep his story straight.

1          Because on Friday, when Mrs. Kanof asked Mr. Delgado

2     about that money and what had happened to it and why he kept

3     it, he changed his story.

4          He told you that the money was a retainer, that his

5     client, G-E-O, had paid him for services.

6          And when she asked him why he kept it he said, At that

7     point we celebrated an agreement and it allowed me to make use

8     of the funds.  We started working for them.

9          And she confronted him about his prior testimony.  She

10    said, You testified you got to keep the $45,000 as a result of

11    working for ICE, didn't you?

12          And he said, No.  As a result -- he said, Not as a

13    result of working for ICE.  I had told Lilian that in any

14    project I would be involved I needed a retainer in advance.

15          Not only was the defendant unable to keep his story

16    straight, his testimony didn't make sense.

17          If the money was payment from a client, G-E-O, to

18    retain Mr. Delgado's services, why was it left on the pavement

19    of a mall parking lot in a brown paper shopping bag wrapped in

20    heat-sealed FoodSaver bags?  Why did Martel drive off with --

21    leaving it on the floor without even so much as asking for a

22    receipt from Mr. Pimentel?

23          Is that how legitimate business people conduct their

24    affairs?  You know the answer.  It's not.

25          The defendant also testified about the million

1    dollars.  He said that when Victor arrived in El Paso, Marco

2    Delgado didn't know he had the money with him and that he had

3    been told the funds were from an inheritance.

4            But, ladies and gentlemen, this story also doesn't

5    hold water.  Let's look at why.

6            First, let's take a look at the fake settlement

7    agreement that Mr. Delgado sent to Mr. Pimentel.

8            You'll recall that on September 4th, 2007, the day

9    before Mr. Pimentel left from Atlanta to El Paso with the

10   million dollars, the day before, Mr. Delgado sent him the

11   settlement agreement.

12           He first tried to send it in Exhibit 29 at 12:46 p.m.

13   And he said that attached was a settlement form.

14           Now remember, Mr. Pimentel was not an attorney, and he

15   had known Mr. Delgado for many years, and that Mr. Delgado is

16   calling him an attorney in this e-mail.

17           Less than an hour later Mr. Delgado re-sent the

18   e-mail, this time including the attachment.  And that is

19   Government's Exhibit 31.

20           Now, Mr. Delgado testified that this was simply a form

21   document that Mr. Pimentel was supposed to use in a mediation

22   over a bond.

23           But, ladies and gentlemen, that doesn't make sense.

24   This is a completed document.  All Mr. Pimentel needed to do

25   was open it on his computer, hit the print button, and sign the

1   last page.

2          For example, look how his name is filled in on

3   Paragraph 2.  His name is also filled in on the signature page:

4   Victor Pimentel, Attorney.

5          Moreover, the amount of the settlement agreement,

6   $1.5 million, was just enough to cover the $1 million that

7   Mr. Pimentel would be traveling with.

8          So is it a coincidence that on the day before

9   Mr. Pimentel left from Atlanta to El Paso carrying $1 million

10  in cash, is it a coincidence that the day before he did that

11  Mr. Delgado sent him a completed settlement agreement that

12  would cover the $1.5 million and that he could show to police

13  if he were stopped?

14          Was that a coincidence?  No.

15          Mr. Delgado sent him this paperwork so that he would

16  have something to show as documentation for the money in case

17  he got stopped.

18          THE COURT:  You have five minutes in your opening.

19          MS. ARREOLA:  Thank you, Your Honor.

20          I want to now discuss with you the special verdict

21  form.

22          As part of your deliberations, you will also be

23  required to determine if the Government has proven the unlawful

24  purpose of the conspiracy.  In other words, what was the

25  illegal goal that the conspirators hoped to achieve?

1             And those three illegal goals are identified in the

2     special verdict form.  The Indictment charges three unlawful

3     goals of the conspiracy.

4             As Judge Briones instructed you, in order to find the

5     defendant guilty, you must find that the Government has proven

6     beyond a reasonable doubt that the Government conspired to

7     commit at least -- excuse me -- that the defendant conspired to

8     commit at least one of these.

9             Just one is enough.  But in order to return a guilty

10    verdict, you must all agree on the same one.

11            Let's take a look at the evidence supporting each of

12    these.

13            The first unlawful goal is that the defendant

14    conspired to conduct financial transactions of the proceeds of

15    illegal drug trafficking and that the purpose of those

16    transactions was in order to conceal, for example, the nature

17    or source of the money.

18            So for example, that the money is from illegal drug

19    trafficking money, that it's illegal drug money.

20            Or to conceal the control or ownership of the money.

21    In other words, that the money belonged to the cartel, or the

22    money was controlled by the cartel.

23            So what is some of the evidence that you heard that

24    this was one of the illegal goals of the conspiracy?

25            Well, you saw the fake settlement that we just talked

1    about.  Why did Mr. Delgado provide a fake settlement?  To
2    cover up the fact that this was actually illegal drug money and
3    that it was owned or controlled by the cartel.
4           You also heard evidence that Marco Delgado intended to
5    use casinos to launder money.  And Agent Alex Ascencio
6    explained how casinos can be used to create a paper trail for
7    illegal drug proceeds.
8           You also heard evidence that in July 2008, Marco
9    Delgado gave his girlfriend at the time, Liliana Narvaez's
10   account number, to Mr. Pimentel in order for him to deposit the
11   $50,000.
12          Why did Marco Delgado want to deposit illegal drug
13   money into his girlfriend's account, the account of somebody
14   who had nothing to do with this?
15          Because it was dirty money, and he wanted to conceal
16   where it came from and who owned and controlled it.
17          The second illegal purpose of the conspiracy is
18   international concealment money laundering.
19          And that just means that the defendant conspired to
20   move money from a place inside the United States to a place
21   outside of the United States, knowing that that movement was
22   designed in order to conceal, for example, the source or the
23   nature of the money, that it was illegal drug trafficking
24   money, or the ownership and control of the money.  In other
25   words, that the cartel owned and controlled it.

1          Well, you heard Victor Pimentel testify that one of

2     the ways they planned their money was through the creation of

3     LLCs, limited liability companies, which are just a type of

4     company in the Turks and Caicos Islands.

5          You also heard Agent Alex Ascencio explain to you that

6     one of the ways that drug dealers launder money is through the

7     creation of companies like LLCs.

8          The third and final illegal goal is international

9     money laundering to avoid a federal reporting requirement.

10         Now you heard about two federal reporting requirements

11    during the course of this trial.  First, the reporting

12    requirement at banks that individuals who deposit more than

13    $10,000 in cash, when that happens, the bank is required to

14    file a report with the federal government.

15         And also, when individuals leave the country at the

16    bridge with more than $10,000 cash, a report -- they must

17    report that money.

18         You also heard evidence that Mr. Delgado conspired to

19    move money from a place inside the United States to a place

20    outside the United States in order to avoid these requirements.

21         For example, Mr. Pimentel testified that he met with

22    Big John, somebody named Big John, to create an LLC in the

23    Turks and Caicos Islands in order to move the illegal drug

24    money.

25         Why the Turks and Caicos Islands?  Well, Mr. Delgado

1   told him that the Turks and Caicos Islands were in the United

2   Kingdom.  In other words, they're not subject to U.S. banking

3   laws or the U.S. reporting requirements.

4          So by getting the money to the Turks and Caicos, and

5   by moving the money from the United States to the Turks and

6   Caicos, they could deposit it in the financial system and avoid

7   the U.S. reporting requirements.

8          Now, ladies and gentlemen, the judge also instructed

9   you on deliberate ignorance.  Before I conclude, I just wanted

10  to make a few comments about that.

11         As the judge instructed you, knowledge can be inferred

12  if the defendant deliberately blinded himself to the existence

13  of a fact.

14         Well, the Government presented testimony from Victor

15  Pimentel that the defendant knew he was dealing with illegal

16  drugs, because Mr. Pimentel told you that they met with members

17  of the cartel, and he also told you that Marco Delgado himself

18  told him that they were going to be moving for the *Milenio*

19  cartel.

