1              IN THE UNITED STATES DISTRICT COURT

2                  WESTERN DISTRICT OF TEXAS

3                       EL PASO DIVISION

4                       VOLUME 1 OF 1

5

6   UNITED STATES OF AMERICA              EP:12-CR-2106-DCG

7   v.                                    EL PASO, TEXAS

8   MARCO ANTONIO DELGADO                 March 31, 2016

9

                       **RE-SENTENCING HEARING**
10            THE HONORABLE DAVID C. GUADERRAMA
                  UNITED STATES DISTRICT JUDGE
11

12  <u>APPEARANCES</u>:

13  For the Government:   Debra P. Kanof
                          Anna E. Arreola
14                        Assistant United States Attorney
                          700 East San Antonio, Suite 200
15                        El Paso, Texas 79901

16  For the Defendant:    Erik A. Hanshew
                          Maureen Franco
17                        Assistant Federal Public Defender
                          700 E. San Antonio, Suite 410
18                        El Paso, Texas  79901

19  Court Reporter:       Kathleen A. Supnet
                          El Paso, Texas
20                        (915)834-0573
                          kathi.supnet5303@gmail.com
21

22

23

24         Proceedings reported by mechanical stenography,

25  transcript produced by computer-aided software and computer.

```
 1              (Proceeding begin at 9:28 a.m.)

 2              (Proceedings held in the Specialty Courtroom, 8th

 3          Floor.)

 4              THE COURTROOM DEPUTY:  EP:12-CR-2106 Marco Antonio

 5      Delgado.

 6              MS. KANOF:  Good morning, Your Honor.  Debra Kanof and

 7      Anna Arreola for the United States.  We are ready for

 8      sentencing.

 9              THE COURT:  Good morning, Ms. Kanof.

10              MR. HANSHEW:  Good morning, Your Honor.  Erik Hanshew

11      and Maureen Franco on behalf of Mr. Delgado.  We are ready as

12      well.

13              THE COURT:  Good morning, Mr. Hanshew.

14              PROBATION OFFICER LUEVANO:  Good morning, Your Honor.

15      Luis Luevano on behalf of the United States Probation Office.

16              THE COURT:  Good morning, Mr. Luevano.

17              And good morning, Mr. Delgado.  You are Marco Antonio

18      Delgado, the defendant in this case; is that correct?

19              DEFENDANT DELGADO:  Yes, sir.

20              THE COURT:  Mr. Delgado, you were found guilty by a

21      jury on August 13th of 2015, to Count One of an indictment that

22      charged you with the offense of conspiracy to commit money

23      laundering.

24              DEFENDANT DELGADO:  That's correct, sir.

25              THE COURT:  Mr. Delgado, prior to this morning's
```

1    proceeding, did you have an opportunity to review and discuss

2    with Mr. Hanshew the contents of Mr. Luevano's presentence

3    report?

4                DEFENDANT DELGADO:  I did, sir.

5                THE COURT:  All right.

6                In that report, he scores your base offense level at a

7    level 22, indicating a base offense level of eight, then

8    increasing it by 14 because of the amount involved.  And then he

9    suggests that we increase this by six, because you had knowledge

10   that the funds that you attempted to launder were, in fact, tied

11   to either manufacturing, importation or distribution of a

12   controlled substance, and then suggest that we increase it by

13   two again, because your conviction came under United States

14   Code, Section 15 -- I'm sorry -- 18 United States Code, Section

15   1956, specifically that section.

16               He's then suggested we increase it by two more levels,

17   because you abused a position of trust, that of an attorney,

18   which would require some additional findings by the Court as

19   suggested by the Court of Appeals in the remand of the case.

20               Then he suggests that we increase it by four more

21   levels, because your role in the offense was aggravated,

22   yielding a total offense level of 36.  You do have a Criminal

23   History Category of I.  These two numbers together then suggest

24   to the Court, but not demand, a guideline imprisonment range of

25   188 months to 235 months, followed by a term of supervised

1   release of one to three years.  You would be subject to a fine

2   of no less than $25,000, but no more than 2,990,720 and a $100

3   special assessment.

4          MS. KANOF:  Excuse me, Your Honor.

5          Since the Court is following the recommendation that's

6   made in the Fourth Addendum, is the Court overruling the

7   Government's objection?

8          THE COURT:  Oh, no, no, no.  I'm just setting out what

9   probation's report is.  I'll take objections from both sides.

10          MS. KANOF:  Okay.  Thank you, Your Honor.

11          THE COURT:  Right at this very moment, actually.

12          Mr. Hanshew, do you concur in that scoring?

13          MR. HANSHEW:  Your Honor, I need to -- I'm going to

14   address, I think, what the Government as jumping up about, which

15   is there was the addendum that probation agreed with the

16   objection I had about the level 14 instead of level 16, based on

17   the valuation.  I had, in looking at the guidelines, found in

18   one -- Chapter One that it says you use the guideline at time of

19   sentencing.  However --

20          THE COURT:  And that's in conflict with the other

21   portion where it says it's the time of sentencing.

22          MR. HANSHEW:  And I will concede, having read the

23   Government's citation of the statute, and albeit unpublished

24   cases, but the case is discussing that that statute, I guess

25   which was enacted in 2003, is -- correctly states what this

1    Court --

2         THE COURT:  So base offense level would then be 24.

3    That's your --

4         MR. HANSHEW:  Correct, Your Honor.

5         THE COURT:  And Ms. Kanof, is that your agreement?

6         MS. KANOF:  Yes, Your Honor.

7         And although the cases that were cited that cite

8    3742(g)(1), most of which are unpublished, were cited in the

9    body of the Government's objection.

10        In a footnote, we did cite *Pepper vs. The United*

11   *States*, which is the United States Supreme Court case.  The

12   citation is 131 S. Ct. 1229, where Justice Sotomayor wrote the

13   opinion where they are clearly recognizing that 34 -- 3742(g)(1)

14   is intact, and that is on a remand that you use the sentencing

15   guidelines that were in effect at the time of the original

16   sentence.

17        We cited in the footnote to note that (g)(2), which in

18   effect -- is invalidated --

19        THE COURT:  Because of *Booker*.

20        MS. KANOF:  Yes, Your Honor.

21        THE COURT:  Okay.  Got it.

22        So 24 is our base.  And then using the remainder of

23   probation's calculations, six, because the funds were related --

24   tied to the drug trade, two, because the nature of the

25   conviction, two, for the abuse of trust requiring additional

1    findings, and then four for the aggravated role.

2             Do you concur with all of that?

3             MR. HANSHEW:  Yes, Your Honor, subject to objections,

4    of course.

5             THE COURT:  Okay.  So what are your objections?

6             MR. HANSHEW:  Your Honor, the remaining objections are

7    that number two and three and -- that I submitted to probation

8    and in turn went to this Court -- and those relate to number

9    two, the objection related to the abuse of position and trust,

10   and then number three related to the aggravating role, Judge.

11   So I wanted to put a backdrop to explain these objections, which

12   is as the Government has repeatedly explained, the Court is to

13   look at the record.

14            And I know the Court acknowledged today, the Court is

15   supposed to make findings based on the record.  And we have to

16   follow the jury's verdict that is guilty.  But what the Court

17   doesn't have to do is blindly agree with all of the testimony

18   that was given.

19            And so what I wanted to point out in the beginning,

20   when we look at the totality of what was said at this trial and

21   what went on, I think a very important fact, which is --

22            If I can approach briefly, Judge?

23            THE COURT:  Sure.  Yes, sir.

24            MR. HANSHEW:  And Judge, what you have is a letter

25   from the U.S. Department of Justice from one of the assistant

1    U.S. attorneys that was on this case, Juanita Fielden, to the

2    prior counsel, the trial counsel in this case, acknowledging

3    that Victor Pimentel, the Government's star witness in this case

4    was paid, that he was paid money and that he was paid in the

5    sense he wasn't prosecuted.

6            And that, you know, is not absolutely unusual, but

7    what does become somewhat extraordinary is Mr. Pimentel's

8    testimony at trial.  And this is part of the record.  And it's

9    at Volume 2, page 214, where he is asked, has HSI -- has not

10   paid you any money?  No.  Have you been -- have you made any

11   money by Homeland Security or ICE via your cooperation in this

12   matter?  No.

13           So what you have is a perjurer, a liar, an absolute

14   liar in this case.  I'll tell the Court what I was even more

15   surprised to see was that after that, there were no further

16   questions by the Government, no clarifications, no explanations

17   about this now perjured testimony by their star witness.

18           THE COURT:  You said that counsel in that case,

19   Mr. Velarde, Mr. Esper, had the notice from the Government that

20   he, in fact, was paid prior to his testimony, right?

21           MR. HANSHEW:  Correct.

22           THE COURT:  Did they cross him on -- did they -- did

23   they redirect him on --

24           MR. HANSHEW:  They didn't either.  I find that

25   surprising, as well.

1           But -- so what you have is now in front of you the

2     testimony from an individual who lied, perjured himself.

3           Making matters worse, you also have the testimony from

4     somebody who, as it's indicated in the PSR, met with one of the

5     co-conspirators in this case, Ms. De La Concha, the wife of

6     former president -- the former wife of President Fox, and

7     brought here into the United States.  After a while, he was

8     working as a cooperator, didn't tell his handlers.  And what was

9     the purpose of this meeting was for him to explain to De La

10    Concha where Mr. Delgado lived, to explain and vent about, you

11    know, the lies that Mr. Delgado had told her to essentially

12    enrage and incense her and fill her with all of the information

13    about where you could find him and how he had double-crossed

14    you.  I mean, it couldn't be more clear what was going on there;

15    you have a Government witness, who's being paid, who perjured

16    himself, who then goes about, frankly, trying to set up a hit on

17    Mr. Delgado.

18          So I put that in the beginning of this, because I

19    think it's important to know.  It's part of the evidence in this

20    trial.  And it's what the Government's relying on in terms of

21    some of its evidence here in this hearing as we saw in the

22    memorandum.

23          So now I'll move into -- let's look at some of the

24    testimony.  And even if you give credence to Mr. Pimentel about

25    his testimony, about the two issues we're looking at here, which

1    are whether or not Mr. Delgado, because he was a lawyer, put

2    himself in a position that was superior to all others, because

3    remember, this is what the Fifth Circuit says is that what was

4    missing in the analysis from Judge Briones in this was a second

5    prong, right, the second prong where you look at whether or not

6    there was the significant facilitation which put you in a

7    position superior to all others in this crime.  And the record

8    flatly shows that's not true.

9         First, you have Ms. De La Concha.  She's involved in

10   this.  She's a co-conspirator for the evidence that even

11   Mr. Pimentel has quoted for the rest of the Government.  Who is

12   she?  She is, again, the former wife of the president of Mexico.

13   And what is she doing in this case?  Per Pimentel, she is -- has

14   the clients, she has the business, she has the political

15   connections.  And you can see that these are stated in the

16   record at various points and I'll cite those.

17        At the record at Volume 1 at 165, it talks about how

18   Lilian and her are friends had the contacts.  Then it talks

19   about -- they ask Pimentel about is she a powerful woman?  Yes,

20   she is a powerful woman.  Is she a -- is she wealthy?  And he

21   explains, well, she's fairly well-off, but she's politically

22   powerful.

23        You have then, as the Government cited, a letter that

24   they claim, because it has attorney heading on it, is evidence

25   of, you know, the -- this use of power, use of your position or

1  also, additionally, aggravating role in this case.  And when you

2  actually read the testimony in this case, it appears that

3  Ms. De La Concha was actually the one that sent off responses in

4  drafts.

5        Down to Volume 1, page 207 and 211.  At 211, they're

6  asking -- he's asked about this e-mail in this letter and says

7  she's actually asking Marco just to review the letter we

8  previously saw in the other exhibit to see if that's -- if it's

9  correct or we need to add something or delete something.  Just

10  pretty much like a reading.  Then what they're telling you is

11  here is that he then also is asked to review and proof the

12  letter of Pimentel himself.

13        So you have a letter that's actually coming from,

14  really, De La Concha.  She has crafted it and then sends it to

15  Mr. Delgado and Mr. Pimentel and they're doing proofs and

16  sending it.  And who is it going to?  This letter is going to

17  the chief of staff of, at the time, President Calderon of

18  Mexico, who is making that introduction, who is facilitating

19  significantly that relationship to try to broker positions for

20  what we've heard is, you know, to get jobs at the Plaza, which

21  is a port of entry on the Mexican side, Ms. De La Concha.  And

22  who would be in a more superior position?  I mean, I analogize

23  it to this.