20         But not only that.  Not only did he have direct

21  knowledge, all of the circumstances surrounding him would have

22  indicated that this was drug money.

23         Mr. Delgado testified -- excuse me -- Special Agent

24  Tom Justice testified that Marco Delgado told him that the

25  group that Liliana [sic] de la Concha introduced him to wanted

1   to slow down the extradition of people from Mexico to the

2   United States.  And that when Marco Delgado went and looked up

3   some of those names, he found that they were on the kingpin's

4   designation list.  In other words, they were drug dealers.

5          And he also told Agent Justice that this group of

6   people wanted to move $600 million.

7          Well, ladies and gentlemen, what group of individuals

8   has $600 million to move and wants to slow down the extradition

9   of drug dealers from Mexico to the United States?  Drug

10  dealers.

11         You also heard from Agent Fry, who interviewed Marco

12  after his arrest.  And Agent Fry testified that Mr. Delgado

13  told him about the $600 million, that he didn't know it was

14  drug money, he didn't want to know it was drug money, and he

15  really wanted this deal to go through.

16         But as Judge Briones instructed you, it's not enough

17  to turn a blind eye and put your head in the sand.

18         You may find the defendant had knowledge of a fact if

19  you find that the defendant deliberately closed his eyes to

20  what had otherwise been obvious.  And deliberate ignorance is

21  not a way to escape criminal liability.

22         Ladies and gentlemen, the Government respectfully

23  submits that if you consider the overwhelming evidence that you

24  heard during the course of the trial, and if you apply the law

25  as Judge Briones instructed you, you will reach the only

1    verdict consistent with the law and the evidence, that

2    Mr. Delgado is guilty.

3          THE COURT:  The Government has 18 minutes left in

4    their final argument.

5          And we're not going to be able to hear them all,

6    ladies and gentlemen of the jury, so we might as well take a

7    break right now.

8          We'll be in recess for the next 15 minutes.

9          (Recess taken; open court; jury present.)

10          THE COURT:  You may proceed, Mr. Velarde.

11          MR. VELARDE:  May it please the Court, Counsel, ladies

12    and gentlemen.

13                      CLOSING STATEMENT

14    BY MR. VELARDE:

15          On behalf of myself personally, Mr. Esper, and

16    Mr. Delgado, I would like to extend to you my heartfelt thanks

17    for your service, your patience, and your attention to the

18    matters that you have heard for the last week.

19          Now that you have heard at least part of the

20    prosecution's closing argument, it is my honor and privilege to

21    address you as one of Mr. Delgado's co-counsel defense

22    attorneys.

23          After my brief summation, I will relinquish the

24    remainder of my time to Mr. Esper, who will touch upon other

25    matters that we believe will help you in your deliberations.

1          The law affords us the opportunity to advance our
2    theory of the case by arguments.
3          However, because this case has been so long and
4    arduous, I believe that I will refrain from arguing the facts.
5    Rather, what I want to do is kind of summarize some of the
6    facts that we believe will help you in your deliberations.
7          We believe that it's very essential that we separate
8    the nonessential from the essential.  And I want to leave you
9    with some thoughts so that hopefully these thoughts will
10   crystalize in your minds and you will take them back into the
11   jury deliberation room as you deliberate the case.
12          My review of the evidence is not completely devoid of
13   motive.  My motive is to challenge the accusation and highlight
14   the evidence which we believe adequately shows that the
15   Government has failed in its burden to show that Mr. Delgado is
16   guilty beyond a reasonable doubt, as charged in the Indictment.
17          The law says that you are the sworn protectors, a
18   shield, if you will, for a person who is accused, until you
19   reach that point where you have been convinced with regards to
20   each and every element of each and every charge that
21   Mr. Delgado is guilty beyond a reasonable doubt.
22          If there is a close call, you are required to resolve
23   it in favor of Mr. Delgado.
24          You don't accept what the prosecutor gives you.  It is
25   your job to look at the evidence, to weigh it, to sift it, to

1   examine it, always keeping in mind that Mr. Delgado is presumed

2   innocent.

3        The Government has the burden in this case, as the

4   Court has already told you, of convincing you beyond a

5   reasonable doubt that Mr. Delgado is guilty as charged.

6        This is not a mere saying, something that we talk

7   about very lightly.  Because in imposing that duty upon you as

8   jurors, the law takes into account the fact that in a criminal

9   trial, before one's life and liberty is placed in jeopardy, the

10   Government must satisfy the burden and must prove their case to

11   the point where you, before convicting Mr. Delgado, must be

12   able to say to yourselves, after an analysis of the evidence or

13   an analysis of the lack of evidence, that you have an abiding

14   conviction of his guilt.

15        However, you must acquit Mr. Delgado if you have a

16   reasonable doubt concerning his guilt.

17        I use the word "must" because that is what the judge

18   has told you.  But beyond this matter of legal duty, logically,

19   you should acquit Mr. Delgado if there is any lingering doubt

20   that would make you pause or halt.

21        You only need one reason.  And I will review the

22   evidence with you and point out many doubts created by the

23   evidence, any one of which is based on reason —— any one of

24   which is the reasonable doubt that shields Mr. Delgado from

25   conviction.

1          On September the 4th, 2004 [sic], the Carroll County

2    Sheriff's Department carried out a routine traffic stop of a

3    vehicle that was being operated by Victor Pimentel.

4          Prior to the sheriff stopping this vehicle, the deputy

5    testified he had no earthly idea that this money [sic]

6    contained money and/or proceeds of any unlawful illegal

7    activity.

8          In the course of his investigation, Mr. Pimentel

9    volunteered that he had money, that he had a million dollars in

10   the back of his car.

11         So Mr. Pimentel was ushered out of the car.  He was

12   handcuffed.  But immediately upon him saying that he was going

13   to cooperate, they took the handcuffs off.  They allowed him to

14   drive the car, and they drove him down to a substation where

15   members of the Immigration and Customs Enforcement were already

16   present.

17         Mr. Pimentel was debriefed at length about the

18   activities that he had undertaken while in Atlanta.  He

19   described the two individuals that gave him the money, as well

20   as Pedro Meneses and Isidro Rubio.

21         Then he also told him that he was en route to El Paso

22   to deliver the money to Mr. Delgado.

23         At that point, it's very important for you to know

24   that Mr. Pimentel was coached and told what to do in terms of

25   these phone calls that he was placing to Mr. Delgado, and those

1    phone calls are in evidence.

2           And in these phone calls, ladies and gentlemen, you

3    will not hear Mr. Delgado acknowledging that he has any

4    knowledge that this money represents the proceeds of any

5    illegal activity.

6           These are controlled phone calls, and it's mindful

7    that you take that into account, because they had the advantage

8    over Mr. Delgado and they didn't solicit -- they didn't obtain

9    that information through those phone calls.

10          Now, there's a controlled delivery here in El Paso.

11   And again, when Mr. Delgado and Mr. Pimentel come together,

12   there is nothing objective that you can rely on to establish

13   that Mr. Delgado knew that the proceeds represented some funds

14   from illegal activity.

15          When Mr. Delgado is placed under arrest, he is then

16   taken to ICE or DPS, one or the other.  But he was in custody,

17   so to speak.

18          When he's taken there, again Mr. Delgado agrees to

19   cooperate.  So he was debriefed extensively, extensively, by

20   Agent Tom Justice and Agent Jose de Jesús.  And there, he was

21   instructed on how to follow up on his cooperation.