24        Imagine if you had a situation where this was in

25  reverse.  You have a lawyer in Juarez, a Mexican lawyer in

1    Juarez, that's trying to create a scheme in the United States.

2    And part of that scheme, you need to have a political connection

3    to get appointments for positions and jobs, to get titles and as

4    such.  Who would have a more significant influence in that

5    scheme, a Mexican lawyer or Hillary Clinton?  I mean, it's

6    ludicrous to think that Mr. Delgado, a lawyer here in the United

7    States, is somehow superior in a deal that's about Mexican

8    politics, Mexican politicians, their connection to get jobs,

9    their connection to cartel members.  There's even a mention in

10   there about how one of the people that he's supposed to meet

11   with is from POM, the Mexican party that President Fox is from.

12   It's not an accident that is the connect that Ms. De La Concha

13   is making.  So you see that letter.  I mean, that letter is

14   really from De La Concha, is going to a contact of De La Concha,

15   and it's only happening because of her.  All right?

16          And then you see there are in these transactions, they

17   talk -- the Government talks about how he used his IOLTA.  Well,

18   really, if you look at that -- and this was even talked about at

19   the -- in the oral argument, the Fifth Circuit on this case,

20   really, originally, it was going to a bank account in the name

21   of Mr. Delgado's girlfriend.  It had nothing to do with his

22   IOLTA account.  That IOLTA account became a default after this

23   failing, this utter failing, in terms of trying to deposit money

24   in Wisconsin or Chicago.  So again, I would submit that negates

25   that somehow his lawyer position put him superior to the others

1    in terms of the IOLTA account.

2              And it goes on and on with all of these scenarios

3    where you also have De La Concha is explaining and directing.

4    They -- she -- they use the terminology and the terminology is

5    coming from her about how many boxes of cookies, ironworkers,

6    all of this, you know, drug jargon that they argue about in the

7    trial, is coming from her and directed out and it's going to

8    Mr. Delgado and others.

9              So, I think you see here there's -- there is

10   absolutely -- there is no fact supporting that he was in an

11   aggravating role in this.  They're equal.  You have them

12   actually discussing and talking about splitting the proceeds

13   equally.  In fact, in one sections of the trial, there is

14   discussion of how much of a cut are they going to get in this,

15   and Pimentel explains that they're going to get ten percent off

16   of the amount that, you know, they're going to launder.  Right?

17   And then he explains that he and Mr. Delgado were going to get

18   four percent each.  So again, you have inconsistencies in that

19   he is in any way superior to them.

20             You also have Mr. Pimentel out and about doing all of

21   that business.  I mean he is going to Mexico.  And let's talk

22   about Mr. Pimentel some more about who he is.  Well, in addition

23   to being a perjurer and in addition to try to set up Mr. Delgado

24   for who knows what, that possibly murder, Mr. Pimentel is no --

25   as they like to portray him, some college boy.  You know, this

1    is a man, who because of his political connections in Mexico,

2    which included the head of the labor union for CFE --

3            Now, CFE -- CFE is the Mexican national electric

4    company.  It is a monopoly of a utility that controls all of the

5    Mexican electric.  Imagine the power.  We just saw this week in

6    a case in the Supreme Court of a four/four tie about California

7    teachers' unions and the influence, and we heard all of the

8    blurbs about how it tied out and, you know, the unions will be

9    able to continue to go and, you know, the arguments on both

10   sides of that, of the power of unions or loss of power of

11   unions.

12           Imagine the power of a union in Mexico that's for a

13   monopoly of all electric, the labor union for that.  And that,

14   Mr. Pimentel gets the contract to have all of the cafeterias, or

15   as they call it in the trial, cantinas, put in and run and

16   profited off of.  That's what Mr. Pimentel does.  This is not a

17   novice in economics.  This is not a novice in business

18   operations.  You know, this is an individual that is very savvy

19   to how finances work, and more importantly, how it works in

20   Mexico and who you need to know to be able to run this type of

21   thing.

22           So, in total, in those two objections, Your Honor,

23   there is significant evidence that contradicts both of the

24   enhancements in this case on that.  If the Court has other

25   questions about those, I'd be glad to address them.

1          THE COURT:  All right.  Did you have any other

2    objections other than those?

3          MR. HANSHEW:  I don't, just those objections.  And

4    then, of course, for allocution, I'm going --

5          THE COURT:  All right.  I'll have Ms. Kanof respond.

6          MS. KANOF:  May I use the podium, Your Honor?

7          THE COURT:  Yes, ma'am.

8          MS. KANOF:  Your Honor, picking out little tiny pieces

9    of lines does not tell the whole picture of the testimony in the

10   case.

11         One of them was telling -- hurts -- first of all,

12   Mr. Pimentel may or may not have remembered he got

13   85-hundred-dollars, but the transcript is -- but obviously the

14   jury believed his testimony.

15         And in addition to that, Your Honor, Mr. Esper

16   cross-examined him.  Mr. Esper, I believe, is one of the finest

17   defense attorneys in El Paso.  And if he didn't ask him about

18   that, it was tactical and that he thought it would be offensive

19   that for a mere 85-hundred-dollars, when we pay informants

20   hundreds of thousands of dollars in cases, it would -- it may

21   not have played well with the jury to have questioned his

22   85-hundred-dollar payment for the conviction of a licensed

23   attorney for money laundering.

24         But if you look at the testimony as a whole, you'll

25   find out that before Mr. Delgado ever got involved with Ms. De

1    La Concha -- and by the way, there's testimony in the record

2    that at the time that he became a business partner and then a

3    personal partner, Ms. De La Concha, she was already divorced

4    from Vicente Fox, and she was divorced from Vicente Fox before

5    he became president of the Republic of Mexico.  The reason that

6    was made a big deal is because it was a sensational, and like

7    any human being, especially the Republic of Mexico, they like to

8    sensationalize their popular individuals in their glitterati.

9         But I would point out to the Court that on 157 of

10   Volume I, page 157, on direct of Mr. Pimentel, he explains how

11   the relationship developed between him and Mr. Delgado.

12        Mr. Hanshew, wants to make Pimentel some very educated

13   brilliant individual, but the record is very, very specific that

14   at the time that they became friends, Mr. Pimentel was a chef.

15   He had a cantina.  The cantina was located in some of the power

16   plants that were run by the Mexican Government, Comisión Federal

17   Electricidad de Mexico, and he had gone to a technológico school

18   in Mexico to become a chef.  And he met Mr. Delgado, because of

19   this idea someone had, that Mr. Delgado might fund and become a

20   partner of Pimentel's in opening a Double Dave's pizza in

21   El Paso.  And that's in the beginning of Mr. Pimentel's

22   testimony.

23        And they became friends.  They hit it off.  He was

24   much -- Pimentel was much younger than Delgado, but at the time

25   that he met him, he was a chef.  And then he went back to UTEP

1    and the transfer reflects that Pimentel was going to UTEP on

2    Thursdays -- on Tuesdays and Thursdays and in between he went

3    home to Chihuahua.

4         Pimentel's family were personal friends of Mr. Vargas,

5    who was the head of the electrical labor union in Mexico, but I

6    don't know what that has do with this case, because Pimentel,

7    there's no indication that Pimentel hooked up Mr. Delgado with

8    any drug dealers or any individuals that could provide money to

9    launder.

10        In fact, Pimentel is some little mule who puts --

11   who's stupid enough to put a million dollars in cash in the back

12   of a station wagon and drive it in one of the most drug traffic,

13   money laundering corridors in the United States between Atlanta

14   and Dallas, Texas, I-10 between Atlanta and Dallas, Texas.  That

15   is not an educated, knowledgeable, distinguished business

16   individual with drug connections.

17        But further, Mr. Pimentel told the jury that what

18   happened is Mr. Delgado, who worked for Delgado and Acosta,

19   worked for his company, Hector Delgado's law firm, was released

20   from that law firm.  And by that time, he was living a high

21   lifestyle.  Mr. Pimentel told the jury that he had a place in

22   Ruidoso, and that they became such good friends, Mr. Pimentel

23   even had a key to that cabin, that they traveled around the

24   world, went to Cuba several times on vacation, and when he was

25   expelled from the law firm, he became unable to continue the

KATHLEEN A. SUPNET, CSR

1    same high lifestyle.  He didn't have money.  That was directly

2    in the transcript, page 157.

3              And then when the money stopped, when they stopped

4    getting in, he tried to continue the same lifestyle, but

5    obviously there's a point where there's no money left.  So he

6    thought that he could offer his service to do money laundering

7    in Mexico, so he could still be living that lifestyle.  That has

8    nothing do to with Mr. Pimentel.  That has nothing to do with

9    Mr. De La Concha.

10             He continued on page 152 to testify that the first

11   time that he knew of Delgado's involvement in money laundering

12   had nothing to do with De La Concha.  It had to do with a woman

13   named Angelica Fuentes.  Angelica Fuentes was a client of

14   Delgado Acosta.  It was why Mr. Delgado was fired, that he got

15   involved in some fraudulent activity with her.  And the first

16   time that Pimentel accompanied Delgado to Mexico was so that he

17   could participate in a mediation -- on page 152 of Volume I, for

18   Angelica Fuentes who was suing Delgado Acosta.

19             Later on in the transcript you find out that when

20   Pimentel meets with Chuy, the conduit between the Milenio drug

21   cartel and Mr. Delgado's money laundering organization, Chuy

22   asks for his ID and he finds out that it does not say Victor

23   Pimentel.  It says Francisco Ruiz and -- or Solis -- and

24   Francisco Solis is the name Pimentel had been using for a couple

25   of years.  That name was given to him by Delgado to testify

1    falsely that he was a client in this mediation with Angelica

2    Fuentes, which was way before De La Concha.  And so Mr. Pimentel

3    explains that the generation of money laundering began even

4    before he met De La Concha, and that the fictitious name was

5    given to Pimentel.

6          This is a young college student who he befriends,

7    gives him a key to his cabin and then asks him to use the

8    fictitious name to testify to get him out of trouble when

9    Angelica Fuentes' father was an extremely wealthy and powerful

10   businessman in Mexico.

11         On page 158, Pimentel testifies.  I asked him:  And

12   when you were at his house as a student at UTEP, did you -- did

13   he support you or could you support yourself; and he said, no,

14   he supported himself with the money from his cantina business.

15         So when -- when was it that he discussed the money

16   laundering business with you?  Everything started when we start

17   the first, I guess, money laundering conversation that we had

18   was with Angelica Fuentes.  So this idea that De La Concha

19   was the -- had a superior position or had the connections is

20   disposed of within the testimony.

21         I'll skip really quickly to page 183.

22         THE COURT:  Before you leave there, I didn't

23   understand from the presentence investigation report the deal

24   with Angelica Fuentes.  I understood, I guess, there was a

25   lawsuit and then some money or from the settlement disappeared

1 and --

2          MS. KANOF:  Yes.

3          THE COURT:  So, Mr. Solis was the guy that took it

4 because his secretary did up some false --

5          MS. KANOF:  No, Mr. Solis didn't take it.  He

6 testified he took it.

7          THE COURT:  Right.

8          MS. KANOF:  Mr. Delgado took it.

9          Your Honor, I have like reams and reams of papers of

10 about Angelica Fuentes was the daughter of a wealthy Mexican --

11          THE COURT:  Are they the people in Juarez, the

12 Fuenteses?

13          MR. HANSHEW:  Yes.  Yes.

14          And she actually became crosswise with her father and

15 started engaging in business relationships and became -- got

16 into a dispute.  She had her own wealth as having been the

17 daughter of this man.  And she, according to the records, and I

18 didn't read the records, because they appear to be privileged to

19 me, but she had -- she sued everybody for everything.  She

20 was -- she had every major law firm in El Paso at some point in

21 time representing her, so she winds up with Delgado Acosta and

22 becomes complicit with Mr. Delgado in skimming money from her

23 father.  That's how I understand it.

24          Now motion in limine was granted in this trial not to

25 talk about it, but Mr. Esper kind of opened the door with regard

1   to the use of the name of Francisco Solis by Pimentel in order

2   to impeach him.  I think it backfired to some extent in front of

3   the jury.  But as to the bad money situation with Angelica

4   Fuentes, we didn't get into that, because I didn't want it to be

5   an issue on appeal and -- but it was clear that it was during

6   that relationship when he was still at Delgado Acosta and living

7   pretty high on the hog that he started making his wealthy and

8   powerful connection in Mexico.  He had not met Vargas yet.  He

9   had met Pimentel and he had not met De La Concha yet, and that's

10  where why trying to point out to the Court when we're talking

11  about the hierarchy of this organization.

12          Page 183, however I think is the most dispositive of

13  both abusive position of trust and leader-organizer.  At line

14  22, Volume I, Page 183.