22          Part of the cooperation that he originally ruled out

23   was that he offered -- at their request, of course -- to place

24   a phone call to Pedro Meneses and to lure Mr. Meneses down to

25   El Paso, where Mr. Meneses and Mr. Rubio showed up.

1          And then the following day a second delivery was -- a
2    controlled delivery was made to them and they were arrested.
3          So following their arrest, Mr. Delgado again gets
4    coached on what to do to confront these two individuals, which
5    he did.
6          And ultimately what happened was that these two
7    individuals who have now been recognized, okay?  They have
8    pictures of them and so forth.  These two individuals are now
9    set free.  Nothing happens to them.
10          Mr. Delgado, in the meantime, the following day he
11    made a series of phone calls.  By my count -- and they're in
12    evidence -- he made approximately six phone calls.  Counsel for
13    the Government has shared one of the transcripts with you.
14          Ladies and gentlemen, those phone calls were staged,
15    because Mr. Delgado was coached on how to talk to Lilian de la
16    Concha, Jesús Chuy Rubio, and others involved with the -- with
17    the group.
18          Whatever was talked about in those discussions, ladies
19    and gentlemen, I submit to you, were part of a ruse that
20    Mr. Delgado was instructed to follow through with in order for
21    his cooperation to be honored.
22          So, so much for those conversations.
23          Agent Ascencio, by the way, when he testified for an
24    hour -- a little over an hour up here -- he testified to the
25    fact that he was here in El Paso.

1          And in response to Ms. Kanof he kept saying, No, I
2  never said that.  I never told him to say that.  I never told
3  him to say that.
4          Well, when it came time for cross-examination, lo and
5  behold, the first thing that came out of the batter's box was,
6  You were not present in El Paso on those dates when those phone
7  calls were made to Mexico from El Paso.
8          And he acknowledged, Yes, I wasn't here.
9          So much for the testimony that Agent Ascencio shared
10  with you about what he did with Mr. Delgado, because he wasn't
11  here.
12          The person that was here was Agent Tom Justice, the
13  case agent in the case, whose ultimate objective was to take
14  this investigation back to Atlanta, because that's where the
15  case originated after all.
16          And there, ladies and gentlemen, starts the problem
17  with this investigation, as Agent Justice testified, the left
18  hand not knowing what the right hand was doing.
19          Let's cut to the chase.  That's what happened.
20          So Mr. Delgado is then instructed to go to Atlanta,
21  where he again is debriefed extensively, not only by Tom
22  Justice, but also by his colleague, Agent Ascencio.
23          Agent Ascencio, by all accounts, is a very
24  well-trained, experienced, skilled undercover agent.  As a
25  matter of fact, he teaches.  So he took it upon himself,

1    because he's a Spanish speaker, to be the one in the lead.

2              The first phone call, or among the first phone calls

3    that were placed, were to Paco Fernandez.  Again, it's very key

4    that you hone in on that conversation.  Because at no time --

5    at no time in that conversation did Paco Fernandez acknowledge

6    that the money involved here in this case involved the proceeds

7    of specified unlawful activity.

8              Following the introduction by Mr. Delgado,

9    Mr. Ascencio -- Agent Ascencio took over.  And he testified to

10   the fact that he carried out 20 additional phone calls.  20

11   additional phone calls which are not in evidence, but he did

12   testify (indicating) that he did 20 phone calls from the time

13   period of -- I believe that was 9/14 -- September the 14th to

14   approximately October the 1st.  So for 17 days he called these

15   individuals that he was gradually working up.

16             None of these individuals, I submit to you, in any

17   way, shape, or form acknowledged that the proceeds involved in

18   this case represented monies involved -- or that originated

19   from specified unlawful activity.  Had that been the case,

20   ladies and gentlemen, you would have heard that.  That wasn't

21   the case.

22             The last thing that happened, as per Agent Ascencio's

23   testimony, was that he had a face-to-face meeting with Pedro

24   Meneses-Mendoza and Chilo Isidro Vega in McAllen.

25             That conversation is not in evidence, even though he

1  testified -- my belief is that it was recorded.  But you don't

2  have it.  We don't have it.

3        The fact is, again, in that face-to-face conversation

4  nothing to acknowledge that these funds represented proceeds

5  from illegal activity came about.  Had that been the case, I

6  can assure you Agent Ascencio would have testified to that, and

7  he didn't testify to that.

8        What he did testify is that he gave up -- he gave up

9  with the investigation because he thought that he had been

10  compromised.  He did not articulate one single good reason to

11  support his belief that he had been compromised by either

12  Mr. Delgado and/or Pedro Mendoza-Meneses or Isidro Rubio.  He

13  didn't.  He just said, I felt like I was compromised, so I

14  distanced myself.

15        Now, there was testimony that because this case was

16  being handled out of Atlanta, Mr. Delgado kept in contact with

17  Atlanta.  He placed a lot of phone calls over there.  And it's

18  very important that you bear that in mind, because they're

19  going to come into focus later on when we have the situation

20  that took place up in Chicago.

21        Indeed, there was an event that took place up in

22  Chicago.  And again -- again, Mr. Delgado was recorded on these

23  phone call conversations.  But before they recorded Mr. Delgado

24  they also recorded Ricardo Martinez.  That's Mr. Martel's real

25  name, Ricardo Martinez.

1           MS. KANOF:  Objection, Your Honor, outside the

2    evidence.  Everybody said they didn't know who he was.

3           THE COURT:  I'll sustain the objection.  No evidence

4    to that.

5           MR. VELARDE:  Mr. Martel, in any event, ladies and

6    gentlemen, was arrested.  He was arrested, and he was arrested

7    in connection with the activities that were testified about.

8           And despite the fact that that was the case, no

9    information was developed from him regarding the allegations in

10   this case.  Had that been the case, ladies and gentlemen, you

11   would have heard it from Agent McCabe.

12          Now with regards to the conversations themselves, the

13   ones involving Mr. Delgado and Mr. Pimentel, there is no

14   mention, absolutely no mention, that these are proceeds of

15   illegal activity.

16          And mind you, Victor Pimentel -- this is the second

17   go-around for him, so to speak.  Because in September, just 10

18   months -- yeah, 10 months before, he was coached by Agent

19   Justice to make these phone calls to Delgado.  And so this is

20   one time, again, they coached him.  They coached him every time

21   that he would call up Mr. Delgado.

22          Again, that is the most objective piece of evidence

23   that's going to be before you.  There's no reference to any of

24   this money originating from any illegal activity.  That

25   happened in July 2008.

1       And then Mr. Delgado was brought into ICE offices, not

2   in Atlanta, but here in El Paso.

3       Incidentally, by the way, before -- with regard to the

4   phone calls that Mr. Delgado was placing to Atlanta, you heard

5   Victor Pimentel testify that he, too, reached out to Agent

6   Justice.  And Agent Justice did not -- basically didn't react

7   to the call.

8       Why?  We subsequently learned because he was fixing to

9   transition from Atlanta to another field office.

10      Mr. Delgado also called up Agent Justice.  Agent

11  Justice testified to that.

12      Now, he did also call up Agent Ascencio.  Now Agent

13  Ascencio, without ever having written a report about these

14  contacts, as minimal as they were in his eyes, he never

15  documented those phone calls.

16      Those phone records that are in evidence don't lie.

17  Again, that's the most objective piece of evidence you'll have

18  to support Mr. Delgado's representation to you that he did have

19  contact with them days before the pickup and on the day of the

20  pickup.  Agent Ascencio did not take any action.

21      Now, fast-forward to December 2008.  There was a

22  meeting, a meeting that was set up by local -- the local ICE

23  office, because Victor Pimentel told them that Mr. Delgado's

24  life had been put in jeopardy, that there was a threat made.

25  Ironically, that threat had been made two months before, in

1   October.

2          And that's also very key, ladies and gentlemen.

3   Because when I asked Mr. Pimentel -- or when Mr. Pimentel was

4   asked about that he said, The reason I didn't call ICE that

5   Lilian de la Concha was here was because I was no longer

6   cooperating with ICE.

7          THE COURT:  Three-minute warning, Mr. Velarde.

8          MR. VELARDE:  And that's very key.  Because if he

9   wasn't cooperating, how can he explain the fact that he was now

10  a witness for the Government?

11         He single-handedly was the main author, the main

12  sponsor, behind these famous e-mails, e-mails that he kept all

13  these years and gave to ICE.

14         But now he came into court, and he gave it a spin.  He

15  gave it a sinister spin, and in the process, implicated Lilian

16  de la Concha.

17         Well, if Lilian de la Concha was a party to this

18  conspiracy, then how does he explain his cavalier attitude

19  about not following through with his cooperation and -- in

20  calling up ICE?