15          Pimentel talked about how the money was going to be

16  earned from the money laundering business.  And he is asked, by

17  me, do you know what her percentage was, meaning, De La Concha.

18  He said yes.  I said what was it.  He responded, out of the ten

19  percent, they were going to get -- they were talking about the

20  600-million from the Milenio cartel altogether, they were going

21  to get ten percent of the 600-million, so they were going to get

22  6-million.  Out of the ten percent it was going to be -- this is

23  Pimentel talking -- or 16 million, sorry.

24          THE COURT:  16, yes.

25          MS. KANOF:  Sorry, Judge.  If I understood math, I

KATHLEEN A. SUPNET, CSR

1   wouldn't be a lawyer.  I leave that to Ms. Arreola.  Out of the

2   $60-million, on line 22, this is Pimentel speaking, out of the

3   ten percent it was going to be four percent for me, four percent

4   for Marco and two percent for her.  And then I said, okay, out

5   of the 600-million, 10 percent would be -- and then I made the

6   same mathematical mistake with the 6-million.

7          After that point in time, they had competition.  They

8   were evidently other individuals that wanted to be hired by the

9   Milenio cartel and they were undercutting them, so the

10  percentage eventually changed.

11         The point I'm making here is that Ms. De La Concha was

12  not only not the boss and did not hold a superior position, but

13  this college student, who was a chef, who was a buddy, like a

14  son to Mr. Delgado, who had traveled on lavished trips with him

15  and had a key to his cabin was going to get and equal amount t

16  Mr. Delgado and more than Ms. De La Concha, and I think that

17  speaks to the hierarchy of his organization.

18         I will tell the Court that, also, I went through and

19  counted the number of people in the organization, ultimately,

20  and I think there're--

21         THE COURT:  But wasn't -- because in paragraph 65 of

22  the presentence report, there comes a time when somebody named

23  Primo, I guess Ms. De La Concha's cousin, tells her not to --

24         MR. HANSHEW:  No, Primo was Pimentel's cousin.

25         THE COURT:  Oh, okay.  Well he's telling De La Concha

1    don't be insisting on your little buddy Delgado getting anymore

2    pickups or we're going to take care of him.  So, if this -- I

3    didn't hear the trial nor have I didn't read the entire

4    transcript, but it seems like Ms. De La Concha is the one that's

5    getting him the gigs.

6              MS. KANOF:  I think perhaps that the transcript was

7    misunderstood.  On page 65 --

8              THE COURT:  No, paragraph 65 of the presentence

9    investigation report.

10             MS. KANOF:  Okay.  This is completely incorrect, Your

11   Honor.  There was no -- De La Concha never had a cousin.

12             THE COURT:  The name is Primo, but maybe that's just

13   what they called him.

14             MS. KANOF:  There was nobody named Primo.

15             THE COURT:  Well, then maybe we should be asking

16   Mr. Luevano.

17             MR. HANSHEW:  Yeah.  You know what?  I'm sorry I

18   didn't catch this, Your Honor, but -- and I don't know which

19   e-mail or phone conversation he's talking about, especially

20   because De La Concha had nothing to do with the Chicago

21   transaction.

22             THE COURT:  Okay.

23             Mr. Luevano, where did we get this information?

24             THE PROBATION OFFICER LUEVANO:  Your Honor, if you can

25   give me a moment.  It's been a while since I actually --

```
 1            THE COURT:  Sure.  No, no problem.
 2            MS. KANOF:  Your Honor, I -- that doesn't ring a bell
 3    to me at all as far as the facts in this case.
 4            Yeah.  Ms. Arreola may have found the --
 5            THE COURT:  Sure.
 6            THE PROBATION OFFICER LUEVANO:  Your Honor, I
 7    apologize.  I must have left my binder with all of the
 8    investigative reports back in the office.  I wasn't expecting
 9    to --
10            MR. HANSHEW:  If you read paragraph 64 and 65
11    together, what you're going to see is that paragraph 65 is what
12    Pimentel related to ICE agents, so Primo was Pimentel's cousin.
13    He was talking about his own cousin.  But he's talking about
14    here is not the drug trafficking.
15            THE COURT:  Hold on.  Here comes a note from the
16    bench.
17            (Ms. Kanof speaking over Judge.)
18            MS. KANOF:  Maybe she can --
19            THE COURT:  Yeah.  Just --
20            MS. KANOF:  She seems to understand this better than I
21    do.
22            MS. ARREOLA:  It's been a while.  But just looking at
23    the PSR --
24            MS. KANOF:  And she did handle the debrief portion.
25            THE COURT:  Okay.
```

1      MS. ARREOLA:  It's not Pimentel.

2      MS. KANOF:  Oh, that's Delgado.

3      MS. ARREOLA:  You Honor, if you just look at and read

4  paragraph 64 and 65, what it indicates is that Pimentel reported

5  all of this to ICE and not that Pimentel had anything do with De

6  La Concha and Primo and their visit together, but that this is

7  something he reported to the agents, which I believe is what

8  later led the agents to confront Delgado to warn him that there

9  was a threat on his life.

10      MS. KANOF:  That's -- that's what I was trying -- was

11  going to get to, Your Honor, is what this is about --

12      THE COURT:  Is there any truth to the things that he's

13  saying?

14      MS. KANOF:  There is a truth to the threat on his life

15  and that's what I was going to try to get to with regard to

16  what --

17      THE COURT:  Because you're the --

18      MS. KANOF:  -- told the Court about Pimentel.

19      THE COURT:  They're saying that she would be taken

20  care of it.  They're threatening her.

21      MS. KANOF:  She means Liliana Nevarez [sic].

22      THE COURT:  Oh.

23      MS. KANOF:  What happened was, Your Honor, and this

24  whole cancer thing, and it's in the rebuttal portion of the

25  transcript, at the same time that he was involved with Lillian

1  De La Concha, Mr. Delgado became involved with a woman named

2  Liliana Narvaez.

3          THE COURT:  She's in El Paso, right?

4          MS. KANOF:  She lived in El Paso.

5          THE COURT:  The one they were going to buy a house for

6  or something and...

7          MS. KANOF:  They -- well, they did buy a house.  He

8  bought a house with other money the Court will hear about

9  later --

10          THE COURT:  The loan thing --

11          MS. KANOF:  -- in another case.

12          THE COURT:  -- with a guy in Italy or whatever?

13          MS. KANOF:  No, no, no.  No.

14          THE COURT:  Okay.

15          MS. KANOF:  That was a lie Delgado told Nevarez [sic].

16          Okay.  So what happens is he's now dating

17  Nevarez [sic].  And Pimentel -- De La Concha confronts Pimentel,

18  because Delgado has sent all of these e-mails telling De La

19  Concha he's dying of cancer and she finds out or suspects it's

20  not true.  So De La Concha confronts Pimentel and tells Pimentel

21  you have to tell me if he's -- if this is all a lie, if --

22  because -- is he really dying of cancer, does he really have

23  another girlfriend, and she comes to the United States with the

24  cousin, her cousin, and makes Pimentel show her where Lilliana

25  Nevarez [sic] lives and where Delgado lives.  They go in a car

1    and I guess the driver must be the cousin -- I was unaware that

2    was another man -- where she makes Pimentel identify where

3    everybody lives, because she's going to put a hit out on the

4    girlfriend and the girlfriend's family, and that's what that's

5    all about.  So Pimentel reports that to ICE, and then ICE goes

6    and warns Delgado that there's a threat to his life.  That's

7    what this is about.  So it gets a little bit confused.  And the

8    notification is at page -- is at paragraph 67.

9            On December 3rd of 2008, that's a whole year later,

10   Judge, a whole year later after this happens, Pimentel advised

11   ICE agents that Delgado's life was in danger.  And then on

12   paragraph 69, again on December 3rd of 2008, ICE agents

13   contacted Delgado after receiving the aforementioned

14   information, instructed him to go to the ICE office in El Paso.

15   So that's what that's about.

16           Her cousin was not involved in the drug trafficking

17   portion, De La Concha's, and she was pretty angry-woman-scorned.

18   And Liliana Nevarez [sic] testified at the trial in rebuttal to

19   the e-mails.  We showed her -- she was actually copied on some

20   of De La Concha's to Delgado, where she -- and she testified

21   that it was Delgado's account and that it was Delgado's words,

22   and that Delgado was lying to De La Concha when he said he

23   had -- was dying of cancer.  It was a way he was trying to get

24   rid of her.  And she testified that, you know, that all of that

25   was a lie.  And she -- basically, that's how the e-mails were

1    admitted, was through her testimony basically showing the fact

2    that Mr. Delgado had, in trying to extricate himself, lied to --

3    about having cancer, trying to get out of the relationship.  And

4    because Pimentel warned ICE, they had to warn Delgado and to

5    protect him from the possible -- the potential hit.  So that's

6    what that was about.  But that part is actually not about -- she

7    would be taking care of means Liliana Narvaez would be murdered.

8            Later on, De La Concha came to understand that it was

9    not Narvaez' fault Pimentel convinced her that she didn't know

10   about De La Concha, that Narvaez did not know about De La

11   Concha.

12           Does that clear that up?  It's still kind of muddy,

13   but --

14           THE COURT:  It does.  It's just that I take it from

15   that paragraph that De La Concha is the one that was getting all

16   of the business for Delgado.

17           MS. KANOF:  No -- in actually -- in the transcript,

18   it's to the contrary.  In -- as I showed it started -- the money

19   laundering idea began with Angelica Fuentes.  On page 158,

20   Pimentel explains how Delgado talks about how he could launder

21   money and this is pre-De La Concha and pre-Milenio cartel.  He

22   said that he knew people in Iceland and in Mexico.  And he

23   talked about several schemes, the casinos and the different ways

24   that he could money launder and that he knew people in the

25   casinos.

 1          He also found -- Pimentel also talks about the Turks

 2     and Caicos.  It was at this time that the Turks and Caicos

 3     account was opened.  In the subsequent indictment, the Turks and

 4     Caicos account is mentioned and used, Mr. Delgado's Turks and

 5     Caicos account.  But the Turks and Caicos account was actually

 6     opened by Delgado to a law firm in the Turks and Caicos and

 7     Pimentel testifies to it.  Pimentel met Big John.  Pimentel went

 8     to Turks and Caicos to open the account.  The account was

 9     supposed to be in Pimentel's name, but it didn't turn out to be

10     that way.  It ended up being in Skippings and Rutledge [sic],

11     the law firm's name.  But that account was opened as part of the

12     money laundering conspiracy.  And it was not opened for the CFE

13     contract with Mitsubishi.  And it -- you'll see in the

14     transcript there's a discussion at one time about CFE and about

15     Vargas where there's an e-mail that has two different

16     paragraphs.

17          The first paragraph is about CFE and Pimentel explains

18     about how Delgado had this dream of the United States selling

19     electricity to CFE.  And then the second paragraph completely

20     switching topics talks about the money laundering.  But Pimentel

21     was initially supposed to go to the Turks and Caicos and did go

22     to the Turks and Caicos to assist in opening up that account,

23     but it was for the money laundering operation and De La Concha

24     had nothing to do with it.

25          Then as far as using his position, on page 153,

1    Pimentel talks about the different e-mail accounts that Delgado

2    had.  He had the one at Delgado Acosta, which got shut down

3    after he was shut down after he was fired and -- or as he said

4    which disappeared when the law firm disappeared, at line four of

5    page 153 of Volume 1.

6          And then he set the AOL account in the Delgado and

7    Acosta e-mail account, which is referenced in the Government's

8    sentencing memorandum.  He could've used his AOL account, but he

9    used his Del- -- he used Delgado and Associates' e-mail account,

10   which is something that he created, which was really fictitious,

11   because at the time that the million dollar money laundering,

12   the actual cash money laundering transaction occurs, Delgado is

13   so poor, because his actual business of being an attorney was

14   not generating any money, that he's living at home.  He has had

15   to give up his lifestyle by that time, which is why he's so

16   desperate to engage in this money laundering proposition.  And

17   so he's asked, when he created Delgado and Associates, and

18   Pimentel says around late 2000 -- around -- from 2004, 2005, but

19   obviously now we're in 2007 and he's poor.  He is not generating

20   any money so that wasn't working out for him very well.

21         And so, the use of the -- I think the use of the

22   Delgado and Associates' attorney account is important, because

23   the signature on it implies he's much more important and that he

24   has some fancy law firm with associates and that he has offices

25   in Mexico City, Calgary, Canada, and in the United States.  He

KATHLEEN A. SUPNET, CSR

1     didn't have offices anywhere.  His own testimony was that he had

2     a virtual law office.