21         Not that anything would have happened, because Agent

22  Fry did testify, Lilian de la Concha has been coming here to

23  the United States, so nothing has ever happened to her.  Okay?

24         And as far as we know -- well, Victor Pimentel -- not

25  Victor Pimentel -- Pedro Mendoza-Meneses, he was allowed to go

1   back.  Chilo Vega, likewise.

2          Nobody -- but nobody that theoretically, or as a

3   practical matter, should know about what was going on with this

4   group has been able to provide any testimony except for Victor

5   Pimentel.  And I submit to you Victor Pimentel has something to

6   make of this.  He's here on a nonimmigrant visa pursuing a

7   Ph.D.

8          What he did back in September of 2007 would have been

9   not only grounds to prosecute, but also to expel out of the

10  country.  To this day, this man is still here with this student

11  visa.  Plus, in spite of the fact that he denied it, he was

12  paid.  He was paid for his involvement in this investigation.

13         So I urge you, when you look at this instruction --

14  when you look at the jury instructions, look at that specific

15  section that pertains to informers.  The instructions are very

16  clear.  You're supposed to handle the testimony of an informer

17  very carefully.

18         Thank you very much.  I will relinquish the remainder

19  of my time to Mr. Esper.

20         MR. ESPER:  May it please the Court, Counsel,

21  Ms. Kanof, Ms. Arreola, ladies and gentlemen of the jury.

22                      CLOSING STATEMENT

23  BY MR. ESPER:

24         I don't have much time to argue, so I will try to be

25  as concise as I can be.

1          His Honor tells you in his Court's Charge a number of

2     things, one of which is that you are the judges and the -- the

3     sole judges of the credibility and the believability of the

4     witnesses in this case and the reasonable inferences to be

5     drawn from that evidence.  That is your decision to make alone.

6     Nobody else can influence you, and you are the ones who are to

7     decide what is the credible believable evidence in this case.

8          Now, you can consider all evidence that was presented

9     so long as you believe it's credible or the reasonable

10    inferences to be drawn from that evidence are credible.

11         And in that vein, ladies and gentlemen, I'd ask you to

12    look at some things that support that this really isn't a money

13    laundering activity involving proceeds of drug distribution,

14    because that's what the Government has to prove.

15         They have to prove that this was a conspiracy to

16    commit money laundering and that the funds were derived from a

17    specified unlawful activity, and that is the conspiracy to

18    possess with intent to distribute controlled substances.

19         Now think about this, first of all, with respect to

20    money laundering and the specified unlawful activity of drug

21    distribution or a conspiracy to do it.

22         Is it reasonable to infer that the wife or the ex-wife

23    of the President of Mexico -- the President of Mexico -- is

24    involved with drug dealers?  I mean, how reasonable is it to

25    infer that, ladies and gentlemen?

```
 1              How reasonable is it to believe that Lilian de la
 2     Concha is involved with drug traffickers?  There's no evidence
 3     that that's the case.
 4              Now, we've heard all this nonsense.  We've heard all
 5     the hoot and hollering about drug cartels, Miliano [sic]
 6     cartels.  What evidence is that there was cartels and that she
 7     was the connection to them?  How believable is that, ladies and
 8     gentlemen, that the former First Lady of the Republic of Mexico
 9     is tied in with this sinister drug trafficking organization?
10     It doesn't make any sense.  And that's why Mr. Delgado's
11     testimony does make sense.
12              Number two, the amount to be laundered, $600 million.
13     How reasonable is that to believe, ladies and gentlemen?
14     That's almost the entire budget of the United States of
15     America.  That's assuming Congress gets around to even passing
16     a budget.
17              MS. KANOF:  Your Honor --
18              MR. ESPER:  But, ladies and gentlemen --
19              THE COURT:  I'll sustain the objection.
20              MS. KANOF:  Thank you.
21              MR. ESPER:  600 --
22              MS. KANOF:  I wish, Your Honor.
23              MR. ESPER:  600 million, ladies and gentlemen.  That's
24     absurd to believe that that kind of money is being involved in
25     this drug conspiracy.  I mean, they're throwing out numbers
```

1    like it's lunch.

2              Third, who is the person that says that this is drug

3    proceeds or that this is a money laundering operation?  Victor

4    Pimentel.

5              This is a guy, ladies and gentlemen, who is -- who

6    lies about having received money in connection with this -- the

7    investigation in this case.

8              He lies -- he's able to fool people as to being a

9    person that he's not.

10             He commits a number of falsehoods.  He lies about --

11   initially about his cousin, you know, Ready or whatever his

12   name was -- Mr. Isaac Ochoa.  He lies about his involvement.

13             But now that he believes that his cousin can't be

14   prosecuted, Oh, yeah, by the way, he was involved.

15             And think about this, ladies and gentlemen.  If this

16   is a real money laundering organization that is sophisticated,

17   how sloppy -- how much more sloppy could this be?

18             Victor Pimentel, working for a drug trafficking

19   organization, goes to Atlanta, Georgia.  I mean, he's in the

20   heart of Dixie with Mexican plates.  He's driving a vehicle

21   with Mexican plates, and he's carrying around this money with

22   him.  He might as well put a neon sign on his vehicle as he's

23   driving through the south saying, Stop me, police.  I'm doing

24   something wrong.

25             I mean, think about that.  That's absurd that he is

1   involved in drug trafficking and in money laundering.

2          Now what the evidence must show, ladies and gentlemen,

3   beyond a reasonable doubt, is that, number one, there was a

4   conspiracy to engage in money laundering.

5          And His Honor, on page 19, tells you -- gives you the

6   definitions of what a conspiracy is.  And basically, a

7   conspiracy is an agreement entered into by Mr. Delgado with at

8   least one other person to violate the laws.

9          It's kind of a partnership in crime.  But you must

10  intentionally and knowingly enter into that agreement to

11  violate the law.

12         His Honor tells you, on page 19 of the instructions,

13  that a person does not become a member of a conspiracy even

14  with knowledge that a crime is being committed -- even with

15  knowledge that a crime is being committed -- or the mere fact

16  that certain persons may have associated with each other.

17         And a person who has no knowledge of a conspiracy, but

18  who happens to act in a way which advances some purpose of a

19  conspiracy, does not thereby become a member of a conspiracy.

20         So a person who may act consistently with something

21  that is illegally going on does not, therefore, become a member

22  of a conspiracy.

23         So first, you must find that Mr. Delgado, the

24  Government's evidence, and considering his evidence as well if

25  you believe it, shows beyond a reasonable doubt that he joined

1  in a conspiracy intentionally and knowingly and he was a
2  participant in this unlawful purpose.
3          Now, what was the purpose of the conspiracy?  And that
4  was to engage in money laundering.
5          Now, His Honor has read you the jury's instructions,
6  and that is the law as it applies to this case.
7          Now very candidly, I think the law on money
8  laundering -- some of you may go back into that jury room and
9  say, Gosh, what in the world does all this mean?  Because
10  there's three different theories that the Government has
11  alleged that money laundering was committed.
12          And I'm going to try to make it as simple as I can.
13  And again, I'm not trying to misinterpret what the law is.  His
14  Honor has given you the law.  You read it when you go back into
15  that jury room.
16          But the three different theories that the Government
17  has alleged is -- number one is basically money laundering.
18          And the overriding elements that must be proved beyond
19  a reasonable doubt are knowledge.  The person who engages in
20  money laundering must have knowledge, must know that he or she
21  is engaging in that particular crime, that he has entered into
22  a conspiracy to commit that crime.
23          Without knowledge being proven beyond a reasonable
24  doubt a person is entitled to be found not guilty.
25          But Part A of this conspiracy to engage in money

1    laundering involves an attempt, or the actual -- to conduct a

2    financial transaction knowing that the proceeds of the unlawful

3    activity is derived from a conspiracy to possess with intent to

4    distribute controlled substances.

5              And, number three, that there's an attempt to conceal

6    or disguise the source of the income.