3           Basically, he paid money to a location on Rencom so

4     that he could use the receptionist and use the conference room.

5     And Liliana Nevarez [sic] testified to that as well as Pimentel.

6     So he was misrepresenting who he was to impress.  And he was --

7     the whole thing with getting the cousin of Pimentel, who was

8     just, you know, some educated cousin, the guy that brought the

9     car to Atlanta with Mexican plates -- again, pretty stupid --

10    but -- to Atlanta for Pimentel to drive, the whole idea of that

11    he sort of left to his people.

12          I went through and counted with regard -- first of

13    all, the Fifth Circuit did not disclose -- did not discount that

14    he was a leader/organizer.  The Fifth Circuit said he probably

15    was.  And what -- what the Government has attempted do in its

16    sentencing memorandum is to point out how that's possible.  And

17    all defense counsel has done is said because she has political

18    connections, she must be the boss.

19          She really didn't have -- the political connections

20    did nothing for her.  She knew some guy that worked for Calderon

21    and they wrote him a letter.  And the purpose of the letter was

22    to get Pimentel's -- again, not very smart -- to get Pimentel's

23    cousin to be the head of customs of Palomas, so they could

24    control the drug trafficking in Palomas, which to me means they

25    were trying to create sort of their own cartel in order to

1    launder money, because if they wanted Pimentel's cousin to

2    control the Palomas' Plaza, that's not necessarily the

3    Milenio -- the Milenio Cartel.  That's branching out on your

4    own.  And that's something that goes to the consideration that

5    the Government would like the Court to make regarding how

6    dangerous this was.

7              There's reference to threats, repeatedly, not just in

8    the transcript, but in the consensual conversation.  And in

9    the -- I'm hesitant, because I don't want the Judge to rely on

10   this from making the decision, but in reality, Your Honor, Chuy

11   died.  Chuy was murdered.  Chuy was the conduit between the

12   Milenio cartel and Delgado.  And he is on the phone with one

13   of -- which I think it was Paco, talking about the death

14   threats.  Pimentel, himself, testifies -- give me just a second,

15   Your Honor -- how dangerous they knew this was going to be.

16             May I have a moment, Your Honor?

17             THE COURT:  Sure.

18             MR. HANSHEW:  Judge, I just note, none of this is in

19   the record or the trial either, so this is the first time I've

20   heard of any of this.

21             MS. KANOF:  Well, it's all in the record.

22             THE COURT:  About the death of Chuy?

23             MR. HANSHEW:  Correct.

24             MS. KANOF:  It is.

25             THE COURT:  Right.  And I understand that, but I also

KATHLEEN A. SUPNET, CSR

1      understand that if we're talking about the drug business,

2      there's a lot of things that we all know just because we know.

3              MS. KANOF:  Actually, Your Honor --

4              THE COURT:  Even though we may not know specific

5      names, we know people die in the drug business.  They do.

6      That's why this is so dangerous and that's why it's ugly.

7              MR. HANSHEW:  No, I understand.  It's just the

8      objections here, the two enhancements had nothing to do with

9      dangerousness.  They had to do with aggravating role or abuse of

10     trust.  This has -- there is zero consideration of dangerousness

11     in either of these, and the Government would have to concede

12     that, so I'm not quite sure where this is going, one, and two,

13     the reason why I say there's no evidence is what the Fifth

14     Circuit said in this context that these two factors with these

15     enhancements is it has to be based on the record evidence.

16             MS. KANOF:  I'm not talking about the obstruction

17     enhancement, You Honor.  I'm talking about the Court being

18     allowed to take 3553 factors into account and that being the

19     history and character of the defendant.

20             THE COURT:  Right.

21             MS. KANOF:  And there is a reference.  And I'm

22     sorry -- where in the testimony of --

23             THE COURT:  Well, let me ask you this before I forget.

24             MS. KANOF:  Okay.

25             THE COURT:  Because I forget easily.

```
 1              I also read something in here about him being in the

 2    Mexican legislature or something and there was some nebulous

 3    reason for why he had to leave there quickly, so money got --

 4              MS. KANOF:  You mean Delgado?

 5              THE COURT:  Yes, ma'am.

 6              MS. KANOF:  That would have been one of his lies.

 7              THE COURT:  Oh, that was a law?

 8              MS. KANOF:  Yeah.

 9              THE COURT:  Oh, okay.

10              MS. KANOF:  He was never in the Mexican legislature.

11    We pretty much know everything about his history and we have no

12    evidence that --

13              THE COURT:  Mr. Luevano, what was it?  It was in your

14    paperwork, something about some money that disappeared in Mexico

15    and then he left there.

16              PROBATION OFFICER LUEVANO:  Your Honor --

17              THE COURT:  Because I've been thinking about this

18    case, am I making things up now?

19              PROBATION OFFICER LUEVANO:  No.  I'm sure you're

20    correct, Judge.

21              Any idea where you might have seen that though, Judge?

22    Was that in my response to --

23              THE COURT:  No.  I think it was in your primary

24    report, the first report you did, something about -- something.

25    Nothing was ever proven.  Nothing was ever established, but
```

1    there was some question.  It was like a nebulous thing that

2    happened and then he quickly left there.

3              Or maybe he was working for a Government agency in

4    Mexico?  Did he ever work for a Government agency in Mexico?

5              MS. KANOF:  No, Your Honor.  Not to my knowledge.

6              THE COURT:  Okay.  Then maybe -- maybe -- then maybe

7    it's all just in my head.  All right.  I'm sorry, Ms. Kanof.

8              MS. KANOF:  Okay.  So again, on page 158, I ask,

9    everything started with -- when he started the first guess [sic]

10   money laundering conversation that we had -- this is Pimentel

11   talking -- the first money laundering conversation that we had

12   was with Angelica Fuentes.  That's page 158 of Volume 1.

13             Now, talking about De La Concha and who was the boss.

14   Page 155, Pimentel is asked, *And when you met her* -- meaning De

15   La Concha -- *was she already divorced from Vicente Fox?*

16             He said, yes, she was already divorced.  And he [sic]

17   asked what the relationship between Delgado -- and he was

18   asked -- and De La Concha was and -- and -- and he responded --

19   this is when he went to Mexico for the first time and met her at

20   the Camino Real there -- *They were business associates and they*

21   *were very good friends.  And they seemed to start -- just*

22   *starting a relationship, a personal relationship.*

23             So I asked, *What business?*

24             And then Pimentel answered, Marco started doing bad at

25   his business and he wanted extra income in Mexico.

1        I said, What do you mean bad in his business?  What

2   business was he in?

3        Well, after the Delgado Acosta law firm closed, he

4   started struggling with money.  And when he met this lady in

5   Mexico, *he just tried to use her contacts to get contracts or*

6   *business in Mexico.*

7        Next page, 156, Volume 1, line 8.  He also offered to

8   De La Concha his financial services to her to move money from

9   point A to point B.

10       I said, What do you mean financial services?  *You knew*

11  *him as an attorney, correct?*

12       Pimentel:  *Yes.*

13       My question:  *Did he do financial services for people*

14  *as an attorney?*

15       Pimentel:  *I never saw him doing that.*

16       Okay.  And so what -- he said he could move money?  Is

17  that what he said?

18       Answer:  *Yes.*

19       What did you take that to mean?

20       Pimentel:  *Money laundering.*

21       Page 168 [sic], Did you learn the source of the money?

22  Yes.

23       Another part that shows that he had to maintain his

24  lifestyle, at page 157.  The first meeting that he has, Your

25  Honor, page 158.

1          And then I asked -- When you were at his house as a

2     student at UTEP, did he support you?  And he says, no, he

3     supported himself from the cantinas.  And then they went to

4     Mexico.  I'm just pointing out again that he wasn't some huge

5     educated individual.

6          And then on 165, the first meeting.  It was in -- and

7     this is Pimentel -- *It was in late 2006, early 2007*.  And this

8     is when they went to Mexico.  And what was the purpose of the

9     meeting?

10         And Pimentel says -- this is at line 20, page 165,

11     Volume 1 -- *Again, we discussed* -- Marco asked him -- that's

12     Paco, Francisco Fernandez -- *Marco asked him to find clients to*

13     *move money*.  This is not asking De La Concha.  This is not De La

14     Concha asking Fernandez.  It's the defendant.

15         On page 168, for the first time, Pedro Meneses

16     Mendoza [sic] gets involved.  If the Court will -- it appears

17     that the Court is very familiar with the record.

18         In the testimony, Liliana also testifies about Delgado

19     using her bank account.  And she saw deposits in her bank

20     account, not just from this Cohen [sic] guy, but from Pedro --

21     Pedro Mendoza Meneses, who she'd never heard of, she had no idea

22     who he was.  And oddly enough, the amount of money -- they're

23     small amounts of money; I think one was 5,000 -- I don't

24     remember the exact amounts, but it was under $100,000 -- she saw

25     two deposits enter her account.  She didn't know what they were,

1  but they were -- it has -- if you looked at the bank records,

2  they're in evidence, it has his name, and we now know that he

3  was part of this money laundering conspiracy.  And the money

4  goes into Delgado's account immediately before the million

5  dollars is given to him to launder.

6          And again, the money could've gone into De La Concha's

7  account.  De La Concha is not calling the shots.

8          So in the Government's sentencing memorandum, the

9  Government pointed out how Delgado and De La Concha spoke to

10  each other.  And it's Delgado calling the shots to De La Concha.

11  It's Delgado saying when to call Chuy.  It's Delgado saying what

12  to tell Chuy.  But I think the most telling part of it, Your

13  Honor, is in one of those conversations.  Basically, what

14  happens is the money gets taken off and everybody panics.  So he

15  cooperates initially with HSI.  And HSI tells him pretend like

16  you're the lawyer.  And that's, by the way, two other

17  individuals that he -- that are part of his leadership, Chilo

18  and another individual.

19          What happens is Pimentel is supposed to bring the

20  million dollars to El Paso.  They do a controlled delivery

21  because he's caught.  He takes the million dollars to Marco's

22  mother's house, where he is living, and it's in two red duffle

23  bags.  There's pictures of the house.  There's pictures of the

24  vehicle.  The vehicle back hatch is opened up and there's

25  pictures of the money in the two red duffle bags in evidence.

1          So he goes and picks ups Marco at his mother's house.

2     And now they're driving.  And where they're driving is toward

3     the Santa Teresa Port of Entry, because these other two guys,

4     Chilo -- and I forget the other guy's name -- are then going to

5     take the money.

6          And interesting enough in the transcript, when I was

7     reviewing it, Pimentel testifies that the whole money laundering

8     process was to be to take the money out of the United States

9     into Mexico and from Mexico to Columbia.  This is actually

10    something I missed initially.  It's in the transcript.  I think

11    I have it noted, and I'll look quick when I go sit down, but

12    that tells me that next week, a 29-year veteran of the U.S.

13    Attorney's Office, that we're talking about cocaine money, not

14    marijuana money.  But regard -- and, also, it's in the

15    transcript as well, they all get all upset when some Columbian

16    official is arrested.  Why are they concerned about the

17    Columbian official?  It kind of corroborates that this money is

18    connected somehow with the country of Columbia.

19         So the Government went through and pointed out to the

20    Court some of these conversations and some of these e-mails

21    between De La Concha and Delgado and where Delgado is calling

22    the shots, but the most significant, I believe, is two parts of

23    a conversation.

24         One is where Delgado wants De La Concha to contact

25    Chuy and she does not have Chuy's phone number.  And that's in

the Government's sentencing memorandum and we cite to the

exhibit that's the transcript.  And she says, I don't have his

phone number and Delgado gives it to her.  And then she says,

what do you want me to tell him?  And then he says, I'm going to

put you in charge of Chuy.  That's one I think that's very

significant showing who the leader was here.  He was in charge

of De La Concha and Chuy at that time.

        The other is when a million dollars is taken off and

Delgado is making these consensual calls.  He makes one to Paco.

He makes one to Pedro.  I think he makes one to Chuy and makes

several to De La Concha.  Why?  Because he's their leader.

        And in one of the conversations with De La Concha she

asks him, how much money was it?  She doesn't even know how much

money they laundered.  Now, how does the leader and organizer,

if it's her, know how much money, especially a million dollars

that's being released, and he tells her it was one, meaning

$1-million.  Pimentel talks about how one means 1-million, six

means -- et cetera, et cetera.