7              Well, I submit to you, ladies and gentlemen, Part A

8    doesn't apply.  The elements have not been proved beyond a

9    reasonable doubt because there was no financial transaction

10   that was conducted either on September the 7th or on July 22nd

11   or 23rd with the intent to conceal or disguise the source of

12   the funds, and knowing that the funds were derived from a

13   conspiracy to possess with intent to distribute controlled

14   substances.

15             Part B involves what is known as international money

16   laundering by concealment.  And Part B involves -- again, a

17   person must act with knowledge that the funds are derived from

18   specific unlawful activity, a conspiracy to possess with intent

19   to distribute a controlled substance, and there's the -- and

20   the person is concealing the source of the funds.

21             Now the Government has told you, Ah, well, there's

22   obviously concealment of the source of these funds by this

23   e-mail about this phony document.

24             But the evidence still must show, ladies and

25   gentlemen, that Mr. Delgado was a knowing participant in

1    attempting to -- or engaging in money laundering for the

2    purpose of concealing the source of the funds.

3            Again, ask yourself what -- is this man, who's a

4    licensed attorney, going to be involved with a woman, the

5    former First Lady of the Republic of Mexico --

6            MS. KANOF:  Your Honor, I'm going to object.  She was

7    never the first lady.  They were divorced before he took the

8    presidency, and there was no evidence.

9            THE COURT:  I'll sustain the objection.

10           MR. ESPER:  The former wife of Vicente Fox, who was

11   President of the Republic of Mexico from 2000 to 2006.  Is it

12   reasonable to infer, ladies and gentlemen, that this woman is

13   going to be involved with drug traffickers and money

14   laundering?  Is it reasonable to infer -- and that she's going

15   to -- and that Mr. Delgado is going to involve her -- himself

16   with her in that type of activity?

17           Finally, the Part C, ladies and gentlemen -- and I

18   submit to you that is the part that is the most -- easiest to

19   resolve.  And that is international money laundering with the

20   intent to avoid a reporting requirement.

21           Reporting requirement means that you're trying to take

22   money to a bank and conceal the bank from reporting that money.

23   So you structure the money in less than $10,000 when you

24   deposit it so that the bank doesn't fill out a form asking you,

25   Okay.  Who are you?  Let me see some identification.  That

```
1    triggers information being sent to law enforcement.

2           Or the other reporting requirement is, when you leave

3    this country or when you come into this country if you have

4    more than $10,000 in cash you have to declare it.  You have to

5    fill out a form.

6           When you're leaving this country -- not just when

7    you're coming into this country, when you're leaving as well --

8    you've got to fill out a form.

9           There's been no evidence, ladies and gentlemen, other

10   than Victor Pimentel saying, I'm going to -- I am going to

11   drive this to Colima, Mexico -- there's no evidence that that

12   took place, that there was the intent to avoid the reporting

13   requirements either of a bank or to U.S. Customs -- or Customs

14   and Border Protection or Homeland Security, whatever the agency

15   is, that you're supposed to fill out the form.  So Part C

16   does -- likewise, does not apply.

17          Ladies and gentlemen, there's an instruction that the

18   Court gives you called unanimity of theory.  And what that

19   means -- it sounds kind of complicated.  But what it means is

20   the Government has alleged three separate types of money

21   laundering that I've just talked to you about.

22          If you are to find the elements of a conspiracy to

23   engage in money laundering, you must also find beyond a

24   reasonable doubt which theory, one or all of them -- it doesn't

25   have to be all three.  It can be one or more -- but you have to
```

1   be unanimous and you have to be convinced beyond a reasonable

2   doubt which one it is.

3          So for example, if five of you say, Oh, I think it

4   was -- I think the defendant's guilty of having engaged in

5   money laundering that's alleged in Part A, and six of you say,

6   No, I think it's the one that's alleged in Part B.

7          If you can't unanimously agree on one or both, then

8   you have to acquit the defendant.

9          Now, that may sound paradoxical, because you might be

10  thinking, Well, gosh. I just thought -- I found that he's

11  guilty. We just can't agree on which one it is.

12         Well, if you can't agree beyond a reasonable doubt,

13  the law says you have to acquit. You have to find not guilty,

14  because there has to be unanimity in the theory of money

15  laundering as to one or more than one. That has to be

16  unanimous. You cannot be split as to, I thought he committed

17  this, Part B. I thought he committed Part A, unless all of you

18  believe it, all 12 of you believe it.

19         And I submit, ladies and gentlemen, just as I've

20  explained, that the evidence does not show that these are funds

21  derived from the -- a conspiracy to possess with intent to

22  distribute a controlled substance.

23         Now, the Government has used some evidence -- or has

24  elicited some evidence and has made a lot to do about

25  statements made by Mr. Delgado.

1          And, ladies and gentlemen, one of the things that is
2     troubling -- and you may find it troubling, I don't know.
3     Maybe you don't.
4          But one of the things that's troubling is, why are
5     these statements not recorded so that ladies and gentlemen of
6     the jury, when they sit on a case and there's a dispute -- and
7     there was a dispute in this case as to what the agents said
8     Mr. Delgado said and what Mr. Delgado said he told the agents.
9     There is a dispute.
10          But you know, ladies and gentlemen, even a dinosaur
11     like myself knows how to record a statement in a matter of
12     seconds.  I mean, you see it all the time, every day in our
13     lives.  You have a cell phone, you have some kind of a
14     recording device and, bam, you record the statement.
15          And that way, when a case comes to court and you as a
16     jury are sitting here and there's a dispute about what was
17     said, what was asked, what was answered, there wouldn't be a
18     problem.  It would be easy for the jury.  And your function is
19     to determine whether guilt has been proven beyond a reasonable
20     doubt.  It would be very easy for the statement, for the
21     recording, to be played.  Bam, there it is.
22          But I submit, ladies and gentlemen, that they're not
23     recorded because who is the jury reasonably going to believe?
24     The argument the Government makes and may make in this case, I
25     don't know.  I don't know what Ms. Kanof will argue.  She's a

1    very articulate and powerful speaker.

2            But what the Government many times argues is, Who are

3    you going to believe, this fine law enforcement agent or the

4    accused, the defendant?  It's always the credibility of an

5    accused versus a law enforcement agent.  And the Government may

6    argue a law enforcement agent isn't going to lie, but the

7    defendant sure has a motive to lie.

8            That's one of the reasons I submit why not have these

9    recordings, so that you can find out what the truth is?

10   Because very candidly, I wouldn't want my credibility -- I

11   don't think any one of you would want your credibility, if

12   you're an accused, pitched against a law enforcement agent.  I

13   mean, they're law enforcement agents.

14           And on top of that, I mean, look at Mr. Fry.  It looks

15   like he -- you know, he looks like a choirboy.  I mean, how can

16   you not believe him?  I mean, just look at him.  He looks

17   totally honest.

18           That places the accused at a disadvantage, ladies and

19   gentlemen.  And if you have a recording and it's there, there's

20   no doubt as to who said what, who asked what, who answered

21   what.

22           If Mr. Delgado was asked, Oh, yes, do you know

23   Mr. Quezada, this drug smuggler?

24           Oh, yes, I know who he is.

25           He says, No, I wasn't.

1          If it's recorded, it's there.  Nobody can come in and

2     say, I didn't say that.  It's on the recording.

3          But the Government chooses not to do that for the very

4     reasons I submit, and it's reasonable to infer, those are the

5     reasons.

6          Ladies and gentlemen, all of this evidence, before you

7     can convict, you must be convinced beyond a reasonable doubt

8     that the defendant knowingly participated in a conspiracy, he

9     knew that the funds were derived from the specified unlawful

10    activity, which is a conspiracy to possess with intent to

11    distribute controlled substances.

12         Now, His Honor gives you a definition of reasonable

13    doubt.  And I would submit to you, ladies and gentlemen, that

14    reasonable doubt is the consideration of all of the credible,

15    believable evidence in this case and the reasonable inferences

16    to be drawn from it in helping you to arrive at that verdict.