        So, I think it's pretty clear from the record and from

all of the information that's contained in the testimony that

Delgado was leader/organizer.  So I counted individuals and even

though the Fifth Circuit was satisfied that he was the leader

and organizer of five, we do have Pedro, Paco, Pimentel,

Pimentel's cousin that's supposed to hit the Plaza and that

who's -- he called -- Pimentel called him Ready or R-E-A-D-Y or

1    I don't know if it's R-E-D-D-Y, but the transcript says

2    R-E-A-D-Y, so, the cousin, De La Concha.  And then we have

3    Chilo.  We have the other individual that was going to pick up

4    the hundred -- the million dollars on the other side of the

5    Santa Teresa Port of Entry.  So I have seven at least in this

6    organization.

7         And then, of course, in all of the -- the different

8    conversations about the Girl Scout cookies and about, you know,

9    there were 500-million Girl Scout cookies in a warehouse in

10   August -- I don't know if the Court has ever had a thin mint,

11   but it wouldn't survive a warehouse in Mexico in August, and

12   Girl Scout cookie month is the end of January and beginning of

13   February, as we all know.

14        And they talk about the ironworkers, the construction

15   workers.  And with regard to the Chicago transactions, they talk

16   about the builders that -- like some people are going to be

17   building some kind of a complex to the extent that it takes

18   people to put money in a warehouse and to move that money and

19   that that money is eventually going to be put in trust to the

20   defendant.  I think that we know there were more than seven

21   people.

22        With regard to his position of trust and to the fact

23   that he used being an attorney, we have him setting up TEPDEL.

24   We have him being hired to create a false provenance for a 19 --

25   what appears to be -- it's not real -- U.S. bond as proof to the

1    drug dealers that he can do this.  So he's going to try to cash

2    this bond and only -- and use his attorney knowledge.  De La

3    Concha could not have done this -- use his attorney knowledge.

4    He had to show them he could do this, so that they would trust

5    him with their million dollars.

6          So he set up TEPDEL.  He made the conspirators acting

7    members of TEPDEL.  He said TEPDEL was a recycling -- plastic

8    recycling plant.  He did it in the State of Nevada.  De La

9    Concha couldn't have done any of that.  And he did that so that

10   they would agree and they would have a structure, a legal

11   structure, where they would divide the money that would come

12   from this counterfeit bond.

13         The bond belonged to Paco, to Francisco Fernandez, if

14   you read the transcript.  He's set up bank accounts at Turks and

15   Caicos.  He -- with another law firm -- he used his -- his

16   albeit bogus law firm appearance of being something it wasn't in

17   order to secure the trust of these individuals.

18         He used his IOLTA account.  And, now, Mr. Hanshew has

19   tried -- has talked about the fact that that was accidental, but

20   it really wasn't, because if you read Pimentel's testimony,

21   Delgado originally said that the number -- bank account number

22   he gave him was the bank account to his attorney account.  He --

23   that's what he told Pimentel when Pimentel went to Chicago.  As

24   it turns out, when Pimentel has to go to Wisconsin, because

25   Chicago doesn't have any Wells Fargo banks and hands the check,

they said this is to some Liliana Narvaez.

So either Delgado made a mistake, you know, got -- he uses so many accounts that he forgot which one he gave her, but his intent was to use his IOLTA from the very beginning because that's what he told Pimentel was the account, too.  So he has to call Delgado and say, hey, this is Lillian's account, and they won't let me deposit it -- Liliana, not Lillian, but Lilliana's account -- and then they, you know, the -- ICE is with him and they make up some kind of a story and they -- ICE flies the money to El Paso.  Pimentel pretends like he brought it.  And -- and then he gives him the correct IOLTA account and then he lies about it.  That's what's really important.

In his testimony -- you know, Judge Briones, I think did very -- a good thing with regard to appellate review, and he specifically said that's why he was doing it.  Judge Briones said, and it's very, very clear to the whole world, to the jury, to me, that Delgado lied, that he committed perjury on the stand, but I'm not going to give you the obstruction, because I don't want to mess up the record.  And that's what the Judge said.  And I totally agree with not messing up the record.  But he told three different stories about where he got that $45,000 that went into his IOLTA account.

He told, ultimately, the story that it was money from a client that was a builder, which was sort of consistent with what the e-mails were saying.  You know, one of the sections of

1    the Milenio cartel were ironworkers, builders, contractors.   And

2    so he continued that fraud.

3        So not only did he use his IOLTA account to launder

4    the money, he lied about it under oath.   And that is definitely

5    abuse of his position of trust and something that no one else in

6    that conspiracy could've done.

7        Most of the people in the conspiracy could not have

8    done it, not only because they were not an attorney, but because

9    they weren't United States citizens.   And Pimentel, who was

10   legally in the United States, was a college student.   He did

11   have a Mexican chef's degree, but he was a college student.

12       Anything else?   That's what I have with regard to

13   response to Mr. Hanshew, Your Honor.

14       THE COURT:  All right.

15       Can we just take like a five-minute recess real quick?

16       All right.   Let's break till 20 till.   That's about

17   eight minutes.

18       THE COURT SECURITY OFFICER:  All rise.

19       (Break taken at 10:33 a.m. to 10:40 a.m.)

20       MR. HANSHEW:  If I may, Judge, I'm just going to

21   briefly reply to a couple of the issues at hand and then I'll --

22   if the Court would like, I can move into allocution.

23       THE COURT:  Okay.

24       MR. HANSHEW:  Thank you, Judge.

25       First issue is the issue relating to all of the

1    discussion that the Government brought up about Angelica Fuentes

2    and the issues surrounding that.

3            As Ms. Kanof herself said in those statements, that

4    was largely precluded because they didn't want to mess up the

5    record for the Fifth Circuit.  And why?  Why is that?  Because

6    that has nothing to do with this crime, that Angelica Fuentes

7    has nothing to with this money laundering.  Ms. Kanof knows it.

8    She impliedly admitted that by acknowledging that, you know,

9    they didn't want to mess the record up with that.  I'm not sure

10   why she decided to mess up your record today with it.

11           But let's be clear, the enhancements at issue, which

12   is what we were supposed to be talking about there in that last

13   session from the Government, were for the aggravating role, one;

14   and, two, the use of position of trust and that as it relates to

15   the crime.  Angelica Fuentes and anything to do with that has

16   nothing to do with that.

17           Two, in turn of Mr. Pimentel and their repeated he's

18   just a UTEP student that's living in his house, I'll read you

19   Mr. Pimentel's statement about how his life was economically, at

20   Volume 1, page 156.

21           Well, again, Marco and I, we were living a pretty high

22   life, to travel and spend a lot of money.

23           Well -- then he's asked by, I believe, Ms. Kanof --

24   *Well, whose money were you spending?*

25           *I was spending my own money and he was spending his*

1    *own money.*

2         Okay.  This is not, you know, a starving student

3    eating Dominoes and/or someone that's being supported by someone

4    else.  His own words:  I'm living a lavish life and traveling

5    and enjoying myself on my own dime and him on his own.  Okay.

6         He, also, later on, at page 223, line 17 and 18, he

7    has called himself the dream team.  He has dubbed himself I am

8    the dream team and he's asked about it.  *I'm the dream team.*

9    You know, this is not some underling.  This is not the poor

10   student.  This is a man who has his own money, living his own

11   lifestyle and is equally involved in this conspiracy.

12        Then we move to De La Concha.  De La Concha at page

13   165 [sic], line 25 [sic], Pimentel explains De La Concha has the

14   clients.  This entire money laundering scheme is non-existent

15   without the clients.  That is the source of the money that's

16   being laundered.  Whose clients are they?  De La Concha.  All

17   right.

18        Then you have Pimentel talking about her political

19   power, page 216 and page 214, and those -- he talks about that

20   she has the political power.  In fact, she goes on about how

21   she's going to cut her veins if this thing doesn't work out

22   right, because of all of the favors that she has reached out

23   for.  And that's in those same pages, Your Honor.

24        Then you heard from the Government about talking about

25   Mr. Delgado trying to maintain his lifestyle.  Again, absolutely

1    irrelevant to the two enhancements that at issue here.  The

2    lifestyle that Mr. Delgado had or didn't have has nothing to do

3    with whether he was the superior person in all of this.

4              And that brings me back to my last point, which is you

5    heard nothing of the Government talking about what the standard

6    of this case was.  Why?  Because we know what that second prong

7    says.  And it says that the person by the trade, the skill that

8    they have, the position they're in, has to be superior to all

9    involved.  The Government can't show that.  The record doesn't

10   show that.

11             So we would submit to the Court that both of these

12   enhancements should be struck, Judge.  And that's all I have in

13   terms of objections.  If the Court would like, I can move into

14   allocution.

15             THE COURT:  All right.  I'll make some finding before

16   you do that.

17             Ms. Kanof, if you can address the issue Mr. Hanshew

18   raises about requiring that the abuse of trust use his position

19   that he be superior to everybody else involved in the deal

20   before we can add the two levels for the abuse of trust.

21             MS. KANOF:  Yes, Your Honor.

22             First, I want to tell you that in the Delgado case,

23   the Fifth Circuit said that he met the first prong.

24             THE COURT:  Right.

25             MS. KANOF:  That's what I was trying to explain to the

1    Court, that De La Concha could not have done this on her own.

2          The transcript portion that I read from was that he

3    was selling his services to her, that he -- and by the way, as

4    far as Angelica, he was already in the money laundering

5    business, and as far as talking about Angelica Fuentes, we

6    haven't dirtied up this record, because, Your Honor --

7          THE COURT:  No, no.  I -- it's -- I totally understand

8    where that --

9          MS. KANOF:  Yeah.  No --

10         THE COURT:  -- I mean, that's part of who he is and I

11   need to consider that.

12         MS. KANOF:  But in addition to that, Mr. Esper opened

13   the door and Mr. -- and Judge Briones acknowledged he opened the

14   door and let me get into it --

15         THE COURT:  Right.

16         MS. KANOF:  -- just --

17         THE COURT:  No, no.  I think Mr. Hanshew was just

18   saying in relation to these two issues, which is the abuse of

19   trust and the aggravating role.

20         MS. KANOF:  Right.  But what I'm saying is he

21   previously used his position as an attorney with regard to

22   Angelica Fuentes and he was conditioned -- continuing to.

23         It's Delgado that says that he has the connections.

24   It's -- Delgado says in the casinos.  It's Delgado that sets up

25   TEPDEL, the LLC in Nevada.  De La Concha couldn't have done

1    that.  And they needed to do that in order to earn the trust of

2    the Milenio cartel.

3            It's Delgado -- you know, it goes back and forth, but

4    the bottom line is, that if he weren't an attorney, she would

5    not have been involved with him.  If he weren't an attorney, she

6    would not have trusted him.  And then once they do get hooked up

7    and she -- the person she introduces him to is Paco.  It's Paco

8    that has the clients.  It's Paco that has Chuy that has the

9    Milenio cartel.  It's not De La Concha and that's very clear

10   from the testimony.  But he uses the fact that he's an attorney

11   over and over.  He doesn't go in just as a businessman.  He's

12   (Spanish) the whole time.  She calls him that and she pushes the

13   fact that he's president of his law firm to try to get

14   Pimentel's cousin the job in Palomas.  They use the fact.

15           And he lies to her a lot, too, about how much power he

16   has.  He tells her he's in Washington D. C., talking to

17   important people and that he knows the Clintons and whoever, the

18   Bushes.  He knows Mrs. Bush.  And I don't know whether that's

19   true or not.  But he held himself out to be powerful as a result

20   of his law license.  And he uses his law license and uses --

21   when he communicates with Chuy, when he communicates with De La

22   Concha, when he communicates with Paco and when he communicates

23   with Pedro, he doesn't use his AOL account.  He uses the fact

24   that he's a licensed attorney to become the boss to be trusted.

25           In one of the conversations, one of the last

```
 1    consensual conversations that he keeps for ICE, he -- he talks
 2    about -- and I think in our most recent filing -- the
 3    objections?  Okay.  I got it.
 4              THE COURT:  I got a copy of it.
 5              MS. KANOF:  I think we actually laid that out, that
 6    Delgado argues that he has equal --
 7              THE COURT:  What page are you reading from?
 8              MS. KANOF:  I'm reading page seven.
 9              THE COURT:  Okay.  Under 3 for enhancement for role?
10              MS. KANOF:  First of all, Your Honor, we do cite what
11    I was telling you about before where he tells De La Concha that
12    he's putting her in charge of Chuy and all of that, but -- let's
13    see -- now I need my glasses.  I'm sorry, Judge.  I'm getting
14    old.
15              THE COURT:  I'm right there with you.
16              MS. KANOF:  Okay.
17              Oh.  Pretty much everything I've -- page five where we
18    lay out that at the meeting with De La Concha he offers his
19    services to her.  He tells all of the co-conspirators how he's
20    going to money -- launder the money, and that he -- let's see --
21    I told Pedro if it falls apart because of his stupidity, I told
22    him he'd have to answer to me because I've been trying to
23    arrange this for a long time.
24              Well, part of the arranging it was setting up TEPDEL
25    was saying he could create a false provenance as an attorney
```

using his law office to do that.  He communicates with his secretary to assist him in some of these areas.  I'm coordinating with my people who make the movements, he tells De La Concha on page six.  He refers to Paco and Jose as my people. I talk about the phone number that I think we quoted.  We quoted a particular -- oh, I know -- okay.