17         So if you look at this pointer that I have, and you

18    judge that evidence, if you use this pointer as a spectrum and

19    all of the credible, believable evidence in this case falls

20    where I have my right thumb and index finger, we're going to

21    mark this point innocent.

22         If that evidence falls at this point and to the right

23    of it, then your verdict is very simple.  Not guilty.  Because

24    if it's innocent, you're not guilty.

25         Where I have my left thumb and index finger, we'll

1    mark this point guilty beyond a reasonable doubt.  If the

2    Government's -- if all the evidence and the reasonable

3    inferences fall at that point and to the left, then the

4    Government has satisfied their burden, the unanimity of theory

5    is clear, and the defendant would be guilty.

6         But there is an area in between these two areas.  And

7    this is an area, ladies and gentlemen, that is a gray area.

8    It's an area of not guilty.  It's an area where you may say,

9    Wait a minute.  This guy had to have known, or surely he knew,

10   or he probably knew, or he probably had knowledge.  He must

11   have had knowledge.

12        But it doesn't get to this point of guilt beyond a

13   reasonable doubt.  And that is what you, the ladies and

14   gentlemen of the jury, must find.  You must find beyond a

15   reasonable doubt that this defendant entered into a conspiracy,

16   that he knew of its unlawful nature, that he knew the funds

17   were derived from a specified unlawful activity; that is,

18   conspiracy to possess with intent to distribute a controlled

19   substance, and that he was a knowing participant and that the

20   unanimity of theory is clear.

21        I submit to you, ladies and gentlemen, give this

22   careful consideration.  And after your deliberations, I hope

23   that you come back with a verdict of not guilty as to Count 1.

24   Thank you for your time.

25        MS. KANOF:  May I borrow your pointer?

1              MR. ESPER:  No, you may not.

2              THE COURT:  I have one, if you want mine.

3              MS. KANOF:  I think I can do it without it, Judge.

4              THE COURT:  You have 18 minutes, Ms. Kanof.

5              MS. KANOF:  May it please the Court, Counsel for the

6    Defense, Co-counsel, Anna Arreola.

7                        CLOSING STATEMENT

8    BY MS. KANOF:

9              He didn't want me borrowing his pointer because he

10   misstated the law to you.  The law's in here.

11             Because he put beyond a reasonable doubt at the very

12   end.  But the Charge specifically says the Government's burden

13   is not beyond all possible doubt.  There really needed to be

14   something sticking out there.

15             The judge defined reasonable doubt.  Reasonable doubt

16   is based in reason and common sense.  And when you go into that

17   room, please take your common sense, because the Defense's case

18   makes absolutely no sense.  It's not common sense.  It's

19   nonsense.

20             When the defendant was on the stand I asked him, Isn't

21   it true, Mr. Delgado, that you told Lilian de la Concha that

22   you were dying of cancer and that your wife, your former wife,

23   had leukemia?

24             And his response was, quote, That is a blatant lie.

25             Well, then we had Government's Exhibit Number 99, all

1   the e-mails that Liliana Narvaez had, because de la Concha sent

2   them to her, where he's talking about how sick he is, and he

3   just has one more treatment in Houston.

4            Ladies and gentlemen, that's what this case is about.

5            Now -- Government's Exhibit 99.

6            Let's take a look at another blatant lie.

7            Government's Exhibit Number 82, the 2008 personal tax

8   returns of the defendant.  He tells you that the Remcon office

9   was his home.  Can you imagine what the IRS would do to any of

10  us if we put down our office and they found out -- you know,

11  there's also business tax returns.  So you know, that it was a

12  virtual office, that he rented communal space.

13           And when I asked his ex-girlfriend, ex-fiancée, Could

14  he sleep there?

15           She said, Only if you want to sleep on the floor of a

16  conference room.

17           Remember he told you, It was my home because I slept

18  there sometimes.

19           The defendant -- I don't really think that's what the

20  IRS means.

21           Then the dollar amount.  He reports $52,000 of income,

22  which is a decent income, in 2008.  And when asked about it, it

23  is either -- it either has, is in the process, or is going to

24  be corrected.

25           Well, really?  What's wrong with it?

1          Well, I made up to 200,000.  I think he said a couple

2   hundred thousand more than that.

3          How is that an accident?  A tax preparer only puts in

4   a tax return what you tell them and show them about your money.

5          You know the truth is a funny thing, ladies and

6   gentlemen, because the truth doesn't change.  It is constant.

7   It stays the same.

8          And what Mr. Esper spent like five minutes doing is

9   something called jury nullification.  Ignore all the evidence

10   and be mad at the Government because ICE has a policy that they

11   don't record confessions.

12          Well, your duty is not to judge the manner in which a

13   case was investigated.  It's to look at the evidence and

14   determine whether or not it happened.

15          The defendant -- or Mr. Esper, when he was giving you

16   the pointer, also misstated what "knowing" means.  Knowing is

17   also -- and the judge tells you -- something known as

18   deliberate ignorance.  You absolutely know what it is, but you

19   turn a blind eye.

20          I don't really even think we have that in this case.

21   But, ladies and gentlemen, as Tom Cruise said in *Jerry Maguire,*

22   "Show me the money."

23          Government's Exhibits 47 and 74, which turned out to

24   be reverse numbers, but the same numbers.  Really?  This is

25   inheritance money in 5s, 10s and 20s?  Or bond money in 5s,

1   10s, and 20s wrapped exactly like construction money, with two

2   rubber bands and shrinkwrapped in bundles?  That's absurd.

3           But the most absurd part about it is which direction

4   the money was going in.  Because if this was inheritance money

5   and they wanted to preserve it, it would be coming out of

6   Mexico, not going into Mexico.

7           If this was construction money, where they were going

8   to pay for building something in the United States, it would be

9   going out of Mexico to pay for the U.S. construction, not going

10  into Mexico.

11          Interestingly enough, Mr. Velarde made a comment.  He

12  summarily dismissed all of the conversations that Mr. Delgado

13  taped and said he was staged.

14          The seminal piece of evidence, one of the most

15  important pieces of evidence in this case is Government's

16  Exhibit Number 58, a 33-minute conversation with Paco.  Because

17  the incriminating information doesn't come from the defendant,

18  it comes from Paco.

19          And I'm going to talk about that a little bit more.

20  But Paco talks about the death threats.  Have you ever heard --

21  again common sense or nonsense -- people being killed because

22  they lost $50,000 in construction money or any kind of bond

23  money or inheritance money?

24          Again, what's inheritance money doing in the

25  United States?  Don't you sort of inherit it because you own

1    something in Mexico?

2              But lies -- lies, they change.  And Ms. Arreola showed

3    you a couple of examples where in direct, to defense counsel,

4    Mr. Delgado made one story, and then when he was cross-examined

5    he made another story.

6              Lies are something that sometimes it's hard for people

7    to keep straight.  Reasonable doubt is not doubt beyond all

8    possible -- it's not beyond all possible doubt.

9              Now, Jose Quezada.  He tells Josh Fry that Lilian

10   introduced him to her cousin-in-law, Jose Quezada.  And it's

11   written in Josh's report.

12             They want you to believe that Josh made that up out of

13   his own head back in 2012, when the defendant was arrested, and

14   put that in the statement when we -- and he also said he and

15   Lilian and Quezada, you know, decided to move this money.

16             And then we find out that, well, in fact, Quezada was

17   at one time her cousin-in-law, because Vicente Fox's real last

18   name is Vicente Fox Quezada.

19             And nobody is saying the former president of Mexico

20   was involved in drug dealing.  But Concha said that he was a

21   very powerful man.  And the defendant said, And if anybody was

22   a drug trafficker that I've ever met, it was him.

23             Now, Pedro Mendoza-Meneses, a very important key in

24   this case.

25             One of the theories is concealment, and of course the

1    interstate and that kind of stuff.

2            How is it that seven months after Ms. Narvaez and the

3    defendant start seeing each other that Pedro Meneses wire

4    transfers money from a *casa de cambio* in Mexico to the

5    defendant's girlfriend's account?

6            That's money laundering.  It conceals the source of

7    the money.  It takes it through somebody's account who's not

8    involved, just like the $45,000 went into Nevarez's [sic]

9    account.