So, when he's caught and he makes the consensual calls, it is clear from listening to the phone calls that he becomes their lawyer.  And he takes his position -- he uses his position as a lawyer to calm them, all of the co-conspirators, and to manipulate them into participating in the share.

Mr. Hanshew, in his original objection, said that they were going to share equally of the amounts of money that they would have to pay back, because they lost the million dollars. Well, he's basically -- because he is the boss and because he is now their lawyer, he's telling them we are going to all share equally.

He uses his position as a lawyer most significantly in the Atlanta transaction with a false settlement agreement.  He creates a false settlement agreement.  The number that he puts on the false settlement agreement, the transaction civil number, is a real number that actually has to do with a lawsuit that involves the city and a local attorney's wife.

So he gets -- as an attorney, he has access to what a true number would be.  He uses a true cause number from a

1  different civil lawsuit.  He places it on a false lawsuit.  He

2  generates a false lawsuit with a Texas oil company that accounts

3  for more than a million dollars in cash that Pimentel has.  Then

4  he e-mails it to Pimentel in a hotel in Atlanta.  And in his

5  e-mail, the cover e-mail that maybe some employee at the hotel

6  might see in the business center, he addresses Pimentel as an

7  attorney, who he definitely was not an attorney, and he calls

8  him his colleague and tells him here's the settlement agreement.

9  And then Pimentel receives the settlement agreement and actually

10  uses it.  And if you look at the video when the trooper, the

11  Georgia state trooper stops him, the first thing Pimentel does

12  is pull out this fake settlement agreement and tells the state

13  trooper, look, this is what the money is.

14       So not only does he use his position as an attorney to

15  facilitate the transfer, but also to cover up the true source of

16  the funds, which is the definition of money laundering.  So he

17  definitely uses his law degree in that transaction.  So he

18  creates an LLC.  He creates a false settlement agreement.  He

19  uses his position to try to recommend Pimentel's cousin as an

20  attorney, an esteemed president of a law firm, as an attorney to

21  try to control the Plaza in Palomas.  He uses his position as an

22  attorney to create a false provenance for a fictitious U.S.

23  savings bond.  He does all sorts of things that not only shows

24  he's the head of the organization, but that other people, were

25  they not licensed to practice law, could not have done in order

1    to further this -- I mean, they don't all work, but they don't

2    have to work for him to have attempted to use it.  And as we

3    know, Your Honor, he was charged with a conspiracy to launder or

4    attempt to launder.  And it's very clear that he used his law

5    degree in many aspects of this case.

6            And I just wanted to cite the Court to Volume 2, page

7    199, where Richard Esper objects in redirect to talking about

8    Angelica Fuentes, and the Court says, you brought it up.  And

9    then I am permitted to proceed and ask him about it a little

10   bit.  So, even in regard to what's in the record, aside from the

11   Court being able to take any information that's relevant about

12   the defendant, it's also in the record.

13           THE COURT:  All right.  Thank you, Ms. Kanof.

14           MR. HANSHEW:  Just one factual correction that I

15   cannot let it stand, which is when he pulled over in Atlanta,

16   Pimentel, Ms. Kanof just stated that he jumps out and shows this

17   agreement.  Ms. Kanof was the one that asked this direct

18   question.  Do you -- he says -- she asks Pimentel, do you have

19   the settlement agreement with you.  At that time, yes.  And at

20   some point in time, did you show that to him?  Not to him.

21           THE COURT:  All right.

22           MR. HANSHEW:  So, you know, that he jumped out and was

23   waiving around this agreement, Ms. Kanof actually asked him and

24   was told otherwise.  Let's be clear about that.

25           THE COURT:  Okay.

1          MS. KANOF:  A second trooper shows up and he shows it

2     to him.

3          THE COURT:  Okay.

4          All right.  Before we go to allocution, the Court is

5     going to adopt the presentence investigation report with the

6     change that we've already articulated in the base offense level,

7     that being 24.  The factual finding is there.  I make the

8     following findings:

9          The defendant was reasonably capable of laundering

10    $1,050,000, which would support the 16-level addition to the

11    base, and that the defendant abused his position of trust to

12    significantly facilitate the commission and concealment of money

13    laundering.

14         He was an attorney.  The Fifth Circuit has already

15    told us that is a position of trust.  And as an attorney, he

16    provided Mr. Pimentel with fraudulent court documents that he

17    could use to try to indicate that the money he was carrying on

18    September 5th, 2007, was in fact legal money from a court

19    settlement, as set out in paragraph five of the report.

20         He instructed, using his knowledge as an attorney,

21    instructed Pimentel what to say if detained by law enforcement

22    officers.  He was in possession of this money and that advice

23    included not to consent to the search of the vehicle.  And I'm

24    not sure what good this would have done, but advised him to tell

25    them that he was represented by Gary hill.  This is at paragraph

KATHLEEN A. SUPNET, CSR

51.

He arranged a meeting with Big John, and I guess a law firm in those islands to set up this dummy corporation for the purposes of laundering money, and uses Delgado and Associate's bank account to deposit funds that they -- that was used in that sting operation and used the law firm's e-mail in connection to that.  All of this supports the two levels for the abuse of a position of trust.

I'm a little bit -- I know that the Fifth Circuit indicated that more than likely the four levels for role probably would apply.  It just seems to me like there's -- like there's two things going on here; one, Mr. Delgado is an independent contractor running his own show, his own money laundering business, and he's offering his services to the drug cartels.  And so in relation to that, he's definitely the big cheese and the guy who was superior to all.

In relation to the big scheme, when we bring in the drug cartel, he's not as big a fish.  I mean, he is making a lot of decisions and determines a lot of things, but the drug cartel is definitely keeping tabs on what's going on with their money and is in control of how much money they're releasing to him and how much they're going to let him do.

So, I'm thinking on this one, I'm not -- it's not -- for me, it's not really a four and it's not a two, so I'm going to go with three.  And so that makes our calculation 24 for the

1    base, six because of the nature of the funds, two because of the

2    nature of the conviction, two for abuse of trust, and then three

3    for role; 37 and one; 210 to 220.

4            All right.  Mr. Hanshew, I would hear from you in

5    allocution.

6            MS. KANOF:  Excuse me, Your Honor, 37 is 210 to 262,

7    not to 220.

8            THE COURT:  But I thought -- I'm sorry.  240, I guess,

9    is the cutoff.

10           MS. KANOF:  Yeah, 240.

11           THE COURT:  240.  Sorry.  Yeah, 240.  Thank you.

12           All right.  Mr. Hanshew.

13           MR. HANSHEW:  All right.  Thank you, Judge.

14           I'm going to take us back to a month ago when the

15   Government demanded and came into this court and put on the

16   record their plea offer in this case.  They chose to come here.

17   They chose to put it on the record and it is part of the record,

18   where they put on the record that a ten-year sentence in this

19   case was reasonable.

20           And now I move, fast-forward till today, a month

21   later, and I ask myself and I ask the Court to consider what's

22   changed in this case.  Nothing has changed in this case.  The

23   only thing that changed is that Mr. Delgado is exercising his

24   constitutional right to a trial in a different case.  That's the

25   only difference.  And, yet, they're asking for this Court to

1   impose a 20-year sentence on Mr. Delgado, a person that had no

2   criminal history prior to this case.

3            I took it upon myself, Judge, to last night and this

4   morning, re-listen to the oral argument from the Fifth Circuit,

5   which of course is no binding authority.  It's not part of their

6   opinion.  But I was struck by two of the judges' commentaries.

7   And the Court can find this on the Fifth Circuit web page on the

8   audio recordings.  The case number is 14-50079.  And they're

9   talking in the context, of course, about, you know, the

10  $600-million issue that, you know, the Court discussed and

11  decided on, but one of the judges says, This man is a failure --

12  and by that man, Mr. Delgado -- you are going to send him to

13  life because he's a failure.  And he pauses.  Doesn't register

14  for me.  That's what this judge says to Joe Gay, the

15  Government's appellate attorney.  And that's at minute marker 23

16  and 23 seconds.

17           And at minute marker 19 and 44 seconds, the judge

18  says, again to Joe gay, you're saying that the man that does the

19  harm gets the same sentence as the man who's ineffectual --

20           THE COURT:  Right.  And that's a basic problem that's

21  built into the guidelines.  And it's not just in this case.

22  It's in every case --

23           MR. HANSHEW:  Right.

24           THE COURT:  -- that whether you're successful at it or

25  not, the guideline is the same.

1          MR. HANSHEW:  Right.

2          THE COURT:  And in this case, whether you launder a

3    million or 30-million, the guideline basically is going to be

4    the same.

5          MR. HANSHEW:  Absolutely.  And that's why we're here

6    also with the huge backdrop of *Booker*, which is the guidelines

7    are simply advisory.

8          THE COURT:  Right.

9          MR. HANSHEW:  And this is a case, frankly, where I

10   highlight these comments from these judges.  Again, they weren't

11   there imposing the sentence, and I understand that, and I

12   understand what they're role is as appellate judges, but they

13   see a lot of cases.  These are seasoned judges that have seen

14   and heard lots of things and sentences and, you know, as such.

15   And they're talking about what I think is absolutely true in

16   this case is that a sentence of 20 years in this case is

17   absolutely unreasonable.

18          You know, you have Mr. Delgado -- I'll tell you, I was

19   sad to see when I read the sentencing transcript, in front of

20   Judge Briones, that none of his lawyers allocuted for him.  You

21   know, no talk about him.  They did their objections and then

22   handed over Mr. Delgado.  Because there's a man that's here,

23   there's a man that spent the last three -- almost

24   three-and-a-half years of his life in that prison across the

25   street, there's a man, who's lived the majority of that time,

1       same amount of time, in isolation.  And I'll tell you what that

2       experience has been for him, because I asked him about it last

3       year.

4                You know, I asked him how are you doing, Marco?  How

5       are -- you know, are things okay?  You know, what are you

6       thinking about, certain topics and such.  And he explained to

7       me, you know, he asked me some questions, which, you know, I

8       think were rhetorical, but partially not, which were, you know,

9       have you ever slept in a square space where the best thing you

10      can do is count the number of marks on the walls?  You know,

11      have you ever been in a place where every day you wake up and

12      you hope that that day you don't get assaulted?  You know, have

13      you ever lived in a place where you fall, crash on your head

14      when you're in shackles and, you know, have to deal with that

15      trauma?  And, of course, you know, thank God, thank everything

16      that, you know, I don't live that life, and you know,

17      Mr. Delgado is there because, you know, he was found guilty by

18      his trial.  But these are the realities of what he's experienced

19      the last three-and-a-half years.

20               The idea that someone, who until his point in his life

21      had no criminal history, I mean, what you see is a traffic

22      ticket in Alamagordo.  I mean, anyone that goes to Ruidoso knows

23      that Alamagordo is, you know, speed zone capital of New Mexico,

24      it appears.  That's his criminal history.

25               What you also didn't hear about before is also the

1    tremendous accomplishments that Mr. Delgado, you know, made for

2    himself and for his family.  He went to college.  He got his

3    Master's degree.  He got a law degree.  And I know now, you

4    know, that's being used against him, but it was an honorable

5    thing he did, and he was in an honorable practice.  And this, of

6    course, you know, is -- I'm not on his behalf admitting that he

7    did this, of course.

8           You know, he exercised his right and protests his

9    innocence and that's -- I'm keeping within that, but if you for

10   sake of argument accept even the Government's positions and the

11   record in this case, much like the Fifth Circuit said, I mean,

12   this was a comedy of errors.  I mean, this was a joke in terms

13   of that attempt to try to launder money.

14          The notion that anyone was going to ever be successful

15   in money laundering when you drive someone with (Spanish),

16   Mexico City plates, through Georgia, let alone the other states

17   I have to get to; I think they made it 30 minutes out of Atlanta

18   before they pulled over this car.  I mean it's a joke.  I mean,

19   you get pulled over just for being Mexican.  Forget about being

20   Mexican with Mexican plates on it, you know, when you've got

21   duffle bags of cash in the back.  I mean, this was doomed before

22   it started.  The follies that go from there with, you know,

23   bouncing around Wisconsin and Chicago and trying to find a place

24   where he can deposit the money as such, again, you know, it's a

25   disaster.