10           How does this account have her number for her bank

11   account seven months after -- she never met him.  She didn't

12   know who he was.  She saw that deposit, had no idea where it

13   came from.  That's money laundering.

14           Now -- and so is just transportation of money.  Look

15   at the definition of money laundering and of the financial

16   transaction.  It doesn't have to go through a bank, but in this

17   case it did.

18           Who is Pedro Mendoza?  In the e-mails he's called the

19   *contador*.  But the defendant refused to say that without saying

20   *publico*, because he wants you to believe that this man was the

21   accountant of a very powerful labor leader who, by the way, his

22   name, you never see anywhere.  Not in a phone call, not in an

23   e-mail.  That's him trying to insinuate himself into legal

24   conduct by taking this person and associating him with legal

25   conduct.

1                 And he calls him over and over and over, CPA.

2                 Does a CPA transfer money into somebody else's account

3       when he doesn't even know who it is?

4                 Does it make sense that the CPA of a wealthy labor

5       leader would come to El Paso to pick up a million dollars in

6       cash with his cousin, because it is he that is arrested.  What

7       CPA for a legitimate labor leader can even be lured -- and he

8       wasn't lured to El Paso.  I know the defendant wants you to

9       believe that -- but can even be lured to come pick up money?

10      Because remember, DPS does a controlled delivery on one day,

11      and the very next day, who is picking up the money but Pedro

12      and his cousin.  They were already here.

13                Now, the defendant says to the DPS officer -- by the

14      way, you'll notice every single witness lied that was from ICE,

15      according to the defendant.  Every single one of them was

16      lying.  The DPS officer was only mistaken.

17                He tells the DPS officer that he's going to Mexico.

18      Victor said they were going to Santa Teresa to the port of

19      entry, and that Victor had a cashier's check, and that he was

20      going to deposit it in a bank.

21                Then why call Pedro and his cousin to come to El Paso

22      if they were going to deposit it in a bank?

23                Now, TEPDEL.  TEPDEL was supposed to be -- he

24      testified TEPDEL was a contract through Nevada, and it was

25      supposed to be the contract that was between them.

1              By the way, if you look at TEPDEL, which I think is

2     Government's Exhibit 26A, if you look at the TEPDEL contract,

3     not only does it say it's for recycling of plastic

4     containers -- which is not a bond.

5              But if you look at TEPDEL, you'll notice in the back

6     who the co-conspirators are.  And an interesting thing.

7              When Paco is talking to the defendant in Government's

8     Exhibit 58, that 33-minute conversation, Paco names the

9     conspirators, and never once is Victor Pimentel named in

10    anything as a co-conspirator.

11             The defendant doesn't name him to ICE.  Paco doesn't

12    discuss that he owes part of the money.  He's never named,

13    because he's not working for this guy Vargas.  He's working for

14    the defendant, because he's a student at UTEP.  And he, at one

15    time, really trusted him, and he was living with him for a good

16    period of time.

17             The defendant -- the settlement agreement.  I think we

18    beat that dead horse.  It's Government's Exhibit 35.  But I

19    mean, notice -- I mean, notice Government's Exhibit Number 35,

20    because he is waving around -- Victor is waving around the

21    settlement agreement in the Georgia tape with the Georgia

22    sheriff.  You see it.

23             And immediately he says, This is what it's for.

24             And you know that that's what it's for.  It was sent

25    the day before.

1              And then you see it again in the DPS video with

2     Mr. Delgado in the car.  And there's no, What are you doing

3     with the mediation papers?  Because there was no mediation.

4              Raul Aceves and the Suburban, another -- you know, the

5     devil is in the details.

6              Over and over again he said that car was for

7     Mr. Aceves, who was running for office in Mexico, and -- the

8     Suburban -- and we were going to lend it to him.

9              Well, you look at Government's exhibit number -- I

10    think, it's Number 19 -- no, it's not Number 19 -- Number 8B.

11             And it says she wants -- it doesn't say the feminine

12    she, it's conclusory.  She wants a new Suburban and for us to

13    pay her.  She.

14             What do you think?  And here's why you know it's

15    Lilian.  "With the power she brings, she deserves that, my

16    little treasure, and more.  I will ask you to respect her."

17             No Mr. Aceves anywhere.

18             Look at how you know it's drugs.  "The plaza is hot."

19    Government's Exhibit Number 9.

20             Knowing that it's drug money, Victor sends him this

21    story about this drug captain or head from Guadalajara being

22    arrested in Colombia.

23             And how does the defendant respond?  "The plaza is

24    hot."

25             Look at the money wrappers.  We already talked about

1    that.

2           Know the defendant was destitute.  Now, there is
3    absolutely nothing wrong with living with your mother, but this
4    guy purports to be some famous lawyer who makes all this money
5    in corporate law.  So then I would think you would build your
6    mother a really nice house and have her live, I don't know, in
7    a very nice house near you or maybe live with you, but you not
8    live with her.

9           Making color adjustments.  You know when Lilian talks
10   about the three groups, the ironworkers, the construction
11   workers -- and I can't remember what the third one is.

12          But anyway, she tells -- and what Victor told you is
13   those are different cells of the same organization.  And you
14   actually see that in the Girl Scout e-mail as well, because
15   she's talking about with the contributions we're getting, it's
16   going from 300 to 500.  Okay?

17          Who contributes more boxes into a warehouse, if it's
18   cookies?  Oh, I'll talk about that a little bit later.

19          Death threats.  Government's Exhibit Number 58.  You
20   must pay back the money.  Page 20.  Paco.

21          And there have been -- there have been death threats.
22   By the way, the fourth -- let's talk about Lilian de la Concha,
23   one other thing.

24          It was the defendant who gave up Lilian de la Concha,
25   not Victor.  He was -- Victor was cross-examined.

1              You didn't tell him about Lilian.

2              He said, No, I didn't.

3              The defendant tapes Lilian, this woman that he, at

4    that time, was allegedly dating, and in one of the calls said

5    he bought her a ring.  A ring.

6              And she talks about the threats.

7              But then not staged, because nobody is talking to Paco

8    and telling him what to say.  He says there have been death

9    threats.  On page 33 he said, Let's say, you know, for example

10   we're normal people who would never kill anyone for money.

11             And Delgado says, Sure.

12             And Paco said, That's it.  It's Pete.  It's Chuy.

13   Pete and Chuy are willing to say, You know what?  We will put

14   up the money.

15             Paco also says, I don't know, Marco.  If you, with

16   your influence, with your power, I understand what you told me,

17   that the option that -- that the -- that having already the

18   product -- the product -- ready to go.  The product.  Code

19   talk.

20             He also talks about the one, instead of the one

21   million dollars.

22             The defense attorneys somehow, you know, obscured the

23   method of drug trafficking and are saying, Ooh, there's not

24   evidence because nobody said, Oh, you know what, Marco?  That

25   drug trafficking money that got caught for the million dollars,

1  can you, like, see if you can get it back so we don't get

2  killed by the cartel?  Really?

3         Common sense or nonsense, that you would ever have an

4  admission between drug dealers who are on the phone that it was

5  drug money.

6         But he said:  The product, and go tomorrow and return

7  the product to its final destination is impossible.

8         We know the product is money.  Paco did not know he

9  was being taped, but he knew he was on the phone.

10         At page 40, Paco:  She told me that someone had

11  chambered a round on Chuy.

12         Page 43.  Okay.  Paco.  Only Paco:  Okay.  Well, very

13  well, Marco.  Now, one thing.  Imagine that Chuy or Chuy's

14  people say flatout, No, no, no, we don't want to do anything

15  more with you.  We want our money and we want it now.

16         Page 44, Paco:  Would you be willing to get in for the

17  part and proportion of the commission that you have taken?  I

18  mean the 50 percent?

19         And then Paco names the conspirators on page 50.

20  Okay.  I have no problem.  Okay.  In assuming that we -- that

21  we are not five, we are six -- you, Lilian, Pete, Chuy, Chuy's

22  cousin, and myself, six.