1            You know, what intent was there or not, I mean,

2   that's -- you know, that's obviously what a jury made a decision

3   on and, you know, we can't change that.  But again, this is not

4   someone that was realistically engaged in laundering money with

5   the cartels on this.  I mean, this was just an absolute failure.

6   And even the Fifth Circuit called him as much in characterizing

7   this.

8            And when you look at the factors, you also look at

9   what he did before this happened.  You know, he gave incredible

10  amounts of money to schools.  You know, he gave money to

11  Carnegie and Mellon, to Texas Tech, you know, to these schools,

12  and he created those endowments in those positions to help

13  Latinos.

14           You know, he came -- he's a naturalized citizen.  He

15  chose, you know, to become a citizen of this country.  He wasn't

16  born here.  He chose to do it.  And he made a good honorable

17  life, of course, until, you know, we deal with this case.

18           With that, he provided for his children.  You know,

19  you're going to hear the Government try to -- in our next case,

20  try to characterize that his kids are a bunch of spoiled brats

21  because they gave them a bunch of money, but you know, sometimes

22  parents, you know, give everything to their kids, whether others

23  agree or not about the moral ethics of that, he provided and

24  provided everything he could.

25           And, you know, he lost everything.  He's truly lost

1   everything.  He's lost his law license.  He's lost his family.

2   He's lost his liberty.  He's lost, frankly, a sense of hope.

3   And that's what I'm asking the Court to consider in this case,

4   is that a ten-year sentence, that's a long time.  Ten years is a

5   long time, but I think if you look at all of these factors, it's

6   a reasonable sentence for what happened here, what he was

7   accused of having done here; ten years, again, it's a monumental

8   amount of time, the idea that he should be put in prison for

9   20 years for this.

10              As the Court noted, as the -- as Your Honor said as

11  well, and be thrown into the same category with individuals that

12  were actually successful, real money launderers for whatever

13  criminal entities may be, it's unjust.  I understand the

14  guidelines score it that way, because, you know, they kind of

15  have to.  There's -- it's hard to differentiate in terms if

16  you're going to look at objective criteria and not individual

17  criteria, you know, how their involvement was, but that's what

18  this Court gets to do by *Booker* and 3553, is to look at

19  individual, look at the offense conduct and consider all of

20  that.  And when you consider all of those, I submit that a

21  ten-year sentence is more than sufficient.  I ask the Court to

22  consider that.

23              THE COURT:  All right.

24              Ms. Kanof?

25              MS. KANOF:  I'll try to be brief, Your Honor.

KATHLEEN A. SUPNET, CSR

1          Wow, the Government demanded to come to Court and tell

2     the Court the plea offer?  The Government didn't demand

3     anything.  The Government followed the *United States v. Fry*, a

4     Supreme Court opinion that requires the Government to make

5     public the terms and conditions of the plea agreement.  And in

6     this case, it was a double plea agreement.  I don't think it's

7     appropriate to go into all of the reasons.

8          THE COURT:  You don't really have to address that.

9          MS. KANOF:  Okay.  Thanks, Judge.

10          Okay.  3553 factors, I think the most important aspect

11     of this case with regard to 3553 factors is that Mr. Delgado was

12     given a chance to come clean and lead a new life and flagrantly

13     turned his back on it.

14          THE COURT:  You're talking about after the

15     $1-million --

16          MS. KANOF:  Yes.

17          THE COURT:  -- then the 50,000?

18          MS. KANOF:  On September 7th, he was caught in 2007.

19     He was deliberate in a consensual delivery, almost a million

20     dollars of cash of money he knew was drug money, maybe going to

21     Columbia.  He agreed to help HSI.  He made a couple of calls and

22     they let him walk away.  And less than a year later, he calls

23     Pimentel and sends him to Chicago to pick up another $100,000 of

24     drug money.  He was scot-free.  And he lies to Pimentel.  He

25     tells him I'm working with the Government, which he was not

1    working with the Government.

2         If you want to look at a 3553 factor that's important,

3    its re-offending.  And this Court knows he re-offended.  He

4    re-offended after Angelica Fuentes.  He re-offended after

5    September of 2007 and he re-offended after 2008.  The man is not

6    some innocent individual who made one mistake.  And that's why

7    we have 3553 criteria, not just to give someone who needs

8    another chance and deserves another chance.

9         So Mr. Hanshew talks about all of the money he gave

10   away and people he helped.  The $250,000 to Carnegie Mellon was

11   ill-gotten gains that the Court will hear about.  It's money

12   that the Government has tried to get back from Carnegie Mellon

13   to give to the victims of another fraud.  So, was the giving

14   away the money because he cared or because he wanted to look

15   like big man on campus?

16        The 3553 factors also go to his character.  And under

17   oath, having raised his hand, having been given a chance and

18   violated that chance, he lied and lied and lied.  And even Judge

19   Briones on the record says everybody knows he perjured himself.

20   If he is going to be sentenced pursuant to the guidelines, he

21   needs to be sentenced to the middle of the guideline range,

22   which is 240 months.

23        120 months, the defendant wants this Court to discount

24   his guidelines to vary below the guidelines, but has not

25   given -- has the Court received letters?  Usually, we get copies

1    of letters.  We haven't.  Maybe the Court has received letters

2    about the character about this man, you know, having only done

3    something once and having, you know, found, I don't know, faith

4    or the right path.  We don't have any of that in this case.

5         We have him having been given a chance that very few

6    criminals are given and getting to walk away from a couple of

7    phone calls and then trying to earn money, not as an attorney,

8    but by trafficking again for a drug cartel.

9         We ask the Court to find the statutory maximum of 240

10   months.

11        THE COURT:  All right.  Thank you, Ms. Kanof.

12        Mr. Delgado, is there something you would like to

13   address to the Court before I assess your sentence?

14        DEFENDANT DELGADO:  Yes, sir.  Do you want me to --

15        THE COURT:  Yes, sir.  Come on up here.

16        DEFENDANT DELGADO:  May it please the Court?

17        Your Honor, before I go into the comments that I want

18   to share with you, I think that the Court, the honor with this

19   Court requires me to just make a side comment regarding the

20   reckless accusations by Kanof regarding Angelica Fuentes, who is

21   an outstanding business individual and outstanding person and a

22   great philanthropist.  It's not fair for her name to be

23   trafficked with, you know, just to get mileage out of it for

24   purposes of God knows what.

25        Anyway, after three-and-a-half years in the county

jail, one of which was solitary confinement, I can hardly think of a criminal justice system, at least a part represented by these prosecutors, and even the probation officer, is little more than a system of simulations, simulations in which the Government's role has evolved from protecting our rights to something aching to an extortion racket.

Throughout my prosecution, there's been 18 different plea deals, 18 different plea deals that want me to authenticate what the Government has only been able to prove to fabrications. But I appear before you, nonetheless, not in an effort to ameliorate any potential sentence, but in the firm belief that your court, this court in particular, strives to do justice, does its best to do that and not just go through the motions and additional simulations.

And as such, justice requires that you have all of the relevant information before dispensing your high responsibility in the form of my sentence, especially the information that was recently discovered, is exculpatory in nature, and the jury not only had a right to have known about it, but would have altered its verdict had it been exposed to it.  But as I want the record today to reflect, this is not the case at hand.

New evidence has been discovered, which basic standards of justice requires that the Court consider, prior to issuing a sentence, evidence unknown to me at the time of trial that speaks not only to my innocence, but which exposes the

1      degree of lawlessness by the prosecution team that not only

2      prejudiced my defense, but greatly jeopardized the integrity of

3      the criminal justice as a whole.

4              The smaller stories, Your Honor, sometimes find the

5      biggest themes.  In misusing abuse of prosecutorial power is no

6      exception.  And although, by far, not only two examples exist,

7      there are two examples that I would like to share with you

8      because it captures the degree of malversation, which defines my

9      prosecution, as well as the motivation behind it, and the

10     commitment of the prosecution team to secure a conviction at

11     whatever cost.

12             We now know, and the jury had a right to have known,

13     the genesis of my money laundering prosecution.  It wasn't to

14     punish me for allegedly conspiring to launder the prosecution's

15     delusional $600-million, which resulted in the Fifth Circuit

16     vacating my previous sentence.  That million dollars, for that

17     matter, as it turns out, it boiled down to a good old shakedown.

18             Information now in my possession is based on comments

19     from the initial prosecutor, the one that indicted the case,

20     established the following:

21             The case was indicted two days prior to the statute of

22     limitations on it, which for a $600-million conspiracy, it's

23     fairly unique for lack of a better term.  Not only that, we also

24     have information that the three offices involved in the

25     investigation, Chicago ICE, El Paso ICE, Atlanta ICE, had closed

1    the investigations, all four related investigations claiming

2    there were no leads, no evidence to pursue it.  Nothing else

3    transpired.

4         The lack of evidence was such that ICE itself had to

5    deploy another entrapment effort two years later in 2010 to try

6    to secure the evidence that they knew did not exist from the

7    previous instances.  That did not lead anywhere.

8         There's only one thing that changed and that was that

9    I took it upon myself to civilly pursue two individuals that

10   were associated with me -- my former CPA and a former employee

11   partner -- in an energy project that I controlled and owned.

12        It was at this time that they had the same attorney,

13   that the attorney came, approached the previous prosecutor, who

14   by the way has been disassociated from the El Paso region to a

15   different part of Texas, not by outstanding conduct, but by the

16   issues associated to misconduct, just like in this case,

17   presented the case, and actually used her for purposes of

18   defending a civil litigation.

19        This prosecutor by the last name of Fielden actually

20   approached my former counsel and told him, we cannot prosecute

21   Delgado on this Mitsubishi litigation.  We don't understand it.

22   And it's obviously above their pay rate or their experience.

23   And she told them, but we are going to make this other case.

24   We're going to fabricate it so we can force him to plead.  And

25   if you review the factual basis sections of all of the plea

1    agreements that have been presented, they only include the

2    defense of this third-party attorney and their clients.

3            It's important to know, because as the prosecutor

4    mentioned, you're going to be hearing about this case when we go

5    to trial on it.  It's a case of fact that took place in Mexico

6    with a Mexican government entity.

7            THE COURT:  You need to be careful what you say,

8    because you're obviously on the record.  This could be used

9    against you and so you may not want to venture into that other

10   case.

11           DEFENDANT DELGADO:  The fact being the motivation

12   behind -- and I appreciate the -- the fact being that the sole

13   motivation behind this prosecution and the prosecution's team

14   decision to fabricate evidence -- because it wasn't just

15   Mr. Pimentel that lied.  Their other star witness that was flown

16   from Buenos Aires, who was the one that authenticated the

17   so-called consensual calls, turns out that he wasn't even part

18   of the investigation when he claims to have witnessed those

19   phone calls.

20           It's a tapestry of misconduct of corruption that this

21   Court has an obligation to consider.  The problem being is that

22   I've been waiting for over eight months in the county jail for

23   access to the law library in order for me to present it in the

24   form of an appropriate motion.  Short of that, I feel like the

25   Court would be doing a disservice if they don't have that entire

1    perspective.

2            I want to close by asking, by imploring this Court the

3    following:  to consider when reviewing, when analyzing, not

4    whether I was active in my community, not whether I was involved

5    with Hospice of El Paso, Candlelighters, our troops here at Fort

6    Bliss, the El Paso Symphony, you know, the Ysleta Independent

7    School District, I want you to just consider the fact that had I

8    not been engaged in a civil litigation, this case would not have

9    been fabricated for purposes of being pressured into that.  And

10   that should color, Your Honor, anything that you analyze with

11   regards to my sentencing.

12           Thank you very much.  And as a final note, having

13   lived in the inside of the system with the underbelly, I'm

14   convinced the system is broken, but there are good aspects

15   within it, and that's why I have that commitment and that faith

16   that even when we're facing rampant misconduct, that people can

17   see through that.  I live it every day with individuals that at

18   times feels there's no hope and they're invincible in their view

19   of life, my fellow cellmates.

20           And I'm also living with Ms. Franco and Mr. Hanshew,

21   who actually have restored in me the -- a faith in what it means

22   to be a public servant .  Thank you, Your Honor.

23           THE COURT:  All right.  Thank you, Mr. Delgado.

24           I'm not exactly sure what about the civil litigation

25   that led to the fabrication of this case, what all that means or

involves.  What I am absolutely sure of is that a jury found you guilty of this charge and that now I have to assess your sentence.

And in assessing that sentence, first thing I have to do is calculate the guidelines, which we've done, and then consider a sentence which is sufficient, but not greater than required, in order to accomplish the goals of the sentencing statute.