23         Again, he doesn't mention Victor.

24         Page 51.

25         THE COURT:  You've got three minutes.

```
1            MS. KANOF:  Thank you, Your Honor.
2            I don't know -- I don't think Lilian has enough money,
3    has half of the possibility to secure the money.
4            Again, portrayed as some rich individual, maybe not.
5            And Exhibit Number 7, the ironworkers.
6            Also, ladies and gentlemen, what's really important to
7    remember is Paco is not being coached.  And he says, Marco, at
8    least you're the smartest among us and the one who knows the
9    most about this.  Where do we go now?  I mean -- I mean, with
10   you, what should I do?  Yes.  You as my leader of this, okay.
11   My leader.  Should I speak with Chuy and tell him?  What should
12   I tell him?
13           Colima.  The defendant mentions Colima.  You heard
14   that it's the Atlanta of Mexico, the hub of drugs and drug
15   money.
16           Victor testified that's where they were going to -- he
17   and Marco Delgado were going to be driving.  And oh, yeah,
18   evidently there was a meeting in Colima.  It's just that
19   Mr. Delgado wants you to believe it was something else.  But if
20   you read it, you see, Why go into the lion's den?  It's hot in
21   Colima.
22           It's in that transcript.
23           Ladies and gentlemen, if you look at the tolls and
24   examine them, there are a lot of calls.  But the defendant is
25   making all of them.
```

1          This -- Victor told ICE that the Chicago deal, he

2     called him on the 15th of July.  There's no calls on the 15th

3     of July.

4          If you look at the tolls, the first time an agent

5     calls -- this is December, from July 9th, which is what the

6     tolls are -- is two days after Chicago.  It is July 25th.

7          He's making a lot of calls, but they're not calling

8     him.  In fact, they're blowing him off.

9          In a conspiracy, the people can be known or unknown.

10    In this case, you know.  You know Chuy was the intermediary

11    between the drug trafficking organization and these individuals

12    that worked from Spain.

13          By the way, they all also talk about Euros in there,

14    corroborative of the fact that it was from Spain.

15          But, ladies and gentlemen, who gives only five boxes

16    of Thin Mints to a school?  Because that's what that e-mail

17    says.  You are obligated to give five boxes to each school a

18    week.

19          That's code talk, because it is nonsense to think

20    anybody is going to say, Hey, to help our money laundering you

21    need to do this.

22          It's common sense, ladies and gentlemen.  It is not

23    nonsense that the defendant conspired.  You don't have -- he

24    didn't have to complete it.  He just had to conspire.

25          And if you look at conspiracy, you don't even have to

```
1    talk about it.  It can be inferred between the conspirators.

2    It's nonsense to think that they were not conspiring to launder

3    up to 600.  Remember 300, 500 cookies, up to $600 million

4    ultimately, so that the defendant could get rich.

5              Thank you.

6              THE COURT:  Ladies and gentlemen of the jury, now you

7    must deliberate.

8              Mr. Saucedo and Ms. Piñedo, I'm going to excuse you

9    with our thanks for helping us.  You know we couldn't use you,

10   but we almost did.  But I do want to thank you, ladies and

11   gentlemen.

12             The rest of you, you're not going out to lunch.  Okay?

13   It's already here.  You'll have your lunch here.

14             And I'm sorry I cannot offer you -- the alternates --

15   I cannot you offer you to stay and have lunch, because now they

16   are officially deliberating.  There cannot be anybody else in

17   the jury room with them.  Okay?

18             So again, with our thanks you are being excused.  Once

19   you leave here you are excused.

20             With that, ladies and gentlemen, we'll be in recess

21   awaiting the jury's verdict.

22             (Jury retired to deliberate; open court.)

23             THE COURT:  Ms. Cuellar, I understand the jury has

24   reached a verdict, ma'am.

25             FOREPERSON:  Yes, Your Honor.
```

1          THE COURT:  If you'll hand it to the officer, please.

2          The defendant will rise.

3          The clerk is going to read the verdict.

4          THE CLERK:  In Cause Number EP-12-CR-2106, the

5   United States of America versus Marco Antonio Delgado.

6          We, the jury, find the Defendant Marco Antonio Delgado

7   guilty as to Count 1.

8          The answer to Question Number 1 is yes.

9          The answer to Question Number 2 is yes.

10          And the answer to Question Number 3 is yes.

11          Signed on this date, the foreperson of the jury.

12          THE COURT:  You may be seated.

13          Any motions or requests, gentlemen?

14          MR. ESPER:  Poll the jury, Your Honor.

15          THE COURT:  Ladies and gentlemen of the jury, a

16   request has been made to poll the jury.  That means that you're

17   going to be asked individually if this is your verdict.

18          You may proceed with polling.

19          THE CLERK:  Juror Number 1, is this your verdict?

20          THE JUROR:  Yes.

21          THE CLERK:  Juror Number 2, is this your verdict?

22          THE JUROR:  Yes.

23          THE COURT:  You don't have to stand up.  You can

24   answer sitting down.

25          THE CLERK:  Juror Number 3, is this your verdict?

```
 1              THE JUROR:  Yes.
 2              THE CLERK:  Juror Number 4, is this your verdict?
 3              THE JUROR:  Yes.
 4              THE CLERK:  Juror Number 5, is this your verdict?
 5              THE JUROR:  Yes.
 6              THE CLERK:  Juror Number 6, is this your verdict?
 7              THE JUROR:  Yes.
 8              THE CLERK:  Juror Number 7, is this your verdict?
 9              THE JUROR:  Yes.
10              THE CLERK:  Juror Number 8, is this your verdict?
11              THE JUROR:  Yes.
12              THE CLERK:  Juror Number 9, is this your verdict?
13              THE JUROR:  Yes.
14              THE CLERK:  Juror Number 10, is this your verdict?
15              THE JUROR:  Yes.
16              THE CLERK:  Juror Number 11, is this your verdict?
17              THE JUROR:  Yes.
18              THE CLERK:  Juror Number 12, is this your verdict?
19              THE JUROR:  Yes.
20              THE COURT:  Ladies and gentlemen of the jury, I placed
21  you under certain instructions that I reminded you every day,
22  and I did this when you were first selected.
23              I'm relieving you of those instructions.  I'm giving
24  you the opportunity to discuss this case with anyone if you
25  wish.  I'm leaving it entirely up to you, if you wish to.  You
```

```
1    don't have to.  It's entirely up to you.

2              Ladies and gentlemen, I want to thank you.  It took a

3    little bit longer than I anticipated when we started, but I

4    hope you -- at least I think you found it interesting.  You

5    paid a lot of attention to the testimony.

6              So with our thanks, ladies and gentlemen of the jury,

7    at this time you are being excused.

8              All rise for the jury.

9              (Jury leaves the courtroom; open court.)

10             THE COURT:  Counsel, I'm setting the sentencing date

11   for January the 24th of next year at 10:30 a.m.

12             Anything else at this time, Counsel, for the

13   Government?

14             MS. KANOF:  Nothing from the Government, Your Honor.

15             MR. VELARDE:  Nothing further, Your Honor.

16             THE COURT:  Very well.  You may be excused.  We'll be

17   in recess.

18                            *  *  *  *  *

19

20

21

22

23

24

25
```

1                           I N D E X

2   Charge of the Court .........................................5

3   Closing Statement by Ms. Arreola ............................5

4   Closing Statement by Mr. Velarde ...........................21

5   Closing Statement by Mr. Esper .............................33

6   Closing Statement by Ms. Kanof .............................47

7   Jury Out to Deliberate .....................................61

8   Verdict ....................................................62

9   Jury Polled ................................................62

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        CERTIFICATION

2

3       I certify that the foregoing is a correct transcript from

4   the record of proceedings in the above-entitled matter.  I

5   further certify that the transcript fees and format comply with

6   those prescribed by the Court and the Judicial Conference of

7   the United States.

8

9   Date:  March 24, 2014

10                                  /s/ Maria del Socorro Briggs

11                                  Maria del Socorro Briggs

12

13

14

15

16

17

18

19

20

21

22

23

24

25