Now, sentencing guidelines are part of the things that I have considered, but because they have a number attached to them, they oftentimes have a disproportionate impact on a court's decision, I think.  They intend to influence you in terms of numbers, because the final result will be a number, and so these others that don't have any numbers attached to them, all of the other factors, perhaps sometimes going to get weighted equally with the guidelines.

I'm going to do my best.  Here's some of the things I already reflected of Mr. Hanshew, that the guidelines don't distinguish between those people that are successful in their attempts and those that are not, and because of the way it's structured, we get very close to the maximum guideline very quickly when there's large amounts of money involved, and so there's no differentiation for a sentencing judge between -- in terms of the guidelines, between those people that might launder $2-million or $20-million, you get the maximum.  But, here's

1          what I do have to consider.

2                  I have to consider the nature and circumstances of the

3          offense.  This is a money laundering case.  You're laundering

4          drug cartel money and that activity furthers the activity of the

5          drug cartel and all of its activities of which we all are very

6          painfully aware.  And unfortunately, there's a lot of misery and

7          pain involved in that particular business, and so those that

8          assist that business are assisting in that pain that those drug

9          cartels cause.  So considering the nature and circumstances of

10         the offense, I think this consideration would favor a sentence

11         close to the guideline range.

12                 Your history and characteristics, you have no criminal

13         record.  That is true.  But judging from what I read in the

14         report, you have a capacity to perjure yourself while testifying

15         in court.  And one of the places -- we're going to have a system

16         where we determine the truth -- one of the places where the

17         truth must be told is in courtroom.  And if we start to allow

18         the courtroom to be abused in a way that people come in and are

19         telling lies under oath, then we are diminishing our ability to

20         achieve what we want to achieve and that's the truth and then

21         justice under law.  So you are capable of lying in court.  That

22         certainly doesn't speak well.

23                 From the report, you've created fictitious evidence,

24         fictitious characters to cover up the loss of the money.  You

25         also, from the report, solicited the money laundering business.

1    Let the -- you let that world know that you were open to

2    laundering their money.  And perhaps had you been successful at

3    this $1-million amount, you would have gone on to bigger things.

4    In any event, your proclivity to engage in this business

5    certainly favors a sentence at the higher range.

6            The next thing we consider is the need for the

7    sentence imposed to reflect the seriousness of the offense.

8    Obviously, money laundering, depending on what kind of money

9    we're laundering is a serious business, and when we're

10   laundering drug cartel money, that's super serious.  $1-million

11   in the drug cartel world isn't all that much, but it's certainly

12   significant for one person, and that would be something the law

13   would want to seriously discourage.  So a stout sentence I think

14   would be one that the guideline to reflect the seriousness of

15   the offense would demand.

16           Proper respect for the law.  Certainly those laws that

17   are sentenced higher get more respect than those that don't, so

18   we would want this particular law to be respected, because of

19   all of the damage that it's caused in this particular business.

20           To provide just punishment for the offense.  Well,

21   that's the million dollar question.  How do we provide just

22   punishment for this offense?  Because in doing that we consider

23   the nature of the offense, and even though not necessarily

24   stated in the guidelines, we also consider the human being that

25   is being impacted by that sentence.

1          We need to afford adequate deterrence to criminal

2     conduct.  Obviously, sentences that are higher in nature in

3     theory would deter others from engaging in this activity and

4     certainly would deter the individual who's sentenced from

5     engaging in this activity.  That particular theory may or may

6     not be correct.  Plenty of people engage in activity against the

7     death penalty and they all seemed to be discouraged by the fact

8     that they might be executed.  But certainly, I think in theory

9     that makes sense, if you're going to try to deter someone from

10    doing something, you would increase the punishments for engaging

11    in that activity.  And this is serious activity.  We can't

12    overlook the fact that it's laundering the drug cartel's money

13    and so you're providing aid and comfort to that particular

14    activity.

15          Protect the public from further crimes of the

16    defendant.  I don't think that we need a sentence within the

17    range of the guidelines in order to protect the public from your

18    further crimes.  I do think you have a proclivity for committing

19    criminal acts.  Ms. Kanof articulated that.  And I agree with

20    her statements in relation to that.

21          You just have a long history of engaging in activity

22    that honest people don't engage.  I mean, that's the bottom

23    line.  And so, unfortunately, once people are caught, they don't

24    necessarily want to pay the price for their actions, so maybe

25    you're in that same category.  I'm not sure.

1        But after having considered probation's presentence

2    investigation report, everything that I heard from counsel, in

3    terms of sentencing memorandums, heard objections and

4    allocution, I do have a sentence, which I think is sufficient,

5    but not greater than required.

6         One of the things I wanted to address was

7    Mr. Hanshew's statement that because there was a plea offer of

8    ten and that was sufficient for both that that kind of is the

9    unofficial guideline that we should use for determining what is

10    sufficient, but not greater than required.  Obviously, if that

11    were the case then any time the Government made a plea offer,

12    then undercut the guidelines, that would be the end of the

13    guidelines.  And what would happen is the Government would not

14    be making any plea offers and I'm not sure that that's good for

15    our criminal justice, so I think that's a false argument and I

16    don't buy into that.

17        But having said all of that, I do think that for

18    various reasons, one, because you weren't any good at the

19    drug -- at the money laundering thing.  You were pretty good, I

20    guess, at confusing the issues regarding Ms. Fuentes and in that

21    issue, but in this venture you weren't very successful.

22        Certainly, as a sentencing Judge, you want to be able

23    to punish more harshly those individuals that are more culpable.

24    And I can certainly see that in the jurisdiction that I live in,

25    we might see persons that are more culpable than you people who

1   are successful at the money laundering, people who are

2   successful in laundering larger amounts of money, and so I need

3   to have some room to punish them higher then I would be

4   punishing you, otherwise, in assessing your sentence equal to

5   someone who is much more culpable, I would feel that I did you

6   an injustice.

7           And so in order to accommodate for that, I think a

8   sentence below the guidelines is one that is appropriate, one

9   that is sufficient, but not greater than required, in order to

10  accomplish the goals of the sentencing statute, would assess

11  your sentence at 192 months, follow that with three years of

12  supervised release, under standard conditions adopted by the

13  Court that you commit no crime against the United States, any

14  state of the United States, any local Government, with the

15  special condition that you submit to up to one year of

16  intermittent confinement as directed by the Court pursuant to

17  law.  I'm going to waive a fine.  Assess a $100 special

18  assessment.

19          Ms. Arreola, are there any forfeiture matters that I

20  need to include in the judgement?

21          MS. ARREOLA:  No, Your Honor.  Thank you for asking.

22          THE COURT:  All right.  So, the Court --

23          MS. KANOF:  The Government does have a request that

24  their mandate to the Court -- if I may, before you find -- have

25  a final judgment entered into the judgment.

1          THE COURT:  I'm sorry?

2          MS. KANOF:  The Court has discussed both the guideline

3   calculations and the 3553 factors, tracked them right down the

4   statute, and Government would like the Court to make a finding

5   that even if your guideline --

6          THE COURT:  Oh, that's coming.

7          MS. KANOF:  Oh, okay.

8          THE COURT:  That's coming.

9          MS. KANOF:  Thanks.

10          THE COURT:  So the Court notes for the record that the

11   sentence imposed today is one that falls outside the suggested

12   guideline range as calculated by the Court, but it is in the

13   Court's opinion a sentence which is sufficient, but not greater

14   than required, in order to accomplish the goals of the

15   sentencing statute, having considered all of the factors set out

16   in title 18, Section 3553(a), if the Court has erred in

17   calculating or applying the sentencing guideline or erred in

18   somebody's opinion from varying from the guideline, I would

19   indicate for the record that the Court would have imposed this

20   very same sentence, based upon all of the 3553(a) factors that I

21   articulated of, in spite of any error that I might have made in

22   calculating or applying the sentencing guidelines.

23          Is that --

24          MS. KANOF:  Your Honor read Ms. Leachman's mind.

25          THE COURT:  Okay.

1          And so -- all right.

2          Mr. Delgado did you understand your appellate rights

3   as I explained them to you prior to the commencement of this

4   proceeding?

5          DEFENDANT DELGADO:  Yes, sir.

6          THE COURT:  Okay.

7          Mr. Hanshew, is there anything else that you require

8   of the Court, perhaps a facility?

9          MR. HANSHEW:  Yes, Your Honor, if I may?

10          We're required under the Fifth Circuit precedent

11   *Pelletier* to lay down our objections to the Court's findings and

12   conclusions.  I'll incorporate by reference so as not to repeat

13   a lengthy recitation of the objections, but again we object to

14   the Court's finding on the two enhancements that were at issue

15   here.

16          Just to address the Court's statement about my having

17   raised the fact that the Government brought in the plea and the

18   plea terms to the Court, the Government doesn't do that in every

19   case.  They selectively choose cases to bring in and put on the

20   record of what it is, so, yes, they did choose to bring that

21   here.

22          THE COURT:  But I would also note for the record that

23   it is my standard to always ask at the -- at the final pretrial

24   conference, whether or not there's been a plea offer made,

25   whether it's been communicated to the defendant and whether or

1    not the defendant has rejected it.  That's my practice here and

2    it was my practice for 16 years across the street.

3          MR. HANSHEW:  I understand, Your Honor.  And the point

4    I was making with it, just to be clear for record purposes, is

5    that they did stand up and put on the record that a ten year

6    sentence was appropriate in the case.  So my argument is not

7    that they're bound to that.

8          THE COURT:  I know.

9          MR. HANSHEW:  My argument was simply that to be clear

10   on this was that that was something that was put by them on the

11   record.  And it wasn't just that it was a term of the plea

12   agreement.  It was for them justifying, additionally, that

13   particular sentence.  And so I raised that for that point.

14          I understand the parameters of Rule 11 and, you know,

15   I would never be in this courtroom talking about some plea

16   discussions that occur between lawyers and our offices.  This

17   Court knows that and I would never participate in that.  But

18   when it is made part of the record and specifically about the

19   reasonableness of the sentence in a particular case, this one

20   and its this record, that's why I felt -- and I understand the

21   Court's ruling, but I just wanted the Court to understand, you

22   know, the perspective of it was part of this record, so I raised

23   it according.

24          THE COURT:  I didn't have any concern with you raising

25   it.  It's the informal guideline.  That's what I called it, the

KATHLEEN A. SUPNET, CSR

informal guideline, that which is sufficient, but not greater
than necessary in a bargaining agreement.

MR. HANSHEW:  Right.

And then moving on to the actual Court findings that
relates to the various 3553 factors.  And I guess respectfully
what I would say is that on a number of the factors that the
Court hit on, if the analysis and logic that's provided would
mean that in every single case those fell in favor of a
guideline sentence.

You know, if you were looking at, you know, for
example, protecting the community, well, every single time if
you're looking to protecting the community, you might as well
max him out or give him the guideline by the rationale that, you
know, it favors that.  So I just wanted to make sure for the
record that a number of the 3553 factors in the way they were
described and enunciated would have to always fall in the favor
of a guideline.  Now, I think that's what *Booker* actually says
is inappropriate.  So I would object to that component.

And lastly, in terms of the ultimate decision for the
119 months, again per *Pelletier*, I'm required to say that it's
substantively and procedurally unreasonable in light of all of
the factors raised, Judge.

THE COURT:  All right.

Ms. Kanof, did you want to put anything on the record?

MS. KANOF:  No, Your Honor, thank you.

KATHLEEN A. SUPNET, CSR

1          THE COURT:  Did you get to a facility?

2          MR. HANSHEW:  That's what I was about to -- as close

3     to El Paso as possible, Your Honor.  And also a recommendation

4     for the RDAP program.

5          THE COURT:  RDAP?

6          MR. HANSHEW:  Yes.

7          THE COURT:  Okay.  I'll recommend that he be screened

8     for severity of addiction, and if found to have an addiction

9     severe enough that requires treatment that he be considered for

10    the RDAP program.

11         MR. HANSHEW:  Thank you, Judge.

12         THE COURT:  Anything else?

13         MS. KANOF:  Nothing further from the Government.

14         MR. HANSHEW:  Nothing further, Your Honor.

15         THE COURT:  All right.  We are adjourned.  Thank you

16    all so much.

17                          * * * * *

18         I certify that the foregoing is a correct transcript

19    from the record of proceedings in the above-entitled matter.  I

20    further certify that the transcript fees and format comply with

21    those prescribed by the Court and the Judicial Conference of the

22    United States.

23    Signature:/S/KATHLEEN A. SUPNET          May 7, 2016
              Kathleen A. Supnet, CSR          Date

24

25